**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16cv1457

LAWRENCE RUBIN MONTOYA,

        *Plaintiff*,

V.

CITY AND COUNTY OF DENVER;
POLICE CHIEF THOMAS SANCHEZ;
DETECTIVE MARTIN E.VIGIL (Shield No. 86-12);
DETECTIVE MICHAEL MARTINEZ (Shield No. 82-29);
LIEUTENANT JONATHAN W. PRIEST (Shield No. 86-12);
DETECTIVE R. D SCHNEIDER JR. (Shield No. 85-24) and
OFFICERS JOHN JOE,
in their individually and official capacities.

        *Defendants*.

---

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY**

---

        Plaintiff Lawrence Rubin Montoya, by and through his attorneys, Fisher & Byrialsen,

PLLC, complains against Defendants and requests trial by jury as follows:

**<u>INTRODUCTION</u>**

        1. Lawrence[1] Rubin Montoya served 13 years, 7 months, and 13 days in prison for a

crime he did not commit.

        2. This is an action brought by Lawrence Rubin Montoya, a thirty-one year old hispanic

---

[1] In 2000, during Mr. Montoya's prosecution he was referred to as Lorenzo, however, his proper first name, and that which appears on his identification documents is and was Lawrence.

male, pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 and the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, for relief through compensatory damages and attorney's fees to vindicate profound deprivations of his constitutional rights caused by coerced interrogation, fabrication and manipulation of evidence, false arrest and imprisonment, violation of his due process rights, malicious prosecution and the conspiracy to deprive him of his constitutionally protected rights.

3.  This action arises under the Constitution and laws of the United States including Article III, Section 1 of the United States Constitution and 42 U.S.C. §§ 1983, 1985 and 1986. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has authority to grant the declaratory relief requested herein pursuant to 28 U.S.C. § 2201.

4.  Emily Johnson, a Denver school teacher, was assaulted in her home located at 3088 W. Denver Place, in the early morning hours of January 1, 2000 and subsequently died from her injuries.  Following the assault, Ms. Johnson's white Lexus was stolen.

5.  On New Year's Eve 1999, Emily Johnson was celebrating and partying with friends at *Liquid*, a night club partially owned by her boyfriend, Robert Davis.  According to the trial testimony of Jamie Zunich, Emily left *Liquid* on January 1, 2000 at approximately 2:10 a.m.

6.  Later in the morning on January 1, 2000, Eric Ortegon, a neighbor of Ms. Johnson, found her lying in the backyard, badly beaten and barely breathing, and called 911 at approximately 8:30 a.m.

7. During the time period of 2:10 a.m. and 8:30 a.m. on January 1, 2000, Plaintiff Lawrence Montoya was asleep at his girlfriend Heather Marquez's house located at 4160 Ames Street and was not involved in the assault of Emily Johnson or the theft of her Lexus.

8.   The Denver Police Department began a homicide investigation into Emily Johnson's death. Between January 1, 2000 and January 10, 2000, detectives of the Denver Police Department interviewed numerous individuals, including witnesses and suspects.  Not one of these individuals implicated Lawrence in the assault and murder of Emily Johnson.

9.   On January 10, 2000, then 14 year old, Lawrence Montoya was taken by police officers to the Denver Police Department Headquarters and was interrogated for over two and a half hours by Detective Martin Vigil, Detective Michael Martinez and Lieutenant Jonathan Priest regarding Emily Johnson's death.

10.   During the course of the more than two and a half hour interrogation, Lawrence was coerced and intimidated by Defendants who used, among other techniques known to cause false confessions including *false evidence ploy, manipulation, minimization, threats, false promises* and other *coercive tactics* such as, cornering Lawrence against the wall in his chair, getting in his face, banging on the table, yelling at him, standing over him, telling him he is not going home, telling him he is going to prison for life, telling him he should be afraid, and telling him to say goodbye to his mother.

11.   During the initial 40 minutes of Lawrence's interrogation, he is interrogated in the presence of his mother.  However, Defendants Vigil and Martinez suggest to him that perhaps it is better that they speak without his mother and he relents.

12.   During the interrogation Lawrence denies being in the home of Emily Johnson or stealing her car more than 65 times, but eventually succumbs to the Defendants' pressure and coercion and falsely confesses to being present at Emily Johnson's house while Nicholas Martinez and J.R. (Lloyd Martinez) assault her.

13.  Lawrence's coerced statements were the sole basis for the "probable cause" of his arrest as well as the sole basis for the charges lodged by the District Attorney's Office.

14.  In actuality, there was no legal probable cause for Lawrence's arrest.  Defendant Schneider authored, and Defendant Vigil signed off, on an affidavit for an arrest warrant containing unquestionably false and patently misleading statements of fact.  Moreover, at the time of Lawrence's arrest, on January 11, 2000, numerous other individuals had been interviewed by the Defendants regarding the assault of Emily Johnson, and the theft of her car, and *none* implicated Lawrence.  Furthermore, the assault of Emily Johnson, which occurred in and around her house, was very violent and resulted in massive amounts of blood on the scene and in the yard, however, no blood, fiber, hair, finger or palm prints were found in the house or the yard linking Lawrence to the crime at the time of his arrest.

15.  Having coerced Lawrence's confession and with no evidence, whatsoever, connecting Lawrence to Emily Johnson's assault and subsequent death, or the theft of her car, in concert or conspiracy, Defendants maliciously and baselessly caused Lawrence to be arrested and prosecuted with the serious charges of Felony Murder, Aggravated Robbery, First Degree Burglary and First Degree Aggravated Vehicle Theft under Denver County District Court Docket No. 00CR176.

16.  Lawrence's confession was the principal basis for Honorable Lawrence A. Manzanares finding probable cause for arrest on February 25, 2000 at the preliminary hearing.

17. During the pendency of Lawrence's criminal prosecution, additional witnesses were interviewed by Defendants and none implicated Lawrence in the actual commission of the assault of Emily Johnson or the theft of her car.

18.  During the pendency of Lawrence's criminal prosecution, forensic evidence was tested and no blood, fiber, hair, finger or palm prints were found at the scene to link Lawrence to the crimes he was charged with.

19.  Trial began on October 24, 2000 before Honorable Manzanares.

20.  On November 3, 2000, Lawrence was convicted at trial on all counts and sentenced that day to life without parole.

21.  Over the years, Lawrence continued to profess his innocence, appeal his claims, petition for relief, and advocate for his release.

22.  The Denver County District Attorney's Office rejected Lawrence's claims of innocence and failed to adequately investigate the overwhelming proof of his wrongful conviction.  Additionally, Lawrence's case was summarily rejected by the Justice Review Project.

23.  After Lawrence's conviction, DNA re-testing conclusively proved that the only two pieces of evidence attributed to Lawrence at trial, belonged to others. The Denver District Attorney's Office had access to these results yet continued to deny Lawrence's innocence.

24. Fourteen and a half years after his arrest ,on June 16, 2014, the charges (Felony Murder, Aggravated Robbery, First Degree Burglary and First Degree Aggravated Vehicle Theft)  were dismissed.

25.  On June 16, 2014, Lawrence entered a plea to accessory after the fact and admitted to being in the stolen Lexus later in the day on January 1, 2000.  He stated as follows in Court:

> "[Lawrence] was in a stolen vehicle, a Lexus, knowing it was stolen on January 1st, 2000, and hearing that they had hit some lady over the head with a rock and then, remaining in the car and not informing the authorities."

*See* **Exhibit A**, June 16, 2014 Transcript at 14:13-18.

26.  Lawrence was released after serving 13 years, 7 months, and 13 days for a crime he did not commit.

27.  The Denver District Attorney's Office continues to deny Lawrence's innocence.

# TABLE OF CONTENTS

JURISDICTION…………………………………………………………………………..9

VENUE……………………………………………………………………………………9

PARTIES………………………………………………………………………………….9

STATEMENT OF FACTS……………………………………………………………….12

   A. EVENTS OF DECEMBER 31, 1999 AND JANUARY 10, 2000………………………14

   B. THE DENVER POLICE DEPARTMENT'S INVESTIGATION PRIOR TO
      LAWRENCE'S FALSE ARREST…………………………………………………17

   C. THE UNCONSTITUTIONAL AND UNLAWFUL EFFORTS TO ELICIT A FALSE
      CONFESSION……………………………………………………………………...17

         i. Lawrence's Cognitive and Developmental Deficiencies………………………...19
        ii. The Interrogation……………………………………………………………...24

   D. THE WRONGFUL ARREST AND CHARGES, MALICIOUS PROSECUTION AND
      DUE PROCESS VIOLATIONS…………………………………………………………24

         i. Arrest Warrant and Complaint……………………………………………...27
        ii. Charges and Affidavits for Search Warrants……………………………………30
       iii. Trial…………………………………………………………………...34
       iv. Post-Conviction……………………………………………………………34
        v. Dismissal………………………………………………………………...39

   E. DEFENDANTS' UNCONSTITUTIONAL MANIPULATION AND FABRICATION
      OF EVIDENCE…………………………………………………………………………39

   F. THE UNCONSTITUTIONAL AND UNLAWFUL EFFORTS TO PERPETUATE THE
      FALSE CONFESSION…………………………………………………………….41

   G. PLAINTIFF WAS INJURED BY DEFENDANTS' UNLAWFUL AND
      UNCONSTITUTIONAL ACTS…………………………………………………………42

   H. SOCIAL SCIENCE SHOWS THAT THE REID TECHNIQUES ARE INHERENTLY
      COERCIVE…………………………………………………………………………44

   I. THE PSYCHOLOGICAL IMPACT OF INTERROGATIONS ON JUVENILES……..47

   J. THE LEGAL IMPACT OF CONFESSION EVIDENCE………………………………49

    K. CONSPIRACY………………………………………………………………..50

    L. LIABILITY OF INDIVIDUAL DEFENDANTS………………………………..51

    M. THE MUNICIPAL LIABILITY – A PATTERN AND PRACTICE OF VIOLATION OF
       THE CONSTITUTION……………………………………………………….........52

        i.    For the Actions of the Police Defendants Pursuant to Policies and Practices in
              Existence at the Time of the Emily Johnson Murder ……………………………52
        ii.   For the Actions of Police Chief Tom Sanchez, District Attorney Mitchell
              Morrissey and Assistant District Attorney Bonnie Benadetti in Condoning and
              Ratifying the Wrongful Conduct of the Police Officer Defendants Herein……...58

    N. LIABILITY OF POLICE DEPARTMENT SUPERVISORS…………………………..59

FIRST CLAIM (Violation of 42 U.S.C. § 1983 and the Fourth, Fifth, Ninth and Fourteenth
Amendments to the Constitution of the United States)................................................................63

SECOND CLAIM (Violation of 42 U.S.C. § 1983-Coerced and False Confession (Fifth
Amendment)...............................................................................................................................65

THIRD CLAIM (42 U.S.C. § 1983-Malicious Prosecution in violation of the Fourth and
Fourteenth Amendments)............................................................................................................66

FOURTH CLAIM (Violation of 42 U.S.C. §§ 1985 and 1986-Conspiracy to Interfere with Civil
Rights)..........................................................................................................................................69

FIFTH CLAIM (Violation of 42 U.S.C. §§§1983, 1985, 1986- Neglect to Prevent
Conspiracy)……………………………………………………………………………………71

SIXTH CLAIM (Violation of 42 U.S.C. §1983 - Deliberately Indifferent Policies, Practices,
Customs, Training, and Supervision in violation of the Fourth, Fifth, and Fourteenth
Amendments and in violation of 42 U.S.C.§1981)......................................................................72

PRAYER FOR RELIEF……………………………………………………………………76

REQUEST FOR A JURY TRIAL……………………………………………………………77

## JURISDICTION

28.  This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986,1988 and the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United State Constitution.

29.  Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

30.  Jurisdiction supporting Plaintiff's claim for attorney's fees is conferred by 42 U.S.C. § 1988.

## VENUE

31. This case is instituted in the United States Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

## PARTIES

32.  At all times relevant hereto, Plaintiff LAWRENCE RUBIN MONTOYA was a resident of the State of Colorado.

33.  Defendant CITY OF DENVER was at all times relevant herein a municipal entity created and authorized under the laws of the State of Colorado.

34.  Defendant CITY OF DENVER was, at all times relevant herein, authorized by law to maintain and did maintain a police department known as the DENVER POLICE DEPARTMENT which acted as its agent in the area of law enforcement, including, without limitation, conducting investigations of and evaluating and causing charges to be brought about alleged crimes.

35.  The DENVER POLICE DEPARTMENT was, at all times relevant herein, a municipal agency of the CITY OF DENVER and was charged with the responsibility of

enhancing the quality of life in the CITY OF DENVER by working in accordance with constitutional rights to enforce the law.

