

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO**<br>1437 Bannock Street<br>Denver, CO 80202<br>Phone: (720) 865-8301 | DATE FILED: June 4, 2016 11:02 AM<br>FILING ID: F167FCEB24D4A<br>CASE NUMBER: 2016CV32034 |
| **Plaintiff:    LAWRENCE MONTOYA also known as LORENZO MONTOYA**<br>v.<br>**Defendants:**   KURT A. METSGER, ESQ., The Law Office of Jeffrey J. Timlin, and JEFFREY J. TIMLIN, ESQ., and Law Office of Gina G. Bischofs, P.C., and REGINA BISCHOFS, ESQ. | **▲ COURT USE ONLY ▲** |
| **Attorneys for Plaintiff Lorenzo Montoya:**<br><br>LISA A. POLANSKY, ATTORNEY AT LAW, LLC, NO. 31539<br>POLANSKY LAW FIRM<br>4450 ARAPAHOE AVENUE, SUITE 100<br>BOULDER, CO 80303<br>Phone:  303-415-2583<br>Fax:      720-398-3099 | Case Number:<br><br>Div: |

## COMPLAINT AND  JURY DEMAND

Plaintiff Lawrence Montoya, also known as Lorenzo Montoya, by his attorneys, Lisa A. Polansky, Attorney at Law, LLC, or his Complaint and Jury Demand against Defendants Kurt A. Metsger, Esq., The Law Office of Jeffrey J Timlin, Jeffrey J. Timlin, Esq. and Law Office of Gina G. Bischofs, P.C., and Regina Bischofs, Esq., alleges and avers as follows:

### PARTIES, JURISDICTION AND VENUE

1.       Plaintiff, Lawrence Montoya, also known as Lorenzo Montoya ("Mr. Montoya") is an individual who resides in Larimer County, Colorado.

2.       Defendant Kurt A. Metsger, Esq. is an attorney licensed to practice in the State of Colorado who, upon information and belief, practices in the City and County of Denver, Colorado.  His law office is located in the City and County of Denver.

3.       Defendant Jeffrey J. Timlin, Esq. is an attorney licensed to practice in the State of Colorado who, upon information and belief, practices in the City and County of Denver, Colorado.  His law office of The Law Office of Jeffrey J. Timlin is located in the City and County of Denver, Colorado.

4.       Defendant Regina Gina Bischofs, Esq. is an attorney licensed to practice in the State  of Colorado who, upon information and belief, practices in the City and County of Denver, Colorado.  Her law office Law Office of Gina G. Bischofs, P.C., is located in the City and County

of Denver, Colorado.

5.      Mr. Metsger, Mr. Timlin and Ms. Bischofs, and their respective law offices, are collectively referred to as "Defense Counsel."

6.      This Court has jurisdiction over the subject matter of this action.

7.      Pursuant to C.R.C.P. 98(c), venue is proper in this county, which Mr. Montoya designates as the place of trial of this action.

## UNDERLYING FACTS AND GENERAL ALLEGATIONS

### Background Information

8.      On January 1, 2000, Emily Johnson was assaulted in her home in Denver, Colorado, and unfortunately died as a result of the injuries sustained in the assault.

9.      Ms. Johnson's vehicle was stolen from Ms. Johnson's home on January 1, 2000, after the assault.

10.     Later in the day on January 1, 2000, Mr. Montoya was standing outside his home with others when Nick Martinez, who Mr. Montoya did not know, drove up in Ms. Johnson's vehicle.  Mr. Martinez invited Mr. Montoya and the others he was with into the car, and Mr. Montoya got in the backseat.

11.     When Mr. Montoya entered the vehicle to go for a ride with the others as a passenger, he did not know that the vehicle had been stolen, and he did not know that Ms. Johnson had been assaulted and killed earlier in the day.

12.     Ms. Johnson's vehicle was found later in the day on January 1, 2000, overturned in a ditch.  When police conducted a forensic examination of the car, they lifted a partial thumbprint on the door handle of the rear driver's side door, which they later identified as Mr. Montoya's.

