**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-01457- JLK-SKC

LAWRENCE RUBIN MONTOYA

Plaintiff,

v.

CITY AND COUNTY OF DENVER;
DETECTIVE MARTIN E. VIGIL (Shield No. 86-12);
DETECTIVE MICHAEL MARTINEZ (Shield No. 82-29);
LIEUTENANT JONATHAN W. PRIEST (Shield No. 86-12);
DETECTIVE R.D. SCHNEIDER, JR. (Shield No. 85-24),

Defendants.

---

**CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant, the City and County of Denver ("Denver"), through its counsel, pursuant to Fed. R. Civ. P. 56, moves for summary judgment on the municipal liability claim asserted in Plaintiff's Second Amended Complaint (Doc. # 96):

**<u>INTRODUCTION</u>**

At this juncture, Plaintiff asserts one remaining municipal liability claim against Denver – a single-incident training claim alleging training failures in the area of suspect interrogations. (Doc. 96; Doc. 138 at 47-49). Plaintiff alleges Denver inadequately trained its police officers, and in particular homicide detectives, to conduct appropriate interrogations, including in situations involving minor suspects with cognitive defects. (Doc. # 96, at ¶¶ 223-294).

Denver now moves for summary judgment on Plaintiff's municipal liability claim because Plaintiff cannot establish that any Denver policy, practice or custom was the moving force behind

the allegedly improper interrogation Plaintiff contends he was subjected to. Rather, the record establishes that Denver's training is constitutionally sufficient, there is no evidence of deliberate indifference, and Plaintiff cannot establish any causal link between Denver's training and any harm he allegedly sustained. For each of these reasons, Plaintiff's claims against Denver should be dismissed as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")[1]

1.      Denver incorporates the respective Statement(s) of Undisputed Material Facts set forth on behalf of Defendants Priest, Vigil, Martinez, and Schneider (collectively, "Individual Defendants").

2.      Detective Vigil joined the Denver Police Department (DPD) in 1986. He joined the DPD homicide division in May 1999. Ex. D at [320:6-8].

3.      Detective Martinez joined the Denver Police Department (DPD) in or around 1981, and remained with DPD until he retired in 2019. He worked as a detective from 1992 - 2019. Exhibit EE, Martinez Declaration.

4.      Detective Priest joined the Denver Police Department (DPD) in 1980. He joined the homicide unit in 1989. At the relevant times, he was working as a sergeant in the DPD homicide division. Ex. C, [41:25 – 42:17]; Ex. DD at 1.

5.      Detective Schneider joined the Denver Police Department (DPD) in 1985. He joined the homicide unit in January 1997. Exhibit F, RD Schneider Deposition, at [319:25 – 320:8]; *see also* Exhibit X, Schneider IA resume.

---

[1] Denver incorporates, by reference, all facts set forth in the respective fact sections of the summary judgment motions filed on behalf of Defendants Priest, Vigil, Martinez, and Schneider. Fed. R. Civ. P. 10(c).

*DPD Policies and Procedures*[2]

6.      The 1999 DPD Operations Manual contains policies and guidelines for many policing topics, including separate sections on investigative procedures (300.00) and juveniles (400.00). Exhibit A ("Ops Manual").

7.      The Ops Manual sets forth requirements for case filing, case preparation, rights advisements, and the filing of criminal actions by detectives (pertinent sections quoted):

a.  Cases must be painstakingly prepared, evidence gathered, witnesses contacted, statements taken, and all possible facts carefully recorded in preparation for trial. *Id.* (DEN008163) (Section 302.01).

b.  ". . . In taking a statement from the suspect, leading questions shall be avoided. Officers shall not resort to inducements, promises, threats, or duress to obtain a confession or admission." *Id.* (DEN008163) (Section 302.01(1)d).

c.  "An officer shall not depend upon a confession or admission made by a suspect to the extent of becoming lax in the preparation of their case. They should anticipate a denial by the defendant or the possibility that the admission or confession may not be admissible in evidence and should spare no effort in investigating the slightest circumstance for the purpose of having their case complete." *Id.* (DEN008163) (Section 302.01(1)e); *see also* Exhibit D, Vigil Deposition, at [145:10 – 146:17] (reflecting this concept in testimony); Exhibit C, Priest Deposition, at [104:18 – 105:19] (same).

d.  In filing a criminal action, investigating detectives must "[o]utline the case completely including all circumstances, principals, M.O., etc." This must include a copy of the police report, suspect records, and the case summary. *Id.* (DEN008164) (Section

---

[2] Unless stated otherwise, all facts herein reference events and facts from the 1990s.

302.01(3)a).

8.    The Ops Manual also sets forth requirements for obtaining statements, including confessions. It provides:

a.  A confession must be voluntary. Ex. A (DEN008168) (Section 302.11(3)b).

b.  The requisite form of initial questioning when an investigator is interviewing a suspect, including 10 specific questions which are to be asked, in order. *Id.* (DEN008168) (302.11(4)a-j).

c.  "If it is known during the taking of a formal statement that any person being questioned is suffering a definite physical or mental impairment, then ask that person if he or she feels physically and mentally able to give a statement." *Id.* (DEN08169) (Section 302.11(5)).

9.    When any suspect is in custody and is to be questioned, they must be advised of their rights in accordance with DPD Form 369. *Id.* (DEN07954).

10.    Any statement made by a suspect following a *proper* advisement is admissible and should be recorded immediately, whether by suspect, officer, audio or video. *Id.* (DEN008145) (Section 301.02(2)).

11.    The Ops Manual prohibits officers from making false statements on reports, among other misconduct. It also instructs that "[o]fficers who receive assistance from any other officer on a case to which they are assigned shall note the assistance on their reports." *Id.* (DEN007741) (Section 3.08).

12.    DPD policy provided that if any prosecution is declined or dismissed due to alleged mishandling by any police officer, the District Attorney will forward the case to such officer's Division Chief. The case will then be forwarded to the officer's supervisor, who must review the

case with the officer to prevent any future violation. *Id.* (DEN008165) (Section 302.01(4)).

13.    The Ops Manual contains a 41-page section on juvenile procedures, including juvenile processing, waivers, identification, detention criteria, etc. *Id.* (DEN8200-8241).

14.    Section 402.03 sets forth the DPD requirements for the juvenile advisement / waiver. *See id.* These include, without limitation:

 a.    A parent or guardian must be physically present for the advisement and questioning of any juvenile (unless there exists a waiver, see below);

 b.    Prior to any questioning, the parent/guardian must be given the opportunity to confer privately with the juvenile;

 c.    The advisement portion of the juvenile advisement/waiver must be signed by the parent/guardian *and* the juvenile;

 d.    The parent/guardian *and* the juvenile must agree to waive the presence of the parent or guardian during questioning. If both agree, both must sign the Waiver of Presence located on the back of the Advisement Form. *Id.* (DEN008205) (Section 402.03).

15.    Children under 10 years of age may not be held for a crime. *Id.* (Section 403.02).

16.    When someone under 18 is arrested, the arresting officer is required to notify a parent or guardian. (DEN008222) (Section 403.09). If one cannot be reached by phone, a uniformed officer must respond to the juvenile's home address. *Id.* (DEN008222) (Section 403.09(1)).

17.    The Ops Manual also contains a section on Elderly / Disabled Persons / Persons with Disabilities. *Id.* (DEN 7873-7838).

18.    All sworn DPD personnel, at all relevant times, received training on DPD's policies and procedures, including the Operations Manual. *See* Exhibit B, Deposition of Denver 30(b)(6)

designee, at [27:17 – 28:6] and [65:23 – 66:13]; *see also* Exhibit E, Deposition of M. Martinez, at [155:13-19] and [178:2-9]; Exhibit F, Deposition of R.D. Schneider, at [192:21 – 193:25]; Exhibit D, at [123:6-25].

