Transcript of the Deposition testimony of:

# Jonathyn Priest
## March 30, 2023

_____

Lawrence Rubin Montoya

v.

City and County of Denver, et al.

Civil No. 16cv1457(JLK)

_____



Mile High
## Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

**EXHIBIT C**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16cv1457 (JLK)

_____

DEPOSITION OF JONATHYN W. PRIEST

March 30, 2023

_____

LAWRENCE RUBIN MONTOYA,

Plaintiff,

vs.

CITY AND COUNTY OF DENVER;
DETECTIVE MARTIN E. VIGIL (Shield No. 86-12);
DETECTIVE MICHAEL MARTINEZ (Shield No. 82-29);
LIEUTENANT JONATHAN W. PRIEST (Shield No. 86-12);
DETECTIVE R.D. SCHNEIDER, JR. (Shield No. 85-24),
in their individual and official capacities,

Defendants.

_____

PURSUANT TO NOTICE, the deposition of
JONATHYN W. PRIEST, called for examination by the
Plaintiff herein, was taken at 4600 South Syracuse
Street, 9th Floor, commencing at 10:02 a.m., on
Thursday, March 30, 2023, before Aimee S. Reisinger, a
Registered Professional Reporter and Notary Public in
and for the State of Colorado.

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

2

APPEARANCES:

DAVID N. FISHER, ESQ.
JANE FISHER-BYRIALSEN, ESQ.
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street
9th Floor
Denver, Colorado 80237
303-256-6345
david@fblaw.org
jane@fblaw.org

         For the Plaintiff

JAMES KADOLPH, ESQ.
(via videoconference)
SGR, LLC
900 E. Mexico Ave, Suite 700
Denver, Colorado 80210
303-320-0509
jkadolph@sgrllc.com

         For the Defendant Michael Martinez

DJ GOLDFARB, ESQ.
(via videoconference)
Berg Hill Greenleaf Ruscitti, LLP
1712 Pearl Street
Boulder, Colorado 80302
303-402-1600
djg@bhgrlaw.com

         For the Defendant R.D. Schneider

BEN LONGNECKER, ESQ.
(via videoconference)
Assistant City Attorney
City and County of Denver
201 West Colfax, Dept. 1108
Denver, Colorado 80202
303-685-2244
ben.longnecker.denvergov.org

         For the City and County of Denver

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

3

APPEARANCES (continued):

SHANNON M. HURLEY, ESQ.
(via videoconference)
Hall & Evans, L.L.C.
1001 17th Street
Suite 300
Denver, Colorado 80202
303-628-3300
hurleys@hallevans.com

For the Defendant Martin Vigil

PETER DOHERTY, ESQ.
Lasater & Martin, P.C.
8822 S. Ridgeline Boulevard
Suite 405
Highlands Ranch, Colorado 80129
303-730-3900
peter@lasaterandmartin.com

For the Defendant Jonathyn Priest

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

4

INDEX

EXAMINATION:                                            PAGE

BY MR. FISHER                                        6, 150
BY MR. DOHERTY                                           --
BY MR. GOLDFARB                                         142
BY MS. HURLEY                                            --
BY MR. LONGNECKER                                        --
BY MR. KADOLPH                                           --

_____

EXHIBITS:                                         INTRODUCED

        (No new exhibits were marked)

                                                     INITIAL
PREVIOUSLY MARKED EXHIBITS:                        REFERENCE


  6    Interrogation video of Lawrence Montoya         48

 14    Denver Police Department Officer Education      112
       Record for Richard D. Schneider
       (DENVER 007679 through DENVER 007683)


       Request for production by Mr. Fisher:

            Page 36, line 22

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

5

P R O C E E D I N G S
* * * * * * * * * *
JONATHYN W. PRIEST,
having been first duly sworn, was examined and
testified as follows:
EXAMINATION
BY MR. FISHER:

Q.  Good morning, Mr. Priest.

A.  How are you?

Q.  Good.  We have never met before, I don't think; is that right?

A.  I don't believe so.

Q.  Okay.  Have you ever been deposed before this?

A.  I have.

Q.  Approximately how many times?

A.  Lots.

Q.  Okay.  When was the last time you were deposed?  What was that about?

A.  Well, I do a lot of civil stuff in -- related to officer-involved shooting cases, homicide cases, sex crimes.  I think the last time I had a deposition was earlier this year.  It may have been December of last year, but I think it was earlier this year.  I -- and if I recall correctly, it was either Ohio or Texas.

6

Q.  Okay.

A.  I would have to do some research to figure out for sure.

Q.  And so those depositions you're being deposed as an expert witness, the ones you're talking about?

A.  Yes.

Q.  So tell me a little bit about your work as an expert witness now.

A.  Well, I've been doing expert work even before I left the job in 2011.  A lot of it deals with forensics -- bloodstain pattern analysis, shooting incident reconstruction, crime scene reconstruction, interview and interrogation, officer-involved shootings -- that's the majority of the things that I do from an expert standpoint.  I will talk about major case management, and things of that nature, depending.  But the majority of it is bloodstain, crime scene, shooting incidents, officer-involved shootings; those are the ones I deal with primarily.

Q.  Like how often would you say you are hired to be an expert these days in those types of cases?  A few a year, or --

A.  I'm probably doing, at any given time, a dozen cases at a time.

Q.  Okay.  Any of those cases involving any kind

7

of shoeprint identification expertise?

A.  Just had a case in Ohio dealing with that.  Now, I don't have an expertise in shoeprint; but from a background in doing homicide investigation, I've gained knowledge of the things that are looked for with respect to that.

Q.  I guess is it fair to say you don't classify yourself as a shoeprint analysis expert?

A.  I do not.

Q.  Okay.  And I guess never have?

A.  No.

Q.  Have you ever been deposed as sort of a fact witness or a lay witness or in a case where you were a defendant in a civil case?

A.  No.  Well, I'm not sure if it qualifies.  I used to be the subject matter expert for the city and in a lot of different things:  Policies and procedures, investigative protocols, things of that nature.

Q.  When you say "the city," you mean DPD?  Or Denver?

A.  City and County of Denver.

Q.  You also said you've been -- you've worked as an expert in the area of interview and interrogation; is that right?

A.  Yeah.

8

Q.  How many times have you been hired as an expert in interview and interrogation?

A.  Specifically, I can't recall.  As part of some other component, major case management, interview styles, child abuse investigations, sex crimes investigations, even homicide investigations, officer-involved shooting investigations, I've been asked to look at interviews in many of those as well.

Q.  So that would be dozens of times, I imagine?

A.  Yeah.  Lots.

Q.  And have you ever been specifically hired only to opine on a certain interview or interrogation in a civil case or something, or a criminal case or --

A.  Not that I recall.  I can't say that it never happened, but that doesn't sound like something I had -- where that was the only thing I was asked to do.

Q.  Do you consider yourself to be an expert in interview and interrogation techniques?

A.  I've taught interview and interrogation techniques for 20 years.  I was the interview and interrogation instructor for the Denver Police Academy while I was still working on the job.

Q.  When did you start doing that, instructing, or being the instructor?

A.  Late 1980s.

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

9

Q. Okay. So well before the incident in this case?

A. Yes.

Q. So just FYI, I'll probably refer to "this case" sometimes, and I'm talking about, you know, the 2000 homicide investigation into Emily Johnson's death and the subsequent prosecution, and that's what I'm talking about when I say "this case." Does that make sense?

A. Sure.

Q. Since you've been deposed a bunch of times, I won't go over all the additional other rules. I will say this one thing that might be a little bit different. You have an attorney representing you here, which is not always the case when you testify as an expert usually, right?

A. Correct.

Q. At certain times during the deposition, he or some of the attorneys on Zoom might object to certain questions I ask. Okay?

A. That's -- yes.

Q. And if they do, I want you and I to both try to allow them space to be able to state their objection on the record. But once that objection is lodged, you can just go ahead and answer the question. Okay?

10

A. Understood.

Q. Occasionally it could be that your attorney directs you not to answer a question, and that would be a different story, and we might have a conversation and then go from there. Okay?

A. Okay.

Q. Getting back to your expertise on interview and interrogation. You said that you were an instructor for interview and interrogation for DPD for how long?

A. Oh, since the late 1980s. So quite a while.

Q. And so like where would you be teaching those classes? At DPD, or at other events where other law enforcement are involved in learning?

A. Yes.

Q. Both? Is that right?

A. That's correct.

Q. How many times would you say you taught interview and interrogation? Would it just be hundreds or something?

A. Exactly.

Q. Okay.

A. I did the teaching for the police academy. I also did instruction for CDI, various law enforcement agencies around the state of Colorado -- and this is

11

when I was still on the job -- through an organization known as HIDTA, which is High Intensity Drug -- High Intensity Drug enforcement agency -- which is a federal funded agency. And I did that in a number of states. So I did interview and interrogation instruction for them as well.

Q. Is it fair to say that over the years you've made yourself familiar with a lot of the social science between research that goes behind interview and interrogation?

A. I have.

Q. Okay. And also, I imagine you're familiar with all the different modalities of law enforcement training regarding interview and interrogations?

A. A lot of different styles. And one of the things I talk about in -- when I would do my instruction is law enforcement, per se, doesn't spend a lot of time on interview and interrogation training. Most investigators, or officers seeking more expertise in interview and interrogation, do so on their own or through some subsequent training facility. Law enforcement agencies offer routinely four hours or less of training in their academies for interview and interrogation. It's not very much. For those people who are good at interviewing, or who are considered

12

good at interviewing, typically you learn that in one of two ways: Additional training that they seek on their own or experience, just doing it.

Q. Are you familiar, I imagine, with the Reid technique?

A. Very.

Q. Is it something that you've taught over the years?

A. No.

Q. Have you ever used any of the things from the Reid Technique in your teaching?

A. I can't say that I haven't. My style of interviewing was more benevolent.

Q. Tell me what you mean by that.

A. Low key. Conversational. I wasn't the in-your-face kind of guy. I know that some of the things that occur in the Reid Technique training is the moving of the chair and getting closer to the individual, invading body space. Although that's a technique that I talk about, it's not something I typically would use or encourage, but it's a tool in the toolbox. It's just one more thing that you could use, but it -- it was never one of the things that worked well for me; so because of that, I never used it much.

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

13

Q.  So you're talking about like the -- the thing that you never used that much and didn't work for you that much was that sort of invading body space/moving the chair closer technique?

A.  Yeah.  I rarely used that particular technique.  I'm not saying I never used it, but it was not something that -- it wasn't a go-to.

Q.  What about the -- I mean, you would agree with me that the Reid style of interrogation is largely accusatory, once you've defined somebody as a suspect?

A.  Well, I think all interview technique -- interrogation techniques at some point become accusatory.

Q.  I guess I --

A.  The difference would be --

Q.  Sorry.  Go ahead.

A.  -- with an interview, you are gathering evidence, gathering information.  It's conversational.  Interrogation, by definition, is express questioning or its functional equivalent.  Words or actions on the part of the police or those that they should know are reasonably likely to elicit an incriminating response.  Now, that's language right out of Rhode Island v. Innis.  And that's basically what an interrogation is.  By its very definition, it becomes accusatory, or it

14

becomes more direct.

Q.  Where you might -- and when I talk about, I guess, accusatory, I'm talking about where you're telling a suspect, "We think you're guilty because," or "Here's some of the evidence we have," or "Here's some of the evidence we might have."

A.  Sure.  Accusatory typically to me would be, "Did you kill your wife?"  "Were you in the store at the time of the robbery?"  You know, basically more accusatory, the "We think you did it and here's the evidence that supports that," that's simply following up with evidence.  Accusing them.  "Here, I've got you right here."

Q.  Did you ever teach any other different methods or brands other than Reid Technique?  I know like W-Z has a school of training, I know there's different modalities, different trainings.  Did you ever use any of those in your trainings?

A.  Well, most of the training that I did was based on, again, the more benevolent style.  I took a number of courses through an individual by the name of Don Rabon --

Q.  Sure.

A.  -- who looked at body language, more specific -- he had a much more benevolent style -- and

15

I adopted much of the curriculum for my training from that type of style and watching those kind of interviews.

Q.  Have you watched the interrogation of Lorenzo Montoya in preparation for this deposition?

A.  I've seen that, yeah.

Q.  More recently?

A.  Yeah.  Probably within the last week or so.

Q.  Would you say that that interview was more in the realm of the benevolent style that he -- that you have taught over the years?

A.  Yes and no.

Q.  And tell me what you mean by that.

A.  Well, some of it was much more aggressive.  You have two very different interviewers that are in that room:  Martin Vigil -- who could be very aggressive, but he could be very benevolent -- and Mike Martinez, who oftentimes was much more benevolent.

The -- Martin's style differed -- he wasn't the only one -- it differed from the way that Mike would do it.  Both of them had a background in child abuse investigations -- in fact, both of them had worked in child abuse before they came to homicide -- so they had an understanding of how to deal with different types of victims or victimology or

16

individuals.

So to say that that interview was predominantly aggressive, I would say no.  To say that it was predominantly benevolent, probably more so than not, because it was asking questions and it was trying to get information.

Q.  Do you teach, in the trainings that you've done, to avoid using a lot of leading questions?

A.  To the most part, yes.  Suggestive questions, definitely.  Leading questions?  Sometimes leading questions are the way that you get to another point.  It's not something that I would say the entire interview should be based on a leading-question methodology, but are they used?  Certainly.  It's a tool in the toolbox.

Q.  Do you teach in your trainings that interrogators should avoid giving facts to the person they are interrogating that only the real perpetrator would know?

A.  Yes, unless it's furthering something that they may be dealing with.  Questions like, "You know we have your fingerprints at the scene," for example, may be phrased in the form of, "What would you say if I told you I had your fingerprints," or "Would you be surprised if your fingerprints were recovered

Deposition of: Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

17

from..." -- you know, those types of things, rather than just saying, "Hey, we've got your DNA," things along that line.

Q. Why do it that way? Why do it in the "What if I told you" versus "We do have your DNA"?

A. Because if I don't have that information and I just accuse the individual of, "Hey, we've got your DNA" or "We've got your fingerprints," and the guy knows that I don't, you know, for whatever reason, you know, now they just caught me in a lie. And that's never good for rapport.

Q. Right. What about if a suspect gives some information that you as the investigator know is incorrect about the crime scene or couldn't be possible, what do you train in regards to should you be correcting that and telling them the real information?

A. No, I would hold onto that. Personally, I would hold onto that information. I may use it later.

Q. Well, why would you hold onto it and not tell the suspect the actual and the real information?

A. During an interview, lies are every bit as important as the truth, because sometimes it gets them to build themselves their own little world based on a lie. And then when you hit them with something that, "Well, this is what we really know and this is why we

18

know it," all of that comes crumbling down. And sometimes it can be a breaking point for them to where they realize, God, I built this entire structure based on this incorrect fact, and now, all of a sudden, it's they know the whole thing.

Q. I guess maybe let me give you a little more context. I guess when you have been teaching interrogations and interviews over the years, have you taught your pupils, for lack of a better term, to avoid contaminating interviews? Do you know what I mean by that?

A. Well, certainly. I mean, you don't want to -- you certainly don't want to build your interview on a bunch of lies.

Q. Not lies. I guess what I mean is oftentimes when you're the investigator doing the interrogation, you know lots of stuff about the actual crime and the crime scene and the evidence and the time of death and where the thing occurred and what the crime scene suggests, like you know lots of those facts, right?

A. Sometimes. Not all the time.

Q. Yeah. And if you know those facts, do you teach that -- do you teach your pupils who you're teaching how to interrogate, you don't want to tell those facts to the suspect, you want those facts to

19

come out of the suspect's mouth in the first place so that we know it's coming from the suspect and not from the police officer?

A. Agreed.

Q. Okay. Do you think, in watching the interrogation in this case, that that was something that was followed by Officers Vigil and Martinez, that lack of contamination, or fixing? If Montoya got a fact wrong, they gave him the right answer afterwards; did you notice that?

A. I guess the short answer is I don't know. Yes, I watched the interview. Did I pay attention to every word? No. Even when this case occurred, watching the interview was not my focus, it was other things.

Q. Tell me more about that. What was your focus while the interview was going on?

A. Well, my main focus on this entire thing was the crime scene and how evidence was adapting and matching and meeting what I saw at the crime scene.

Q. So you had been to the crime scene pretty shortly after the body was discovered?

A. I was there as the ambulance was pulling away.

Q. Yeah. And so by the time Lorenzo Montoya got

20

interrogated ten days later, you had been to the crime scene more than once?

A. Oh, many times. I spent probably two months on that crime scene.

Q. Okay. And so by the time Lorenzo Montoya is interrogated, you know a lot about the crime scene?

A. I do, yes.

Q. But at the time Lorenzo Montoya is being interrogated, I notice you come in and out of the room a couple times; fair to say?

A. The first time I was called into the room to look at the shoes.

Q. Uh-huh.

A. My knowledge of Lorenzo Montoya in the early stages of the investigation was he was there because he was with our prime suspect, Nick Martinez, and we thought he could provide us more information regarding Nick.

Q. And when you say "with Nick Martinez," you mean the following day --

A. In the car.

Q. -- in the Lexus?

A. Yes.

Q. Okay. When Lorenzo Montoya came in, you didn't have any information that he had been at Emily

21

**Johnson's house on the night of the murder; is that fair to say?**

A.  Specific information, no.

**Q.  And so in any event, you said during the interrogation -- we talked about how you had come in once or twice.  I think you said -- you agreed that you had been called in to look at the shoes, correct?**

A.  Yes.

**Q.  Did you notice you also came in at least one other time during the interrogation?**

A.  I came in twice more.  Once was to ask him if he was willing to take a polygraph.

**Q.  Right.**

A.  And that wasn't unusual for us to use that particular technique, and one of them was to avoid compromising any developed rapport.  Mike and Martin -- Martin Vigil and Mike Martinez had developed a rapport with Lorenzo and his mother, and I didn't want them contaminating that by asking what might be considered a hard question, "Do you want to take a polygraph."  So used a surrogate.  And that's really why I went in there to do that was to avoid contaminating their rapport.

The second time that I went -- or, actually, would ultimately be the third time, was to compare his

22

statements to physical evidence, and that's the shoeprints that were at the scene, and, you know, why his shoes -- you know, why we were looking at those shoes in relation to the photographs at the scene.

**Q.  So but you came in at various points.  You also, I imagine, watched the interview from a different room at various points?**

A.  No.  If I did, it was just occasionally.  I know that at one point I directed mom -- in the viewing room -- we had two of them -- and plus we had some remote areas that you could view the interviews.  We had two of them next to the two interview rooms, which were all along the hall.  We moved mom into the viewing room right next door to the interview room where Lorenzo was so that she could watch the interview, and if at any point in time she says "I don't like this," she could stop it.  And that was the whole point of that was to put her in there.  I really wasn't spending a lot of time watching the interview.

**Q.  Was that on purpose?  Did you not want to watch the interview?  Did you not have time to do it?  Were you doing something else?**

A.  I had a lot of balls in the air.  I still was dealing with stuff at the crime scene; Nick Martinez was over in the assault unit; he was being interviewed

23

over there.  There were other individuals who were down there.  I was facilitating -- which is really what the role of a supervisor is, is to facilitate; it wasn't to direct the investigation, per se.  I'm not there to be the better detective, I'm there to help these guys do what they need to do.

**Q.  I mean, we'll get into this later -- well, let me ask you this question.  Were there times during the interview or afterwards where Vigil or Martinez would come to you and say, "This is what Montoya is saying" or "Let me fill you in on what he has said" or "Here's a written summary of what he said"?**

A.  No.

**Q.  So when the interview was over but before -- and we'll get into this later -- but when the interview was over before an arrest affidavit was authored that night, did you ever learn the full contents of what Montoya had said?**

A.  No.  Basic stuff.

**Q.  When did you learn, if ever, the full contents of what Montoya had said or not said during that interrogation?**

A.  It was probably within -- I wouldn't say hours, but maybe days of the interview.  And now I'm comparing -- there were a couple things that he said

24

during the interview -- and I don't recall specifically when I learned this -- but they were things that fit very closely to the evidence that was at the scene.  And those are the kind of things that piqued my interest, but not necessarily that night.  Like I said, I had a lot of balls in the air that evening and was making sure that everybody had what they needed to do their jobs.

**Q.  So we'll get into this later, but now I'm just too curious not to ask you.  Are you familiar with what Detective Schneider, who authored the arrest warrant in this case, said about where he got the information from?**

A.  I am.

**Q.  And that he said he got all that information from you and that you told him what Lorenzo said and he wrote that in the affidavit?**

A.  It's not how I would have done it.  It's just not the way we did business.  And why Rick would say that, I have no clue.  I can tell you that if I have information for an affidavit, I'm typing it myself.  And for a couple reasons.  One, I was a much better typist than Rick was, and I could do it a whole lot quicker.  So it's just not the way that I would have done it.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

25

**Q.  So when you say "not the way I would have done it," are you saying that you don't have a specific recollection of whether or not that happened, but you're just going on your general practice?**

A.  I can tell you, I would not have dictated to him what somebody else is learning.  If somebody was going to dictate that to Schneider, it should have been one of those two that was in the interview room, not me listening to it off of it, no.  That's just not the way I would have done it.

**Q.  Okay.  So we'll get back to it a little later.**

**So we -- I want to ask you what other things you reviewed before this deposition just to familiarize yourself with some of this stuff.  I know a lot of it is very old, right?**

A.  23 years.

**Q.  Yeah.  So you watched Lorenzo's videotaped interrogation.  Did you watch any other audio or video interviews that had occurred back then?**

A.  No.

**Q.  Did you read any reports or written statements of Luke Anaya or Nick Martinez, or anything like that?**

A.  No.  Again, when this whole thing first

26

started, I was asked questions about it, and I told them then, I said, my primary focus was that crime scene.  That, I remember very well.  I testified as an expert at the preliminary hearing, I testified as an expert at the motions hearings, and I testified in an expert capacity at trial dealing with the crime scene.  And those are the things that I remembered very well.  And all of -- I didn't review anything to bolster any of that.  The only thing that I reviewed prior to this is the interview of Lorenzo.

**Q.  Okay.  Have you not reviewed any of your expert reports from back then or your testimony from back then, or anything like that?**

A.  No.

**Q.  Okay.  Have you ever seen the -- either the original complaint that was filed in this case, the civil case, the one that you were served with, or the amended complaint?  I'm just trying to understand if you know sort of the accusations against you and the other defendants in the case.**

A.  I likely have.  I don't recall what it says.  I mean, typically when I get one of those, they -- it's blah, blah, blah, a lot of times.

**Q.  Understood.**

A.  I mean, it's just -- no.  I know I would have

27

read the original complaint, but now we're talking six years ago now, so...

**Q.  Sure.  Have you reviewed the arrest affidavit that caused Mr. Montoya to become charged with first-degree murder, the one authored by Schneider?**

A.  I want to say that I have.  I know that there was a time that I reviewed it, and that's probably been months ago that I did that.

**Q.  I know I sort of asked you this, but I'll be a little more specific.  Have you reviewed any other police reports, forensic reports, anything like that, just to kind of refamiliarize yourself with anything?**

A.  No.  And, again, there were things that I learned about tests that were done once this thing happened.  I didn't know some of those things at the time.

**Q.  And when you say "this thing," you mean the civil lawsuit?**

A.  Yes.

**Q.  Okay.  Do you know what things you're referencing there?**

A.  The shoe pattern report.  I never saw that.

**Q.  Okay.**

A.  Originally.

**Q.  So you testified at a preliminary hearing in**

28

**this case?**

A.  I believe so, yes.

**Q.  And you testified at trial twice, that I could see?**

A.  Yes.

**Q.  Did you also testify at Nick Martinez's, trial?**

A.  I would have to say I did.

**Q.  Did you testify at any suppression hearing for Lorenzo Montoya, or any other hearings that you can recall?**

A.  I believe that I testified at the motions hearing where Lorenzo's statement was suppressed --

**Q.  Okay.**

A.  -- by Judge Martinez.

**Q.  Have you learned about Nick Martinez's proffer interview that he gave in 2014?**

A.  I knew that he did that.  I don't know what it says.

**Q.  Okay.  So you learned back at the time in 2014 that he came in and gave that statement, or in and around that time?**

A.  I don't recall if it was in 2014 that I learned about that.  I can -- probably the best answer I can give there, at some point I knew that he had

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

29

given such a statement.

Q.  I guess I'll represent to you that he gave that statement in 2014, just so you know the timeline or the timeframe.  You had already been retired from DPD at that point?

A.  2011.

Q.  So where did you learn or how did you learn that Nick Martinez had come in and gave a statement about this?

A.  At some time after the statement.  And it would have been as part of the civil suit.

Q.  Oh, I see.  It's not like in and around the time it happened before you were sued somebody told you --

A.  No.

Q.  -- reached out and told you or anything?

A.  No.  I can tell you, my contact with the Denver Police Department since I left -- not that I have a bad relationship, I just haven't been there. I've worked two cases for the DA's office -- one was a -- both of them were police shootings -- since I left the job.  And that's really my only contact I've had with Denver since then.  So nobody has called me and told me about anything with respect to those old cases.

Q.  Do you know in general terms what Nick

30

Martinez said in his proffer interview?

A.  No.

MR. DOHERTY:  And I'll just caution you that any communications we've had or information you've learned from your legal counsel is privileged.

Q.  (By Mr. Fisher)  Right.  So in general in this deposition I won't be asking you for what did your lawyer tell you.  So just kind of keep that in the back of your mind.  That's not what I'm trying -- information I'm trying to get from you.

I know this is totally off topic, and we've already talked about this topic, but have you ever authored any reports as an expert about an interview and interrogation in the past in terms of in your role as an expert witness, like after you retired?

A.  Specific to interview and interrogation, no. As part of an analysis of an investigation, possibly. I've had those cases where I might comment on the lack of questioning or the way the questioning was done.  I have done an investigative analysis where an interview was a big part of the case, and I might comment on -- again, the lack of questioning or the way the questioning was done.

Q.  Have you ever written a report or testified in a manner where you were critical of the way the

31

questioning was done by police officers?

A.  I want to say that I have.  I believe there -- in fact, I think it was a -- was it a Denver case or a Jeffco case -- dealing with -- in fact, it was a sex assault investigation where there -- and mostly I was looking at the lack of investigative follow-up, but there were some issues with the interview.  But mostly about questions that were asked or not asked.

Q.  And when you say there were some issues about the interview, what are you talking about?  What kind of case was this?

A.  It was a sex assault case.

Q.  Okay.  And the alleged sex assaulter was the person being questioned by detectives?

A.  Yes.

Q.  And you had some issues with the way the questions were being asked?

A.  No.  It wasn't -- it wasn't the defendant that was being questioned, it was the victim who was being questioned.

Q.  I see.  Okay.

A.  And it was talking about the way that the questions -- not the way the questions were asked, but the questions that were asked, or the lack of questions

32

being asked.  That's what I recall.

Q.  And what was wrong with the questions being asked?

A.  A lot of them just deal with sufficiency. Not asking enough information, following up on particular information.  Somebody gives you information about -- I can't think of anything off the top of my head specific to that case, but it may be -- and I'll just throw it out -- somebody makes a statement, "The guy was clowning me, so I sparked him."  Okay.  Now, I might know what that means, but people who watch this interview won't.

So a lack of sufficiency would be, Well, what does all that mean?  I get it, I know what you're talking about, but there are others who won't.  So what about the follow-up question to that?  That would be the kind of thing that I would talk about.

Q.  In all the times you've been retained as an expert since you became an expert, like outside of law enforcement, like outside of working for DPD, have you ever been hired by somebody who was accusing the police of wrongdoing and they wanted to hire you to help them give an opinion to that effect?

A.  Yes.

Q.  Tell me about how many times.

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

33

A.  Oh, several.  Most of them -- I would say -- I would say all -- well, no, that's not true either. Most of them, the majority of them, were officer-involved shooting cases.

Q.  I see.  So the officer is being accused of wrongdoing because he shot somebody?

A.  Yes.

Q.  And that officer hires you to render an opinion in his case about whether or not he did anything wrong when he shot the person?

A.  That could be one way, where I'm working for the officer.  The other one is I could be working for the State against the officer.  So I've done that, too.

Q.  I see.  Okay.

A.  I've had cases where I've been hired by the family of -- suicide case -- I've been hired by the family to take a look at it and talk about, you know, why is this -- you know, we think it's a suicide, the police -- or we think it's a homicide, the police say it's a suicide.  Can you look at it and tell us?  And I've done cases like that.

Q.  In any of those cases did you ever render an opinion that it was a homicide and not a suicide, as the police were saying?

A.  No.

34

Q.  How many of those cases, approximately, have you done?

A.  Oh, lots.  Typically when you're dealing with that type of case, the decision to call it or not call it a suicide is not the purview of law enforcement. Law enforcement gathers facts, presents it to other authority.  You know, with that particular determination, that's made by the coroner or the medical examiner, depending on the state you're in. But law enforcement would gather those facts.  Same as me presenting a case to the district attorney.  I don't get to make filing decisions, you know, they do.  So, you know, I'm just a fact-gatherer.

Q.  Have you ever been hired by a plaintiff in a civil rights lawsuit, someone who said they were mistreated by the police, assaulted by the police, coerced into a confession by the police, anything like that?

A.  No.  Never had anything -- no coercion-type of things.  Never been an expert on either side with respect to that.  I may have been asked questions about interview techniques and things of that nature in various cases.

I'm trying to get to the first part of that question.  In criminal trials where the officer was the

35

defendant in a case and I was testifying for the State against the officer, I have been approached many times by civil attorneys who were going to follow up with lawsuits, and they wanted to retain me in areas like that.

Q.  But did you never take those jobs?

A.  Oh, I -- I told them that I certainly would be -- I could do that, if necessary, but the cases never went any further.

Q.  Okay.

A.  The civil cases never got to the point where they went further.

Q.  So you've never been hired to opine in a civil case whether an officer did something wrong during an officer-involved shooting?

A.  Oh, sure.  I mean, civil cases, yeah.  I mean, on both sides.

Q.  Okay.

A.  Typically I don't -- there have been those cases where, yeah, I believe the officer acted inappropriately.  There were other cases where I've had -- a Plaintiff would hire me to say, Hey, we think the law enforcement did wrong, would you take a look at this case for us?  And I would, and I would say, I'm really not finding where the officer did anything

36

wrong.  In those cases, I generally -- it's "Thank you; have a nice day."  It did just depends on the case.

You know, I've done so many of these, it's hard for me to think of a specific example.  I had a civil case on an officer-involved shooting in Texas where the plaintiff was saying that the officers did wrong and I didn't see where they did, and...

Q.  Where can we find a list of all the cases you've been involved in as an expert?

A.  Well --

Q.  Or a lot of them?

A.  I -- I would have to dig those up.  I have a list, my four-year list --

Q.  Okay.

A.  -- that I provide.

Q.  So that's something you could provide to your attorney and he could provide it to us?

A.  Sure.

Q.  Okay.

MR. FISHER:  We can follow up in writing, but I'll ask that you provide that.

MR. DOHERTY:  (Nodded his head.)

Q.  (By Mr. Fisher)  And that's something -- that's a list that you provide when you become an expert, kind of a here's my CV, here's my list of

37

testimony, et cetera, in the last four years?