36.  Defendant THOMAS SANCHEZ was, at all times relevant herein, the Chief of the DENVER POLICE DEPARTMENT and was responsible for, and the chief architect of, the policies, practices and customs of the DENVER POLICE DEPARTMENT, as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers and detectives under his command.  He is sued individually and in his official capacity.

37.  Although not currently named as a defendant, ARMEDIA GORDO was, at all times relevant herein, the Police Division Chief at the Denver Police Department under the supervision, guidance, and authority of Chief THOMAS SANCHEZ and that the responsibility of supervising named defendant officers and carrying out the directives and orders of defendant THOMAS SANCHEZ.

38.  Defendants MARTIN E. VIGIL, MICHAEL MARTINEZ, JONATHAN W. PRIEST, R. D SCHNEIDER JR. and OFFICERS JOHN DOE were, at all times relevant herein, officers, employees, and agents of the CITY OF DENVER and DENVER POLICE DEPARTMENT. They are sued individually and in their official capacities.

39.  At all times relevant hereto, Defendant MARTIN E.VIGIL was acting under color of state law in the capacity as a law enforcement officer employed by the Defendant CITY OF DENVER and/or the DENVER POLICE DEPARTMENT.  Defendant MARTIN E. VIGIL was assigned, during all times relevant hereto, to the DENVER POLICE DEPARTMENT Homicide Unit. Defendant MARTIN E. VIGIL is sued in his individual and official capacity.

37. At all times relevant hereto, Defendant MICHAEL MARTINEZ was acting under color of state law in the capacity as a law enforcement officer employed by the Defendant CITY OF DENVER and/or the DENVER POLICE DEPARTMENT. Defendant MICHAEL MARTINEZ was assigned, during all times relevant hereto, to the DENVER POLICE DEPARTMENT Homicide Unit. Defendant MICHAEL MARTINEZ is sued in his individual and official capacity.

38. At all times relevant hereto, Defendant JONATHAN W. PRIEST was acting under color of state law in the capacity as a law enforcement officer employed by the Defendant CITY OF DENVER and/or the DENVER POLICE DEPARTMENT. Defendant JONATHAN W. PRIEST was assigned, during all times relevant hereto, to the DENVER POLICE DEPARTMENT Homicide Unit. Defendant JON PRIEST is sued in his individual and official capacity.

39. At all times relevant hereto, Defendant R. D. SCHNEIDER JR. was acting under color of state law in the capacity as a law enforcement officer employed by the Defendant CITY OF DENVER and/or the DENVER POLICE DEPARTMENT. Defendant R. D. SCHNEIDER JR. was assigned, during all times relevant hereto, to the DENVER POLICE DEPARTMENT Homicide Unit. Defendant SCHNEIDER is sued in his individual and official capacity.

40. At all times relevant hereto, Defendant OFFICERS JOHN DOE were citizens of the United States and a resident of the State of Colorado and was acting under color of state law in the capacity as a law enforcement officer employed by the Defendant CITY OF DENVER and/or the DENVER POLICE DEPARTMENT. Defendant Officers JOHN DOE are sued in their individual and official capacity.

41.  At all times relevant herein, the individual defendants and those other not-yet-named individuals were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of either of the CITY OF DENVER and DENVER POLICE DEPARTMENT and otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

42. Although not a named party, District Attorney MITCH MORRISSEY, was at times relevant herein the District Attorney of the County of Denver, responsible for, and the chief architect of, the policies, practices and customs of the Denver County District Attorney's Office, as well as responsible for the hiring, screening, training, supervision, discipline, counseling and control of the assistant district attorneys who working in his office.   Although not a named party, Chief Deputy District Attorney BONNIE BENADETTI, was at times relevant herein an Assistant District Attorney for the County of Denver, performing her duties under the supervision, guidance, and direction of District Attorney Mitch Morrissey.

43.  Although not a named party, MAYOR WELLINGTON WEBB was, at times relevant, the acting Mayor of the county and city of Denver, head spokesman for the Denver Police Department, and responsible for overseeing, managing, and operating the Denver Police Department with the authority to implement guidelines, protocols, and practices for the Denver Police Department to follow.

## STATEMENT OF FACTS

### A.  EVENTS OF DECEMBER 31, 1999 AND JANUARY 10, 2000

44.  Emily Johnson, a Denver school teacher, was assaulted in her home located at 3088 W. Denver Place by Nicholas Martinez, Luke Anaya and Lloyd Martinez, and subsequently died

from her injuries, in the early morning hours of January 1, 2000. Following the assault, Ms. Johnson's white Lexus was stolen.

45. On New Year's Eve 1999, Emily Johnson was celebrating and partying with friends at *Liquid*, a night club partially owned by her boyfriend, Robert Davis. According to the trial testimony of Jamie Zunich, Emily left *Liquid* on January 1, 2000 at approximately 2:10 a.m.

46. Later in the morning on January 1, 2000, Eric Ortegon, a neighbor of Ms. Johnson, found her lying in the backyard, badly beaten and barely breathing, and called 911 at approximately 8:30 a.m. Ms. Johnson inevitably passed away from her injuries.

47. During the time period of 2:10am and 8:30am on January 1, 2000, Lawrence Montoya was asleep at his girlfriend Heather Marquez's house located at 4160 Ames Street and was not involved in the assault of Emily Johnson or the theft of her Lexus.

48. During the assault, Emily Johnson's boyfriend, Robert Davis, lay asleep and intoxicated in her bedroom.

49. In the afternoon of January 1, 2000, after having stolen Emil Johnson's Lexus in the early morning hours, Nicholas Martinez picked up several individuals for a joy ride, including Freddie Torres, Anthony Barela and Lawrence Montoya.

50. This was the first time Lawrence Montoya was ever introduced to Nicholas Martinez. In the car with Nicholas Martinez was Luke Anaya, Lawrence's cousin.

51. Lawrence did in fact get into the back seat of the Lexus, causing his fingerprint to be left on the exterior left rear passenger handle from when he opened the door to get in.

52. Lawrence rode in the vehicle as a passenger for approximately 20 minutes and then exited the vehicle.  He had no further interactions with Nicholas Martinez or contact with Emily Johnson's Lexus.

53. On the evening of January 1, 2000, Ms. Johnson's white Lexus was found overturned in a ditch.

## B.    THE DENVER POLICE DEPARTMENT'S INVESTIGATION PRIOR TO LAWRENCE'S FALSE ARREST

54. The Denver Police Department focused on numerous suspects prior to Lawrence Montoya's arrest.

55. On January 1, 2000, at approximately 1:30 p.m., officers of the Denver Police Department executed a search warrant for Emily Johnson's home. Nothing was found associated with Lawrence Montoya.

56. On January 1, 2000, Detectives interviewed suspects, Ronald David Craggs and Mario R. Alverez, individuals the Denver Police Department initially believed to have last driven Emily Johnson's Lexus. These two individuals lived near where the Lexus flipped over. The Crime Laboratory of the Denver Police Department took photographs of the two suspects, footprints, and a pair of shoes discovered on the roof of their house.

57. On January 3, 2000, at 9:51 a.m., Defendant Vigil responded with Detective  L. Valencia to the Denver Police 'Secure Cage' at Traffic Operations to execute a search warrant on a 1995 four door Lexus, 80300X.  Defendant Vigil completed the inventory report.  On the floorboard of the front driver's seat was a small black briefcase with a gold plate that read

'Robert Davis.' Three possible prints were located from the outside of the vehicle. Also taken was a blood sample from the driver's seat.

58. No evidence was found inside the Lexus associated with Lawrence Montoya. One fingerprint on the outside passenger handlebar matched Lawrence Montoya as he did in fact go joyriding in the vehicle for approximately ten minutes in the afternoon of January 1, 2000, however, the print was not tested until after Lawrence's arrest and charges had been brought.

59. On January 3, 2000, at 1:50 p.m., Defendant Schneider executed another search warrant at the home of Robert Davis, Emily Johnson's boyfriend, at 335 Sherman Street. One pair of tennis shoes with possible blood on them were seized.

60. On January 5, 2000, the results of a search warrant for the cellular phone of Robert Davis was received by the Denver Police Department. The report showed a call was placed to Wendy Barr's cellular phone at 2:46 a.m. on January 1, 2000. In a later Police Department interview with Wendy Barr, Ms. Barr said that she had been called by Dr. Davis after he and Emily Johnson left the club together and he said they were going to Chubby's to eat. At 2:46 a.m., Lawrence Montoya was asleep at his girlfriend Heather Marquez's house.

61. On January 7, 2000, Rebecca Romero, the mother of, Marcus and Tommy Armstrong, individuals at club *Liquid* the same time as Emily Johnson, was interviewed and consented to a search of her vehicle. Inside the vehicle were the following items: screwdriver, one pair of Lugz boots, one pair of Timberland boots, one pair of men's black loafers, and one tire iron with traces of fiber and hair on it.

62. On January 7, 2000, Detectives received an anonymous call about a party known as Nicholas Martinez, whose father, Nicholas DeLeon, had told relatives that Nicholas Martinez had taken Emily Johnson's car and that he had found it running in front of her house. Further

investigation revealed that the last call placed by the cellular phone in Emily Johnson's vehicle was to a landline phone at 1025 Newton Street, the residence of Amanda Johns, girlfriend of Anthony Barela. Further investigation revealed a connection between Anthony Barela and Nicholas Martinez.

63. On January 10, 2000 at 3:10 p.m., Nicholas Martinez was interviewed at Denver Police Headquarters. Nicholas Martinez stated that he and his cousin J.R. (Lloyd Martinez) had found Emily Johnson's Lexus unlocked and the keys were on the floor, they took the car, and later on picked up Anthony Barela, Luke Anaya, Freddie Torres and an unnamed individual identified as "Freddie's brother" at Anthony Barela's house. Nicholas Martinez's mother, Cynthia Martinez was present during the interview and stated that she heard her son and J.R. (Lloyd Martinez) in her house at 2:30 a.m. on January 1, 2000 when she went to bed. She also stated that later that afternoon, Nicholas had come home with his shoes smelling like gasoline. Nicholas Martinez makes no mention of Lawrence Montoya during his video-taped statement.

64. On January 10, 2000, at 10:17 p.m., after the interview with Nicholas Martinez revealed that he had stolen Emily Johnson's Lexus and that he had been in the car when it was wrecked, a search warrant was signed by Judge Patterson to search Mr. Martinez's resident at 2543 West 33rd Avenue. Detectives searched the basement, identified as Mr. Martinez's room, and seized a pair of black shoes that had an odor of gasoline on them and what appeared to be blood residue. A pair of denim pants was also found with possible blood residue on them. In the laundry room, on the main floor, a bed sheet with possible blood and a tee shirt with possible blood, were seized. In the west middle bedroom upstairs, a pair of Lugz shoes with a sole pattern similar to that found at the scene were seized. No evidence found at Nicholas Martinez's house was associated to Lawrence Montoya.

65. Evidence later confirmed that Nicholas Martinez's palm print was conclusively on the milk chute outside Emily Johnson's backdoor and in the interior of the Lexus.

66. Also interviewed on January 10, 2000 at Police Headquarters were Matthew Barela, Anthony Barela, Lloyd Martinez, Luke Anaya, and Freddie Torres, none of whom implicate Lawrence Montoya in the assault of Emily Johnson. Only Anthony Barela made a taped statement. Luke Anaya did not make a statement but came into Lawrence's interrogation stating that the shoes Lawrence was wearing on his feet were his but that Lawrence was wearing them on the morning of January 1, 2000. The other individuals either refused to make statements or requested an attorney, thus limiting the available suspects to interrogate and resulting in greater pressure on law enforcement to ensure a confession from Lawrence Montoya, the last of these witnesses to be interviewed.

67. At the time Lawrence Montoya was taken to the Denver Police Headquarters, there was no evidence, whatsoever, tying him to the assault and murder of Emily Johnson.

## C. THE UNCONSTITUTIONAL AND UNLAWFUL EFFORTS TO ELICIT A FALSE CONFESSION

68. On January 10, 2000, Lawrence was taken by police officers to Denver Police Department Headquarters.

69. When Lawrence was brought to Denver Police Department Headquarters on January 10, 2000 at approximately 8:00 p.m., he was interrogated for over two and a half hour by Defendant Vigil, Defendant Martinez, and Defendant Priest.

### i. Lawrence's Cognitive and Developmental Deficiencies

70. At the time, Lawrence was 14 years old, and in the 8th grade.

71. This is a picture of Lawrence just three days after his interrogation:



FOO.4
Lorenzo
montoya
1·13·00

72. At the time of the interview, it was obvious Lawrence suffered from clear cognitive deficiencies and developmental delays.

73. At the time, Lawrence also suffered from emotional and learning disabilities due to deficits in written language, math skills, communication skills, decision making/problem solving skills and inter/intra personal skills.