13.     On January 10, 2000, police brought Mr. Montoya, who was then 14 years old, to the Denver Police Department ("DPD") headquarters for questioning.  DPD detectives interrogated Mr. Montoya for over two and one-half hours in connection with the assault and death of Ms. Johnson.

14.     Mr. Montoya's mother, Mary Torres, was present for the interrogation for approximately the first forty minutes. At that point, DPD detectives asked her to leave the room and proceeded to interrogate Mr. Montoya for the remaining period of almost two full hours

outside Ms. Torres' presence.

15.     During the interrogation DPD detectives bullied and intimated Mr. Montoya when they, among other tactics, cornered him, yelled at him, threatened him, and banged the table. These bullying and intimidation tactics forced Mr. Montoya to break down and sob during the interrogation.

16.     During the interrogation, Mr. Montoya denied more than 65 times even being at Ms. Johnson's home, or having any knowledge of the circumstances of Ms. Johnson's death.

17.     Notwithstanding his repeated denials, as is common in police interrogations of youth, DPD detectives forced a false confession from Mr. Montoya after two and one-half hours of interrogation. Mr. Montoya simply succumbed to the pressure, threats, intimidation, and coercive tactics applied upon him by the DPD detectives and repeated back to the detectives their facts of Mr. Montoya's supposed involvement in Ms. Johnson's death, allegedly confessing to being at Ms. Johnson's home when she was assaulted and killed.

18.     Mr. Montoya's alleged confession was coerced, involuntary and was a false confession.

19.     Mr. Montoya was not at Ms. Johnson's home on January 1, 2000.  Mr. Montoya had no role in Ms. Johnson's assault or death.  No blood, fiber, hair, finger or palm prints of Mr. Montoya were found at Ms. Johnson's house to link Mr. Montoya to the crime.  Nor did Mr. Montoya have any role in stealing Ms. Johnson's vehicle.

20.     Based on Mr. Montoya's alleged confession, the Denver Police Department prepared an arrest warrant.  The arrest warrant included details of Mr. Montoya's alleged confession.  Mr. Montoya was arrested and charged with the crimes of First Degree Murder, Aggravated Robbery, First Degree Burglary and First Degree Aggravated Motor Vehicle Theft.

21.     In charging Mr. Montoya with Ms. Johnson's murder, DPD alleged that Mr. Montoya had been wearing a Denver Broncos jacket that was found at Ms. Johnson's house after her murder and that Mr. Montoya had been wearing shoes that matched a shoe wear impression or print police found at the crime scene.

22.     Mr. Montoya's family is indigent, and could not afford to hire private counsel to defend Mr. Montoya after had was charged.  Accordingly, Mr. Montoya received legal representation appointed by the court, with funding through Colorado's Office of Alternate Defense Counsel.  The attorneys who were appointed to represent Mr. Montoya were Mr. Metsger, Mr. Timlin and Ms. Bischofs.

23.     Mr. Montoya's case proceeded to trial in the District Court for the City and County

of Denver in October 2000.

24.     On November 3, 2000 a jury found Mr. Montoya guilty of First Degree Murder-Felony Murder, Aggravated Robbery, First Degree Burglary and First Degree Aggravated Motor Vehicle theft.

25.     On that same day, Mr. Montoya was sentenced as follows:

      Count 1, Felony Murder – Life without parole
      Count 2, Aggravated Robbery – 10 consecutive years to Count 1
      Count 3, First Degree Burglary – Merges into Count 1
      Count 4, Aggravated Motor Vehicle Theft – 4 consecutive years to Count 1

26.     The Colorado Court of Appeals affirmed Mr. Montoya's conviction on February 26, 2004.  A Petition for Certiorari was filed with the Colorado Supreme Court on April 12, 2004. That Petition was denied on July 27, 2004.  No Petition for Certiorari was filed in the United States Supreme Court.  The final mandate from the Colorado Court of Appeals was issued August 3, 2004.