19.    All DPD officers are expected to be familiar with the entire Operations Manual, and must sign off on their review of the same, including any policy / legal updates. *Id.*

20.    Between 1995 and 2000, the basic recruit curriculum (at the DPD Academy) included specific training on interviews and interrogations of suspects, in addition to warrants and affidavits of probable cause. *See* Exhibit G, 1997 Recruit Curriculum (DEN006719-21); Exhibit H, 1998 Recruit Curriculum (DEN006754-55); Exhibit I, 1999 Recruit Curriculum (DEN006809-11); *see also* Exhibit F, at [89:5-9].[3]

21.    During the relevant years, training recommendations of the Colorado POST Board[4] with respect to recruit training, and the DPD-provided basic academy training were as follows:

|  | POST Recommendation / Requirement (total hours) | DPD (total hours) | POST Recommendation / Requirement (total hours) | DPD (investigations hours) |
|---|---|---|---|---|
| 1997 | 433 | 826.5 | 56 | 63 |
| 1998 | 433 | 858 | 56 | 66 |
| 1999 | 435 | 858 | 56 | 66.5 |

Exhibit G, at DEN 6708 (1997); Exhibit H, at DEN 6743 (1998); Exhibit I, at DEN 6799 (1999).

22.    DPD's recruit training during these years also included training in the Colorado Juvenile Code each year.  *See* Ex. G (DEN006721); Ex. H (DEN006755); Ex. I (DEN006811).

***Continuing / "In-service" Training***

---

[3] This includes specific academy training courses entitled "interview and interrogation techniques." Ex. G (DEN 6719); Ex. H (DEN 6754); Ex. I (DEN6810).

[4] The Colorado Police Officer Standards and Training (POST) board establishes and maintains minimum standards to serve as a peace officer in Colorado. https://post.colorado.gov

23.    All DPD police officers received mandatory annual and repeated in-service training, from Denver, throughout the 1990's. This annual training included formal training courses held by DPD and the Denver District Attorney's Office ("DAO"), as well as mandatory training updates and bulletins. Ex. B, [15:7 – 16:25] and [65:23 – 66:13]; Ex. F at [89:5 – 22]; Ex. E at [150:6-9].

24.    DPD provided annual training in the law and legal updates, including training in the constitutional standards pertaining to police action and the *Miranda* rights of suspects. *See id.* Ex. B at [20:13 – 21:21]; Ex. F at [165:6-13]; *see also* Exhibit K, 1999 Interrogation and Confession Law Training.

25.    Without limitation, the DPD continuing education curriculum in the years just before the Emily Johnson murder included the following courses:

a.    DAO-taught training course – Col. Children's Code (K. Steinhauser, 1999). Exhibit J (DEN 7598-7606).[5]

1.    Summarizes the then-recently enacted provisions of the 1997 Colorado Children's Code, including procedures and legal process(es) for juvenile arrests, charging, and processing, as well as investigative requirements including rights advisements. *See*

2.    Specifically covered need for *both* juvenile and parent/guardian to waive right to parental/guardian presence. *Id.* at DEN7599.

b.    DAO-taught training course - Interrogation and Confession Law (T. Mulvanhill, December 20, 1999). Exhibit K (DEN 7607-7613)

---

[5] As noted below, DPD record-keeping and file labeling indicates this training was provided in 1999. This also stands to reason since the content was the 1997 Children's Code.

i.   This training specifically informed DPD personnel that the statement of a suspect "*must not be extracted by any sort of threats* or violence, nor obtained by any direct or implied promises, however slight, *nor by the exertion of any improper influence.*" *Id.* at 7607.

ii.  Under "voluntariness" heading, mentions prohibitions and admonishments in obtaining a voluntary confession, including abuse, threats, coercion, promises, and deceit. It also discusses "condition of the suspect," including any emotional problems. *Id.* at DEN007610-11.

iii. The course curriculum indicates interrogation training, including "objective indicators of custody," consideration of "how accusatory" the questioning was, length of questioning, number of officers present, and techniques. A substantial portion of the curriculum is on waiver of rights, including voluntariness and informing the suspect of their rights and charges. *Id.* at DEN007610-13.

c.  DAO-taught training course – Interrogation and Confession Law (Cooper and Mulvahill, Nov. 2, 1998) (DEN 7572-7575) (similar to above).

d.  DAO or DPD training course – Preparing a Search Warrant Affidavit (Egelhoff, Oct. 15, 1998). Ex. II (DEN 7576-7588).

***Outside Training Courses***

26.     It was the practice of the DPD homicide unit, through its supervisors, to send homicide detectives to competent outside training schools (i.e. not provided by DPD or DAO) to receive additional teaching and training in specialized investigatory skills, including suspect interrogations and interviews. *See* Ex. F at [168:5-20]; Ex. B at [16:20 – 17:3], Ex. E at [149:11 – 150:2]; *see generally* Exhibit N, Priest Training Resume; Exhibit O, Vigil Training Resume;

8

Exhibit P, Martinez Training Resume; Exhibit Q, Schneider Training Resume; *see also* Ex. DD,
at 5; Ex. CC, at 5, 7.

27.     All Individual Defendants attended various "outside" training courses during the
1990s. *See id.*

28.     Outside training courses were offered and provided by outside vendors and/or
training schools, but were a part of the DPD continuing education program ("CEP"), and were paid
for (along with travel costs and expenses) by DPD. Exhibit Z, Priest Outside Training Request;
*see also* Ex. D at [91:3-18]; Ex. F at [168:5 – 20]; Ex. B at [16:20 – 17:24]; Ex. E at [149:13 –
150:19]; Ex. DD at 4-5.

29.     The Individual Defendants attended – including many others – outside training
courses taught by the Southern Police Institute, John E. Reid & Associates ("REID"), Don Rabon,
FBI training schools, and various other law enforcement agencies throughout the 1990s. *See id;
see also* Exs. N, O, P. Q and Ex. EE.

30.     The Southern Police Institute and REID were, throughout the 1990s and after,
prevailing schools in the area of police investigations, including interviews and interrogations. Ex.
CC at 6; Ex. DD at 3.

31.     The REID technique was the prevailing and most widely-taught police
interrogation technique used in the United States throughout the 1990s.[6] *See* Police-Induced
Confessions, Risk Factors and Recommendations, Kassin, S., et al., Law and Human Behavior, 34
LHUMB 3, at *6-7 (Feb. 2010) (describing REID technique as "most influential" approach to
police interrogations); Going to the Source: The "New" REID Method and False Confessions,

_____

[6] REID continued its prominence well beyond the 1990s, although such post-incident facts
are not relevant to the instant motion. Incidentally, REID's prominence is not limited the United
States, it has also been widely utilized in Canada throughout the same time periods.

Hirsch, A., 11 Ohio St. J. Crim. L. 803, 804-805 (Spring 2014) (REID conducts "the most widely attended training sessions for interrogators.")[7]

32.     When conducting interrogations during the relevant period of time, the Individual Defendants utilized certain techniques advanced in the training they attended, while refraining from utilizing others they did not agree with or find helpful. *Compare* Ex. D, [326:7 – 327:19] (utilizing certain REID practices) *with* Ex. C, [12:4 – 13:13 and [14:14 – 15:18] (describing and preferring a different approach); *see also* Ex. B at [39:19-40:17].

33.     During the 1990s, the DPD continuing education program ("CEP") also endorsed, and facilitated officers to attend, courses in an interrogation method taught by Don Rabon. *See, e.g.,* Exhibit S, 1998 Fall Course Descriptions and Calendar (DEN 6360-61); *see also* Ex. E at [149:7 – 150:9]; Ex. D at [86:6 – 15] and [105:13-22] and [320:23 – 321:16]; Ex. C at [14:14 – 15:3]; Ex. F at [317:15 – 318:6]; *see also* Ex. DD at 4-6; Ex. CC at 5, 7.