A. Yes.

Q. Okay. Do you also keep a lot of the reports that you've written over the years as an expert?

A. Some. Typically once a case is adjudicated and it's gone, I try not to hold onto all that stuff. I likely have some of it, but I can't tell you what -- what I do and what I don't have.

Q. As part of larger investigations that you're looking into as an expert, have you ever opined, either one way or another, whether there was threats or promises made in an interrogation, or improper contamination where the officers were conducting themselves in such a way that could cause a false confession? Did you ever opine on that one way or another?

A. No.

Q. Is that something you feel you could opine on, based on your experience and training?

A. If I was asked, I certainly could.

Q. Okay. Would you say -- have you been keeping up over the years with the social science and the law as it's been changing in regards to interview and interrogation tactics and techniques?

A. Some.

38

Q. Do you think the social science teaches us something different now than it did, say, in 2000 about things that should be avoided in interrogations and interviews?

A. To an extent, yeah. I think some of that has changed as far as some of the techniques that might be employed -- not saying that they're not still employed, but there have been technique changes, but there hasn't been corresponding law changes to say you can't do that anymore. Like when Miranda came out, that was a big change. There hasn't been that kind of change. But in some of the training and some of the suggestions and things like that, those are changed.

Q. Can you tell us --

THE REPORTER: Hold on, we lost Mr. Longnecker. Sorry to interrupt.

MR. FISHER: No problem.

THE REPORTER: Let's take a break while we get him reconnected.

(A recess was taken from 10:44 to 10:55 a.m.)

MR. FISHER: Okay. We're back on the record after a short break.

Q. (By Mr. Fisher) How long were you a police officer?

A. 32 years.

39

Q. Can you tell us any complaints that were ever made against you while you were a police officer by anybody?

A. I had one where they were -- probably the biggest one that I can remember was there was an investigation into the off-duty practices of the police department where one officer was accused of, quote, double-dipping; working on the job and working off duty. And several other officers got dragged into that. I was one of them with respect to that. And it all was investigated by the Adams County DA's office.

Q. When was that, approximately? 2007 or something?

A. Say that again.

Q. 2007, perhaps?

A. It was probably about 2003.

Q. Okay.

A. Maybe. But, anyway, the AdCo DA came back, at least in my case, and said -- I was putting in 12-, 14-hour days, so there was -- I didn't really have a connection to that. But there was an optics issue, so I ended up catching some bad time because of that administratively. That was the one case that I remember off the top of my head.

Q. So when you say "catching some bad time,"

40

what do you mean by that?

A. I got fined days off.

Q. Okay. But you had done nothing wrong?

A. Criminally, no.

Q. Not criminally. I guess did you do something wrong against the DPD policy or something?

A. The claim was that there was violation of the off-duty policy, but the problem with the off-duty policy is it was very -- it was a poor policy, so they couldn't actually find me in violation of that. So what I was found in violation of is conduct prejudicial. So because it made the department look bad, they were going to spank me. That's basically what happened there.

Q. Okay. And what was the other one you were thinking of?

A. I've had things like missed a subpoena for court, and that was in my early days in the early 1980s. I got up late or overslept or something because I was working morning shift, and that was a nightmare.

I think I had a case where I served a subpoena to an officer for a case. Somebody came in and dropped a subpoena on me saying, Hey, this is for one of your people, and I just gave it to the guy and that was it. They filed the complaint. Apparently

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

41

they were trying to avoid service, and they filed a complaint that it didn't go through proper channels. I don't recall the outcome of that. I don't think anything happened with respect to that.

Those are the ones that come to mind.

**Q. Have you ever been sued before, other than this case?**

A. Yes.

**Q. And tell us about that.**

A. Involved an individual that was -- it was an officer-involved shooting case where the officer -- it -- we were involved in the investigation of the officer-involved shooting, but how the shooting occurred was related to a warrant that had the wrong address on it and they hit the wrong place. And ultimately an individual in some -- Ismael Mena was the individual's name -- he ends up getting shot by police. Turns out he's actually wanted for murder in Mexico at the time. He shoots at the cops, hits one of the officers in the arm, they shoot back and kill him. I did the officer-involved shooting investigation as part of that and the reconstruction of the scene. And because my name was part of that investigation, I ended up on the lawsuit.

**Q. Were you working for DPD doing that**

42

**investigation --**

A. Yes.

**Q. -- or this was after you --**

A. Yes.

**Q. Okay. So in what time period was this in? In and around --**

A. I was still a sergeant, so this would have been in the '90s when that occurred.

**Q. Okay. You became a lieutenant --**

A. 2000.

**Q. 2000. Not long after Montoya's arrest?**

A. February 1st.

**Q. Right. Did your promotion have anything to do with this case or the arrest or the solving of this case, or is it just completely coincidental that it was --**

A. No, just happened.

**Q. -- a month after?**

A. No, we -- promotions didn't happen that way in Denver. You didn't get rewarded for doing -- you know, having a great case and that got you promoted. No, didn't work that way.

**Q. What happened to that civil lawsuit against you?**

A. Ultimately, it was -- the whole thing was

43

dismissed. Ismael Mena got paid out -- I think the City ended up paying him just a settlement.

**Q. So there was some settlement and the case then got dismissed against the individual --**

A. Yeah. There were several -- there must have been 50 of us on that lawsuit. And I was probably on there longer than most, only because of, you know, my reconstruction countered what their expert was saying, and so I ended up staying on that lawsuit a lot longer. But ultimately the whole thing went away and the City paid out.

**Q. During that reconstruction, was that -- were you part of IA or something?**

A. No, it was homicide.

**Q. Was that like a -- was there a homicide criminal case against the officer who shot?**

A. No. It was an officer-involved shooting, and the homicide unit investigated the officer-involved shootings.

**Q. Okay. And --**

A. Plus, one of the things that I -- I did a number of things in Denver that other sergeants or lieutenants -- and detectives, for that matter -- didn't do because I had background and expertise in bloodstain pattern analysis, shooting incident

44

reconstruction, and crime scene reconstruction. So I was tasked oftentimes to help out with investigations that required that kind of work. And I'd do it for the assault unit or the sex crimes unit or the metro SWAT when they had an unintentional discharge or shooting a dog or -- could be any number of things that I would go in and do reconstructions on.

**Q. So now I know it to be the standard practice of most police agencies when they have officer-involved shootings, they don't do their own investigations, it gets farmed out to like a CRT team. It's a different agency investigating it. Was it not that way back then?**

A. No. And it's not that way in most places. Colorado has enacted a law where if you're involved in a shooting, then somebody else is going to come in and do the investigation.

Now, with respect to -- back in the days when I was doing all of this, with respect to Colorado, if there was an officer-involved shooting, typically the investigation was done by a task force, which was a group of individuals who were in that judicial district. Okay. They didn't come from outside the judicial district.

The reason that the Denver homicide unit did

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

45

officer-involved shootings in Denver was because the City and County boundaries are the same as the judicial district boundaries.  So we only have one DA, and the DA, being the chief law enforcement officer, chose who got to do the investigation.  And that's why we did that.

Most of Colorado used the task force team.  Still, throughout the U.S., you know, you go to LA and if they're involved in a shooting in LA, LA is doing the investigation.  I was part of a group of subject matter experts in the State of Washington where they're trying to adopt -- and I think have statutely adopted -- a civilian authority for doing officer-involved shooting investigations.  I was part of the task force in creating that.  I was part of the force in British Columbia where they adopted that, were doing civilian authority-type of investigations.

It's not something that I'm against, but, you know, the larger the department, the more -- the less bias there is in the investigation.  Small agencies don't have the expertise, don't have the background, don't have the personnel to do these kind of investigations, and that's why the others are brought in.

Q.  Since you got served in this civil case,

46

**other than your civil attorneys, who have you spoken to about the lawsuit?**

A.  No one.

**Q.  Not even family?  Friends?  Nothing?**

A.  No.

**Q.  Have you had no conversations with any of the other people who are also defendants in this civil lawsuit?**

A.  None.

**Q.  Is that intentional?  You wanted to make sure you didn't talk to them about anything, or do you never talk to them at all anymore?  Do you not have phone numbers?**

A.  Like I said, when I left the police department, I really haven't had any contact with them since leaving, for a couple reasons.  One, the -- there really hasn't been a need to, you know.  And, two, I'm busy doing other things.  I -- I -- I'm not one of those guys, and never wanted to be one of those guys, that they said, Oh, Christ, here he comes again.  You know, can't he find something to do?  Because we used to get that stuff all the time, these retired guys would come sit in the office and just drone on and on about whatever.  And I wasn't going to be that guy.  And, like I said, I did two cases for the DA's office,

47

which had nothing to do with the police department.  One of the cases I know the police department wasn't a big fan of mine for coming in and telling them they were screwed up -- and those are my words, it had nothing to do with any kind of legal opinion, or even my opinion.  And the other one was an officer-involved shooting case where I was looking at the forensic analysis on it and --

**Q.  Have you ever written anything about this civil lawsuit, whether in an email, an internet blog...**

A.  This case?

**Q.  Yes.**

A.  No.

**Q.  Okay.**

A.  I don't do that.

**Q.  Okay.  Obviously back when the criminal case was going on, you wrote several things that would all be in the case file, right?**

A.  Anything that I created as part of this investigation would be part of the case file.

**Q.  I'm going to show you one clip -- we talked about it earlier -- when you came into the room to look at Lorenzo Montoya's shoes.  I'm going to show you a clip of that and ask you some questions.  Okay?**

A.  Sure.

48

**Q.  Can you see that on the screen there?**

A.  "False evidence ploy"?  Yeah.

**Q.  Do you see that?**

A.  Yeah.

**Q.  Okay.  So just for the record, this is clip -- this is from the larger Exhibit 6.  Sorry.  This is from the larger Exhibit 6, which is the entire video.  And this is from segment 3 from timestamp 1:25 to four minutes and 12 seconds.**

(Video played/not herein transcribed.)

**Q.  So I'm going to stop the video 30 seconds in.  You would agree with me in the beginning of that video, Vigil is in the room with Montoya alone?**

A.  Yes.

**Q.  And all a sudden he just says, "Hey, let me see your shoes"?**

A.  Yes.

**Q.  And Montoya puts one of his shoes up on the table, right?**

A.  Yes.

**Q.  And then Vigil exits the room and he can be heard saying, "Hey, Jon, can you come over here a minute"?**

A.  Yes.

**Q.  Okay.  Was this totally impromptu?  Had there**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

49

been any discussion about this beforehand?

A. No.

Q. Was this just all a sudden he thought to himself, "Let me look at this guy's shoes and call Jon in here"?

A. And that's how I recall it. And we all knew -- all of us working this particular case knew that there were bloody shoeprints at the crime scene and that it was a pattern that was consistent. Not only was it in the crime scene, but it also was out on the concrete and up the sidewalk and up to an alley that was north of the scene, the same shoeprint -- same class characteristic shoeprint -- going all these different directions.

So they all knew that stuff, knew they existed and knew that there was likely a set of shoes that we would be looking for. In fact, early on when the car crash occurred, when we first found the car crash, we had people saying, "Hey, some guys ran over that way." And we went over to a house and there on the roof of that house was a plastic bag that had shoes in it. Huh, case solved. So, you know we hit that place; had nothing to do with. Why do you have shoes in a plastic bag on the roof? No clue. They didn't match what we were looking for. But, anyway. So we

50

all knew that we were looking for shoes.

Q. Okay. So there had been no discussion ahead of time, like, "Hey, if you're interviewing suspects here, look at their shoes" --

A. No.

Q. -- or "Maybe let's compare their shoes to what we know"?

A. No. This was something that we likely discussed at some point during the investigation, but I can tell you, there was no, "Hey, if you get a chance, take a look at his shoes and make it look really silly," you know. No, nothing like that happened.

Q. Did anybody call you -- Nick Martinez was interviewed that same night in the police precinct; Luke Anaya was interviewed that same night in the precinct --

A. This was the headquarters building.

Q. I'm sorry. In the headquarters building. Lloyd Martinez was also there interviewed. Did anybody call you in to look at any of their shoes?

A. No.

Q. Do you know why?

A. Well, I can't say that nobody called me in. I don't recall that. I recall this mainly -- my office is two doors away from where this interview room is.

51

And, like I said, I had a lot of moving parts and a lot of things that were going on, and I was likely either in my office, which you can see from the interview room, or I was standing near my office at the time. And that's when Martin came out and he called me. Literally, he could walk 10 feet and meet me in my office from where he is.

Q. And this -- I mean, we'll keep playing this video, but you come in pretty promptly and you have a magnifying glass and plastic gloves, or I guess rubber gloves?

A. Well, I had to go back out and get the gloves and come back in.

Q. Okay. Did you -- is that -- like a magnifying glass, is that something you just had sitting around in your office?

A. No, I had it in my pocket. I used to carry that. It was the Sherlock Holmes kind of thing where I would have that kind of thing in my pocket.

Q. All right. So let's go back a little bit and we'll keep playing it.

(Video played/not herein transcribed.)

Q. So you would agree with me, you came into the room, Montoya put first his right foot up on the table, you looked at it for a second or two, you said, "Let me

52

see the other one," right?

A. Uh-huh.

Q. And then he put his left foot up on the table, you looked at it for a second or two, and then you said, "I'll be right back," right?

A. Yes.

Q. Okay. And I'll keep playing it.

(Video played/not herein transcribed.)

Q. 10, 15 seconds later you came back into the room, you're putting on latex gloves, and you tell him to take his shoes off, right?

A. Yes. Like I said, all that stuff I kept in my office, so...

Q. Now, on the video, 41 seconds in, you are looking at one of the shoes with a magnifying glass?

A. Yes.

(Video played/not herein transcribed.)

Q. And you look at that one shoe with a magnifying glass for, I don't know, roughly eight, ten seconds, something like that?

A. Yeah. I'm looking for blood --

Q. Okay.

A. -- in the tread pattern.

Q. And the tread pattern and blood, you said?

A. No, I'm looking for blood in the tread

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

53

pattern.

Q.  Okay.  Are you looking for unique characteristics to that shoe --

A.  No.

Q.  -- other than regular class characteristics, or anything like that?

A.  No.  And, like I said, I'm not a shoewear guy, but I can recognize the pattern, and I knew looking at this pattern, it's a pattern like this that left the shoeprint at our scene.

Q.  Okay.  Did you see any blood when you were looking at it with a magnifying glass?

A.  Nothing that jumped out, but I know that we ultimately had that tested for blood as well.

Q.  And there was no blood, correct?

A.  None that I'm aware of.

Q.  Okay.  So now you're -- I'll just keep playing it.

(Video played/not herein transcribed.)

Q.  So now you're asking him whose shoes they are, right?

A.  Yes.

Q.  And he says, "They're Luke's shoes," correct?

A.  Right.  Well, I asked him, I said, "Are these your shoes?"  And he said, "They're Luke's."  "Luke

54

who?"

Q.  Did you know that the Luke he's referring to was also at the headquarters?  Police headquarters?

A.  Ultimately.

Q.  Okay.  And now you're looking at the other shoe with a magnifying glass, correct?

A.  Correct.

(Video played/not herein transcribed.)

Q.  So now you're looking at the other shoe for roughly ten seconds, maybe a little bit more, with the magnifying glass, right?

A.  Uh-huh.

Q.  And you asked Lorenzo, "Would you be surprised if I told you this shoe was at a homicide scene"?

A.  Yes.

Q.  Were you being careful to not say directly, "This shoe was at a homicide scene," like we talked about before, only saying "Would you be surprised to learn that this shoe was at a homicide scene"?

A.  Yes.

Q.  Why?  Why do that versus say, "This shoe was at a homicide scene"?

A.  I'm just recovering these shoes right now, so they haven't been tested, they haven't been looked at,

55

they haven't been examined.  So for me to come out and say, "Hey, these were the shoes that were at the homicide scene," and if he knows that they weren't and there's a reason why, then I'm basically showing him cards that he doesn't need to see.

Q.  And it's fair to say at that point, in looking at these shoes with a magnifying glass for ten seconds a piece, you don't know if these shoes were at the homicide scene, right?

A.  I can tell you that the pattern that's on those shoes was the same pattern that was in blood at the homicide scene.  So if it wasn't these shoes that made the print, it was shoes like them.

Q.  Right.  And the pattern that was on these shoes, it's a pattern that was on all Lugz brand shoes and also all Timberland brand shoes at the time; is that fair to say?

A.  No, because Timberland makes a lot of different styles.  So to say that it's only associated with one or the other, I can't say that.  But what I can say is that the pattern that was on those shoes matched the pattern that was at -- the class characteristics -- not the individual characteristics, but the class characteristics were the same.

Q.  Right.  And the class characteristics of the

56

pattern of the blood prints at the scene would be found in millions of shoes that were in the Denver area at or around that time?

A.  I don't have any kind of statistics like that.

Q.  Okay.  I'll represent to you that Chuck Martinez, who testified at the criminal trial, said that.

A.  Okay.

Q.  Do you have any reason to doubt that for some reason?

A.  No.  If Chuck said it, I'm sure that he knows.

Q.  Okay.  He's -- you know that he, at least at the time, was actually an expert in shoe pattern recognition and analysis, right?

A.  Yes.

Q.  Okay.  So when you're saying to Lorenzo Montoya, in front of his mother here, "Would you be surprised if I told you these were the shoes from the homicide scene," you don't know whether they were the shoes from the homicide scene, right?

A.  No.  And it's -- again, the way that I phrased it -- and I didn't phrase it the way you just parroted it back, but --

57

Q.  What did you say?

A.  "Would you be surprised if I told you these shoes were at a homicide scene?"

Q.  Right.

A.  That's what I said.

Q.  Right.

A.  And I had no clue whether they -- the shoes that made them, but I can tell you that they were very similar to what we were looking for.

Q.  Do you know that at the trial the prosecution never even proffered or made any kind of argument that these shoes that Lorenzo Montoya wore to the interview were the shoes that were found at the homicide scene? Are you aware of that?

A.  No.  I don't know anything about -- I remember what I did at the trial, and that was to talk about the bloodstains at the scene.

Q.  Okay.  Let me just keep playing this for a second.

(Video played/not herein transcribed.)

Q.  And then you said to him, "I'll tell you right now, this is the pattern we have at the homicide scene," right?

A.  Yes.

Q.  You said, "You better think long and fast

58

about this one, pal"?

A.  Yes.

Q.  And then we see you exit the room holding the shoes.

At one point during that video you had asked him, "If I talk to Luke about this, is he going to tell me the same thing"?

A.  Words to that effect.  "Is that what Luke's going to tell me?"

Q.  Right.

A.  Saying that, you know, I've only had these shoes whatever period of time.

Q.  Did you talk to Luke about it?

A.  No.  I know one of the other -- I may have told one of the other investigators, "Hey, see if we've got a Luke Anaya down here and, you know, find out what he's doing," and then ultimately one of the detectives brought him into the room.

Q.  Okay.  I know you sort of answered this question already, but do you know that at trial the prosecution put on Chuck Martinez, the expert in shoe analysis, to say that a pair of shoes recovered from 951 Newton, from Luke's room where he was living in the basement, those were the shoes that were a, quote, probable match, or a high-probability match with the

59

crime scene?

A.  The shoes --

MS. HURLEY:  Object to form; foundation.

Q.  (By Mr. Fisher)  You can answer.

A.  The shoes that were recovered from Lorenzo were -- there was -- they couldn't be eliminated as making the print.  The other ones that were recovered from the scene also could not be eliminated but had a higher probability of being the shoe.  Neither one of them could be eliminated.  That was my understanding of the shoeprint.

Q.  And when you say "recovered at the scene," you meant to say, I think, recovered from 951 Newton, which was --

A.  Correct.  The address that you just --

Q.  Right.  Which was -- there was a search warrant executed that was -- and they recovered those Lugz boots from Luke Anaya's room in the basement.  Are you aware of that?

A.  I don't know where they were recovered.  I know that they -- that some were recovered.

Q.  Okay.  And that's the same Luke Anaya who was in that station house that night?

A.  I'm assuming.

Q.  Luke Anaya was not subjected to a

60

two-and-a-half-plus-hour video interrogation.  You were the sergeant overseeing this investigation at the time; do you have any idea why he was not subjected to such an interview?

A.  Like I said, I wouldn't have known that Lorenzo Montoya was being interviewed unless Martin came out and had me come in and look at the shoes.  I knew that interviews were occurring; I didn't specifically recall who was being interviewed where.  But I knew from a general sense that we had a number of people that were downtown being interviewed.

Q.  Did you ever learn that Nick Martinez -- well, I will represent to you that Nick Martinez has come forward in 2014 in a very open-ended fashion, gave all the details of what had happened during the incident in Emily Johnson's house, including that Luke Anaya was an integral part in the assault and murder of her.

Outside of your conversations with counsel, did you ever learn that before?

A.  No.  I can tell you, I have no independent knowledge of anything that Nick Martinez said in 2014.

Q.  This was -- now I'm talking about Luke Anaya, who was at the station house that night, who had later been come in -- brought into Lorenzo's interview room

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

61

to say, "Yeah, he's been wearing these shoes on New Year's Eve," that's the same Luke Anaya we're talking about.  You understand that?

A.  I'm assuming.

Q.  Yeah.  And as far as you know, no one looked at his shoes that night and did a shoe examination of him like you did?

A.  I don't recall that.  I can't say that I never looked at anybody else's shoes.  There's a good possibility I did, but I don't have any independent recollection.  And the only reason I remember this is because of what I did right there.

Q.  Sure.  Now, again, you say to him, "Would you be surprised to learn that this is the same shoe from the homicide scene," right?

A.  "Would you be surprised to hear that these shoes were at a homicide scene."

Q.  Right.  And then you also say to him, "This is the same pattern we have from the homicide scene"?

A.  Yes.

Q.  Okay.  Let me show you a couple other clips that also occurred subsequent to you making this -- to you looking at these shoes with a magnifying glass.

So this is from clip 3, 8:15 to 9:19.

And just before I start it, you can see that

62

in the room -- I'll just put on the record in the room is Lorenzo Montoya, his mother is still sitting next to him, Mike Martinez is sitting at the desk behind a computer, and Vigil just walks into the room.

(Video played/not herein transcribed.)

Q.  So here's -- Vigil comes into the room showing Montoya a picture, right?

A.  I'm assuming that's what he's doing.  That sounds like what he's doing, and he's holding something in his hand.

Q.  It looks like a pretty small picture, like a 4-by-6?

A.  Yeah.  We were pretty frugal with our print size, yeah.

Q.  And he's showing Montoya this picture and saying to him -- let me just rewind it so we get it right.

(Video played/not herein transcribed.)

Q.  Let me go back.

(Video played/not herein transcribed.)

Q.  And he shows him the picture and says, "That's the same exact print" --

A.  Right.

Q.  -- "as the shoes you just had on your foot"?

A.  Right.

63

Q.  "Same exact print," right?

A.  That's what it says.

Q.  You know, again, from later on, that the shoe expert never even made an exact identification, right?  He never said this was the same exact shoeprint, right?

A.  Sure.

Q.  I mean, that's even a thing -- that is a terminology used -- I don't know if you know this or not, but there is a terminology used in shoeprint analysis where you say, "I can make a shoe identification."

A.  Correct.  To the exclusion of all others.

Q.  Right.  "This is the shoe," right?

A.  Yeah.  And I can tell you, that's unusual.

Q.  Right.  And this was -- that was not done in this case?

A.  Agreed.

Q.  And, in fact, the shoes on Montoya's feet right there basically couldn't be excluded, but were never even put into that high probability category, right?

A.  Oh, no.

Q.  Right.  But here we have Vigil telling him, "This is the exact print from the crime scene," right?

A.  Okay.

64

(Video played/not herein transcribed.)

Q.  And, again, "the same exact print," he says, right?

A.  Yes.

(Video played/not herein transcribed.)

Q.  And here he is again saying, "That's the same footprint.  Doesn't it look like the same footprint to you?  That's the same one," right?

A.  Yes.

(Video played/not herein transcribed.)

Q.  So I know you said something before.  I labeled this clip as "False evidence ploy."  Do you know what I mean by that?  Is that a terminology in interrogation that you're familiar with?

A.  I am, but that's not what was going on here.

Q.  Tell me why not.

A.  That wasn't -- we weren't creating evidence to get them to do something.  I mean, using something along the lines of bringing in the packet that, you know, says "DNA," and you throw it down and it's got their name on it and says, "You know what that is?"  You know, false evidence ploys.  That's not what was being done here.

Q.  Okay.  I guess terminology aside, what is being done here certainly by Vigil is he's telling him,

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

65

**"This is the same exact print from the scene," even though he has no idea whether that's true or not; fair to say?**

A.  That's what he's saying.

**Q.  And why do that?  You teach interrogations. Is that something proper to do?  Why do that with a suspect?  Why tell them that you're sure this is the same print if you're not?**

A.  It's --

**MS. HURLEY:**  Objection; foundation.

**Q.  (By Mr. Fisher)  What's that?**

**MS. HURLEY:**  Objection; foundation.

A.  It's a risk.  It would be like saying, "Hey, we got your fingerprints at the scene" when you know you don't.  It would be the same sort of thing.  It's a risk when you do that.  And sometimes that risk doesn't pay off, sometimes it does.

**Q.  (By Mr. Fisher)  What's the possible reward that you're looking for in doing that?**

A.  To get him to admit to it.

**Q.  Right.**

A.  Okay, you've got me, I was there.  Or it could be that it just -- he knows that it's not him, he knows he didn't leave those prints, and he just never admits to it.  I mean, it could be that.

66

**Q.  Were you ever taught or did you ever teach that there is also a risk of creating false confessions by continually telling somebody there's evidence against them in a crime could lead them to falsely confess?**

A.  Sure.  Not only have I taught it, I've been taught that.

**Q.  Okay.  So this is just one example I'm showing you here of that in this interview.  Were you ever taught or did you ever teach that doing that should be avoided for that express reason, to avoid false confessions?**

A.  It should be used cautiously.

One of the things about false confessions that is always a concern is we've had people come into the homicide unit or the assault unit or the sex crimes unit and confess to crimes they didn't commit.  And regardless of the confession that they produce, they still have to be supported by the evidence.

So let's just say, for example, that he said, "Yeah, I was there," we're not going to stop there. He's going to have to go further and help us understand -- help us understand why you were there.  I mean, you already told us that you weren't wearing these shoes on that night, so how is it that all of a

67

sudden now you are wearing them on that night?  So we would be going through stuff of that nature.

So the confession alone doesn't mean that, "Ah-ha, we finally got you."  Doesn't work that way.

**Q.  Right.  And if the confession that is ultimately given, for instance, just doesn't fit the crime scene in a lot of ways, that's something that should be considered very cautiously by the police at that point?**

A.  Certainly.

**Q.  And perhaps further investigation is warranted before you go ahead and arrest or charge somebody sometimes, right?**

A.  And I'll certainly admit, with respect to Lorenzo, much of the information, of the evidence against him, is circumstantial.  And it's primarily related to those shoes and knowledge that he has of an event that he shouldn't have knowledge of.

**Q.  Well, a lot of the details that he gave he got wrong.  Are you aware of that?**

A.  And that's not unusual in any kind of case. I mean, people don't -- they're not taking notes and not videotaping what it is that they're doing, so their recollection oftentimes can be skewed.  I mean, they can tell me something about, "Well, I never touched

68

that."  "Okay.  Well, then how do we have your fingerprint on it then?"  "I don't know, I guess I must have touched it."

**Q.  Do you know some of the things he got wrong in this interrogation?**

A.  Off the top of my head, no.

**Q.  Do you know that when he was asked by Vigil what time this thing occurred, he said 9:00 p.m.?**

A.  I -- I kind of remember something like that, but...  You know, he also talked about -- there was a lot of speculation early on about how they got into the house --

**Q.  Uh-huh.**

A.  -- and there was obviously attempt break-ins in the rear.  I was never able to support that that's how they got in.  And the reason for that is, is that the back door was assumed to be locked, and all indications are it was locked.  Pulling the boards off the milk chute, I couldn't reach that doorknob.  And I'm a tall guy with really long arms, and I couldn't reach that.  So I started thinking, how does a short kid do this?  You know, is he able to crawl in here to some extent?  I mean, I got some small detectives and I said see if you can get in there and get that door, and we couldn't do it.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

---

**69**

So I never really understood how they got in through the back.  But then when Lorenzo started talking about going in through the front door, even the blood evidence supported that.  And I said, this make a lot of sense, you know, based on other evidence that we had.

Q.  Well, Lorenzo also said several times during this interview that they bashed in the back window and that's how they got in?

A.  Yeah, but there's no evidence supporting that.

Q.  Right.  That was a fact he would have gotten wrong, correct?

A.  Agreed.  And why he's saying it, I don't know.

Q.  Right.

A.  And it could be that he's mixing it up with some other place that they did that.

Q.  Right.  There's no reason to admit I was there for a homicide and I went there to commit a burglary but lie about your mode of entry really, right?

A.  Not true.

Q.  That doesn't make a lot of sense?

A.  Not true.  People do some weird things for

---

**70**

weird reasons.

Q.  Sure.

A.  And to -- for me to say that -- well, why admit to this and not to that, you know, is -- it happens.  You know, people do some weird things for weird reasons.

Q.  How is it that you know Lorenzo said something about coming in the front door?  Is that something you watched during the interrogation?

A.  No, that was information that came later when he was over in Gilliam.

Q.  I see.

A.  And he made statements to individuals over there.

Q.  So Lorenzo told Detective Vigil that the assault and murder happened at 9:00 p.m.  That, the detectives knew was wrong, it was impossible, right?

A.  I can't say that they absolutely knew that because they didn't -- did you know that was wrong? I never asked them those questions.  I can only assume that they knew what time this thing actually occurred.

Q.  You know that's wrong, I should say?  I mean, everybody knows Emily Johnson was at a club until after midnight, right?

A.  Yes.

---

**71**

Q.  Okay.  And then Vigil corrected him about that and said, "You know what, the crime scene evidence suggests that it would have happened sometime between midnight and 4:00 a.m."

A.  Okay.

Q.  Isn't that what really happened, and Lorenzo agreed?  Did you see that in the video?

A.  I do remember something like that.

Q.  Okay.  And he asked Lorenzo at one point to draw an arrow where the Lexus was parked, and Lorenzo put it in the wrong spot.  And Vigil said, "Actually, someone put it over here"; isn't that correct?  Do you remember that?

A.  Yes.

Q.  At one point he asks Lorenzo, "What was she wearing?"  And he said, "Pants.  Pants or sweats."  But actually everybody knew that she was wearing a distinctive silver dress that night, correct?

A.  I don't recall that, what she was actually wearing during the assault.  I don't recall that.

Q.  Okay.  I'll represent to you that it was a silver dress.

A.  Well, I know that at some point that evening she was wearing a silver dress.  I can't say that that's what she was wearing at the time the assault

---

**72**

occurred.

Q.  Do you know what she was wearing when her body was found?

A.  I don't.

Q.  Okay.  I will represent to you that it was the silver dress.

A.  Okay.

Q.  Let me show you one more clip here.  So this one is from clip 4, 2:03 to 2:45.

(Video played/not herein transcribed.)

Q.  And just before -- towards the end of this clip he says, "We can prove positive that those are the shoes at the scene," right?