74. In a report dated November 14, 1997, written by Paula Acker, LSP, Ed. S., Lawrence's cognitive abilities were tested using the Wechsler Intelligence Scale for Children- III (WISC-III). His results yielded a Verbal Scale IQ of 60-69, placing him in the Intellectually Deficient range, and a Performance Scale IQ of 80-89, placing him in the Low Average range. *See* **Exhibit B,** Jane Cleveland Psy. D. Report at p. 4.

75. Department of Correction's initial assessment dated December 4, 2000 later found Lawrence to be vocationally functionally illiterate and academically illiterate/disabled with mild

mental retardation/ developmental disabilities. *See* **Exhibit C,** Excerpts from Colorado Department of Corrections Mental Health Records.

### ii. The Interrogation

76.  For approximately the first 40 minutes of the interrogation Lawrence's mother, Mary Torres, was present and advised Lawrence to talk to the police.

77.  At one point during the first 40 minutes of the interrogation, Ms. Torres left the room to go to the bathroom. While Lawrence's mother was out of the room, the police continued to interrogate Lawrence.

78.  During this time, the Defendants Vigil, Martinez, and Priest conducted an illegal search of Lawrence's shoes and ultimately seized them.

79.  Approximately 10 minutes after Lawrence's mother re-entered the interrogation room, the Defendants Vigil and Martinez suggested to Lawrence that it would be better if he talked to them without his mother present.  After hesitating, Lawrence agreed.  His mother left and did not return. No waiver was signed by Lawrence or his mother authorizing Defendants Vigil, Martinez, and Priest to question Lawrence without the supervision of his parent.

80.  Lawrence was not read his Miranda rights after his mother left the room.

81. After Lawrence's mother left the room, Defendants Vigil, Martinez and Priest aggressively interrogate Lawrence using techniques known to cause false confessions, including, but not limited to, *false evidence ploy*, *manipulation, threats, false promises, minimization* and *maximization,* and feed him statements *to be repeated. See generally* **Exhibit D, Interrogation Video.**

82.  During the course of the interrogation there is no demonstration by Defendants Vigil, Martinez, and Priest to assure that Lawrence or his mother understood the Miranda warning.

Defendants make a cursory statement to Lawrence if he understood, to which Lawrence replied in the affirmative, but Lawrence did not articulate any recitation or verbal understanding of the process or his rights other than to acquiesce to the interview.

83. During the interrogation, Defendants Vigil, Martinez and Priest threaten and intimidate Lawrence by cornering him against the wall in his chair, getting in his face, banging on the table, screaming at him, insulting him, and stand and sit in extremely close proximity to him.

84. The Defendants Vigil, Martinez, and Priest substantially outsize Lawrence, who stood only 5'3 inches and weighed 110 pounds.

85. At several points, Defendant Vigil lays his hands on Lawrence and yells at him ordering him to sit up.

86. Defendants Vigil and Martinez use psychological manipulation by mentioning Lawrence's mother numerous times (**Exhibit D** at 26:10, 1:31:20, 1:24:05), telling Lawrence that he could not leave until he confessed (*Id.* at 31:00, 1:30:30), continually threatening Lawrence with life in prison (*Id.* at 1:14:30, 1:15:10, 1:16:05), and telling Lawrence that he needs to be "scared" of people in prison (*Id.* at 1:16:05).

87. Defendants Vigil, Martinez, and Priest use false evidence ploy by stating that other individuals had implicated Lawrence when they had not (*Id.* at 35:45, 1:08:30); or that fingerprints, shoe prints, and blood prints matching Lawrence were found on the crime scene when no such evidence existed (*Id.* at 40:10). In fact, Lawrence is told by defendants numerous times that the shoes on Lawrence's feet during the interrogation left shoe prints that were found at the crime scene. However, the *black* shoes that were seized during Lawrence's interrogation

were never admitted at trial. Rather, the *brown* shoes used at trial belonged to Luck Anaya. *See* October 27, 2000 Trials Transcript p. 61:13-25.

88.  During the interrogation, Lawrence repeatedly expressed his innocence notwithstanding the coercive tactics used against him (*see e.g,* **Exhibit D** at 1:08:00, 1:26:50, 1:29:45).  In fact, Lawrence denies being in the home of Emily Johnson or involved in the actual theft of the Lexus more than 65 times.

89.  After some time, Lawrence is unable to endure the incredible pressure the Defendants put on him during the interrogation and he breaks down sobbing heavily for several minutes (*see e.g. Id.* at 1:18:10).

90.  As Lawrence is sobbing, he is told by Defendant Martinez that he is not going to be allowed to leave unless he talks to them. *See e.g. Id.* at 1:19:30, 1:19:35, 1:30:30.

91.  The Defendants also promise leniency, an example being when Defendant Vigil makes false statements that they know another youth is coming in to inculpate Lawrence and Defendant Vigil states "[w]hoever gets first to the finish line, wins on this deal." *See Id.* at 1:22:40.

92.  Lawrence eventually succumbs to the pressure.  However, not a single statement made by Lawrence comes from his own memory.  In fact, every "statement" he makes is preceded by leading questions in which Defendants Vigil, Martinez and/or Priest feed Lawrence facts and have him change what he is saying if he says something that does not match what they believe the evidence to be.

93.  For example:

> Vigil: And so, which way did they go in?
> Montoya: Through the front.
> Vigil: ...I dont think they went in the front.

21

Montoya: (pause) the back.[2]

**Exhibit D** at 1:42:15.

> Vigil: Where was the car at… here let me give ya, a red marker again. Put a circle
> where the car was at. Just put a circle.
> Montoya: the car?
> Vigil: Yeah.
> Montoya: (long pause) it was like around here somewhere.
> Vigil: Okay. See where the blue arrow is?
> Montoya: the arrow?
> Vigil: Yeah. Somebody said the car was right there, is that about where it was at?
> Montoya: Yeah.

*Id.* at 1:48:25

    94. In telling the Defendants what they want to hear, Lawrence makes incorrect

statements of fact that prove he was not actually involved in the assault of Emily Johnson or the

theft of her Lexus. *See e.g.,* **Exhibit D** at 1:50:20 (Montoya: "I didn't know what they were

doing to that *old* lady"). Emily Johnson was only twenty-nine years old at the time of the

incident. Additionally, Lawrence states that Emily Johnson was wearing pants or sweats but she

was found by her neighbor and EMTs with a silver dress on. *See Id.* at 2:18:40. Furthermore,

Lawrence states that immediately after the crime was completed, he went to a 7-11 store with

Nicholas and J.R. and J.R. went into the store at 9:00-9:15pm. *See Id.* at 2:00:00. It is a fact that

Emily Johnson was assaulted between 2:10 a.m. and 8:30 a.m. Detective Vigil then tells

Lawrence that the crime happened between midnight and 8:00 a.m. Lawrence then changes his

story and says this happened at 1:00 a.m. *See Id.* at 2:00:25. Yet, another example, is when

---

[2] These leading questions are consistent with the Defendants' theory of the case at the time, which was that entrance
was gained to Emily Johnson's house through the back door, however, by the time of trial this had changed, due to
the testimony of an informant, Matthew Hernandez, so Defendants were forced to change the theory, which then no
longer matched the statements they had coerced out of Lawrence.

Lawrence states that Nicholas bashed in a window to get into the house, yet it is a fact that there was no broken window. *See Id.* at 2:15:58.

94. Additionally, after Defendant Vigil asked Lawrence where they went after the attack on Emily Johnson, Lawrence states they went to the 7-11 on Federal. Lawrence, under pressure from Defendant Vigil gives a detailed account of J.R. going into the store and what he purchased. Subsequently the Defendants pull the surveillance tape from the 7-11 on Federal during the time frame in questions and there is no evidence of J.R. ever being there, however, the defendants simply ignore this inconsistency in Lawrence's statement.

96. Lawrence proceeds to similarly mimic the Defendants statements until he gives back the same information the Defendants have told him; about a shoe being used to hit Emily Johnson (2:19:25), a rock being used to hit her in the head (1:55:07), Nicholas losing the jacket that the Defendants showed him a picture of (1:58:18), and that Nicholas and J.R. tried to burn Emily Johnson with lighter fluid after the Defendants suggested it (2:25:18).

97. Defendant Jonathan Priest physically threatens Lawrence by stating "[i]f I find out this is all bullshit, I am going to come back and have your ass because you're not telling me the truth." *See Id.* at 2:30:42.

98. Defendant Jonathan Priest suggests he knows Lawrence is lying, yet nonetheless, his statements are used later as the sole basis for probable cause to arrest: "[w]e are here busting our butts to save your ass and all you are giving us is this song and dance and bullshit story. It's getting old. You're giving us what you think we want to hear. You don't have a fucking clue what we can prove. Your ass is hanging out big time. You should think about what is going to happen because we know what is going to happen." *See Id.* at 2:30:42.

99. Lawrence's statements were coerced, involuntary, and marked by classic signs of false confession.

100. In fact, Judge Lawrence A. Manzanares later stated on the record during trial, that the officers tactics during Lawrence's interrogation were "awfully intimidating" after his mother left the room. *See* October 31, 000 Trial Transcript p. 117:7-8.

101. Expert in false confessions, Dr. Richard Ofshe, evaluated Lawrence's interrogation and wrote a report finding in his expert opinion that,

> "the interrogation of 14 year old Lorenzo Montoya in January 2000 was psychologically coercive; that it was an interrogation that overbore Montoya's ability to resist the interrogations; and that it was an interrogation that could have precipitated a false confession from Montoya…
>
> The interrogators conducted a psychologically coercive interrogation by electing to try to motivate compliance from Lorenzo by making threats of harm and promises of help, contingent upon his decision regarding confession. Lorenzo was repeatedly threatened that he would receive severe punishment if he failed to comply with the Detective's demands."

*See* **Exhibit E**, *Dr. Richard Ofshe Report* at p.3.

102. Lawrence's entire "statement" was fabricated by the police through coercion, manipulation and threats.

## D. THE WRONGFUL ARREST AND CHARGES, MALICIOUS PROSECUTION AND DUE PROCESS VIOLATIONS

### i. Arrest Warrant and Complaint

103. Despite no other persons implicating Lawrence Montoya in the assault of Emily Johnson, the inadequacies of Lawrence's false "confession," and with knowledge of the

24

unconstitutional and unlawful methods used to secure the alleged "confession," Defendants wrongfully arrested and caused Lawrence to be criminally charged for allegedly attacking and murdering Emily Johnson on January 1, 2000.

104. Based solely on Lawrence's coerced confession, Defendant R.D. Schneider Jr. authored, and Detective Vigil signed off on, an affidavit for Lawrence's arrest. The affidavit for arrest contained unquestionably false statements of fact and/or was patently misleading by creatively manipulating facts. *See generally* **Exhibit F,** Arrest Warrant Affidavit.

105. For example:

Schneider Affidavit:

*Lorenzo Montoya then disclosed that he **and** the other two suspects searched the residence for valuables. See* **Exhibit F**, p. 1.

Interrogation Statements:

Montoya: "**They** were lookin' for money an' all that."

*See* **Exhibit D,** at 1:33:30.

Schneider Affidavit:

*After victim Emily Johnson had been struck in the head with the rock, the suspects retrieved a can of lighter fluid from **a grill which was on the patio. At this point Lorenzo Montoya related that the suspects Nicholas Martinez and Lloyd Martinez discussed douching victim Emily Johnson with the lighter fluid to destroy evidence.** See* **Exhibit F,** at p. 1-2.

Interrogation Statements:

Vigil: Did they have lighter fluid or something? ... Where'd they get that at?
Montoya: the back (sniffling)
Vigil: From the back? The garage or the backyard or what?
Montoya: the **backyard.**

*See* **Exhibit D,** at 2:25:18.

Schneider Affidavit:

*Lorenzo Montoya discussed that **he,** Nicholas Martinez and Lloyd Martinez confronted the victim Emily Johnson, **who was asleep** on the living room couch.*

Interrogation Statements:

Vigil: She's on the couch? What's she doin' sitin' there? She just sittting up or lying down?
Montoya: Laying down.
Vigil: Oh, she's lay'in there… is she sleepin' or awake?
Montoya: **Awake, watchin TV.**

*See* **Exhibit D,** at 2:17:30.

Schneider Affidavit:

*Lorenzo Montoya then related that suspect Lloyd K. Martinez used **high heel shoe** and also struck her in the head causing victim Emily Johnson to pass out. See* **Exhibit F,** p. 1.

Interrogation Statement:

Vigil: What did he do?  Tell me how they beat her up.
Montoya: Hit her.
Vigil: With what?
Montoya: **A shoe**.
Vigil: What color was the shoe?
Montoya Black.

*See* **Exhibit D,** at 2:19:25

106.   The affidavit omitted reference to the following: the fact that no physical evidence tied Lawrence to the scene of the crime, no witnesses had implicated Lawrence in Emily Johnson's assault, that Lawrence made over 65 assertions of innocence, the fact that he was questioned outside the presence of his mother, and the threats, false evidence, and promises of leniency that were made by the Detectives.  *See generally* **Exhibit F**.