27.     Mr. Montoya's case received extensive media coverage.  Indeed, Mr. Metsger maintains a link on his website, even as of the date of this Complaint, to an article covering Mr. Montoya's conviction and sentence to life without the possibility of parole.

<u>Defense Counsels' Deficient and Substandard Representation – Pre-Trial Case Workup and Investigation</u>

28.     In the investigation and pre-trial phases of Mr. Montoya's case, Defense Counsel failed to provide adequate representation to Mr. Montoya, constituting ineffective assistance of counsel and substandard practice.

29.     Defense Counsel, knowing that Mr. Montoya was a minor, knowing that Mr. Montoya was in special education class in school, and knowing that Mr. Montoya did not understand the actual circumstances regarding his case, failed to have Mr. Montoya's competency tested and failed to have Mr. Montoya evaluated by a mental health professional.  Nor did Defense Counsel obtain Mr. Montoya's school records or interview Mr. Montoya's family (or anyone else) to assess Mr. Montoya's competency.

30.     At a pre-trial hearing on June 9, 2000, the presiding judge questioned Defense Counsel as to whether any psychological, emotional, intellectual, and maturity assessment had been made of Mr. Montoya, including whether any IQ testing had been performed.  The judge stated, "I guess I'm counting on counsel to look into all those things."

4

31.     Mr. Montoya's guardian ad litem ("GAL") also raised concerns to Defense Counsel that Mr. Montoya should be evaluated for competency.

32.     Defense Counsel obtained approval from The Office of Alternate Defense Counsel to retain a psychologist, Robert Pelc, Ph.D., to evaluate Mr. Montoya for competency.

33.     Defense Counsel did not at any point have Mr. Montoya's competency to stand trial assessed by Dr. Pelc or anyone else.

34.     By the time of Mr. Montoya's trial, he had been diagnosed with a learning disability, had a Verbal IQ score of between 60-69, had a Performance IQ score of between 80-90, had auditory processing difficulties, was considered intellectually deficient and was of borderline intellectual functioning.

35.     As a consequence of his limited intellectual function, Mr. Montoya was incompetent to understand plea deals, was incompetent to make knowing decisions about the trial, including whether Mr. Montoya could knowingly waive the right to testify, and was likely incompetent to stand trial.

36.     If Defense Counsel had Mr. Montoya's competency assessed, as the court trusted them to do, as Mr. Montoya's GAL had recommended, and as they had apparently planned and sought approval to do, they would have learned that Mr. Montoya was incompetent to stand trial.

37.     Further, Defense Counsel were aware of information, notwithstanding their failure to conduct a basic investigation into Mr. Montoya's competence, that Mr. Montoya was likely incompetent to stand trial.

38.     For example, Defense Counsel were aware that on July 3, 2000, Mr. Montoya gave a handwriting sample to determine if the sample would match a letter dated May 14, 2000.  Mr. Montoya struggled so substantially in providing the sample that the police officer conducting the test told Defense Counsel's investigator that if Mr. Montoya wrote the May 14, 2000 letter, he would still be writing it on that day (July 3, 2000) due to his difficulty in writing simple words.

39.     Prior to trial, the prosecution offered Mr. Montoya a plea deal for six years imprisonment in a Colorado Youth Offender Services facility.  Defense Counsel failed to adequately inform Mr. Montoya of the consequences of rejecting the plea deal, including that, if convicted at trial, Mr. Montoya would receive a mandatory sentence of life without the possibility of parole.

40.     Additionally, by failing to have Mr. Montoya's competency assessed, Defense Counsel did not determine if Mr. Montoya was mentally capable of understanding the plea deal and of making an informed decision regarding the plea deal.  He was not.