34.     Don Rabon advanced a non-confrontational approach to witness questioning, known as Investigative Discourse Analysis, which emphasized the suspect or interview subject do most of the talking, and in which the investigator focused more on nonverbal communication and cues.  Ex. C at [14:14 – 15:3] (describing Don Rabon training, like most of the training he himself [Priest] personally did, based on a "more benevolent style"); Ex. D at [105:7 – 22]; *see also* Ex. DD at 4 (elaborating on Don Rabon method).

35.     Individual Defendants attended the following training courses during the second

---

[7] The Reid technique has been criticized in more recent years by several scholars, articles, etc. These articles, however, show that during the 1990s, the technique was widely-accepted and well-regarded in the industry.

half of the 1990s:[8]

    a.  *Common to multiple detectives:[9]*

        i.  DPD Academy: Advanced officer skills (Martinez, Schneider, and Vigil - Mar. 22-23, and Oct 25-26, 1993, 16 hours) (Exs. O at DEN7666, P at 7666, Q at 7680)[10]

        ii.  NCFUH: Interview and interrogation (Vigil and Schneider, Jan. 15, 1997, 24 hours) (Exs. O at 7685, Q at 7679)

        iii.  REID (Advanced) Interview and Interrogation (Martinez and Vigil - Mar. 11-12, 1999, 16 hours) (Ex. O at 7685, Ex. P at 7666)

        iv.  Public Agency Training Council: Practical homicide investigations (Vigil and Priest, Aug. 25-27, 1997 and Aug. 23-25 1999, 24 hours).[11]

        v.  Interview and interrogation (Schneider and Priest - May 12, 1998, 16 hours) (Ex. N at DEN 7676; Ex. Q at 7681)

    b.  *Priest:*

        i.  Southern Police Institute – homicide investigations (Jan 19, 1990, 80 hours) (Ex. N at DEN7674)

---

[8] This is not an exhaustive list of all training, or training courses attended, by the Individual Detectives. It includes, however, courses in interrogations / interviews, as established either by the name of the course, or additional context within the evidentiary/testimonial record.

[9] The record also indicates Vigil and Schneider took a 24-hour "Waiver" course on April 25, 1997. (Exs. O at 7687, Q at 7681). While this would appear to likely involve *Miranda* waivers, the record cannot establish that one way or the other.

[10] Detective Martinez attended this training in March 1993, while Detectives Schneider and Vigil attended this training in October 1993 (Ex. O at DEN 007685, Ex. P at DEN007666).

[11] Detective Vigil attended this 24-hour training in August 1999, while Detective Priest attended in August 1997 (Exs. N at DEN 7673, O at 7685).

    ii.   CO. Assoc. of Robbery Investigations at Glenwood Springs, CO. (June 1-3, 1994, 24 hours) (*Id.* at DEN7673)

    iii.   DPD criminal profiling – homicide suspects (Jan. 7, 1996) (*Id.* at 7673)

    iv.   Instructor – Academy Course (Nov. 11, 1996, 16 hours) (*Id.* at DEN7676)

    v.   Homicide seminar (40 hours, Sep. 18-23, 1999) (*Id.* at 7675)

c.  *Martinez:*

    i.   Training in evidence gathering, homicide investigation, interview, and interrogation (16 hours, Feb. 17, 1995). (Ex. P at DEN7666)

    ii.   Investigator Development 1, Interviews & Interrogations (CEP-301) (8 hours, Feb. 7, 1996). (*Id.* at DEN7667)[12]

d.  *Schneider*

    i.   Investigative Discourse Analysis - Don Rabon training course (Apr. 16, 1997, 24 hours) (Ex. Q at DEN7681)

    ii.   Lakewood PD – sex crimes investigators interview & interrogation seminar (May 12-13, 1998, 16 hours) (*Id.* at DEN7679)

    iii.   Southern Police Institute: Homicide Investigation Seminar (80 hours, Apr. 19, 1999) (*Id.* at DEN7679)

e.  *Vigil*:

    i.   D.U. Child welfare training and research project: Specialized interviewing skills for child welfare (May 28 – 30, 1997, 24 hours) (Ex. O at DEN7685)

---

[12] This 8-hour course focused on interviewing and interrogation for the investigator. The course is described as "an introduction to the techniques necessary to progress from the short-term street contacts to complex interviews and interrogations." (Ex. R, Spring 1996 CEP Course Descriptions and Calendars, at DEN 6353; DEN 6356; DEN6358).

ii.  The REID Technique of Investigative Interviewing (Aug. 25-27, 1998) (*Id.*).

***On-the-job training***

38.    Investigators and detectives also received on-the-job training in various areas of homicide investigations – including interrogations and preparing affidavits of probable cause – throughout their employment, including during their respective tenures in homicide. Ex. D at [93:15-18]; Ex. F at [89:2-9]; Ex. C, [87:21 – 89:21]; Ex. E, [152:5-15] and [253:16 – 254:3].

***Knowledge and Understanding of Individual Defendants***

39.    DPD homicide detectives were specifically trained and unequivocally understood that it was improper to coerce or improperly obtain confessions. Ex. E, [281:8 – 23]; Ex. C, [83:14 – 84:3]; Ex. D, [114:4-24].

40.    Homicide investigators were trained on and were aware of the possibility of, and the critical need to avoid, false confessions. Ex. E, [166:4 – 167:15]; Ex. B, [41:10 – 43:22]; Ex. C, [66:1 – 67:4] and [74:15-22] (explaining that to avoid "false confessions, you need to think about what – the abilities of the individual who is being interviewed. If I was dealing with somebody that had cognitive issues, I would be much more cautious about [more aggressive] tactics.").; Ex. F, [166:19 – 168:4].

41.    Individual Defendants were trained that in order to properly interview or interrogate any interview subject, that person must be able to properly understand the situation at hand, their rights advisement, and the questions they are being asked. Ex. C, [75:17-76:25]; Ex. B, [20:13 – 21:7]; Ex. D, [117:23 – 122:10]; Ex. E, [172:12 – 173:6] and [176:14 – 177:14]; *see also* Ex. DD at 7.

42.    It was communicated within DPD, including to the Individual Defendants by their supervisors, that if a person has diminished capacity or could not properly answer interview

questions, that individual should not be interviewed. Ex. D at [333:20 – 334:12] and [117:23 – 118:19]; Ex. E, [176:14 – 177:14]; Ex. C, [75:12-76:8].

43.     All Individual Defendants understood that if a person appeared to not understand the situation, or could not properly understand or respond to questions, that person should not be interviewed. *See id.*

44.     Homicide investigators were trained, and understood, that they were not permitted to threaten suspects or make them promises in obtaining confessions, and of the consequences of improperly doing so (i.e. inadmissible or false confession, murderer goes free, etc.). Ex. B, [41:10 – 43:22]; Ex. E, [166:4 – 167:15]; Ex. F, [166:19 – 168:4] and [175:25 – 176:12].

45.     It was trained, and understood within the homicide unit, that leading questions were generally to be avoided, but in certain situations, leading questions may be appropriate and/or necessary in conducting an interview or interrogation. Ex. F, [191:21 – 192:6]; Ex. E, [168:20-23] and [174:24 – 176:13]; Ex. C, [16:7 – 17:3] (similar), Ex. B, [33:23 – 35:1].

46.     Investigators were trained, and expected to understand, that information relied upon in a probable cause affidavit (or any affidavit) should be sourced to the person(s) who were in fact the true source of the information. *See* Ex. C at [118:12 – 120:15]*;* Ex. E at [253:16-255:22]; *see also* Ex. B at [148:12 – 149:3]; [150:8-152:18]; [64:1 – 65:7]; [61:3 – 63:10].

47.     DPD investigators understood that DPD wanted and expected well-trained and ethical detectives. Ex. D at [333:13-19]; Ex. F at [321:5-15].

48.     It was the expectation of DPD, as reflected in training, that investigators include exculpatory information in probable cause affidavits. Ex. F [311:1 – 312:1]; *see also* Ex. CC at 8.

49.    DPD employees were not permitted to include false information in affidavits of probable cause. Ex. B at [61:3-15]; Ex. F at [310:16 – 311:4]; Ex. D at [267:7-25]; Ex. E at [254:4-13].