A.  Yes.

Q.  And that was not true at the time, right?

A.  No.

Q.  And never became true?

A.  No.

Q.  Any risk -- like we said, there is a risk in doing this that you could potentially create a false confession by telling somebody that there is evidence against them when there is not?

A.  Well, it -- not only that, but a risk that he's going to know that you ain't got me and I'll just not give you anything.

Deposition of: Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

73

Q. Right.

A. Or I'll tell you something else.

Q. There's, I guess, two potential risks that I can identify quickly off the top of my head: One is that you might lose credibility or rapport if the guy knows you're lying, right?

A. Yes.

Q. And the other is, if you keep telling somebody there's all this evidence against them, they might feel, "Gosh, I should tell these people what they want to hear," right?

A. And you can. And typically that's something that you're -- you know; if the person is really intoxicated or they have some mental weakness or something along those lines, yeah, that can be a risk there.

Q. I mean, but even his mom -- do you recall, even at his mom at one point said, "Lorenzo, would you just tell them what they want to hear so we can get out of here and go home?"

A. Yeah, I remember that.

Q. Yeah. I mean, even his mom, who was supposed to be the adult there, was convinced by the officers and what they had said so far that if he told them what they wanted to hear, she could go home, right? That's

74

what it appears from the video?

A. Yeah, I don't know what she was convinced by.

MS. HURLEY: Objection; foundation.

Q. (By Mr. Fisher) What did you say?

A. I don't know what she was convinced by.

Q. Sure.

A. Or what she thought.

Q. She said that though, right?

A. Something like that, yes.

Q. Okay. Let's just talk about in your expertise in interrogations and interviews, the other things in addition to telling a person evidence against them that really isn't true that can create false confessions.

What kinds of other things should police officers avoid to create false confessions -- to avoid creating false confessions?

A. Again, in false confessions, you need to think about what -- the abilities of the individual who is being interviewed. If I was dealing with somebody that had cognitive issues, I would be much more cautious about those types of tactics.

Q. Let me stop you there for a second and I'll let you go on in a moment. But do you know that Lorenzo has been classified as mentally impaired, he

75

has an IQ either in the 60s or 70s? Do you know anything about that?

A. No.

Q. Did you know anything about that at the time?

A. No.

Q. Did anyone inquire about that at the time, that you're aware of?

A. I don't know that now.

Q. Okay.

A. If that's true, this is the first I'm hearing of it.

Q. Okay. Is that anything that would routinely be inquired about at DPD --

A. It could be.

Q. -- when interviewing a suspect?

A. Could be.

Q. Okay. Is there any reason they wouldn't have asked Lorenzo Montoya about that or his mother about that?

A. No. Many of the questions that are asked in the early stages -- "Are you under the influence of any narcotic, drug, or alcohol?" "Is this statement being made voluntarily?" "Have any promises or threats been made to you at any time by myself or anyone else to get you to make this statement?" -- all those kind of

76

questions are designed to get -- to see what kind of response they give and how articulate they are in their response. Even when you go through a Miranda advisement, you're doing the same thing; you're trying to get an understanding of how well they understand what's going on. And if there's a question about whether they do or they don't understand this, then you're going to explore further.

Q. But, I mean, pretty much all of those questions you just asked are typically answered with just a yes or a no, right?

A. Sometimes, yes. But it's how they answer them.

Q. Sure.

A. For example, if I have somebody that's really intoxicated, doesn't mean I'm not going to interview them, but I'm going to be real cautious about how quickly I go forward, and I want to make sure they understand where they are and what they're doing.

Q. So you were saying the one thing -- before I interrupted you -- one of the things to consider is is this somebody with a mental impairment?

A. Sure. Are there any outward signs of that and are they giving me that indication that maybe they really don't understand what it is that I'm doing.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

77

Q.  Okay.

A.  I can tell you that -- Martin is a good interviewer; he's always been a good interviewer.  One of the things that -- we don't go into an interview browbeating somebody hoping that we can get them to confess to something they didn't do.  That's not what our intent is ever.  What we want is them to give us information that we can support through other means.  Like I said, if I walked into an interview with this guy and he came in and says, "I did it, it was me," now my job is to, okay, we need to be able to match what you just said with the evidence.  So we're going to talk about those things as well.

Q.  Uh-huh.

A.  Now, you talked about some of the things.  Well, he didn't know where the car was parked.  Okay.  That's assuming we knew where the car was parked.  So there's some things with respect to that.  Talks about the broken window going in.  Well, there was no broken window there.  But does that mean that he's not connecting that to some other memory that he could be having?

Q.  Let me stop you just on the broken window point and then we'll go back.

You're aware that Nick Martinez -- or there

78

was certainly a theory that they had gained entry through the milk chute, correct?

A.  That was the initial indication.  I couldn't duplicate that.

Q.  Well, there was a palmprint that matched Nicholas Martinez inside of that milk chute, correct?

A.  On the boards.

Q.  Okay.  On the boards which were covering the milk chute?

A.  Yes.

Q.  Okay.  But going back.  So I'm talking about what are the things -- you're an expert in interviews and interrogations.  What are the things detectives should do to avoid creating false confessions?

A.  Well, you certain -- no third-degree tactics.  I mean, you wouldn't want to do that in any particular case.

Q.  And by that, you mean like physical abuse?

A.  Physical abuse, right.

Q.  Okay.

A.  You know, one of the reasons that Miranda exists at all is because police interrogations are actually -- are psychologically coercive.

Q.  Sure.

A.  They just are.  And that's just the nature of

79

how they are.  But when you're dealing with false confessions, you want to have the ability to compare that to what you actually have.

Q.  I'm just talking about the things that the officers should and should not do during the interrogation to avoid false confessions.

A.  Well, you want to avoid leading and suggestive questions --

Q.  Okay.

A.  -- over and over and over.  But, again, that goes back to the mental ability of the individual that you're talking to and what kind of response that you appear to be getting from that person.

Q.  Are you aware that Lorenzo Montoya denied being in that home over 65 times, and he kept being asked over and over and over again whether he was there; we know you were there.

A.  Of course.  But that's, again, not unusual.

Q.  Okay.

A.  I mean, I've seen interviews go six, eight, ten hours, you know, before somebody finally gives up that they were actually there.  And then ultimately we were able to show through physical evidence that they were, in fact, there, and this is how we know all of that stuff.  So denials, you know, however many times

80

they want to deny, doesn't mean they weren't there or didn't do it.

Q.  Okay.  But you just expressed that it should be avoided; it can lead to false confessions to continue --

A.  I'm not saying it should be avoided; it should be used cautiously.

Q.  Okay.

A.  Because, again, police interrogations are psychologically coercive.  They just are.  And that's the reason that we give them the warnings that we do, and at any time he can say, "I don't want to talk anymore," you know.  But as long as they're talking, we'll continue to work at it.

Q.  Okay.  So let's keep going.  What else should police officers do in terms of their questioning to avoid false confessions?

A.  You know, I don't know -- most of the stuff I have on slides, and I don't recall it off the top of my head.

Q.  Even though you're an expert in interviews and interrogations, you can't say?

A.  Again, I would have to look at that information that I've done in the past.

Q.  But as we're sitting here, you can't think of

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

81

any types of questioning or things that should be avoided by police officers, other than what we've already talked about?

A.  Probably the top things are suggestive questions and leading questions are big things.

Q.  What about threats of possible consequences, for instance?

A.  It's kind of like the statement -- the paragraph that's at the bottom of many written statements, you know, "Any false information can result until a perjury investigation."  These are things that are at the bottom of many statements.  It's an implied threat, but we don't read it to them.  We don't tell them things like that.

Q.  What about if an officer just repeatedly is saying things like, "You can keep denying this.  You keep denying it, you're going to go to prison for the rest of your life"?

A.  It's a tactic that's used.  Tool in the toolbox.

Q.  Right.  Is that something, as an expert in interrogations, should be used cautiously?  Could cause false confessions if used improperly?

A.  I would say use cautiously.  Could -- if used improperly, could, yes.

82

Q.  Cause false confessions?

A.  Correct.

Q.  And especially if you couple that with either express or implied promises of leniency?  In other words, "Here's one option:  You keep denying it, you go to prison for rest of your life.  Your other option is we're here to help you.  We're trying to get you a deal here.  First one to the finish line wins."

Those types of promises, coupled with the types of threats for continued denials, those can be, if not used judiciously, a recipe for false confessions?

A.  Well, sure.  And one of the things you want to avoid is making promises that you can't keep.  For example, if the guys says, "Well, I want to talk with my mother."  "Well, if you'll confess, I'll let you talk to your mother."  Okay.  Well, that's a promise that I can keep.  Okay.  But if my promise was, "Hey, if you confess, I'll talk to the DA and make sure that you don't do any jail time," that's not a promise I can keep.  So that's not a promise I should be making.

Q.  That's a problem for one reason, it's not a promise you can keep.  But, also, that could induce the person being interrogated to think, okay, even if I didn't really do it, it seems like I can gain a benefit

83

here by saying that I did.  That's another problem with doing such a thing like that, right?

A.  Can be.

Q.  Did you notice any things like that when you viewed the confession of Lorenzo Montoya now in preparation for this deposition, threats about "You're going to go to prison."  "You're going to go to big boy jail."  Promises like "First one to the finish line wins on this deal."  "We've got someone in the other room; you need to help yourself out on this thing."  Do you remember things like that?

A.  I do.  All tactics that have been used in other interviews many times.

Q.  Okay.  Did you ever learn or did you ever teach that using all of those types of tactics in combination -- threats, promises of leniency, contaminating the interview, you know, giving the person information that they may or may not have known, leading questions, too many leading questions -- doing all that stuff in combination can cause false confessions?

A.  Well, can -- not necessarily false confessions, but false information certainly.  False confessions may be part of that.

Q.  Sure.

84

A.  And, you know, I don't want to characterize this as if you do these tactics, it results in -- it equals false confession.

Q.  Of course not.

A.  Not true.  Can it?  Certainly.  Has it?  Yes.

MR. FISHER:  You know what, let's take another five minutes or so, and then we'll get back.  We can go off the record.

(A recess was taken from 11:50 to 11:58 a.m.)

Q.  (By Mr. Fisher)  Switching back to the topic of shoeprints and shoeprint analysis.  Can you tell us about your knowledge of how that's done in the laboratory setting and what are the steps?

A.  Well, it works a lot like fingerprints.  Basically you're looking for class characteristics.  You pick up two shoes, and one of them has a -- I don't know, like a -- what I call a Lugz pattern, which was real popular and is still around.  I mean, if you have a wavy pattern from a tennis shoe and you have something more distinct like you have with the Lugz print here, that -- class characteristics.  Two different things completely.  Like whirls and loops on a fingerprint.  Individual characteristics are going to be those marks that -- those are the ones that you're trying to look at so you can make identification, okay,

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

85

as you try to find those individual characteristics. And with a shoeprint, that's really, really tough.

Q.  Right.

A.  The same sort of process when you're looking at rifling on a fired bullet or tool marks on a fired cartridge case.  You're looking for the same sorts of things, the class characteristics and then the individual characteristics.  So those are the different processes that you're going to go through in making identification, or saying that, well, we can't eliminate it, okay.

Q.  And those other characteristics, I think in the shoeprint world, are called random characteristics; does that sound right?

A.  Well, random or individual.  Yeah.  The types of -- random characteristics would be those that don't occur as a result of the manufacturing process; so it would be something more along those lines.

Q.  Do you know what standards and transparencies are in this realm?

A.  Well, standards would be taking the shoe, making a print, and, say, okay, I've made this.  A transparency is where you can take a transparency, say, of the suspected print and overlay it onto the sample print.

86

Q.  Right.  And you actually have to -- you can't take a little 4-by-6 photograph of a shoeprint like --

A.  It's going to be -- it's going to need to be one-to-one.

Q.  Right.  It's got to be to scale size-wise?

A.  Correct.  One-to-one.

Q.  Right.  And all of these things we're talking about are done in laboratories by expert technicians and whatnot.  Obviously none of that was done in the interrogation room with Lorenzo Montoya with the shoes he was wearing there, correct?

A.  Agreed.

Q.  In addition to all the training that you've been to and conducted regarding interviews and interrogation, you also, I imagine, have lots of practical experience?

A.  Yes.

Q.  How many interviews do you think you've done over the years?  Thousands?  Interviews and interrogations I'm talking about, I guess.  Not like on-the-street interviews with people.

A.  I couldn't put a number on it.  It's lots.

Q.  Yeah.  I guess hundreds, if not thousands sound right?

A.  Well, it's certainly better than a thousand.

87

I don't know -- I'd be real careful about saying "thousands."  That's a big number.

Q.  Gotcha.

A.  But it's certainly more than a thousand.  But it may be thousands.  I don't know.  Lots.

Q.  And most of those interrogations, if not all of them, were done while you were with DPD?

A.  The majority, yes.

Q.  Did you do some for other agencies or something?

A.  I have.

Q.  While still working at DPD?

A.  Yes.

Q.  Okay.  And you've probably, you know, assisted in others that you weren't the main person doing, correct, in addition to the ones we've been talking about?

A.  Say that again.

Q.  Never mind the question.  It's not important.

A.  Okay.

Q.  In addition to the interrogations that you've conducted, have you also supervised some over the years?

A.  Supervised interviews?

Q.  Yes.

88

A.  I've watched them to see where they were going so that I could -- and oftentimes -- well, let me back up.

When we were investigating a homicide, or an officer-involved shooting, or anything else that would have been under the purview of the homicide unit, we typically had two components that were working simultaneous.  We had the crime scene evidence component, which is those investigators who were processing the crime scene, looking at the crime scene, gathering evidence, analyzing evidence, evaluating evidence; we had that going on.  And then we had the interview information component, which was going on roughly at the same time.  Some agencies don't have the ability to do that because they don't have the personnel to do that, so it's -- you do the crime scene, get it out of the way, and then you come and do your interviews.  We split that up.

One of my jobs was to get a good handle on what was going on at the crime scene and then come and see where we were with the interviews and start gathering that information, and then make sure that the people doing interviews and gathering information were transmitting that in some fashion to the people at the crime scene and vice versa, so that everybody, for as

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

89

best we could do, were getting the same information virtually at the same time.

If you were learning something at the -- in the interview that, hey, the guy cut his hand going through the window, the crime scene people need to know that.  Hey, look for any kind of blood evidence or evidence that may be at the point of entry, or at this broken window, or whatever.  Or the guy says, Hey, I fired a gunshot into the floor.  Hey, look for blah, blah, blah, so that we make sure that those sorts of things are coming up.

And the same thing with the crime scene: Hey, we've got seven fired cartridge cases here at the scene, yet we've got junior over here saying the gun went off once.  All right.  That's going to be something the interview team is going to want to know about.

So one of the things that I would do as a supervisor is to make sure that communication was occurring between the two of them.  To actually stand by and watch the entire interview; I rarely did that.

Q.  Okay.

A.  Mainly because I just didn't have the time.

Q.  Okay.  So during this interview -- during Lorenzo's interview on the 10th of January, 2000, you

90

know, between 8:30 p.m. roughly and 11:00 p.m., or something like that, were you the only supervisor there working on this at headquarters, or were there others as well?

A.  For the homicide unit, I was likely the only supervisor.  I can't say I was the only supervisor there; but I would have been the only homicide supervisor there, to the best of my recollection.

Q.  And so you were the direct supervisor at headquarters of Martinez and Vigil, correct?

A.  Yes.

Q.  And there weren't other direct supervisors of theirs at headquarters at that time that you're aware of?

A.  Not that I recall.  In fact, there were two homicide unit supervisors.  And in 2000 -- I don't recall who the other supervisor was in 2000.  It could have been Al Miller; it could have been Mike Fetrow.  It certainly wasn't Gordon Reed; he wasn't in there then.  It wasn't Jim Kukris.  I don't know who the other --

Q.  Let me ask you this question.  To your knowledge, was there another supervisor there watching the interview conducted of Montoya, or any of the others, to make sure --

91

A.  No.  And that typically wasn't something the supervisor would do anyway.

Q.  Okay.

A.  We just didn't have time.  We -- there was a lot of other stuff that was going on.  Plus, my focus was the crime scene, mainly because of the bloodstain.  I got called into this when the assault unit still had it before Emily Johnson died.  They called me and said, Hey, can you come look at the bloodstains?

Q.  So what I'm trying to get at is what kind of supervision there was of your subordinates' interrogation tactics and techniques during this interview, if any?

A.  Well, as a supervisor, my job is not to be the better detective.  And although I had a great deal of experience in doing homicide detective work, my job wasn't to be the better detective.  These guys knew their jobs.

Q.  So --

A.  My job was to ensure that they had the resources necessary to do that job.

So if something came up that they needed assistance with this or needed a question asked or needed a -- you know, a firewall broken down or whatever, my job was to take care of that.  My job

92

wasn't to stand there and watch them do this and say, Whoop, they made a mistake there, I better get on them about that.  No.

Q.  So is it fair to say in this case, at least, regarding Lorenzo Montoya's interview, there was no supervisor watching the interview to make sure that these detectives were conducting it properly?

A.  To watch --

MR. GOLDFARB:  Object to the form.

A.  No.  I was there for that purpose, but I wasn't going to critique their interview style at that point.  That would have just been counterproductive.

Q.  (By Mr. Fisher)  What if you had been watching it and you saw they did something was against policy, something was wrong, something -- they did something that could potentially cause a false confession or -- you wouldn't have been able to see it because you weren't watching it; is that fair to say?

A.  Well, that's fair to say.  But, again, these are investigators that -- this wasn't their first rodeo, and so they certainly weren't new at it.

In some regards, these guys knew every bit as much as I did about how to do an interview.  So for me to stand there over them and micromanage them, no, that's not a good management style.

93

**Q.  So I was just asking you specifically about this case.  It sounds like in general there's also not a practice for supervisors to watch interrogations at DPD, critique them, make sure their subordinate officers are doing it correctly, et cetera?**

A.   Critique interviews I would do all the time. But usually that was after the fact, it wasn't during.

**Q.  Okay.**

A.   You know, if -- for example, if I had information or saw an officer getting into somebody's face and about to get physical, yeah, I'm going to take action on something like that.

But to interrupt a particular interview that they're doing, knowing what their particular interview style is -- like if I saw Martin getting in somebody's face; that's the way Martin did business, and he was good at it.  If I saw Mike sitting over there and being very nonchalant and very, you know, calm about it; that's Mike's style, you know, and he would do stuff that way.

So for me to go in and critique that, no.  It may be something later where I says:  Watch the leading questions.  You asked a few too many leading questions here.

To the extent that I thought it was going to

94

generate a false confession?  No.

**Q.  How would you know that?  How would you know if they asked too many leading questions?**

A.   Watching the interview afterwards.

**Q.  Okay.**

A.   You know, having information, or just talking to them afterwards.  Or just the in and out that I would do.  I'm not saying I didn't see any of the interview, but I didn't stand there and watch the entire interview.

**Q.  So I get that you're saying that about this case.  I'm just trying to find out if, in general, at DPD at that time there was any kind of practice where supervisors were watching large parts of or most of interviews to make sure they were going according to policy and practice?**

A.   Well, sure.  I mean, I would do that all the time to where I would watch interviews to see where they're going, but there were some people that I would watch more than other people.  If I had a relatively new detective that was doing this, I'm probably going to pay closer attention to what they're doing and how they're doing it.

I've had those cases where a detective would come out and says "This guy doesn't know anything."

95

You know, well, you were only in there with him for 20 minutes.  I mean, you basic- -- you barely had time to even develop a rapport.  You know, we need to go a little further than this.  And I might even switch out interviewers and I would say, We need to have somebody else go in and do this one because you're just not getting the kind of information.  So I would do things like that.

A lot of it just depended on who the person was.  If it was a crime scene where I had a relatively new guy, I'm probably going to spend more time at the crime scene with that guy.

If it was somebody that had done crime scenes a lot, they don't need me micromanaging them.

**Q.  So it sounds like sometimes you did supervise interrogations and sometimes you wouldn't?**

A.   No, I supervised all of them.  How much I was involved in it would depend on who it was that was doing the interview and what it looked like the interview was -- where it was going.

**Q.  Let me take that word back.  What about supervise?  I'm talking about in general sometimes you would watch interrogations done by other officers who were your subordinates and other times you would mostly not watch that?**

96

A.   I think the keyword is "mostly not."  I was aware that these things were going on and did I pay attention to them?  Certainly I did.  Did I stand there and intently watch every word that was said?  No.

**Q.  Okay.  You didn't make like a purposeful, I'm not going to watch this on purpose because I don't want to see it; you're saying you would have other things to do and too busy to watch it?**

A.   Exactly.  It -- I can -- I wouldn't call it a waste of time for me to do that, but, like I said, I had a lot of balls in the air.  And for me to stand there and do that, I'm now neglecting some other part of the investigation.  So I had to be a floater in this whole thing.  And not only that, but with the responsibilities of comparing what I had at the crime scene to what was going on in these interviews.

**Q.  If in this case -- because you did not watch most of the interview, correct?**

A.   I can't recall.  When I watched this interview for -- in relation to this thing, I can tell you that much of what went on in that interview, I have no recollection whatsoever.  Other than I can see myself, I don't remember any of that.

**Q.  So as you sit here today, you do not know whether or not you watched this interview?**

97

A.  No, I watched the interview.

Q.  Let me take that back.  Watched the interview while it was going on?

A.  Well, of course I did.  But, like I said, I didn't stand there and watch intently word-for-word exchange.  I wasn't doing that.

Q.  So you -- how much of the interview did you watch?

A.  I couldn't tell you.  I -- I don't even remember walking into the room in some -- I don't remember going in and asking him to take a polygraph, for example, personal knowledge of that.  I know I did it because I saw myself do it.  I don't remember that.

Q.  So it's really --

A.  So how much of this interview I watched, I can't tell you.

Q.  Okay.  Could have been most of it?  Could have been half of it?  Could have been a third of it?  It's just impossible to say with any certainty; is that fair to say?

A.  Well, I think it's fair to say it's impossible for me to tell you how much of the interview I saw or didn't see.

Q.  Okay.

A.  I can tell you that I recall directing mom,

98

when she came out of the interview, because that was something that was not unusual, you know, for -- to ask, "Hey, can we talk to junior by himself?"  You know, if a parent came out, I would put them in that room next to the -- so they could watch the interview, because I wanted them to be able to say, "Stop, we don't want to go any further."

Q.  So if Vigil or Martinez were making some kind of improper threats or promises, or asking too many leading questions or something in this interview, would you have been in a position to be able to know that at the time?

A.  Sure.

Q.  And potentially put a stop to it?

A.  Sure.  If they were doing something that I felt was illegal or something that was improper or in violation of policy, then, yeah, I was in a position where I could deal with that.  I never left the homicide unit when all this was going on, other than to go to the other areas where interviews were taking place.

Q.  Right.  But I guess if you're not watching the whole interview, there is a chance certainly you could miss some improper conduct?

A.  They could.  And if it was a younger

99

detective that I didn't have the experience of working with.  Like I said, Mike and Martin have done this a long, long time, and they're very good at it, so my expectations of them doing something in violation of policy or something wrong were not there.

You know, much of law enforcement work is autonomous in nature.  You know, a supervisor can't watch every officer continuously all the time.  It's like an officer that goes out to a domestic violence call.  A supervisor can't go along with them to make sure that they're, you know, handling it all properly.  They have to assume that the officer knows their business, and their job is to facilitate and answer questions and be there should something happen.  But to follow them around?  I mean, there's just not enough supervisors.  There would have to be one-on-one supervision in that case.

Q.  So in the roughly thousand interviews that you've done, plus other ones that you've watched or seen other officers do, have you ever, as a supervisor, stopped an interview, went in and told the officer to come out and said, "Hey, you're being too threatening here"?  "You're making promises."  "You're doing things that could lead to a false confession."  Have you ever had to have a conversation like that with an officer?

100

A.  No.

Q.  How many interviews have you watched of other officers?  Again, we're talking hundreds, if not thousands, right?

A.  Yes.

Q.  And there has never once been an issue where you're like, "Gosh, you're being a little too threatening here"?

A.  When these investigators get to the level of homicide unit, there is an expectation -- and we go through an interview process with these individuals, we look at their background in their investigations.  We just didn't, you know, give them a chance, per se, saying, "Hey, I'd really like to work in the homicide unit."  Well, we're going to need to see a track record to see what it is that you do and how you do it.  So there is a great deal of trust that goes into this as well.

Supervision of any kind of unit like this certainly is -- can be daunting, at times, depending on what it is that you're supervising.  But these guys who are doing interviews -- one of the reasons that we bring some of these investigators into the homicide unit is because of their background in interview and interrogation, because they understand it.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

101

So it's like somebody telling me how to do a bloodstain scene that has no background in bloodstain analysis.  You know, for -- they might be my direct supervisor, but, "Oh, you didn't look at that bloodstain correctly."  "Well, what do you know about it?"  You know, nothing.  You're a supervisor; I get that.

This is the same sort of thing that we're dealing with here.  As a supervisor looking at somebody that does interview and interrogation, yeah, I have a background in that and would teach that, but that doesn't mean I know more than the detective that's actually doing it.

You know, when you're dealing with a major investigation, if you have somebody that might be a captain, that doesn't mean the sergeant shouldn't be running the show because they actually have greater knowledge of that particular incident.  That guy is a higher rank and he should be telling us how to do things.  No.  His job is to facilitate and make sure that we have what we need to make this thing happen.

That was part of my job at that point.  I wasn't there to tell them how to do their interview.  If I would have saw them getting violent or beating him up or doing stuff where, you know, all of a sudden

102

they're yelling and screaming and hollering and throwing things around, yeah, that's going to cause me to do something different.  But that didn't happen here.

Q.  Right.  This interview -- you've seen it more recently -- you said that Martin, in general, had a more -- I forget the term you used -- a more something kind of style.

A.  Aggressive.

Q.  Aggressive kind of style.  I'll represent to you that he told me there was nothing atypical that went on in this interview compared to what he would normally do in other interviews.

A.  And I would agree with that.

Q.  Okay.  And so the kind of interview we see here in Montoya's case by Vigil -- the different things he said to him, his tone, what I would characterize as different threats and promises -- what we're seeing in this video was not an atypical interrogation, by any stretch of the imagination, from what was happening in and around homicide at this time; is that fair to say?

A.  Or --

MS. HURLEY:  Objection; form.

A.  Or many --

MR. LONGNECKER:  Join.

103

A.  Or many agencies around the country.  You know, police interrogations are psychologically coercive.  They just are.  It's why we have Miranda, or one of the reasons we have Miranda, is because of that.

Q.  (By Mr. Fisher)  Are there times that you've seen that they get too psychologically coercive and you think there's over the line by the officer?

A.  I have.

Q.  In your career in DPD?

A.  With younger detectives or younger officers, I have seen that.  And typically it's dealing with those situations of arrest where there's already heightened emotion and physical depletion to where the individual is struggling and they're yelling and screaming and saliva is coming out of their mouth.

Q.  I'm talking about in interviews and interrogations.

A.  That's an interview or interrogation.  Even though it's in a street function, they're still -- again, an interview is an information-gathering method.  Interrogation:  Express questioning or its functional equivalent.  Either one of them doesn't mean that I have to be sitting in a room that's labeled "interrogation room."  I can do an interrogation anywhere.  I can do an interview anywhere.

104

Q.  Did you think in the interrogation that you watched in this case anything that Vigil or Martinez did was even borderline inappropriate in any way, shape, or form?

A.  I wouldn't want to characterize their -- you know, we all make mistakes, and we all do things that maybe I could have handled it better.  To say that they made no mistakes, I can't say that, because I can't weigh that.  I can say that the reason that we're sitting here today is because there's a perception that mistakes were made.

So for me to say that, well, I don't think any mistakes were made, I can't -- no, that's not true.  You know, could mistakes have been made?  Sure.  Are they so egregious that it -- that, boy, you should never do that again?  No.  I mean, these guys are effective in what they do.

Q.  Right.  But there's a difference between effective at getting confessions from people, but you also have to be careful, of course.  You can be too effective and you get confessions from innocent people.  That's a concern, right?

A.  I would agree with that.  However, if somebody were to tell me that they were involved in a particular case, or in a particular incident, and there

Deposition of: Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

105

was zero physical evidence to back any of that up, I'd say we've got a problem here.

It's like eyewitness testimony. You know, back in the '50s -- '40s, '50s, '60s, and even into the '70s, eyewitness testimony was a pretty big deal. You know, you get the eyewitness, there's the guy. Okay. Well, eyewitness testimony has been found to be very unsupported and people make grave mistakes. What else exists? Okay. They said he did it; what else exists that supports that?

Okay. I can talk about a number of cases where we had an ID witness that picked out a guy. And the interesting thing about that was we had evidence that put him at the scene, but that was it. That was the only thing that put him there. We needed to go further in that particular investigation.

Same sort of thing would happen with this particular case. If he gives this confession, I want to see how it matches up with the evidence.

Q. So Lorenzo Montoya, none of his DNA was found anywhere at this crime scene, correct?

A. There was -- none of the individual's DNA was found there.

Q. And there were 30 potential fingerprints that were found at the scene, and none of them matched

106

Lorenzo Montoya, correct?

A. Other than -- I think Nick was the only one that had fingerprints that were identified.

Q. No blood or hairs or fiber, or anything like that, were found on any of Lorenzo Montoya's possessions or him himself, correct?

A. Ten days later, that wouldn't be surprising. But, no.

Q. None of his things were left at the crime scene, were they?

A. Other than --

MR. DOHERTY: Object to the form.

A. Other than a set of shoeprints that was consistent with shoes he was wearing in that interview.

Q. (By Mr. Fisher) Consistent, but there was no match; and they weren't even found to be probably or highly probable, correct?

A. They couldn't be eliminated.

Q. Sure.

A. And that's actually pretty strong in itself.

Q. Couldn't be eliminated, along with millions of other shoes that were Lugz or Timberland in and around that area at that time, according to the expert?

A. Couldn't be eliminated. Just like DNA, sometimes the result is "I can't eliminate this guy."

107

Doesn't mean that they were there, but I can't eliminate. That's the same thing that we have here; I can't eliminate him.

And with the millions of other shoes that were going on, those millions of other -- the other millions of people wearing those millions of shoes don't have a friend who has his fingerprints at that scene.

Q. Nick Martinez is Lorenzo's friend?

A. There's a connection between them.

Q. How are they friends? Tell me about that.

A. I don't know how they're friends. This is -- he's in a car with him.

Q. Sure. Okay. How else do they know each other? Do you know?

A. I don't know.

Q. Were they the same age?

A. Don't know.

Q. Were they close to the same age?

A. I don't know.

Q. Do you know how many times they had met before that car ride?

A. No clue.

Q. Do you know how many times they talked afterwards or before?

108

A. No clue.

Q. Okay. So tell me about all the other physical evidence that corroborated Lorenzo's, I'll call it, quote, unquote, confession.

A. Circumstantial. Coming in the through the front door fit with the bloodstain evidence.

Q. So let's stop. I'm going to stop you as we go.

Lorenzo Montoya first said we bashed through the back door; later said somebody broke a window through the back door, that's how we got in; at some point later he said went through the front door. Is that all fair to say?