107.   Relying on the false and misleading information contained in the arrest warrant affidavit, Judge Robert Patterson signed the arrest warrant.

108.  Defendant Vigil arrested Lawrence Montoya on January 11, 2000.

109. Lawrence was incarcerated in the Gilliam Juvenile Detention Facility. He did not return home for over 14 years.

## ii. Charges and Affidavits for Search Warrants

110. Lawrence's coerced statements were the sole basis used by the District Attorney's office to charge him in a four count indictment for Felony Murder, §18-3-102(a)(b), Aggravated Robbery, §18-4-302(1)(a), First Degree Burglary, §18-4-202, and Aggravated Motor Vehicle Theft §18-4-409(2)(e).

111. On the day of Lawrence's arrest, January 11, 2000, a press conference lead by Mayor Wellington Webb, Defendant Chief of Police Tom Sanchez, Assistant District Attorney Chuck Lepley, Police Division Chief Armedia Gordon and Defendant Jonathan Priest was held at Denver Police Department headquarters.

112. At the conference, Mayor Webb *applauded* the work of the Denver Police Department in apprehending Lawrence and his then, two co-defendants, Nicholas Martinez and J.R. (Lloyd Martinez).[3] Moreover, Defendant Sanchez *denounced* media reports of possible alternative suspects, indicating that Emily Johnson's lifestyle and a reputation for going to nightclubs, had *nothing* to do with her murder.[4]

113. On January 11, 2010, having had a press conference celebrating the arrest of Lawrence, but having no evidence linking him to the murder of Emily Johnson other than his coerced confession, the Defendants executed a search warrant at Lawrence's aunt, Tomasita Martinez's, house for Lawrence's belongings.

---

[3] All charges against Lloyd Martinez were eventually dismissed as the People could not prove them.
[4] After Lawrence's arrest, the Denver Police Department stopped all investigation into alternative suspects including but not limited to Robert Davis, Tommy and Marcus Armstrong, and Ronald David Craggs and Mario R. Alverez.

114. On January 11, 2000, at 5:00 p.m., Defendant Vigil, assisted by Defendant Schneider, Defendant Martinez and others executed a search warrant on 951 Newton Street. Defendant Vigil authored a report describing how the Detectives executed the search warrant. In the report, Defendant Vigil writes that he found a pair of Lugz shoes near the garbage cans outside of the house prior to executing the search warrant. Tomasita Martinez testifies at trial that during the execution of the search warrant, she informed Defendant Vigil that one specific room in the basement was her son's, Luke Anaya, and that the shoes on the bed belonged to her son, not to Lawrence. *See* October 27, 2000 Transcript at 24:7-8, 26:4-5, 29:5-6.[5] Defendant Vigil then told Tomasita Martinez to return upstairs while he and other officers conducted a search. The shoes, identified by Tomasita Martinez as belonging to her son, Luke Annaya, were confiscated and later used at trial as evidence against Lawrence because Defendant Vigil falsely testifies that Tomasita Martinez said those shows were Lawrence Montoya's shoes. *See* October 27, 2000 Trial Transcript, p. 48:5-12, 49:5-16.

115. On February 25, 2000, a preliminary hearing. Relying principally on Lawrence Montoya's coerced confession, Honorable Lawrence A. Manzanares found probable cause for Lawrence's arrest.

116. On June 9, 2000, a motions hearing was held. At the close of the hearing, the Court ruled to suppress the portion of Lawrence's statement that was made after his mother left the room, based upon a finding of an invalid waiver.

117. However, the ruling did not remedy the great injustice already caused -- the coerced statements made during this period of time were used as the sole basis for probable cause to

---

[5] This complaint includes by reference the entire trial transcript for this matter, a public record that is both accessible through the Denver County District Court as well as by Plaintiff upon request .

arrest and the sole basis to charge Lawrence with a four count indictment. Moreover, Lawrence's false statements were leaked to the press and heavily reported throughout the pendency of the criminal prosecution.

118. The Denver Police Department limited its investigation following Lawrence's arrest. Throughout the pendency of Lawrence's criminal prosecution, no blood, fiber, hair, finger or palm prints were ever found at Ms. Johnson's house to link Lawrence to the crime. Moreover, three witnesses, Heather Marquez, Arieda Marquez, and Robert Marquez, were interviewed by the Denver District Attorneys and confirmed that Lawrence was at their house during the time period Emily Johnson was assaulted, 2:10 a.m. to 8:30 a.m. on January 1, 2000.

119. During Lawrence's interrogation on January 1, 2000, Luke Anaya was dramatically marched into Lawrence's interrogation room by Defendant Vigil. Mr. Anaya was prompted to look at the shoes Lawrence had on his feet and was asked by Defendant Vigil, "who's shoes are those." Mr. Anaya stated that the shoes Lawrence was wearing that day were actually his but that Lawrence had borrowed them and worn them on December 31, 2000.

120. However, on October 17, 2000, days prior to trial, an investigator for the Denver District Attorney's Office interviewed Luke Anaya in front of his house. Luke Anaya was shown pictures of shoes seized during the search of his house, 951 Newton Street, on January 11, 2000. He indicated that the picture was of **his** bedroom and that the shoes were **his** which supports his mother's statements to Defendant Vigil during the execution of the search warrant on January 11, 2000. Mr. Anaya was also shown property item 138, which were the actual shoes later shown to the jury at trial that the prosecution falsely claimed Lawrence was wearing the night of Emily Johnson's assault. Mr. Anaya indicated these shoes, later introduced at trial as evidence against Lawrence, were in fact **his** shoes. Additionally, in direct contradiction to his statements

29

during Lawrence's interrogation, Luke Anaya told the investigator he did not know what shoes Lawrence was wearing on December 31, 1999.

### iii. Trial

121.  Trial began on October 24, 2000 before Honorable Lawrence A. Manzanares.

122.  During the course of trial, no blood, fiber, hair, finger or palm prints found at Ms. Johnson's house were presented to the jury to link Lawrence to the crime. Nonetheless, the District Attorney's Office adamantly stated that Lawrence's footprints and jacket were found at the crime and therefore, he was culpable.

123.  Without any physical evidence tying Lawrence to the assault of Emily Johnson and since the statements Lawrence made outside the presence of his mother were suppressed, the prosecution had to rely in proving their case on the incredible testimony of cooperating witness Matthew Hernandez.

124. Matthew Hernandez, a juvenile that was momentarily in custody with Lawrence at Gilliam Detention Center, made three separate contradictory statements to law enforcement prior to trial that Lawrence Montoya confessed to the assault of Emily Johnson while they were assigned to the same cell.

125. However, it is a fact that Matthew Hernandez was never incarcerated in the same cell as Lawrence Montoya. *See* **Exhibit G,** *Gilliam Inmate Logs*. Nonetheless, Matthew Hernandez perpetuated a series of lies by giving three separate statements and trial testimony that he was housed in the same cell as Lawrence Montoya and that Lawrence confessed to him. Despite Matthew Hernandez's testimony being completely incredible, Defendant Priest provided false and misleading testimony to match Matthew Hernandez's testimony, most importantly that

a gun was used to hit Emily Johnson over the head, and that her wrists were stomped on, a fact that is not supported by any physical evidence presented at trial.

126.  Matthew Hernandez's trial testimony contradicted his own prior statements made on January 13, 2000, January 17, 2000, and July 12, 2000. For example, in Matthew Hernandez's January 13, 2000 and January 17, 2000 taped interview, he stated that Lawrence told him they hit Emily Johnson with a rock and on January 17, 2000 added that Lawrence and others had raped her. However, at the trial Matthew Hernandez stated that Emily Johnson was hit with the butt of a gun, leaving out any testimony about rape, as there was no evidence whatsoever that she had been raped. *See* October 25, 2000 Trial Transcript p. 140:7-10.  Moreover, in the January 2000 interviews, Matthew Hernandez stated that Lawrence said Emily Johnson let him into the house, yet his testimony at trial was that they forced their way into her house. *See* October 25, 2000 Trial Transcript, p. 167: 15-20.  Matthew Hernandez's trial testimony not only contradicted his own prior statements but contradicted Lawrence's false confession.  Lawrence does not mention in his false confession, among other things, a gun, a forced entry through the front door, or the fact that Nicholas Martinez and LLoyd Moartinez stomped on Emily Johnson's wrists.

127.  In reality, Matthew Hernandez had spent time with Nicholas Martinez at Gilliam Detention Center prior to making any statements about Lawrence Montoya. *See* October 25, 2000 Trial Transcript p. 160:11-16.

128. Defendant Jonathan Priest testified as a "crime scene reconstruction" expert. He testified to jurors inside of Emily Johnson's house during a remote crime scene visit. During his testimony, Jonathan Priest made assertions of fact without any evidentiary support with regard to the timeline of events, the sequence of actions taken inside the house, and the method and instrument of assault.

129.  Defendant Priest falsely testified and mislead the jury in a way that bolstered the testimony of Matthew Hernandez, notably that Emily Johnson's injuries *could* have been caused by both a gun as well as stomping on her wrists, facts not supported by any other evidence other than Matthew Hernandez's testimony.  *See* October 26, 2000 Trial Transcript p. 193:6-12, 21-25, 198:6-11. There was no gun found at the crime scene, however the false testimony was needed to corroborate the testimony of the prosecution's main witness.

130.  During the trial, Defendant Martin Vigil falsely testified that during the execution of the search warrant, Tomasita Martinez said that the basement bedroom that was searched was Lawrence's room and that brown Lugz shoes found on the bed were Lawrence's shoes.  *See* October 27, 2000 Trial Transcript, p. 48:5-12, 49:5-16.  Defendant Vigil testified that the report he made after executing the search warrant, containing the same patent fabricated statements, was accurate. *See Id.* at 50:3-17.   However, Tomasita Martinez testified at trial that during the execution of the search warrant, she informed Defendant Vigil that one specific room in the basement was her son's, Luke Anaya, and that the shoes on the bed belonged to her son, not to Lawrence.  *See* October 27, 2000 Transcript at 24:7-8, 26:4-5, 29:5-6.  In essentially implicating her son in Emily Johnson's assault while under oath, Tomasita Martinez's testimony both discredits Defendant Vigil's trial testimony and the report he authored after the search warrant was executed. Moreover, prior to Defendant Vigil's testimony, the Denver District Attorney's Office confirmed with Luke Anaya that the room searched was his and that all shoes seized were his and that the actual shoe attributed to Lawrence at trial was his.

131. Further fabrication and manipulation of evidence, Defendant Vigil testified at trial about Lawrence's interrogation testimony.  His testimony contained unquestionably false statements of fact and was patently misleading. Defendant Vigil stated at trial that "[Lawrence]

stated to me that he didn't know Nick's last name, which I find hard to believe, he's a **friend** of

his, but that's what he told me. And then he also stated he's -- he knew Nick from **several times**,

I believe." *See* October 31, 2000 Trial Transcript, 109:25-110:1-4. Defendant Vigil's testimony

is patently false. Lawrence never asserted he was friends with Nicholas Martinez or that they had

met several times. In fact, Lawrence's only statements on the matter are that he had not been

introduced to Nicholas Martinez until January 1, 2000 when he was picked up in the Lexus in

front of Anthony Barela's house.

132. Defendant Vigil further fabricates and manipulates evidence by twisting Lawrence's

interrogation testimony to make the inference to the jury that he was at the scene of the crime:

> "**We were talking again about the murder of Ms. Emily Johnson and we were
> specifically asking about the murder and those questions.** And Detective Martinez
> asked Mr. Montoya, 'Were you high at the time?' [Lawrence] responded 'Yes.'"...
> Detective Martinez asked [Lawrence], "So you just didn't know what you were doing
> because you were high on marijuana?" **In reference to the night of the homicide of Ms.
> Johnson.** And he stated, 'Yes.'"

*See Id.* at 113:1-17. None of Defendant Vigil's statements actually came from the interrogation

itself, but rather were mere conjecture. It is clear, that all of Lawrence's references to being

"high" were while he was joyriding in the Lexus in the afternoon of January 1, 2000, " Montoya:

"Me, my cousin, my brother, Nick, when we were **in the car** we were high" *See* **Exhibit D,** at

1:03:10.

133. The only evidence presented at trial to support the prosecution's claims that

Lawrence left the Bronco's jacket found at Emily Johnson's house were the testimonies of

Nichole Lucero and April Hammerly. Nichole Lucerno testified at trial and wrote in a statement

on January 12, 2000 that she saw Lawrence on December 31, 1999 wearing a Bronco's jacket.

*See* October 27, 2000 Trial Transcript p. 184:5. However on cross examination she indicated that

she was drunk on December 31, 1999 (*Id.* at 188:11) and questioned whether the photograph exhibit of the Bronco's jacket, given to her at trial, was the same she had previously identified. (*Id.* at 191:1).