5

41.     Defense Counsel also failed to interview several witnesses who had critical information supporting Mr. Montoya's defense. For example, Defense Counsel failed to interview David Valdez and Jennifer Valdez, who saw Mr. Montoya the night of the crime.  Mr. and Mrs. Valdez could and would have testified they did not see Mr. Montoya wearing the Denver Broncos jacket that police alleged connected Mr. Montoya to the scene of Ms. Johnson's murder. Mr. and Mrs. Valdez also could and would have corroborated Mr. Montoya's alibi.

42.     Defense Counsel further failed to interview Anthony Barela, Amanda Johns and Lee Aragon, all of whom could and would have testified that Mr. Martinez confessed to hitting Ms. Johnson with a rock and taking her car, which would have supported an alternate suspect defense.

43.     Defense Counsel additionally failed to interview the family members of Mr. Montoya's co-defendants, including the family members of Mr. Martinez.  Mr. Martinez's family members could and would have testified that the Denver Broncos jacket that prosecutors alleged tied Mr. Montoya to the scene of Ms. Johnson's murder in fact belonged to Mr. Martinez.

44.     Defense Counsel failed to appropriately investigate the details of testimony that one of Mr. Montoya's alibi witnesses was to give.  As a consequence of this failure to investigate, the prosecution impeached the witness, Robert Marquez, in the presence of the jury, to Mr. Montoya's detriment.

45.     Defense Counsel failed to test any of the physical evidence obtained from the crime scene, which would have supported an alternative suspect theory and bolstered the argument that Mr. Montoya was not present at the scene of the crime.  Without such testing, these defenses were not presented to the jury at trial.

46.     For example, Defense Counsel failed to obtain testing on the shoe imprint that allegedly linked Mr. Montoya to the scene of the crime.  As subsequent testing conducted during the post-conviction appeal process revealed, the shoe supposedly worn by Mr. Montoya that allegedly left the imprint at the scene lacked any DNA belonging to Mr. Montoya.  Had Defense Counsel had a forensic examination completed, including testing for DNA evidence, they would have known there was no match, and could have presented that defense at trial.

47.     Defense Counsel failed to conduct any investigation into whether the Denver Broncos jacket found at the scene of the crime did in fact belong to Mr. Montoya, despite Mr. Montoya's repeated protestations to his counsel that it did not.  Subsequent DNA testing revealed the Bronco's jacket did not belong to Mr. Montoya.

48.     Defense Counsel failed to consult with or retain any expert witnesses to assist in the preparation of Mr. Montoya's defense.

6

<u>Defense Counsels' Deficient and Substandard Representation - Trial</u>

49.     During trial, Defense Counsel made a number of mistakes in their representation of Mr. Montoya, thereby ineffectively assisting Mr. Montoya in violation of his rights protected by the U.S. and Colorado Constitutions and breaching their duty of care as imposed upon them by Colorado law.

50.     Ms. Johnson's murder, and Mr. Montoya's case, generated significant media coverage. In advance of trial the media reported on the contents of the arrest warrant affidavit, including Mr. Montoya's alleged confession.  During voir dire, knowing of this extensive media coverage and aware that the media had reported on Mr. Montoya's alleged confession, Defense Counsel failed to strike jurors with preconceived opinions of Mr. Montoya's guilt.  Three jurors indicated that they had seen or heard the media coverage regarding the case and would have trouble putting that information aside for trial.  Yet Defense Counsel did not question these prospective jurors regarding prejudicial media coverage during the individual voir dire sessions, did not pose any challenges for cause, and did not strike these three jurors from the panel using a peremptory challenge.

51.     The jury foreperson, Mark Meigs, reported that during the trial the media coverage was pervasive and the jurors were hounded by the press.  With the extensive media coverage, it was evident that the case was being reported daily during the trial, with detail of rulings by the trial court along with references to evidence, including Mr. Montoya's alleged confession, which had been suppressed and would not be presented at trial.  Despite this extensive media coverage, and the coverage of the suppressed confession, Defense Counsel failed to request that the jury be sequestered once impaneled.