50.    During the relevant times, Schneider understood he was required to include exculpatory information in any affidavit of probable cause, and that he was not permitted to include false information in any affidavit of probable cause. *Id.* at [310:16 – 312:1].

**Practices and procedures of the DPD homicide unit**

51.    Officers must be highly qualified and experienced investigators *before* they become homicide detectives. Candidates are formally interviewed before they receive an invitation to join the homicide unit, and their candidacy is considered in connection with their track record in investigations, including interviews. Ex. C, [100:6 – 25]; Ex. F, [87:2 – 88:22] and [312:19 – 315:6] (summarizing his own pre-homicide experience); Ex. B at [58:10-20].

52.    Supervisors would observe certain interviews by other unit members after the fact, and would critique them or provide feedback based on their observations. Ex. C at [93:1 – 95:20]; Ex. D at [149:22 – 150:11] and [151:11 – 152:20] (testifying Priest, while sergeant and his direct supervisor, subsequently reviewed interviews he conducted and provided feedback).[13]

---

[13] Defendant Jon Priest was a supervisor within the homicide unit during the relevant time period. At deposition, a distinction was drawn between situations in which a supervisor would watch the entirety of suspect interviews *in real time* for the purpose of intervening or providing feedback, and those in which the supervisor would *subsequently* review the interviews of investigators under their supervision, for purposes of providing feedback. Lieutenant Priest – one of multiple supervisors in the DPD homicide unit at the time – clarified that while he watched portions of many interviews in real-time, he did not typically provide feedback or critique during the interview/investigation itself. Instead, he would watch portions of interviews in real-time for practical, crime-solving purposes, and then would later review the interviews for purposes of review / critique. Ex. C at [93:1 – 99:17].

53.    It was proper procedure within DPD to, when relying on officer-officer information in a warrant affidavit, provider proper attribution to the officer who provided the same (or in the case of a civilian, such attribution as permissible given any privacy or safety considerations). Ex. C at [118:12 – 120:15]; Ex. E at [253:16-255:22]; *see also* Ex. B at [148:12 – 149:3]; [150:8-152:18]; [64:1 – 65:7]; [61:3 – 63:10].

54.    Affidavits of probable cause (i.e. for warrantless arrests) at all relevant times must be approved of by a judge. It is further subject to review by the prosecutor, defense attorney, and the Court. Ex. B at [64:1-65:7]; Ex. E at [246:25 – 248:4].

*Juvenile Suspects*

55.    It was taught and understood within DPD, including the homicide unit, that the general rule with all minors was that a parent or guardian be present for questioning. Ex. F at [249:11–250:11]; Ex. B at [106:10-15]; Ex. D at [119:15 – 120:1]; *see also* Ex. A (DEN8200-41); Ex. CC at 6; Ex. DD at 7.

56.    Pursuant to both policy and training, the only exception to the above rule that permits a juvenile to be questioned without an adult present is if both the parent/guardian and minor execute a knowing and voluntary waiver. *See* Ex. A, DEN008205 (Section 402.03); *see also* Ex. B at [19:25 – 21:21] and [39:19-40:17].

57.    In the case of juvenile suspects, for any waiver to be effective, both the parent and juvenile must understand the rights they were waiving. *See id.; see also* Ex. J (reflecting training on subject, in accordance with Colorado Children's Code).

58.    Prior to any viable waiver, the parent and juvenile were provided the chance to meet, unmonitored and without the presence of police, to privately discuss waiving their rights.

The juvenile and parent/guardian would then execute a waiver with the detective. *See id.*[14]

59.     At the time of the Emily Johnson murder underlying the matters at issue here, DPD policy and training with respect to the rights and protections of juvenile suspects was based directly on, and in accordance with, then-existing Colorado law. *Compare* Ex. A *with* Ex. J (directly training on Colorado Children's Code); Ex. D at [119:15 – 120:1]; Ex. E at [281:19 – 282:6]; Ex. CC at 6; Ex. DD at 7.

### *Individual Defendant histories*

60.     Prior to the interrogation and arrest of Plaintiff, none of the Individual Defendants had been accused of, or were found to have engaged in, misconduct or unlawful behavior in connection with any suspect interrogation or interview. *See* Exhibit U, Priest IA resume; Exhibit V, Vigil IA resume; Exhibit W, Martinez IA resume; Exhibit X, Schneider IA resume.[15]

61.     Prior to the interrogation and subsequent arrest of Plaintiff, none of the Individual Defendants in this matter had been accused of, or were found to have engaged in, misconduct or unlawful behavior concerning the contents or issuance of any affidavit of probable cause for a warrant. *See id.; see also* Ex. F at [309:23 – 310:15].

### *Plaintiff's Interrogation*

62.     When Plaintiff spoke to detectives on January 10, 2000, detectives had previously spoken with, among other witnesses, Amanda Johns, who stated "Nick [Martinez] had told Matt

---

[14] DPD further recognized a distinction between teenagers, who receive the above waiver protections, and younger children (typically 10 or 11 and under) who are likely not capable of providing a knowing and voluntary statement. In those cases, the interview was to take a more forensic – i.e. victim-based – style. Ex. B at [23:3-19].

[15] Vigil was asked at deposition about several incidents, nearly all of which post-date this matter by a number of years. In one case, counsel referenced a 2006 federal lawsuit against Vigil filed by a person named "Dante Grissom," but ECF "query" searches for that name, and for Vigil as a defendant, turn up no results. As to the latter, the only other case that appears is *Kearney v. DiManna, et al.,* 03-cv-00146-RPM, a RICO suit with over 30 defendants, dismissed in 2007.

Barela he hit some lady over her head with a rock." Ex. GG at (DEN00467).

63.     Plaintiff was advised of his rights, along with his mother, prior to speaking with detectives. He was told his statement was voluntary and he had the right to an attorney. His mother was present and she subsequently indicated both Plaintiff and she had understood and agreed to her later leaving the room. Ex. Y at [147:23 – 148:6].

64.     Detectives left the room and gave Plaintiff a chance to speak with his mother, which he did. Following that conversation, Plaintiff and his mother determined he still wanted to make a voluntary statement to police. *Id.* at [148:7-18].

65.     The first thing Plaintiff says to detectives in his interview is "wrong friends, wrong time." Ex. Y at [161:18-162:1].

66.     During the interrogation, Plaintiff provided multiple incriminating facts that are unequivocally not "fed" to him by detectives. *See, e.g., infra ___*.

67.     During his interrogation, in response to questioning by Vigil, Plaintiff made a statement that Nick and J.R. were going to try to burn Emily Johnson with lighter fluid, a lighter, and charcoal. Ex. FF at [153:8-17]. When asked at his deposition about that fact, Plaintiff testified it was "fabricated in my false confession," before stating "[i]t just came off top of my head and that's what I told them." Ex. Y at [175:3 – 176:4].

68.     During his interrogation, Plaintiff and Vigil had the following exchange, with Plaintiff's mother still in the room:

>       **Detective**: []. You should not withhold information. Now, tell us exactly what Nick said about him and Lloyd, how they did it. I know they told you the story.
>
>       **Mr. Montoya**: They hit the lady in the head with a rock.
>
>       Ex. FF at [28:12-17].

This information was not provided to Plaintiff by any detective. Ex. Y at [201:16-204:5].

69.    Plaintiff's "sole basis" for making the above statement was a single news clip he had watched on television, during the week after the murder, in which a local news reporter outside the home reported on the crime and identified the weapon as a rock. *See id.*

70.    During questioning about the layout of Emily Johnson's house, Plaintiff was asked "What's past the kitchen?" and responded "The front room and the dining room and stuff." When the detective asked "What's first? The front room or the dining room?" Montoya responded "Dining room."[16] Plaintiff admits no detective had previously told him that information and now states he "made up that lie in [his] false confession." Ex. Y at [206:20 – 210:15].