A. Yes.

Q. But you're saying his statement that we went through the front door matches some of the crime scene evidence?

A. It's consistent with some of the bloodstain evidence. It made sense to bloodstain evidence. It couldn't be explained by going through the back area. The back area, I couldn't duplicate anybody getting in through the back area. And certainly an attempt was made.

Q. Okay. So you're saying one of the three different ways he claimed to have gained entry was

109

somewhat consistent with crime scene evidence; is that what you're saying?

A.  Yes.

Q.  And the other two were inconsistent with the crime scene evidence, or you found no evidence to support that?

A.  Certainly a broken window, no.  Going in through the back, I couldn't duplicate it or find anybody that could.

Q.  And Lorenzo is saying they went in through the front door.  Is that something that he volunteered on his own or is that something that was brought up in questioning beforehand by Vigil and suggested to him at some point?

A.  No, this was something that came up when he got to Gilliam.  That's the first I remember him talking about the front door entry.

Q.  I see.  So you're saying in the entire interrogation, even when he started admitting things, he never said something about the front door?

A.  Not to my knowledge.

Q.  Okay.  And that whole interview, even when he's admitting guilt later in the interview -- I'll put "admitting" in air quotes -- he didn't say anything about "front door" during any of that interview?

110

A.  Not that I recall.

Q.  Okay.  And this statement about him allegedly saying something at Gilliam to Matt Hernandez; is that what you're talking about?

A.  If that's his name, yes.

Q.  The person who later testified as what I would call a jailhouse snitch?

A.  Yes.

Q.  Do you know what I mean by that?

A.  Yes.

Q.  Okay.  And of course that person said Lorenzo said these things to him, but you don't know whether Lorenzo actually said those things to him, right?

A.  I can only go by what he's saying.

Q.  Right.  And, again, this mode of how they got into the house, he didn't -- never mind.  Withdrawn.

So tell me about the other corroborative evidence.

A.  He talks about her getting hit in the head with a rock.

Q.  Go ahead.

A.  Okay.  He talks about getting sick and running away.  And in the direction he runs away, he runs up to an alley where he ultimately gets into the car, and we've got a set of -- the same shoeprints that

111

we found inside the house going up the sidewalk, across the street, and onto the next block up to an alley, which is consistent.

Q.  When did he say he ran into an alley?

A.  I don't recall specifically.  I know that that was one of the statements that came out.  I think that was during the Gilliam interview that that information came.

Q.  Okay.  So this is another thing that wasn't in his videotaped confession?

A.  Not to my -- and I can't say that it wasn't; I just don't recall it.

Q.  Okay.  The rock -- that the lady got hit in the head with a rock.  Did you know that that was something that was in the news media before Mr. Montoya was ever arrested?

A.  I would have to see it, because that's not the kind of information that we would have put out.

Q.  Sure.  I'll show it to you.

MR. FISHER:  I'm not sure if I've already made this an exhibit or not, so it's going to take me a second.  I apologize.

I have it on my computer here and I can't get it to show up.  The annoyance of technology.  Give me a second and I'll figure it out.

112

(Pause.)

Q.  (By Mr. Fisher)  And you said -- before I even show it to you, you said this is something that normally we wouldn't put out.  Is that what you said?

A.  Well, no, that's information we certainly wouldn't have been able to -- we wouldn't even acknowledge that she was hit in the head with that rock at this time.

Q.  Okay.

A.  I mean, is that an object that could have been used?  Certainly.  Would we know that that rock was used or a rock was used?  No, we wouldn't know that at this point anyway.

MR. FISHER:  Ah-ha.  Sorry about this taking so long.  Sometimes my computer doesn't cooperate with me, but it finally has.  Now let me get it to share the screen.  Challenge number two.  Ah-ha again.  All right.  If you need me to make it bigger --

THE DEPONENT:  No, I can read it.

THE REPORTER:  Is this a new exhibit?

MR. FISHER:  No, this has actually previously been marked as Exhibit 14.

Q.  (By Mr. Fisher)  I'll just draw your attention, while you're reading it, to the top.

Do you see "Rocky Mountain News Denver"?

113

A.  Yes.

Q.  You see the date, January 6th, 2000, right?

A.  Yes.

Q.  So just take your time and read it, and let me know if you need me to scroll down, or when you need me to.

(The deponent perused the exhibit.)

A.  Okay.  Go ahead.  Can I scroll it up or --

Q.  Sure.

A.  I can?

Q.  Oh, no, you cannot.

A.  Okay.

Q.  Do you need me to scroll up more?

A.  Yes.

Q.  Okay.  Tell me when to stop.

MR. DOHERTY:  It's not changing on the screen.

MR. FISHER:  It's not?

Q.  (By Mr. Fisher)  So what are you seeing? You're seeing --

A.  The last line I can see is --

Q.  "Davis was jailed"?

A.  -- "Davis was jailed after Johnson was found."

Q.  Here.  We'll just go old school and I'll show

114

it to you on my computer.

A.  Okay.

Q.  It's a pretty short article.

(The deponent perused the exhibit.)

A.  Okay.  No, I see what you're talking about.

Q.  Okay.  And what I'm talking about is where it says, "Lombard said the murder weapon may be a bloodstained rock discovered in Johnson's yard."

A.  Right.

Q.  Do you see that?

A.  Right.

Q.  Who is Lombard?

A.  Tony Lombard.  He's a sergeant, was a sergeant, and was doing public information duty as well.

Q.  Meaning talking to the media sometimes?

A.  Yes.

Q.  Okay.  And this was an article that was in the media four days before Lorenzo was questioned, and it's a statement from the police that says the murder weapon may be a bloodstained rock discovered in Johnson's yard?

A.  Right.  And I didn't read past that point.  I didn't see anything in there where the rock was used to hit her in the head.

115

Q.  Sure.

Tell me what else Lorenzo said which was corroborated by the evidence?

A.  That Nick was there.  That J.R. was there.

Q.  We'll go slowly.

A.  Except J.R. -- none of the evidence actually corroborates that J.R. was there.

One of the reasons that I was actually looking at the crime scene is that Davis, the boyfriend, was -- the media was all over this, wondering how come we're not calling him a suspect, because there was no evidence at the scene that said that he could have done all this, created this kind of blood-staining, and got back into that bedroom and left no clue.  Right.  So --

Q.  You're talking about Davis?

A.  I'm talking about Davis.  I was having a problem with that.

And the second thing I was having a problem with is blood stains that were on the steps in the back of the house were consistent with somebody being set down and lifted up, not dragged.  So I said, We've got to have two people here, at minimum.  We have to have two people.

Lorenzo making the statement that there were

116

three people there fit with the bloodstains as well, because the evidence was supporting at least two.

Q.  Okay.  The fact that he's saying Nick Martinez was there or Lloyd Martinez was there, did that come originally from him, or is that something that was suggested to him by Vigil earlier on in the interview?

A.  I can't say.  I mean, it -- could it have been suggested?  I suppose it could have been.

Q.  Okay.

A.  Suggested because he made some reference to it?  I don't know.

Q.  Okay.  So obviously the video will speak for itself on that one better than you or I's recollection; fair to say?

A.  Like I said, even after watching this thing, I don't remember doing the things that I see in there.

Q.  Sure.  So tell me some other kind of independent things that Lorenzo said.

A.  Those -- those are the big things.

Q.  Okay.  None other that you can think of right now off the top of your head; is that fair to say?

A.  Not off the top of my head.  I may -- I know I generated a report referenced to the reconstruction in this.  Typically in a reconstruction I don't

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

117

actually say, okay, Defendant A did blah, blah, blah. I just talk about what the evidence shows.

Q.  Sure.

A.  Okay.  So I can't tell you that there's not additional things that are in there that support his connection to this.  Because, again, I basically was talking about the fact that you've got two people that are involved in this thing at minimum, and these are the things that I see.

Q.  Let's talk a bit about the arrest warrant affidavit in some more detail.  Okay?

A.  Okay.

Q.  Fair to say that you've probably authored hundreds, if not thousands, of affidavits in your career?

A.  Between arrest and search warrants, sure.

Q.  And you know how to do it and you know how not to do it, and you know what the procedures are and the correct ways to do it; is that fair to say?

A.  Yes.

Q.  In fact, it sounded like before, that's part of your expertise now in your current role as an expert.  Like how -- police procedure, is that part of -- let me ask it a different way.

Is part -- have you ever opined on the proper

118

way to fill out search warrants or arrest affidavits, or anything like that?

A.  Yes.

Q.  Okay.  Several times?

A.  Yes.

Q.  Okay.  So that's something you consider yourself to be an expert in, I guess?

A.  I have an expertise in that.

Q.  Okay.  In and around the year 2000, was it proper procedure for somebody to swear out an arrest affidavit based on information they got from another officer but not attribute that information to that other officer in the arrest affidavit?

A.  Officer-to-officer information?

Q.  Sure.  Like, okay --

A.  Officer X told Officer Y blah, blah, blah, and he wrote it down?  Yeah.

Q.  Say I'm the one swearing out the arrest affidavit, right?

A.  Okay.

Q.  And I write in there this is the information that I know to be true and accurate --

A.  Right.

Q.  -- and I write it all down there.  I don't write in there, Actually, Mr. Priest told me all of

119

this information, and that's the place I got it from.

A.  Yes.

Q.  Was that in line with proper DPD procedure to do at that time?

A.  It -- no.  I mean --

MR. GOLDFARB:  Objection; form.

A.  If you're going to attribute officer-to-officer, you name the officer.

Q.  (By Mr. Fisher) Sure.  And why is that?

A.  Where is the information coming from?

Q.  Sure.  We want to know that whoever is swearing to this -- to this information, where they're getting it from?  If they know it from themselves, they should say that; if they know it from reports, they should say that; if they know it from other officers, they should say that?

A.  Agreed.

Q.  So that the judge knows when he's looking at this affidavit where this information is coming from; and if there's wrong information in there, he knows who to blame, for instance, right?

A.  Sure.

Q.  Okay.  So I will represent to you that Mr. Schneider -- I deposed him in this room a few months ago, and I asked him where did you get this

120

information from this arrest affidavit?  And he told me:  I had very little involvement in this case.  I didn't watch the interview of Lorenzo Montoya; I didn't read a report of it; I still haven't watched it to this day.  The only way I knew anything about what he had allegedly told the police is what Jon Priest and DA Lamar Sims told me about what Montoya had said.

MR. DOHERTY:  I'll object to the form.  He said the warrant.

MR. FISHER:  Sure.

Q.  (By Mr. Fisher)  What is your response to that?

A.  Not the way I would have done it.  And I can tell you, if I'm going to dictate the information in a warrant, I'll type it myself.

Q.  Okay.

A.  This is -- that is -- I don't know what Rick said, other than what you just said here.  That's not how I would have done it.

Q.  Okay.  So Rick even said --

A.  Nor how Lamar would have done it.

Q.  Sure.

Was Lamar -- do you remember Lamar Sims being there?

A.  I do not.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

121

Q.  Is it unusual that he would have been there?

A.  No.

Q.  Okay.  Because he was a homicide DA at the time and they sometimes worked on these cases with you guys?

A.  He was there all the time on homicide, or other -- certain DAs would come in and assist us. There was a group of DAs that we usually came in.  If Lamar was there -- I can't say he wasn't, but I don't have any independent recollection that he was.

Q.  Okay.  So Schneider tells me he never watched the video, only learned it from you or Lamar Sims, right?  Vigil told me he didn't relay to Schneider any of the information about what Montoya said in that affidavit.  Okay?  Just answer out loud.  Are you with me so far?

A.  I am.

Q.  Okay.  Martinez says he didn't relay any information about what Montoya allegedly said to Schneider, who wrote the affidavit.  Are you with me so far?

A.  I am.

Q.  You are saying you did not relay that information to Schneider either?

A.  Correct.

122

Q.  Where -- do you have any idea where Schneider could have possibly gotten that information, if not from any of you folks, to put into that affidavit about what Lorenzo said?

A.  No clue.  I can tell you that it wasn't unusual for investigators to -- one of their functions is you type the warrant while we're doing this.  It's not unusual for that to happen.

But what would be unusual -- and I'm saying that I didn't do it -- would be for me to go out and dictate that information to a detective.

Q.  Right.  And if I understand you correctly, even if you were dictating to another detective, which you would not normally do, you would say "put in there that Jon Priest is telling you," or "I'm going to sign this affidavit," or "I'm going to type it myself"?

A.  I would expect all of those things to have occurred, or at least one of those things to occur.

Let me go back to if he were typing this and I was dictating, I would say "I'll type it."

Q.  Sure.

A.  Okay.  But -- and the reason for that is is I already don't have any time to be dictating a warrant; I don't have any time to be writing the warrant.  All right?  So it -- if I'm going to dictate it, I'm going

123

to type it myself because I'm a faster typist.  I can do it quicker.  So it made no sense that I would be standing there dictating it to him.  And it even made less sense that Lamar would be helping me.

Q.  Right.  Because as far as you know, did Lamar watch the interview?

A.  I don't know.  Like I said, I don't remember whether Lamar was there or not.

Q.  Sure.

A.  I don't remember being there.  I know that I was.

Q.  But you said it wouldn't make sense for Lamar to dictate.  Why do you say that?

A.  Not his function.  His function is to review it and -- now, can I see Lamar, "Hey, change the wording here to blah, blah, blah."  Okay?  But him to say, "Hey, Martin said..."  No, I don't see Lamar doing that.

Q.  Sure.  Would you agree with me that it's important to be as accurate as possible when drafting warrants?

A.  Yes.

Q.  Right?  And here in this case, there was a videotape of the interrogation, right?

A.  Well, not only that, but the homicide unit,

124

where Rick likely was typing that warrant, is right next to the video rooms.  He easily could have watched the interview and typed it at the same time.

Q.  Right.  He said that he did not do that.

A.  Okay.  And I -- I'm not saying that he's not being accurate, but I can't say that he didn't watch it and type it, because I don't know.

Q.  Sure.

A.  I don't remember Rick being there.  I just don't.  But I don't remember being there, although I know I was, so, you know...

Q.  Getting back to this idea of we want the affidavit to be as accurate as possible, right?

A.  Sure.

Q.  You've seen the affidavit.  Most of, if not all of the incriminating information about Montoya in that affidavit is what he allegedly said in that interview; is that fair to say?

A.  Agreed.  But he got the information from somewhere.

Q.  Right.

Now, there are pieces of that affidavit which are just wrong or exaggerated.  Do you know anything about that?  Have you ever been made aware of that?

A.  You would have to tell me what they are

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

125

and -- otherwise I can't comment on them, because I don't have any independent recollection of it.

Q.  Sure.  In your career, the 30-plus years, a lot of it being a supervisor, do you ever recall any officer at DPD ever getting in any kind of trouble for putting false information in an affidavit or exaggerating information in an affidavit?

A.  Nothing that I can recall off the top of my head.  I mentioned Ismael Mena where the detective had the wrong address on a warrant.  Did he get in trouble? Yeah.

Q.  Okay.

A.  But, I mean, the department as a whole, in all the investigations that the agency does, to say that nobody ever wrote a bad warrant, I can't tell you that.  I don't have any independent recollection of it.

Q.  Right.  But, I mean, you have been involved with, or cases, thousands of warrants, where you're either authoring them or your subordinates are authoring them.  Do you ever recall, is what I'm saying, anybody getting -- doing anything where they were exaggerating things that could perhaps make out probable cause and getting in trouble for that?

A.  Not at our level, no.

Q.  Okay.  So in this affidavit it says, quote,

126

Based on subsequent witness interviews, DPD homicide detectives learned the identity of a third individual who was also present when the victim's vehicle was stolen from her residence.  That individual was identified as Lorenzo Montoya.

That's not true.  Are you aware of it being true?  Was there ever a subsequent witness interview where DPD homicide detectives learned the identity of a third individual who was also present at the victim's -- when the victim's vehicle was stolen from her residence, and that was Lorenzo Montoya?  Did any other person who was interviewed ever say Lorenzo Montoya was there when her vehicle was stolen from her home?

A.  You mean other than Lorenzo?

Q.  Correct.

A.  Not that I'm --

MR. LONGNECKER:  Objection; form.

Q.  (By Mr. Fisher)  What's that?

MR. LONGNECKER:  Oh, objection; form.

A.  Other than Lorenzo, I'm not aware of any other witness that may have said something like that.

Q.  (By Mr. Fisher)  Okay.

A.  But I can't say that nobody did.

Q.  Okay.  In this affidavit that Schneider

127

wrote, he wrote one of the things that Lorenzo says was that, quote, The three suspects gained entry to the victim's home by removing several boards covering a small opening near the rear of the house.

Lorenzo Montoya never said that in his interview, did he?

A.  I can't say that he didn't.  I don't recall it off the top of my head.

Q.  Okay.  I will represent to you that he did not.  He said in the interview two different things: One, they bashed in the back door; one, they broke a window into the back door.

Do you have any independent recollection of him saying something about gaining entry by removing several boards covering a small opening near the rear of the house?

A.  No.  I can't say that he never said that. You're representing that he never said that; I don't have any independent recollection of it.

Q.  Sure.

A.  And I can say just from efforts that I did at the crime scene, I don't believe that's how they got in anyway.

Q.  Okay.  That was an ongoing theory at the time to some degree?  I mean, there were boards that were

128

removed --

A.  Oh, absolutely.

Q.  -- right?

A.  That's what the scene appeared as.  I couldn't duplicate it.

Q.  And one of those boards you said had Nicholas Martinez's handprint on it; isn't fair to say?

A.  Fingerprints.  Four fingerprints.

Q.  Fingerprints.  Okay.

In any event, Schneider attributed Montoya to saying that in his interview when he did not.  I'll represent to you that that's what went on.

A.  Okay.

Q.  That's not something that DPD detectives should be doing when they draft arrest warrants, right, putting --

MR. GOLDFARB:  Object to form.

Q.  (By Mr. Fisher) -- putting things in here that are not accurate?

A.  Again, without knowledge of where he's getting that information, I can't tell you whether that's accurate or inaccurate that he's writing what somebody told him.  I can tell you that I had knowledge before this interview that the back door was likely not the way that they got in.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

129

Q. Uh-huh.

A. So for me to say that...

Q. Say what?

A. To say that they got in through that milk chute, no.

Q. But for him to say that Lorenzo had said in his interview that that's how they gained entry, by removing these small boards, if it's not true, that's not something a detective obviously is supposed to do in an arrest affidavit?

A. If it's not true, agreed.

Q. Right.

A. But, again, he's getting his information from somewhere; I just don't know what that is.

Q. Yeah. I mean, apparently he didn't get it from Vigil or Martinez or the tape or reading a report of the tape. Who in the world else could he have got it from?

A. Well, probably the strongest statement I can make with respect to that is I have limited recollection of that 23-year-old incident. I would venture to say that Mike and Martin and Rick are compromised by the same thing that I am. I can't say that for certain. Memories fade. So who he talked to or how he got this information, I don't know. I don't

130

know that he knows. But that's me. I just don't know.

Q. If you had told him this information that he put in this affidavit and it was wrong, obviously you should -- you know that you should not be relaying false information or exaggerated information to somebody who is filling out an affidavit; is that fair to say?

A. Of course.

Q. Okay. And if Schneider says this information came from you, you say that didn't happen --

MR. DOHERTY: Object to the form.

Q. (By Mr. Fisher) -- that would be up for someone else to decide, right?

A. Agreed. And I -- the information that he would be attributing to me is not information, number one, that I believed and, number two, not the way I would have done it. So I don't know who he's getting the information from, but I can tell you I have no independent recollection of giving him information about what was going on. But I can tell you that that's not the way I would have done it.

Q. Sure. He also wrote in the affidavit attributing this to what Montoya said in the interview: "Prior to entering the residence, suspect Nicholas Martinez armed himself with a large rock."

131

I will tell you that Montoya never said that in his interview. He didn't specifically say, "Prior to going into the house, Martinez grabbed a rock and brought it in there." That's not something he ever said.

Rick Martinez -- I'm sorry, Rick Schneider wrote in the affidavit that's what Montoya said, he said he got that information from you. You're saying that's not true?

MR. DOHERTY: Same objection.

MR. GOLDFARB: Object to form.

MR. DOHERTY: He never said he got it from Priest. He said he didn't know where he got it, he said it was probably -- it could have been Lamar or it could have been Priest. He never said it was Priest. That's a misrepresentation.

MR. FISHER: Thank you.

MR. DOHERTY: You're welcome.

Q. (By Mr. Fisher) Go ahead.

A. Can you ask it again?

MR. FISHER: Sure. Can you just read back the last question?

(The following was read back by the reporter: "Rick Schneider wrote in the affidavit that's what Montoya said, he said he got that information from you.

132

You're saying that's not true?")

A. I'm saying I provided no such information. I have no recollection of providing any information like that.

Q. (By Mr. Fisher) Are you saying that you could have and perhaps forgotten it or you definitely did not provide this information?

A. No. I'm saying I have no recollection of providing any kind of information like that. So Rick's getting it from somewhere, so he's either misconstruing -- I don't know. That's not the kind of information that I would have provided.

Q. It's also written in the affidavit, "Lorenzo then related that the suspect, Lloyd Martinez, used a high-heel shoe to strike her in the head, causing her to pass out."

That's not true again. Montoya never said high-heel shoe in his interview. Do you have any reason to dispute what I'm saying there about that not being true?

A. No, that the statement is consistent with the evidence.

Q. Exactly.

A. But --

Q. That's what I was about to get to with you.

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

133

A.  The statement is consistent with the evidence.  But to attribute that to Montoya, no.

Q.  Right.

A.  I don't -- I didn't see anything in the interview where that was discussed whatsoever.

Q.  Right.  But that was consistent with the crime scene evidence?  You guys believed that she was hit with a high-heel shoe, correct?

A.  Well, there was -- not only believed; there was physical evidence that supported it.

Q.  Sure.  And so that's put into the affidavit by Schneider that Lorenzo said this, even though he didn't, and then the judge later finds probable cause to charge Lorenzo Montoya for first-degree murder.  Are you following with me?

A.  I am.

Q.  Okay.  And, again, this is information -- certainly if Montoya didn't say that in his interview and it happens to match the crime scene evidence, you would agree with me certainly that should not be put in the interview whether through inadvertence, recklessness, or purposely misleading the judge, right?

MR. GOLDFARB:  Object to form.

A.  Yeah.  Again, not knowing where Rick would have got that information, it -- if that information is

134

in there and attributed to Montoya, I can't tell you how he comes to that conclusion.

Q.  (By Mr. Fisher)  Right.  But that should not happen in this affidavit, right?  There shouldn't be a misstatement about what Montoya says just because it matches the crime scene; would you agree with that?

A.  I agree with that.

MR. GOLDFARB:  Object to form.  Go ahead.

Q.  (By Mr. Fisher)  At one point in the affidavit Schneider says, quote, Lorenzo then disclosed that he and the other two suspects searched the residence for valuables.

You would agree with me, that statement makes the reader -- makes it sound to the reader like Lorenzo was committing a burglary, right?

MR. GOLDFARB:  Object to form.

A.  And I don't have any -- I can tell you that, again, not knowing where that information is coming from -- because it didn't come from me because I don't have any information that that occurred, period.

Q.  (By Mr. Fisher)  Yeah, I'm just saying to you, that statement would make the reader understand that Lorenzo is committing a burglary.  After talking about the assault, Lorenzo then disclosed that he and the other two suspects searched the residence for

135

valuables.

A.  Yeah, but a burglary --

MR. GOLDFARB:  Object to form and foundation.

MR. LONGNECKER:  Join.

A.  Burglary fits simply by going in and killing her.

Q.  (By Mr. Fisher)  Sure.

A.  Breaking and entering and once you're in there commit a crime.  Doesn't mean you had to go steal stuff.

Q.  Right.  I mean, just being there when somebody else kills somebody --

A.  (Unintelligible).

Q.  Well, is not a crime?

THE REPORTER:  I'm sorry, I didn't hear what he said.  Just being there when somebody else kills...

Q.  (By Mr. Fisher)  Just being present when somebody else kills somebody in a house doesn't make you guilty of a crime, right?  It could make you a witness?

A.  Felony murder.  I mean --

MR. GOLDFARB:  Object to foundation.

Q.  (By Mr. Fisher)  To commit felony murder, you have to go into that house with the intent of committing some kind of crime and then somebody gets

136

killed, right?

A.  Well, if you're inside the house and you don't belong, trespass.  There's a crime.

Q.  Sure.  Potentially, right.  I mean, there is nothing in this affidavit about Lorenzo not being permitted to go into the house.

My point is, this statement, Lorenzo disclosed that he and the other two suspects searched the residence for valuables.  That, by itself, along with the fact that she's dead, would make him guilty of felony murder, right?

A.  That's one fact pattern certainly.

Q.  Right.  And if that wasn't true, that Lorenzo never said that, that he searched for valuables, that shouldn't be something that's in this affidavit that a judge is relying on later; is that fair to say?

A.  True.  And I have to assume that -- because I don't have any independent knowledge of it -- that the arrest warrant was completed the same night that he's being interviewed.

Q.  Correct.

A.  Is that accurate?

Q.  Yeah --

A.  Is that when the arrest warrant was done?

Q.  Somewhere around midnight; a little after

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

137

midnight.

A.  But the same day that he's interviewed for it?  The same time frame?

Q.  Same -- a few hours later, yes.

A.  Within hours of the interview?

Q.  Yeah.

A.  Okay.  Yeah.  I mean, that statement -- I can't tell you where he's getting that information.

Q.  Sure.  But you would agree with me, again, one should not exaggerate or lie to try to get a judge to believe there's probable cause rather than say exactly what the person said?

A.  Well, to answer -- actually, a two-part answer would be:  One, lie or exaggerate in a warrant?  No, don't do that.  Is that what Rick was doing?  I can't tell you that.

Q.  Sure.  I understand that.

He also writes in the warrant, "Nicholas and Lloyd dragged Emily Johnson from the living room to the rear patio."

Does that assertion -- does that match the crime scene evidence, that she was dragged from the living room to the rear patio?

A.  To an extent, yes.

Q.  Tell me.  Tell me why.

138

A.  Dragged to the back stairway and then carried down the stairs one step at a time and then dragged into the back yard, all of that occurred.

Q.  Back yard or rear patio, or is there --

A.  Well, it's the back yard.

Q.  Okay.  It was like --

A.  It's a big concrete pad; back yard is right there.

Q.  And if Montoya never said, though, that specific thing, that they dragged her from the living room to the rear patio, that's obviously not something that should have been attributed to him in the warrant; is that fair to say?

A.  Agreed.

MR. GOLDFARB:  Objection; form.

Q.  (By Mr. Fisher)  Regardless of whether or not it fits with the crime scene evidence.  I mean, that's not the criteria for putting something in a warrant, right?  It just needs to be accurate?

A.  Agreed.

Q.  Were you also Schneider's supervisor on this night, if he was there authoring the warrant?

A.  The homicide unit had -- at that time had 12 detectives.  Six were responsible directly to one supervisor, six responsible to the other supervisor.  I

139

can't say that I was Schneider's direct supervisor.  But if I was the only supervisor there, then I would have been the supervisor.

Q.  Would you have had any responsibility to review the warrant that he authored before it was submitted?

A.  Arrest warrant, no.  Basically he could take that directly to a judge.  It's not unusual, however, to have someone else review it for any number of reasons:  Grammar, spelling, content.  But it's my understanding that Lamar reportedly reviewed the warrant, which I can't say did or didn't happen.  My experience, if Lamar ever reviewed any of my warrants, he had his signature on there that he reviewed it.

Q.  Okay.  Let me back up to that.  I guess you're saying you understand that Lamar potentially reviewed this -- outside of conversations with counsel, did you ever learn that from some independent source?  Do you have some memory of that?  Did somebody tell you that, outside of conversations with counsel?

A.  My understanding -- I don't know why I have the understanding -- my understanding is that Lamar looked at that warrant.

Q.  Okay.

A.  And I don't know why I -- I'm remembering

140

that.

Q.  Sure.

A.  It could be that I'm remembering it simply because I'm hearing the words "Lamar" and "warrant," and it could be that, well, that was just what Lamar would do.  Maybe that's why I'm remembering it that way.

Q.  I'll represent to you that -- and anybody can pipe in and object if they like -- that Lamar's signature does not appear anywhere on this warrant.  What does that mean to you?

A.  It means that Lamar didn't look at the warrant.

Q.  Okay.

A.  And that's based on my experience.

Q.  Sure.

A.  I'm not saying he didn't.

Q.  In this case --

A.  I'm just saying, in my experience if Lamar looked at that, then he would have made some notation that he did so.

Q.  Got you.  Or especially if he's approving it, he would indicate such?

A.  Agreed.  But these are probable cause warrants.  Not unusual for the detective to type it and

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

141

take it right to the judge.

MR. FISHER:  Let's take five minutes and not take any kind of lunch break yet because I don't think that I have that much questioning left.  So rather than take a lunch break, maybe we can expedite leaving.

THE WITNESS:  Okay.

MR. DOHERTY:  Sounds good.

(A recess was taken from 1:06 to 1:16 p.m.)

(Ms. Jane Fisher-Byrialsen, Esq., is no longer present for the proceedings.)

Q.  (By Mr. Fisher) So just very briefly, you talked earlier today about testifying at various proceedings during the criminal case, right?

A.  Yes.

Q.  Fair to say that everything you said during any and all of those testimonies was accurate and true, to the best of your belief and knowledge?

A.  I would assume I did.  I mean, did I lie during any of those?  No.

Q.  Okay.  And everything you said -- withdrawn.

MR. FISHER:  That's it.  I have no further questions for you.  So unless your attorney does or other attorneys on the line, thank you for your time, sir.

MR. DOHERTY:  Okay.  This is Pete Doherty.  I

142

don't have any questions for you.

THE DEPONENT:  Thank you.

MR. FISHER:  Anybody else?

MS. HURLEY:  Shannon Hurley doesn't have any questions.  Thank you.

MR. KADOLPH:  None from James Kadolph.

MR. GOLDFARB:  Mr. Priest, this is DJ Goldfarb.  I do have some follow-up questions for you, but I'm not going to waste too much of your time.  Okay?

THE DEPONENT:  Okay.

EXAMINATION
BY MR. GOLDFARB:

Q.  At various points during your deposition today, you described that on the evening of January 10th and leading into the early morning hours of the 11th, you had a lot of balls in the air.

What did you mean by that?

A.  Well, the interview with Lorenzo Montoya was not the only thing that was going on that night.  There were other interviews that were occurring; other witnesses that were being sought; there was a car that needed to be processed, and arrangements needed to be made to have that done.  There was analysis of existing evidence; photographs to assist those other interviews

143

that were occurring.  I was assisting with things of that nature.

And I can't say that this was the only homicide that we were working.  We may have had other cases going on, suicides, homicides.  I don't recall any of them off the top of my head, but this was just the nature of what we did.  I mean, trying to make sure that all the bases were covered is part of my function.

Q.  And what you described earlier is that in your role as a supervisor within the homicide department at that time, you acted as a facilitator between crime scene investigation and those who were conducting interviews at the department?

A.  One of the functions, yes.

Q.  Sure.  And so you were passing information back and forth to officers?

A.  It could have been officers that, you know, were doing -- like say, for example, whoever it was that was recovering the stolen car -- and I can't -- without seeing the supplemental report and looking at that chronology, I can't tell you exactly when all that was occurring, but that's one thing that I could have been doing.