134. The testimony of Nichole Lucero and April Hammerly should be questioned, if not discounted completely. After the close of evidence but prior to jury deliberation, trial counsel for the defense was approached by Cynthia Martinez, the mother of Nicholas Martinez, who indicated that the Bronco jacket harped on by the prosecution as Lawrence's was in fact her son's and he had just received it as a Christmas present. She even had a photograph with Nick Martinez wearing the Bronco's jacket. Moreover, later DNA retesting conclusively proved the jacket was worn by Nicholas Martinez.

135. On November 3, 2000, Lawrence was convicted of first-degree felony murder, aggravated robbery and first-degree burglary and sentenced that day to life without parole.

### iv. Post-Conviction

136. Following his conviction and sentencing, Lawrence continued to profess his innocence and advocate for his release.

137. On April 7, 2004 Lawrence appealed his conviction and judgment to the Colorado Court of Appeals.

138. The judgment was affirmed by the Colorado Court of Appeals on February 26, 2004.

139. A Petition for Certiorari was filed on April 12, 2004 and denied on July 27, 2004.

140. The final mandate from the Colorado Court of Appeals was issued on August 2, 2004.

141. On January 9, 2007 Lawrence filed with the Denver District Court, a *pro se* Petition for Post-Conviction relief under Crim. P. Rule 35(c).

142. On June 23, 2013, with the assistance of post-conviction counsel Lisa A. Polansky Esq., Lawrence filed a supplemental petition for post-conviction relief pursuant to Crim. P. Rule 35(c)(03).

143. The Petition discussed in great detail not only constitutional violations but proof of Lawrence's actual innocence. *See Id.*

144. The petition included an Affidavit by Investigator Gina Brovege, which detailed an interview she had with co-defendant Nicholas Martinez. *See* **Exhibit H,** *Affidavit of Gina Brovege.* As the Affidavit makes clear, Nicholas Martinez confirmed that he met Lawrence for the first time **after** he stole Emily Johnson's Lexus. *Id.* Nicholas confirms that Freddie Torres, Lawrence's older brother, was with Nick Martinez when the Lexus flipped into a ditch. *Id.* Nicholas admitted to being the owner of the Bronco's jacket that was attributed to Lawrence at trial. *Id.* Most astounding, Nicholas asserts that **none** of the statements in Lawrence's videotaped interrogation were accurate. *Id.*

145. Moreover, on May 14, 2014, forensic evaluator Jane Cleveland Psy. D. evaluated Lawrence and all relevant documents and reports related to his case and concluded that: "[t]he information obtained and reviewed during this evaluation raise significant concerns that Lorenzo likely had significant deficits in his cognitive capacities and neurodevelopment that suggest he had competence related deficits at the time of his legal proceedings in 2000." *See* **Exhibit B,** *supra.*

146. Following the filing of the supplemental petition, the Denver District Attorney's

office, under the supervision and direction of District Attorney Mitch Morrissey, continued to deny and refuse to investigate Lawrence's claims of innocence.

147. It is now known, that District Attorney Mitch Morrissey refused to, or inadequately, investigated over 5,000 other pleas of innocence during this time while he jointly headed the Justice Review Project with the Colorado Attorney General, a joint, federally funded effort between the Colorado Attorney General's Office and the Denver District Attorney's Office between 2010 and 2014. The project was granted federal funds of $2.6 million.

148. The Justice Review Project launched in 2010, the same year Larimer County and the city of Fort Collins agreed to pay DNA exoneree Timothy Masters a $10 million settlement for police misconduct resulting in his wrongful conviction for Homicide.

149. Legal interns and staff in both the Attorney General and District Attorney's Office were supposed to read court documents, trial transcripts and court decisions in the nearly 5,000 eligible cases for review. Their reports were then reviewed by a supervising attorney to decide whether a case merited presentation to the "Case Review Panel."

150. Out of over 5,000 cases eligible for review, prosecutors running the project deemed only one case, Robert Dewey, to be worthy of testing. The Attorney General and District Attorney's Offices weeded out all cases in which defendants admitted any sort of involvement. That excluded from consideration cases where confessions may have been coerced or later withdrawn like Lawrence's case. Reviewers also disqualified cases in which there was no DNA evidence, or in which evidence previously had been DNA tested also like Lawrence's case. Records show many cases also were disqualified because reviewers, many legal interns, arbitrarily decided that DNA could not exonerate them.

151.  A lawsuit was filed against Attorney General Cynthia Coffman and District Attorney Mitch Morrissey asserting that they were hiding the Justice Review Project's investigative records that revealed cases that were rejected but warranted DNA testing. The suit requests the Court to order Attorney General Cynthia Coffman and District Attorney Mitch Morrissey to turn over the records of all cases rejected by the project. The case is still pending.

152. In this case, Chief Deputy District Attorney Bonnie Benedetti, under the supervision of Mitch Morrissey adamantly denied Lawrence Montoya's innocence, despite overwhelming evidence of such, refused to cooperate in his post-conviction investigation, refused to consent to DNA testing, and inadequately reviewed and considered the evidence presented to her.

153.  Specifically, the Justice Review Project reviewed Lawrence's case and claimed that they did not believe that DNA testing would help show his innocence, despite the fact that the only  two pieces of "evidence" linking Lawrence to the murder of Emily Johnson was the Bronco's jacket that was found at the scene and which two witnesses claimed to have seen him wearing in the past and a shoe belong to Luke Anaya that matched a shoe print at Emily Johnson's house; all excellent candidates for DNA testing.

154.  As for DNA evidence, in July 2013, after refusal by the Justice Review Project to do so, Lawrence petitioned the Court to release certain items from his trial so that they could be tested for DNA evidence by the Colorado Bureau of Investigation.  Inexplicably, the District Attorney opposed Lawrence's request.  Over the prosecution's objection, the Court ordered the DNA testing, finding that "favorable results of the DNA testing will potentially demonstrate [Lawrence's] actual innocence."  Those DNA test results—which the District Attorney had in its possession since March 2014—were indeed favorable.  In fact, the test results eviscerated the only two physical pieces of evidence used to convict Lawrence at trial, the shoes that were

conclusively shown to belong to Luke Anaya, as well as the Bronco's jacket, which was conclusively proven to belong to Nicholas Martinez, each of which were were central to Lawrence's request for post-conviction relief. *See* **Exhibit I,** DNA Report.

155.   Additionally, on or about June 17, 2014, perpetuating the conspiracy, the District Attorney's Office, on their website, made a posting regarding Lawrence's case, under the heading "Setting the Record Straight," where the Office claimed that Lawrence was not "wrongfully convicted."   In public statements, the District Attorney's Office has also suggested that Lawrence is somehow to blame for his original conviction because he refused to accept the plea offer advanced to him prior to his trial underscores one of the fundamental problems with our criminal justice system.

156.   Equally important, in 2014 after Lawrence's exoneration, the District Attorney repeatedly and publicly characterized accusations against Mr. Montoya which were incorrect, stating that they *always* knew Lawrence was the "lookout."   Contrary to the District Attorney's statements, Lawrence was <u>not</u> merely prosecuted as a "lookout."   Rather, he was charged and prosecuted as an active participant, as is clear from the District Attorney's closing argument:

> "Lorenzo Montoya was in that house, and while he was inside that house, he burglarized Emily Johnson, committed an aggravated robbery against Emily Johnson, committed two different types of murder against Emily Johnson, and then stole her car."

The trial transcripts are public record.   This is yet another example of the manipulation and fabrication of information to suit the defendants' and the District Attorney's agendas.

157.   A wrongful conviction occurs when someone is convicted of a crime he or she is innocent of committing.   Lawrence is innocent of Felony Murder and the underlying charges he

was convicted of at trial.  All of the original charges against Lawrence—for which he served more than 13 years in prison—have now been dismissed.

> ### v.  Dismissal

158.  On June 16, 2014, all the charges against Lawrence for Felony Murder, §18-3-102(a)(b), Aggravated Robbery, §18-4-302(1)(a), First Degree Burglary, §18-4-202, and Aggravated Motor Vehicle Theft §18-4-409(2)(e) were all dismissed.

159.  Lawrence spent 13 years, 7 months, and 13 days in jail for a crime he did not commit.

## E.  DEFENDANTS' UNCONSTITUTIONAL MANIPULATION AND FABRICATION OF EVIDENCE

160.  As the specific facts alleged above show, the defendant police officers and detectives fabricated and manipulated evidence in violation of Lawrence's Constitutional Due Process rights.

161.  The defendants purposely ignored facts that demonstrated Lawrence's innocence and manipulated evidence in order to show guilt.  The Defendants favored their collective predetermined attributions of guilt and the speedy and politically expedient accusation that it was Lawrence who had participated in the murder of Emily Johnson.

162.  As detailed throughout this complaint, the unreliability of the wrongful methods utilized by the defendants to elicit the false statements from Lawrence concerning his alleged involvement in the murder of Emily Johnson was also clearly demonstrated by: (a) the inconsistencies in Lawrence's statement with the actual evidence from the crime scene; (b) the fact that Gilliam Juvenile Detention Facility records clearly indicate that Matthew Hernandez and Lawrence were never held in the same cell as Mr. Hernandez testified to; (c) the later testing

39

of DNA conclusively proving the Bronco's jacket belonged to Nicholas Martinez and the shoes belonged to Luke Anaya (**Exhibit I**), and (d) the statements by Nicholas Montoya to Investigator Gina Brovege (**Exhibit H**)– all totally undermining and negating Lawrence's false statements.

163. As detailed throughout this complaint, the Defendants lacked any evidence whatsoever, that Lawrence was involved in the assault of Emily Johnson prior to January 10, 2000 when they took him into custody and coerced him to confess. Subsequent to his arrest the Defendants fabricated and manipulated evidence fit their preconceived notions of guilt.

164. As detailed throughout this complaint, the defendants had an obligation to fairly investigate and completely failed to do so. The Defendants failed to adequately investigate the claims by Matthew Hernandez that Lawrence confessed to him notwithstanding three separate statements given prior to trial that all contradicted each other. The Defendants also took him at his word, that Matthew Hernandez was actually in the same cell as Lawrence without confirming such; an easily verifiable assertion that they simply did not bother to confirm. The defendants purposely ignored the fact that despite the extreme violence and massive amount of blood and forensic evidence at the crime scene, there was absolutely no physical evidence linking Lawrence to the crime. The defendants purposely ignored inconsistencies in Lawrence's false confession, as well as inconsistencies between Lawrence's false confession and Mr. Hernandez's recitation of Lawrence's alleged confession to him. The defendants purposely ignore the fact that Nicholas Martinez admits to stealing the Lexus, however, he never implicated Lawrence in the theft of the car. Defendant fabricated evidence in the form of testimony claiming that Tomasita Martinez informed him that the room in the basement was Lawrence's and the shoes on the bed were his. In addition, the defendants failed to test the Bronco's jacket for DNA which

would have conclusively proven that it was owned by Nicholas Martinez and thus discrediting the testimony of two witnesses that stated otherwise.

165.  Instead defendants, who had already held a press conference on January 11, 2000 stating that they had solved the Emily Johnson murder and arrested the individuals response, did everything they could to manipulate the physical evidence to bolster Matthew Hernandez's claims and version of the events.  Which, as discussed above, do not match Lawrence's alleged confession on major points.

166. The Defendants failed to properly, fairly and honestly investigate the accusations against Lawrence, violated their obligations to act as neutral police and prosecutors, and violated Lawrence's constitutional rights to due process of law.  Contrary to those obligations, and contributing to defendants' liability to Lawrence, defendant City of Denver through its agencies Denver Police Department and Denver District Attorney's Office had a policy and practice of failing to continue to investigate despite lack of evidence or exculpatory evidence which came to light once they had settled on their intended suspect of a crime.

167. The Defendants, in failing to fairly and properly investigate and in manipulating evidence to fit their preconceived notions of guilt, deprived Lawrence of due process.

168.  An honest appraisal of the substantial evidence of Lawrence's innocence detailed above would have resulted in a dismissal of the charges prior to any trial.

### F.  THE UNCONSTITUTIONAL AND UNLAWFUL EFFORTS TO PERPETUATE THE FALSE CONFESSION

169. The false statements elicited from Lawrence were used as the sole factual basis for an arrest warrant affidavit, were used at the Preliminary Hearing as the principal basis for Judge

Manzanares' probable cause determination, and were admitted, in part, into evidence at Lawrence's trial and were critical to his conviction.

170. As shown by the factual statements recited above regarding the illegal interrogation of Lawrence, and the false reports, for example the arrest warrant affidavit, false statements and false testimony of the various Defendant police officers and detectives, those defendants intentionally or in reckless disregard for the truth and of their constitutional obligations and of constitutional due process requirements, thereby perpetuated and reinforced those false reports, statements and confession through the underlying investigation, prosecution and criminal proceeding.