52.     Defense Counsel did not call any expert witnesses at trial.  Additionally, as Defense Counsel failed to consult with any expert witnesses, they were not properly prepared to, and failed to, properly cross-examine the prosecution's expert witnesses during trial.

53.     The prosecution presented evidence at trial that a shoe print impression linked Mr. Montoya to the crime scene.  The shoe print matched a shoe that was found in the home of Mr. Montoya's aunt, where Mr. Montoya was residing in January 2000 (along with other males, including a cousin).

54.     Mr. Montoya did not own that shoe, and did not wear that shoe on January 1, 2000. Mr. Montoya told Defense Counsel that he had neither owned nor worn the shoe on January 1, 2000.

55.     Nevertheless, Defense Counsel failed to consult with a footwear impression expert or present expert testimony from such an expert to rebut the prosecution's crime scene evidence

regarding the shoe print impression.  Had a footwear impression expert been consulted, the prosecution's evidence would have been rebutted and discredited.

56.    Because Defense Counsel failed to consult with an appropriate footwear impression expert, they were also unprepared to, and failed to, appropriately cross-examine the prosecution's footwear impression witness.

57.    Defense Counsel did not retain an expert witness to analyze and rebut the prosecution's crime scene reconstruction expert.  Matthew Hernandez, a jailhouse snitch who alleged to have been housed with Mr. Montoya at a juvenile detention center where Mr. Montoya was held pending trial, testified for the prosecution and told the jury that Mr. Montoya admitted to the crimes while he and Mr. Montoya were detained together.

58.    Jail records obtained during the post-conviction investigation of Mr. Montoya's case revealed, however, that Mr. Hernandez was never housed in the same cell as Mr. Montoya at the juvenile detention center. But Defense Counsel failed to present any evidence at trial that Mr. Hernandez was lying about when and how Mr. Montoya allegedly confessed to him.

59.    The prosecution presented the testimony of crime scene reconstruction Lieutenant Jon Priest to bolster Mr. Hernandez's testimony.  Lieutenant Priest testified that the crime had been committed in the same manner that Mr. Hernandez alleged Mr. Montoya had described to him. The prosecution argued that Mr. Montoya's supposed confession to Mr. Hernandez was therefore credible because only someone who had been at the crime scene could have known the information Mr. Montoya allegedly disclosed to Mr. Hernandez.

60.    Even though Lieutenant Priest's testimony was flawed and filled with errors, Defense Counsel presented no rebuttal testimony, lending credibility to Mr. Hernandez's false testimony.

61.    Defense Counsel failed to adequately impeach Mr. Hernandez, who was a key witness in the prosecution's case.  Defense Counsel knew that Mr. Hernandez had a criminal/juvenile record, including crimes of moral turpitude and that Mr. Hernandez was on probation when he made the statements to the police and when he testified at trial. Yet, Defense Counsel failed to elicit this information when they cross-examined Mr. Hernandez.

62.    Defense Counsel failed to consult with a DNA expert, or call a DNA expert at trial, even though the only forensic testing performed in the case did not accord with DNA testing standards in October 2000.

63.    At trial, Defense Counsel failed to object to, and even stipulated to, the admissibility of gruesome crime scene photos that were highly prejudicial to Mr. Montoya.

8

64.     Defense Counsel also failed to object to the prosecution's request to bring the jury to the crime scene—Ms. Johnson's house—and purportedly reenact the crime. The court granted the request, and the prosecution was permitted to present Lieutenant Priest's testimony, including a purported reconstruction and reenactment of the crime, in Ms. Johnson's living room.

65.     When Mr. Montoya's post-conviction attorney's investigator interviewed Mr. Metsger about defense counsel's failure to object to the crime scene visit, Mr. Metsger said he was sure that they had in fact objected, but lost.   Mr. Metsger agreed that the crime scene visit was inflammatory and highly prejudicial to Mr. Montoya, and was a "disaster."