71.    During questioning about what he observed within Emily Johnson's home, Plaintiff and Detective Vigil have the following exchange:

> **Detective:**  Let's go back. When you get to the dining room, where's Nick and J.R.?
>
> **Mr.** Montoya: They're starting to beat that lady up.
>
> **Detective:**  Where is she at?
>
> **Mr. Montoya:** In the front room.
>
> **Detective:** Where at in the front room?
>
> **Mr. Montoya:** On the couch.
>
> **Detective:** She's on the couch? What's she doing, sitting there? She's just sitting up or laying down?
>
> **Mr. Montoya:** Laying down.

---

[16] While certain questions in this line of questioning were leading (i.e. there being stairs, and the kitchen being the first room), more were not. Plaintiff admits none of this information, regarding the specific location of Ms. Johnson within her home during the murder, was provided to him by the detectives. *See id.*

**Detective:**  Oh, she's laying. Is she sleeping or awake?

**Mr. Montoya:** Awake, watching TV.

**Detective:** Did you see her? What was on TV? What was on TV?

**Mr. Montoya:** I don't remember.

**Detective:** Okay. So who goes up to her first, you? Who goes up to her first?

**Mr. Montoya:** Nick and JR.

**Detective:** Okay. Which one, Nick or JR?

**Mr. Montoya:** Nick.

**Detective**: Okay. What does he do? What's the first thing he does?

**Mr. Montoya:** He hits her.

**Detective**: He hits her with what?

**Mr. Montoya**: A rock.

**Detective**: He had a rock? Hmm. Where did you guys get the rock at?

**Mr. Montoya**: Outside.

**Detective**: Show me where at.

Ex. FF at [144:14 - 145:23].

72.    The first mention of "front room" during the interrogation was when Plaintiff mentioned it, in response to a non-leading question. *See id.* (generally).

73.    The first mention of "couch" during the interview was when Plaintiff identified it as Emily Johnson's location when she was attacked, in response to a non-leading question. *See id.*

74.    Plaintiff admits he was never told about the couch earlier, and states he told detectives this information because he "made up the lie in [his] false confession." Ex. Y at [211:9 – 212:17].

75.     This information was accurate and consistent with what detectives knew at the time regarding a murder weapon. *Id.* (admitting same regarding couch); *see also* Ex. HH, photograph of couch; *see also* Ex. GG, Statement of A. Johns.

## ARGUMENT[17]

A municipality cannot be held liable for the actions of its employees under the theory of *respondeat superior*; it can only be held liable when a municipal policy, practice, or custom causes a constitutional violation. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770–71 (10th Cir. 2013). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and therefore make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

To establish municipal liability, Plaintiff must prove: (1) an underlying constitutional violation; and (2) an offending municipal policy, practice or custom. *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. Dep't of Soc. Svcs.,* 436 U.S. 658, 694 (1978)).[18] As to the latter, Plaintiff must (1) identify a Denver policy or custom (2) which caused his injury and (3) show the policy or custom was enacted or maintained with deliberate indifference. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770–

---

[17] Denver incorporates, by reference, all argument(s) set forth in the respective summary judgment motions filed on behalf of Defendants Priest, Vigil, Martinez, and Schneider. Fed. R. Civ. P. 10(c).

[18] With respect to the first element – whether Plaintiff can show an underlying constitutional violation – Denver defers to the Individual Defendants. In the event the Court agrees with any constitutional argument for their dismissal, Denver should likewise be dismissed from this case. *See, e.g., Dodds v. Richardson,* 614 F.3d 1185, 1198 (10th Cir. 2010).

71 (10th Cir. 2013); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (municipal liability in this context requires deliberate indifference to the injuries that may be caused. (citations and quotations omitted)); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Here, Plaintiff's sole remaining municipal liability claim asserts Denver failed to adequately train its officers regarding constitutionally sound interviews and interrogations, particularly in the case of juvenile suspects with cognitive impairments (Doc. 96). But this claim fails because Plaintiff cannot establish any training failure, let alone any to which Denver was deliberately different, or that plausibly caused his alleged harms.

Although a municipality's failure to train its employees may support a *Monell* claim, this theory represents the most "tenuous" sort of municipal liability under § 1983. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Here, Plaintiff seeks to impose liability based on Denver's alleged failure to train its investigators on proper, constitutional methods of interrogation, including those that should be utilized with juvenile suspects. This claim fails.

**A.  Denver's Training at all Relevant Times was Constitutionally Sufficient**

Plaintiff cannot satisfy the first element of his *Monell* claim because he has not created a genuine issue of fact as to the sufficiency, or propriety, of Denver's relevant training during the 1990s. Not only is Plaintiff unable to show a pattern of prior violations, the record shows the Individual Defendants received extensive training in leading investigatory techniques, specifically including interviews and interrogations, and the attendant protocols and safeguards under the law.

1.  <u>Plaintiff has adduced no pattern of incidents or violations</u>

"A *pattern of similar constitutional violations* by *untrained* employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (emphasis added); *Est. of Waterhouse v. City of Lakewood*, No. 21-cv-00982-KLM,

2022 WL 2753434, at *11 (D. Colo. July 14, 2022). Here, Plaintiff can point to no comparable situation that was caused by the same alleged failure – i.e. failure to train on constitutionally sound interrogations – he now asserts. Since there is no record evidence of other interrogation-related violations or improprieties by DPD employees, Plaintiff cannot proceed on such a pattern of violations theory here, whether for purposes of showing a "widespread practice" or "notice" on Denver of the existence of any problem. *See, e.g., Simmons v. Hinton,* No. 13-cv-2566-CMA-MJW, 2015 WL 1041583, at **8-9 (D. Colo. Mar. 5, 2015) (no failure-to-train claim for use of taser, despite absence of scenario training and expert report which asserted specific deficiencies).

2.  Plaintiff Cannot Create a Genuine Fact Issue Under a Single-Incident Theory

As this Court has noted, a failure-to-train claim need not be based on a "pattern of violations" but may occasionally rest on a "single incident" of unconstitutional activity. In these cases, liability can only attach in the "narrow range of circumstances" from which constitutional violations are a "highly predictable consequence" of the alleged failure(s). *Connick v. Thompson*, 563 U.S. 51, 63-4 (2011) (quoting *Commrs. of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997)). There exists the chance, "*however rare*, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* (citing *City of Canton*, 489 U.S. at 390 n.10) (emphasis added)). As the Tenth Circuit recently noted, the plaintiff in these cases must carry a "demanding burden." *Valdez v. Macdonald,* 66 F.4th 796, 813 (10th Cir. 2023); *see also Bark v. Chacon*, No. 10-CV-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011). Plaintiff cannot carry this burden here.

The inquiry in a single-incident failure-to-train claim is whether the plaintiff has adduced sufficient facts to demonstrate: (1) the existence of a policy or custom of deficient training; (2) an

injury caused by the policy that is "obvious" and "closely related"; and (3) that the municipality
adopted the policy or custom with "deliberate indifference." *Valdez,* 66 F. 4th 796, at **816-17
(citing *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021)). To establish the first element,
Plaintiff must prove Denver's training was, in fact, deficient. *See Valdez,* 66 F. 4th at 816-17;
*Brown v. Gray,* 227 F.3d 1278, 1286 (10th Cir. 2000); *Porro v. Barnes,* 624 F.3d 1322, 1328
(10th Cir. 2010) ("plaintiff must identify a specific deficiency. . .") (citations omitted). More
specifically, she must "identify *how* [the] training was inadequate." *Hughes v. Kvasnicka*, 2014
WL 36627, at *4 (D. Colo. Jan. 6, 2014); *Tivis v. City of Colo. Springs*, No. 19-cv-867-KMT,
2020 WL 1166842, at *5 (D. Colo. Mar. 11, 2020) (no viable *Monell* claim where "Plaintiff does
not proffer any facts regarding the officers' training or supervision—when it occurred, who
conducted it, or how it was deficient"); *Chacon*, 2011 WL 1884691, at *3.

a) <em>Plaintiff Cannot Show any Actionable Training Deficiency</em>

Here, Plaintiff's surviving municipal liability claim alleges the City failed to adequately
train its officers on proper interrogation tactics, specifically when interrogating a minor with
cognitive defects. But Plaintiff has adduced no record evidence to plausibly suggest Denver failed
to adhere to any widely accepted training practices regarding interrogations – with respect to
juveniles or adults – let alone *how* Denver's training falls short of any such standards. *Simmons,*
2015 WL 1041583, at *9 (emphasizing absence of "widespread or flagrant instances" of similar
conduct); *Brown v. Whitman,* 651 F.Supp.2d 1216, 1230 (D. Colo. 2009). Absent such record
evidence, the Court cannot reasonably infer the existence of any training failure.