There were other interviews -- other witnesses who were present, other individuals who were

144

present -- who were also being interviewed.

Q.  Right.

A.  And I'm bouncing between those and seeing how those things were going and trying to get that information.  And I'll guarantee you, the chief was burning up my phone, so -- asking me questions about all this, so I was dealing with that as well.

Q.  Sure.  So to summarize, you were potentially in and out of various witness interviews related to the Johnson murder investigation, correct?

A.  That's fair.

Q.  And we know that you were in and out of Mr. Montoya's interview from the video, right?

A.  Yes.

Q.  But absent that video, you have no recollection of being in and out of that interview?

A.  The only thing that I can tell you that I have recollection of is Martin saying, Hey, can you come look at these shoes for me?  I remember that.

Q.  Okay.

A.  And the reason I remember it is because it fit with the evidence at the crime scene, and that was a connection for me.

Seeing myself in those other situations in that interview, I don't have any -- I don't even

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

145

remember going in and taking the shoes.  I don't recall that.  But I do remember Martin coming and getting me asking me to come look at the shoes.

Q.  And you were also trying to coordinate various other kind of evidentiary/investigative tasks related to this particular murder investigation on that same evening, correct?

A.  Yes.  And likely I would have been making sure the crime lab was available to come take photographs and take clothing and take possession of those shoes that I recovered, and all of that stuff would have occurred also.

Q.  In addition to these variety of tasks related to this particular murder investigation, you also said that it could have been that there were other investigations that you were playing a role in that were going on contemporaneous with this particular investigation?

A.  I can't say that others weren't going on. But if they were, yes, I would have been responsible for those also.

Q.  And one of the reasons that's difficult for you to say, you know, what exactly was or was not going on is that you're now having to recall this 20-some-odd years later?

146

A.  Agreed.

Q.  And remembering one particular evening in question is difficult when you're doing it two decades after the fact?

A.  Agreed.

Q.  So sitting here today, can you state with 100 percent accuracy that Rick Schneider was ever in a position to review the interview of Lorenzo Montoya?

A.  Given the proximity of the homicide unit to the viewing room for the video rooms, yeah, he was -- he could have overheard and listened to the interview without actually watching it just from his desk.

Q.  Sure.  He could have.  But do you know with 100 percent certainty that he did listen to the interview, yes or no?

A.  No.  Like I said, I don't even remember Rick being there.

Q.  Sure.  Do you know with 100 percent certainty, yes or no, if he ever went into that interview room?

A.  No.

Q.  Okay.  And given that two decades have passed, and the fact that you had so many balls in the air coordinating various components of this investigation and others, can you state with

147

100 percent certainty that you never spoke to Rick Schneider about any information obtained during the course of Lorenzo Montoya's interview?

A.  Can I say I never spoke to Rick Schneider? No.  Can I say that the information that is in that warrant I provided?  That's inconsistent with how I would have done business.

Q.  Sure.  I understand that that's inconsistent, but you cannot state with 100 percent accuracy that you did not communicate any information to Rick Schneider, correct?

A.  Well, again, "communicate information," it would depend on what that is -- "Hi, Rick, how are you?"  "Hey, can you do the arrest warrant for us?" -- was that the kind of conversation I had?  Can't say that that didn't happen.  But the information that is in that warrant, that is inconsistent with how I would have given information.

Q.  Okay.  But, regardless, you can't state one way or the other if you even spoke with him that night because you don't even remember him being there, right?

A.  That's accurate.

Q.  Okay.  Now, in the affidavit itself -- well, let me ask you this.  If an officer receives information from a fellow officer, they can use that as

148

the basis for a probable cause affidavit?

A.  Yes.

Q.  Okay.  And if the affiant indicates that information from a suspect was disclosed to a fellow officer and identifies that officer by name, would that be appropriate attribution in an arrest affidavit?

A.  Officer to officer?

Q.  Yeah.

A.  Yes.

Q.  Okay.  And I'll be specific.  If -- if Rick Schneider stated in the arrest affidavit that Lorenzo Montoya disclosed the following information to Detective Vigil of the Denver Police Homicide Unit and then lists off information, would that be proper attribution?

A.  It would if the information -- if he's getting that information from Detective Vigil.

Q.  Okay.  And when crafting an arrest affidavit, in your experience, is it required, once you receive information from a fellow officer, to go back and reinterview that suspect to make sure every single piece of information shared with that fellow officer is, in fact, correct?

A.  Let me see -- if --

Q.  Or let me ask it to you a little bit more

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

149

simply.

Does the affiant, even if they're receiving information from a fellow officer, have to go back and redo the interview?

A.  No.

Q.  Okay.  If the fellow officer passes on information to the affiant, does the affiant need to go and say, Oh, I need to get a transcript of that interview to confirm that everything you're telling me is 100 percent accurate?

A.  No.

Q.  Does the affiant need to, after receiving information from a fellow officer, need to go back and rewatch the entire video of the interrogation to make sure the information that's being shared is 100 percent accurate?

A.  No.

Q.  Do you know if other arrests or arrest affidavits or search warrant affidavits were authored at the same time that Mr. Montoya's arrest affidavit was put together?

A.  I don't have any personal recollection of that, no.

Q.  Okay.  And if Lamar Sims' initials and name appeared on any of those, would that be indicative of

150

his presence while those affidavits were being created, do you think?

A.  If his name was on those warrants that could have been created?  Sure.

MR. GOLDFARB:  Okay.  Those are all the questions that I have.  Thank you.

THE DEPONENT:  Thank you.

MR. FISHER:  Super brief follow-up.

THE DEPONENT:  Okay.

EXAMINATION

BY MR. FISHER:

Q.  You do not know where Rick Schneider got the information that he put in the arrest affidavit; fair to say?

A.  Fair.

Q.  You know that reading it now, you could not have provided all that information because you didn't have all that information; is that also fair to say?

MR. GOLDFARB:  Objection; form.

A.  Well, I don't want to pick and choose. Certainly there were things that were in that affidavit that weren't clearly known at that time, but there were other things that were in there that were accurate. But when were they accurate, I don't know.

Q.  (By Mr. Fisher)  Okay.  Let me ask it this

151

way.  All the stuff that he attributes to Lorenzo Montoya as having said in his interview, you didn't know all those details because you hadn't watched the entire interview; is that fair to say?

MR. GOLDFARB:  Object to form.

A.  It's fair to say.  But there were things that were in there that certainly were supported by the crime scene.

Q.  (By Mr. Fisher)  I understand what you're saying, yes.

A.  But, again, I spent two months in that crime scene.  So to come to certain conclusions took time.

Q.  Yeah, yeah.  I'm just talking about we're trying to figure out where Rick Schneider got this information that he says Lorenzo Montoya said.  Are you with me?

A.  And, again, I can't tell you where he's getting the information.

Q.  But you're saying you did not provide it?

A.  That's correct.

MR. FISHER:  Okay.  That's all the questions I have.

THE DEPONENT:  Thanks.

MR. DOHERTY:  I have nothing.

MR. LONGNECKER:  This is Ben Longnecker, I

152

have nothing as well.

MR. FISHER:  All right.  Unless anyone else speaks up, thanks all, and have a good weekend, or close to it.

THE DEPONENT:  Thanks everybody.

THE REPORTER:  I'll go off the record.

(The deposition concluded at 1:29 p.m.)

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

153

                    AFFIDAVIT
        I have read my deposition and it is true and
accurate, except for any changes or corrections now
indicated by me on the Amendment sheet.
        Amendment sheet attached   ( )
        No changes to testimony    ( )

_____
JONATHYN PRIEST
        SUBSCRIBED AND SWORN to before me this
date, _____.

        My commission expires _____

_____
NOTARY PUBLIC

_____
STREET ADDRESS
_____
CITY, STATE, ZIP


Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
        14143 Denver West Parkway
        Suite 100
        Golden, Colorado 80401

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

154

CERTIFICATE


        I, Aimee S. Reisinger, RPR, Notary Public of
the State of Colorado, do hereby certify that prior to
the commencement of the examination of JONATHYN PRIEST,
said witness was sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said examination was taken in
machine shorthand by me and was thereafter reduced to
typewritten form, and that the foregoing is a true and
accurate transcript of the questions asked, testimony
given, and proceedings had.

        I further certify that I am not related to
any party herein, nor their counsel, and have no
interest in the result of this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 17th day of April, 2023.




        _____
        Aimee S. Reisinger, RPR, CSR
        My Commission expires 9/20/2024
        Notary No. 19964015065

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

155

April 17, 2023


PETER DOHERTY, ESQ.
Lasater & Martin, P.C.
8822 S. Ridgeline Boulevard
Suite 405
Highlands Ranch, Colorado 80129

RE:  Montoya v. City and County of Denver, et al.
     Civil Action No. 16cv1457 (JLK)
     Deposition of JONATHYN PRIEST
     Taken:  March 30, 2023

Dear Mr. Doherty,

Attached with your electronic copy of the
above-referenced deposition is the signature page from
the Court's original transcript.

In accordance with the Rule, please have the witness
read and sign his or her testimony, then return the
executed signature page and any amendment sheets used
to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.

Encl.

cc:  Original transcript
     David N. Fisher, Esq.
     James Kadolph, Esq.
     DJ Goldfarb, Esq.
     Ben Longnecker, Esq.
     Shannon Hurley, Esq.

Deposition of:  Jonathyn Priest – March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 1

**A**

**a.m**
1:18 38:20 71:4
84:9
**abilities**
74:19
**ability**
79:2,11 88:15
**able**
9:23 68:15,22
77:11 79:23
92:17 98:6,11
112:6
**above-referen...**
155:12
**absent**
144:15
**absolutely**
70:18 128:2
**abuse**
8:5 15:22,23
78:18,19
**academies**
11:23
**academy**
8:21 10:23
**accuracy**
146:7 147:9
**accurate**
118:22 123:20
124:6,13
128:19,22
136:22 138:19
141:16 147:22
149:10,16
150:23,24
153:3 154:11
**accusations**
26:19
**accusatory**
13:10,13,25
14:3,7,10
**accuse**
17:7

**accused**
33:5 39:7
**accusing**
14:12 32:21
**acknowledge**
112:7
**acted**
35:20 143:11
**action**
1:2 93:12 155:7
**actions**
13:20
**actual**
17:20 18:17
**Adams**
39:11
**adapting**
19:19
**AdCo**
39:18
**addition**
74:12 86:13
87:16,21
145:13
**additional**
9:12 12:2 117:5
**address**
41:15 59:15
125:10 153:15
**adjudicated**
37:5
**administrativ...**
39:23
**admit**
65:20 67:14
69:19 70:4
**admits**
65:25
**admitting**
109:19,23,24
**adopt**
45:12
**adopted**
15:1 45:13,16
**adult**

73:23
**advisement**
76:4
**affiant**
148:3 149:2,7,7
149:12
**affidavit**
23:16 24:17,21
27:3 117:11
118:11,13,19
119:19 120:1
121:15,20
122:3,16
124:13,15,17
124:22 125:6,7
125:25 126:25
129:10 130:3,6
130:22 131:7
131:24 132:13
133:11 134:4
134:10 136:5
136:15 147:23
148:1,6,11,18
149:20 150:13
150:21 153:1
**affidavits**
117:14 118:1
149:19,19
150:1
**affixed**
154:16
**age**
107:17,19
**agencies**
10:25 11:22
44:9 45:20
87:9 88:14
103:1
**agency**
11:3,4 44:12
125:14
**aggressive**
15:14,17 16:3
102:9,10
**ago**

27:2,8 119:25
**agree**
13:8 48:12
51:23 102:14
104:23 123:19
133:20 134:6,7
134:13 137:9
**agreed**
19:4 21:6 63:17
69:14 71:7
86:12 119:17
124:19 129:11
130:14 138:14
138:20 140:24
146:1,5
**Ah-ha**
67:4 112:14,17
**ahead**
9:25 13:16 50:2
67:12 110:21
113:8 131:19
134:8
**Aimee**
1:19 154:3,20
**ain't**
72:24
**air**
22:23 24:6
96:11 109:24
142:17 146:24
**al**
90:18 155:7
**alcohol**
75:22
**alleged**
31:14
**allegedly**
110:2 120:6
121:19 124:17
**alley**
49:11 110:24
111:2,4
**allow**
9:23
**ambulance**

19:23
**amended**
26:18
**amendment**
153:4,5 155:15
**analysis**
6:11 7:8 30:17
30:20 43:25
47:8 56:16
58:22 63:10
84:11 101:3
142:24
**analyzing**
88:11
**Anaya**
25:23 50:15
58:16 59:22,25
60:17,23 61:2
**Anaya's**
59:18
**annoyance**
111:24
**answer**
9:25 10:3 19:9
19:11 28:24
59:4 76:12
99:13 121:15
137:13,14
**answered**
58:19 76:10
**anybody**
39:3 50:13,20
61:9 108:21
109:9 125:21
140:8 142:3
**anymore**
38:10 46:12
80:13
**anyway**
39:18 49:25
91:2 112:13
127:23
**apologize**
111:22
**apparently**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 2

40:25 129:15
**appear**
79:13 140:10
**APPEARAN...**
2:1 3:1
**appeared**
128:4 149:25
**appears**
74:1
**approached**
35:2
**appropriate**
148:6
**approving**
140:22
**approximately**
5:16 34:1 39:12
**April**
154:17 155:1
**area**
7:23 56:2
106:23 108:20
108:21,22
**areas**
22:11 35:4
98:20
**argument**
57:11
**arm**
41:20
**armed**
130:25
**arms**
68:20
**arrangements**
142:23
**arrest**
23:16 24:11
27:3 42:11,14
67:12 103:12
117:10,16
118:1,10,13,18
120:1 128:15
129:10 136:19
136:24 139:7

147:14 148:6
148:11,18
149:18,20
150:13
**arrested**
111:16
**arrests**
149:18
**arrow**
71:10
**article**
114:3,18
**articulate**
76:2
**aside**
64:24
**asked**
8:8,16 26:1 27:9
31:8,9,18,24
31:25 32:1,3
34:21 37:20
53:24 54:13
58:5 68:7
70:20 71:9
75:18,20 76:10
79:16 91:23
93:23 94:3
119:25 154:11
**asking**
16:5 21:19 30:7
32:5 53:20
93:1 97:11
98:9 144:6
145:3
**asks**
71:15
**assault**
22:25 31:5,13
44:4 60:17
66:16 70:16
71:20,25 91:7
134:24
**assaulted**
34:16
**assaulter**

31:14
**assertion**
137:21
**assist**
121:7 142:25
**assistance**
91:23
**Assistant**
2:20
**assisted**
87:15
**assisting**
143:1
**associated**
55:19
**assume**
70:20 99:12
136:17 141:18
**assumed**
68:17
**assuming**
59:24 61:4 62:8
77:17
**attached**
153:5 155:11
**attempt**
68:14 108:22
**attention**
19:12 94:22
96:3 112:24
**attorney**
2:20 9:14 10:2
34:11 36:17
141:22
**attorneys**
9:19 35:3 46:1
141:23
**attribute**
118:12 119:7
133:2
**attributed**
128:10 134:1
138:12
**attributes**
151:1

**attributing**
130:15,23
**attribution**
148:6,15
**atypical**
102:11,19
**audio**
25:19
**authored**
23:16 24:11
27:5 30:13
117:13 139:5
149:19
**authoring**
125:19,20
138:22
**authority**
34:7 45:13
**authority-type**
45:17
**autonomous**
99:7
**available**
145:9
**Ave**
2:10
**avoid**
16:8,17 18:9
21:15,22 41:1
66:11 74:16,16
78:14 79:6,7
80:17 82:14
**avoided**
38:3 66:11 80:4
80:6 81:2
**aware**
53:16 57:14
59:19 67:20
75:7 77:25
79:14 90:13
96:2 124:24
126:6,21

———————
**B**
———————
**back**

10:7 25:11,20
26:12,13 28:20
30:8 38:21
39:18 41:20
44:12,18 47:16
51:12,13,20
52:5,9 56:25
62:19 68:17
69:2,8 77:24
78:11 79:11
84:7,10 88:3
95:21 97:2
105:1,4 108:10
108:11,20,21
108:22 109:8
115:14,20
122:19 124:12
127:11,12
128:24 131:21
131:23 138:1,3
138:4,5,7
139:15 143:16
148:20 149:3
149:13
**background**
7:4 15:21 43:24
45:21 100:12
100:24 101:2
101:11
**bad**
29:19 39:22,25
40:13 125:15
**bag**
49:21,24
**balls**
22:23 24:6
96:11 142:17
146:23
**barely**
95:2
**based**
14:20 16:13
17:23 18:3
37:19 69:5
118:11 126:1

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 3

140:15
**basement**
58:24 59:18
**bases**
143:8
**bashed**
69:8 108:9
127:11
**Basic**
23:19
**basic-**
95:2
**basically**
13:24 14:9
40:13 55:4
63:19 84:15
117:6 139:7
**basis**
148:1
**beating**
101:24
**bedroom**
115:14
**beginning**
48:12
**belief**
141:17
**believe**
5:12 28:2,12
31:2 35:20
127:22 137:11
**believed**
130:16 133:7,9
**belong**
136:3
**Ben**
2:19 151:25
155:23
**ben.longnecke...**
2:23
**benefit**
82:25
**benevolent**
12:13 14:20,25
15:10,17,18

16:4
**Berg**
2:15
**best**
28:24 89:1 90:8
141:17
**better**
18:9 23:5 24:22
57:25 86:25
91:15,17 92:2
104:7 116:14
**bias**
45:20
**big**
30:21 38:10
47:3 81:5 83:7
87:2 105:5
116:20 138:7
**bigger**
112:18
**biggest**
39:5
**bit**
6:7 9:13 17:21
51:20 54:10
92:22 117:10
148:25
**blah**
26:23,23,23
89:9,10,10
117:1,1,1
118:16,16,16
123:16,16,16
**blame**
119:21
**block**
111:2
**blog**
47:10
**blood**
52:21,24,25
53:11,14,15
55:11 56:1
69:4 89:6
106:4 115:20

**blood-staining**
115:14
**bloodstain**
6:11,17 43:25
91:6 101:2,2,5
108:6,18,19
**bloodstained**
114:8,21
**bloodstains**
57:17 91:9
116:1
**bloody**
49:8
**boards**
68:18 78:7,8
127:3,15,25
128:6 129:8
**body**
12:19 13:3
14:24 19:22
72:3
**bolster**
26:8
**boots**
59:18
**borderline**
104:3
**bottom**
81:9,12
**Boulder**
2:16
**Boulevard**
3:9 155:4
**bouncing**
144:3
**boundaries**
45:2,3
**boy**
83:7 104:15
**boyfriend**
115:10
**brand**
55:15,16
**brands**
14:15

**break**
38:18,22 141:3
141:5
**break-ins**
68:14
**breaking**
18:2 135:8
**brief**
150:8
**briefly**
141:11
**bring**
100:23
**bringing**
64:19
**British**
45:16
**broke**
108:10 127:11
**broken**
77:19,19,23
89:8 91:24
109:7
**brought**
45:23 58:18
60:25 109:12
131:4
**browbeating**
77:5
**build**
17:23 18:13
**building**
50:17,18
**built**
18:3
**bullet**
85:5
**bunch**
9:11 18:14
**burglary**
69:21 134:15,23
135:2,5
**burning**
144:6
**business**

24:19 93:16
99:13 147:7
**busy**
46:18 96:8
**Byrialsen**
2:3

————————
C
**C**
5:1
**call**
34:4,4 49:4
50:13,20 84:17
96:9 99:10
108:4 110:7
**called**
1:16 20:11 21:7
29:23 50:23
51:5 85:13
91:7,8
**calling**
115:11
**calm**
93:18
**capacities**
1:12
**capacity**
26:6
**captain**
101:16
**car**
20:21 49:18,18
77:16,17
107:13,22
110:25 142:22
143:19
**cards**
55:5
**care**
91:25
**career**
103:9 117:15
125:3
**careful**
54:17 87:1

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 4

104:20
**carried**
 138:1
**carry**
 51:17
**cartridge**
 85:6 89:13
**case**
 6:16 7:2,13,14
   8:4,13,13 9:2,5
   9:8,15 19:6,13
   24:12 26:16,17
   26:20 28:1
   30:21 31:4,4
   31:12,13 32:8
   33:9,16 34:4
   34:11 35:1,14
   35:24 36:2,5
   37:5 39:19,23
   40:21,22 41:7
   41:11 42:14,15
   42:21 43:3,16
   45:25 47:7,11
   47:16,18,20
   49:7,22 63:16
   67:21 78:17
   85:6 92:4 93:2
   94:12 96:17
   99:17 102:16
   104:2,25
   105:18 120:2
   123:23 140:18
   141:13
**cases**
 5:21,21 6:21,24
   6:25 29:20,24
   30:18 33:4,15
   33:21,22 34:1
   34:23 35:8,11
   35:16,20,21
   36:1,8 46:25
   47:2 89:13
   94:24 105:11
   121:4 125:18
   143:5

**catching**
 39:22,25
**category**
 63:20
**caught**
 17:10
**cause**
 37:14 81:22
   82:1 83:20
   92:16 102:2
   125:23 133:13
   137:11 140:24
   148:1
**caused**
 27:4
**causing**
 132:15
**caution**
 30:3
**cautious**
 74:22 76:17
**cautiously**
 66:13 67:8 80:7
   81:22,24
**cc**
 155:21
**CDI**
 10:24
**certain**
 8:12 9:18,19
   78:15 121:7
   129:24 151:12
**certainly**
 16:14 18:12,13
   35:7 37:20
   64:25 67:10,14
   78:1 83:23
   84:5 86:25
   87:4 90:19
   92:21 96:3
   98:23 100:20
   108:22 109:7
   112:5,11
   133:18,20
   136:12 150:21

 151:7
**certainty**
 97:19 146:14,19
   147:1
**CERTIFICA...**
 154:1
**certify**
 154:4,13
**cetera**
 37:1 93:5
**chair**
 12:18 13:4
**Challenge**
 112:17
**chance**
 50:10 98:23
   100:13
**change**
 38:11,11 123:15
**changed**
 38:6,13
**changes**
 38:8,9 153:3,6
**changing**
 37:23 113:16
**channels**
 41:2
**characteristic**
 49:13
**characteristics**
 53:3,5 55:23,23
   55:24,25 84:15
   84:21,23 85:1
   85:7,8,12,13
   85:16
**characterize**
 84:1 102:17
   104:5
**charge**
 67:12 133:14
**charged**
 27:4
**chief**
 45:4 144:5
**child**

 8:5 15:21,23
**choose**
 150:20
**chose**
 45:4
**Christ**
 46:20
**chronology**
 143:21
**Chuck**
 56:6,12 58:21
**chute**
 68:19 78:2,6,9
   129:5
**circumstantial**
 67:16 108:5
**city**
 1:9 2:20,21,24
   7:16,19,21
   43:2,10 45:2
   153:16 155:7
**civil**
 1:2 5:20 7:14
   8:13 26:17
   27:18 29:11
   34:15 35:3,11
   35:14,16 36:5
   42:23 45:25
   46:1,7 47:10
   155:7
**civilian**
 45:13,17
**claim**
 40:7
**claimed**
 108:25
**class**
 49:13 53:5
   55:22,24,25
   84:15,21 85:7
**classes**
 10:13
**classified**
 74:25
**classify**

 7:7
**clearly**
 150:22
**clip**
 47:21,24 48:6
   61:24 64:12
   72:8,9,12
**clips**
 61:21
**close**
 107:19 152:4
**closely**
 24:3
**closer**
 12:18 13:4
   94:22
**clothing**
 145:10
**clowning**
 32:10
**club**
 70:23
**clue**
 24:20 49:24
   57:7 107:23
   108:1 115:15
   122:5
**coerced**
 34:17
**coercion-type**
 34:19
**coercive**
 78:23 80:10
   103:3,6
**cognitive**
 74:21
**coincidental**
 42:15
**Colfax**
 2:21
**Colorado**
 1:1,21 2:4,10,16
   2:22 3:4,10
   10:25 44:15,19
   45:7 153:21

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 5

154:4 155:5
**Columbia**
 45:16
**combination**
 83:16,20
**come**
 19:1 20:9 21:5
  23:10 29:8
  41:5 44:16,23
  46:23 48:22
  51:9,13 55:1
  60:7,14,25
  66:15 88:17,20
  91:9 94:25
  99:22 115:11
  116:5 121:7
  134:19 144:19
  145:3,9 151:12
**comes**
 18:1 46:20 62:6
  134:2
**coming**
 19:2 47:3 70:8
  89:11 103:15
  108:5 119:10
  119:19 134:18
  145:2
**commencement**
 154:5
**commencing**
 1:18
**comment**
 30:18,21 125:1
**commission**
 153:11 154:21
**commit**
 66:17 69:20
  135:9,23
**committing**
 134:15,23
  135:25
**communicate**
 147:10,12
**communication**
 89:19

**communicatio...**
 30:4
**compare**
 21:25 50:6 79:2
**compared**
 102:12
**comparing**
 23:25 96:15
**complaint**
 26:16,18 27:1
  40:25 41:2
**complaints**
 39:1
**completed**
 136:19
**completely**
 42:15 84:22
**component**
 8:4 88:9,13
**components**
 88:7 146:24
**compromised**
 129:23
**compromising**
 21:16
**computer**
 62:4 111:23
  112:15 114:1
**concern**
 66:15 104:22
**concluded**
 152:7
**conclusion**
 134:2
**conclusions**
 151:12
**concrete**
 49:11 138:7
**conduct**
 40:11 98:24
**conducted**
 86:14 87:22
  90:24
**conducting**
 37:13 92:7

143:13
**confess**
 66:5,17 77:6
  82:16,19
**confession**
 34:17 37:15
  66:18 67:3,5
  72:21 83:5
  84:3 92:17
  94:1 99:24
  105:18 108:4
  111:10
**confessions**
 66:2,12,14
  74:14,16,17,18
  78:14 79:2,6
  80:4,17 81:23
  82:1,12 83:21
  83:23,24
  104:19,21
**confirm**
 149:9
**connecting**
 77:21
**connection**
 39:21 107:10
  117:6 144:23
**consequences**
 81:6
**consider**
 8:17 76:21
  118:6
**considered**
 11:25 21:19
  67:8
**consistent**
 49:9 106:14,15
  108:18 109:1
  111:3 115:21
  132:21 133:1,6
**contact**
 29:17,22 46:15
**contaminating**
 18:10 21:19,22
  83:17

**contamination**
 19:8 37:13
**contemporane...**
 145:17
**content**
 139:10
**contents**
 23:17,21
**context**
 18:7
**continually**
 66:3
**continue**
 80:5,14
**continued**
 3:1 82:10
**continuously**
 99:8
**controversy**
 154:7
**conversation**
 10:4 99:25
  147:15
**conversational**
 12:15 13:18
**conversations**
 46:6 60:19
  139:17,20
**convinced**
 73:23 74:2,5
**cooperate**
 112:15
**coordinate**
 145:4
**coordinating**
 146:24
**cops**
 41:19
**copy**
 155:11
**coroner**
 34:8
**correct**
 9:17 10:17 21:7
  53:15,23 54:6

54:7 59:15
  63:12 69:13
  71:12,18 78:2
  78:6 82:2 86:6
  86:11 87:16
  90:10 96:18
  105:21 106:1,6
  106:17 117:19
  121:25 126:16
  133:8 136:21
  144:10 145:7
  147:11 148:23
  151:20
**corrected**
 71:1
**correcting**
 17:16
**corrections**
 153:3
**correctly**
 5:25 93:5 101:5
  122:12
**corresponding**
 38:9
**corroborated**
 108:3 115:3
**corroborates**
 115:7
**corroborative**
 110:17
**counsel**
 30:5 60:19
  139:17,20
  154:14
**countered**
 43:8
**counterprodu...**
 92:12
**country**
 103:1
**County**
 1:9 2:21,24 7:21
  39:11 45:2
  155:7
**couple**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 6

20:10 23:25 24:22 46:16 61:21 82:3
**coupled** 82:9
**course** 79:18 84:4 97:4 104:20 110:11 130:8 147:3
**courses** 14:21
**court** 1:1 40:18 153:19 155:18
**Court's** 155:12
**covered** 143:8
**covering** 78:8 127:3,15
**crafting** 148:18
**crash** 49:18,19
**crawl** 68:22
**create** 72:20 74:13,16
**created** 47:19 115:13 150:1,4
**creating** 45:15 64:17 66:2 74:17 78:14
**credibility** 73:5
**crime** 6:12,17 17:14 18:17,18,19 19:19,20,21 20:1,4,6 22:24 26:2,6 44:1 49:8,10 59:1 63:24 66:4

67:7 71:2 88:8 88:10,10,16,20 88:25 89:5,12 91:6 95:10,12 95:13 96:15 105:21 106:9 108:16 109:1,5 115:9 127:22 133:7,19 134:6 135:9,14,19,25 136:3 137:22 138:17 143:12 144:22 145:9 151:8,11
**crimes** 5:22 8:5 44:4 66:16,17
**criminal** 8:13 34:25 43:16 47:16 56:7 141:13
**criminally** 40:4,5
**criteria** 138:18
**critical** 30:25
**critique** 92:11 93:4,6,21
**CRT** 44:11
**crumbling** 18:1
**CSR** 154:20
**curious** 24:10
**current** 117:22
**curriculum** 15:1
**cut** 89:4
**CV** 36:25

**D**

**D** 4:12 5:1
**DA** 39:18 45:3,4 82:19 120:6 121:3
**DA's** 29:20 39:11 46:25
**DAs** 121:7,8
**date** 113:2 153:10 155:15
**daunting** 100:20
**David** 2:2 155:21
**david@fblaw....** 2:5
**Davis** 113:22,23 115:9 115:16,17
**day** 20:20 36:2 120:5 137:2 154:17
**days** 6:21 20:1 23:24 39:20 40:2,18 44:18 106:7 114:19 155:15
**dead** 136:10
**deal** 6:19 15:24 32:4 82:7 83:9 91:15 98:18 100:17 105:5
**dealing** 7:2 16:21 22:24 26:6 31:4 34:3 74:20 79:1

101:9,14 103:11 144:7
**deals** 6:10
**Dear** 155:10
**death** 9:6 18:18
**decades** 146:3,22
**December** 5:23
**decide** 130:13
**decision** 34:4
**decisions** 34:12
**defendant** 2:12,18 3:6,12 7:14 31:19 35:1 117:1
**defendants** 1:13 26:20 46:7
**defined** 13:10
**definitely** 16:10 132:6
**definition** 13:19,25
**degree** 127:25
**denials** 79:25 82:10
**denied** 79:14
**Denver** 1:9 2:4,10,21,22 2:24 3:4 4:11 4:12,12 7:20 7:21 8:21 29:18,23 31:3 42:20 43:22 44:25 45:1 56:2 112:25