## G.  PLAINTIFF WAS INJURED BY DEFENDANTS' UNLAWFUL AND UNCONSTITUTIONAL ACTS

171. During the course of the trial, news media were permitted, by court order, to videotape and record the trial proceedings which were aired on television daily.

172. During the course of pretrial and trial, numerous news articles were written about Lawrence that placed him in a disparaging light and falsely stated that he was, among other things, a murderer.

173. Lawrence was taken away from his mother and siblings, relatives, and his friends at the age of 14.

174. Because of the Defendants' misconduct, Lawrence has missed out not only on the lives of his family and friends, but on his own childhood and life. He has returned home to estranged relationships- changed or lost by years away.

175. Lawrence was stripped of his teenage years and adulthood; he was deprived the

42

opportunities to gain an education, to develop a career, to pursue his interests and passions, and he was forced to delay starting a family of his own. Lawrence has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

176.  Over the course of the 13 years, 7 months, and 13 days Lawrence spent incarcerated, he was transferred to numerous different maximum security facilities, threatened with rape and molestation by inmates, and was placed in solitary confinement for over four years.

177.  While in solitary confinement, Lawrence was permitted only one hour a day outside of his cell, was not allowed any human interaction that was not behind glass or bars, and was locked inside the shower and left inside until the guards wanted to let him out, sometimes for hours at a time.

178.  Because Lawrence had been sentenced to life in prison without parole, he feared that he would die alone inside the prison walls.

179.  Over the course of the 13 years, 7 months, and 13 days Lawrence spent incarcerated, he experienced severe and permanent mental distress and turmoil, anxiety, depression, insomnia, embarrassment, and humiliation and sought substantial mental health treatment from the Department of Corrections medical and mental health staff.[6]

180.  The emotional distress stemming from Lawrence's coercive interrogation, false imprisonment and arrest, and malicious prosecution continue to this day and will persist long into the future.

---

[6] These records are voluminous and are therefore incorporated in this complaint by reference an available upon request.

## H.  SOCIAL SCIENCE SHOWS THAT THE REID TECHNIQUES ARE INHERENTLY COERCIVE

181.  When they interrogated Lawrence, Defendants Vigil, Martinez, Priest and Officers John Does used interrogation methods similar to those commonly known as the REID Technique.  Specifically they used classic methods of *minimization*, *maximization*, *promises of leniency*, *false evidence ploy*, *manipulation*, *threats*, and other coercive methods.

182.  These types of techniques are known to be leading factors in false confessions.

183.  Trainings based on, or in accordance with, the REID technique continues to be offered to members of the Denver Police Department.  For example, a REID training is scheduled at the Denver Sheriff's Department on July 12-14, 2016 and September 20-23, 2016.

184.  Defendant Vigil claims to be trained in interrogation techniques and also claims to train other officers in interrogation techniques. *See* October 26, 2000 Trial Transcript at 48:23-25, 49:1-2, 49:5-9. As the ranking officer in the Denver Police Department Homicide Unit, he trained his subordinates, including Defendants Vigil and Martinez, and/or guided them in interrogation techniques.

185.  As is clear in the video recording of Lawrence's interrogation, the techniques used by the Defendant officers were clearly coercive.

186.  The REID technique is named after John R. Reid who, along with Fred Inbau, developed the technique during the 1940s and published the first edition of their manual in 1962.

187.  According to the methods of REID, investigators are advised to isolate the suspect in a small private room, which increases his anxiety and incentive to escape. *See*  Kassin. S.M., Drizin, S. A., Grisso, T., Gudjonsson, G.H., Leo, R.A., & Redlich, A.D. (2010). Police-induced

confessions: Risk factors and recommendations. *Law and Human Behavior 34,* 3-38.  This

happened in Lawrence's case.

188.  The REID technique then involves closely monitoring a suspect to interpret

nonverbal behavior and demeanor to determine at the outset if the suspect is guilty, a technique

that social science has found to be ineffective,

> The social science research literature is replete with case examples of innocent
> suspects who were coercively interrogated (and ultimately confessed falsely) only
> after they were misclassified as guilty because detectives misinterpreted their
> nonverbal behavior and demeanor and thereafter erroneously presumed their guilt.

*See* Lassiter, G.D., & Meissner, C. A. (Eds.). (2010). *Police interrogations and false*

*confessions: Current research, practice, and policy recommendations.* Washington, DC:

American Psychological Association, p. 15.

> Once detectives misclassify an innocent person as a guilty suspect, they will often
> subject him or her to an accusatorial interrogation. This is because getting a
> confession becomes particularly important when there is no other evidence
> against the suspect, and typically no credible evidence exists against an innocent,
> but misclassified suspect.

*Id.* at p. 17.  This happened in Lawrence's case, as the Defendants routinely commented on

Lawrence's posture and his crying in accordance with how he was not telling the truth.

189. After making a preliminary nonverbal assessment of the suspect, interrogators are

then taught to question the suspect with the goal of rendering a confession, and not necessarily

finding out the truth.

190.  To do this, an interrogator employs both negative and positive incentives to get the

suspect to confess. The interrogator confronts the suspect with a technique known as

"Maximization" which includes accusations of guilt, assertions that may be bolstered by evidence, real or manufactured, and refusals to accept alibis or denials. The interrogator then offers sympathy and moral justification, introducing "themes" that minimize the crime and lead suspects to see confession as an expedient means of escape, a technique known as "Minimization." These techniques were used throughout Lawrence's interrogation.

191. The REID Technique adamantly applauds the use of false evidence ploy if it will assist in rendering a confession. In this case, the Defendants repeatedly suggested that Lawrence's hair, fingerprints, and shoeprints were found at the scene, which was a lie.

192. The REID techniques have been found effective in producing confessions, regardless of whether they are truthful or not. The reason being that the interrogation techniques cumulatively causes a suspect to perceive that he or she has no choice but to comply with the interrogator's demand." (p.17). *See* Lassiter et. al. (2010), *supra.* "When suspects perceive there is no choice but to comply, their resulting compliance and confession are, by definition, involuntary and the product of coercion," (p. 18). *Id.*

193. This happened during Lawrence's interrogation. As detailed above, Lawrence was told on numerous occasions that the Defendants were in possession of hair, fiber, fingerprint, and shoe print evidence that put Lawrence at the scene of the crime. He was also told numerous times that he would not be going home that night and that he faced life in prison. Lawrence was also told that a polygraph would be administered but was never provided one. It was clear after Lawrence was confronted by false evidence that his shoe prints were at the scene of the crime, he began to acquiesce to the Defendants' demands.

# I.  THE PSYCHOLOGICAL IMPACT OF INTERROGATIONS ON JUVENILES

194.  Researchers who have attended the REID training note that no special instructions are given for interrogating youths; rather, the method advocated is to follow that for interrogating adults. *See*  Meyer, J. R., Owen, J. A., & Reppucci, N.D. (2005, March). *The Effect of Coercive and Deceptive Interrogation Techniques on the Reliability of Young Suspects' Reports,* Paper presented at a meeting of the American Psychology and Law Society, La Jolla, CA.   In fact, the REID training manual states that when interrogating a juvenile, "the same general rules prevail as for adults." *See* Inbau, F.E., Reid, J.E., Buckley, J. P., & Jayne, B. C. (2001). *Criminal Interrogation and Confessions* (4th ed.).

195.  At the time of his interrogation, Lawrence was not only fourteen years old, but he also suffered from emotional and learning disabilities due to deficits in written language, math skills, communication skills, decision making/problem solving skills and inter/intra personal skills.

196.  Defendants Vigil, Martinez, and Priest completely disregard Lawrence's very young age and his mental deficiencies.  It is clear from the videotaped interrogation that they entered the interrogation room with one goal in mind – to get a confession no matter what.

197.  Social science and research shows that juveniles are especially at risk for involuntary and false confessions in the interrogation room.  *See* Inbau et al. (2004), *supra.*

198.  In studies of wrongful convictions, false convictions are most common among young exonerees.  For example, in a descriptive study of 328 exonerations cases, 44% of the juvenile exonerees falsely confessed, compared with 13% of the adults and among the youngest juveniles (aged 12 to 15 years), 75% falsely confessed.  *See* Gross, S., Jacoby, K., Matheson, D.,

Montgomery, n., & Patel, S. (2005).  Exonerations in the United States, 1989 through 2003. *Journal of Criminal Law & Criminology, 95* , 523-553.

199.  Basic research has shown that children and adolescents are cognitively and psychosocially less mature than adults-- and that this immaturity manifests in impulsive decision making, and decreased ability to consider long-term consequences. *See* Kassin et. al. (2010), *supra.*

200. The link between allocation of decision-making capabilities to the less advanced sections of the brain and increased risk taking is also well documented in juveniles. "[P]atterns of development in the prefrontal cortex, which is active during the performance of complicated tasks involving long-term planning and judgment and decision making, suggest that these higher order cognitive capacities may be immature well into late adolescence."  Laurence  Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence*, 58 Am. Psychologist 1009, 1013 (2003).

201.  Children's and adolescent's suggestibility with authority figures might make them less likely than adults to correct misinformation presented by police, which means that they might be more vulnerable to the presentation of false evidence.  *See* Owen-Kostelnik, J., Reppucci, N. D., & Meyer, J.R. (2006)/ Testimony and Interrogation of Minors: Assumptions about Maturity and Morality. *American Psychologist. 61,* 286-304.

202.  There is a strong consensus among psychologists, legal scholars, and practitioners that juveniles and individuals with cognitive impairments or psychological disorders are particularly susceptible to false confessions under pressure. *Id.*

203. In 1962, the Court in *Gallegos v. Colorado*, ruled,

> "[a] 14-year-old boy, no matter how sophisticated… is not equal to
> the police in knowledge and understanding… A lawyer or an adult
> relative or friend could have given the petitioner the protection
> which his own immaturity could not… Without some adult
> protection against the inequity a 14 year old boy would not be able
> to know, let alone assert, such constitutional rights as he had." (p.
> 54).

204.  The Defendants capitalized on Lawrence's' age, immaturity, learning disability, and petite size to psychologically manipulate, intimidate and coerce him.

## J.  THE LEGAL IMPACT OF CONFESSION EVIDENCE

205.  The U.S. Supreme Court has recognized that confession evidence is perhaps the most powerful evidence of guilt in Court (*Miranda v. Arizona*, 384 U.S. 436 (1966)) - so powerful, in fact, that "introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained." *Colorado v. Connelly*, 479 U.S. 157 (1986).

206.  In actual cases, when defendants who had falsely confessed pled not guilty and proceeded to trial, jury conviction rates ranged from 73%.  *See* Leo, R. A., & Ofshe, R. J. (1998) The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation. *Journal of Criminal Law and Criminology, 88*, 429-49) to 81% (Drizin et al. (2004), *supra*).  Confession evidence is "inherently prejudicial and highly damaging to a defendant, even if it is the product of coercive interrogation, even if it is unsupported by no other evidence, and even if it is ultimately proven false beyond any reasonable doubt." (p, 959). *See* Drizin et al. (2004), *supra*

207.  In Lawrence's case, had the Defendants not coerced him into making false

incriminating statements, there would not have been a basis for arrest or prosecution and he would have not spent his entire teenage and early adult years behind bars for a crime he did not commit.

### K.  CONSPIRACY

208. The Defendants acted in concert, agreeing to violate Lawrence's federal constitutional rights by fabricating evidence including, but not limited to, Lawrence's coerced statements, perpetuating the false evidence leading to Lawrence's malicious prosecution, failing to properly and adequately investigate alternative suspects, DNA evidence, the credibility of the cooperating witness, and evidence of Lawrence's innocence.

209. As discussed throughout this complaint, Defendants Vigil, Martinez, and Priest conspired together to fabricate evidence by coercing Lawrence into making false statements by using coercive tactics such as *minimization, maximization, false evidence ploy, manipulation, promises of leniency,* and *threats. See* **Exhibit D.** The Defendants purposefully worked together to orchestrate these coercive tactics to maximize its effect on overboring Lawrence's free will. The defendants would strategically come in and out of the room at purposeful times indicating that new evidence, known to be false, had just been found or divulged from another witness.  At all times, one of the defendants would be outside the interview room watching Lawrence's interrogation from a two-way window. Each defendants was thus aware at all times about what coercive methods were being used and how Lawrence was responding to them. The defendants then worked together to perpetuate the use of the false evidence in Lawrence's prosecution.

210.  As discussed throughout this complaint, Defendant Schneider and Vigil conspired to author and sign off on an arrest affidavit (**Exhibit E)** that contained patently false and

misleading statements that were contradictory to Lawrence's false confession. Lawrence's false confession, procured by the conspiratorial actions of Defendants Vigil, Martinez, and Priest were the only evidence referenced in the arrest affidavit and did not mention any independent evidence, such as hair, fiber, fingerprint, shoe print, DNA, or witness statements, linking Lawrence to the assault of Emily Johnson.