66.     Also in an interview with post-conviction counsel's investigator, Mr. Meigs described the crime scene visit as pivotal to the jury's decision to convict Mr. Montoya and relayed that the visit had a powerful emotional impact on the jurors.

67.     Defense Counsel failed to present evidence of an alternative suspect theory related to two others, Mr. Martinez and Luke Anaya.  Had this defense been presented, Mr. Montoya's alibi defense would likely have been viewed more favorably by the jury, and the outcome of the trial different.

68.     Defense Counsel failed to call Mr. Martinez at trial.  Mr. Martinez could have exonerated Mr. Montoya in that Mr. Martinez knew Mr. Montoya was not at Ms. Johnson's house, and was only in Ms. Johnson's vehicle after the crime had been committed.

69.     Defense Counsel failed to propose jury instructions for conspiracy to commit aggravated robbery or conspiracy to commit burglary, neither of which is a predicate offense to felony murder. Had the jury convicted Mr. Montoya of conspiracy to commit aggravated robbery or conspiracy to commit burglary, such a conviction would have precluded a conviction for felony murder and its mandatory life without parole sentence.

70.     At the close of trial but prior to the jury beginning its deliberations, Cynthia Martinez, Mr. Martinez's mother, approached Defense Counsel and confessed to them that the Denver Broncos jacket found at the crime scene was not Mr. Montoya's, as the prosecution argued, but belonged to her son.  Ms. Martinez showed Defense Counsel a photograph of Mr. Martinez wearing the same Denver Broncos jacket only days before Ms. Johnson's murder.

71.     Remarkably, Defense Counsel did not accept the photo from Ms. Martinez and told Ms. Martinez there was nothing they could do with this new evidence.  Defense Counsel did not move to reopen the evidence, ask for a stay in the proceedings to investigate the new evidence, move for a mistrial, move for a new trial, or take any other action that would have alerted the court to their discovery of the new, exculpatory evidence.

72.     In November 2000, defense investigator Heather Mann notified Defense Counsel

9

that the jury foreperson, Mr. Meigs, had at least two prior felony convictions that he had failed to divulge on his juror questionnaire.  Even though Mr. Meigs' dishonesty constituted grounds for a mistrial or a new trial, Defense Counsel did nothing when they received this information.

73.     After Mr. Montoya was convicted and sentenced, Defense Counsel failed to argue that to mandatorily sentence Mr. Montoya, who was 15 years old, to life in prison without the possibility of parole violates the Eighth Amendment to the U.S. Constitution.

Mr. Montoya's Request for Post-Conviction Relief Based on Ineffective Assistance of Counsel

74.     Eleven years after being wrongfully convicted of felony murder and being sentenced to life without parole, Mr. Montoya obtained post-conviction counsel, Lisa Polansky, Esq.

75.     Ms. Polansky was the first person to ever investigate Defense Counsel's deficient representation of Mr. Montoya.

76.     Through her investigation of Defense Counsel's representation of Mr. Montoya, Ms. Polansky eventually formed the opinion that these lawyers had failed to effectively assist Mr. Montoya in violation of his rights protected by the U.S. and Colorado Constitutions.

77.     The Petition conclusively demonstrated that Mr. Montoya was entitled to have his conviction overturned as a consequence of Defense Counsel's deficient representation of him.

78.     In the Petition, Ms. Polansky also established Mr. Montoya's actual innocence related to Ms. Johnson's murder and the felony murder conviction, and that Mr. Montoya was not present at Ms. Johnson's home when she was assaulted and killed on January 1, 2000.

79.     The facts presented in the Petition were available to Defense Counsel in 2000, but Defense Counsel failed to present these facts to the prosecution, in violation of their duties to effectively assist Mr. Montoya.  Had Defense Counsel presented the facts Ms. Polansky presented in the Petition to the prosecution or the jury, it is highly probable that Mr. Montoya would not have been convicted.