On the other hand, the record shows DPD ensured its officers, and especially the members
of the homicide unit, were comprehensively trained to conduct interrogations and interviews, and
in the applicable rules and protections for suspects under the law. Even at the academy, DPD

recruits in the late 1990s received training far in excess of the state mandate, including specific courses in interviews and interrogations. After the academy, all DPD personnel complete a comprehensive annual in-service training curriculum. All officers must read and be familiar with the entirety of the Ops Manual, and sign off on their review of the policies within. SUMF, at 24-25. During 1998 and 1999, DPD was specifically training its police officers in a course entitled Interrogation and Confession Law (taught by members of the DAO), which the curriculum indicates focused largely on *Miranda,* suspect rights, and advisements. *Id.* (providing on first page, *inter alia, "*the statement must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence.") Also in 1999, DPD administered a training course on the Colorado Children's Code, which clearly addressed the protections afforded *juvenile* suspects under the law. *Id.*  This course touched on many topics, including identifications, warrants, statements and advisements, with reference in each case to specific provisions of the Colorado Children's Code. *Id.* at DEN7599. The existence of these particular courses within the DPD curriculum provides a strong defense to Plaintiff's allegations here.

As to the homicide unit, it consisted of highly-trained investigators who were required to interview for the role. Candidates were only selected if they had substantial investigative experience and an established track record within DPD, typically in another detective unit. SUMF at 51. DPD arranged and paid for its homicide investigators (among other detective units) to attend a wide range of specialized courses, not only in Colorado but throughout the country. Regarding interrogation and interview skills, DPD sent detectives to courses in the REID technique and Don Rabon, two training schools with the same objective, but which advanced different approaches. DPD also regularly sent (and continues to send) investigators to 80-hour homicide seminars at the

Southern Police Institute ("SPI"), a leading training program which also teaches interrogation and interview skills, among many others. SUMF at 26-38. Utilization of these multiple, distinct training schools for the same topic – interviews and interrogations – shows DPD's commitment to well-trained, well-rounded investigators during the relevant years.

These training efforts and programs are reflected in the training resumes of the Individual Defendants, who attended a host of advanced investigatory courses (both before and after joining the homicide unit), including multiple schools and seminars with a singular focus on interrogations and interviews. SUMF at 26-38. Consistent with the above, Plaintiff cannot create a fact issue as to whether DPD provided its employees constitutionally sufficient investigatory and interrogation-related training, with respect to juvenile suspects or anyone else.[19]

      b) *Plaintiff Cannot Show an Actionable Training Failure because neither REID, nor the techniques Plaintiff takes issue with, are inherently unlawful*

No authority suggests REID is unconstitutional, or that failing to prohibit any Reid-based tactic can amount to a civil rights violation. On the contrary, the law indicates Reid methods (including those alleged here; i.e. false evidence ploys, minimization/maximization, leading questions) should be used with caution, within the overarching premise that investigators must ensure all suspects understand their rights advisement, the situation, and any waiver(s). This is wholly consistent with DPD policy and the applicable training. *Compare* SUMF at 26-50 *with Frazier v. Cupp*, 394 U.S. 731 (1969) (confession not inadmissible when obtained after police lie to suspect about co-defendant confessing guilt); *Oregon v. Elstad*, 470 U.S. 298, 312 (1985); *U.S. v. Jacques*, 744 F.3d 804, 812 (1st Cir. 2014) (concluding the technique "fall[s] safely within the

---

[19] The above was consistently, if not always, supplemented by on-the-job training, which involved skilled detectives' observations of each other, including supervisors and fellow investigators with different approaches and/or time in the field. SUMF at 38.

realm of the permissible 'chicanery' sanctioned by this and other courts"); *Dassey v. Dittmann*, 877 F.3d 297, 313–16 (7th Cir. 2017) (denying relief for juvenile interrogation in very similar circumstances, including where detectives made "assurances of leniency" and asked "leading and suggestive questions" to intellectually limited juvenile, due to appropriateness of *Miranda* warnings); *see also People v. Zamora,* 940 P.2d 939 (Colo. App. 1996) ("Most courts have recognized that ruses are a sometimes necessary element of police work and have held that deception standing alone does not invalidate consent[.]").[20]

Courts have also authorized the Reid technique, and the methods it taught, when used with juveniles. In *Stoot v. City of Everest*, a Ninth Circuit panel reviewed a very similar municipal liability claim to the one at issue here, in which plaintiffs argued the city "failed to properly train or supervise [defendant officer] in conducting juvenile interrogations, and that the continued use of the so-called Reid technique . . . amounts to a deliberate indifference . . . ." 582 F.3d 910, 929–30 (9th Cir. 2009). But the panel rejected that argument because there was not "any case law establishing that a particular interview technique, applied to juveniles, violates their constitutional or statutory rights, nor have [plaintiffs] identified any incident other than [the disputed interrogation] to corroborate their claims of deliberate indifference." *Id.* at 930; *see also Dassey,* 877 F.3d at 313–16 (applying similar reasoning in individual liability context); *Dumas*, 2020 WL 3443480, at *3 ("[n]one of the Reid techniques complained of have been found to be unduly

---

[20] These techniques have also been recently analyzed by supreme courts in Connecticut and Oregon (see *State v. Griffin*, 262 A.3d 44, 71 & n.23 (Conn. 2021); *State v. Jackson*, 430 P.3d 1067, 1084 (Or. 2018)), and appellate courts in Wisconsin, Kansas, and New Jersey. *State v. Rejholec*, 963 N.W.2d 121, 131 (Wisc. Ct. App. 2021); *State v. Garrett*, 518 P.3d 1276 (Table) (Kan. Ct. App. 2022); *State v. Dumas*, No. A-2207-18T4, 2020 WL 3443480 (N.J. Super. Ct. June 24, 2020). Not one found it coercive. *Accord Griffin*, 262 A.3d at 71 & n.23 ("We are unaware of any federal cases, addressing voluntariness under the fourth amendment, that have deemed the Reid Technique illegal or impermissible to employ.").

coercive even when applied to juvenile suspects . . . .").

Accordingly, where neither the Reid technique itself, nor any of the methods it advanced (including those criticized by Plaintiff here) are unlawful—and can certainly be effective investigatory tools—the finding Plaintiff seeks would be inconsistent with the law. *Accord Stoot*, 582 F.3d at 929–30. Even if Plaintiff can identify some other training that could or even should have been provided, neither the absence of such training nor any attendant risk to suspects— especially considering the wide array of specialized training provided in the same subject—would have been "so obvious" to Denver as to impose liability, especially absent a similar incident. *See Carr v. Castle,* 337 F.3d 1221, 1229-31 (10th Cir. 2003); *Simmons,* 2015 WL 1041583, at **8-9.[21]

> c)  *The Individual Defendants Possessed Sufficient Knowledge, Experience, and Skill to Conduct Suspect Interrogations during the 1990s*

The training courses attended by the Individual Defendants are reflected in their understandings of the relevant law and procedures pertaining to investigations and suspect interrogations. SUMF, at 26-38. Nonetheless, Plaintiff will likely point to statements by the Individual Defendants that they did not receive and/or cannot recall certain policies or training.[22] The law, however, does not require individual employees to meet certain training or knowledge thresholds, only that the City's program be sufficient. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability, for the officer's shortcomings may

---

[21] Notably, none of the Reid training here was provided by DPD directly; it was instead provided by trainers or instructors from Reid itself (or possibly some other program that advanced its methods). This, too, cuts against liability because sending detectives to outside training schools was consistent with prevailing standards at the time, and marks a commendable effort by DPD to ensure well-trained detectives.