148:13 153:20 155:7
**deny** 80:1
**denying** 81:16,17 82:5
**department** 4:11 29:18 39:7 40:12 45:19 46:15 47:1,2 125:13 143:11 143:13
**depend** 95:18 147:13
**depended** 95:9
**depending** 6:16 34:9 100:20
**depends** 36:2
**depletion** 103:13
**deponent** 112:19 113:7 114:4 142:2,11 150:7,9 151:23 152:5
**deposed** 5:13,19 6:4 7:12 9:11 119:24
**deposition** 1:4,15 5:22 9:18 15:5 25:14 30:7 83:6 142:14 152:7 153:2 155:8,12
**depositions** 6:4
**Dept** 2:21
**described** 142:15 143:9
**designed** 76:1

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 7

**desk**
 62:3 146:12
**detail**
 117:11
**details**
 60:15 67:19
 151:3
**detective**
 1:10,10,11 23:5
 24:11 70:15
 91:15,16,17
 94:21,24 99:1
 101:12 122:11
 122:13 125:9
 129:9 140:25
 148:13,17
**detectives**
 31:15 43:23
 58:17 68:23
 70:17 78:13
 92:7 103:10
 126:2,8 128:14
 138:24
**determination**
 34:8
**develop**
 95:3
**developed**
 21:16,17
**dictate**
 25:7 120:14
 122:11,25
 123:13
**dictated**
 25:5
**dictating**
 122:13,20,23
 123:3
**died**
 91:8
**differed**
 15:19,20
**difference**
 13:15 104:18
**different**

7:17 9:14 10:4
 11:13,15 14:14
 14:17,17 15:15
 15:25 22:6
 38:2 44:11
 49:14 55:19
 84:22 85:8
 102:3,16,18
 108:25 117:24
 127:10
**difficult**
 145:22 146:3
**dig**
 36:12
**direct**
 14:1 23:4 90:9
 90:12 101:3
 139:1
**directed**
 22:9
**directing**
 97:25
**direction**
 110:23
**directions**
 49:14
**directly**
 54:17 138:24
 139:8
**directs**
 10:3
**discharge**
 44:5
**disclosed**
 134:10,24 136:8
 148:4,12
**discovered**
 19:22 114:8,21
**discussed**
 50:9 133:5
**discussion**
 49:1 50:2
**dismissed**
 43:1,4
**dispute**

132:19
**distinct**
 84:20
**distinctive**
 71:18
**district**
 1:1,1 34:11
 44:23,24 45:3
**DJ**
 2:14 142:7
 155:22
**djg@bhgrlaw....**
 2:17
**DNA**
 17:2,5,8 64:20
 105:20,22
 106:24
**dog**
 44:6
**Doherty**
 3:8 4:3 30:3
 36:22 106:12
 113:16 120:8
 130:11 131:10
 131:12,18
 141:7,25,25
 151:24 155:3
 155:10
**doing**
 6:9,23 7:4 8:23
 12:3 18:16
 22:22 41:25
 42:20 44:19
 45:9,13,17
 46:18 58:17
 62:8,9 65:19
 66:10 67:23
 72:20 76:4,19
 76:25 83:2,19
 87:16 88:23
 91:16 93:5,14
 94:21,22,23
 95:19 97:6
 98:15 99:4,23
 100:22 101:13

101:25 114:14
 116:17 122:7
 123:17 125:21
 128:15 137:15
 143:18,23
 146:3
**domestic**
 99:9
**Don**
 14:22
**door**
 22:14 68:17,24
 69:3 70:8
 108:6,10,11,12
 108:16 109:11
 109:17,20,25
 127:11,12
 128:24
**doorknob**
 68:19
**doors**
 50:25
**double-dipping**
 39:8
**doubt**
 56:10
**downtown**
 60:11
**dozen**
 6:24
**dozens**
 8:9
**DPD**
 7:19 10:9,13
 29:5 32:20
 40:6 41:25
 75:13 87:7,12
 93:4 94:13
 103:9 119:3
 125:5 126:1,8
 128:14
**draft**
 128:15
**drafting**
 123:20

**dragged**
 39:9 115:22
 137:19,22
 138:1,2,10
**draw**
 71:10 112:23
**dress**
 71:18,22,24
 72:6
**drone**
 46:23
**dropped**
 40:23
**drug**
 11:2,3 75:22
**duly**
 5:4
**duplicate**
 78:4 108:21
 109:8 128:5
**duty**
 39:9 114:14

_____
E
_____
**E**
 1:10 2:10 5:1,1
**earlier**
 5:23,24 47:22
 116:6 141:12
 143:9
**early**
 20:14 40:18,18
 49:17 68:11
 75:21 142:16
**easily**
 124:2
**Education**
 4:11
**effect**
 32:23 58:8
**effective**
 104:17,19,21
**efforts**
 127:21
**egregious**

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 8

104:15
**eight**
52:19 79:20
**either**
5:25 26:15 33:2
34:20 37:10
51:2 75:1 82:3
103:22 121:24
125:19 132:10
**electronic**
155:11
**elicit**
13:22
**eliminate**
85:11 106:25
107:2,3
**eliminated**
59:6,8,10
106:18,21,24
**else's**
61:9
**email**
47:10
**Emily**
9:6 20:25 60:16
70:23 91:8
137:19
**emotion**
103:13
**employed**
38:7,7
**enacted**
44:15
**Encl**
155:20
**encourage**
12:21
**ended**
39:22 41:23
43:2,9
**ends**
41:17
**enforcement**
10:14,24 11:3
11:13,17,22

32:20 34:5,6
34:10 35:23
45:4 99:6
**ensure**
91:20
**entering**
130:24 135:8
**entire**
16:12 18:3
19:18 48:7
89:21 94:10
109:18 149:14
151:4
**entry**
69:21 78:1 89:7
108:25 109:17
127:2,14 129:7
**equals**
84:3
**equivalent**
13:20 103:22
**especially**
82:3 140:22
**Esq**
2:2,2,8,14,19
3:2,8 141:9
155:3,21,22,22
155:23,23
**et**
37:1 93:5 155:7
**evaluating**
88:11
**Evans**
3:3
**Eve**
61:2
**evening**
24:6 71:23
142:15 145:7
146:2
**event**
21:4 67:18
128:10
**events**
10:13

**everybody**
24:7 70:23
71:17 88:25
152:5
**evidence**
13:18 14:5,6,11
14:12 18:18
19:19 22:1
24:3 48:2
64:12,17,22
66:3,19 67:15
69:4,5,10 71:2
72:21 73:9
74:12 77:12
79:23 88:8,11
88:11,12 89:6
89:7 105:1,13
105:19 108:3,6
108:17,19,19
109:1,5,5
110:18 115:3,6
115:12 116:2
117:2 132:22
133:2,7,10,19
137:22 138:17
142:25 144:22
**evidentiary/in...**
145:5
**exact**
62:22 63:1,4,5
63:24 64:2
65:1
**exactly**
10:21 96:9
132:23 137:12
143:21 145:23
**exaggerate**
137:10,14
**exaggerated**
124:23 130:5
**exaggerating**
125:7,22
**examination**
1:16 4:1 5:6
61:6 142:12

150:10 154:5,8
**examined**
5:4 55:1
**examiner**
34:9
**example**
16:22 36:4 66:8
66:20 76:15
82:15 93:9
97:12 143:18
**exchange**
97:6
**excluded**
63:19
**exclusion**
63:12
**executed**
59:17 155:15
**exhibit**
48:6,7 111:21
112:20,22
113:7 114:4
**exhibits**
4:6,7,9
**existed**
49:16
**existing**
142:24
**exists**
78:22 105:9,9
**exit**
58:3
**exits**
48:21
**expect**
122:17
**expectation**
100:10
**expectations**
99:4
**expedite**
141:5
**experience**
12:3 37:19
86:16 91:16

99:1 139:13
140:15,19
148:19
**expert**
6:5,8,9,15,21
7:8,16,23 8:2
8:17 9:16 26:4
26:5,6,12
30:13,15 32:19
32:19 34:20
36:9,25 37:4
37:10 43:8
56:15 58:21
63:4 78:12
80:21 81:21
86:8 106:23
117:23 118:7
**expertise**
7:1,3 10:7 11:19
43:24 45:21
74:11 117:22
118:8
**experts**
45:11
**expires**
153:11 154:21
**explained**
108:20
**explore**
76:8
**express**
13:19 66:11
82:4 103:21
**expressed**
80:3
**extent**
38:5 68:23
93:25 137:24
**eyewitness**
105:3,5,6,7

_____ F _____

**face**
93:11,16
**facilitate**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 9

| | | | | |
|---|---|---|---|---|
| 23:3 99:13 | 78:14 79:1,6 | **felt** | 85:5,5 89:9,13 | **fixing** |
| 101:20 | 80:4,17 81:10 | 98:16 | **firewall** | 19:8 |
| **facilitating** | 81:23 82:1,11 | **Fetrow** | 91:24 | **floater** |
| 23:2 | 83:20,22,23,23 | 90:18 | **first** | 96:13 |
| **facilitator** | 84:3 92:16 | **fiber** | 5:4 19:1 20:11 | **floor** |
| 143:11 | 94:1 99:24 | 106:4 | 25:25 34:24 | 1:18 2:4 89:9 |
| **facility** | 125:6 130:5 | **figure** | 49:18 51:24 | **focus** |
| 11:21 | **falsely** | 6:2 111:25 | 75:10 82:8 | 19:14,16,18 |
| **fact** | 66:4 | 151:14 | 83:8 92:20 | 26:2 91:5 |
| 7:12 15:22 18:4 | **familiar** | **file** | 108:9 109:16 | **folks** |
| 19:9 31:3,4 | 11:8,12 12:4 | 47:18,20 | **first-degree** | 122:3 |
| 49:17 63:18 | 24:10 64:14 | **filed** | 27:5 133:14 | **follow** |
| 69:12 79:24 | **familiarize** | 26:16 40:25 | **Fisher** | 35:3 36:20 |
| 90:15 93:7 | 25:14 | 41:1 | 2:2,3 4:2,14 5:7 | 99:15 |
| 116:3 117:7,21 | **family** | **filing** | 30:6 36:20,23 | **follow-up** |
| 136:10,12 | 33:16,17 46:4 | 34:12 | 38:17,21,23 | 31:7 32:16 |
| 146:4,23 | **fan** | **fill** | 59:4 65:11,18 | 142:8 150:8 |
| 148:23 | 47:3 | 23:11 118:1 | 74:4 84:6,10 | **followed** |
| **fact-gatherer** | **far** | **filling** | 92:13 103:5 | 19:7 |
| 34:13 | 38:6 61:5 73:24 | 130:6 | 106:15 111:20 | **following** |
| **facts** | 121:16,21 | **finally** | 112:2,14,21,23 | 14:11 20:20 |
| 16:17 18:20,22 | 123:5 | 67:4 79:21 | 113:18,19 | 32:5 131:23 |
| 18:25,25 34:6 | **farmed** | 112:16 | 119:9 120:10 | 133:15 148:12 |
| 34:10 | 44:11 | **find** | 120:11 126:19 | **follows** |
| **fade** | **fashion** | 36:8 40:10 | 126:23 128:18 | 5:5 |
| 129:24 | 60:14 88:24 | 46:21 58:16 | 130:12 131:17 | **foot** |
| **fair** | **fast** | 85:1 94:12 | 131:19,21 | 51:24 52:3 |
| 7:7 11:7 20:10 | 57:25 | 109:8 | 132:5 134:3,9 | 62:24 |
| 21:2 55:6,17 | **faster** | **finding** | 134:21 135:7 | **footprint** |
| 65:2 92:4,18 | 123:1 | 35:25 | 135:17,23 | 64:7,7 |
| 92:19 97:20,21 | **February** | **finds** | 138:16 141:2 | **force** |
| 102:21 108:13 | 42:12 | 133:13 | 141:11,21 | 44:21 45:7,15 |
| 116:15,22 | **federal** | **fined** | 142:3 150:8,11 | 45:16 |
| 117:13,19 | 11:3 | 40:2 | 150:25 151:9 | **foregoing** |
| 124:18 128:7 | **feel** | **fingerprint** | 151:21 152:2 | 154:10 |
| 130:6 136:16 | 37:18 73:10 | 68:2 84:23 | 155:21 | **forensic** |
| 138:13 141:15 | **feet** | **fingerprints** | **Fisher-Byrials...** | 27:11 47:7 |
| 144:11 150:13 | 51:6 63:18 | 16:22,24,25 | 2:2 141:9 | **forensics** |
| 150:15,18 | **fellow** | 17:8 65:14 | **fit** | 6:11 |
| 151:4,6 | 147:25 148:4,20 | 84:14 105:24 | 24:2 67:6 108:6 | **forget** |
| **false** | 148:22 149:3,6 | 106:3 107:7 | 116:1 144:22 | 102:7 |
| 37:14 48:2 | 149:13 | 128:8,8,9 | **fits** | **forgotten** |
| 64:12,22 66:2 | **felony** | **finish** | 135:5 138:17 | 132:6 |
| 66:12,14 72:20 | 135:21,23 | 82:8 83:8 | **five** | **form** |
| 74:13,16,17,18 | 136:11 | **fired** | 84:7 141:2 | 16:23 59:3 92:9 |

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 10

102:23 104:4
106:12 119:6
120:8 126:18
126:20 128:17
130:11 131:11
133:23 134:8
134:16 135:3
138:15 150:19
151:5 154:10
**forth**
143:16
**forward**
60:14 76:18
**found**
40:11 49:18
56:1 57:13
72:3 105:7,20
105:23,25
106:5,16 109:5
111:1 113:24
**foundation**
59:3 65:10,12
74:3 135:3,22
**four**
11:22 37:1 48:9
114:19 128:8
**four-year**
36:13
**frame**
137:3
**friend**
107:7,9
**friends**
46:4 107:11,12
**front**
56:19 69:3 70:8
108:6,12,16
109:11,17,20
109:25
**frugal**
62:13
**full**
23:17,20
**function**
103:19 123:14

123:14 143:8
**functional**
13:20 103:21
**functions**
122:6 143:14
**funded**
11:4
**further**
35:9,12 66:22
67:11 76:8
95:4 98:7
105:16 141:21
154:13
**furthering**
16:20
**FYI**
9:4

———— G ————
**G**
5:1
**gain**
82:25
**gained**
7:4 78:1 108:25
127:2 129:7
**gaining**
127:14
**gather**
34:10
**gathering**
13:17,18 88:11
88:22,23
**gathers**
34:6
**general**
25:4 29:25 30:6
60:10 93:2
94:12 95:22
102:6
**generally**
36:1
**generate**
94:1
**generated**

116:24
**getting**
10:7 12:18
41:17 79:13
89:1 93:10,15
95:7 101:24
104:19 108:21
110:19,22
119:13 124:12
125:5,21,23
128:21 129:13
130:17 132:10
137:8 145:2
148:17 151:18
**Gilliam**
70:11 109:16
110:3 111:7
**give**
18:6 28:25
32:23 72:25
76:2 77:7
80:11 100:13
111:24
**given**
6:23 29:1 67:6
146:9,22
147:18 154:12
**gives**
17:12 32:6
79:21 105:18
**giving**
16:17 76:24
83:17 130:19
**glass**
51:10,15 52:15
52:19 53:12
54:6,11 55:7
61:23
**gloves**
51:10,11,12
52:10
**go**
9:12,25 10:5
13:16 41:2
44:6 45:8

51:12,20 62:19
66:22 67:12
73:20,25 74:24
76:3,18 77:4
77:24 79:20
81:17 82:5
83:7,7 84:8
85:9 93:21
95:3,6 98:7,20
99:10 100:10
105:15 108:8
110:14,21
113:8,25 115:5
122:10,19
131:19 134:8
135:9,24 136:6
148:20 149:3,7
149:13 152:6
**go-to**
13:7
**God**
18:3
**goes**
11:9 79:11 99:9
100:17
**going**
19:17 25:4,7
35:3 40:13
44:16 46:24
47:17,21,23
48:11 49:13
51:2 58:6,9
64:15 66:21,22
67:2 69:3
72:24 76:6,8
76:16,17 77:12
77:19 78:11
80:15 81:17
83:7,7 84:23
85:9 86:3,3
88:2,12,13,20
89:4,15,16
91:5 92:11
93:11,25 94:15
94:19,21 95:11

95:20 96:2,6
96:16 97:3,11
98:19 100:15
102:2 107:5
108:7,20 109:7
111:1,21 119:7
120:14 122:15
122:16,25,25
130:20 131:3
135:5 142:9,20
143:5 144:4
145:1,17,19,23
**Golden**
153:21
**Goldfarb**
2:14 4:3 92:9
119:6 128:17
131:11 133:23
134:8,16 135:3
135:22 138:15
142:7,8,13
150:5,19 151:5
155:22
**good**
5:8,10 11:25
12:1 17:11
61:9 77:2,3
88:19 92:25
93:17 99:3
141:7 152:3
**Gordon**
90:19
**Gosh**
73:10 100:7
**Gotcha**
87:3
**gotten**
69:12 122:2
**grabbed**
131:3
**Grammar**
139:10
**grave**
105:8
**great**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 11

42:21 91:15 100:17
**greater**
 101:17
**Greenleaf**
 2:15
**group**
 44:22 45:10 121:8
**guarantee**
 144:5
**guess**
 7:7,10 13:14 14:3 18:6,7,15 19:11 29:2 40:5 51:10 64:24 68:2 73:3 86:20,23 98:22 118:7 139:15
**guilt**
 109:23
**guilty**
 14:4 135:19 136:10
**gun**
 89:14
**gunshot**
 89:9
**guy**
 12:16 17:8 32:10 40:24 46:24 53:8 68:20 73:5 77:10 89:4,8 94:25 95:11,12 101:18 105:6 105:12 106:25
**guy's**
 49:4
**guys**
 23:5 46:19,19 46:22 49:19 82:15 91:17 92:22 100:21

104:16 121:5 133:7

___ **H** ___

**hairs**
 106:4
**half**
 97:18
**hall**
 3:3 22:13
**hand**
 62:10 89:4
**handle**
 88:19
**handled**
 104:7
**handling**
 99:11
**handprint**
 128:7
**happen**
 42:19 99:14 101:21 102:3 105:17 122:8 130:10 134:4 139:12 147:16
**happened**
 8:15 25:3 27:15 29:13 40:14 41:4 42:17,23 50:12 60:15 70:16 71:3,6
**happening**
 102:20
**happens**
 70:5 133:19
**hard**
 21:20 36:4
**head**
 32:8 36:22 39:24 68:6 73:4 80:20 110:19 111:14 112:7 114:25 116:22,23

125:9 127:8 132:15 143:6
**headquarters**
 50:17,18 54:3,3 90:3,10,13
**hear**
 61:16 73:11,19 73:25 135:15
**heard**
 48:22
**hearing**
 26:4 27:25 28:9 28:13 75:10 140:4
**hearings**
 26:5 28:10
**heightened**
 103:13
**help**
 23:5 32:22 44:2 66:22,23 82:7 83:10
**helping**
 123:4
**hereto**
 154:8
**Hernandez**
 110:3
**hey**
 17:2,7 35:22 40:23 48:15,22 49:19 50:3,10 55:2 58:15 65:13 82:18 89:4,6,8,9,13 91:9 98:3 99:22 100:14 123:15,17 144:18 147:14
**Hi**
 147:13
**HIDTA**
 11:2
**high**
 11:2,2 63:20

153:19 155:18
**high-heel**
 132:15,18 133:8
**high-probabil...**
 58:25
**higher**
 59:9 101:19
**Highlands**
 3:10 155:5
**highly**
 106:17
**Hill**
 2:15
**hire**
 32:22 35:22
**hired**
 6:20 8:1,11 32:21 33:15,16 34:14 35:13
**hires**
 33:8
**hit**
 17:24 41:15 49:22 110:19 111:13 112:7 114:25 133:8
**hits**
 41:19
**hold**
 17:17,18,19 37:6 38:15
**holding**
 58:3 62:9
**hollering**
 102:1
**Holmes**
 51:18
**home**
 73:20,25 79:15 126:14 127:3
**homicide**
 5:21 7:4 8:6 9:6 15:23 33:19,23 43:14,15,18 44:25 54:14,18

54:20,23 55:3 55:9,12 56:21 56:22 57:3,13 57:22 61:15,17 61:19 66:16 69:20 88:4,6 90:5,7,16 91:16 98:19 100:10,14,23 102:21 121:3,6 123:25 126:1,8 138:23 143:4 143:10 146:9 148:13
**homicides**
 143:5
**hoping**
 77:5
**hours**
 11:22 23:24 79:21 137:4,5 142:16
**house**
 21:1 49:20,21 59:23 60:16,24 68:12 110:16 111:1 115:21 127:4,16 131:3 135:18,24 136:2,6
**Huh**
 49:22
**hundreds**
 10:19 86:23 100:3 117:14
**Hurley**
 3:2 4:4 59:3 65:10,12 74:3 102:23 142:4,4 155:23
**hurleys@hall...**
 3:5

___ **I** ___

**I's**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 12

116:14
**IA**
43:13
**ID**
105:12
**idea**
60:3 65:2 122:1
124:12
**identification**
7:1 63:4,11
84:25 85:10
**identified**
106:3 126:5
**identifies**
148:5
**identify**
73:4
**identity**
126:2,8
**illegal**
98:16
**imagination**
102:20
**imagine**
8:9 11:12 12:4
22:6 86:15
**impaired**
74:25
**impairment**
76:22
**implied**
81:12 82:4
**important**
17:22 87:19
123:20
**impossible**
70:17 97:19,22
**impromptu**
48:25
**improper**
37:12 98:9,16
98:24
**improperly**
81:23,25
**in-your-face**

12:16
**inaccurate**
128:22
**inadvertence**
133:21
**inappropriate**
104:3
**inappropriately**
35:21
**incident**
6:12 9:1 43:25
60:16 101:18
104:25 129:21
**incidents**
6:18
**including**
60:16
**inconsistent**
109:4 147:6,8
147:17
**incorrect**
17:14 18:4
**incriminating**
13:22 124:16
**independent**
60:21 61:10
116:19 121:10
125:2,16
127:13,19
130:19 136:18
139:18
**INDEX**
4:1
**indicate**
140:23
**indicated**
153:4
**indicates**
148:3
**indication**
76:24 78:3
**indications**
68:18
**indicative**
149:25

**individual**
1:12 12:19
14:21 17:7
41:10,16 43:4
55:23 74:19
79:11 84:23
85:1,8,15
103:14 126:2,4
126:9
**individual's**
41:17 105:22
**individuals**
16:1 23:1 44:22
70:13 100:11
143:25
**induce**
82:23
**influence**
75:21
**information**
13:18 16:6 17:6
17:13,16,18,20
20:17,25 21:3
24:13,15,21
30:4,10 32:5,6
32:6 67:15
70:10 77:8
80:24 81:10
83:18,23 88:13
88:22,23 89:1
93:10 94:6
95:7 111:8,18
112:5 114:14
118:11,12,14
118:21 119:1
119:10,12,19
119:20 120:1
120:14 121:14
121:19,24
122:2,11
124:16,19
125:6,7 128:21
129:13,25
130:2,5,5,9,14
130:15,18,19

131:8,25 132:2
132:3,7,9,12
133:17,25,25
134:18,20
137:8 143:15
144:5 147:2,5
147:10,12,16
147:18,25
148:4,12,14,16
148:17,20,22
149:3,7,13,15
150:13,17,18
151:15,18
**information-g...**
103:20
**initial**
4:8 78:3
**initials**
149:24
**Innis**
13:24
**innocent**
104:21
**inquire**
75:6
**inquired**
75:13
**inside**
78:6 111:1
136:2
**instance**
67:6 81:7
119:21
**instructing**
8:23
**instruction**
10:24 11:5,17
**instructor**
8:21,24 10:9
**integral**
60:17
**Intensity**
11:2,3
**intent**
77:7 135:24

**intentional**
46:10
**intently**
96:4 97:5
**interest**
24:5 154:15
**interesting**
105:13
**internet**
47:10
**interrogate**
18:24
**interrogated**
20:1,6,9 82:24
**interrogating**
16:18
**interrogation**
4:10 6:13 7:23
8:2,12,18,19
8:21 10:8,9,19
11:5,10,18,20
11:24 13:9,12
13:19,24 15:4
18:16 19:6
21:5,10 23:22
25:19 30:14,16
37:12,24 60:1
64:14 68:5
70:9 79:6
86:10,15 91:12
100:25 101:10
102:19 103:18
103:21,24,24
104:1 109:19
123:24 149:14
**interrogations**
11:14 18:8 38:3
65:5 74:11
78:13,22 80:9
80:22 81:22
86:20 87:6,21
93:3 95:16,23
103:2,17
**interrogators**
16:17

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 13

**interrupt**
38:16 93:13
**interrupted**
76:21
**interviewed**
22:25 50:14,15
50:19 60:6,9
60:11 74:20
126:12 136:20
137:2 144:1
**interviewer**
77:3,3
**interviewers**
15:15 95:5
**interviewing**
11:25 12:1,13
50:3 75:15
**interviews**
8:8 15:3 18:8,10
22:11 25:20
38:4 60:8
74:11 78:12
79:20 80:21
83:13 86:14,18
86:19,21 87:24
88:18,21,23
93:6 94:15,18
96:16 98:20
99:18 100:2,22
102:13 103:16
126:1 142:21
142:25 143:13
143:24 144:9
**intoxicated**
73:14 76:16
**INTRODUCED**
4:6
**invading**
12:19 13:3
**investigated**
39:11 43:18
**investigating**
44:12 88:4
**investigation**
7:4 9:6 20:15

23:4 30:17
31:5 39:6
41:12,21,23
42:1 44:17,21
45:5,10,20
47:20 50:9
60:2 67:11
81:11 96:13
101:15 105:16
143:12 144:10
145:6,14,18
146:25
**investigations**
8:5,6,6,7 15:22
37:9 44:2,10
45:14,17,23
100:12 125:14
145:16
**investigative**
7:18 30:20 31:6
**investigator**
17:13 18:16
**investigators**
11:19 58:15
88:9 92:20
100:9,23 122:6
**involved**
10:14 36:9
41:10,12 44:15
45:9 95:18
104:24 117:8
125:17
**involvement**
120:2
**involving**
6:25
**IQ**
75:1
**Island**
13:23
**Ismael**
41:16 43:1
125:9
**issue**
39:21 100:6

**issues**
31:7,10,17
74:21

———————
**J**
———————
**J.R**
115:4,6,7
**jail**
82:20 83:8
**jailed**
113:22,23
**jailhouse**
110:7
**James**
2:8 142:6
155:22
**Jane**
2:2 141:9
**jane@fblaw.org**
2:6
**January**
89:25 113:2
142:16
**Jeffco**
31:4
**Jim**
90:20
**jkadolph@sgr...**
2:11
**JLK**
1:2 155:7
**job**
6:10 8:22 11:1
29:22 39:8
77:11 91:14,16
91:20,21,25,25
99:13 101:20
101:22
**jobs**
24:8 35:6 88:19
91:18
**Johnson**
70:23 91:8
113:23 137:19
144:10

**Johnson's**
9:6 21:1 60:16
114:8,22
**Join**
102:25 135:4
**Jon**
48:22 49:4
120:6 122:15
**JONATHAN**
1:11
**Jonathyn**
1:4,16 3:12 5:3
153:8 154:5
155:8
**JR**
1:11
**judge**
28:15 119:18
133:13,22
136:16 137:10
139:8 141:1
**judicial**
44:22,24 45:2
**judiciously**
82:11
**jumped**
53:13
**junior**
89:14 98:3

———————
**K**
———————
**Kadolph**
2:8 4:5 142:6,6
155:22
**keep**
30:8 37:3 51:8
51:21 52:7
53:17 57:18
73:8 80:15
81:16,17 82:5
82:14,18,21,23
**keeping**
37:21
**kept**
52:12 79:15

**key**
12:15
**keyword**
96:1
**kid**
68:22
**kill**
14:8 41:20
**killed**
136:1
**killing**
135:5
**kills**
135:12,16,18
**kind**
6:25 12:16 15:2
24:4 27:12
30:8 31:11
32:17 36:25
38:11 44:3
45:22 47:5
51:18,19 56:4
57:11 67:21
68:9 75:25
76:1 79:12
81:8 89:6
91:10 94:13
95:7 98:8
100:19 102:8
102:10,15
111:18 115:13
116:18 125:5
132:9,11
135:25 141:3
145:5 147:15
**kinds**
74:15
**knew**
28:18,25 49:7,7
49:15,15,16
50:1 53:8 60:8
60:10 70:17,18
70:21 71:17
77:17 91:17
92:22 120:5

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 14

**knowing**
93:14 133:24
134:18
**knowledge**
7:5 20:14 60:22
67:17,18 84:12
90:23 97:12
101:18 109:21
128:20,23
136:18 141:17
**known**
11:2 60:5 83:18
150:22
**knows**
17:9 55:3 56:13
65:23,24 70:23
73:6 99:12
119:18,20
130:1
**Kukris**
90:20

—————— **L** ——————
**L.L.C**
3:3
**LA**
45:8,9,9
**lab**
145:9
**labeled**
64:12 103:23
**laboratories**
86:8
**laboratory**
84:13
**lack**
18:9 19:8 30:18
30:22 31:6,25
32:13
**lady**
111:13
**Lamar**
120:7,21,23,23
121:9,12 123:4
123:5,8,12,15

123:17 131:14
139:11,13,16
139:22 140:4,5
140:12,19
149:24
**Lamar's**
140:9
**language**
13:23 14:24
**large**
94:14 130:25
**largely**
13:9
**larger**
37:9 45:19 48:6
48:7
**Lasater**
3:8 155:4
**late**
8:25 10:11
40:19
**latex**
52:10
**law**
10:13,24 11:13
11:17,21 32:19
34:5,6,10
35:23 37:22
38:9 44:15
45:4 99:6
**Lawrence**
1:6 4:10
**lawsuit**
27:18 34:15
41:24 42:23
43:6,9 46:2,8
47:10
**lawsuits**
35:4
**lawyer**
30:8
**lay**
7:13
**lead**
66:4 80:4 99:24

**leading**
16:8,10,10 79:7
81:5 83:19,19
93:22,23 94:3
98:10 142:16
**leading-questi...**
16:13
**learn**
12:1 23:17,20
29:7,7 54:20
60:12,20 61:14
83:14 139:18
**learned**
24:2 27:14
28:16,20,24
30:5 121:12
126:2,8
**learning**
10:14 25:6 89:3
**leave**
65:24
**leaving**
46:16 141:5
**left**
6:10 29:18,21
46:14 52:3
53:10 98:18
106:9 115:14
141:4
**legal**
30:5 47:5
**leniency**
82:4 83:16
**let's**
38:18 50:6
51:20 66:20
74:10 80:15
84:6 108:7
117:10 141:2
**letter**
155:15
**level**
100:9 125:24
**Lexus**
20:22 71:10

**lie**
17:10,24 69:21
137:10,14
141:18
**lies**
17:21 18:14,15
**lieutenant**
1:11 42:9
**lieutenants**
43:23
**life**
81:18 82:6
**lifted**
115:22
**limited**
129:20
**line**
4:15 17:3 82:8
83:8 103:7
113:21 119:3
141:23
**lines**
64:19 73:15
85:18
**list**
36:8,13,13,24
36:25
**listen**
146:14
**listened**
146:11
**listening**
25:9
**lists**
148:14
**Literally**
51:6
**litigation**
154:15
**little**
6:7 9:13 17:23
18:6 25:11
27:10 51:20
54:10 86:2
95:4 100:7