211. Defendant Police Chief Thomas Sanchez supervised Defendants Vigil, Martinez, Priest and Schneider. This case was high profile and highly publicized. Defendant Sanchez was aware of the on going investigation and participated in at least one press conference on January 11, 2000 with Defendant Priest. At this press conference, Defendant Sanchez commented on the investigation, the arrests that had been made and discounted alternate suspects. Defendant Sanchez knew and acquiesced to the individual officers' actions and did not question the conduct, actions, or methods used in their investigation and reporting. After Lawrence's arrest, the Defendants had stopped investigation into alternative suspects, notably Luke Anaya, Freddie Torres, and Anthony Barela who were never arrested and Lloyd Aragon, whose case was ultimately dismissed. Moreover, there were numerous individuals at club *Liquid* the same time as Emily Johnson, principally Marcus Armstrong, and Tommy Armstrong who were never interviewed. By discounting alternative suspects to the press, Defendant Sanchez was signaling his own directive to the Defendant officers to stop further investigation which they agreed to do.

## L. LIABILITY OF INDIVIDUAL DEFENDANTS

212. All of the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers, supervisors, and employees, acting within the scope of their employment.

213. The individual defendants, in committing the aforesaid conspiracies, acts and omissions to act, were deliberately indifferent to, and in reckless disregard of, Lawrence's rights and thereby caused actual injuries to Lawrence.

214. The defendants, in committing the aforesaid acts, were acting as joint tortfeasors.

215. As a direct and proximate result of the conspiracies, acts and omissions to act described above, the individual defendants subjected the adolescent Lawrence to loss of liberty and other deprivations of constitutional rights, including, but not limited to, deprivation of the rights to substantive due process, pain and suffering, severe and permanent emotional distress, shame, humiliation, indignity, damage to reputation, and loss of earnings.

## M. THE MUNICIPAL LIABILITY – A PATTERN AND PRACTICE OF VIOLATION OF THE CONSTITUTION

### i. For the Actions of the Police Defendants Pursuant to Policies and Practices in Existence at the Time of the Emily Johnson Murder

216. All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of Denver which were in existence at the time of the conduct described herein and were engaged in with the full knowledge, consent, cooperation and under the supervisory authority of the defendant City and its agency, the Denver Police Department.

217. All of the above-described acts were done by the Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Lawrence's federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent official custom, practice, decision, policy, and supervision of the Defendant City and Defendant Sanchez acting under the color of state law.

218.  Defendant City and the Denver Police Department, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the police defendant's wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

219.  The actions of the police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegations without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons.

220.  The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the Denver Police Department and the City, including, without limitation Defendant Sanchez and his predecessor in interest, for a substantial period of time.

221.  Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officers and officials of the Denver Police Department and the City and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs and practices upon the constitutional right of person in the City of Denver.

222.  The City's policies and practices in existence at the time of the conduct complained of herein, which caused Lawrence's injuries herein include, *inter alia*, the following:

a. The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

b. The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful arrest and search warrant application affirmations and accusatory instruments;

c. The failure to properly supervise, train, instruct, and discipline police officers with regard to adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

d. The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, particularly juveniles, and to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions, including, but not limited to:

> i. The failure to conduct sufficient training or supervision with respect to the constitutional limitations on coercing involuntary statements;
>
> ii. By failing to adequately punish unconstitutional coercion of involuntary statements;
>
> iii. Tolerating the use of unconstitutional coercive tactics such as the REID techniques;
>
> iv. The failure to properly or neutrally investigate citizen complaints on coercive interrogation tactics; and

v.  By allowing and tolerating the use of manufactured evidence to obtain arrest and search warrants;

vi.  By allowing, tolerating and encouraging the manipulation of evidence to guarantee convictions no matter how slight the evidence of guilt it; and

e.  Encouraging and/or failing to discipline officers for "testifying" and/or fabricating false evidence and/or manipulating evidence to bring about the police officer's preconceived perceptions or determinations of guilt, including, but not limited to, such perceptions and/or determinations influenced by racial prejudice and/or ethnic bias; and

f.  The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stores, *inter alia*, in sworn testimony, official reports, in statements to Internal Affairs, Civilian Complaint Review Board,  and in public statements designed to cover for and/or falsely exonerate accused police officers.

223.  The aforementioned City policies, practices and customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the broad-sweeping police misconduct detailed herein.  The police officer defendants subjected Lawrence to coercive interrogations and deprived him of his right to due process of the law by fabricating and/or manipulating evidence.  The officers represent the corrupt policies and practices of various investigative units of the Denver Police Department.

224.  The City policies, practices and customs in existence on January 1, 2000 failed to supervise, train, instruct and discipline police officers and encouraging their misconduct are further evidence, *inter alia*, by the following:

a.   Defendant Sanchez, the Denver Police Department Chief, and chief architect of the policies and practices of the Denver Police Department, was forced to resign after just 18 months of service due to several critical constitutional rights violations occurred under his leadership including but not limited to Fourth Amendment violations, wrongful death, use of excessive force, and as in this case, malicious prosecution and coercion of involuntary statements.

b.  During his 18 months of service, Defendant Sanchez supervised and had direct knowledge of several prominent incidences of civil rights violations including, but not limited to, the killing of Ismael Mena, a 45-year-old Mexican immigrant who was shot to death by police officers during a raid on what turned out to be the wrong house; he authorized the use of tear gas on civilians in a crowd after the Broncos won the super bowl; supervised uses of excessive force; and permitted continued training and use of coercive interrogation methods.

c. All Defendants, including Defendant Sanchez, debriefed each other and had conversations and meetings about the case throughout the investigation and prosecution.   Moreover, Defendant applauded the officers actions during the January 11, 2000 news conference in which Defendant Priest was present.

d. On the day of Lawrence's arrest, January 11, 2000, the defendants, specifically Defendants Sanchez and Priest held a press conference at the Denver Police Department headquarters updating the public on the case and claiming that the

56

case was solved with the arrest of Lawrence Montoya, Nicholas Martinez and Lloyd Martinez (J.R.).

225. Upon information and belief, Denver Police Officers in general, and the defendant police officers in this case specifically, received no training regarding how to conduct investigations in a manner that will prevent false statements or confessions, particularly with respect to interrogations of juveniles, and, in fact, are indoctrinated in the use of isolation, false promises, lying about the existence of inculpatory evidence, threats and intimidation.

226. Upon information and belief, defendant City and its agency, the Denver Police Department, failed to effectively screen, hire, train, supervise and discipline their police officers, including the defendant police officers herein, for racial bias, lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing the defendant police officers to be in a position to elicit false confessions from the adolescent plaintiffs and to fabricate evidence sufficient to secure convictions in violation of federal and state constitutional rights, and/or to permit these actions to take place with those officers' knowledge and consent.

227. Upon information and belief, the defendant police officers herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to, or should have given notice to defendant City and its agency, the Denver Police Department, that the defendant police officers herein were likely to engage in conduct that would violate the civil and constitutional right of the public, such as the conduct complained of by the plaintiff herein.

228. As a result of the foregoing conscious policies, practices, customs and/or usages, defendant City and its agency, the Denver Police Department, permitted and allowed the employment and retention of individuals as police officers whose individual circumstances place

the public or segments thereof at substantial risk of being the victims of racially motivated behavior and of preconceived determinations of guilt.

229.  The plaintiffs' injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowing and repeated failure of the Defendant City and the Denver Police Department to properly supervise, train and discipline their police officers.

230.  Defendant City knew or should have known that the acts alleged herein would deprive plaintiffs of their rights, in violation of the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution, including, without limitation, Lawrence's freedom from deprivation of liberty without due process of the law.

231.  The defendant City is directly liable and responsible for the acts of the defendant officers because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the Denver Police Department, and to require compliance with the Constitution of the United States.

> **ii.  For the Actions of Police Chief Tom Sanchez, District Attorney Mitchell Morrissey and Assistant District Attorney Bonnie Bernadetti in Condoning and Ratifying the Wrongful Conduct of the Police Officer Defendants Herein**

232.  In addition to their efforts to suppress the truth at the time of the prosecutions, the defendants have continued to actively conspire to propound the belief that Lawrence was and is in fact guilty of the crimes they have charged him with, notwithstanding his exoneration of the murder of Emily Johnson, the Gilliam Juvenile Detention Facility  records showing that Matthew

Hernandez and Lawrence were never in the same cell as Hernandez testified, the DNA evidence showing that the Bronco's jacket belonged to Nicholas Martinez and the shoe matching the prints at the scene belonged to Luke Anaya, the statements from Nick Martinez made to investigator Gina Broverage that Lawrence was not present at Emily Johnson's murder, and that the defendants engaged in flagrant misconduct in the course of their investigation and prosecution of the plaintiff.

233.  Overt acts in furtherance of this conspiracy include, *inter alia*, continuing statements by District Attorney Mitch Morrissey and Assistant District Attorney Bonnie Benadetti, that Lawrence committed the crimes he was charged with, refusing to accept his case for DNA re-testing under the Justice Review Project and even objecting to Lawrence application to the Court for DNA testing, which as detailed above in paragraphs 146-157 was ultimately granted and proved to result in exonerating evidence.

### N.  LIABILITY OF POLICE DEPARTMENT SUPERVISORS

234.  All of the acts by the police defendants involved with the investigation and prosecution of Lawrence were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/or cooperation of the supervisory authority of former Police Chief Tom Sanchez and Lieutenant Jonathan Priest.

235.  These Supervisory Police Defendants were well aware that police officers, including, without limitation, the individual detectives, lieutenants, sergeants and officers involved in the Emily Johnson case, unconstitutionally and unlawfully prosecuted and continued to prosecute Lawrence through fabricated and manipulated allegations without adequate basis in fact.

236.  These Supervisory Police Defendants had not properly trained police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead acquiesced and ratified these unconstitutional and unlawful practices through their callous, reckless and/or deliberate indifference to the effect of these practices upon the constitutional rights of persons in the City of Denver, including Lawrence.

237.  Without limiting the foregoing, the Supervisory Police Defendants, acting jointly and severally, did the following:

e.  The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

f.  The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful arrest and search warrant application affirmations and accusatory instruments;

g.  The failure to properly supervise, train, instruct, and discipline police officers with regard to adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

h.  The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, particularly juveniles, and to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions, including, but not limited to:

i. The failure to conduct sufficient training or supervision with respect to the constitutional limitations on coercing involuntary statements;

ii. The failure to adequately punish unconstitutional coercion of involuntary statements;

iii. Tolerating the use of unconstitutional coercive tactics such as the REID technique;

iv. The failure to properly or neutrally investigate citizen complaints on coercive interrogation tactics; and

v. By allowing and tolerating the use of manufactured evidence to obtain arrest and search warrants;

vi. By allowing, tolerating and encouraging the manipulation of evidence to guarantee convictions no matter how slight the evidence of guilt it; and

e. Encouraging and/or failing to discipline officers for "testifying" and/or fabricating false evidence and/or manipulating evidence to bring about the police officer's preconceived perceptions or determinations of guilt, including, but not limited to, such perceptions and/or determinations influenced by racial prejudice and/or ethnic bias; and

f. The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stores, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board

and the Internal Affairs Bureau, Civilian Complaint Review Board,  and in public statements designed to cover for and/or falsely exonerate accused police officers.

238.  The Supervisory Police Defendants are rendered directly liable and responsible for the acts of the defendant detectives, sergeants, lieutenants and police officers, because the Supervisory Police Defendants repeatedly and knowingly failed to properly supervise, train and discipline the police officers under their command and because the Supervisory Police Defendants repeatedly and knowingly failed to enforce the rules and regulations of the Police Department, and to require compliance with the Constitutions and law of the United States.

239.  The knowing and repeated failure of the Supervisory Police Defendants to properly supervise, train and discipline officers under their command actually caused the injuries to Lawrence alleged herein.

240.  The Supervisory Police Defendants knew or should have known that the acts alleged herein would deprive Lawrence of his rights, in violation of the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments of the United States Constitution, including, without limitation, Lawrence's freedom from deprivation of liberty without due process of the law.

241.  In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C §1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 and the Fourth, Fifth, Ninth and Fourteenth
### Amendments to the Constitution of the United States

242. The plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 270.

243. 42 U.S.C. §1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges, or immunities secured by the constitution shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress….