80.     After Ms. Polansky filed the Petition, the court set an evidentiary hearing to determine, among other things, whether Defense Counsel had ineffectively assisted Mr. Montoya.

81.     Recognizing that it was not going to prevail at the hearing, the prosecution approached Ms. Polansky prior to the evidentiary hearing and offered Mr. Montoya a plea deal whereby Mr. Montoya would agree to plead guilty to being an accessory to murder and the prosecution would agree to stipulate to reversal of Mr. Montoya's convictions.

82.     As a condition of the plea agreement, the prosecution stipulated to Defense Counsel's ineffective assistance.

10

83.    Mr. Montoya signed the plea agreement on June 10, 2014, and after spending approximately thirteen and one-half years in prison for a crime he did not commit, Mr. Montoya was released shortly thereafter.

84.    Mr. Montoya suffered immensely as a consequence of being wrongly imprisoned for thirteen and one-half years. The restraint on his liberty—being precluded from seeing friends and family, working, learning, and choosing what he is going to do each and every day of his life—is significant in and of itself.

85.    Further, as is virtually inevitable for a juvenile sent to adult prison, Mr. Montoya was forced to spend many years of his incarceration in the torturous and harsh conditions of the Colorado Department of Corrections' ("CDOC") "administrative segregation." During that time, Mr. Montoya was isolated from other humans 24 hours per day, permitted only to read two books per year, and deprived of any access to the outdoors.

86.    As a consequence of his thirteen and one-half years of wrongful incarceration, Mr. Montoya's relationships with his friends and family suffered greatly, and on his release, Mr. Montoya has been forced to start an entirely new life from what he knew before he was convicted and sent to prison for life without the possibility of parole.

87.    Because CDOC pays prisoners on average 60 cents per day, Mr. Montoya was deprived of the ability to earn a living wage for thirteen and one-half years. Relatedly, because CDOC does not provide any meaningful educational or vocational programming to its prisoners, particularly those serving life sentences, Mr. Montoya's present earning capacity is substantially diminished.

88.    Mr. Montoya has suffered incalculable emotional and psychological distress as a direct consequence of Defense Counsel's actions, causing him to be wrongfully convicted of felony murder and mandatorily sentenced to life imprisonment without the possibility of parole.

### **FIRST CLAIM FOR RELIEF**
**(Negligence – Against All Defendants)**

89.    Mr. Montoya incorporates his allegations in paragraphs 1-88 above as if fully set forth herein.

90.    Defense Counsel each had an attorney-client relationship with Mr. Montoya at all times pertinent to this claim. As Mr. Montoya's legal counselors, Defense Counsel owed their client a duty to provide services within the standard of care for attorneys having and using similar knowledge and skill and practicing law at the same time.

91.    As set forth herein, Defense Counsel each provided deficient legal services to Mr.

11

Montoya that reasonably careful attorneys would not have provided, and each breached the standard of care.

92.     As a result each of Defense Counsel's breach of the standard of care, Mr. Montoya has sustained economic and non-economic damages in an amount to be proved at trial.

WHEREFORE, Plaintiff Lorenzo Montoya prays for judgment against Defendants, jointly and severally, as follows:

A.     For compensatory economic damages in amounts to be proven at trial;

B.     For compensatory non-economic damages in amounts to be proven at trial;

C.     For all pre- and post-judgment interest as allowed by law;

D.     For reasonable attorney fees, expenses, expert witness fees, and the costs of suit herein; and

F.     For such other and further relief as this Court deems just and proper under the circumstances.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 3rd day of June 2016.

**LISA A. POLANSKY, ATTORNEY AT LAW, LLC, POLANSKY LAW FIRM**

_s/Lisa A. Polansky_
Lisa A. Polansky, Attorney at Law
*Attorney for Plaintiff Lorenzo Montoya*

Plaintiff's Address:

c/o Lisa A. Polansky
4450 Arapahoe Avenue, Suite 100
Boulder, Colorado 80303