[22] For example, Vigil cannot recall any training on avoiding false confessions. Ex. D, at [115:1-11]. However, Vigil fully understood of the need to avoid false confessions. SUMF at 39-50.

have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-

91.  Here especially, where more than 20 years has passed since the death of Emily Johnson and

the depositions were appropriately focused on events during the 1990s, these statements should be

interpreted not in isolation, but with reference to the records which show the extensive training

provided to these detectives, as further reflected in their understanding of the pertinent concepts.

Consistent with their extensive and varied training, the record shows the Individual

Defendants understood the proper methods of suspect interrogations. They knew it was improper

to coerce or improperly obtain confessions, and were well-aware of the need to avoid false

confessions. They understood, in accordance with their training, that if a person has diminished

capacity, or may otherwise be incapable of comprehending or participating in the interview, they

should not be questioned. The Individual Defendants collectively recognized that leading

questions can be problematic, but explained they may be useful and necessary tools in certain

situations. Finally, they clearly understood that in order to be properly questioned, *any* witness

must understand the situation, their rights advisement, and any questions asked of them. SUMF at

39-50. These individual and shared understandings – and the trainings on which they are based –

fully comport with the law (as reflected in DPD policy). Accordingly, Plaintiff cannot point to an

actionable training failure here.

       2.     <u>Plaintiff cannot demonstrate deliberate indifference by Denver</u>.

Plaintiff also cannot establish deliberate indifference. *See Valanzuela v. Snider*, 889 F.

Supp. 1409, 1419 (D. Colo. 1995). "[D]eliberate indifference is a stringent standard of fault,

requiring proof that a municipal actor disregarded a known or obvious consequence of his action,

as a less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat*

*superior* liability on municipalities." *Waller,* 932 F.3d at 1284 (internal citations and brackets

omitted). In the single-incident (as opposed to pattern of violations) context, deliberate indifference only lies in a "narrow range of circumstances" in which a rights violation is "a highly predictable consequence of the failure to train . . .." *Brown,* 520 U.S. at 398. A plaintiff must show "a particular glaring omission in a training regimen" such that the violation could be seen as a "plainly obvious consequence" of the municipal practice. *Id.* at 410–11. The showing of "obviousness" must be so compelling that it could be said to "substitute for the pattern of violations ordinarily necessary to establish municipal culpability." *Connick,* 563 U.S. at 63; *see also Carr,* 337 F.3d at 1229-31 (where failure-to-train claim is based on *absence* of specific training, court must separate "omniscience of hindsight" from that which is constitutionally actionable).

Here, Plaintiff cannot establish deliberate indifference because there is no record evidence which could be said to have placed Denver on notice—whether actual or constructive—as to any training failure that was substantially certain to cause constitutionally infirm interrogations. The absence of such evidence, when weighed against DPD's policies and training programs show DPD homicide detectives were thoroughly trained in interrogations, including those involving persons who might be infirm, have a disability, or be otherwise unable to comprehend the situation. SUMF, at ¶¶ 23-59. And no evidence suggests Denver was or should have been on notice that any Individual Defendant – or any detective during the relevant years – was engaging in unsound or improper interrogations. Nor has Plaintiff attempted to identify a municipal policymaker with knowledge or awareness of the same. *See Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019).

To aid the deliberate indifference inquiry, the Tenth Circuit now considers whether: (1) the city's policymakers know, "to a moral certainty," their employees will confront a certain situation; (2) such situation presents the employee with a "difficult choice of the sort that training or supervision will make less difficult;" and (3) the wrong choice "will frequently cause" a civil rights

violation. *Lance v. Morris,* 985 F.3d 787, 801-02 (10th Cir. 2021) (citations omitted). While Denver agrees its detectives will inevitably encounter suspects of varying competencies, the second element cannot be met here. The detectives were trained and properly aware that *no suspect*, including persons with infirmities or cognitive defects, may be questioned if they lack full understanding of their rights or circumstances. SUMF at 23-59.. Since DPD detectives were fully aware of these protections at the relevant times, it cannot be concluded that any "difficult choice" would be aided by further training in these areas (except to the extent "more" training is always desirable). While witness questioning inherently involves judgment calls, there is no record basis to conclude the Individual Defendants – seasoned investigators at the time – were unprepared to make any "difficult choices." The third element also cannot be met because many interrogations do not result in charges, and even if they do, the criminal process does not end with the interrogation. Especially here, where DPD policy provides and its investigators understood that a confession or admission is but one step within a larger investigatory process, DPD clearly expects its investigators to corroborate their evidence through other sources. *Id.;*[23] *see also Szabla v. City of Brooklyn Park Minn.*, 486 F.3d 385, 393 (8th Cir. 2007) ("[A] written policy that is facially constitutional, but fails to give detailed guidance that might have averted by constitutional violation by an employee, does not itself give rise to municipal liability.").

Next, the record indicates the Reid technique was the prevailing police interrogation technique during the relevant years, and it was widely advanced in training curriculums throughout the United States. SUMF at 30-31. Plaintiff cannot show Denver was "on notice" of any deficiency

---

[23] There are inherent checks in the charging and prosecutorial process which afford an accused the opportunity to test the evidence against them, including the involvement of the DAO, judge, defense attorney, preliminary hearings, etc. which preclude a finding that any "wrong choice" necessarily causes, or is akin to a civil rights violation. SUMF, at [_____].

in its application when there was no *known* deficiency at the time. No witness, including experts, has opined that *during the 1990s,* Reid was considered inappropriate or problematic in the 1990s, and there is no law to suggest the same.

This acceptance of Reid means Denver could not have been deliberately indifferent in sending its detectives to schools which taught the technique(s). At least in certain circumstances, "a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established." *Szabla,* 486 F.3d at 393 (citing *Townes v. City of New York*, 176 F.3d 138, 143–44 (2d Cir. 1999)). As the Eighth Circuit explained in *Szabla*:

> The absence of clearly established constitutional rights . . . undermines the assertion that a municipality *deliberately* ignored an *obvious* need for additional safeguards to augment its facially constitutional policy. This is not an application of qualified immunity for liability flowing from an unconstitutional policy. Rather, the lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of deliberate indifference to constitutional rights that were not clearly established.

*Id.* at 394.

Since Reid was readily accepted by courts and in police training curriculums throughout the nation alike—and still is today—neither the technique itself, nor any tactic now complained of, was clearly established as unconstitutional, which means Denver could not have acted with deliberate indifference for the inclusion of Reid courses in its outside training. *See id.*

Finally, even if Plaintiff could show Denver had "notice" of any deficiency with respect to REID or its methods, he cannot show any "indifference" or "disregard" of any such consequences. For one, REID was surrounded by other *uncriticized* training schools within the DPD training curriculum. While the record indicates REID taught a relatively aggressive approach, investigators

were also attending schools at SPI, and Don Rabon, which taught their own rubrics and corresponding approaches. These additional courses – among a host of others – are fatal to Plaintiff's theory.[24] Accordingly, Plaintiff cannot establish the requisite facts to prove deliberate indifference on behalf of Denver. *Barney*, 143 F.3d at 1307; *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013).