**living**
58:23 137:19,23
138:10
**LLC**
2:9
**Lloyd**
50:19 116:4
132:14 137:19
**LLP**
2:15
**locked**
68:17,18
**lodged**
9:24
**Lombard**
114:7,12,13
**long**
10:10 38:23
42:11 57:25
68:20 80:13
99:3,3 112:15
**longer**
43:7,9 141:10
**Longnecker**
2:19 4:4 38:16
102:25 126:18
126:20 135:4
151:25,25
155:23
**look**
8:8 20:12 21:7
33:17,20 35:23
40:12 47:22
49:4 50:4,11
50:11,20 52:18
60:7 64:7
80:23 84:25
89:6,9 91:9
100:12 101:4
140:12 144:19
145:3
**looked**
7:5 14:24 51:25

120:2 136:25
148:25

Deposition of:   Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 15

52:4 54:25
61:5,9 95:19
139:23 140:20
**looking**
22:3 31:6 37:10
47:7 49:17,25
50:1 52:15,21
52:25 53:2,9
53:12 54:5,9
55:7 57:9
61:23 65:19
84:15 85:4,6
88:10 101:9
115:9 119:18
143:20
**looks**
62:11
**loops**
84:22
**Lorenzo**
15:4 19:25 20:5
20:8,14,24
21:18 22:15
24:16 26:10
28:10 47:23
54:13 56:18
57:12 59:5
60:6 62:2
67:15 69:2,7
70:7,15 71:6,9
71:10,15 73:18
74:25 75:18
79:14 83:5
86:10 92:5
105:20 106:1,5
108:9 109:10
110:11,13
114:19 115:2
115:25 116:19
120:3 122:4
126:5,11,12,15
126:21 127:1,5
129:6 132:13
133:12,14
134:10,14,23

134:24 136:5,7
136:13 142:19
146:8 147:3
148:11 151:1
151:15
**Lorenzo's**
25:18 28:13
60:25 89:25
107:9 108:3
**lose**
73:5
**lost**
38:15
**lot**
5:20 6:10 7:17
11:8,15,18
16:8 20:6
22:19,23 24:6
24:23 25:15
26:23 32:4
36:11 37:3
43:9 51:1,1
55:18 67:7,19
68:11 69:5,24
84:14 91:5
95:9,14 96:11
125:4 142:17
**lots**
5:17 8:10 18:17
18:20 34:3
86:15,22 87:5
**loud**
121:15
**Low**
12:15
**Lugz**
55:15 59:18
84:17,20
106:22
**Luke**
25:23 50:15
53:25 54:2
58:6,13,16
59:18,22,25
60:16,23 61:2

**Luke's**
53:23,25 58:8
58:23
**lunch**
141:3,5
**lying**
73:6

— M —

**M**
3:2
**machine**
154:9
**magnifying**
51:10,15 52:15
52:19 53:12
54:6,11 55:7
61:23
**main**
19:18 87:15
**major**
6:15 8:4 101:14
**majority**
6:14,17 33:3
87:8
**making**
24:7 59:7 61:22
82:14,21 85:9
85:22 98:8
99:23 115:25
145:8
**management**
6:16 8:4 92:25
**manner**
30:25
**manufacturing**
85:17
**March**
1:5,19 155:8
**marked**
4:7,9 112:22
**marks**
84:24 85:5
**Martin**
1:10 3:6,8 15:16

21:16,17 51:5
60:6 77:2
93:15,16 99:2
102:6 123:17
129:22 144:18
145:2 155:4
**Martin's**
15:19
**Martinez**
1:10 2:12 15:18
19:7 20:16,19
21:17 22:24
23:9 25:23
28:15 29:8
30:1 50:13,19
56:7 58:21
60:12,13,22
62:3 77:25
78:6 90:10
98:8 104:2
107:9 116:4,4
121:18 129:16
130:25 131:3,6
132:14
**Martinez's**
28:6,16 128:7
**match**
49:25 58:25,25
77:11 106:16
133:19 137:21
**matched**
55:22 78:5
105:25
**matches**
105:19 108:16
134:6
**matching**
19:20
**Matt**
110:3
**matter**
7:16 43:23
45:11
**matters**
154:7

**mean**
7:19 12:14 13:8
15:13 18:10,12
18:15 20:20
23:7 26:22,25
27:17 32:14
35:16,17 40:1
51:8 63:7
64:13,18 65:25
66:24 67:3,22
67:24 68:23
70:22 73:17,22
76:9,16 77:20
78:16,18 79:20
80:1 84:18
94:17 95:2
99:15 101:12
101:16 103:22
104:16 107:1
110:9 112:10
116:8 119:5
125:13,17
126:15 127:25
129:15 135:9
135:11,21
136:4 137:7
138:17 140:11
141:18 142:18
143:7
**Meaning**
114:16
**means**
32:11 77:8
140:12
**meant**
59:13
**media**
111:15 114:16
114:19 115:10
**medical**
34:9
**meet**
51:6
**meeting**
19:20

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 16

**Memories**
129:24
**memory**
77:21 139:19
**Mena**
41:16 43:1
125:9
**mental**
73:14 76:22
79:11
**mentally**
74:25
**mentioned**
125:9
**met**
5:10 107:21
**method**
103:20
**methodology**
16:14
**methods**
14:15
**metro**
44:4
**Mexico**
2:10 41:18
**Michael**
1:10 2:12
**micromanage**
92:24
**micromanaging**
95:14
**midnight**
70:24 71:4
136:25 137:1
**Mike**
15:17,20 21:16
21:17 62:3
90:18 93:17
99:2 129:22
**Mike's**
93:19
**MILE**
153:19 155:18
**milk**

68:19 78:2,6,9
129:4
**Miller**
90:18
**millions**
56:2 106:21
107:4,5,6,6
**mind**
30:9 41:5 87:19
110:16
**mine**
47:3
**minimum**
115:23 117:8
**minute**
48:23
**minutes**
48:9 84:7 95:2
141:2
**Miranda**
38:10 76:3
78:21 103:3,4
**misconstruing**
132:11
**misleading**
133:22
**misrepresenta...**
131:16
**missed**
40:17
**misstatement**
134:5
**mistake**
92:2
**mistakes**
104:6,8,11,13
104:14 105:8
**mistreated**
34:16
**mixing**
69:17
**modalities**
11:13 14:17
**mode**
69:21 110:15

**mom**
22:9,13 73:17
73:18,22 97:25
**moment**
74:24
**month**
42:18
**months**
20:3 27:8
119:25 151:11
**Montoya**
1:6 4:10 15:5
19:8,25 20:5,8
20:14,24 23:10
23:18,21 27:4
28:10 48:13,18
51:24 56:19
57:12 60:6
62:2,7,15
75:18 79:14
83:5 86:10
90:24 105:20
106:1 108:9
111:15 120:3,7
121:14,19
124:16 126:5
126:11,13
127:5 128:10
130:23 131:1,7
131:25 132:17
133:2,14,18
134:1,5 138:9
142:19 146:8
148:12 151:2
151:15 155:7
**Montoya's**
42:11 47:23
63:18 92:5
102:16 106:5
144:13 147:3
149:20
**morning**
5:8 40:20
142:16
**mother**

21:18 56:19
62:2 75:18
82:16,17
**motions**
26:5 28:12
**Mountain**
112:25
**mouth**
19:1 103:15
**moved**
22:13
**moving**
12:18 51:1
**murder**
21:1 27:5 41:18
60:17 70:16
114:7,20
133:14 135:21
135:23 136:11
144:10 145:6
145:14

─────────────
**N**
─────────────
**N**
2:2 5:1 155:21
**name**
14:21 41:17,23
64:21 110:5
119:8 148:5
149:24 150:3
**narcotic**
75:22
**nature**
6:16 7:18 34:22
67:2 78:25
99:7 143:2,7
**near**
51:4 127:4,15
**necessarily**
24:5 83:22
**necessary**
35:8 91:21
**need**
23:6 46:17 55:5
74:18 77:11

83:10 86:3
89:5 95:3,5,14
100:15 101:21
112:18 113:5,5
113:13 149:7,8
149:12,13
**needed**
24:7 91:22,23
91:24 105:15
142:23,23
**needs**
138:19
**neglecting**
96:12
**Neither**
59:9
**never**
5:10 7:10 8:14
12:23,24 13:2
13:6 17:11
27:22 34:19,20
35:6,9,11,13
46:11,19 57:11
61:9 63:4,5,20
65:24 67:25
68:15 69:1
70:20 72:17
87:19 98:18
100:6 104:16
109:20 110:16
121:11 127:5
127:17,18
131:1,12,15
132:17 136:14
138:9 147:1,4
**new**
4:7 61:1 92:21
94:21 95:11
112:20
**news**
111:15 112:25
**Newton**
58:23 59:13
**nice**
36:2

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 17

**Nicholas**
78:6 128:6
130:24 137:18
**Nick**
20:16,18,19
22:24 25:23
28:6,16 29:8
29:25 50:13
60:12,13,22
77:25 106:2
107:9 115:4
116:3
**night**
21:1 23:17 24:5
50:14,15 59:23
60:24 61:6
66:25 67:1
71:18 136:19
138:22 142:20
147:20
**nightmare**
40:20
**Nodded**
36:22
**nonchalant**
93:18
**normally**
102:13 112:4
122:14
**north**
49:12
**Notary**
1:20 153:13
154:3,21
**notation**
140:20
**notes**
67:22
**notice**
1:15 19:10 20:9
21:9 83:4
**number**
11:4 14:21
43:22 44:6
60:10 86:22

87:2 105:11
112:17 130:15
130:16 139:9
**numbers**
46:13

———————
**O**

**O**
5:1
**object**
9:19 59:3 92:9
106:12 112:10
120:8 128:17
130:11 131:11
133:23 134:8
134:16 135:3
135:22 140:9
151:5
**objection**
9:23,24 65:10
65:12 74:3
102:23 119:6
126:18,20
131:10 138:15
150:19
**obtained**
147:2
**obviously**
47:16 68:14
86:9 116:13
129:9 130:3
138:11
**occasionally**
10:2 22:8
**occur**
12:17 85:17
122:18
**occurred**
18:19 19:13
25:20 41:14
42:8 49:18
61:22 68:8
70:21 72:1
122:18 134:20
138:3 145:12

**occurring**
60:8 89:20
142:21 143:1
143:22
**off-duty**
39:6 40:8,8
**offer**
11:22
**office**
29:20 39:11
46:23,25 50:24
51:3,4,7,16
52:13
**officer**
4:11 19:3 33:5,8
33:12,13 34:25
35:2,14,20,25
38:24 39:2,7
40:22 41:11
43:16 45:4
81:15 93:10
99:8,9,12,21
99:25 103:7
118:12,13,16
118:16 119:8
125:5 147:24
147:25 148:5,5
148:7,7,20,22
149:3,6,13
**officer-involved**
5:21 6:13,18 8:7
33:4 35:15
36:5 41:11,13
41:21 43:17,18
44:9,20 45:1
45:14 47:6
88:5
**officer-to-offi...**
118:14 119:8
**officers**
11:19 19:7 31:1
36:6 37:13
39:9 41:20
73:23 74:16
79:5 80:16

81:2 93:5
95:23 99:20
100:3 103:10
119:15 143:16
143:17
**official**
1:12
**oftentimes**
15:18 18:15
44:2 67:24
88:2
**Oh**
10:11 20:3
29:12 33:1
34:3 35:7,16
46:20 63:22
101:4 113:11
126:20 128:2
149:8
**Ohio**
5:25 7:2
**old**
25:16 29:24
113:25
**on-the-street**
86:21
**once**
9:24 13:10 20:2
21:6,11 27:14
37:5 89:15
100:6 135:8
148:19
**one-on-one**
99:16
**one-to-one**
86:4,6
**ones**
6:5,19 41:5 59:7
84:24 87:16
99:19
**ongoing**
127:24
**open-ended**
60:14
**opening**

127:4,15
**opine**
8:12 35:13
37:15,18
**opined**
37:10 117:25
**opinion**
32:23 33:9,23
47:5,6
**optics**
39:21
**option**
82:5,6
**organization**
11:1
**original**
26:16 27:1
155:12,21
**originally**
27:24 116:5
**outcome**
41:3
**outside**
32:19,20 44:23
60:19 139:17
139:20
**outward**
76:23
**overheard**
146:11
**overlay**
85:24
**overseeing**
60:2
**overslept**
40:19

———————
**P**

**P**
5:1
**P.C**
3:8 155:4
**p.m**
68:8 70:16 90:1
90:1 141:8

Deposition of:   Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 18

152:7
**packet**
64:19
**pad**
138:7
**page**
4:1,15 155:12
155:15
**paid**
43:1,11
**pair**
58:22
**pal**
58:1
**palmprint**
78:5
**Pants**
71:16,16
**paragraph**
81:9
**parent**
98:4
**parked**
71:10 77:16,17
**Parkway**
153:20
**parroted**
56:25
**part**
8:3 13:21 16:9
29:11 30:17,21
34:24 37:9
41:21,23 43:13
45:10,14,15
47:19,20 60:17
83:24 96:12
101:22 117:21
117:23,25
143:8
**particular**
13:5 21:15 32:6
34:7 49:7
78:16 93:13,14
101:18 104:25
104:25 105:16

105:18 145:6
145:14,17
146:2
**parties**
154:8
**parts**
51:1 94:14
**party**
154:14
**pass**
132:16
**passed**
146:23
**passes**
149:6
**passing**
143:15
**patio**
137:20,23 138:4
138:11
**pattern**
6:11 27:22
43:25 49:9
52:23,24 53:1
53:8,9,9 55:10
55:11,14,15,21
55:22 56:1,15
57:22 61:19
84:17,19
136:12
**Pause**
112:1
**pay**
19:12 65:17
94:22 96:2
**paying**
43:2
**Pearl**
2:15
**people**
11:24 32:11
40:24 46:7
49:19 60:11
66:15 67:22
69:25 70:5

73:10 86:21
88:23,24 89:5
94:19,20
104:19,21
105:8 107:6
115:23,24
116:1 117:7
**percent**
146:7,14,18
147:1,9 149:10
149:15
**perception**
104:10
**period**
42:5 58:12
134:20
**perjury**
81:11
**permitted**
136:6
**perpetrator**
16:18
**person**
16:17 31:15
33:10 73:13
74:12 79:13
82:24 83:18
87:15 95:9
110:6,11
126:12 137:12
**personal**
97:12 149:22
**Personally**
17:17
**personnel**
45:22 88:16
**perused**
113:7 114:4
**Pete**
141:25
**PETER**
3:8 155:3
**peter@lasater...**
3:11
**phone**

46:12 144:6
**photograph**
86:2
**photographs**
22:4 142:25
145:10
**phrase**
56:24
**phrased**
16:23 56:24
**physical**
22:1 78:18,19
79:23 93:11
103:13 105:1
108:3 133:10
**pick**
84:16 150:20
**picked**
105:12
**picture**
62:7,11,15,21
**piece**
55:8 148:22
**pieces**
124:22
**pipe**
140:9
**piqued**
24:4
**place**
19:1 41:15
49:23 69:18
98:21 119:1
**places**
44:14
**plaintiff**
1:7,17 2:7 34:14
35:22 36:6
**plastic**
49:21,24 51:10
**played/not**
48:10 51:22
52:8,17 53:19
54:8 57:20
62:5,18,20

64:1,5,10
72:10
**playing**
51:8,21 52:7
53:18 57:18
145:16
**please**
155:14
**PLLC**
2:3
**ploy**
48:2 64:12
**ploys**
64:22
**plus**
22:10 43:21
91:5 99:19
**pocket**
51:17,19
**point**
13:12 16:11
18:2 22:9,16
22:17 28:25
29:5 35:11
50:9 55:6 58:5
67:9 71:9,15
71:23 73:18
77:24 89:7
92:12 101:22
108:12 109:14
112:13 114:23
134:9 136:7
**points**
22:5,7 142:14
**police**
4:11 8:21 10:23
13:21 19:3
27:11 29:18,21
31:1 32:21
33:19,19,24
34:16,16,17
38:23 39:2,6
41:17 44:9
46:14 47:1,2
50:14 54:3

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 19

67:8 74:15
78:22 80:9,16
81:2 103:2
114:20 117:23
120:6 148:13
**Policies**
7:17
**policy**
40:6,8,9,9 92:15
94:16 98:17
99:5
**polygraph**
21:12,20 97:11
**poor**
40:9
**popular**
84:18
**position**
98:11,17 146:8
**positive**
72:12
**possession**
145:10
**possessions**
106:6
**possibility**
61:10
**possible**
17:15 65:18
81:6 123:20
124:13
**possibly**
30:17 122:2
**potential**
73:3 105:24
**potentially**
72:20 92:16
98:14 136:4
139:16 144:8
**practical**
86:16
**practice**
25:4 44:8 93:3
94:13,16
**practices**

39:6
**precinct**
50:14,16
**predominantly**
16:3,4
**prejudicial**
40:12
**preliminary**
26:4 27:25
**preparation**
15:5 83:6
**presence**
150:1
**present**
126:3,9 135:17
141:10 143:25
144:1
**presenting**
34:11
**presents**
34:6
**pretty**
19:21 51:9
62:11,13 76:9
105:5 106:20
114:3
**previously**
4:9 112:21
**Priest**
1:4,11,16 3:12
5:3,8 118:25
120:6 122:15
131:13,15,15
142:7 153:8
154:5 155:8
**primarily**
6:19 67:16
**primary**
26:2
**prime**
20:16
**print**
55:13 59:7
62:13,22 63:1
63:24 64:2

65:1,8 84:21
85:22,24,25
**prints**
56:1 65:24
**prior**
26:9 130:24
131:2 154:4
**prison**
81:17 82:6 83:7
**privileged**
30:5
**probability**
59:9 63:20
**probable**
58:25 106:17
125:23 133:13
137:11 140:24
148:1
**probably**
6:23 9:4 15:8
16:4 20:3
23:23 27:7
28:24 39:4,16
43:6 81:4
87:14 94:21
95:11 106:16
117:13 129:19
131:14
**problem**
38:17 40:8
82:22 83:1
105:2 115:18
115:19
**procedure**
117:23 118:10
119:3
**procedures**
7:17 117:18
**proceedings**
141:10,13
154:12
**process**
85:4,17 100:11
**processed**
142:23

**processes**
85:9
**processing**
88:10
**produce**
66:18
**production**
4:14
**Professional**
1:20
**proffer**
28:17 30:1
**proffered**
57:11
**promise**
82:17,18,20,21
82:23
**promises**
37:12 75:23
82:4,9,14 83:8
83:16 98:9
99:23 102:18
**promoted**
42:21
**promotion**
42:13
**promotions**
42:19
**promptly**
51:9
**proper**
41:2 65:6
117:25 118:10
119:3 148:14
**properly**
92:7 99:11
**prosecution**
9:7 57:10 58:21
**protocols**
7:18
**prove**
72:12
**provide**
20:17 36:15,16
36:17,21,24

132:7 151:19
**provided**
132:2,12 147:6
150:17
**providing**
132:3,9
**proximity**
146:9
**psychologically**
78:23 80:10
103:2,6
**public**
1:20 114:14
153:13 154:3
**pulling**
19:23 68:18
**pupils**
18:9,23
**purpose**
22:20 92:10
96:6
**purposeful**
96:5
**purposely**
133:22
**PURSUANT**
1:15
**purview**
34:5 88:6
**put**
22:18 51:24
52:3 58:21
62:1 63:20
71:11,12 86:22
98:4,14 105:14
105:15 109:23
111:18 112:4
122:3,14 130:3
133:11,20
149:21 150:13
**puts**
48:18
**putting**
39:19 52:10
125:6 128:16

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 20

128:18 138:18

**Q**

**qualifies**
 7:15
**question**
 9:25 10:3 21:20
  23:8 32:16
  34:25 58:20
  76:6 87:19
  90:22 91:23
  131:22 146:3
**questioned**
 31:15,20,21
  114:19
**questioning**
 13:19 30:19,19
  30:22,23 31:1
  80:16 81:1
  103:21 109:13
  141:4
**questions**
 9:20 16:5,8,9,10
  16:11,21 26:1
  31:8,18,24,24
  31:25,25 32:2
  34:21 47:24
  70:20 75:20
  76:1,10 79:8
  81:5,5 83:19
  83:19 93:23,23
  94:3 98:10
  99:14 141:22
  142:1,5,8
  144:6 150:6
  151:21 154:11
**quicker**
 24:24 123:2
**quickly**
 73:4 76:18
**quite**
 10:11
**quote**
 39:7 58:24
  108:4 125:25

127:2 134:10
**quotes**
 109:24

**R**

**R**
 5:1
**R.D**
 1:11 2:18
**Rabon**
 14:22
**ran**
 49:19 111:4
**Ranch**
 3:10 155:5
**random**
 85:13,15,16
**rank**
 101:19
**rapport**
 17:11 21:16,17
  21:23 73:5
  95:3
**rarely**
 13:5 89:21
**reach**
 68:19,21
**reached**
 29:16
**read**
 25:22 27:1
  81:13 112:19
  113:4 114:23
  120:4 131:21
  131:23 153:2
  155:14
**reader**
 134:14,14,22
**reading**
 112:24 129:16
  150:16
**real**
 16:18 17:16,20
  76:17 84:18
  87:1

**realize**
 18:3
**really**
 17:25 21:21
  22:18 23:2
  29:22 35:25
  39:20 46:15,17
  50:11 68:20
  69:1,21 71:6
  73:13 74:13
  76:15,25 82:25
  85:2,2 97:14
  100:14
**realm**
 15:10 85:20
**rear**
 68:15 127:4,15
  137:20,23
  138:4,11
**reason**
 17:9 44:25 55:4
  56:10,11 61:11
  66:11 68:16
  69:19 75:17
  80:11 82:22
  104:9 122:22
  132:19 144:21
**reasonably**
 13:22
**reasons**
 24:22 46:16
  70:1,6 78:21
  100:22 103:4
  115:8 139:10
  145:22
**recall**
 5:25 8:3,14 24:1
  26:21 28:11,23
  32:1 41:3 49:6
  50:24,24 60:9
  61:8 71:19,20
  73:17 80:19
  90:15,17 96:19
  97:25 110:1
  111:5,12 125:4

125:8,20 127:7
  143:5 145:1,24
**receive**
 148:19
**receives**
 147:24
**receiving**
 149:2,12
**recess**
 38:20 84:9
  141:8
**recipe**
 82:11
**recklessness**
 133:22
**recognition**
 56:16
**recognize**
 53:8
**recollection**
 25:3 61:11
  67:24 90:8
  96:22 116:14
  121:10 125:2
  125:16 127:13
  127:19 129:21
  130:19 132:3,8
  144:16,18
  149:22
**reconnected**
 38:19
**reconstruction**
 6:12,12 41:22
  43:8,12 44:1,1
  116:24,25
**reconstructions**
 44:7
**record**
 4:12 9:24 38:21
  48:5 62:1 84:8
  100:15 152:6
**recovered**
 16:25 58:22
  59:5,7,12,13
  59:17,20,21

145:11
**recovering**
 54:24 143:19
**redo**
 149:4
**reduced**
 154:9
**Reed**
 90:19
**refamiliarize**
 27:12
**refer**
 9:4
**reference**
 4:9 116:11
**referenced**
 116:24
**referencing**
 27:21
**referring**
 54:2
**regarding**
 11:14 20:17
  86:14 92:5
**regardless**
 66:18 138:16
  147:19
**regards**
 17:15 37:23
  92:22
**Registered**
 1:20
**regular**
 53:5
**Reid**
 12:4,11,17 13:9
  14:15
**reinterview**
 148:21
**Reisinger**
 1:19 154:3,20
**related**
 5:20 41:14
  67:17 132:14
  144:9 145:6,13

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 21

154:13
**relation**
22:4 96:20
154:7
**relationship**
29:19
**relatively**
94:20 95:10
**relay**
121:13,18,23
**relaying**
130:4
**relying**
136:16
**remember**
26:3 39:5,24
57:16 61:11
68:9 71:8,13
73:21 83:11
96:23 97:10,11
97:13 109:16
116:17 120:23
123:7,10 124:9
124:10 144:19
144:21 145:1,2
146:16 147:21
**remembered**
26:7
**remembering**
139:25 140:3,6
146:2
**remote**
22:11
**removed**
128:1
**removing**
127:3,14 129:8
**render**
33:8,22
**repeatedly**
81:15
**report**
27:22 30:24
116:24 120:4
129:16 143:20

**reportedly**
139:11
**reporter**
1:20 38:15,18
112:20 131:23
135:15 152:6
**REPORTING**
153:19 155:18
**reports**
25:22 26:12
27:11,11 30:13
37:3 119:14
**represent**
29:2 56:6 60:13
71:21 72:5
102:10 119:23
127:9 128:12
140:8
**representing**
9:14 127:18
**Request**
4:14
**required**
44:3 148:19
**research**
6:2 11:9
**residence**
126:4,11 130:24
134:12,25
136:9
**resources**
91:21
**respect**
7:6 29:24 34:21
39:10 41:4
44:18,19 67:14
77:18 129:20
**response**
13:22 76:2,3
79:12 120:11
**responsibilities**
96:15
**responsibility**
139:4
**responsible**

138:24,25
145:20
**rest**
81:18 82:6
**result**
81:10 85:17
106:25 154:15
**results**
84:2
**retain**
35:4
**retained**
32:18
**retired**
29:4 30:15
46:22
**return**
153:19 155:14
**review**
26:8 123:14
139:5,9 146:8
**reviewed**
25:14 26:9,11
27:3,7,10
139:11,13,14
139:17
**reward**
65:18
**rewarded**
42:20
**rewatch**
149:14
**rewind**
62:16
**Rhode**
13:23
**Richard**
4:12
**Rick**
24:19,23 120:17
120:20 124:1,9
129:22 131:6,6
131:24 133:24
137:15 146:7
146:16 147:1,4

147:10,13
148:10 150:12
151:14
**Rick's**
132:9
**ride**
107:22
**Ridgeline**
3:9 155:4
**rifling**
85:5
**rights**
34:15
**risk**
65:13,16,16
66:2 72:19,19
72:23 73:15
**risks**
73:3
**robbery**
14:9
**rock**
110:20 111:13
111:14 112:7
112:11,12
114:8,21,24
130:25 131:3
**Rocky**
112:25
**rodeo**
92:21
**role**
23:3 30:14
117:22 143:10
145:16
**roof**
49:21,24
**room**
15:16 20:9,11
22:7,10,14,14
25:8 47:22
48:13,21 50:25
51:4,24 52:10
58:3,18,23
59:18 60:25

62:1,1,4,6
83:10 86:10
97:10 98:5
103:23,24
119:24 137:19
137:23 138:11
146:10,20
**rooms**
22:12 124:2
146:10
**roughly**
52:19 54:10
88:14 90:1
99:18
**routinely**
11:22 75:12
**RPR**
154:3,20
**rubber**
51:10
**RUBIN**
1:6
**Rule**
155:14
**rules**
9:12
**running**
101:17 110:23
**runs**
110:23,24
**Ruscitti**
2:15

_____
**S**
_____
**S**
1:19 2:3 3:9 5:1
154:3,20 155:4
**saliva**
103:15
**sample**
85:24
**saw**
19:20 27:22
92:14 93:10,15
93:17 97:13,23

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 22

| | | | | |
|---|---|---|---|---|
| 101:24 | 17:14 18:18,19 | **school** | 109:18 111:17 | 89:13 |
| **saying** | 19:19,20,21 | 14:16 113:25 | 112:25 113:2 | **sex** |
| 13:6 17:2 23:11 | 20:2,4,6 22:2,4 | **science** | 113:21 114:5 | 5:21 8:5 31:5,13 |
| 25:2 33:24 | 22:24 24:3 | 11:8 37:22 38:1 | 114:10,24 | 31:14 44:4 |
| 36:6 38:7 | 26:3,6 41:22 | **screaming** | 116:17 117:9 | 66:16 |
| 40:23 43:8 | 44:1 49:8,10 | 102:1 103:15 | 123:15,17 | **SGR** |
| 48:22 49:19 | 49:12 53:10 | **screen** | 133:4 148:24 | 2:9 |
| 54:19 56:18 | 54:15,18,20,23 | 48:1 112:17 | **seeing** | **Shannon** |
| 58:11 62:16 | 55:3,9,12 56:1 | 113:17 | 102:18 113:19 | 3:2 142:4 |
| 64:6 65:4,13 | 56:21,22 57:3 | **screwed** | 113:20 143:20 | 155:23 |
| 69:14 76:20 | 57:13,17,23 | 47:4 | 144:3,24 | **shape** |
| 80:6 81:16 | 59:1,8,12 | **scroll** | **seek** | 104:4 |
| 83:1 85:10 | 61:15,17,19 | 113:5,8,13 | 12:2 | **share** |
| 87:1 89:14 | 63:24 65:1,14 | **se** | **seeking** | 112:16 |
| 94:8,11 96:7 | 67:7 71:2 | 11:17 23:4 | 11:19 | **shared** |
| 100:14 108:15 | 72:13 88:8,10 | 100:13 | **seen** | 148:22 149:15 |
| 108:24 109:2 | 88:10,17,20,25 | **search** | 15:6 26:15 | **sheet** |
| 109:10,18 | 89:5,12,14 | 59:16 117:16 | 79:20 99:20 | 153:4,5 |
| 110:3,14 116:3 | 91:6 95:10,12 | 118:1 149:19 | 102:5 103:6,11 | **sheets** |
| 121:23 122:9 | 96:16 101:2 | **searched** | 124:15 | 155:15 |
| 124:5 125:21 | 105:14,21,25 | 134:11,25 136:8 | **segment** | **Sherlock** |
| 127:14 128:11 | 106:10 107:8 | 136:14 | 48:8 | 51:18 |
| 131:8 132:1,2 | 108:16 109:1,5 | **second** | **sense** | **Shield** |
| 132:5,8,19 | 115:9,12 | 21:24 51:25 | 9:9 60:10 69:5 | 1:10,10,11,11 |
| 134:21 139:16 | 127:22 128:4 | 52:4 57:19 | 69:24 108:19 | **shift** |
| 140:17,19 | 133:7,19 134:6 | 74:23 111:22 | 123:2,4,12 | 40:20 |
| 144:18 151:10 | 137:22 138:17 | 111:25 115:19 | **sergeant** | **shoe** |
| 151:19 | 143:12 144:22 | **seconds** | 42:7 60:2 | 27:22 52:18 |
| **says** | 151:8,12 | 48:9,11 52:9,14 | 101:16 114:13 | 53:3 54:6,9,14 |
| 22:16 26:21 | **scenes** | 52:20 54:10 | 114:14 | 54:18,20,22 |
| 28:19 48:15 | 95:13 | 55:8 | **sergeants** | 56:15 58:21 |
| 53:23 62:21 | **Schneider** | **see** | 43:22 | 59:9 61:6,14 |
| 63:2 64:2,20 | 1:11 2:18 4:12 | 28:4 29:12 | **served** | 63:3,10,13 |
| 64:21 72:12 | 24:11 25:7 | 31:22 33:5,14 | 26:17 40:21 | 84:19 85:21 |
| 77:10 82:15 | 27:5 119:24 | 36:7 48:1,3,16 | 45:25 | 132:15,18 |
| 89:8 93:22 | 121:11,13,20 | 51:3 52:1 | **service** | 133:8 |
| 94:25 114:7,20 | 121:24 122:1 | 53:11 55:5 | 41:1 | **shoeprint** |
| 121:18 125:25 | 126:25 128:10 | 58:3,15 61:25 | **set** | 7:1,3,8 49:12,13 |
| 127:1 130:9 | 130:9 131:6,24 | 68:24 70:12 | 49:16 106:13 | 53:10 59:11 |
| 134:5,10 | 133:12 134:10 | 71:7 76:1 88:1 | 110:25 115:21 | 63:5,9 84:11 |
| 151:15 | 146:7 147:2,4 | 88:21 92:17 | **setting** | 85:2,13 86:2 |
| **scale** | 147:10 148:11 | 94:8,18 96:7 | 84:13 | **shoeprints** |
| 86:5 | 150:12 151:14 | 96:22 97:23 | **settlement** | 22:2 49:8 84:11 |
| **scene** | **Schneider's** | 100:15,16 | 43:2,3 | 106:13 110:25 |
| 6:12,17 16:22 | 138:21 139:1 | 102:15 105:19 | **seven** | **shoes** |