244. Defendants, under color of state law, subjected plaintiffs to the foregoing conspiracies, unlawful acts and omissions without due process of the law and violation of 42 U.S.C. § 1983, thereby depriving Mr. Montoya of rights, privileges and immunities secured by the Constitution and laws, including, but not limited to, those rights, privileges and immunities secured by the Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights, privileges, and immunities:

    a. Lawrence was denied his constitutional right not to be deprived of his liberty without due process of the law;

    b. Lawrence was denied his constitutional right to a fair trial;

c. Lawrence was denied his constitutional right to be free from self-incrimination, protected under the Fifth Amendment and in violation of his right to due process under the Fourteenth Amendment;

d. Lawrence was denied his constitutional right to be free from unlawful arrest without probable cause protected under the Fourth Amendment and in violation of his right to due process under the Fourteenth Amendment;

e. Lawrence was denied his constitutional right to be free from malicious prosecution protected under the Fourth Amendment and in violation of his right to due process under the Fourteenth Amendment;

245.   Any reasonable police officer, including Defendant Police Officers, knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

246.   To the extent any of these constitutional deprivations require a showing of specific intent and/or motive, the individual defendants acted intentionally, maliciously, and/or with reckless disregard for the natural and probable consequences of their actions.

247.   As a result of this violation, Plaintiff suffered injuries, including but not limited to, deprivation of liberty, severe emotional distress, pain and suffering, severe and permanent mental distress and turmoil, anxiety, depression, insomnia, embarrassment, and humiliation, and loss of income as is more fully detailed above.

248.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

249.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual

physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages. Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983-Coerced and False Confession (Fifth Amendment)

250.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

251.  At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from self-incrimination, protected under the Fifth Amendment and in violation of due process under the Fourteenth Amendment.

252.  Any reasonable police officer, including the Defendants in this case, knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

253.  The Defendants individually, jointly, and in conspiracy with one another, as well as under the color of law and within the scope of their employment, forced and coerced Lawrence to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

254.  The false statements made by Lawrence were used against him to his detriment in his criminal case. As detailed above, Lawrence's statements were the sole basis for the arrest warrant sworn to by Defendant Schneider, were the sole basis for the criminal charges lodged against him and were the contributing factor to his indictment and his conviction at trial.

255. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Lawrence's clear innocence.

256. The defendant officers' misconduct in coercing Lawrence, also directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

257. As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, specific and serious bodily, mental and emotional harm, economic injury and pain and suffering.

258. The misconduct described in this Count was undertaken pursuant to the policy and practices of the Denver Police Department in the manner described more fully above.

259. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages. Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983-Malicious Prosecution in violation of the Fourth and Fourteenth Amendments**

260. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

261.  At the time of the complained of events, Plaintiff had the clearly established constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment and in violation of due process under the Fourteenth Amendment.

262.  Any reasonable police officer, including the defendants in this case, knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

263.  The individual defendants violated Lawrence's Fourth and Fourteenth Amendment rights to be free from malicious prosecution without probable cause and without due process when they worked in concert to secure an arrest warrant based only on his coerced statements and to secure false charges against him, resulting in his unlawful confinement and prosecution.

264.  The defendants conspired and/or acted in concert to institute, prosecute and continue a criminal proceeding for Felony Murder, First Degree Aggravated Robbery, First Degree Motor Vehicle Theft and First Degree Burglary against Lawrence without probable cause.

265.  Defendants coerced Lawrence to falsely incriminate himself and then willfully, maliciously, in bad faith, and in reckless disregard of Lawrence's federally protected constitutional rights, perpetuated the use of Lawrence's false statements to secure his arrest, prosecution and conviction.

266.  The procurement of the prosecution against Lawrence for the, known to be false, allegations of Felony Murder, First Degree Aggravated Robbery, First Degree Motor Vehicle Theft and First Degree Burglary were malicious, shocking, and objectively unreasonably in light of the circumstances.

267.  The criminal proceedings against him terminated in Lawrence's favor. The District Attorney's Office dismissed all charges for which Lawrence had been arrested, indicted and prosecuted on: Felony Murder, Aggravated Robbery, First Degree Burglary and First Degree Aggravated Vehicle Theft.

268.  The acts and omissions of all individual Defendants were moving forces behind Lawrence's damages.

269.  These individual Defendants acted in concert and joint action with each other.

270.  The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

271.  Defendants are not entitled to qualified immunity for the complained of conduct.

272.  The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in its actions pertaining to Lawrence.

273.  As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## FOURTH CLAIM FOR RELIEF
## Violation of 42 U.S.C. §§ 1985 and 1986-Conspiracy to Interfere with Civil Rights

274. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

275. Any reasonable police officer, including the Defendants in this case, knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

276. Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe, conspired, combined, and agreed with each other and other individuals, not named as defendants, for the purpose of impeding, hindering, obstructing, or defeating the due course of justice, with intent to false arrest and imprison Lawrence without probable cause in violation of his Fourth and Fourteenth Amendment, coerced Lawrence into falsely incriminate himself denying him the due process of the law and his rights secured under the Fifth Amendment and perpetuating the use of his false statements to maliciously prosecute him without probable cause in violation of the Fourth and Fourteenth Amendment.

277. Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe, conspired, combined, and agreed with each other and other individuals and other institutions, including but not limited to the Denver District Attorney's Office, as well as with other law enforcement offices, and other individuals, not named as defendants, to specifically deprive Plaintiff of his right to the establishment of probable cause prior to his imprisonment, arrest, and prosecution secured under the Fourth and Fourteenth Amendment and due process of the law and his rights secured under the Fifth Amendment and and in furtherance

of that combination or agreement, Defendant City and its defendant officers acted with a specific intent to deprive Plaintiff of such rights.

278.  Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe had an understanding and/or an implicit agreement that the City would not aggressively enforce policies which purport to prohibit the violations of constitutional rights of people with whom they interact, and that any deception on the part of individual officers in attempting to cover up unconstitutional conduct will not be disciplined. This agreement between Defendant City and its individual law enforcement officers to allow such unconstitutional behavior on the part of its law enforcement officers despite explicit policies, regulations, and laws prohibiting such conduct is supported and furthered by other entities within the municipality of Denver, including but not limited to Denver's District Attorney's Office, as well as by other law enforcement officers.

279.  The actions of Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe, as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

280.  As a direct result of Defendants' unlawful conduct, Lawrence has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.  As a further result of the Defendants' unlawful conduct, Lawrence has incurred special damages in amounts to be established at trial.  Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## FIFTH CLAIM FOR RELIEF
## Violation of 42 U.S.C. §§§1983, 1985, 1986- Neglect to Prevent Conspiracy

281.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

282.  Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe had knowledge that the wrongs conspired to be done, as described in this Complaint, were about to be committed, had the power to prevent or aid in preventing the commission of those wrongs, neglected or refused to prevent the commission of those wrongs, and could have, by reasonable diligence, prevented those wrongs.

283.  Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe knew that conspiring to cover up their unconstitutional actions is illegal, but did so anyway, causing injuries, damages, and losses to Lawrence.

284.  The custom, policy, and practice of the City of Denver encourages, condones, tolerates, and ratifies the unlawful conduct by Defendants City and County of Denver, Sanchez, Martinez, Vigil, Priest, Schneider and Officers John Doe by neglecting or refusing to prevent such unlawful conduct, as described herein.

285.  This custom, policy, and practice of neglect on the part of Defendant City was the moving force behind and proximate cause of the violations to Plaintiff's rights.

286.  As a direct result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages.  Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## SIXTH CLAIM FOR RELIEF

**Violation of 42 U.S.C. §1983 - Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fifth, and Fourteenth Amendments and in violation of 42 U.S.C.§1981**
***Monell* Claim Against the Municipal Defendants**

287.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

288.   The City of Denver, through its Police Department and Police Chief, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia*:

> a.  a policy, practice and custom of manipulating and fabricating evidence;

> b.  a policy, practice and custom of failing to properly train or supervise officers in the proper techniques of investigating serious crimes, particularly when juveniles are involved;

> c.  a policy, practice and custom of using coercion, isolation, intimidation, manipulation, deceit, false promises, threats and other unlawful and improper methods to secure false confessions, particularly in matters in which juveniles were involved;

> d.  a policy, practice and custom of failing to properly discipline officers who violate the United States Constitution or law, or otherwise transgress the rights of criminal suspects during their investigation; and

> e.  a policy, practice and custom of immediate public vilification of persons accused of "high-profile" crimes with concomitant refusal to consider evidence inconsistent with that portrayal.

289.  These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of Lawrence's Constitutional violations and injuries, as set forth above.

290.  These interrelated policies, practices and customs, separately and/or together, were the direct and proximate cause of the injury and damage to Lawrence and violated his rights guaranteed by the United States Constitution.

291.  The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police misconduct like that alleged herein.

292.  The existence of these interrelated policies, practices and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized by individuals with policymaking authority in the Police Department.

293.  Defendant Sanchez, a Police Chief of the City of Denver, was, by operation of law and as a matter of fact, the final decision-maker for Denver with regards to investigative, arrest, custodial, and administrative acts, omissions, and decisions which he made or participated in, as alleged above.

294.  The City policies, practices and customs in existence on January 1, 2000 of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are further evidenced, *inter alia*, by the following:

> a.  Defendant Sanchez, the Denver Police Department Chief, and chief architect of the policies and practices of the Denver Police Department, was forced to resign after just 18 months of service due to several critical constitutional rights violations that occurred under his leadership including but not limited to Fourth

Amendment violations, wrongful death, use of excessive force, and as in this case, malicious prosecution and coercion of involuntary statements.

b. During his 18 months of service, Defendant Sanchez supervised and had direct knowledge of several prominent incidences of civil rights violations including, but not limited to, the killing of Ismael Mena, a 45-year-old Mexican immigrant who was shot to death by police officers during a raid on what turned out to be the wrong house; he authorized the use of tear gas on civilians in a crowd after the Broncos won the super bowl; supervised uses of excessive force; and permitted continued training and use of coercive interrogation methods.

c. All Defendants, including Defendant Sanchez, debriefed each other and had conversations and meetings about the case throughout the investigation and prosecution. Moreover, Defendant Sanchez applauded the officers actions during a January 11, 2000 news conference where Defendant Priest was also present.

d. On the day of Lawrence's arrest, January 11, 2000, the defendants, specifically Defendants Sanchez and Priest held a press conference at the Denver Police Department headquarters updating the public on the case and claiming that the case was solved with the arrest of Lawrence Montoya, Nicholas Martinez and Lloyd Martinez (J.R.).

e. Defendant Police Chief Thomas Sanchez supervised Defendants Vigil, Martinez, Priest, Schneider and John Doe. This case was high profile and highly publicized. Defendant Sanchez was aware of what investigative steps were taken and participated in at least one press conference on January 11, 2000 with Defendant Priest. At this press conference, Defendant Sanchez commented on the

investigation, the arrests that had been made and discounted alternate suspects. Defendant Sanchez knew and acquiesced to the individual officers' actions and did not question the conduct, actions, or methods used in their investigation and reporting. After Lawrence's arrest, the Defendants had stopped investigation into alternative suspects, notably Luke Anaya, Freddie Torres, and Anthony Barela who were never arrested and Lloyd Aragon, whose case was ultimately dismissed. Moreover, there were numerous individuals at club *Liquid* the same time as Emily Johnson, principally Marcus Armstrong and Tommy Armstrong who were never interviewed. By discounting alternative suspects to the press, Defendant Sanchez was signaling his own directive to the Defendant officers to stop further investigation which they did.

295. These acts by Defendant Sanchez directly and proximately caused the constitutional violations and injury to Lawrence, and are directly chargeable to the defendant City because of Chief Sanchez's status as final decision-maker for the City with respect to matters involving the Denver Police Department.

296. Defendants are not entitled to immunity for the complained of conduct.

297. Defendant Sanchez and Defendant City were, at all times relevant, policymakers for the City and County of Denver and the Denver Police Department, and in that capacity established policies, procedures, customs, and/or practices for the Denver Police Department.

298. Defendant Sanchez and Defendant City have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train

and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

299.  In light of the duties and responsibilities of those police officers that participate in arrests and preparation of police reports on alleged crimes, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

300.  The deliberate indifference to training and supervision by Defendant City and Defendant Sanchez resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and Defendant Sanchez and was the moving forces in the constitutional and federal violations complained of by Lawrence.

301.  As a direct result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages.  Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.


**PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grants:

A.  Compensatory and punitive damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount of $30,000,000, or such greater amount as may be set by a jury;

B.  Economic losses on all claims allowed by law;

C. Special damages;

D. Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988,

   including expert witness fees, on all claims allowed by law;

E. Pre- and post-judgment interest at the lawful rate; and

F. Any further relief that this court deems just and proper, and any other appropriate relief at

   law and equity.

**REQUESTS FOR A TRIAL BY JURY**

A trial by jury is hereby demanded on each and every one of the claims as pled herein.

Dated:           New York, New York
                 June 14, 2016

                                        Respectfully submitted,

                                         /s/ Jane Fisher-Byrialsen (#49133)
                                         David N. Fisher (#48253)
                                         Kaitlin F. Nares (#48419)
                                        **FISHER & BYRIALSEN, P.L.L.C.**
                                        4600 S. Syracuse Street, 9th Floor
                                        Denver, Colorado 80237
                                        T: 303-256-6345
                                        Jane@FBLaw.org
                                        David@ FBLaw.org
                                        Kaitlin@ FBLaw.org