3.    Plaintiff cannot establish causation.

Finally, Plaintiff can only prevail on his municipal liability claim if he can establish "a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Therefore, Plaintiff must show how Denver's alleged training failures caused *his* alleged harms. *See Carr*, 337 F.3d at 1231-32; *Estate of Reat v. Rodriguez*, No. 12-CV-02531-REB-MEH, 2014 WL 4358333, at *11 (D. Colo. Sept. 3, 2014) (plaintiff did not sufficiently allege a direct causal link between the alleged failure to train and his injury because he failed to adequately identify how Denver's policy actually caused the injury). Plaintiff, however, cannot identify any specific deficiency and/or missing component in Denver's training which could have directly caused the Individual Defendants to engage in any improper action, and he is thus unable to show the requisite nexus to continue with his municipal liability claim. *See Brown*, 520 U.S. at 405 ("rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). For this reason too, Denver is entitled to summary judgment.

a)    *Plaintiff cannot establish causation due to the sufficiency of his advisement and the voluntariness of his mother's departure.*

---

[24] Plaintiff did not attempt to subpoena, or depose any representative from, any training school attended by any Individual Defendant. Having not done so, Plaintiff cannot show that none of these leading training schools provided sufficient protections for any vulnerable populations.

First, Plaintiff cannot proceed with his claims against Denver because his rights advisement, and subsequent waiver, was knowing and articulate. Because Plaintiff was properly advised of his rights, and since the law requires no additional protection for juvenile suspects beyond those afforded Plaintiff here, *see Blankenship v. Estep*, 316 F. App'x 758, 760 (10th Cir. 2009) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979), Plaintiff – even if he could prove a DPD deficiency in juvenile-related interrogation training – cannot show he was harmed by any such deficiency. His claim should be dismissed for this reason alone.

Second, the Tenth Circuit has authorized officers to interrogate a juvenile without a parent present so long as the parent voluntarily agrees to leave. *United States v. Erving L.*, 147 F.3d 1240, 1251 (10th Cir. 1998) ("To the extent that E.L.'s will was overborne, it was overborne by the actions of his parents[—who encouraged him to confess and left the room to facilitate his confession—]rather than the actions of the officers"). That is exactly what happened here: Plaintiff's mother encouraged him to confess, then voluntarily left the room to facilitate his confession. Interrogation Tr. at 59–61. So, as with the advisement and waiver, even if Plaintiff could prove DPD insufficiently trains its detectives regarding the questioning of juveniles, he cannot show any harm from it because he was properly advised in this case. *See Erving L.*, 147 F.3d at 1251.

    b) *Plaintiff cannot establish causation because the objective facts known to detectives supported probable cause for his arrest*

One of Plaintiff's chief contentions is that any inculpatory statements he made during the interrogation – and in particular any statement pertaining to the actual murder of Emily Johnson – were coerced, or "fed" to him by detectives. (Doc. 96 ¶¶ 50, 70, 83).

But this is not true. On the contrary, at least two of Plaintiff's most important admissions

were *not* "fed" or provided to him by detectives, but were rather – as he now contends – solely products of his own imagination. First – while his mother was still in the room – Plaintiff stated, in response to a question about how the others committed the murder, that "they hit the lady in the head with a rock." Ex. FF at [28:7 – 17] and [31:6-21]. This corroborated information *already known* to detectives that Emily Johnson had been hit in the head, potentially *with a rock.* SUMF at 62-75. And as Plaintiff now admits, there had been no mention of a rock as the murder weapon *before* he volunteered it.

Later, after Plaintiff's mother was no longer present, Plaintiff had a lengthy exchange with Vigil about the actual attack of Emily Johnson. SUMF at 71. In that line of questioning, Vigil asks over a dozen questions, none of them leading, and very few even suggestive. And Plaintiff mentions, without being prompted or "fed" this information, that Emily Johnson was first assaulted "in the front room" and "on the couch." *Id.* In doing so, Plaintiff once again corroborates critical and accurate details about the murder, which he now admits he did not learn from any other source. *Id.* These admissions – and especially their accuracy – following Plaintiff's earlier unprompted mention of the "rock," would cause any reasonable police officer to believe Plaintiff knew something about Emily Johnson's house, not just her car.

Additionally, this line of questioning is probative as to Plaintiff's burden to prove this single-incident claim. Despite some aggressive questioning on certain subjects, when asking Plaintiff about the seminal, inculpatory facts in the case – how the victim was killed – Vigil reverted to an open-ended style of questioning, never feeding Plaintiff the answers. And although the officers of course knew such facts before the interview, they did not raise them until Plaintiff mentioned them himself.

The culpability suggested by these answers, together with the fact that Plaintiff cannot

challenge his advisement and/or rights waiver in this case, place the facts of his particular interrogation outside the contours of his *Monell* claim. Even if Denver had a custom or practice of improperly using Reid-based techniques on vulnerable suspects – which the evidence does not suggest – this should not inure to the benefit of a suspect who, after a procedurally appropriate advisement and waiver, then voluntarily admits to knowing the murder weapon, and the location of the victim when she was killed.[25]

Even discarding any allegedly coerced statement, Plaintiff's voluntary admissions situate him outside the contours of his *Monell* claim. Plaintiff cannot plausibly argue he could not comprehend the situation, leading him to falsely incriminate himself, while at the same time providing the police *accurate* details about the crime and crime scene. Since Plaintiff's voluntary admissions would have led any reasonable officer to believe he was at Ms. Johnson's house that evening (and thus a proper suspect for a felony murder charge), those admissions are what caused his arrest and prosecution, not faulty training procedures.

## CONCLUSION

Plaintiff's attempt to impose municipal liability under the circumstances of this case fails. Plaintiff has identified no specific deficiency in Denver's training, investigation or discipline with respect to officers' use of force. As a result, he cannot show deliberate indifference by Denver or

---

[25] Plaintiff may argue that to the extent these admissions *followed* any improper questioning, they are not relevant, because they remain a product of any backwards-looking coercion. But at his deposition, Plaintiff did not attribute these answers to coercion; he attributed them to the newscast which stated the rock was the murder weapon, and his own fabrication, respectively. SUMF at [___]. Further, Denver submits it cannot be liable here when some of Plaintiff's most critical admissions were obtained in response to *appropriate* interview questions, at least in the single-incident context.

that his allegations of a failure to train, investigate or discipline directly caused the officers' alleged use of force against him. Accordingly, Denver is entitled to summary judgment.[26]

      **WHEREFORE**, for the reasons discussed above, the City and County of Denver respectfully requests that the Court enter summary judgment in its favor and dismiss Plaintiff's Second Amended Complaint (Doc. # 96) against it, in its entirety, with prejudice.

      Dated this 20th day of July, 2023.

                    Respectfully submitted,

                    By: *s/ Jonathan Cooper*
                    Jonathan Cooper, Assistant City Attorney
                    Denver City Attorney's Office
                    Civil Litigation Section
                    201 West Colfax Ave., Dept. 1108
                    Denver, Colorado 80202
                    Telephone: (720) 913-3100
                    Facsimile: (720) 913-3155
                    jonathan.cooper@denvergov.org
                    *Attorney for City and County of Denver*

---

[26] Denver incorporates all arguments, and any all requests for relief by co-Defendants Vigil, Schneider, Martinez, and Priest.

**CERTFICATE OF SERVICE**

I hereby certify that on this 20th day of July, 2023, a true and correct copy of the foregoing **CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jane Fisher-Byrialsen
David N. Fisher
FISHER & BYRIALSEN, P.L.L.C.
Jane@FBLaw.org
David@FBLaw.org
*Attorneys for Plaintiff*

Peter H. Doherty
LASATER & MARTIN, P.C.
Peter@lasaterandmartin.com
*Attorney for Defendant Jonathan Priest*

Eric M. Ziporin
SENTER GOLDFARB & RICE, LLC
eziporin@sgrllc.com
*Attorney for Defendant Michael Martinez*

Andrew D. Ringel
HALL & EVANS, LLC
ringela@hallevans.com
*Attorney for Defendant Martin Vigil*

Josh A. Marks
David J. Goldfarb
BERG HILL GREENLEAF RUSCITTI, LLP
jam@bhgrlaw.com
djg@bhgrlaw.com
*Attorneys for Defendant R.D. Schneider, Jr.*

s/ *Jonathan Cooper*
Denver City Attorney's Office

*s/Conor D. Farley*
Denver City Attorney's Office

38