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 23

20:12 21:7
22:3,4 47:23
48:16,18 49:4
49:16,21,23
50:1,4,6,11,20
52:11,15 53:20
53:23,25 54:24
55:2,7,8,11,12
55:13,15,15,16
55:21 56:2,20
56:22 57:3,7
57:12,13 58:4
58:12,22,24
59:2,5 60:7
61:1,6,9,17,23
62:24 63:18
66:25 67:17
72:13 84:16
86:10 106:14
106:22 107:4,6
144:19 145:1,3
145:11
**shoewear**
53:7
**shoot**
41:20
**shooting**
5:21 6:11,18 8:7
33:4 35:15
36:5 41:11,13
41:13,21 43:17
43:25 44:5,16
44:20 45:9,14
47:7 88:5
**shootings**
6:14,18 29:21
43:19 44:10
45:1
**shoots**
41:19
**short**
19:11 38:22
68:21 114:3
**shorthand**
154:9

**shortly**
19:22
**shot**
33:6,10 41:17
43:16
**show**
47:21,23 61:21
72:8 79:23
101:17 111:19
111:24 112:3
113:25
**showing**
55:4 62:7,15
66:9
**shows**
62:21 117:2
**sick**
110:22
**side**
34:20
**sides**
35:17
**sidewalk**
49:11 111:1
**sign**
122:15 155:14
**signature**
139:14 140:10
154:17 155:12
155:15
**signs**
76:23
**silly**
50:12
**silver**
71:18,22,24
72:6
**similar**
57:9
**simply**
14:11 135:5
140:3 149:1
**Sims**
120:7,23 121:12
**Sims'**

149:24
**simultaneous**
88:8
**Sincerely**
155:17
**single**
148:21
**sir**
141:24
**sit**
46:23 96:24
**sitting**
51:16 62:2,3
80:25 93:17
103:23 104:10
146:6
**situations**
103:12 144:24
**six**
27:1 79:20
138:24,25
**size**
62:14
**size-wise**
86:5
**skewed**
67:24
**slides**
80:19
**slowly**
115:5
**small**
45:20 62:11
68:23 127:4,15
129:8
**snitch**
110:7
**social**
11:8 37:22 38:1
**solved**
49:22
**solving**
42:14
**somebody**
13:10 25:6,6

29:13 32:6,9
32:21 33:6
40:22 44:16
66:3 67:13
72:21 73:9
74:20 76:15,22
77:5 79:21
95:5,13 101:1
101:9,15
104:24 108:10
115:21 118:10
128:23 130:6
135:12,12,16
135:18,18,25
139:19
**somebody's**
93:10,15
**somewhat**
109:1
**sorry**
13:16 38:16
48:6 50:18
112:14 131:6
135:15
**sort**
7:12 13:3 26:19
27:9 58:19
65:15 85:4
101:8 105:17
**sorts**
85:6 89:10
**sought**
142:22
**sound**
8:15 85:14
86:24 134:14
**sounded**
117:21
**sounds**
62:9 93:2 95:15
141:7
**source**
139:18
**South**
1:17

**space**
9:23 12:19
**space/moving**
13:3
**spank**
40:13
**sparked**
32:10
**speak**
116:13
**speaks**
152:3
**specific**
14:25 21:3 25:2
27:10 30:16
32:8 36:4
138:10 148:10
**specifically**
8:3,11 24:1 60:9
93:1 111:5
131:2
**speculation**
68:11
**spelling**
139:10
**spend**
11:17 95:11
**spending**
22:18
**spent**
20:3 151:11
**split**
88:18
**spoke**
147:1,4,20
**spoken**
46:1
**spot**
71:11
**stages**
20:15 75:21
**stains**
115:20
**stairs**
138:2

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 24

stairway
 138:1
stand
 89:20 92:1,24
   94:9 96:3,11
 97:5
standard
 44:8
standards
 85:19,21
standing
 51:4 123:3
standpoint
 6:15
start
 8:23 61:25
   88:21
started
 26:1 68:21 69:2
   109:19
state
 1:21 9:23 10:25
   33:13 34:9
   35:1 45:11
   146:6,25 147:9
   147:19 153:16
   154:4
stated
 148:11
statement
 28:13,21 29:1,3
   29:8,10 32:9
   75:22,25 81:8
   108:15 110:2
   114:20 115:25
   129:19 132:21
   133:1 134:13
   134:22 136:7
   137:7
statements
 22:1 25:23
   70:13 81:10,12
   111:6
states
 1:1 11:4

station
 59:23 60:24
statistics
 56:4
statutely
 45:12
staying
 43:9
steal
 135:9
step
 138:2
steps
 84:13 115:20
stolen
 126:4,10,13
   143:19
stop
 22:17 48:11
   66:21 74:23
   77:23 98:6,14
   108:7,7 113:15
stopped
 99:21
store
 14:8
story
 10:4
street
 1:18 2:3,15 3:3
   103:19 111:2
   153:15
stretch
 102:20
strike
 132:15
strong
 106:20
strongest
 129:19
structure
 18:3
struggling
 103:14
stuff

5:20 18:17
   22:24 23:19
   25:15 37:6
   46:22 49:15
   52:12 67:2
   79:25 80:18
   83:20 91:5
   93:19 101:25
   135:10 145:11
   151:1
style
 12:12 13:9
   14:20,25 15:2
   15:10,19 92:11
   92:25 93:15,19
   102:8,10
styles
 8:5 11:15 55:19
subject
 7:16 45:10
subjected
 59:25 60:3
submitted
 139:6
subordinate
 93:4
subordinates
 95:24 125:19
subordinates'
 91:11
subpoena
 40:17,22,23
SUBSCRIBED
 153:9
subsequent
 9:7 11:21 61:22
   126:1,7
sudden
 18:4 48:15 49:3
   67:1 101:25
sued
 29:13 41:6
sufficiency
 32:4,13
suggested

109:13 116:6,9
   116:11
suggestions
 38:12
suggestive
 16:9 79:8 81:4
suggests
 18:20 71:3
suicide
 33:16,18,20,23
   34:5
suicides
 143:5
suit
 29:11
Suite
 2:10 3:4,9
   153:20 155:5
summarize
 144:8
summary
 23:12
Super
 150:8
supervise
 95:15,22
supervised
 87:22,24 95:17
supervising
 100:21
supervision
 91:11 99:17
   100:19
supervisor
 23:3 89:19 90:2
   90:6,6,8,9,17
   90:23 91:2,14
   92:6 99:7,10
   99:20 101:4,6
   101:9 125:4
   138:21,25,25
   139:1,2,3
   143:10
supervisors
 90:12,16 93:3

94:14 99:16
supplemental
 143:20
support
 68:15 77:8
   109:6 117:5
supported
 66:19 69:4
   133:10 151:7
supporting
 69:10 116:2
supports
 14:11 105:10
suppose
 116:9
supposed
 73:22 129:9
suppressed
 28:13
suppression
 28:9
sure
 6:3 7:15 9:10
   14:7,23 24:7
   27:3 35:16
   36:18 46:10
   47:25 56:12
   61:13 63:6
   65:7 66:6 70:2
   74:6 76:14,18
   76:23 78:24
   82:13,19 83:25
   88:22 89:10,19
   90:25 92:6
   93:4 94:15,17
   98:13,15 99:11
   101:20 104:14
   106:19 107:14
   111:19,20
   113:9 115:1
   116:18 117:3
   117:16 118:15
   119:9,11,22
   120:10,22
   122:21 123:9

Deposition of:   Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 25

123:19 124:8
124:14 125:3
127:20 130:22
131:21 133:11
135:7 136:4
137:9,17 140:2
140:16 143:7
143:15 144:8
145:9 146:13
146:18 147:8
148:21 149:15
150:4
**surprised**
 16:25 54:14,19
  56:20 57:2
  61:14,16
**surprising**
 106:7
**surrogate**
 21:21
**suspect**
 13:10 14:4
  17:12,20 18:25
  19:2 20:16
  65:7 75:15
  115:11 130:24
  132:14 148:4
  148:21
**suspect's**
 19:1
**suspected**
 85:24
**suspects**
 50:3 127:2
  134:11,25
  136:8
**SWAT**
 44:4
**swear**
 118:10
**swearing**
 118:18 119:12
**sweats**
 71:16
**switch**

95:4
**Switching**
 84:10
**sworn**
 5:4 153:9 154:6
**Syracuse**
 1:17 2:3

_____ **T** _____
**table**
 48:19 51:24
  52:4
**tactic**
 81:19
**tactics**
 37:24 74:22
  78:15 83:12,15
  84:2 91:12
**take**
 21:12,20 33:17
  35:6,23 38:18
  50:11 52:11
  84:6 85:23
  86:2 91:25
  93:11 95:21
  97:2,11 111:21
  113:4 139:7
  141:1,2,3,5
  145:9,10,10
**taken**
 1:17 38:20 84:9
  141:8 154:8
  155:8
**talk**
 6:15 11:16
  12:20 14:2
  32:17 33:17
  46:11,12 57:16
  58:6,13 74:10
  77:13 80:12
  82:15,17,19
  98:3 105:11
  117:2,10
**talked**
 21:5 30:12

47:21 54:18
 68:10 77:15
 81:3 107:24
 129:24 141:12
**talking**
 6:5 9:5,8 13:1
  14:3 27:1
  31:11,23 32:15
  60:23 61:2
  69:3 78:11
  79:4,12 80:13
  86:7,20 87:17
  94:6 95:22
  100:3 103:16
  109:17 110:4
  114:5,6,16
  115:16,17
  117:7 134:23
  151:13
**talks**
 77:18 110:19,22
**tall**
 68:20
**tape**
 129:16,17
**task**
 44:21 45:7,15
**tasked**
 44:2
**tasks**
 145:5,13
**taught**
 8:19 10:18 12:7
  15:11 18:9
  66:1,6,7,10
**teach**
 14:14 16:7,16
  18:23,23 65:5
  66:1,10 83:15
  101:11
**teaches**
 38:1
**teaching**
 10:12,23 12:11
  18:7,24

**team**
 44:11 45:7
  89:16
**technicians**
 86:8
**technique**
 12:5,11,17,20
  13:4,6,11
  14:15 21:15
  38:8
**techniques**
 8:18,20 13:12
  34:22 37:24
  38:6 91:12
**technology**
 111:24
**tell**
 6:7 12:14 15:13
  17:19 18:24
  19:16 24:20
  25:5 29:17
  30:8 32:25
  33:20 37:7
  38:14 39:1
  41:9 50:10
  52:10 55:10
  57:8,21 58:6,9
  60:21 63:14
  64:16 65:7
  67:25 73:2,10
  73:19 77:2
  81:13 84:11
  96:20 97:9,16
  97:22,25
  101:23 104:24
  107:11 108:2
  110:17 113:15
  115:2 116:18
  117:4 120:14
  122:5 124:25
  125:15 128:21
  128:23 130:18
  130:20 131:1
  134:1,17 137:8
  137:16,25,25

139:19 143:21
 144:17 151:17
**telling**
 14:4 17:16 47:3
  63:23 64:25
  66:3 72:21
  73:8 74:12
  101:1,19
  122:15 149:9
**tells**
 121:11
**ten**
 20:1 52:19
  54:10 55:7
  79:21 106:7
**tennis**
 84:19
**term**
 18:9 102:7
**terminology**
 63:8,9 64:13,24
**terms**
 29:25 30:14
  80:16
**tested**
 53:14 54:25
**testified**
 5:5 26:3,4,5
  27:25 28:3,12
  30:24 56:7
  110:6
**testify**
 9:15 28:6,9
  154:6
**testifying**
 35:1 141:12
**testimonies**
 141:16
**testimony**
 26:12 37:1
  105:3,5,7
  153:6 154:11
  155:14
**tests**
 27:14

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 26

**Texas**
5:25 36:5
**thank**
36:1 131:17
141:23 142:2,5
150:6,7
**thanks**
151:23 152:3,5
**theirs**
90:13
**theory**
78:1 127:24
**thing**
8:16 9:13 12:22
13:1 18:5,19
19:18 25:25
26:9 27:14,17
32:17 42:25
43:10 51:18,19
58:7 63:7
65:15 68:8
70:21 76:4,20
83:2,10 89:12
96:14,20 101:8
101:21 105:13
105:15,17
107:2 111:9
115:19 116:16
117:8 129:23
138:10 142:20
143:22 144:17
**things**
6:14,16 7:5,17
7:18 11:16
12:10,17,23
17:1,2 19:15
23:25 24:2,4
25:13 26:7
27:13,15,20
34:20,22 38:3
38:13 40:17
43:21,22 44:6
46:18 47:17
51:2 66:14
68:4 69:25

70:5 74:12,15
76:21 77:4,13
77:15,18 78:12
78:13 79:4
81:1,4,5,11,14
81:16 82:13
83:4,11 84:22
85:7 86:7
89:11,18 95:7
96:2,7 99:23
101:20 102:2
102:16 104:6
106:9 109:19
110:12,13
116:17,19,20
117:5,9 122:17
122:18 125:22
127:1,10
128:18 143:1
144:4 150:21
150:23 151:6
**think**
5:11,22,24
13:11 14:4,10
19:5 21:6 31:3
32:7 33:18,19
35:22 36:4
38:1,5 40:21
41:3 43:1
45:12 57:25
59:13 74:19
80:25 82:24
85:12 86:18
96:1 97:21
103:7 104:1,12
106:2 111:6
116:21 141:3
150:2
**thinking**
40:16 68:21
**third**
21:25 97:18
126:2,9
**third-degree**
78:15

**thought**
20:17 49:3 74:7
93:25
**thousand**
86:25 87:4
99:18
**thousands**
86:19,23 87:2,5
100:4 117:14
125:18
**threat**
81:13
**threatening**
99:22 100:8
**threats**
37:11 75:23
81:6 82:10
83:6,16 98:9
102:18
**three**
108:24 116:1
127:2
**throw**
32:9 64:20
**throwing**
102:2
**Thursday**
1:19
**Timberland**
55:16,18 106:22
**time**
5:18,22 6:23,24
11:18 14:9
18:18,21 19:25
20:5,8,11
21:10,24,25
22:16,19,21
27:7,16 28:20
28:22 29:10,13
39:22,25 41:19
42:5 46:22
50:3 51:4
55:16 56:3,15
58:12 60:2
68:8 70:21

71:25 72:15
75:4,6,24
80:12 82:20
88:14 89:2,23
90:13 91:4
93:6 94:13,18
95:2,11 96:10
98:12 99:3,8
102:21 106:23
112:8 113:4
119:4 121:4,6
122:23,24
124:3 127:24
137:3 138:2,23
141:23 142:9
143:11 149:20
150:22 151:12
**timeframe**
29:4
**timeline**
29:3
**times**
5:16 8:1,9 9:11
9:18 10:18
20:3,10 23:8
26:23 32:18,25
35:2 69:7
79:15,25 83:13
95:24 100:20
103:5 107:21
107:24 118:4
**timestamp**
48:8
**today**
96:24 104:10
141:12 142:15
146:6
**told**
16:24 17:5
24:16 26:1
29:13,16,24
35:7 54:14
56:20 57:2
58:15 66:24
70:15 73:24

99:21 102:11
118:16,25
120:1,6,7
121:13 128:23
130:2
**tone**
102:17
**Tony**
114:13
**tool**
12:21 16:15
81:19 85:5
**toolbox**
12:22 16:15
81:20
**top**
32:7 39:24 68:6
73:4 80:19
81:4 112:24
116:22,23
125:8 127:8
143:6
**topic**
30:11,12 84:10
**totally**
30:11 48:25
**touched**
67:25 68:3
**tough**
85:2
**track**
100:15
**train**
17:15
**training**
11:14,18,21,23
12:2,17 14:16
14:19 15:1
37:19 38:12
86:13
**trainings**
14:17,18 16:7
16:16
**transcribed**
48:10 51:22

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 27

52:8,17 53:19
54:8 57:20
62:5,18,20
64:1,5,10
72:10
**transcript**
149:8 154:11
155:12,21
**transmitting**
88:24
**transparencies**
85:19
**transparency**
85:23,23
**tread**
52:23,24,25
**trespass**
136:3
**trial**
26:6 28:3,7 56:7
57:10,16 58:20
**trials**
34:25
**trouble**
125:5,10,23
**true**
33:2 65:2 69:23
69:25 72:15,17
74:13 75:10
84:5 104:13
118:22 126:6,7
129:8,11 131:9
132:1,17,20
136:13,17
141:16 153:2
154:10
**trust**
100:17
**truth**
17:22 154:6
**try**
9:22 37:6 85:1
137:10
**trying**
16:5 26:18 30:9

30:10 34:24
41:1 45:12
76:4 82:7
84:25 91:10
94:12 143:7
144:4 145:4
151:14
**Turns**
41:18
**twice**
21:6,11 28:3
**two**
12:2 15:15 20:3
22:10,12,12
25:8 29:20
46:17,25 50:25
51:25 52:4
73:3 84:16,21
88:7 89:20
90:15 109:4
112:17 115:23
115:24 116:2
117:7 127:10
130:16 134:11
134:25 136:8
146:3,22
151:11
**two-and-a-hal...**
60:1
**two-part**
137:13
**type**
15:2 34:4
120:15 122:7
122:16,20
123:1 124:7
140:25
**typed**
124:3
**types**
6:21 15:25 17:1
74:22 81:1
82:9,10 83:15
85:15
**typewritten**

154:10
**typically**
12:1,21 14:7
26:22 34:3
35:19 37:5
44:20 73:12
76:10 88:7
91:1 103:11
116:25
**typing**
24:21 122:19
124:1
**typist**
24:23 123:1

—————————
U
—————————
**U.S**
45:8
**Uh-huh**
20:13 52:2
54:12 68:13
77:14 129:1
**ultimately**
21:25 41:16
42:25 43:10
53:14 54:4
58:17 67:6
79:22 110:24
**understand**
26:18 61:3
66:23,23 76:5
76:7,19,25
100:25 122:12
134:22 137:17
139:16 147:8
151:9
**understanding**
15:24 59:10
76:5 139:11,21
139:22,22
**understood**
10:1 26:24 69:1
**Unintelligible**
135:13
**unintentional**

44:5
**unique**
53:2
**unit**
22:25 43:18
44:4,4,25
66:16,16,17
88:6 90:5,16
91:7 98:19
100:10,15,19
100:24 123:25
138:23 146:9
148:13
**UNITED**
1:1
**unquote**
108:4
**unsupported**
105:8
**unusual**
21:14 63:14
67:21 79:18
98:2 121:1
122:6,8,9
139:8 140:25
**use**
12:21,23 14:18
17:18 21:14
81:24 147:25
**usually**
9:16 93:7 121:8

—————————
V
—————————
**v**
13:23 155:7
**valuables**
134:12 135:1
136:9,14
**variety**
145:13
**various**
10:24 22:5,7
34:23 141:12
142:14 144:9
145:5 146:24

**vehicle**
126:3,10,13
**venture**
129:22
**versa**
88:25
**versus**
17:5 54:22
**vice**
88:25
**victim**
31:20
**victim's**
126:3,10,10
127:3
**victimology**
15:25
**victims**
15:25
**video**
4:10 25:19 48:8
48:10,11,13
51:9,22 52:8
52:14,17 53:19
54:8 57:20
58:5 60:1 62:5
62:18,20 64:1
64:5,10 71:7
72:10 74:1
102:19 116:13
121:12 124:2
144:13,15
146:10 149:14
153:19 155:18
**videoconference**
2:9,14,20 3:2
**videotape**
123:24
**videotaped**
25:18 111:10
**videotaping**
67:23
**view**
22:11
**viewed**

Mile High Court Reporting and Video, Inc.   303-202-0210
contact@milehighreporting.com

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 28

| | | | | |
|---|---|---|---|---|
| 83:5 | 9:22 18:12,13 | 22:18 23:3 | 37:11,14,15 | 15:8 |
| **viewing** | 18:24,25 21:18 | 31:19,19 46:24 | 42:19,22 44:12 | **weekend** |
| 22:9,13 146:10 | 21:20 22:20 | 47:2 55:12 | 44:14 49:20 | 152:3 |
| **Vigil** | 25:13 27:6 | 64:17 90:19,19 | 56:23,24 67:4 | **weigh** |
| 1:10 3:6 15:16 | 31:2 73:11,19 | 90:20 91:1,17 | 88:17 93:16,20 | 104:9 |
| 19:7 21:17 | 76:18 77:7 | 92:1,11,20 | 104:3 117:24 | **weird** |
| 23:9 48:13,21 | 78:16 79:2,7 | 93:7 97:6 | 118:1 120:5,13 | 69:25 70:1,5,6 |
| 62:4,6 63:23 | 80:1,12 82:13 | 101:23 111:9 | 128:25 130:16 | **welcome** |
| 64:25 68:7 | 82:15 84:1 | 111:11 121:9 | 130:21 140:7 | 131:18 |
| 70:15 71:1,11 | 89:16 96:6 | 122:5 136:13 | 147:20 151:1 | **went** |
| 90:10 98:8 | 98:7 104:5 | **waste** | **ways** | 21:21,24 35:9 |
| 102:16 104:2 | 105:18 119:11 | 96:10 142:9 | 12:2 67:7 | 35:12 43:10 |
| 109:13 116:6 | 124:12 150:20 | **watch** | 108:25 117:19 | 49:20 69:20 |
| 121:13 129:16 | **wanted** | 22:15,21 25:19 | **we'll** | 89:15 96:21 |
| 148:13,17 | 32:22 35:4 | 32:11 89:21 | 23:7,15 24:9 | 99:21 102:12 |
| **violation** | 41:18 46:10,19 | 92:1,8 93:3,22 | 25:11 51:8,21 | 108:12,15 |
| 40:7,10,11 | 73:25 98:6 | 94:9,18,20 | 77:24 80:14 | 109:10 128:12 |
| 98:17 99:4 | **warnings** | 95:23,25 96:4 | 84:7 113:25 | 146:19 |
| **violence** | 80:11 | 96:6,8,17 97:5 | 115:5 | **weren't** |
| 99:9 | **warrant** | 97:8 98:5 99:8 | **we're** | 55:3 64:17 |
| **violent** | 24:12 41:14 | 120:3 123:6 | 27:1 38:21 61:2 | 66:24 80:1 |
| 101:24 | 59:17 117:10 | 124:6 | 66:21 77:12 | 87:15 90:12 |
| **virtually** | 120:9,15 122:7 | **watched** | 80:25 82:7,7 | 92:18,21 |
| 89:2 | 122:23,24 | 15:4 19:12 22:6 | 86:7 100:3,15 | 106:16 145:19 |
| **voluntarily** | 124:1 125:10 | 25:18 70:9 | 101:8 102:18 | 150:22 |
| 75:23 | 125:15 136:19 | 88:1 96:19,25 | 104:9 115:11 | **West** |
| **volunteered** | 136:24 137:14 | 97:1,2,15 | 122:7 151:13 | 2:21 153:20 |
| 109:11 | 137:18 138:12 | 99:19 100:2 | **we've** | **whatnot** |
| **vs** | 138:18,22 | 104:2 120:4 | 17:2,7,8 30:4,11 | 86:9 |
| 1:8 | 139:5,7,12,23 | 121:11 124:2 | 58:15 66:15 | **whatsoever** |
| | 140:4,10,13 | 151:3 | 81:2 83:9 | 96:22 133:5 |
| **W** | 147:6,14,17 | **watching** | 87:16 89:13,14 | **WHEREOF** |
| **W** | 149:19 | 15:2 19:5,14 | 105:2 110:25 | 154:16 |
| 1:4,11,16 5:3 | **warranted** | 22:19 90:23 | 115:22 | **whirls** |
| **W-Z** | 67:12 | 92:6,14,18 | **weakness** | 84:22 |
| 14:16 | **warrants** | 94:4,14 98:22 | 73:14 | **Whoop** |
| **walk** | 117:16 118:1 | 116:16 146:12 | **weapon** | 92:2 |
| 51:6 | 123:21 125:18 | **wavy** | 114:7,21 | **wife** |
| **walked** | 128:15 139:13 | 84:19 | **wearing** | 14:8 |
| 77:9 | 140:25 150:3 | **way** | 61:1 66:24 67:1 | **willing** |
| **walking** | **Washington** | 15:20 16:11 | 71:16,17,20,24 | 21:12 |
| 97:10 | 45:11 | 17:4 24:19,24 | 71:25 72:2 | **window** |
| **walks** | **wasn't** | 25:1,9 30:19 | 86:11 106:14 | 69:8 77:19,20 |
| 62:4 | 12:15 13:7 | 30:22,25 31:17 | 107:6 | 77:23 89:5,8 |
| **want** | 15:19 21:14 | 31:23,24 33:11 | **week** | 108:10 109:7 |

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 29

127:12
**wins**
82:8 83:9
**withdrawn**
110:16 141:20
**witness**
6:5,8 7:13,13
30:15 105:12
126:1,7,22
135:20 141:6
144:9 154:6,16
155:14
**witnesses**
142:22 143:25
**wondering**
115:11
**word**
19:13 95:21
96:4
**word-for-word**
97:5
**wording**
123:16
**words**
13:20 47:4 58:8
82:5 140:4
**wore**
57:12
**work**
6:7,9 13:2 42:22
44:3 67:4
80:14 91:16
99:6 100:14
**worked**
7:22 12:24
15:23 29:20
121:4
**working**
8:22 32:20
33:11,12 39:8
39:8 40:20
41:25 49:7
87:12 88:7
90:3 99:1
143:4

**works**
84:14
**world**
17:23 85:13
129:17
**wouldn't**
23:23 60:5
75:17 78:16
92:17 95:16
96:9 104:5
106:7 112:4,6
112:6,12
123:12
**write**
118:21,24,25
**writes**
137:18
**writing**
36:20 122:24
128:22
**written**
23:12 25:22
30:24 37:4
47:9 81:9
132:13
**wrong**
19:9 32:2 33:10
35:14,23 36:1
36:7 40:3,6
41:14,15 67:20
68:4 69:13
70:17,19,22
71:11 92:15
99:5 119:20
124:23 125:10
130:3
**wrongdoing**
32:22 33:6
**wrote**
24:17 47:17
118:17 121:20
125:15 127:1,1
130:22 131:7
131:24

**—— X ——**
**X**
118:16

**—— Y ——**
**Y**
118:16
**yard**
114:8,22 138:3
138:4,5,7
**yeah**
7:25 8:10 13:5
15:6,8 18:22
19:25 25:18
35:16,20 38:5
43:5 48:2,4
52:21 61:1,5
62:13,14 63:14
66:21 69:10
73:15,21,22
74:2 85:15
86:23 93:11
98:17 101:10
102:2 118:17
125:11 129:15
133:24 134:21
135:2 136:23
137:6,7 146:10
148:8 151:13
151:13
**year**
5:23,24,24 6:22
118:9
**Year's**
61:2
**years**
8:20 11:7 12:8
15:11 18:8
25:17 27:2
37:1,4,22
38:25 86:19
87:23 125:3
145:25
**yelling**
102:1 103:14

**younger**
98:25 103:10,10

**—— Z ——**
**zero**
105:1
**ZIP**
153:16
**Zoom**
9:19

**—— 0 ——**
**007679**
4:12
**007683**
4:12

**—— 1 ——**
**1:06**
141:8
**1:16**
141:8
**1:25**
48:8
**1:29**
152:7
**10**
51:6 52:9
**10:02**
1:18
**10:44**
38:20
**10:55**
38:20
**100**
146:7,14,18
147:1,9 149:10
149:15 153:20
**1001**
3:3
**10th**
89:25 142:16
**11:00**
90:1
**11:50**

84:9
**11:58**
84:9
**1108**
2:21
**112**
4:11
**11th**
142:17
**12**
48:9 138:23
**12-**
39:19
**14**
4:11 112:22
**14-hour**
39:20
**14143**
153:20
**142**
4:3
**15**
52:9
**150**
4:2
**16cv1457**
1:2 155:7
**17**
155:1
**1712**
2:15
**17th**
3:3 154:17
**1980s**
8:25 10:11
40:19
**19964015065**
154:21
**1st**
42:12

**—— 2 ——**
**2:03**
72:9
**2:45**

Deposition of:  Jonathyn Priest - March 30, 2023
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 30

**72:9**
**20**
8:20 95:1
**20-some-odd**
145:24
**2000**
9:6 38:2 42:10
42:11 89:25
90:16,17 113:2
118:9
**2003**
39:16
**2007**
39:12,15
**201**
2:21
**2011**
6:10 29:6
**2014**
28:17,21,23
29:3 60:14,22
**2023**
1:5,19 154:17
155:1,8
**22**
4:15
**23**
25:17
**23-year-old**
129:21

_____ **3** _____

**3**
48:8 61:24
**30**
1:5,19 48:11
105:24 155:8
**30-plus**
125:3
**300**
3:4
**303-256-6345**
2:5
**303-320-0509**
2:11

**303-402-1600**
2:16
**303-628-3300**
3:5
**303-685-2244**
2:22
**303-730-3900**
3:10
**32**
38:25
**35**
155:15
**36**
4:15

_____ **4** _____

**4**
72:9
**4-by-6**
62:12 86:2
**4:00**
71:4
**405**
3:9 155:5
**40s**
105:4
**41**
52:14
**4600**
1:17 2:3
**48**
4:10

_____ **5** _____

**50**
43:6
**50s**
105:4,4

_____ **6** _____

**6**
4:2,10 48:6,7
**60s**
75:1 105:4
**65**

79:15
**6th**
113:2

_____ **7** _____

**700**
2:10
**70s**
75:1 105:5

_____ **8** _____

**8:15**
61:24
**8:30**
90:1
**80129**
3:10 155:5
**80202**
2:22 3:4
**80210**
2:10
**80237**
2:4
**80302**
2:16
**80401**
153:21
**82-29**
1:10
**85-24**
1:11
**86-12**
1:10,11
**8822**
3:9 155:4

_____ **9** _____

**9/20/2024**
154:21
**9:00**
68:8 70:16
**9:19**
61:24
**900**
2:10

**90s**
42:8
**951**
58:23 59:13
**9th**
1:18 2:4