Transcript of the Deposition Testimony of:

# Martin E. Vigil
**May 24, 2022**

_____

Lawrence Rubin Montoya

v.

City and County of Denver, et al.

Civil Action No. 16cv1457 (RPM)

_____



**Mile High**
*Court Reporting & Video, Inc.*

14143 Denver West Parkway, Suite 100  •  Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

**EXHIBIT D**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16cv1457 (RPM)

_____

DEPOSITION OF MARTIN E. VIGIL
May 24, 2022

_____

LAWRENCE RUBIN MONTOYA,

Plaintiff,

vs.

CITY AND COUNTY OF DENVER;
DETECTIVE MARTIN E. VIGIL (Shield No. 86-12);
DETECTIVE MICHAEL MARTINEZ, (Shield No. 82-29);
LIEUTENANT JONATHAN W. PRIEST (Shield No. 86-12);
DETECTIVE R.D. SCHNEIDER, JR. (Shield No. 85-24),
in their individual and official capacities,

Defendants.

_____

PURSUANT TO NOTICE, the deposition of

MARTIN E. VIGIL, called for examination by the

Plaintiff herein, was taken at 4600 South Syracuse

Street, 9th Floor, commencing at 10:42 a.m., on

Tuesday, May 24, 2022, before Aimee S. Reisinger, a

Registered Professional Reporter and Notary Public in

and for the State of Colorado.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**2**

APPEARANCES:

        DAVID N. FISHER, ESQ.
        JANE FISHER-BYRIALSEN, ESQ.
        Fisher & Byrialsen, PLLC
        4600 S. Syracuse Street
        9th Floor
        Denver, Colorado 80237
        303-256-6345
        david@fblaw.org
        jane@fblaw.org
                For the Plaintiff

        JONATHAN COOPER, ESQ.
        Senior Assistant Attorney
        City and County of Denver
        201 West Colfax
        Denver, Colorado 80202
        303-685-2244
        jonathan.cooper@denvergov.org

                For the City and County of Denver

        ANDREW D. RINGEL, ESQ.
        (via videoconference)
        Hall & Evans, L.L.C.
        1001 17th Street
        Suite 300
        Denver, Colorado 80202
        303-628-3300
        ringela@hallevans.com

                For the Defendant Martin Vigil

        JOSH MARKS, ESQ.
        (via videoconference)
        Berg Hill Greenleaf Ruscitti, LLP
        1712 Pearl Street
        Boulder, Colorado 80302
        303-402-1600
        jam@bhgrlaw.com
                For the Defendant R.D. Schneider

Deposition of:   Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

3

APPEARANCES (continued):


                PETER DOHERTY, ESQ.
                (via videoconference)
                Lasater & Martin, P.C.
                8822 S. Ridgeline Boulevard
                Suite 405
                Highlands Ranch, Colorado 80129
                303-730-3900
                peter@lasaterandmartin.com

                        For the Defendant Jonathan Priest


                Also Present:  (None)

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

4

                              INDEX
EXAMINATION:                                      PAGE

BY MR. FISHER                                  6, 335

BY MR. COOPER                                     315

BY MR. RINGEL                                      --
_____

EXHIBITS:                                        MARKED
1   Affidavit for Search Warrant                     64
    (DENVER 000277 and DENVER 000278)
    (Confidential/Subject to Protective Order)

2   Curriculum Vitae of Martin E. Vigil             83
    5 pages

3   Excerpt of Denver Police Department            124
    Operations Manual
    (DENVER 008168 and DENVER 008169)

4   Photocopy of Detective Vigil's business        135
    card with letter (undated) to Cristie
    Wilburn from Detective Vigil

5   Excerpt of Denver Police Department            142
    Operations Manual
    (DENVER 008163)

6   Interrogation Video of Lawrence Montoya        158

7   Affidavit and Application for Arrest           265
    Warrant and the Arrest Warrant for the
    Persons(s) of:  Lorenzo Montoya -
    DOB 02-10-85
    (DA_00486 through DA_00489)

8   Supplementary Report - Suspect #3 -            266
    Lorenzo Ruben Montoya
    (DA_00210 and DA_00211)

9   Supplementary Report - Suspect #1 -            277
    Nicholas Martinez, 8/16/83
    (DA_00205 through DA_00207)

10  Handwritten statement of Luke Anaya            282
    (DA_00307 through DA_00309)

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**5**

INDEX OF EXHIBITS (continued)

EXHIBITS:                                              MARKED

11   Denver Police Department Internal Affairs        294
     Office Resume - Detective Martin E. Vigil
     (DENVER 006337 through DENVER 006352)

12   Denver Police Department Officer Education       315
     Record for Martin Vigil
     (DENVER 007684 through DENVER 007687)

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**6**

P R O C E E D I N G S
* * * * * * * * * *
MARTIN E. VIGIL,
having been sworn by the Reporter, testified as
follows:
EXAMINATION
BY MR. FISHER:
Q.  Good morning, Mr. Vigil.
A.  Good morning.
Q.  You and I have never met before today, right?
A.  We have not.
Q.  Okay.  I represent Lorenzo Montoya.  I understand your attorney, Andrew Ringel, is here by Zoom; is that right?
A.  Correct.
Q.  Okay.  Have you ever been deposed before?
A.  I have.
Q.  In what -- in what cases, or what matters?
A.  I can't tell you the specific cases.  I have given depositions several times as my job as a detective in court cases.  I --
MR. RINGEL:  I'm sorry for interrupting, Mr. Fisher.  I just need to make a record, if I could.
MR. FISHER:  Sure.
MR. RINGEL:  Just for purposes of the record,

**7**

this is Andrew Ringel.  I represent Detective Martin Vigil in this litigation.  We are agreeing to participate in this deposition without waiving any of Mr. Vigil's rights pursuant to his assertion of qualified immunity, which is currently pending before the United States Court of Appeals for the Tenth Circuit.  The District Court denied a motion to stay in part and allowed discovery to proceed with respect to the Plaintiff's claims against the City and County of Denver.  It is Defendant Vigil's position that he should not be required to participate in any discovery because of his assertion of qualified immunity, and we're participating in this deposition with that position preserved.
Thank you, Mr. Fisher.
MR. FISHER:  Thank you.
MR. MARKS:  And this is Josh Marks.  Let me just also make a brief record.  I represent Richard Schneider; and Peter Doherty is also on the Zoom, he represents Jonathan Priest.
We are in the same boat as Mr. Vigil in terms of our clients, except for purposes of today we are just monitoring this deposition.  We do not intend to raise objections and actively participate, but nor do we intend to waive any rights we have to be free from

**8**

discovery pursuant to the qualified immunity doctrine.  So we just wanted to put that on the record as well.  Thank you.
Q.  (By Mr. Fisher)  So you were saying that you have been deposed sort of as a police officer pertaining to your criminal cases?
A.  Correct.
Q.  Tell me about that.  Because typically in Denver there aren't depositions in criminal cases, right?
A.  Usually not.
Q.  So what were the circumstances that led to depositions in a criminal case?
A.  You know, I know I was, but I can't tell you the exact circumstances.
Q.  Are you talking about once or more than once?
A.  Very few.  A couple times, probably.
Q.  Okay.  And those weren't pursuant to civil cases, those were about the criminal cases that you were involved in?
A.  Affirmative.
Q.  Okay.  You've also been deposed more recently as an expert witness in a case called O'Connell versus Alejo, right?
A.  Correct.

**9**

Q.  So I'm just going to go over the rules with you of a deposition just very briefly, just so we're on the same page.  Okay?
And one of the rules is going to be that you should always answer out loud --
A.  Yes, correct.
Q.  -- because the court reporter is not going to take down nods of the head.  Just wait for me to finish my question before you give your answer.  Is that okay?
A.  Correct.
Q.  I'm sure you've testified many times in court, of course, right?
A.  Yes.
Q.  And there there's a judge who rules on objections, right?
A.  Correct.
Q.  A deposition is a little bit different.  Your counsel, Mr. Ringel, can object to certain questions; but after he puts his objection on the record, you should answer the question anyway unless he specifically tells you not to answer the question.
Do you understand that?
A.  Correct.
Q.  Okay.  Whenever I ask you questions in this deposition, I'm never going to be intending to ask you

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**10**

about conversations that you had with Mr. Ringel. Okay?

A.  Correct.

Q.  Do you know what it means to plead the Fifth?

A.  I do.

Q.  Okay.  What does it mean to you to plead the Fifth?

A.  It's a right to self-incrimination.

Q.  A right not to incriminate yourself?

A.  Correct.

Q.  Okay. So if somebody asked you a question at a deposition and you pled the Fifth, what would that mean to you?

A.  It meant that I was confused and the deposing lawyer stated I had to plead the Fifth in the deposition. Which after the deposition I talked to Mr. Ringel and he said you don't need to plead the Fifth. That was a separate matter, had nothing to do with this matter. Even though that lawyer deposed me on questions about Lorenzo Montoya, they're two separate matters. That case is a civil case on its own.

I was very confused and upset that she would query me about Lorenzo Montoya, specific statements and specific questions about the Lorenzo Montoya case. I

**11**

thought that was inappropriate and out of line. And I reflected that to the lawyer who was representing me in regards to the Alejo case, but I just pled the Fifth, which didn't mean I was self-incriminating myself. Basically I said at the beginning of the deposition when she started querying me about the Lorenzo Montoya case, "I'm not going to answer these questions." And then she insisted that I plead the Fifth, so I followed suit upon her advice, which I believe now is incorrect.

Q.  Okay. So let's unpack a little bit there.

So you're talking about several months ago you were deposed in that case when you were an expert witness, right?

A.  Correct.

Q.  And that case is O'Connell versus Alejo, right?

A.  Correct.

Q.  And you weren't represented necessarily by an attorney, you were hired by an attorney, right?

A.  I was.  But he represented me in the deposition.

Q.  Okay.

A.  He objected to certain things and he was my lawyer for advice and counsel at that time during the deposition.

**12**

Q.  And you're talking about Mr. Driskell?

A.  I am.

Q.  But just to be clear, he's the lawyer that hired you for that case, right?

A.  Correct.

Q.  And you got paid to be an expert in that case?

A.  I haven't been paid a cent.

Q.  Oh.  Were you supposed to be paid?

A.  Well, that's to be determined.  That's my business.

Q.  So in a deposition you really have to answer all questions unless you have some valid objection to answering a question.  "That's my business" is not a valid objection.

Are you planning to be paid?  Do you want to get paid for that case?

A.  That's my decision.  I haven't submitted a bill yet.

Q.  Okay.  So you haven't decided whether or not you want to get paid for that?

A.  Correct.

Q.  Did you create a contract with that attorney where you should be paid some amount?

A.  A verbal contract.

**13**

Q.  Okay.  And you just haven't submitted a bill yet?

A.  Yes.

Q.  Okay.  Was that the only case you've ever been retained in as an expert?  In that case you were retained as an expert in forensic interviews, right?

A.  No, homicide investigation.

Q.  Just homicide investigations more generally?

A.  Yes.

Q.  That case was a case where the plaintiff was alleging that there was improper interrogation techniques, correct?

A.  Oh, I believe that was one of the allegations.

Q.  Okay.  And you made an opinion on that, you opined in a report and at your deposition that the interrogation tactics used by the Officer Alejo were proper, correct?

A.  Correct.

Q.  And, in fact, at that deposition we talked about why you're qualified to opine about interrogations, right?

A.  Say that again, please.

Q.  At that deposition you explained why you believe you're qualified to opine about forensic

Deposition of: Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**14**

interviews, interrogations, correct?

A. I don't recall the specific question, but I think so.

Q. Okay. And you do believe you're qualified to talk about forensic interviews as an expert, right?

A. Yes.

Q. Okay. Because of your experience, right?

A. Correct.

Q. And your training?

A. Correct.

Q. Okay. So -- but just going back to that deposition, you're saying nobody gave you advice that you should plead the Fifth? Or you're saying the lawyer for the plaintiff advised you you should plead the Fifth?

A. Yes. The deposing lawyer.

Q. She, Elizabeth Wang, told you during the deposition you need to plead the Fifth to these questions?

A. Yes. If I remember correctly, there was a point in time when she was asking me questions about Lorenzo Montoya in this case. And I said, "I'm not answering those questions."

Q. Uh-huh.

A. "I'm not going to answer those questions."

**15**

She said, "Well, then you need to plead the Fifth." So I continued with that answer, even though it was incorrect, in my mind.

Q. Okay. I've seen and read the deposition of that, and I can get it during a break and show it to you later.

My memory of it was that she asked you the first question about Lorenzo Montoya, and you said, "Upon advice of counsel, I'm pleading the Fifth, and I refuse to answer that question." And then you continued to give that exact same answer maybe 30, 40 times.

A. You know, I can't recall the exact questions or what was said totality of that deposition. But it's my recollection that she -- at one point I just said, "I don't want to talk about this case." And she said, "Well, you have to plead the Fifth."

So it may not have been the very first question, it may have been farther down the line. Because I think I took a break with Mr. Driskell and said, "Why am I pleading the Fifth here? Do I have to do that?" And he didn't really have any advice on that.

Q. Okay. So he didn't advise you to plead the Fifth?

**16**

A. No.

Q. Okay. And there's no other -- let's take Elizabeth Wang, the plaintiff's lawyer, out of the equation for a second.

A. We can't take her out of the equation.

Q. Just for one second for the purposes of this question. There was no other lawyer, aside from her, who advised you to plead the Fifth to questions about Montoya's case, correct?

A. Correct.

Q. So you're saying she advised you during the deposition to do that, right?

A. Correct.

Q. And I imagine that should be in the transcript if that's what happened, right?

A. Correct. Yes.

Q. So when you kept saying over and over and over again, "Under advice of counsel I'm pleading the Fifth and I refuse to answer questions about this" --

A. I don't believe I said "under advice of counsel." I may have several times, but I don't think every time I said "I plead the Fifth Amendment" did I use that verbiage of -- I may have just said "I plead the Fifth Amendment."

Basically my confusion was, I did not want to

**17**

talk about the Lorenzo Montoya in the Alejo case. I thought it was inappropriate and not pertinent to the case that I was an expert on.

Q. Okay. So you weren't pleading the Fifth because you were afraid you were going to incriminate yourself by giving answers about the Montoya case?

A. Correct, because I didn't give any answers about the Montoya case.

Q. Right.

A. I didn't respond to her questions about that, correct.

Q. Okay. But the reason you weren't answering those questions is you didn't feel it was appropriate that she would ask those questions in regards to her case?

A. Correct. I thought it was a cheap trick.

Q. Okay. But it -- even though you pled the Fifth, it wasn't because you were trying not to incriminate yourself?

A. Correct. Because I did not answer the questions about the Montoya case, so there was nothing to incriminate myself on. See what I'm saying? Do you follow my logic?

Q. Yeah. If you had answered those questions,

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**18**

do you believe that they would have incriminated you?

A. No.

Q. Okay. We'll get back to that afterwards and I can maybe show you the deposition transcript.

A. Sure. She -- during the deposition she asked me specific questions about specific statements that I made to Mr. Montoya without a transcript or me reviewing the tape. There is no way I could have answered that question.

Q. Right. But you didn't explain that to her, you just said, "Under advice of counsel, I'm pleading the Fifth"?

A. She was very succinct and curt and no explanation was available.

Q. Okay.

A. To put it lightly.

Q. Again, I've just -- again, I've seen the transcript. But you didn't tell her, "Hey, I can't answer that question because I haven't been able to review the videotape of the transcript"?

A. I may have said that to her during the deposition, if I recall correctly, that I said "I haven't seen that case in 20 years."

Q. Okay.

A. Something to that.

**19**

Q. Okay. You know what, we'll look at the transcript later.

A. Please do.

Q. So we can have an accurate portrayal of what happened.

A. Please do.

Q. What have you reviewed in preparation for this deposition?

A. I have reviewed your Second Amended Complaint.

Q. Okay.

A. The PH transcripts, the day one testimony.

Q. Wait, let's just go a little slowly. Sorry.

A. Okay. I'm sorry. Am I going too fast?

Q. Just for me, because I may want to stop you in between to make sure we're on the same page.

A. Okay. The preliminary hearing transcripts.

Q. Of what? Whose preliminary hearing?

A. Lorenzo Montoya's.

Q. Okay.

A. The day one testimony of me in trial against Lorenzo Montoya.

Q. So your testimony from Mr. Montoya's trial on day one?

A. Correct.

**20**

Q. Okay.

A. Day two testimony of me in the trial against Mr. Montoya.

Q. And when you say day one and two testimony, that doesn't necessarily mean those are the first or second days of the trial? You've testified twice, and you're talking about the first and the second time, correct?

A. Right. And that's the way it was titled when I got the transcripts from Mr. Ringel.

Q. Okay.

A. So I just used the same title. And your Second Amended Complaint.

Q. Okay. Did you review the video of your interrogation of Mr. Montoya?

A. I did. Mr. Ringel provided me with eight segments of the interview. I don't know if you discovered that to him, but there was some missing parts in it, I could tell. Like between Segment Number 1 and Segment Number 2, there was a missing, I don't know how long, space of time. Because it doesn't go -- a lot of them when it ends, it starts right where it ends.

Q. Sure.

A. 1 and 2 didn't. There was one where

**21**

Mr. Montoya was crying when Mr. Martinez was in the room. Right before that, whatever number that is, those didn't match up either, because I -- like I was -- I don't think I was in the room, then all of the sudden it cuts to Mr. Montoya sobbing and Detective Martinez in there and then I came into the room. So there's some spots that are missing the totality of the interview.

Q. Okay. So the ones that you watched are in eight segments, right?

A. Affirmative.

Q. Okay. And you believe that there is some missing video from what you watched, right?

A. Yes. Yes.

Q. Okay. And you're basing that on your memory of what actually happened, or just because it looks like there's kind of jumps and cuts?

A. Not my memory, because I can't remember the interview without reviewing it. But I can tell -- like I said, most of them when they stop, they started right where they were, same position of the people in the room, same subject matter, same talking. But those two segments stick out in my mind that there wasn't a continuance of the same scene in the interview room.

Q. Do you have any idea what would have happened

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

---

**22**

in those missing segments?

A.  I do not.  As I stated, I cannot remember the interview -- because it's been 22 years ago --

Q.  Okay.

A.  -- except for what I reviewed.

Q.  So you did review those eight segments, though, correct?

A.  Yes.

Q.  Pretty recently?

A.  Sunday night.  Sunday day.

Q.  And it pretty much totals about two and a half hours' worth of interrogation interview?

A.  Approximately.

Q.  Did you also review a transcript of that interview?

A.  I did not.

Q.  Okay.  So anything other than the things we just discussed?  Did you review anything else in preparation for this deposition?

A.  No.

Q.  Okay.  In addition to the things we've just talked about, have you reviewed anything since this lawsuit has started about the case?

A.  No.

Q.  So since the lawsuit in 2016, the only things

---

**23**

you reviewed pertaining to this case are the things we just mentioned and talked about?

A.  That is correct.

Q.  Okay.

A.  I never went and looked for the case, never looked at the case.  When I got notice of service on 2016, I didn't -- you know, I was in robberies, I was busy; I didn't do any research or any -- look at any discovery.

Q.  When did you go to robberies, by the way?

A.  Oh, I don't know.

Q.  Was it before or after --

A.  Let's see, I retired in 2019, and I believe I was there five years.  So I think it was somewhere around '14.  It's on my CV, but I don't know the exact date.

Q.  So if your CV said 11/1/14 to 7/27/19, does that sound about right?

A.  That sounds about right.

Q.  Okay.  And I'll get to this later, but were you still in homicide when Nick Martinez came in and made a statement in 2014, a videotaped statement about this case?

A.  I never knew Nick Martinez came in and made a statement.

---

**24**

Q.  Until I just told you?

A.  Correct.

Q.  Just this second?

A.  Correct.  And so what date in 2014 did he respond to police headquarters?

Q.  I think it was in October or September of 2014.

A.  Yeah, well, as you see from my CV, I didn't leave until November.  So I would have been in homicide, but I didn't -- I had no knowledge of it.

Q.  So this is the first you're hearing of it, right this second?

A.  Affirmative.

Q.  Okay.  So obviously you haven't reviewed his one-hour interview?

A.  I have not.

Q.  Okay.  He gave an interview with Detective Martinez.  You know who Detective Martinez is?

A.  Mike?

Q.  Yeah.

A.  Yes.

Q.  So he gave about an hour interview with Detective Martinez where he just kind of, in response to open-ended questions, gave all the details of what happened during the homicide.

---

**25**

A.  That's amazing.  I'm surprised.  I'm surprised I didn't hear about it.

Q.  Right.  I mean, you were the quote/unquote arresting officer for Mr. Montoya, right?  That's how it's labeled in the paperwork.

A.  Well, you'd have to define to me what you call "arresting."  I -- my participation in the case was to interview Lorenzo Montoya.

Q.  Yeah.

A.  After the interview when the decision was made to arrest him, I don't recall physically putting handcuffs or taking him down to the juvenile bureau or transporting him.  I could have; I don't recall that.

So if you say I'm the arresting officer and you got it from the case in chief, I don't know why Schneider put that in there.  But I have no recollection of placing handcuffs on him or telling him "You're under arrest" or taking him to the juvenile bureau for processing.  I have no recollection of that. In fact, I tend to think that I didn't do any of that.

Q.  Well, let me just put it this way.  You were heavily involved in the investigation as it pertained to Mr. Montoya?

MR. RINGEL:  Object to the form and the foundation.

---

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**26**

Q. (By Mr. Fisher)  You can answer.

A. That is just what I said.

Q. Yeah.

A. My involvement in this case was I went to the crime scene twice briefly, and then I was assigned to interview Lorenzo Montoya.

Q. And you also wrote search warrants?

A. I did?

Q. Yes.

A. Okay.  I don't recall.

Q. You don't recall?  I can show you later.

A. No.  Oh, well -- oh, I stand corrected. Because when I looked at the transcript of the testimony of one of -- either the PH or the trials, it states that I -- I obtained the search warrant, possibly wrote it, for the aunt's house to go recover the shoes --

Q. Right.

A. -- from the house.  So it's possible that I recall -- I wrote the search warrant.

Q. Right.  And do you recall you also wrote a search warrant for Nicholas Martinez's house?

A. No.

Q. Okay.  And like you just said, you went and executed a search warrant at Lorenzo Montoya's aunt's

**27**

house where he was living at the time of the incident, right?

A. Correct.

Q. Is that all the involvement that you can remember in the case?

A. That's it.

Q. Okay.  Also going to the crime scene as well?

A. Correct.

Q. So that would have been on the day she was found?

A. Correct.

Q. New Year's Day?

A. After -- her body had been removed from the crime scene.  So I don't recall what time I went there, but I know I went in the morning when they were still processing the crime scene and helped search a little bit around the area.  I didn't process the blood or the fingerprints or the footprints or the area where she was found.  I didn't do any of that processing with the crime lab.  I just basically searched through I guess paperwork and stuff.  It was very brief, it wasn't very long, and then I left.

And then I recall probably the next day or the day after, they went back to the scene -- they had secured the scene -- went back to the scene to do some

**28**

fingerprint analysis based upon super glue, and I watched that.  I was interested in the process, it was kind of a new process, and I watched that.  I didn't participate in it.  And they used the lighting on the front door, too, for processing fingerprints, which was kind of new at that time.  And I watched it, but I didn't really do anything.  I just basically observed to see how the process was done.

Q. The biggest part of your involvement in this case was the interrogation of Mr. Montoya?

A. Correct.

Q. Okay.  And at the time he was arrested, if he hadn't talked to you at all, he wouldn't have been arrested that night, right?  If he had just asked for a lawyer?

MR. RINGEL: Object to the form and foundation.

MR. COOPER: Same thing.

A. I can't tell you.

Q. (By Mr. Fisher)  Well, I mean, at the time he was arrested, what other evidence was there that would have given you probable cause to arrest him other than the statement that he made to you?

A. I really can't --

MR. RINGEL: Object to the form and

**29**

foundation.

Q. (By Mr. Fisher)  You can answer.

A. I really can't tell you that either.

Q. Well, I can represent to you that there was no other evidence that could have given probable cause to arrest him at that time.  Can you think of any that maybe I don't know about?

MR. RINGEL: Object to the form and the foundation.

MR. COOPER: Objection to the form.

A. With all due respect, that's your opinion. But other detectives were working the case.  The primary detective was Schneider.  I don't think the decision to arrest him, with or without the interview, was mine.

Q. (By Mr. Fisher)  Well, forget about the decision to arrest him.  I'm asking you what other evidence you're aware of that would have given them probable cause to arrest Montoya that night if he had not made a statement to you?

A. I'm not aware of any, but that doesn't mean that some didn't exist.

Q. Okay.  So some might have existed, but you're just not aware of it?

A. Right.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**30**

MR. RINGEL:  Object to the form and foundation.

Q.  (By Mr. Fisher)  Do you have any idea who might be aware of it or what it might be?

MR. RINGEL:  Same objections.

MR. COOPER:  Same objections.

A.  No.  I can speculate, but I don't want to do that.

Q.  (By Mr. Fisher)  Yeah, I don't want you to completely outright guess.

A.  Yeah, I'm not going to.

Q.  Okay.  At all in the deposition, I guess, I don't want you to completely -- just sort of a rule of a deposition again.

A.  Yeah.

Q.  I don't want you to completely outright guess to stuff.  You can, in a deposition, tell me, "Okay, I'm not sure of X, Y, and Z, but my best opinion would be," and you can clarify things like that.  Does that make sense?

A.  It does.  And I won't guess or speculate.

Q.  I'm just telling you in general what you can do, okay?

A.  Great.  Thank you for your advice.

Q.  So getting back to, I mean, you elicited --

**31**

you elicited incriminating statements from Mr. Montoya in the interrogation, correct?

A.  Correct.

Q.  And after his interrogation, the things that he had said to you certainly, in your mind, gave you all probable cause to arrest him, right?

A.  Correct.

MR. RINGEL:  Object to the form.

Q.  (By Mr. Fisher)  Oh, so, in any event, so you elicited this information, this confession from him, right?

MR. RINGEL:  Object to the form.

A.  What do you mean by "elicit"?

Q.  (By Mr. Fisher)  You asked him questions --

A.  Yes.

Q.  -- and got him to make a statement or a confession, right?

A.  He made the statement voluntarily, yes.

Q.  Okay.  He made it voluntarily.  In response to your questions, right?

A.  Correct.

Q.  And then there was enough to charge him with the murder, right, after he made that confession?

A.  I believe so.

MR. RINGEL:  Object to the form and

**32**

foundation.

MR. FISHER:  Did you get the answer?

THE REPORTER:  I did.

A.  I believe so, yes.  I'll answer again.

Q.  (By Mr. Fisher)  So that's why I'm just curious.  In 2014, nobody told you about Nick Martinez coming back in to make that statement?

A.  No.

Q.  In 2014 you're aware that Mr. Montoya's murder conviction, his burglary conviction, his robbery conviction, the auto theft conviction, were all vacated, right?

A.  Mr. Montoya's?

Q.  Yes.

A.  I did not keep up with the case.  I did not know that.

Q.  You haven't heard that until this minute?

A.  Correct.

What -- can I ask you a question?  What --

Q.  Sure.

A.  What day did they decide -- the legislature passed the law to decide to release Mr. Montoya.  What month and day was that?

Q.  Is that what you understood, that the legislators passed a law to release him?

**33**

A.  Correct.  Well, no, you know, that's a simplifying of terms.  What happens is legislation said that juveniles convicted of murder will not serve life sentences and then without prejudice the DA's office could refile or retry the case.  So it's a conglomeration of events.

But what month or day did that get passed?  And then I don't know, I'm sure there's a time after that there was a decision made by the Denver District Attorney's office.

Q.  Right.  So I can represent to you that there was a decision made by the Denver District Attorney's office in 2014, I think around September, that they were going to dismiss all the charges against Mr. Montoya that he was convicted of.

A.  And that's the same time Nick came in?

Q.  A little bit later Nick came in and gave a statement.

A.  I never heard that.

Q.  You never heard any of that?

A.  No.

Q.  Okay.

A.  I'm flabbergasted.

Q.  Okay.  So I guess nobody from the DA's office or homicide or DPD ever consulted you on any of those

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**34**

decisions?

A. No.

MR. RINGEL: Object to the form.

Q. (By Mr. Fisher) You can answer.

A. No. Bonnie Benedetti talked to me about retrying the case.

Q. When was that conversation?

A. I don't know. After the legislature made their ruling, or their new law.

Q. Okay.

A. And I said, "Yes, we need to retry this case."

Q. Against Mr. Montoya?

A. Correct.

Q. And why did you say yes? What did you mean by that?

A. Because I believe it's a good case and I believe he murdered her. Emily Johnson didn't deserve to get murdered. And I believe that we could have won the case and it's the right thing to do.

Q. Okay. Might your opinion change on that if you actually saw the videotaped interview of Nick Martinez?

MR. COOPER: Objection to form; foundation.

MR. RINGEL: Object to the form and

**35**

foundation.

Q. (By Mr. Fisher) Go ahead, you can answer.

A. Not necessarily. I don't really -- in my feelings, I don't really trust Nicholas Martinez.

Q. And why is that?

A. He was involved in this. He was the main actor in this.

Q. Right.

A. I would not know what his incentive to come in and talk to police would be. I don't know how that came about or what he said. So I -- he wouldn't -- his statement wouldn't solely convince me --

Q. Sure.

A. -- that he was telling the truth.

Q. Okay. He -- I'll represent to you that he gave very detailed step-by-step of exactly what happened in that house. I'll represent to you that he said he was there with Lloyd Martinez, his cousin, and also Luke Anaya, that it was the three of them. I'll tell you that he said Luke Anaya was the first one to hit her, and he hit her with the gun by the couch in the living room. I'll tell you that he said they all kicked her while she was down by the couch. I'll tell you that he said before they went in, they found the dog, which was a white Husky, and they got it to come

**36**

over to them and put it inside the garage. I can tell you that he said the way that they got in was by -- he had a milk chute just like that at his house, and he was able to peel back the boards from the milk chute, reached in -- he was standing on Lloyd Martinez's knee -- he was able to reach in and unlock the door, and that's how they gained entry. I can tell you that he said him and Luke Anaya and Lloyd Martinez all dragged the body out after they beat her up. I can tell you that he said he did that because they heard Robert Davis sleeping in the other room and snoring and they didn't want him to hear what was going on. I can tell you that they beat her more outside with a rock and with the gun and with kicking.

Do all those details that I'm conveying to you sound --

A. Some of those details that you're telling me I believe weren't known during the initial investigation.

Q. Were what? I couldn't --

A. Were not known during the initial investigation. Excuse me. I believe -- I don't know if we knew about a gun, when he said he hit her in the head with a gun, I don't know. A lot of that stuff could be obtained from discovery, and discovery makes

**37**

its way around prisons all the time.

Q. Sure.

A. Even though it's not supposed to be. So I don't know what his incentive would be to come in. It just seems coincidental that Lorenzo got let out of jail and he was going to maybe be being retried again, and -- I don't know. Is Nick in jail?

Q. Nick is in jail, yes.

A. He is? I did not know that.

Q. Yeah. Well, you knew he was convicted, right?

A. I did not know that.

Q. Did you not follow the case at all after your involvement?

A. No.

Q. Did you not testify in Nick Martinez's --

A. I thought Nick was free as a bird. In fact, I even represented that to Mr. Ringel. I thought Nick -- he did not want to interview the first day because Larry Valencia went up to Northglenn, up to his house, and talked to his mom in the kitchen and asked him and says, "Do you want to come down and talk to police?" And she got on the phone with his dad and said, "We better get a lawyer." So he never came down and interviewed, I don't believe. I don't know. But I

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**38**

never heard any of this.

Q.  Do you remember -- you just watched the video interrogation of you and Mr. Montoya, right?

A.  I did.

Q.  Did you see in there where he kind of talked about over and over how Nick is in the other room; he's talking to us right now?

A.  I did.

Q.  Was that a lie?

A.  I don't know if that was the truth or not, but I did say it during the interview.

Q.  I'll represent to you, I've listened to audio recordings of his interviews.  He was interviewed by Webster and Wallis.  Do you know those guys?

A.  I do.

Q.  He was interviewed by them for maybe two hours plus.  Does that sound like it could be true?

A.  It's been my assumption for 22 years that he never came down and interviewed with us.

Q.  I mean, did you testify at the preliminary hearing?

A.  I did.  On the interview.  About Lorenzo Montoya.

Q.  Martinez was sitting there in handcuffs during the preliminary hearing.

**39**

A.  Of Lorenzo Montoya?

Q.  Yeah.  They all had a PH together, him and Lloyd Martinez.

A.  I don't recall that.

Q.  Okay.  And then Nick Martinez was subsequently tried a few months after Lorenzo, and he was also convicted.

A.  And did Curt Alfrey prosecute that case?

Q.  I believe it was the same prosecutor.

A.  I get along with Curt Alfrey, I call him a friend, but I never knew this.

Q.  Okay.

A.  This is the first time I knew this.

Q.  Okay.  And when you were talking about the details that I was conveying to you that Nick Martinez said in his 2014 interview, you're saying some of those match, but some could come from discovery, et cetera, right?

A.  Right.

MR. RINGEL:  Object to the form and foundation.

MR. COOPER:  Same objection.

Q.  (By Mr. Fisher)  You don't have any doubt that Nick Martinez was involved, right?

A.  I -- doubt?  Yes.  I believe he was involved.

**40**

Q.  What doubt do you have?  Why do you have doubt that he was involved?

A.  I don't know.  I guess not.  I guess I don't have any doubt.

Q.  Okay.  And it sounds like you don't have any doubt that you believe Lorenzo Montoya was involved?

A.  Correct.

Q.  Okay.  What about Luke Anaya?

A.  I don't really know much about him.  I don't know his interview.  I know during Lorenzo Montoya's interview I said that he was talking to us and he was saying this.  I'm trying to recall who came in the room with Dale Wallis.  I think it was Dale Wallis.

Q.  You brought Luke Anaya in.

A.  Okay.  I did, then -- okay.

Q.  Do you remember?

A.  That's who came in the room, Luke Anaya.  And what the heck -- now my memory is going.  But what the heck did he say when he got in the room?  He said something specifically to Lorenzo Montoya.

Q.  Yeah.

A.  He was only in there about 30 seconds.

Q.  Right.  Lorenzo had been saying that the shoes he was wearing belonged to his cousin, Luke.

A.  Oh, that's right.

**41**

Q.  Right?

A.  And Luke said that he had been wearing them for a long time.

Q.  So you went out of the room --

A.  Yeah.

Q.  -- to talk to Luke, right?  And now you parade Luke back into the room --

A.  Parade?

Q.  Well, yeah, sort of.  In a big dramatic fashion, you open the door --

A.  Dramatic?

Q.  We can watch the tape.  We'll watch it in a little bit.  And you bring in him and you say to him, "Whose shoes are those?"  Do you remember you saw that on the video?

A.  Correct.

MR. RINGEL:  Object to the form and the foundation.

Q.  (By Mr. Fisher)  Okay.  And he says -- he points to Lorenzo, right?

A.  I believe so, yes.

Q.  And you say, "But who was wearing them on New Year's Eve?"  Remember?

A.  I believe so.

Q.  And he says, "He was," meaning Lorenzo,

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**42**

right?  So you guys at that point thought those shoes were at the scene, right?  The prints of those shoes were at the scene?

A.  Correct.

Q.  In fact -- sorry if you take offense to this -- but you guys made a whole big show of it.  You brought Priest in and he put on rubber gloves and he took out a magnifying glass and he looked at the shoe?

MR. COOPER:  Object to the form.

A.  I didn't bring Priest in.

MR. RINGEL:  Object to the form.

Q.  (By Mr. Fisher)  Well, Priest came in.  I apologize.

THE REPORTER:  Can you guys just slow it down a little?  There's a lot of bantering going on.

MR. FISHER:  Sure.

THE REPORTER:  Please restart your question.

Q.  (By Mr. Fisher)  I said, in fact, Priest came in at one time during the interview, right?

A.  Correct.

Q.  And he brought in rubber gloves?

A.  Correct.  Which is a good idea.

Q.  Okay.  And he's looking at the shoe in front of Lorenzo, right?

A.  With a magnifying glass.

**43**

Q.  Right.  With a magnifying glass.

A.  Correct.

Q.  And it seems like he's sort of on the fly coming to conclusion, "This is the same shoe as we have at the homicide scene," right?

A.  I believe if you look at the picture of the footprint, it was similar.  Or the same.  Lugz.

Q.  I mean, certainly there is more than one pair of Lugz going around?

A.  In the world?

Q.  Right.

A.  Yes.

Q.  Millions of them, right?

A.  Yes.  I have a pair.

Q.  You weren't at that scene on the night of the murder, were you?

A.  I was not.

Q.  Okay.  But, actually, at trial -- you guys insisted over and over again during the interrogation that his shoe that he was wearing in the interrogation was at the scene, right?

A.  Correct.

Q.  Maybe over a dozen times, if not more?

A.  I don't know the count, but it was several times.

**44**

Q.  Okay.  But, in fact, you didn't have any certainty of that as you sat there in the interrogation room, right?

A.  Just based upon the photo, the print, the similarity, or the exactness of the print on his shoe, based upon Luke saying that he was wearing those shoes New Year's Eve, put those three or four pieces together, and it seemed certain.

Q.  I mean, at the trial, the prosecutor didn't even argue, nor did any witness even testify that the shoes Montoya wore during the interrogation were actually placed at that homicide scene.  Are you aware of that?

MR. RINGEL:  Object to the form and foundation.

A.  Say your question again, please.

Q.  (By Mr. Fisher)  I said at the trial -- I'll take it in separate parts -- the prosecutor didn't even argue that the shoes Lorenzo wore to the interrogation matched any prints from the scene?  Were you aware of that?

MR. COOPER:  Objection to form.

MR. RINGEL:  Object to the form and foundation.

A.  I don't know.  I don't know the totality of

**45**

the trial.

Q.  (By Mr. Fisher)  Okay.  You never learned about that after, whether or not the shoes that he wore to the interrogation, which you guys told him over and over again put him at the scene, that was not even evidence presented at the trial?

A.  I did not.

MR. RINGEL:  Object to the form and the foundation.

Q.  (By Mr. Fisher)  Okay.  I mean, there was another pair of shoes that you went and found from Tomasita Martinez's house, his brown Lugz that were down in the basement.  Do you remember that?

A.  Correct.

Q.  Those, the prosecutor argued, matched what was at the scene.

MR. RINGEL:  Object to the form and foundation.

Q.  (By Mr. Fisher)  Are you aware of that?

MR. COOPER:  Same objection.

Q.  (By Mr. Fisher)  Are you aware of that?  I mean, you were just watching -- you just read that transcript of that testimony, right?  You read your transcript of your testimony recently where you talked about going and recovering that shoe from her house,

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**46**

right?

A.  Correct.

Q.  And aren't you aware that that is the shoe they claim matched a print at the scene?

MR. RINGEL:  Object to the form and foundation.

Q.  (By Mr. Fisher)  As opposed to the shoe he was wearing during the interrogation?

MR. RINGEL:  Same objections.

A.  I don't know if that shoe recovered in the search warrant was the shoe that was recovered or was at the scene versus Lorenzo Montoya's shoe that he was wearing the day of the interview.  I don't know that. What I testified to in court was that I obtained those Lugz shoes and, as I stated before, and as you stated, Lugz have similar patterns on their feet.  So I would believe that would be one reason why I would obtain those.

Mr. Montoya said that he lived there and he could have had two pair of Lugz with similar patterns on the shoe.  They were recovered from where he slept in the furnace room down there.  So I can't answer correctly whether they were the shoes and the other ones weren't.

Q.  (By Mr. Fisher)  Okay.  So as you sit here,

**47**

you don't know what the prosecution or the officers testified -- I'm sorry, what the prosecution argued or what the officers testified about which pair of Lugz shoes actually allegedly matched the prints at the crime scene?

A.  I assume you mean the crime lab officers. No.  I didn't participate in that, I did not view that, did not read a transcript, I don't know anything about that.

Q.  Okay.  I'll represent to you, having read all the transcripts --

A.  Great.

Q.  -- that the prosecution argued and the crime lab guys testified that the shoes that were the closest matched to the prints at the crime scene were the brown Lugz that you recovered pursuant to the search warrant. Does that make sense, what I'm saying?

MR. RINGEL:  Object to the form and foundation.

MR. COOPER:  Object to the form.

A.  You would have to explain more about closeness.  I don't know -- that doesn't make sense to me when you mean closeness.  Why is one Lugz shoe closer than another Lugz shoe with the same pattern sole?

**48**

Q.  (By Mr. Fisher)  They determined that -- I'm trying to remember the exact words they used.  There was a probable match between the shoes found at Tomasita Martinez's house and the prints at the scene. Does that make sense?

MR. COOPER:  Same objection.

MR. RINGEL:  Object to the form and foundation.

A.  That's not a definitive answer that they were most likely 110 percent the shoes at the scene.  A probable match is the terminology used, it could have been a probable match.  I'm not aware of it; I don't know anything about it; I -- this is the first I've heard of it.

Q.  (By Mr. Fisher)  Okay.  Well, I'm telling you, nobody testified at the trial that the shoes he wore in the interrogation were a match or a probable match at all for the prints at the scene.

A.  I can accept that if you're telling me that.

Q.  Okay.  And that would be the first time you're learning of this now?

A.  Correct.

Q.  Okay.  So would you all have been able to make the kind of determination that you claim to be making on the fly in the interrogation room about the

**49**

shoe being a match?

MR. RINGEL:  Object to the form and the foundation.

A.  I guess I don't understand the question. Would you all be able to make the determination that the shoe in the interview room was a match?

Q.  (By Mr. Fisher)  Yeah.  So yourself, Priest, and Martinez, throughout the interview, many, many times, kept saying to Lorenzo, "Your footprints are there."  "You were there."  "Your footprints are at the scene, Lorenzo; you were there."  "We know you were there."  Right?

A.  Correct.

MR. RINGEL:  Object to the form and the foundation.

Q.  (By Mr. Fisher)  And you -- how certain were you of that when you kept making that statement to him over and over again?

A.  As I stated in this deposition --

THE DEPONENT:  Did you want to say something, Mr. Ringel?

(No response.)

A.  As I stated in this deposition, it was based upon looking at the shoe and the print -- looking at the picture and JR's statements.  That's how certain I

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**50**

am, using those three factors.

Q.  Okay.  I guess I'm trying to say --

A.  I'm not a forensic shoe specialist.

Q.  Okay.

A.  I don't pretend to be.  I use common sense and observations.  And those are my observations and my common sense, and that's why I believe those shoes were used or at the scene.

Q.  So you hadn't made a, quote, unquote, forensic match at that point during the interview?

A.  Me?

Q.  Correct.

A.  No.

Q.  And did any of the other officers, had they made a quote, unquote, forensic match at the time of the interview?

A.  That's left up to the --

MR. RINGEL:  Object to the form and foundation.

A.  That's up to the crime lab.

Q.  (By Mr. Fisher) Okay.  That's not something that I guess you three detectives could have done sitting there in the room with a magnifying glass?

MR. RINGEL:  Object to the form.

A.  I would say no.

**51**

Q.  (By Mr. Fisher) Okay.

What have you written about the criminal case where Emily Johnson was killed and that investigation?  What have you written about that case?

A.  I believe just my write-ups --

Q.  Meaning?

A.  -- that I've submitted to the case.

Usually when you do something, after you get done you sit down and do a brief synopsis of what you did.  The search warrant, I know I did a synopsis of what was done and what was said, where we found this, where we found that, documented that.  That's the only thing I would have written.

Q.  So you would have written police reports about your actions in the investigation?

A.  Yes.  We call it supplemental reports.

Q.  And you would have put those in the case file, right?

A.  Yeah.  Schneider would have incorporated those into the case.

Q.  So what was Schneider to the investigation?  You kind of mentioned this earlier, like he was in charge of it.

A.  He was assigned the case.  He's the primary -- primary detective on the case.

**52**

The way homicide works is you had a primary and secondary.  You didn't always have a secondary.  It could be based upon who got called out to the scene or who was in the office and was assigned the case.  It could be immediately after the case was discovered or the victim's body was discovered, or it could be a couple days after investigation has continued that they assign detectives.

Really all it means is that the primary is responsible for putting the paperwork together and investigating further in the case and the secondary helps him or does things on his own.  But in homicide in those days, when we got a murder and we were on staff or in the office or got called in, we all worked it.

Q.  Together?

A.  Together.  And we had a white board and they would put the facts of the case on the white board and then an assignment.  Go look at -- go talk to the mailman.  Go down and get video from the corner store.  Go do this.  And we would work through that list.  And they would put up another list sometimes.  Sometimes they -- at that point in time they didn't have any idea of what we needed to do, and we'd work as much as we could together 'til we exhausted assignments and leads,

**53**

and then the primary and secondary would take it on further on in their case.

Q.  Who was the secondary in this one?

A.  I do not remember.  But we -- we would also help -- if I had a 10-year-old case and I needed help, I would solicit help, even though he wasn't my primary or secondary.  Mike and I were not -- I don't believe Mike was the secondary.  Mike and I were not assigned to the case.

Q.  Okay.  So fair to say in this case, like a general rule, you guys all collaborated on this investigation, all the guys in homicide?

A.  Yes.  On this one, yes.  Many.

Q.  And as much as you could, you talked with each other and shared information about the case?

A.  Yes.  But we don't have the totality of all the information.  Like I came out of the interview room during Lorenzo, and somebody must have said something about JR and the shoes, so that's why I took him back into the interview room.

Q.  You mean Luke Anaya?

A.  Luke Anaya.  I'm sorry.  Isn't Luke Anaya the same as JR?

Q.  No, JR is a different guy.  Lloyd Martinez.

A.  Okay.

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**54**

Q.  And he was actually prosecuted and convicted, and Luke Anaya was never arrested.

A.  All right.  So Luke Anaya was brought into the room to verify the information he had.  I don't know where I obtained it from.  Somebody must have told me.  I just didn't go out and grab Luke Anaya because I wanted to.

Q.  Right.  In other words, like if you would go out of the room, you might talk with Lieutenant Priest or Webster or --

A.  Correct.

Q.  -- or Wallis --

A.  Correct.

Q.  -- or R.D. Schneider, and they might say, "Let me give you this piece of information so you know a little bit more," or "He's lying about X, Y and Z," or "Ask him this question," right?

A.  Or while you're doing interviews in room number B, they're doing interviews in room numbers A and C, and then you go out and get caught up on what one guy said and another guy said and another guy didn't say or another guy did say, and then you go back in the room and use that information the best you can.

Q.  Right.

A.  But it's not a very good system.  It's not

**55**

very complete.  You know, it's just -- it's giving information while things are working.

Q.  Right.  But the idea is, you want to collaborate with each other as much as you can so that you guys don't miss stuff, right?

A.  Correct.

Q.  And you do the best job you can investigating?

A.  Correct.

Q.  And, in fact, while you're doing an interrogation, others are watching, right?

A.  Sometimes.  Not always.

Q.  What about in this case?

A.  I don't -- well, I wouldn't know, because I'm in the room.

Q.  But you didn't go out and consult with folks who were watching in the other room on the TV?

A.  May have.  May have.  But I don't know who was watching.

Q.  And when you weren't in the room, were you watching on the TV?

A.  Oh, I don't know.  I may have looked at something, but I don't think so.  I think when I walked out of the room, I was doing something.

Q.  Going to get information from others?

**56**

A.  Could be.

Q.  Finding out what others are saying?

A.  Could be.  Getting a cup of coffee, going to the bathroom.  I was in and out quite a bit; I don't know why.

Q.  I mean, sometimes you would go out, come back and say, "I just learned X, Y and Z," right?

A.  Yeah.  And that's -- talk to somebody and somebody said, "Well, he said this" or "They said that," or this or that.

Q.  Okay.  Forget about what happened in this investigation but, in general, when you were doing homicide investigations like this, if you go out of the -- if you're the interrogating detective and you go out of the room to talk to others who might be watching or know more about it -- that happens sometimes, right?

A.  Yes.

Q.  Most of the time?

A.  Well, it varies.  You've got to understand the Denver Police homicide unit and what our resources were.  At that time we had a crew of 8 or 10 detectives, now they've got 16 detectives in homicide.  So they have a lot more people that they can work on a case.

I've done interviews of murderers by myself

**57**

with a sergeant sitting in the office not participating or helping me out at all and I'm on my own.  This case it seems like there was several people out in the homicide unit and -- while the investigation was going on.

Q.  I mean, it was -- it was a high-profile case, right?

A.  It was the fact that she was a schoolteacher and she was brutely murdered.  Yeah, I think the paper ran an article on it.  But I don't know what a high-profile case is, to be honest with you.

Q.  There was a lot of media attention to it?

A.  Some media.  I didn't read it all.  I don't read the paper.

Q.  Okay.  It was on the news every single day.  You don't remember that?

A.  I don't usually watch the news, either.

Q.  Okay.  You weren't made aware that this was -- I mean, it said at the bottom --

A.  Yeah, I would agree that it's a high-profile case.

MS. BYRIALSEN:  What did you say about the news?

THE DEPONENT:  I don't watch the news every day.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**58**

MS. BYRIALSEN: Oh, yeah.

Q. (By Mr. Fisher) You didn't see at the bottom of all the police paperwork, like search warrant affidavits, arrest affidavits, it says, "Due to the media attention of this case, such and such has to be done differently"?

MR. COOPER: Object to the form. Go ahead.

Q. (By Mr. Fisher) Do you know what I'm talking about?

A. I know what you're trying to say. I didn't recall seeing that verbiage at the bottom of the search warrant.

But what usually that is used for is to seal the search warrants --

Q. (By Mr. Fisher) Right.

A. -- from the media. They have a right -- once the search warrant is completed, we file it with the clerk. But if we get an order by a judge to seal the search warrants, they use that verbiage to seal the search warrants so information doesn't get out before the investigation is concluded and harm comes to the investigation.

Q. Does this sound right: "Due to the elevated media attention associated with this case, additional interviews necessary, and extensive forensic analysis,

**59**

and pursuant to Criminal Procedure 41(d)(2), your affiant respectfully requests that the affidavit and all associated warrants be sealed for a period not to exceed 15 days"?

A. That's exactly what I said, yeah.

Q. Okay. And is that something that you would put at the bottom of every affidavit in every case, or only in actually cases with, quote, unquote, elevated media attention?

A. Not necessarily elevated media attention.

Q. I mean, that's what it says here.

A. I know it says that in that, but it's not necessarily.

If I have a case where I believe there's a lot of suspects or witnesses that we haven't gotten to or a need to keep it secret, I'll put that on there. And I won't say "media," because the media probably doesn't know about it yet.

Q. In this case, all the documents said, "Due to elevated media attention associated with this case."

A. I don't believe my search warrant said that, but it may have.

Q. Okay. Do you not believe there was elevated media attention in this case? That doesn't comport your memory?

**60**

A. There was some, yes.

Q. Just some?

A. Yeah. I don't know what you mean by "elevated." You know, when a police officer gets killed, it's more high profile.

Q. Okay. So you -- I guess you're not aware until I'm telling you right now that this case was in the news every single day?

A. No, I don't believe so. I myself don't recall exactly what was in the news. I don't read the paper, I don't watch the news. I'm busy working.

Q. Okay. Did the -- did media officers or any supervisors alert you guys, "Hey, this case is in the news. X, Y and Z should be done differently"?

A. The media officers get their information from us. And I don't talk to them, either, because they tend to put stuff in the paper that shouldn't be in the paper. I don't like to talk to them. I just -- they have no need. We just get the job done.

Q. Do you remember a guy, Lombardi?

A. Yeah.

Q. He was a media dude? Media officer?

A. Yeah. Lombard.

Q. Lombard.

A. Tony Lombard.

**61**

Q. Right. So you typically wouldn't talk to him about a case? You wouldn't tell him details?

A. No.

Q. Okay.

A. They show up on scenes and ask us what's going on. And my practice is to say, "We have a murder; we don't know who did it." I don't tell them how it happened, when it happened, where it happened, who our witnesses are, who are our suspects are, because they tend to give the media information that they shouldn't have. So I just say, "We have a murder and that's it. We don't have it solved yet." Plain and simple.

Q. To the extent that Lombard gave stuff to the media, that wouldn't have come from you?

A. Not from me.

Q. It could have come from other officers, it could have come from his own viewing of the files or the --

A. Only Tony Lombard knows. You're going to have to ask him.

Q. Right. So you were saying you've authored your police report -- supplemental reports in this case, right?

A. Correct.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**62**

Q.  At the time the investigation was going on, would you have sent any emails to and from other officers, to and from higher-ups, about the case?

A.  I wouldn't have emailed higher-ups, that's not my job or my position.  I wasn't the primary, so I probably wouldn't email anybody about this case.  If I had to talk to somebody about something, a question about the case or something, a question about anything, I would probably go straight to Schneider.

Q.  If you had to talk to any officer about the case, it would have been Schneider, you're saying?

A.  Well, he's the primary.

Q.  Okay.

A.  So he would know the most, I hope.  Sometimes not.  But I -- he would know the most.  And I ask him a question, say, "Hey, what about this?" or "What about that?"

Q.  So that's the idea, the primary is supposed to know the most about the investigation?

A.  Well, he puts everything together.

Q.  Sure.

A.  He follows everything.  He reads the reports, he synopsizes them, he puts together a supplemental report.  So based upon that, you learn everything about the case you can.

**63**

Q.  Did you have a department email at the time?

A.  Yes.

Q.  What was that email address?

A.  They've changed over the years.  I don't know what they were there.

Q.  I'm just going to show you something real quick. I'll just make it a digital exhibit, so to speak, because I don't have a printout of it.  But I'm going to show you -- it's Bates Stamp DENVER 000278.  That's the -- I'm sorry, that's the last page of it.  It is a two-page document.  It's an affidavit for a search warrant written by Detective M.E. Vigil.  That's you, right?

A.  Yes.

Q.  I'm just going to show you the second page of it here where you signed off on it.  Right above that.

MR. COOPER:  David, is this one where we're going online?  Or I can pull it up separately.  I don't know --

MR. FISHER:  I wasn't going to share it.  I'm just showing him literally just a couple words on this one.

MR. COOPER:  Just remind me what the Bates number is.

MR. FISHER:  The Bates stamp of the relevant

**64**

page is 278.  DENVER 278.

MR. COOPER:  Okay.

MR. FISHER:  It starts on 277.

THE REPORTER:  And you want to make this Exhibit 1?

MR. FISHER:  Yeah.

(Deposition Exhibit 1 was introduced for identification.)

Q.  (By Mr. Fisher) I'll just show you real quick here.  You can look at the whole document, you can take your time.  I just want you to look at the paragraph preceding your signature.

A.  It's that paragraph that you read.  "Due to the elevated media attention associated with this case, additional interviews necessary..." so on, so on, and so on.  You read it already.  It's in the search warrant.  So I must have been asked to put that in there because we were going to seal the warrants.

Q.  Okay.

A.  So I don't recall doing it on my own.  I must have been asked by either Schneider or Priest or somebody.

Q.  And those warrants are made under oath, right?

A.  Correct.

**65**

Q.  And everything you're putting in those warrants is true, right?

A.  Correct.

Q.  So you did believe that there was elevated attention associated with this case, or were you not telling the truth about that?  I'm just asking.

A.  Yeah.

MR. RINGEL:  Object to the form.

MR. COOPER:  Object to the form.

A.  You would have to define to me what "elevated" is.  I used the word "elevated" in my search warrant.  That was kind of a boilerplate statement to seal the search warrant.  I would have obtained that from somebody else, because those are not my words.  But, yes, it was elevated because it was a schoolteacher and it was on New Year's Eve, which made it enticing to the media.  How much coverage, I don't know.  What the TV did, I don't know.  What the paper did, I don't know.  I didn't read them at that time.

Q.  (By Mr. Fisher) So when you put "elevated media attention" in this warrant, you didn't really mean that?

A.  Yes, I did.

Q.  Oh, you did?

A.  Yes.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**66**

Q.  Okay.  Because you felt that there was elevated media attention?

A.  Yes.

Q.  Okay.  And, again, I think I'll find it in a different document, but you can't recall your email address from back then?  You have no idea?

A.  No.  They've changed them.  The last one when I left was VigilM@DenverPD or something.  But that's not -- wouldn't have been the one in 2000.  I don't know what they were.

Q.  And what was the last one, you said?

A.  VigilM@DenverPD.com, I think, or .org.

Q.  Back then when you were doing the investigation, would you have written any text messages back and forth with other officers?

A.  I'm trying to think of what phones we had at that time.  At one point all we had was pagers.

Q.  Did you maybe have Nextels at that time or something?  This was in the year 2000.

A.  I don't know if they didn't come afterwards.  You know, I don't recall any texts or the ability to text.

Q.  Would you have been writing like interoffice memos about this case?

A.  No.

**67**

Q.  Is that something that just didn't happen in homicide investigations?  I'm just asking.

A.  Why?  I've got Schneider right next to me sitting 5 feet away from me or something.

Q.  So that's just not a thing that happened during homicide investigations, interoffice memos?

A.  I've never --

MR. COOPER:  Objection; form.

A.  I've never known to do that.

Q.  (By Mr. Fisher)  Okay.  And, again, 2014, when Mr. Montoya's convictions got vacated.  You didn't -- you didn't get any correspondence about that?  You didn't receive any emails, letters, notification in any way?

A.  I --

MR. RINGEL:  Object to the form and foundation.

A.  I did not.

Q.  (By Mr. Fisher)  Okay.  Are you surprised that nobody let you know?

A.  I told you, I was flabbergast.

Q.  Okay.

A.  But it wasn't my case.

Q.  Just a couple more things about the Nick Martinez interview, I'll just tell you because you

**68**

haven't seen it.

He also says in there that he was wearing an orange Broncos jacket at the time he committed the crime.  He says in there he had a black hat with him at the time he committed the crime.  He says in there that Luke recovered something like $1,600 from inside of the house and gave him 400 of it.  He says in there that the reason they chose the house is because they thought that Robert Davis was a drug dealer and he would have some money and maybe some drugs in the house they could get.  He said that they knew that the teacher lived there with him, just kind of knew of her but didn't know her specifically.

He said that him and Luke Anaya and Lloyd were all at his mom's house until about 2:00 p.m. playing video games and were getting drunk and high, and that's when they decided to go over that guy's house and see if they could break in there and get some money.

He was asked specifically if Lorenzo Montoya was involved, and he said, No, he hadn't met Lorenzo Montoya until the following day.

He described the milk chute and how he got in there.

Is his description I gave you earlier about

**69**

the milk chute, prying the boards loose, reaching in there and unlocking the door, is that consistent with what you guys saw at the crime scene?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Same objection.

A.  I believe we looked at the milk chute during the crime scene investigation.  Like I said, I was there briefly.  I didn't process it or really analyze it, but I remember it, in my memory, being to the left of the door out back.

Now, whether the jacket was recovered -- I don't remember a jacket, but later on they said the jacket was right there at the milk chute.  I -- I didn't remember seeing that.  I didn't really look much outside.  I was inside looking through papers and stuff.  Very brief.

Q.  (By Mr. Fisher)  Do you -- do you remember that Nick Martinez's palm print was actually found on the milk chute?

MR. RINGEL:  Object to the form and foundation.

MR. COOPER:  Same objection.

A.  I don't remember that.

Q.  (By Mr. Fisher)  Okay.  That was evidence

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**70**

introduced into the trial.  It would have been testified to in the preliminary hearing transcript.

MR. RINGEL:  Object to the form and foundation.

A.  By me?

Q.  (By Mr. Fisher)  Yeah.

A.  I testified to that?

MR. RINGEL:  Object to the form and foundation.

Q.  (By Mr. Fisher)  No.  I'm saying it would have been in that preliminary hearing -- oh, did you only read your testimony from the preliminary hearing transcript?

A.  Yes.

Q.  Not other detectives' testimonies?

A.  Correct.

Q.  Okay.

He says the gun was a silver semiautomatic.  That Luke first hit her with it in the head when she was over by the couch.  He said he hit her with it in the head also outside the house where Nick was hitting her with a rock outside the house.

A.  Say that again.  The gun was silver, but who -- Nick was also hitting her in the head with a rock?

**71**

Q.  No, Luke hit her --

A.  Oh, Luke hit her in the head with a rock?

Q.  -- inside with the gun, outside with the gun, and Nick also hit him outside with the rock.

A.  That's outrageous.

Q.  Yeah, it's just terrible.

Is that what you mean?  Or what did you mean by "outrageous"?

A.  Terrible.

Q.  Like it's unbelievable?

A.  It's terrible.

Q.  Yes, it's terrible.

He also said in his interview that at the time this happened, she was wearing a silver dress.

Does that comport with your memory of what actually happened?

MR. RINGEL:  Object to the form and foundation.

MR. COOPER:  Objection to form and foundation.

A.  I learned later on that she may have had a silver dress on.  She was transported from the scene by the time I got there.  I never saw her or the dress.

Q.  (By Mr. Fisher)  Okay.  But you learned from crime scene folks who first showed up or police

**72**

detectives who first showed up that that was the condition she was found in?

A.  No, I learned probably within the last couple days that she had a silver dress on reading some of these transcripts.

Q.  Transcripts of?

A.  Either the trial or the PH.  I believe that's what my source was.

Q.  Okay.

A.  I didn't know that until just recently.

MR. COOPER:  I think you said this before.  Just for the record, though, PH is preliminary hearing?  We already established that?

THE DEPONENT:  Correct.

MR. COOPER:  Okay.

THE DEPONENT:  I'm sorry.

Q.  (By Mr. Fisher)  Aside from Mr. Ringel, who have you spoken to about this civil case since you were served with the lawsuit?

A.  No one.

Q.  Not family?

A.  Oh, my wife; I tell her I'm being sued and that I have to go give a deposition, but I don't tell her the facts of the case.

Q.  Okay.  Have you spoken to the other police

**73**

officers who are being sued?

A.  No.

Q.  Do you speak to them at all in general?

A.  No.  Really.  I see Mike once in a while, and I've seen him at some retirement parties, but --

Q.  And that's Martinez, right?

A.  Yes, Mike Martinez.  But I haven't really done anything with him.

Q.  When was the last time you saw him?

A.  Oh, we had breakfast -- he just showed up -- I don't know, four months ago.

Q.  And so he's the one who conducted this hour-long interview of Nick Martinez.  He didn't mention a word about it to you?

A.  He did not.  We didn't discuss this case during breakfast.

Q.  Okay.  Are you surprised that he hasn't told you about it?

A.  Kind of.

Q.  Schneider or Priest, have you spoken with them since this lawsuit was filed?

A.  No, Schneider is mad at me for something.  I don't know why he's not talking to me.  We've been friends since I was 20 years old.  We came on at the police department the same time.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**74**

And then Priest, I don't really talk to him.

Q.  Okay.  Is there any reason why?

A.  I -- I don't know.  I see his wife in the grocery store and her mother died and I talked to her briefly, but I never talked to John.  He's busy doing stuff.

Q.  Did you ever talk to any other police officers about this civil case?

A.  No.

Q.  Any district attorneys about the civil case?

A.  No.

Q.  You did talk to Driskell about the civil case?

A.  Yes.

Q.  What did you all discuss?

A.  Just told him I was being sued civilly.  And after that lawyer brought up this case in his deposition, then I kind of gave him a quick synopsis that we did an interview and they were suing us based upon the interview, and that it's still pending and that I had a lawyer through Hall & Evans; and I couldn't even remember Mr. Ringel's name at that time.  And that was about it.  And I said, "How do you want me to handle this?"  I said, "I'm not answering these questions."

**75**

Q.  What did Driskell say to you when you said, "How do you want me to handle this"?

A.  He said, "That's fine.  You don't have to answer them."

Q.  Okay.

A.  Like I said, I got -- I'd call it tricked, or lured into saying Fifth Amendment.  But I wasn't incriminating myself because I didn't answer any questions.  And none of the questions she asked would have incriminated me.

Q.  I forget if I asked you this earlier.  Was that the only case you've ever been hired in an expert --

A.  Hired, yes.

Q.  -- for a civil case?

A.  Yeah.

Q.  You've had other cases where you were involved in the criminal case and you might have been put on as an expert by the prosecution?

A.  I believe twice.

Q.  Okay.  What are you doing now for work?  You're retired, right?

A.  I'm enjoying my retirement.

Q.  Okay.  You're not -- do you have a consulting company or something?

**76**

A.  No, I don't have any -- I could do polygraphs, but -- I became a polygraph examiner -- I'm just not into it.  I was going to get a side job one day a week doing something that I like.  I haven't.  I just -- honey-do stuff around the house and volunteer for the police department with my wife on simple stuff.  We give out ice cream and we just do simple things, and that's it.

Q.  How long ago did you retire?

A.  August of '19.

Q.  Okay.  How did Mr. Driskell find you to be a civil expert in that civil case?

A.  That was before I retired.  Mark Vasquez used to be assistant chief of the police department, must have had some business dealings with him before, and he recommended me.  And Mr. Driskell and Mark and I got on a three-way call and then he hired me to be an expert on that case.

Q.  So you don't have like a business that you advertise --

A.  No.

Q.  -- or anything like that?

A.  No.  No.  It's a lot of work.

Q.  Have you written anything about this case since you've been sued?

**77**

A.  No.

Q.  Any emails?

A.  No.

Q.  Text messages?  Social media posts?

A.  No.

Q.  Nothing?

A.  No.

Q.  What was your last email address at work?

A.  VigilM@DenverPD.org.

Q.  Whatever the regular ending was?  It might have been DenverPD --

A.  Yeah.  In 2000 it wasn't that same email address.

Q.  Right.  I'm just asking about the one before you retired.

A.  Yeah.

Q.  Would have been VigilM?

A.  At DenverPD.org or com or something.  If I'm correct.  I can't really remember it.  I haven't used it.

Q.  But whatever the regular ending was to everybody's email address at that time?

A.  Correct.

Q.  DenverPD.co.state, or whatever it was?

A.  Well, at one time the email just was

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**78**

state.co.us, but I don't know what years or anything.

Q. Okay.

A. They changed over the years.

Q. Did you -- what is your personal email address currently?

A. Do I have to give that to you?

Q. Yes, sir.

A. It's --

MR. RINGEL:  What's the relevance of that, David?

MR. FISHER:  Because I'm going to ask him whether or not he's sent any emails about this case.

MR. RINGEL:  Well, he sent some to me.

MR. FISHER:  Well, other than --

MS. BYRIALSEN:  Those would be privileged.

MR. FISHER:  Those would be privileged.

Q. (By Mr. Fisher)  Other than to your attorney, have you sent --

A. No.

Q. -- any emails about this case?

A. Nope.

Q. So if I subpoenaed your emails from your email company, there would be none that had any relevance to this case?

A. That's correct.

**79**

Q. So can you give me --

A. I have nobody to talk to about this case.

Q. Would you mind giving me that email address, then?

A. I don't want to.

Q. Is that because you're hiding emails?

A. No, it's because it's my personal email address.

Q. Okay. And if I subpoena that email address and get a judge to order the subpoena, you will give it to me then, or would you still refuse to give it to me?

A. Well, if it's a court order, what do you think I have to do?

Q. I'm asking you whether you'd do it or not.

A. Well, what do you think I have to do?

Q. I hope you'd say yes. I would think you'd volunteer to give it to me because you're not hiding anything.

A. I'm not hiding anything.

Q. So why won't you --

A. It's not an admission of guilt just because I don't want to give it to you.

Q. But you're refusing to give it to me voluntarily?

A. Jmemev@q.com.

**80**

Q. Can you say that again, please?

A. Yeah, I know, it's difficult at best. Jmemev@q.com. John, Mary, easy, Mary, easy, Victor at Q, for queen, or Qwest is what it was, dot com.

Q. And who is your email provider?

A. I guess Xfinity now.

Q. Okay. And how long have you had that email address?

A. Long time.

Q. Okay. But you had separate work ones? Would you use that personal email address for work emails?

A. No.

Q. Okay. Would you use your work email address for work emails?

A. Yeah.

Q. Okay. Do you have any social media accounts? Do you know what I mean by that?

A. I'm on Facebook --

Q. Okay.

A. -- and that's it.

Q. Okay. What's your Facebook name?

A. I do not know. Martin Vigil, I think.

Q. Do you know what the user name is?

A. No. I'm not very proficient on it.

Q. Okay. If I sent you a written request for

**81**

that, would you be able to look it up?

A. I guess I can. I don't know how to look it up. Somebody is going to have to help me.

Q. Okay.

A. I'll get a young kid.

Q. Okay. If I got your call logs from your cell phone carrier for the past several years since this lawsuit has been instituted, would it show calls between you and Martinez?

A. I've talked to Mike on the phone since he retired about going out and having breakfast or coffee or something. I haven't extensively talked to him. I don't think any other subjects -- we didn't talk about work. He called one time about the homicide unit was having a party or something, and I said I'm not wanting to go. So that's just simple stuff. And it's very few and far between. It would be less than one a year, probably.

Q. There would be a handful of calls between you and Martinez?

A. Not even that, probably.

Q. And what about between you and Priest?

A. No calls.

Q. And what about between you and Schneider?

A. No. He's not talking to me.

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**82**

Q.  How long --

A.  I talked to his wife.

Q.  How long have you guys not been talking for?

A.  About when he retired.  He retired about a year ahead of me.

Q.  That was '18?

A.  Yeah.

Q.  What is your current phone number?  I promise I won't call you.

A.  303-319-9235.

Q.  And what's the carrier?

A.  Oh, who is -- oh, Verizon.

Q.  What was your last work phone number?  Did you have a work cell phone before you retired?

A.  I don't recall.  Yeah, I did.

Q.  You don't recall the number, but you had one?

A.  Yeah.

Q.  Okay.

MS. BYRIALSEN:  Is it on the card that you handed Aimee?

THE DEPONENT:  It might be.  Here's a card right here.  Yeah.

Q.  (By Mr. Fisher)  What's that work number?

A.  720-913-6099.

Q.  And that would be a work cell phone?

**83**

A.  No, that's a work desk.  720-641-0931 is my work cell.

Q.  Okay.

MR. RINGEL:  Just for the record, can we mark all of the email addresses and cell phone numbers and Facebook information as confidential under the protective order?  I'll make a designation after the deposition of specific pages and lines, but I want everybody to know that -- to treat that as confidential under the protective order entered by the district court.

MR. FISHER:  Yeah, that's fine.

MR. COOPER:  Fine with Denver.

MR. FISHER:  Why don't we take a five-minute break or so and then come back.

(A recess was taken from 12:02 to 12:10 p.m.)

MR. FISHER:  Okay.  So we're back on the record.  I just put a document in front of Mr. Vigil, and I put it up on the screen here.  This is Mr. Vigil's CV that he provided when he was an expert in that O'Connell versus Alejo case.  It says "Exhibit B" on it; that's how it was marked in that case.  We're going to refer to it as Exhibit 2 in this deposition.

(Deposition Exhibit 2 was marked for identification.)

**84**

Q.  (By Mr. Fisher)  So before you even look at that document, Mr. Vigil, I just wanted to ask you:  In general, you received training on interrogations in your time at DPD?

A.  I did.

Q.  And you got some training on that from the academy?

A.  Yes.  They didn't really have a lot of training.

Q.  On interrogations?

A.  Correct.

Q.  You had some while you were in the homicide school?

A.  Yes, several -- several seminars in homicide that included interrogation and interview training in their seminars.

Q.  And if you look at -- starting on page -- I think it's 2 -- starting on -- sorry, yeah, page 2 of that document I put in front of you -- well, I'm sorry, bottom of page 1, and then you go to 2.  So start at the bottom of page 1, the first page.

A.  Okay.

Q.  These are all trainings that you listed in your CV, right?

A.  Correct.

**85**

Q.  And on the bottom you note that you went to Reid & Associates Incorporated; right?  The Reid Technique Investigating and Interviewing.  And you put the date, 8/25/98?

A.  Correct.  I was in child abuse at that time.

Q.  And then on the next page you also see you attended the -- and by the way, for the record, I put in these highlights.  This is not how the document was provided to me.  I guess you would call them "gray lights" because it's not in color.

But on the next page you see one, "NCFUH: Interview and Interrogation, 1/15/97"?

A.  Correct.

Q.  Is that a training that you attended?

A.  Yes.

Q.  And what does "NCFUH" stand for, do you know?

A.  I do not know.

Q.  Okay.  And then right below that, Reid & Associates again, right?

A.  Yes, in 1999.

Q.  And this was the advanced course on the Reid Technique of Interview and Interrogation, right?

A.  That's what it was called, right.

Q.  And that was -- you attended that one on 3/11/99?

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

---

86

A.  Correct.

Q.  So that would have been roughly ten months before this homicide and the homicide investigation?

A.  Right.  And it still was before I went to homicide.

Q.  Before you started in homicide?

A.  Yeah.  I think I started in May of '99.

Q.  I also see the "Don Rabon Interpretation of Written Statements Academy"?

A.  Yeah.  Don Rabon.  And it was held at the academy.  He also does it on nonverbal communication, and I think that's part of that same training.

Q.  Okay.  And then the Practical Kinesic Interview and Interrogation in 2001?

A.  Correct.  Correct.

Q.  I also see a few down where I've highlighted, "D.U. Child Welfare Training and Research Project: Specializing in Interviewing Think Skills for Child Welfare" in '97?

A.  Yes.

Q.  Did you do a lot of training on how to interview like children in child abuse cases?

A.  No.

Q.  Didn't you work in child abuse for a while?

A.  I did.

---

87

Q.  There was no training on how do that?

MR. COOPER:  Objection to form; foundation.

A.  Interviewing the child victim?

Q.  (By Mr. Fisher)  Yeah, victims.

A.  I went to seminars.  In regards to child abuse seminars, like this Child Death Investigation, probably a portion of that was interviewing victims.  I have had some training in interviewing victims, but not a real just specific interviewing victims/training in regards to juveniles.  It was on-the-job training, and that was about it.

Q.  Okay.  So there wasn't -- when you were working in child abuse, did you have to interview children frequently?

A.  I did.  We used to interview the victims ourselves.

Q.  And how old would those children be?  I know it would have been a range.

A.  It was a variety of ages, you know, anywhere -- you would want them to understand and be able to speak, so I would say approximately 5, 6, on up to 16, 19.

Q.  And you didn't receive any specialized training in how to communicate better with small children like that?

---

88

MR. COOPER:  Objection to form.

A.  Yes, in those various seminars I attended for child abuse seminars, they would talk about the victim understanding the terms that you use during the interview.  We would -- I would go through a process -- I'll give you an example -- on a victim interview of a young child.  Beside the glass, inside the glass, underneath the glass, on top of the glass.  So when you query them about the allegation or the offense, "Did he place his penis inside your vagina," you know, so the victim had already determined -- we had already determined the victim knew what "inside" was.  We would go through that.  We would go through some terms.  Colors.  Who's your parent?  Who's your mom?  Who's your dad?  Stuff like that.  Simple stuff like that.  Try not to use leading questions on victims in child abuse.

Q.  Why is that?

A.  Because you don't want to lead the child to outcry or information about an allegation, but thus you want to completely interview the child about everything that happened.  So if the allegation said that the parent penetrated the child digitally in the vagina, you would ask the child about that.  But you don't want to stop there.  You don't want to stop there.  You

---

89

would say, "Anyplace else on your body?"  We would have child -- diagrams of children.  "Anyplace else on your body that someone hurt you or did something to you?" and they would say maybe anally.

So you don't want to lead them to that anal, you want to ask them an open-ended question and let them answer.  I could have said, you know, "Did your dad put his finger in your butt or your anus?"  She wouldn't know anus, but, you know, your buttocks, and that would be kind of a leading question.  I want her to tell me the information.  That's the best way to interview victim children.

Q.  Okay.  And that's -- that was part of your training, that you should try to avoid leading questions when interviewing victim children?

A.  Correct.

Q.  The whole "inside," "under," "outside," would you --

MS. BYRIALSEN:  Maybe you should describe for the record what was done.

Q.  (By Mr. Fisher)  Oh, for the record, when Mr. Vigil was describing that, he was placing his pen either on top of his water glass or to the side of it or below it in a way demonstrating what he was talking about.  Is that fair?

---

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**90**

A.  That's correct.

Q.  So would you do that with all children -- victims of child abuse, like even a 16-year-old, or really only for younger children?

A.  I not necessarily would do that with a 16-year-old.  I could, and I may have used that practice, but usually a 16-year-old, they're pretty versed -- 14 years old -- they're pretty versed about life and what "inside," "outside" means, and "beside," and what happened to them.

Q.  Okay.  You can -- yeah, you've already got that document closed.

All these trainings that we just went through -- aside from the child abuse one -- that we went through on your CV there, they deal with interviewing suspects or witnesses, right?

A.  Correct.

Q.  And those classes teach certain philosophies and techniques that can be used in interviews and interrogation?

A.  They teach --

MR. RINGEL:  Object to the form.

MR. COOPER:  Same objection.

A.  They teach their philosophies and their opinions, but it's not -- I don't use all of everything

**91**

I've learned, I use a conglomerative of everything I know.

Q.  (By Mr. Fisher)  But those classes that we were just talking about, the ones listed on your CV, those were all approved by DPD?

MR. COOPER:  Objection to form.  You can answer.  And foundation.

A.  Yes, they were.  I have to get approval -- usually there's a cost to the seminar, and you have to get approval to pay for it, and then time away from the office to attend the seminar.

Q.  (By Mr. Fisher)  And were those classes we've just mentioned and the others listed on your CV, were they sanctioned by DPD?  In other words, was DPD okay with you going to all these classes?

MR. COOPER:  Same objection.

A.  Well, yes, they approved my attendance and being away from work, and they approved the cost.

Q.  (By Mr. Fisher)  Were those classes that we mentioned and the others on your CV, were they mandatory or were they voluntary?

A.  They're usually voluntary.  I come across information that they're having an interview class or a child abuse class or a homicide class and I would like to go to it.  And they like to train their officers

**92**

that way, and so I submit it and then get approval.  And upon approval, I attend.

Q.  So you were in homicide doing homicide investigations, doing interrogations, right?

You have to answer --

A.  Correct.

Q.  And you've --

MR. RINGEL:  Mr. Fisher, if you're done with this exhibit, can you take it off the screen?

MR. FISHER:  Oh, sure.

MR. RINGEL:  Thank you.

Q.  (By Mr. Fisher)  And you've conducted thousands of forensic interviews in your career?

A.  I believe so.

Q.  So it was not mandatory that -- by DPD that you had to take classes involving interview and interrogation techniques?

MR. COOPER:  Objection to form.

A.  It was not mandatory; it was encouraged.  They want to educate their officers and their detectives on all venues of their assignments, so it was encouraged.  Very few, if I asked to go, did they refuse attendance.  Sometimes they would pick different people because of tenure or experience.  But, I mean, if we found something that was good -- you know, a lot

**93**

of these are repetition, so I wouldn't want to go to 'em because they were advertising and they said this is about this and that, and I said it's not -- I've already had this and I've experienced it in my job, so I don't need to go to that.  But they would send me if I requested it.

Q.  (By Mr. Fisher)  So but just to be clear, so even though you were a detective engaged in thousands of forensic interviews over your career, DPD didn't mandate that you did any kind of specific interrogation or interview training?

MR. COOPER:  Objection to form; foundation; asked and answered.

A.  No.

Q.  (By Mr. Fisher)  Okay.  Over the years you've done lots of on-the-job training regarding interviews and interrogation, right?  You've got experience?

A.  Yes.

Q.  Like we just talked about, you've done probably thousands of forensic interviews, correct?

A.  Correct.

Q.  And you've probably obtained hundreds of confessions, correct?

MR. COOPER:  Objection to form.

A.  Possibly.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**94**

Q. (By Mr. Fisher) It's -- I mean, I can take it out, if you want, but that's what you put in your report in the O'Connell versus Alejo case. Does that sound right?

A. Yes.

Q. Okay. What does that mean, "obtained hundreds of confessions"?

MR. COOPER: Object to the form; foundation.

A. During forensic interviews, the suspect confessed to the crime.

Q. (By Mr. Fisher) Okay. So you've had thousands of forensic interviews, and out of that you've had hundreds of cases where you've obtained confessions, right?

A. Correct.

Q. So there were, I guess, hundreds and hundreds where you didn't obtain a confession, right?

A. I believe so. I don't know the number. But you -- you don't obtain a confession on every interview.

Q. What are some of the things that stop you from obtaining a confession on every interview? Why can't you do that?

MR. COOPER: Objection to form.

A. Oh, I mean, there's a variety of reasons.

**95**

The suspect may not be willing to talk. The suspect may want counsel and the interview is concluded. The suspect may blame it on somebody else. I don't believe that's a confession. A variety of reasons.

Q. (By Mr. Fisher) Are there any other reasons why sometimes you can't obtain a confession when you do a forensic interview?

MR. COOPER: Same objections.

Q. (By Mr. Fisher) That you can think of.

A. No, it's just that they wouldn't give it up. I mean, they wouldn't confess, I guess. I don't want to use the word "give it up." That's not right.

Q. Is it possible that the suspect you're interrogating may actually be innocent of the crime?

MR. COOPER: Same objection.

A. Always a probability, yes.

Q. (By Mr. Fisher) When you say a probability, what --

A. Possibility.

Q. Okay. Is that something you consider in your forensic interviews, that it's possible a suspect may not be guilty of the crime you're asking him about?

A. I do.

Q. Okay. As we talked about, like you were hired as an expert in O'Connell versus Alejo, right?

**96**

A. Correct.

Q. And you feel because of your training and your experience and conducting thousands of interviews, you are an expert in forensic interviews, right?

A. Homicide investigations is really what the -- my expertise was in, which is inclusive of forensic interviews. I also became a polygraph examiner for nine, ten years for the department, which relies heavily on interview and interrogation.

Q. What do you think makes you an expert in interviews and interrogations? Like why are you qualified to be an expert in those things?

MR. COOPER: Objection to form; foundation.

A. My experience and tenure conducting a lot of interviews, obtaining confessions, seeing a lot of things.

Q. (By Mr. Fisher) You just said earlier, I think, DPD relies heavily on interviews and interrogations?

A. I said that?

Q. (By Mr. Fisher) Did you?

A. I don't recall saying that.

Q. Okay. Is that true?

A. DPD relies heavily on interviews and interrogations? I think any investigation relies upon

**97**

that.

Q. Okay. That's an important piece of any investigation?

A. Yes.

Q. Okay. Why is that?

A. Because --

MR. COOPER: Object to the form.

A. Because witnesses will tell you what they saw, suspects might tell you what they did. Of course on homicides, you can't interview the victims, but in child abuse and other areas, you can interview the victims to see if the allegation matches their information. It's just -- it's really the basic part of the investigation.

Q. (By Mr. Fisher) Do you know in that -- were you made aware that in that O'Connell versus Alejo case, the case recently settled?

A. I am.

Q. Do you know how much the plaintiff got in the settlement?

A. I think it was a million, I was told by a lawyer.

Q. And that's the case in which you said that the officer's actions were appropriate in the investigation?

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

**98**

A.  Correct.  I commented on his interview of one of the suspects or witnesses.  I did not comment basically on the interview of the female suspect because it was not recorded.  And procedures were written down on what the sheriff did, and I commented on that, that they were appropriate to the investigation.  But, yeah, it wasn't just one thing.

Q.  Out of those thousands of forensic interviews you conducted, was that all with DPD or some in other jurisdictions?

A.  No, I've only worked for DPD.

Q.  Did you ever have occasion to get kind of farmed out to work on a case in Jeffco, to -- brought in to interrogate a suspect in Jeffco?

A.  No.  I've worked with Jeffco, their cold case unit, in regards to similar cases.  I don't believe I ever did an investigation in regards to the case in Jeffco.  I may have been with a Jefferson County detective and went and interviewed somebody and asked about my Denver case and then they asked about their Jefferson County case, but I wasn't brought in for that.

Q.  I'm thinking specifically about a case where the defendant had the same last name as you.  Do you know what I'm talking about?  Frank Vigil?

**99**

A.  I think I recall a case.  He -- I don't know.  No, I can't -- I'm not going to speculate.  I can't remember.

Q.  You don't remember anything about that case?

A.  The name sounds familiar.  There's a Frank Vigil who's a lawyer.  But I can't remember that case.

Q.  Okay.  So as we said, you've conducted thousands of interrogations.  You've also probably witnessed more than that where you were just around the homicide unit where you saw other people doing interrogations?

A.  Yes.

Q.  In any of those thousands that you participated in, or in any of those countless others that you witnessed, did you ever see another officer do anything that you considered to be inappropriate in an interrogation?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Same objection.

A.  No.

Q.  (By Mr. Fisher)  So would that -- that would include your interrogation of Lorenzo Montoya, you don't believe that there was any inappropriate behavior by you or any of the other detectives in that

**100**

interrogation?

A.  I do not.

MR. COOPER:  Objection to form; foundation.

Q.  (By Mr. Fisher)  So out of those thousands that you conducted, the countless others that you've seen, you've never done anything or used any techniques that you even consider to be sort of borderline inappropriate?

MR. RINGEL:  Object to the form and foundation.

MR. COOPER:  Same.

A.  I've answered no.

Q.  (By Mr. Fisher)  Okay.  And, again, that's including your interrogation of Lorenzo Montoya?

A.  No.  The answer is no.

Q.  Okay.

A.  I did not do anything improper --

Q.  Okay.

A.  -- in regards to the interview.

Q.  As someone who's so experienced in conducting forensic interviews and has so much training about it, done thousands of them, what are some inappropriate behaviors that a detective should not engage in in an interview or interrogation?

MR. COOPER:  Objection to form.

**101**

MR. RINGEL:  Join.

A.  Striking a suspect physically.

Q.  (By Mr. Fisher)  Okay.  You shouldn't hit a suspect?

A.  Yeah.

Q.  What else?

A.  I don't know.  I can't think off the top of my head.  What would be inappropriate?

Q.  There is really nothing else, just hitting a guy is the only thing you shouldn't do?

A.  Well, I'm sure there's something else, but I can't list them.  I can't make a list.

Q.  So that's the only one you can think of is avoid striking a suspect?

MR. COOPER:  Objection to form.

A.  Yeah.

Q.  (By Mr. Fisher)  So pretty much everything else is okay?

A.  No, I didn't say that.

Q.  Okay.  In addition to your training and experience in conducting forensic interviews, would you also say that your life experience was a significant factor in teaching you how to conduct forensic interviews?

A.  Sure.  And that's what I'd say.  It starts

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**102**

when you're a kid, learning how to talk to people or talk to your parents.

Q.  Talk to friends?

A.  Friends.

Q.  Teachers?

A.  Teachers.

Q.  Clergy?

A.  Clergy.

Q.  And those are all life experiences that have made you -- that have helped you learn how to talk to people in forensic interviews?

A.  Correct.

Q.  Okay.  Obviously those experiences are not something that are part of your training at DPD, right?

A.  Correct.

Q.  What did you learn from those folks -- teachers, friends, parents, clergy -- on how to conduct forensic interviews?

A.  A lot.  I'm not going to name specifically or list specifically.  When you talk to your parents about something, you should learn something.  You know, you should learn their values, their morals, what's right from wrong.  Same with clergy.  Teachers, their experiences.  Other officers.  People -- when you become a patrol officer for the Denver Police

**103**

Department, you're on the street for four or five years and you learn when you go to a call to interview and interrogate.

Q.  As someone who is an expert in interview and interrogation techniques, what would you say the goal of an interrogation of a suspect is?

MR. COOPER:  Object to form.

A.  There's a variety of them.  To obtain information, to obtain facts about the case.

Q.  (By Mr. Fisher)  Is that it?

A.  To see if -- if the person is a suspect you're interviewing, see if he did it.

Q.  And not only to see if he did it, but to get him to make admissions that you could use as prosecution, right?

A.  I want to know what he did.  I want him to say he did it.

Q.  Right.  But is that part of the goal of the interrogation, is to have the suspect admit his involvement?

A.  It could be one facet of it, yes.

Q.  That's one of the things you're going in -- if you think the person is guilty when you're interrogating, you want them to admit that in the interrogation, right?

**104**

A.  Correct.  And I want them to give me information about the case, about facts that I don't know about the case.

Q.  Or corroborate facts that you might know about the case already?

A.  Sometimes.

Q.  Is it different between an interrogation -- do you differentiate between an interrogation and an interview?

A.  Oh, there are schools of thought that say yes.  They should be separate.  And I somewhat agree to that.  But I think it's all the same.  There's parts of interview and interrogation in the totality of all interviews.

Q.  Is that something -- did you learn about that in the Reid school -- do you know what I'm talking about -- where they say the beginning, first 30, 45 minutes is the interview where you're trying to gather information?  Have you learned what I'm talking about?

A.  That's correct.  That's one of their philosophies is that you interview the suspect, you know, "Where did you go to school?"  "Who's your relatives?"  "What do you like?"  "What do you dislike?"  I don't know, there's a variety of questions.  There is no set script for that.  And then

**105**

they suggest to physically leave the room and then take a break, and then come back in and start the interrogation about the crime itself.

I kind of subscribe to that philosophy, but it's not foolproof, and it's not every case.  Some cases don't lend themself to that.

Q.  They also teach in Reid, and maybe in other classes, that during that initial interview phase you should be conducting a behavioral analysis of the suspect?

Do you know what I'm talking about?

A.  That's just common sense.

Q.  But do you know what I'm talking about, that training?

A.  You mean facial expressions and body movement and stuff?

Q.  Yeah.

A.  Yeah.  Don Rabon talks about nonverbal communication.  A lot of seminars in regard to interview and interrogation talk about that.  Posture.  How the suspect reacts to certain questions.  Yeah, that's just common human nature.

Q.  And so that's something that you do when you're conducting interviews, you look at body language, tone of voice, et cetera?

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**106**

A.  I do.

Q.  And you're trying to look for cues of the person as being deceptive or being truthful, right?

A.  Well, they teach that.  Sometimes it's true, sometimes it's not.  But, yeah, I've had suspects who have interviewed with me and all the sudden they drop their head, look down in a mournful position, and then immediately confess.  So that was the truth.  That's the way they teach the philosophy, that that's kind of what happens.  And that was true, but it doesn't always happen that way.

Q.  Right.  So it's something that you were trained to look for, but you don't feel it's -- obviously it's not foolproof?

A.  Correct.  Like Lorenzo Montoya.  When I went back in to talk to him about a polygraph, he confessed.

Q.  Hmm.  We'll get to that.

What about arms crossed?  What does that body language relate to you?

A.  To me it states -- and I don't really know this in the school -- it states that you're just not open to talking to the person.  You're not -- you're not really open.  I mean, people who just sit like you're sitting is open talking to me.  Just open arms, open -- sometimes open legs.  They're open to questions

**107**

and talking.

When you're closed up like this, it reflects that you don't -- you really don't want to talk.  When you turn away, you really want -- don't want to look at the guy and your avoidance, you know, that kind of stuff.  That's common sense.

Q.  Is that something you were taught and is also common sense, both things?

A.  It's common sense; it's experience.  They say that in schools.  But it doesn't always -- there is no script, there is no 100 percent perfect reading of a person.

Q.  Right.  Like if somebody, for instance, is looking away from you -- looking away from you, refuses to look you in the face -- does that necessarily mean that they're guilty and they don't want to talk to you, or could it mean a multitude of different things?

A.  It could mean a multitude of different things.  What it reflects to me immediately is that he doesn't want to face the questions that I'm asking.  He doesn't want to talk to me.

Q.  Could it be that he's just scared of you, independent of whatever crime you're asking him about?

A.  Could be.  But I don't know many people scared of me.

**108**

Q.  Okay.  Could it be when you see somebody's body language and they're not looking at you, could they have some kind of autism or something?  Is that ever something you consider?

MR. RINGEL:  Object to the form and foundation.

MR. COOPER:  Same objection.

Q.  (By Mr. Fisher)  Do you know what that is?

A.  I know what autism is.  My nephew has it.

Q.  Okay.  Could that be a factor?

A.  He --

Q.  I'm not talking about Lorenzo.

A.  Okay.  My nephew displays those attributes, not all the time.  But when I sing to him, he doesn't like singing, so he looks away from me.

Q.  Okay.

A.  So I think that's part of his autism.  He's high-functioning autism.  But I didn't -- I don't know about autism, really, I haven't studied it or know much about it.

Q.  What about crying?  What does it mean to you if the person starts off sobbing during the interview?

A.  Could mean a lot of things.  Could mean they're guilty, they're worried about going to prison.  As Mr. Montoya said, he's scared of going to prison.  I

**109**

was standing right next to him.  He didn't say, "I'm scared of you, Detective."  "I'm scared of going to prison."  And he -- I believe Mr. Montoya, from the beginning, thought about what's going to happen to me?  What am I going to do?

Q.  I'm talking about in general.  When someone starts sobbing uncontrollably for five minutes in an interview, what would that mean to you?

MR. COOPER:  Objection to form.

MR. RINGEL:  Join.

A.  It could mean a lot of things.  I -- my analysis would be they're upset -- they're upset about something.

Q.  (By Mr. Fisher)  Sure.  It could be upset about having some involvement in the crime, as one possibility, right?

A.  Correct.

Q.  Another possibility is could be upset at the way they're being treated in the interrogation, perhaps?

MR. COOPER:  Objection to form.

Q.  (By Mr. Fisher)  Is that a possibility?

A.  Some people, yes.

Q.  Could be they're just stressed out over being in a police headquarters, not liking the situation

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**110**

they're in?

A.  Could be.

Q.  **Could be they're just an emotional person?**

A.  Could be.

Q.  **When you do an interrogation of a suspect -- because, you know, you could classify it as an interrogation of a suspect -- does that mean that you believe that person is guilty of something at that point?**

MR. COOPER:  Objection to form.

A.  Oh, as I stated, interview and interrogation are interchangeable during the whole totality of the interview.  So if I'm asking someone point blank, "Did you do this?" "Did you kill Emily Johnson?" I would think, yes, I would consider them a suspect and I want to know if they did or not.

But it's also intertwined with interview.

Q.  **When Lorenzo Montoya first came in to be interviewed, he was not a suspect in the beginning?**

A.  I believe we were going to interview him concerning the stolen car.

Q.  **Right.**

A.  Which common sense will tell you that possibly if the victim's car is stolen and he's inside the car, he could have had something to do with the

**111**

murder, but I don't know.  But we're going to interview him about the car and his participation in that stolen car and the gentlemen that were with him.

Q.  **In your trial testimony that -- when did you review that?**

A.  Sunday.  Or Friday.  Last Friday.

Q.  **So less than a week ago?**

A.  Yeah.

Q.  **You said in that trial testimony, in response to the DA's question, "When Lorenzo first came in, he wasn't considered a suspect."  Do you recall that?**

A.  I don't recall it.  Do you have a cite?

Q.  **I could find it during a break.**

MS. BYRIALSEN:  We could take a lunch break right now?

MR. FISHER:  No, not quite yet.

Q.  **(By Mr. Fisher)  Does that sound right to you?**

A.  Was it an attorney, the DA or somebody, asked me if I thought Lorenzo Montoya was a suspect?

Q.  **When he first came in you said, no, he was just a witness at that point.**

A.  Well, that's what I just told you.  I believe we were questioning him about the stolen car, and we wanted to know what he knew about how the car was

**112**

stolen and how he got in it and the other characters that were in the car.  So that would be a witness to that.

Q.  **Right.**

A.  Or a suspect for stealing the car.

Q.  **Right.  And the information you had before you interviewed Lorenzo was that Nick said Freddie's little brother was also in the car the following day?**

A.  You know, I don't recall that.

Q.  **Okay.  Do you --**

A.  Whether I knew that or not.

Q.  **Okay.  Do you recall any information at that point when you interviewed Lorenzo that was showing he was involved in a homicide?  Like before --**

A.  At the beginning of the interview with Lorenzo Montoya?

Q.  **Before you interviewed him, before you interviewed him, did you have any information that he was involved in the homicide?**

A.  I don't believe so.

Q.  **Okay.  So if he would have, in the beginning of the interrogation, said "I would like a lawyer," he would have been able to go home that night and not been arrested; fair to say?**

A.  That would be determined by other people than

**113**

me, but I would assume -- you know, you know what "assume" means -- that he would get to go home.

Q.  **Okay.  As someone who's an expert in forensic interviews, can you tell us what confirmation bias means as it relates to forensic interviews?**

A.  Confrontation bias?

Q.  **Confirmation bias.**

A.  Confirmation bias?

MR. COOPER:  Objection; foundation.

A.  I do not know.

Q.  **(By Mr. Fisher) Okay.  As an expert in forensic interviewing and interrogation, are you aware of the occurrence of false confessions?**

A.  No.

Q.  **Okay.  You don't even know that they can occur?**

A.  Well, yes, I know that they possibly happen sometimes, but I thought you meant the frequency of the occurrence -- the number is 97 percent, 5 percent, whatever -- no, I don't know that.  But, yeah, I know false confessions could happen.

Q.  **That's the next question I was going to ask you.  Were you ever given any training at DPD or any of the classes sanctioned by DPD talking about the percentages of occurrence of false confessions?**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**114**

A.  No.  They may have talked about false confessions during the seminars I attended, but I don't recall percentages or numbers or frequency.

Q.  What did you learn from DPD about what an investigator should do to avoid eliciting a false confession?

MR. COOPER:  Objection to form; foundation.

A.  Well, it's -- the policy of the DPD is to do the job correct.  I don't want a false confession in an interview.  I once gave a polygraph to a young man who 65 times said he did it, and then I would -- every time he said he did it would you say, "Are you sure?  Give me some details."  And he couldn't give me details and then said "I didn't do it."  And we could have stopped there and said, "Well, you confessed."  He didn't -- he was outside -- I believe he was outside when the home invasion happened and the murder happened and helped flee with the suspects, but he said he was right inside.  And I'm not going to accept that.  I didn't accept that during the interview.  I just was like -- he just -- it was just too confusing because he could not give me any details.

Q.  So try to listen to my question specifically and answer that one, if you can.

A.  I will.

**115**

Q.  What training did you receive through DPD or sanctioned by DPD that an investigator should or should not do to avoid obtaining a false confession?

MR. COOPER:  Object to form.

MR. RINGEL:  Object to the form.

A.  The processes of not obtaining a false confession?

Q.  (By Mr. Fisher)  Right.  Like what was your training of these are the things an investigator should be careful of to avoid a false confession?

A.  I don't recall any training on that.

THE REPORTER:  I'm sorry, did you object?

MR. COOPER:  Same objection.

MR. FISHER:  Okay.  Just -- did you get that answer?

A.  I don't recall any training on that.

Q.  (By Mr. Fisher)  What kind of training did you get from DPD about -- well, let's start with defining it.  Do you know what contamination is in regards to an interview?  A forensic interview?

A.  No.

Q.  Do you have any idea what I'm talking about?

A.  (The deponent shook his head in the negative.)

MS. BYRIALSEN:  Can we just have a minute?

**116**

Are you ready for lunch?

THE REPORTER:  Whenever is fine.

Q.  (By Mr. Fisher)  So you don't know what that is in regards to contamination?  You don't know what that is in regards to a forensic interview?

A.  I do not.  I know what the word "contamination" means, I know if it's applied to a crime scene.  But I do not know that term in regards to forensic interviews.

Q.  Okay.  So you were never trained in any of your DPD-sanctioned trainings to avoid contamination in an interrogation or interview?

A.  Well, if you define it for me.  Maybe if you can explain it to me without using the word "contamination."

Q.  I don't want to define for you how you were trained to do something or not, either you were or you weren't.

MR. COOPER:  Objection to form.

A.  Well, you're not defining that; you're defining the word "contamination" in a forensic interview.

Q.  (By Mr. Fisher)  If you don't know what it is, probably you were never trained.

MR. COOPER:  Objection.

**117**

A.  I don't know.

Q.  (By Mr. Fisher)  Okay.  Were you ever -- in any of your DPD-sanctioned training on interviews or interrogations, were you ever taught to avoid physical and mental interrogation of a suspect?

A.  Physical?

Q.  Yeah.  Either physical or mental intimidation of a suspect.

A.  I know it's inappropriate to slap somebody or push them around or be physical with them in an interview.

Q.  But, again --

A.  That's inappropriate.  Mental, no.

Q.  You were never taught to avoid mental intimidation of a suspect?

A.  No.

Q.  Were you ever taught in any of your DPD training that you should take extra care with vulnerable suspects?

MR. COOPER:  Objection to form.

A.  Well, through my experience and tenure and doing forensic interviews --

Q.  (By Mr. Fisher)  Mr. Vigil, you just -- I want you to answer my question about the training.  If that's what you were doing, you can continue.  But I

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**118**

don't want to ask you about what you learned on the job, I'm asking you about your training. DPD-sanctioned training.

A.  Yeah, I believe a supervisor or someone who I worked for, we discussed probably that, you know, if somebody does not have the mental capacity, you should not interview them.

Q.  What do you mean by mental --

A.  A diminished mental capacity -- I'm sorry.  A diminished mental capacity.  And, you know, that would be improper.

And I -- you know, I know we've talked amongst ourselves and with our supervisors in regards to that.

Q.  So that's not something you got in any of the DPD-sanctioned training, it's something you've heard from your supervisors?

A.  And I've discussed it with district attorneys and stuff.  You know, I based -- yeah, correct.

Q.  Okay.  And other than somebody with -- what did you call it, mental what?

A.  Diminished.

Q.  Diminished mental capacity?

A.  I guess so.  That's my words.

Q.  Okay.

**119**

A.  Just like interviewing somebody when they were drunk.  You don't do that either.

Q.  So it's your understanding that you shouldn't interview people when they're drunk?

A.  Correct.

Q.  Okay.  So besides somebody with a diminished mental capacity, what else was your training -- what else did your training teach -- who else is a vulnerable suspect that should elicit extra care in doing an interrogation?

MR. COOPER:  Objection to form.

A.  I can't recall.

Q.  (By Mr. Fisher)  You can't recall?

A.  Can't recall at this point.

Q.  Okay.  So do you remember any training about children should be given special care in interrogation versus adults?

A.  No.

Q.  Any policies about that from DPD or DPD homicide?

MR. COOPER:  Objection to form and foundation.

A.  The policies in regards to interviewing juveniles is the policy goes hand in hand with the Miranda advisement, that a guardian or parent be

**120**

present during the interview.

Q.  (By Mr. Fisher)  So that's the one special consideration for a minor is that they should have the -- they need to have their parent present?

A.  Correct.  And if the minor is under 10 years old, I don't believe they're culpable for crimes such as murder, so they should not be interviewed as a suspect.

Q.  (By Mr. Fisher)  So according to your training from DPD, if someone is older than 10 and younger than 18, they need to have a parent or guardian present during the interview, right?

A.  Yes.

Q.  But there's no other special considerations that should be given --

A.  Not that I recall.

Q.  -- as a matter of course?

A.  Not that I recall.

Q.  Okay.  What if you're made aware of somebody having a low IQ?  Is that something that you should give that person extra -- treat that person differently in an interrogation?

A.  I think you would have to evaluate their responses, their actions, their understanding of the questions during the interview.  And if they were, what

**121**

did you call it, mental what?

Q.  I said if somebody has a low IQ.

A.  Oh, low IQ?  Not necessarily, no.  But I thought you said mental retardation.  I don't think you should interview them.

Q.  You shouldn't interview somebody who is mentally retarded?

A.  Correct.  Diminished mental capacity.

Q.  What about somebody with learning disabilities, were you ever taught or trained that --

A.  No.  No training.

Q.  So no training that you should ever take special care with somebody with learning disabilities?

A.  No.

Q.  Treat them the same as any other suspect?

A.  No, we would evaluate the suspect.  Like I said, those factors that I named, whether they're comprehension and their understanding of what's going on.

Q.  What was the training and policy if you don't know whether or not the suspect has some kind of diminished mental state or difficulty understanding?  If you're not aware of that, have not been made aware of it, what was the policy on whether or not you're supposed to ask about it?

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**122**

MR. COOPER:  Object to the form; foundation.

A.  There is no policy.  But I have an opinion about it.

Q.  (By Mr. Fisher)  Sure.  Give me your opinion first.

A.  I would think if somebody didn't understand what was going on or was -- had a learning problem, they would reflect it to us.  Especially with their mother in the room, maybe that would be made aware to detectives.

Q.  Well, I'm not even necessarily talking about a child.  I'm just talking about anybody.

A.  Yeah.

Q.  And my question really is, again, about what is the -- well, you were giving your own personal opinion as opposed to the training or the policy, right?

A.  Correct.

Q.  So there was no -- to your understanding, there wasn't any training or policy about if you don't know whether the person has some kind of diminished mental capacity, you shouldn't ask?

MR. COOPER:  Objection; form.

A.  I don't believe so.  I don't recall.

Q.  (By Mr. Fisher)  Okay.  Do you know what the

**123**

DPD policies are?  Like not do you know all of them; I'm saying in general.  Can you tell me what it is? What is DPD policy?

MR. COOPER:  Objection; form.

A.  That's a broad question.

Q.  (By Mr. Fisher)  There's a -- well, let me help you out a little bit.  There's a policy manual, right?

A.  Operations manual, yes.

Q.  Right.  Operations manual.  And that has in it all of Denver PD's policies, right?

A.  Yes.  It's constantly changing.

Q.  Yeah.  And it gets updated from time to time, right?

A.  Correct.

Q.  And you, as an officer, are given a copy of that when you first start?

A.  Yes.

Q.  And as updates come along, you're supposed to be made aware of those updates, right?

A.  Yes.

Q.  And you're -- it's part of your job to be knowledgeable of what the policies are, correct?

A.  Yes.  But they change on how they process those and give us updates.  It was a big book, blue

**124**

book, when I came on.  And like you're holding a piece of paper; and when the changes come, you would replace a section.  Then it went to the computer.  Now it's on the computer in a gigantic file.  And I don't believe the officer does the changes himself; they're just automatically made.  I don't believe they publish the changes -- they may have -- publish the changes as they come about.

MR. FISHER:  Okay.  I'm going to hand you an exhibit.  If we could have this one marked.  It will be 3?

THE REPORTER:  It will be 3.

MR. FISHER:  It is Bates-stamped Denver 8168 through 8169.

I'll put it up here on the screen here in a minute.  I'll try to, anyway.

(Deposition Exhibit 3 was marked for identification.)

MR. FISHER:  And I'll just try to share this exhibit on my computer screen so you all can see it. And you can take a look at that.  It's a two-sided document.  I highlighted something on the second side. But feel free to peruse that while I try to share this thing.  Okay?

THE DEPONENT:  Correct.

**125**

MR. FISHER:  So what I'm sharing now is just the second -- the top of the second page, which is highlighted on it.  It's a two-page document.

Q.  (By Mr. Fisher)  And so, Mr. Vigil, I'll represent to you that this is a document that I got from Denver during this litigation, and they represented to me that this is part of the 1999 operations manual from DPD.  And you'll see this section in general is talking about confessions, right?

A.  Correct.

Q.  And I'm just going to direct your attention to the second page where it's highlighted.

Do you see where it says, "If it is known during the taking of a formal statement" -- do you see that part?

A.  Correct.

Q.  -- "that any person being questioned is suffering from a definite physical or mental impairment, then ask that person if she -- he or she feels physically and mentally able to give a statement."

Do you see that?

A.  Correct.

Q.  But then the next thing it says in Denver policy from '99 is, "Do not ask this question relevant

**126**

to impairment generally during an interrogation, but only when you have definite knowledge of such physical or mental impairment."  And then you see the next thing, "If there is, in fact, no obvious impairment, then asking the question could constitute an invitation to the suspect to set up a possible defense for the commission of the act or an excuse for making the statement."

Do you see that?

A.  Correct.

Q.  So were you aware, before I just handed it to you, that that was actually part of Denver's policy, is that you should avoid asking the question unless you know for certain about a person's mental impairment?

MR. COOPER:  Objection to the form.

MR. RINGEL:  Object to the form and foundation.

A.  No.

Q.  (By Mr. Fisher) No, you --

A.  I was not aware.

Q.  Okay.  I can take that document back.

Thank you.

Besides this case, this Montoya case, have you ever been sued before?

A.  No.

**127**

Q.  In 2006 I see a complaint filed with the federal district court on behalf of Dante Grissom.  He named you as a defendant, along with some other DPD officers, for a case that happened in 1999.

You don't recall being sued about that?

A.  No.

Q.  Do you remember Dante Grissom?  He got convicted, got a life sentence.

A.  I recognize the name, but I don't remember the facts of the case or the case itself.

Q.  You remember his conviction got overturned six years later?

A.  I said I don't remember anything.

Q.  Okay.  This -- I'll represent to you that his criminal case happened in 1999.  And in his federal complaint he filed with the federal district court, he said that you slammed him against the wall several times because he didn't want to speak to you, and that he was also left in an interrogation room for hours and was deprived of food.

Is this ringing a bell to you at all?

A.  I think I know who he is.  He made a complaint to the Department, but I don't believe there was a lawsuit.  I know I was never made aware of a lawsuit.

**128**

Q.  Okay.  Did the Department ever question you about those allegations?  IA or anybody?

A.  No.

Q.  Okay.  Me bringing up those little specifics about the case, you still can't remember anything about it?

A.  I can't recall whether he was a witness or a suspect.  He had a bad back, if I recall, and complained about sitting in the interview room for a long time, so we let him stand up.  But I don't remember the facts.

Q.  Do you remember slamming against --

A.  Did I not slam him against the wall.

Q.  Okay.  Do you know if Martinez, Priest, or Schneider were involved in that criminal investigation?

A.  I don't know who was involved in that, but we did not physically abuse him at all.  Nobody did.

Q.  Did you mentally abuse him at all?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Join.

Q.  (By Mr. Fisher) I'm just asking because you carved out in your answer "We didn't physically abuse him at all," so I'm just asking.

A.  No.

**129**

Q.  Okay.  Aside from Dante Grissom that I just mentioned, did anyone -- forget about a lawsuit for a second -- are you aware of anyone ever accusing you of treating them improperly during an interrogation?

A.  No.

Q.  Are you familiar with how -- I think you pronounce it Hal -- I think you pronounce it Hebert?

A.  Oh, Hal Hebert?

Q.  Yeah.  Do you remember that case?

A.  I do.

Q.  Do you remember --

MR. RINGEL:  David, can you take the exhibit off?

MR. FISHER:  Sure.

Q.  (By Mr. Fisher)  What do you remember about it?

MR. COOPER:  I'm sorry, what was the name?  Hal -- what was the last name?

THE DEPONENT:  Hebert.  H-e-b-e-r-t.

MR. FISHER:  I think it's H-a-b-e-r-t.

THE DEPONENT:  I think it's H-e.

MR. COOPER:  I just wanted to hear it.

Q.  (By Mr. Fisher)  What can you tell us about that case?

A.  I can tell you volumes.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**130**

Q.  Okay.  What can you -- are you aware of the -- when did that case happen?  2006 or so, somewhere around there?

A.  Oh -- yeah, I can't recall the exact date.

Q.  Do you -- are you familiar with the allegations that Hal -- I won't say his last name since there's some controversy on how to pronounce it here -- are you familiar with the allegations that Hal made against you since he's been convicted?

A.  He has written articles for newspapers, he has muddied my name everywhere he can.  He is -- currently I believe the case is being reviewed for a reconsideration by an outside source.  He is just -- he said every dirty thing about me in the book.

Q.  Do you know specifically what he said about you?  What dirty things?

A.  Oh, he said I didn't do a thorough investigation because I missed some shoes in Cherry Creek Shopping Center, which I believe he planted.  I never really did interview him because he was one of the gentlemen that I cite as being drunk.  He was drunker than drunk the night we took him downtown.  And he said -- I found the wallet at 40th and York; he says I planted it there.  He says I took her rings off her body, which I never did have any doings with her body

**131**

until the autopsy.  He says that -- I don't know, he -- there's a multitude of things.  He calls me fat every time he sees me.  He's just a jerk.  But he's in prison.

Q.  Okay.  Do you know that he says about you that when he was at the police station about to be interrogated, that you came in and said, "Okay, you lousy son of a bitch, if you don't cooperate with me, I'll make you ride the needle"?

A.  "Ride the needle"?  I didn't say that to him.  I don't think the interview was very long.  I don't think we got past Miranda, if we did.  He was drunker than a skunk.

Q.  He said you were dressed in an orange window plaid suit and an oversized bow tie with white polka dots.

A.  That's incorrect.  I don't own an orange windowpane suit.  I do wear bow ties.

Q.  Okay.

A.  And I have some polka dot ones.

Q.  And you used to wear bow ties back then, or your whole time --

A.  Yeah -- well, yeah.  A good many years.

Q.  And at one point you affixed him to a steel bench in a dark room for 25 minutes to help him, quote,

**132**

unquote, think?

Do you know that he said that about you?

A.  No.  When he was brought down, they placed him in the holding cell, which is a metal bench with handcuffs on.  The officers do that.  I don't know how long he was there.

Q.  So you never said to him, "I'm going to put you here to help you think"?

A.  No.

Q.  He says that you kicked him in the shins and slapped him in the face and ground a cigarette out on his arm.

A.  Oh, that is -- no.  No.

Q.  No what?

A.  I did not do those things.

Q.  Okay.  He said that you dispensed a lot of information to the media in that case.  Is that true?

A.  I proceeded not to talk to the media about that.  The PIO talks to the media and maybe command, but I have no reason to talk to the media.

Q.  Okay.  So you did not speak to the media about that case at all?

A.  No.

Q.  Okay.  So if there was --

A.  It's not my job.

**133**

Q.  If there was an article quoting you, that would be a misquote, I imagine?

A.  I don't believe I was ever interviewed by the media in regards to that case.  I'm sure I wasn't.

Q.  Okay.  Do you remember that Mr. -- Hal got out of jail during the pendency of that prosecution at one point?  He was out on bail or something?

A.  Correct.  Correct.

Q.  And he said that you then went to a witness's house, gave him a business card and a letter saying that they might be in danger from him; is that correct?

A.  I don't recall ever doing that, no.  He was fleeing to Costa Rica, and the bondsman called me.  And I sent some officers over there and they arrested him.

Q.  Does your business card have your name on the front of it and then on the back it says, "We work for God," or did it at that time?

A.  At one time, it did.

Q.  Okay.  And you don't recall hand-delivering a letter to a Ms. Wilburn?

A.  Wilburn?  No.

Q.  That said, "Ms. Wilburn, this letter is in regards to your safety and events concerning the release of Hal Hebert.  I received some information that may be pertinent to your immediate safety."

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**134**

A.  No.

Q.  "I had received information from a source at the county jail in regards to the safety of witnesses in the Carol Hebert case.  The information received was that the defendant, Hal Hebert, was to perform 'the Listerine effect' on a witness, possibly 'Cristie.'  The facts of the case are that the victim, Carol, was murdered by the use of a Listerine bottle as a silencer.  I believe that 'the Listerine effect' refers to shooting someone..."

A.  That's the facts of the case.  Why would I reveal that in a letter to someone, a witness in a case?  That's incorrect.  I never did that.  Whether he fabricated that letter and put my card on it, I don't know, but I never did that.

Q.  So if there was a letter like that and had your signature at the bottom of it, that would be fabricated?

A.  I guess so.  I never did it.

Q.  And this letter that I'm looking at has your email address as VigilM@ci.denver.co.us.

A.  Yeah.  That's the one I tried to tell you.

Q.  Okay.

MR. FISHER:  I had a paper copy of this somewhere.

**135**

MS. BYRIALSEN:  What is it?

MR. FISHER:  It's a 13-page --

Q.  (By Mr. Fisher)  I'm going to -- at the break I'll try to find this and give everybody a copy of it.  But I'm just going to show you a copy of this letter right here and ask you whether this is your signature, your information, and where it says, "Hand-delivered, January 9, 2002," if that's your handwriting.

A.  Hand-delivered?  Why would I write that?

THE REPORTER:  Do you want to mark it as an exhibit once you have a copy?

MR. FISHER:  Yeah.

(Deposition Exhibit 4 was introduced for identification.)

A.  "Hand-delivered" is not my writing.

Q.  (By Mr. Fisher)  Not your handwriting?

A.  It looks like my signature.

Q.  Okay.

A.  But I signed a lot of things in that case.

Q.  Okay.

A.  Cristie Wilburn.  I don't even know who that is.

MR. COOPER:  Is this one Bates-stamped, just so I --

MR. FISHER:  No.  This is just something I

**136**

found.  It's publicly available.  It wasn't anything that was discovered.

MR. COOPER:  Okay.  It was on --

MS. BYRIALSEN:  But we will send it to you.

MR. COOPER:  I appreciate that.

MS. BYRIALSEN:  We can print it at the lunch break and send you a copy.

A.  I don't ever recall him threating to use the same way we believe the victim was killed on somebody else.

Q.  (By Mr. Fisher)  Okay.  So you don't recall sending that letter, hand-delivering that letter?

A.  No.  No.

Q.  Okay.  Do you recall anybody else besides the people I've mentioned now that over the years have made any accusation that you treated them improperly during an interrogation?

A.  No.

Q.  Again, Frank Vigil, a case from Jeffco, you don't recall -- apparently you were brought in from Denver to interrogate him in a Jeffco case?

A.  I was not brought in from Denver to interrogate somebody on a Jeffco case.

Q.  Okay.

A.  I worked with Mike Felsoci, who later became

**137**

a Denver officer, and I can't think of the female's name, on a cold case up there.  But I -- why would they bring me in?

Q.  I don't know.

A.  No.  That's stupid.

Q.  That just never happened, to your --

A.  No, no, no.

Q.  Okay.  Do you remember a guy named Al Yousif?  He was a Saudi Arabian guy.  He was charged with homicide in 2001.

A.  Oh, we had one case where -- it wasn't my case, but a Saudi -- two guys killed this guy and then used his credit cards.  And I may have done interviews on that case, but I don't --

Q.  Martinez and Priest did an interview of Al Yousif and then you came in and did an interview with him, and then he said he didn't -- he wanted a lawyer once you came in and interviewed him.  Do you remember this?  There was a later Miranda issue in court, whether or not he understood his rights because of his lack of speaking of English.

A.  I don't recall that.  I could have interviewed him.  But, as you stated, it was just five seconds.  But, I know we had a case with some Saudi Arabian -- persons who lived in Saudi Arabia, and

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**138**

they -- two of them fled the country, or three of them fled the country, as a matter of fact.

MR. FISHER: Okay. I think maybe this is a good time for a break. How long -- we can go off the record.

(A discussion was held off the record.)

(The lunch recess was taken from 1:20 to 1:57 p.m.)

Q. (By Mr. Fisher) Mr. Vigil, you know you're still under oath, right?

A. Yes.

Q. Okay. Did you ever get -- in any of your DPD-sanctioned training, did you ever get taught that you should not lie to a suspect that you're interrogating?

A. No.

Q. Did you get taught in your DPD-sanctioned training that lying to suspects is okay to do?

A. No.

Q. It just never came up one way or the other?

A. No, I don't believe so in training.

Q. Did you ever get taught in your DPD training that you should avoid using aggressive tones when you're interrogating somebody?

A. Say that again, please.

**139**

Q. Did you ever get taught in your DPD-sanctioned training that you should avoid using aggressive tones while interrogating somebody?

A. No.

Q. Did you ever get taught in your DPD-sanctioned training that you should avoid using foul language or curses when you're interrogating somebody?

A. No.

Q. Did you ever get taught in your DPD-sanctioned training that you should avoid crowding a suspect, getting in his face for a prolonged period of time?

A. No.

Q. Did you ever get taught in your DPD-sanctioned training that there should be any time limit in an interrogation?

A. No.

Q. Did you ever get taught that there should be any time limit by which you should let the suspect take a break?

A. Taught, no.

Q. Okay. In your report in that O'Connell versus Alejo case you opined that it is not inappropriate for an investigator to use leading

**140**

questions in an interrogation.

A. Correct.

Q. Do you stand by that opinion?

A. Yes.

Q. So I'm just kind -- I was just phrasing it the way you did, but just to do it not as a double negative. You think it is appropriate for an interrogator to use leading questions in an interrogation?

A. I think it can be used. I don't think it's inappropriate.

Q. Okay. Do you even believe --

A. Barring juveniles -- like I said, juvenile victims.

Q. Okay. So when you have like a juvenile victim that you described before, like a --

A. Child abuse.

Q. -- child abuse case where the person is like under 10 years old?

A. Well, really, 10 isn't a factor.

Q. Okay. But with interrogating suspects, you were never trained or taught by DPD that you should avoid using leading questions?

A. No.

Q. Okay. So, I mean, you watched your Montoya

**141**

interrogation recently, right?

A. Correct.

Q. You used a lot of leading questions in that interrogation, correct?

A. I wouldn't say "a lot," but maybe so.

Q. This wasn't the only case you used leading questions in when you did interrogations, right?

A. Probably not.

Q. I'm in the process of getting or trying to get a bunch of different interrogation tapes from many of your cases in and around that time. I imagine we'll see leading questions peppered throughout those interviews?

MR. COOPER: Objection to form; foundation.

A. I couldn't tell you.

Q. (By Mr. Fisher) You can't say?

A. I can't tell you what you'll find.

Q. Okay. But you never were trained or taught that leading questions should be avoided? So it's not like that's something you actively avoided in interrogations, I should say?

A. No.

Q. So you were never told by supervisors or command staff that there's any -- withdraw.

Did you ever get any criticism after doing an

Deposition of:  Martin E. Vigil – May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**142**

interrogation by a supervisor or somebody saying, "Vigil, you asked way too many leading questions in that interview"?

A. No.

Q. Never any criticism about leading questions?

A. Correct.

Q. Never got in trouble with IA for asking leading questions, or something like that?

A. Internal affairs, no.

Q. Okay. I'm going to show you --

MR. FISHER: I don't know what exhibit number we're up to here.

THE REPORTER: Number 5.

MR. FISHER: So this will be Number 5.

(Deposition Exhibit 5 was marked for identification.)

MR. FISHER: So let me just put it up on the screen. But while I'm doing that, you can take a look at this document.

For the record, it's Bates-stamped Denver 8163. It's a one-page document. And I'll represent to everybody here, this is something I obtained from Denver in discovery, and it is part of the 1999 Operations Manual from DPD.

And I'll just put it up on the screen while

**143**

you read it to yourself, Mr. Vigil.

THE DEPONENT: I've read the highlighted portion.

MR. FISHER: Okay. Well, keep reading while I'm -- you can read the whole thing, if you want, because it will take me a minute to put this up on the screen, so...

(The deponent perused the exhibit.)

MR. FISHER: Okay. I'll put it up here in a second. No, that's not it. Okay. Yeah, I've got it up there.

Do you guys see it now on the computer? Andrew, do you see it?

MR. RINGEL: Yeah, I can see it. Thank you.

Q. (By Mr. Fisher) Okay. So, again, I'm going to represent to you that this was part of the 1999 Denver Police Department Operations Manual.

Can you read to us what paragraph "d" says here?

A. "Officers shall conduct and take statements from all witnesses and shall interrogate the suspect for the purpose of obtaining a confession or admission. In a statement taken -- in a statement from the suspect, leading questions should be avoided."

Q. So just stop there a second. Let me start

**144**

with the first sentence.

So this part of the policy, it says, "Officers shall contact and take statements from all witnesses and shall" -- specifically about the suspect it says, "shall interrogate the suspect for the purpose of obtaining a confession or admission."

Is that your understanding of what the policy of DPD was, that you should interrogate a suspect for the purpose of obtaining a confession or admission?

MR. RINGEL: Object to form and foundation.

MR. COOPER: Same objection.

A. That would be my training and experience and opinion. You know, I go to court on these cases and I work with the DA's office on these cases, and that is their opinions, too, I believe, shared. I'm not aware of this section myself.

Q. (By Mr. Fisher) Okay. So this next part, "In a statement from a suspect, leading questions should be avoided."

That may be here in the written policy, but that's not something you were ever trained on, correct?

MR. COOPER: Objection to form.

MR. RINGEL: Object to the form and foundation.

A. Correct.

**145**

Q. (By Mr. Fisher) Okay. I can take that document back from you now. Thank you.

And as we said earlier, that's not something you ever got in trouble for doing, using leading questions in the interrogation, right?

A. No. It said "shall be avoided."

MR. RINGEL: You can take it down if you're done with it, David.

MR. FISHER: Okay. Thanks.

Q. (By Mr. Fisher) Regarding your sanctioned training by DPD around interrogations and interviewing suspects, were you ever taught that you should try to compare what the suspect tells you with other known evidence in the case to see if it matches?

A. That's my practice and that's common sense. Was I specifically taught that? I don't think anybody taught that.

Q. Okay.

A. Well, I take that back. I would think interview and interrogation schools would teach that. You know, you want to have the information given by the suspect match the physical evidence that you have on the case.

Q. And what if the suspect -- what was your training in regards to what if the suspect is

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**146**

consistently getting information wrong about the particular crime he's confessing to?  What are you supposed to do at that point?

MR. COOPER:  Object to the form.

A.  Well, not everybody, in my opinion, tells the whole truth.  Even when they confess, they don't confess to every little detail.  People leave things out; they minimize.  As you quoted in your Second Amended Complaint, maximization.  People minimize, and they don't give you all the details unless you know them or you try to get it from them.  So some people get things wrong, and I can live with that.  For various reasons, they may not want to tell the truth about everything.

I just continue on, and a decision is made by the DA's office and the Department whether to file charges on the party based upon the interview.

Q.  (By Mr. Fisher)  So I'm just asking, though, what were you trained in your DPD-sanctioned trainings?

A.  You asked me what I would do if somebody gave false statements.

Q.  Yeah, what was your training in that regard?  In other words, if a suspect continues to give you wrong details and facts about the crime in the confession, what are you trained to do at that point?

**147**

A.  There is no specific training to that.

Q.  Okay.

A.  I mean, it's an overall picture of training that if somebody keeps getting facts wrong, you want to reevaluate and reassess what's going on and maybe get more information from the suspect.

Q.  Were you trained that if somebody is continually giving wrong details, that they might be actually innocent of the crime?

A.  It's a possibility.

Q.  Is that part of your training?

A.  No, it is not.

Q.  Was it part of your training that if someone is continually giving you wrong details about the crime, that you should correct them and give them the right details in the interview?

A.  I haven't been trained on that, but my opinion is not necessarily.

Q.  Okay.  So that's not something you were trained on in your DPD-sanctioned trainings, but your opinion is sometimes you can give them the information and sometimes you shouldn't?

MR. COOPER:  Objection to form.

A.  Possibly.

Q.  (By Mr. Fisher)  Okay.

**148**

A.  My job is not to give suspects information, it's to obtain information from them.

Q.  Right.  And so if they're giving you wrong details and you provide them with the right details that you know from another source, is that a bad practice or is that an okay practice?

A.  It depends on the individual interview and the suspect.  Like Mr. Montoya misquoted things, and then he would go back and give correct statements.  So it depends on who it is and what the interview is going on.

Q.  Okay.  And so -- withdrawn.

What was your training in regards to -- now I'm talking about -- when I say "your training" on this topic, just keep in mind that I'm always talking about your DPD-sanctioned training.  Okay?

A.  When you say "sanctioned," does that include seminars that they authorized me to go to?

Q.  Correct.

A.  Okay.

Q.  Any trainings that you received from DPD or they authorized you to go for, they're paying for, any authorized sanctioned trainings by DPD.

A.  Okay.

Q.  So in any of your trainings were you taught

**149**

about what you should do if a suspect just continually denies involvement in the crime over and over and over again, what you should do at that point?

A.  Not specifically that.

Q.  Were you ever taught that there's got to be some limit, the person denies something 50, 100 times, eventually you have to let them deny it, or you can keep going as long as you want?  What was the training on that?

MR. COOPER:  Objection to form; foundation.

A.  There is no training.

Q.  (By Mr. Fisher)  There is no training on that?

A.  No.  No policy, no training.

Q.  Okay.  So we talked about some of your training, and we touched on this a little bit.  But I want to talk about kind of the supervision of your interrogations that happened in the real world.  Okay?  As we've established, you've done thousands of forensic interviews in your career?

A.  Correct.

Q.  What kind of supervision or oversight was there by your supervisors or higher-ups in the command staff about your interrogations, or regarding your interrogations?

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**150**

MR. COOPER: Objection to form.

A. Sometimes supervisors watch the interview and they will give you advice or tell you what they think is going on while the interview is going on. Sometimes I believe supervisors watch the interview on their own just to see what occurred. I know the DA's office watches them and we discuss them about what's going on in the interview. That would be -- to me, that's a supervisor, too, because they're filing the case and going to try the case, so I would listen to what they had to say.

Q. Did any of your supervisors -- I mean, what level were you as a detective? A sergeant?

A. No.

Q. Just a police officer detective?

A. Yeah. The way Denver works is you're a patrolman, and then you're appointed in the detective bureau.

Q. Okay.

A. And you get a bump in pay. I guess I'd call it rank, but you really don't outrank anybody. But you -- and that's it. A sergeant is a testing promotion, lieutenant, captain, on above, until you get to the chief positions or commander positions, and they are appointed also.

**151**

Q. So at the time in 2000 when you're doing Lorenzo's interrogation, what positions were above you in the chain of command? I know lieutenant was above you.

A. A sergeant would be my immediate supervisor.

Q. Who was that at the time, do you know?

A. Oh, I can't recall.

Q. Was it somebody in the homicide unit?

A. Yeah. It might have been Mike Petrol, but I don't recall. I know I've had a variety of them.

Q. And I know Priest was a lieutenant of yours at the time, right?

A. Priest was a sergeant in homicide, immediate supervisor. And then he made lieutenant and became a lieutenant in command of major crimes.

Q. Not long after the interrogation, or --

A. Well, I can't tell you -- I can't remember whether he went back to the street for a while as a lieutenant or he stayed up there, but he was lieutenant for quite a while up there and I worked under him.

Q. Was he your supervisor at the time of the Montoya interrogation?

A. Yes, he was. But I don't know what his rank was. He could have been a sergeant in the unit at the time.

**152**

Q. What other positions were there above you in the chain of command?

A. Lieutenant, and then they report to a captain. Captain of the crimes against persons bureau. And then they report to a division chief, and the division chief reports to the chief itself. Sometimes there's an assistant chief, but I don't think in 2000 there was an assistant chief.

Q. Okay. Did any of those people, those positions you just described, over all the years you were a detective, thousands of interrogations, did any of them ever sit down with you and say, "Hey, I watched your interrogation of so and so; here's some feedback, positive or negative"?

A. Any of those people?

Q. Yeah.

A. Sure. Sergeants have. Priest has. I don't think above that. I don't think captains watched the interview. They may on their own, I don't have privy to that.

Q. But they never came to you --

A. No.

Q. -- and said "Here's some feedback, positive or negative"?

A. No.

**153**

Q. And what about the ones who did watch some of your thousands of interrogations, did you ever get any negative feedback, "You shouldn't be doing X, Y and Z that I'm seeing here"?

A. I don't recall, but I think I would have to say no.

Q. Okay. Out of the thousands of interviews you've participated in and the countless other ones you've viewed or seen, have you ever heard of an officer with DPD ever getting in trouble for improper interrogation practices?

MR. COOPER: Object to the form.

A. Not that I recall. There could have been out of my knowledge.

Q. (By Mr. Fisher) Sure. Did you ever get any positive feedback on your interrogation practices from supervisors or others?

A. Sometimes from the DA's office and from supervisors, you know, "You did a good job on that." One comes to mind is Ronald Garcia killed a police officer, and I interviewed his wife. And she confessed that he did it and information about the case. They said it was a good job.

Q. Which -- what year was that, approximately?

A. 2005. Donnie Young was the victim.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**154**

Q.  What about in this case, did you -- in Montoya's case, did you receive any positive feedback from any other police officers or from the DAs regarding your interrogation of Mr. Montoya?

A.  I don't recall.

Q.  I'm just going to ask you briefly -- I know we touched on it a little bit earlier, but briefly about the circumstances under which Montoya was kind of brought into the investigation.  I'll try to ask you some more pointed questions and see if we can jog your memory.

Do you remember that Robert Davis was the prime suspect from the beginning, the boyfriend?

A.  I wouldn't say prime suspect, but he was a suspect.  It was confusing that he was in the house when they found the body, I believe.

Q.  Right.  And he said he had been sleeping there that night during the whole -- like he had just been sleeping when she was assaulted, right?

A.  Correct.  And during his interview was a strange nuance, they asked him if he killed her and he goes, "I could have."

Q.  Right.  "I just don't remember.  There might be somebody inside of me that I'm not aware of."

A.  It was like, what's going on here.

**155**

Q.  And he had like a five-hour interrogation?

A.  I didn't interrogate him.  I don't believe I saw the interrogation, I just heard scuttlebutt that he said that and I thought "whoa."

Q.  And also there was some evidence that apparently he had blood on his hands.  Were you aware of that?

A.  I don't recall that.

Q.  Okay.  I know we talked about it earlier, you said you didn't remember.  I'll represent to you that Nick Martinez was brought in earlier that day before Lorenzo Montoya to be interrogated.  Does that sound about right?

A.  My recollection is he wasn't brought in at all, but I don't know anything about that.

Q.  Do you recall anybody -- before Montoya was interrogated, do you recall anybody pointing the finger at Lorenzo Montoya and saying he was at the homicide the night of the homicide before you guys interrogated him?

A.  I really wasn't involved in the case; I was just assigned to interview Lorenzo.

Q.  Okay.  So when you interviewed him, did you have any independent corroboration that he was the killer, or was involved --

**156**

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Same objection.

Q.  (By Mr. Fisher)  Or that he was involved in the murder, or --

A.  Well, during the interview I stated that --

Q.  I'm sorry, before the interview.

A.  Before the interview?

Q.  Right.

A.  No, I don't believe so.

Q.  Okay.  Do you know -- do you know of any physical evidence tying Lorenzo Montoya to the crime, the death of Emily Johnson?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Same objection.

A.  I would say that she was -- you have told me that they weren't used during the trial, but the shoes would be my answer.

Q.  (By Mr. Fisher)  Okay.  And you're talking about the shoes he was wearing during the interrogation?

A.  Correct.

Q.  Okay.  If it turned out those shoes were not a forensic match, you're not aware of that one way or

**157**

the other?

A.  I'm not.  Just from what I learned from you.

Q.  Okay.  There was fingerprints recovered from the scene of the murder, correct?

A.  I believe so.  I don't know really where.  I stated that I went to see the processing of the scene for fingerprints, but I can't recall whether -- you know, the super glue takes overnight to complete, and then the light on the front door, I don't know if they obtained prints from there.  You stated that they obtained a handprint from the milk box.  I don't think I knew of that.

Q.  Okay.  Were you ever made aware that any fingerprints in the house matched Lorenzo Montoya?

A.  I'm not aware of that.

Q.  Okay.  Any trace evidence from the scene that you know of that matched Lorenzo Montoya?  Let's put the shoeprints aside.

A.  Not that I know of.

Q.  Okay.  All right.  So I'm going to go through with you some of the things that you said and did during Montoya's videotaped interrogation, and I'm going to ask you some additional questions about whether or not the things that you were doing were in line with your training and supervision and all that.

**Okay?**
A. Correct.
**MR. FISHER:** So let's virtually mark the entire interrogation video as Exhibit Number 6.
(Deposition Exhibit 6 was introduced for identification.)
**MR. FISHER:** I'm just going to be playing you clips of it. And when I play the clip, I will tell the court reporter from which of the eight segments it's from and what the time stamp is so that it will be on the record. Okay?
And, Andrew, I can share these every time I do it, but I have quite a few clips and I think it will probably take two to three times as long if I do that. Do you want me to do that or do you want me to just play them and you'll be able to hear the audio no problem?
**MR. RINGEL:** Why don't we try it with you just playing it and I'll see how it works to start with. Okay?
**MR. FISHER:** Okay.
**MR. COOPER:** And I'll stand, too, if that works. That will be easier, I think.
**MR. FISHER:** So I'll turn the screen towards you so that we can see it together. And you have the

speakers right in front of you so you can listen.
THE DEPONENT: Can I move around --
**MR. FISHER:** Yeah, I'll move it around more even so you'll be able to see it. Okay?
THE DEPONENT: Okay.
**MR. FISHER:** Okay. So this first one I'll play here. So this is from -- I'll call it Clip 5. What I mean by that is the fifth segment out of 8.
Do you understand what I'm saying, Andrew?
**MR. RINGEL:** I do.
**MR. FISHER:** And this will be from timestamp 9:27 to 10:35 from that discrete segment. Each segment of those eight are split up into maybe like 20-minute blocks, 17-minute blocks. So the timestamp I'm giving is into that particular segment. So this will be -- I'll call it Clip Number 5 from 9:27 to 10:35. And I'm just going to play this part for you, and you let me know if you can't hear it or see it or whatever and we'll see what we can do to change that. Okay?
**MR. COOPER:** And, David, the file on the bottom left there on the blue screen, that's what shows us that it's Clip 5, right?
**MR. FISHER:** That's what's -- I've designated that as the fifth of the eight segments.
**MR. COOPER:** Okay. Got it.

**MR. FISHER:** You know what I mean? It's a timestamp from that particular --
**MR. COOPER:** Yeah, that makes sense.
**MR. FISHER:** Okay.
(Video played but not transcribed.)
**Q. (By Mr. Fisher) So just that last part of the video we heard, "You need to get on board here so you can help yourself out on this."**
**What did you mean by that?**
**MR. RINGEL:** Object to the form and the foundation.
A. I don't know what the DA would file if he came forward and told us everything about the murder, if they would file on him or they would use him as a cooperating witness or what the results would be. So that's basically saying, "If you've got information to tell us, tell us the whole story and we'll see where it goes." It's not articulated that clearly, but it's "Help yourself out."
**Q. (By Mr. Fisher) Meaning, if you tell us this, you could help yourself out punishment-wise, or what the DA --**
A. No, no promises of leniency, no promises of going home, no promises of not going to jail. It's just "Help yourself out." You've got to tell us what

happened, and then we determine then -- at one point in the interview I said that we're going to determine what's going to happen to you.
**Q. So "help yourself out," you were talking about regarding the consequences of his prosecution, right?**
A. It's regarding what's going to happen to him -- I guess so, yes.
**Q. And when you said, "You're going down for this," "They're going to put you in prison," "They don't put you in juvenile hall for a case like this, they put you in big boy prison."**
**Is that type of statement in line with the training that you received from DPD on how to conduct interrogations and interview?**
A. It's the truth.
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Objection to form.
A. It's the truth.
**Q. (By Mr. Fisher) Okay. But --**
A. He ultimately ended up in prison.
**Q. That he --**
A. So that's big boy jail.
**Q. Yeah.**
A. So that's the truth. It's not a lie.

**Q. So if it was the truth that someone is going to jail, your training was you were allowed to tell them that in the interview? "You're going to jail," "You're going to big boy jail"?**
A. I don't have any training in regards to that. That's common sense.
**Q. Okay.**
A. You're going to jail.
**Q. So you never -- you were never trained that you shouldn't make threats like that one we just heard?**
A. That's not a threat.
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Same.
**Q. (By Mr. Fisher) Okay. So according to your training?**
A. Let me answer. That's not a threat.
**Q. That's what I was going to ask you. According to your training, that clip we just heard was not a threat?**
**MR. COOPER:** Objection to form.
A. No. It became true. It was a truthful statement.
**Q. (By Mr. Fisher) Okay. So if it's true that somebody is going to go to jail, that makes it not a**

**threat?**
**MR. COOPER:** Same objection.
**MR. RINGEL:** Object to the form and the foundation.
A. It's all couched about how it was said.
**Q. (By Mr. Fisher) Okay. Let's watch this next one. This one is -- let's see here. I'll just pause it right in the beginning.**
**So this one is, again, Number 5, or Clip 5, 10:37 to 11:21.**
**(Video played but not transcribed.)**
**Q. So I'll just stop it there for a second.**
**You heard Detective Martinez say, "Are you ready to tell your mom good-bye?" And then you said, "And your cousin, and your girlfriend, and your life."**
**Was that kind of statement to somebody you're interrogating in line with your training on how to conduct interviews and interrogations?**
**MR. COOPER:** Objection to form; foundation.
**MR. RINGEL:** Join.
A. There's no training about that. That's common sense.
**Q. (By Mr. Fisher) Okay.**
A. Just like I stated the last segment, when you go to jail, sure, you may get visits, con- -- not

conjugal -- but you may get visits from your parents and stuff. But you're going to jail; you're leaving your life.
**Q. But at this point in the interrogation, Montoya hadn't admitted to actually being involved in the homicide, and here you are telling him, "Are you ready to tell your mom good-bye? And your sister, and your cousin, and your girlfriend, and your life," that that's appropriate at that point, according to your training?**
**MR. COOPER:** Object to the form.
A. Not according to my training. It's appropriate, yes. Martinez says, "Are you ready to say good-bye to your mom?" I said to the other relatives.
**Q. (By Mr. Fisher) Okay. This -- we can see in this video, and the previous one, that you're pretty darn close to Mr. Montoya, right?**
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) Would you agree with that characterization?**
A. Correct.
**Q. Like maybe your face is within a foot of his face?**
A. Oh, I think it's a little more than that. 2 feet.

**Q. 2 feet. And for most of the last clip we played and this one, your face is about that distance from him, right?**
A. Possibly.
**Q. Is that in line with your training? Was there any admonitions about getting that close to a suspect and staying that close to him?**
A. There is no training. That is my style and technique.
**Q. Okay.**
A. I like the person to look at me. This is a serious subject. I want you to look at me and respond to what I'm saying. I don't like barriers like tables, I like to be next to somebody. And I have multitude of interviews that way.
**Q. And you never got reprimanded or counseled or --**
A. It's not --
**Q. -- against doing that?**
A. It's not incorrect. It's not improper.
**Q. That's what I'm trying to elicit. Like none of your supervisors ever said to you, "You've got to stop doing this, John" -- or Martin -- "You can't get this close to the suspects and get in their face"?**
A. No.

**Q. And you weren't trained against doing that either, correct?**
A. Correct.
**Q. I'm just going to keep playing this one from where we left off.**
**(Video played but not transcribed.)**
**Q. Again, you see Lorenzo starts crying, right?**
A. Yeah.
**Q. And you said, "Do you want to help yourself out?"**
A. Correct.
**Q. And, again, you mean with -- if he confesses, that could help him out with the prosecution?**
A. Not necessarily confessing to the crime that he killed her himself. He participated in it. So if he tells us his participation and the other peoples' participation in the murder, the outcome for him could be different.
**Q. Then that's what you're trying to convey to him when you say --**
A. He had the opportunity to come in there from the beginning and tell us what happened.
**Q. Okay. I'm going to keep going.**
**(Video played but not transcribed.)**
**Q. Is there anything wrong with what you said**

**there at the end, kind of mocking him for crying a few minutes ago?**
**MR. COOPER:** Object to --
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Same.
**Q. (By Mr. Fisher) Is that in line with your training on interrogation procedures?**
A. There is no training with that. There is nothing wrong with that. I've had multiple people cry in interviews, sometimes crocodile tears, what I explain them as, fake tears.
**Q. Do you think Montoya's tears were fake in this interview?**
A. No, I don't.
**Q. But it was okay to kind of say to him, "Go ahead and stare me down, you're not that tough. I just watched you crying for five minutes"? That was in line with your training and --**
A. I don't think that's inappropriate.
**Q. Say that again.**
A. I don't think that's inappropriate.
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) And that kind of statement and that kind of behavior was in line with your training on interrogation procedures that you received**

**from DPD?**
**MR. COOPER:** Same objection.
A. You keep saying "training," I keep saying they didn't train us about that. That is just an interview.
**Q. (By Mr. Fisher) Okay.**
A. That's what happened in this interview.
**Q. And they didn't counsel you against doing things like that as well?**
A. Correct.
**Q. I'm going to play this next one. This one is, again, Number 5, 11:27 to 11:44.**
**(Video played but not transcribed.)**
**Q. (By Mr. Fisher) And that's you asking him, "Do you want your mother in here?" Not to help you or not to participate in the interview, but so that he can say good-bye to her, right?**
A. Well, I don't know if he wanted his mother in there. I gave him the opportunity to have her back in there. I don't know whether she wanted to respond. I can't recall what she said out in the other room. But I think we were concluding the interview at that point. You asked me before what happens if somebody keeps denying about things? Well, I think we were ready to conclude the interview.

**Q. Well, that, again, was Section 5 out of 8. So that was about two-thirds of the way through the interview. There was plenty of interview after that.**
**But what you were saying to him there is, "You want me to bring your mom in so you can say good-bye to her"?**
A. No, I didn't say that. I said, "Do you want me to bring your mom in, Lorenzo?" "You want your mom in here?" He didn't answer back. Martinez says, "You want to say good-bye to your mom?"
**Q. Let's listen to it again.**
**(Video played but not transcribed.)**
A. Okay. I said, "Bring her in, let's say good-bye." But when I asked him if he wanted his mother in there, I didn't say "to say good-bye."
**Q. Right. And then he didn't answer, and you said, "Okay, let's bring her in here and we can say good-bye"?**
A. Correct.
**Q. Right? You didn't actually go and get his mother and bring her in at that point, right?**
A. I don't recall what happened, if I went out and talked to her or what.
**Q. I mean, I can represent to you, she doesn't come in the room at all in the rest of this interview.**

170

A. She doesn't, I agree with that.
**Q. Okay. Why did you tell him that, "I'm going to bring your mother in so you can say good-bye to her"? What was the purpose of telling him that?**
A. Because --
**MR. RINGEL:** Object to the form and foundation.
**Q. (By Mr. Fisher) You can answer.**
A. I believed we were going to conclude the interview at that time.
**Q. So you wanted him to have a chance to say good-bye to his mom --**
A. Yes.
**Q. -- before he went to prison?**
A. Yes.
**Q. Okay.**
A. I really wanted to know if she wanted to come in there, if he wanted her in there. He didn't answer.
**Q. I'm going to play another one here. Oh, that procedure, telling somebody "I'm going to bring your mom in so you can say good-bye to her" two-thirds of the way through an interview, anything wrong with that?**
A. No.
**Q. Okay. Never received any training about that's an improper threat, or anything like that?**

171

A. Correct.
**MR. FISHER:** Okay. Let me play the next one. So this is -- oh, goodness, I don't have the timestamp. Huh. This one I don't have the timestamp from. I apologize, I'll have to find it and supply it to you guys later. It will take me a long time to find it right now, but it shouldn't be that long of a clip. Let's see --
**MR. RINGEL:** Which one is it? Which video?
**MR. FISHER:** That's what I'm saying, I don't have that listed right here. I'm going to have to find it. I'll make a note to find this particular one.
**MR. RINGEL:** Okay.
**MR. FISHER:** I just neglected to put the timestamp on here. I apologize. I think it might be a short one. Let's see. Oh, it's a little bit longer.
**MS. BYRIALSEN:** He's not watching.
**MR. FISHER:** Okay. Mr. Vigil, can you --
THE DEPONENT: I am.
**MR. FISHER:** Okay. So I think this is -- I'm pretty sure this is in the fifth section. It's not long after his mom has left the room, and you'll see there's like a lot of crying for like a minute period. But I'll find the timestamp and I'll get it to you guys. I apologize.

172

THE DEPONENT: Well, this section is quite a bit of time after his mother left the room.
**MR. FISHER:** Yeah. I'll have to find it. I apologize.
(Video played but not transcribed.)
**Q. (By Mr. Fisher) I'll stop it there for a second.**
**You asked him, "What are you scared of?" "Are you scared of going to prison?" He didn't give you an answer, right?**
A. Not in this segment, but I believe later on he said he's scared of going to prison.
**Q. He's just kind of crying and sobbing too hard to really answer you there, right?**
A. No, he could have answered. He's just crying.
**Q. Okay. I'm going to continue here.**
**(Video played but not transcribed.)**
**Q. Oh, okay, so that, I believe -- all right. Here's the timestamp for both of those. I'm sorry. So that just started, the video I just played, was from 4 -- Clip Number 4 from 19:22 to the end of that video, and then it picks up right here where I'm about to press play again from Number 5 up until 27 seconds of Number 5. Okay?**

173

**So I'm just going to just pick up with the video here. You can just see Vigil left the room and we're going to see a little bit -- another 27 seconds here.**
**(Video played but not transcribed.)**
**Q. So I know you didn't make those statements at the end, but Lorenzo is crying for a minute or so and Martinez says to him, "Lorenzo, you can cry all you want. We're not going away. We're not going away," right? Is that what he said?**
A. That's correct.
**Q. Were you ever taught or trained or counseled that you should not tell a suspect "We're not going away." In other words, this is going to continue?**
A. I specifically was not trained or taught that.
**Q. Okay. So it was appropriate to say to somebody, "We're not going away," sort of to implicate this is not ending? We're not going away?**
**MR. COOPER:** Objection; foundation.
**Q. (By Mr. Fisher) Is that okay?**
**MR. RINGEL:** Object to the form.
A. I don't think it's inappropriate.
**Q. (By Mr. Fisher) Okay.**
A. Just because you cry during an interview, you

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

174

get to walk home on a murder?
**Q. Okay. Let's watch this next one. This one is Section 4, or Clip 4, 14:36 to 15:05.**
**(Video played but not transcribed.)**
**Q. So that clip that we just watched, making those kinds of statements to a 14-year-old boy while you're sitting about a foot and a half away from his face, is that appropriate?**
**MR. RINGEL:** Object to the form.
A. Over 2 feet away. That's the truth. As stated in your Second Amendment Complaint, he had a difficult time. People were terrorizing him and certain things. That's the truth. He -- jail is tough. And they are -- it's life in prison until the legislature changed the law. That's the truth.
**Q. (By Mr. Fisher) Okay. So since it was the truth that you believed he was going to go to prison for life, you feel it was appropriate to say that to him to try to get him to, quote, unquote, give it up?**
A. I'm --
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Join.
A. I'm stating the truth to him. It's not inappropriate to tell him the truth.
**Q. (By Mr. Fisher) So if you -- I guess maybe**

175

**you're drawing a distinction about the truth or not. If you didn't really believe he was going to prison for murder, then you wouldn't be allowed to say that?**
A. I don't understand the question.
**Q. You believed that it was the truth what you were saying to him, that he was going to go to prison for murder for life, right?**
A. If he's convicted of this crime, he would go to prison for life.
**Q. Okay. If he didn't believe that he was really going to prison for life, then you wouldn't be allowed to say it? So it's the truth that makes it okay to make a threat like that?**
**MR. RINGEL:** Object to the form.
A. I guess I'm confused by your question. If I didn't believe he didn't commit the crime, would that be inappropriate? No.
**Q. (By Mr. Fisher) It would still be appropriate?**
A. Correct.
**Q. So it's not about the truth of whether he's really going to go to prison, you just think telling somebody during an interrogation that they better give it up because you're going to go to prison for the rest of your life, it's always appropriate to do that?**

176

**There is no problem doing that?**
A. I don't think it's inappropriate.
**MR. COOPER:** Object to the form.
**Q. (By Mr. Fisher) Say again.**
A. He objected to form.
**Q. And you said?**
A. I don't think it's inappropriate.
**Q. Okay. And that not your own personal belief -- that is your own personal belief, but that's -- you believe that according to DPD, your training, your supervision, their policy, that what you're saying here in this clip is in line with all of that?**
**MR. COOPER:** Same objection.
A. There would be no training in regards to that specific statement or specific topic.
**Q. (By Mr. Fisher) Okay. In other words, no admonitions against what you were just saying there, or trainings against doing that?**
A. I've gone through multiple seminars, and I've never had training about not saying you're going to jail.
**Q. Okay. This one is from 5, 3:42 -- so Section 5, 3:42 to 4:32.**
**(Video played but not transcribed.)**
**Q. I'll just pause it for a second.**

177

**You're very close to his face again, right?**
A. I'm --
**MR. RINGEL:** Object to the form.
**Q. (By Mr. Fisher) You're within --**
A. 2 feet.
**Q. 2 feet. And you're pointing repeatedly in his face, right, with your index finger?**
A. Yes.
**Q. And let me just rewind that last part, I forgot how you phrased it there. I just rewound a little bit.**
**(Video played but not transcribed.)**
**Q. So that video clip we just watched, do you feel you did anything inappropriate in that clip?**
**MR. COOPER:** Objection to form.
A. No.
**Q. (By Mr. Fisher) Anything in that clip run afoul of your training, as you understood it, or the policy of DPD on how you were supposed to do interrogations?**
A. No.
**MR. COOPER:** Same objection.
**Q. (By Mr. Fisher) Let me just play the beginning of that, because I just have a question about the beginning of it again.**

Mile High Court Reporting and Video, Inc. 303-202-0210
contact@milehighreporting.com

**(Video played but not transcribed.)**
**Q. (By Mr. Fisher) So that's saying like "We're not going to stop," "you're not going to be able to avoid this," "we're not going away," you were never trained or counseled not to say that to a suspect who wasn't quote, unquote, giving it up?**
A. No.
**Q. Okay. That was never taught to you to be like an improper threat or anything?**
A. It's not a threat.
**Q. Okay.**
A. It's a fact.
**Q. In other words, it's a fact, if he didn't, quote, unquote, give it up, you guys are not going to quit until he does. That's a fact?**
A. No, it's a fact that we're just not going away based upon the information we got so far. The interview in totality was only two and a half hours. That's not very long.
**Q. That's not long for a 14-year-old boy without a break or drink or bathroom break?**
A. If he needed to go to the bathroom, we would have obliged him. If he wanted something to drink, we would have obliged him.
I wasn't drinking anything.

**Q. Well, you were going in and out of the room, right?**
A. Yeah.
**Q. He was on the other end stuck in the corner of the room with you right next to him, in between him and the door, for a lot of the time.**
A. He wasn't stuck in the corner. He placed himself in that seat when his mother left. His mother left out the door. It's not locked. As you represented in your Complaint, the door is not locked. True, you have to navigate through the homicide unit to get out to outside. But the door wasn't locked; he could have concluded this interview at any time.
**Q. Let me play the next one. This is from Clip 4, 14:19 to 14:37.**
**(Video played but not transcribed.)**
**Q. So here you are in this clip telling him "You're not that tough to be spending the rest of your life in prison," right?**
A. And he agrees.
**Q. And you say, "You're not that tough." Let me just rewind to what you said right there at the end after "You're not that tough to be spending the rest of your life in prison."**
A. I think it was whether you or Nick killed

her.
(Video played but not transcribed.)
**Q. Ah, that was it. So "You better fess up."**
A. Correct.
**Q. All right. So is that appropriate, within your training and the policy of DPD? You tell a suspect, "You're not that tough." "You're not going to last the rest of your life in prison, so you better give it up"?**
**MR. COOPER:** Object to form and foundation.
**MR. RINGEL:** Object to the form.
**Q. (By Mr. Fisher) That's okay to do?**
A. There is no training in regards to that. I don't think it's inappropriate. After I said, "You better fess up," I said, "Did you or Nick kill her?" So there's still an option that he didn't do it, and I'm admitting to that.
**Q. Yeah.**
A. Well, you can make that face, but there's still an option where he didn't do it.
**Q. You know that if he admitted to being there -- you didn't tell him this during the interview, right -- but you know that if he admitted to going there with Nick to commit some other crime but he wasn't the one who killed the woman, he still admitted**

**to felony murder?**
A. Felony murder. And I could have told him that. If he admitted that, I would have said, "You're eligible for felony murder." I believe so. I can't tell you what I would have said. But, yes, I would have said that to him. I mean, you're right, he's eligible for that.
**Q. Felony murder is also First degree murder? It has the same punishments?**
A. Correct.
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) Okay. In any event, you were talking -- you were never taught it was improper to say, "You're going to prison, so you better give it up"? "You better confess now"?**
A. I was never taught that specific statement that you made. I don't think it's improper.
**Q. Okay. Next one. So this one is from -- oops -- Clip 4, 15:32 to 15:58.**
**(Video played but not transcribed.)**
**Q. So, again, this is another instance where you're telling him, "You need to be scared of everyone else in prison."**
**Anything wrong with repeatedly telling him throughout the interview that he's going to prison and**

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

182

**he needs to be scared of people in prison?**
**MR. RINGEL:** Object to the form and foundation.
**MR. COOPER:** Same objection.
A. No.
**Q. (By Mr. Fisher) And that clip, and all the others we've seen so far, are all in line with your training and procedures with DPD, correct?**
**MR. COOPER:** Objection to form.
A. Well, there is no DPD procedures or training in regards to that. I don't think it's inappropriate.
**Q. (By Mr. Fisher) Okay. And you don't think your supervisors would have thought it was inappropriate either?**
**MR. COOPER:** Objection.
**MR. RINGEL:** Object to the foundation.
A. I don't speculate on what they would think.
**Q. (By Mr. Fisher) Certainly nobody told you that it was?**
A. Nobody did tell me that.
**Q. Okay. Next one. This one is -- oh, I don't have the timestamp on this.**
**(Video played but not transcribed.)**
**MR. FISHER:** Oh, this is just, for the record, his mom is still in the room here. So it's

183

probably towards the end of where she's getting out of the room, but I'll have to find the timestamp.
(Video played but not transcribed.)
**Q. (By Mr. Fisher) Let me stop it there. You say, "Have you seen this article in the paper every day?" You're talking about --**
A. Emily Johnson's murder.
**Q. Being in the paper every day?**
A. I guess so, yes.
**Q. Okay.**
**(Video played but not transcribed.)**
**Q. So at this point in the interview, say maybe for 30 or 40 minutes, he had been denying any involvement in the homicide, his mom was still in the room, right?**
A. Oh, I can't recall the exact time. We took this segment out of context. It seems like we're explaining to him that he could be a suspect in a murder and we believe that he may be. But before that I think we had discussed the car theft.
**Q. Okay. He did not admit to the homicide, is what I'm saying?**
A. Say that again. Had he admitted to the homicide at that point?
**Q. Yeah.**

184

A. No.
**Q. And you were telling him and he had kind of steadfastly denied, "I wasn't there, I wasn't at no lady's house," "I wasn't there, I wasn't at no lady's house," right?**
A. I believe he did.
**Q. And you're telling him towards the end of that clip, "We are not going away." "We're not going to be satisfied until you tell us what we want to hear"?**
**MR. RINGEL:** Object to the form.
A. Correct.
**Q. (By Mr. Fisher) Is there anything wrong with doing that, according to your training and the policies of DPD and your supervision? Was there anything wrong with doing that? Did you ever get admonitions against --**
A. No trainings or policies. I did not receive an admonition. I don't believe it was inappropriate.
**Q. Okay. This one is from 3 -- Section 3, 9:20 to 9:36.**
**(Video played but not transcribed.)**
**Q. So that, saying to him, "You're in a world of trouble, buddy," anything wrong with doing that?**
A. No.

185

**Q. This one is Section 4, 18:12 to 19:19.**
**(Video played but not transcribed.)**
**Q. So here we have Mr. Montoya crying for about a minute, right?**
A. Correct.
**Q. Sobbing pretty uncontrollably, right?**
A. I wouldn't say "uncontrollably."
**Q. What if your 14-year-old kid was sobbing like that in a room with detectives, how would you feel?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Join.
**Q. (By Mr. Fisher) Or your grandkid. Would you be okay with that type of sobbing?**
A. I don't have kids or grandkids, but, yeah.
**Q. You would be fine with that?**
A. I don't think it's inappropriate.
**Q. Okay. And you kind of pulling on him, getting him to sit up?**
A. I didn't pull on him. I suggested that he sit up here and pay attention. As I stated before, that's why I get close to people, so they can know the seriousness of the crime and talk to me. And he was just using that wall to lean on. He wasn't afraid, he didn't jump away from me when I touched him, he didn't get startled or pull away or say, "Don't do that." I

Mile High Court Reporting and Video, Inc. 303-202-0210
contact@milehighreporting.com

just said, "Sit up here."
**Q. Do you hear when Martinez was saying, "You're not leaving here tonight. You're not leaving here tonight"?**
A. Yes.
**Q. Anything inappropriate about that statement?**
A. No.
**Q. Okay. Do you think it's possible maybe he's bawling his eyes out, crying in that room because there's two detectives from the homicide division who are getting in his face for an hour and refusing to accept his denials over and over again and he's feeling like he's got no way out? Do you think maybe that's why he's sobbing and crying like that?**
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Same.
A. I don't think he's happy about being there. I don't think he's happy about being involved in this crime. Later on in the interview he says he's scared of prison. I asked him if he was scared of me, and he says, "I'm scared of prison." So he could have just answered me and said, "Yes, I'm scared of you. You intimidate the shit out of me," but he didn't.
**Q. (By Mr. Fisher) Okay.**

A. Excuse me for cussing.
**Q. That's fine.**
**This one is Section 4, 12:32 to 13:11.**
**MR. RINGEL:** Can you tell me the second part of it?
**MR. FISHER:** Yes, Section 4.
**MR. RINGEL:** Yeah, 12:32. And then what's the end time?
**MR. FISHER:** 13:11.
**MR. RINGEL:** Thank you.
(Video played but not transcribed.)
**Q. (By Mr. Fisher) So there at the end of the clip you're asking, "Do you want to go to jail for murder," right?**
A. Correct.
**Q. Just before that you were telling him -- you were real -- pretty close to him again, within 2 feet or so --**
A. Same distance.
**Q. And you kind of say to him in a really gentle voice over and over again, "We've got fingerprints," "we've got hair," "we've got blood," "we've got all this stuff to be tested," right?**
A. I don't believe I said "tested." I said we have it.

**Q. Okay.**
A. But, yes, I did say that.
**Q. Do you know if any of that evidence implicated or incriminated him at that time?**
A. No.
**Q. Okay. And, again, is there anything wrong with what you're doing in this clip? Is it against your training, your policy, saying he's going to go to prison at the end of it, bringing up the specter of all this possible evidence against him? Anything wrong with any of that?**
**MR. RINGEL:** Object to the form.
A. No training or policies, but it's not inappropriate.
**Q. (By Mr. Fisher) Okay.**
**This one is Section 5, 8:57 to 9:03.**
**(Video played but not transcribed.)**
**Q. It's just a short clip there of you saying, "You want to go to prison?" He says "No." And then you say, "That's where you're headed," right?**
A. Correct.
**Q. Anything wrong with doing that?**
A. No.
**Q. Not against the trainings or the policies of the DPD or the homicide unit, or anything like that?**

A. No.
**Q. Perfectly in line with the training?**
**MR. COOPER:** Objection to form.
A. There is no training or policies in regards to that.
**Q. (By Mr. Fisher) Okay. This one is Section 2, 20:11, that's where it starts, and then it goes -- leads into Section 3 up to 31 seconds.**
**(Video played but not transcribed.)**
**Q. So there you are again telling him, "We have all this evidence to be tested," right?**
A. I didn't say "tested." I said, "We have this evidence." I don't believe we had saliva. I don't know why I said that.
**Q. Why are you telling him about these things, this evidence that you guys had? What's the purpose of that?**
A. Because it prompts people who are lying about investigations to maybe tell the truth. If you tell somebody you have DNA at a scene, they're going to question and wonder what did they leave at the scene? DNA is difficult. Shoeprints are difficult. You know, he's already questioned -- this is before we discovered his shoe -- so he already knows that -- I don't know if he knows or not, but those shoes are the same pattern.

I don't know if he knows that. He probably doesn't know that, I don't know. But it prompts people to give us information saying, "Hey, they've got me."
**Q. And were you ever taught in your trainings, or anything like that, that kind of -- I'll call it an evidence ploy, suggestion of all this different evidence -- do you know what I mean by that?**
A. Yes.
**Q. -- that that kind of evidence ploy is something that could also lead innocent people to confess to crimes they didn't commit?**
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Join.
A. You're asking about leading innocent people to confess. And you asking if I've been trained or there's policies about that?
**Q. (By Mr. Fisher) Correct.**
A. There isn't, that I know of.
**Q. And never been trained to avoid these types of things so that you can avoid a false confession?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and foundation.
A. Not everybody you tell that to is a false

confession.
**Q. (By Mr. Fisher) Right. You do want to avoid false confessions, right?**
A. I sure do.
**Q. Okay. Let me just play that last part of it again. Sorry. I just forgot what you said there.**
**(Video played but not transcribed.)**
A. I said we had Nick in custody; is that what you're talking about?
**Q. No, I --**
**(Video played but not transcribed.)**
**Q. So you tell him, "You're going to be spending life in prison," right?**
A. If you're involved in this, yes.
**Q. So then I'm just going to keep playing it from there.**
**(Video played but not transcribed.)**
**Q. So now you're telling him -- right after you say "You're going to be in prison for life," you say, "Because I'm not going to rest and the rest of these 12 homicide detectives here are not going to rest until we find the murderer, and it's going to go down tonight," right?**
A. Correct. That's an incorrect statement, because we didn't have 12 in homicide at that time.

**Q. You had eight?**
A. Eight or ten.
**Q. Okay.**
A. Makes a difference. Guys are on days off, vacation. We're never at full strength.
**Q. The point there is, you're telling -- why are you telling him, "We're not going to rest"? "This is going down tonight." "We're not going to rest until we find the murderer." Why are you telling him that?**
A. Because we believe we have the people involved in the murder that were captured in the car, and so we're going to try to solve this thing.
**Q. And you're not going to rest until you've got people in custody, right?**
A. The unit itself, hopefully not.
**Q. Okay.**
A. That's our job.
**Q. Is there anything wrong in your training of saying, like, "We're not going to rest," "We're not going to stand down tonight until we get these people in custody"?**
**MR. COOPER:** Object to form.
A. No training or policies about that, but there is nothing inappropriate about saying that.
**Q. (By Mr. Fisher) Okay. And even though you**

**had just preceded that with "You're going to be spending the rest of your life in prison," nothing wrong with putting those two together?**
A. If you're convicted of murder, you're going to spend the rest of your life in prison, whether you're a juvenile or an adult.
**Q. Nothing wrong there with implicating, "We're not going to quit tonight," "This is not going to end and you're going to spend the rest of your life in prison," nothing wrong with coupling those two things together?**
A. No. That's the truth.
**Q. So this one is at Clip 5 or Section 5, 1:56 to 2:19.**
**(Video played but not transcribed.)**
**Q. (By Mr. Fisher) So there you're again pretty close to his face, right?**
A. Same proximity.
**Q. And you're kind of hitting the table a few times to make some points, right?**
A. Yeah, to -- I -- what would you call it?
**Q. Emphasize?**
A. Emphasize. Thank you.
**Q. Do you think that proximity and that emphasis and that constant proximity to the 14-year-old boy's**

**face, do you think that made him feel comfortable or uncomfortable?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and foundation.
A. He did not flinch; he did not react. It wasn't that loud. It's basically as loud as you did it. It's not slamming on the table or banging, it's to emphasize what I'm saying, the words I'm saying. That's just my style. My wife -- like the finger. I do it to my wife; she hates it. She just tells me, "Don't be waving that finger at me." And I've been retired two and a half years. You know, it's just a quirk that I have. It's stupid.
**Q. (By Mr. Fisher) But, again, you were never trained that that kind of proximity for a prolonged period of time, there was anything inappropriate about that?**
A. I don't believe so, there was anything inappropriate. We had no training or procedures. They don't specifically say that stuff.
**Q. And then at the end -- towards the end of that clip you're saying, "The first one at the finish line wins the deal on this thing," right?**
A. Yes.

**Q. Was that -- was there anything wrong or inappropriate about saying that to a suspect that you're interrogating?**
A. There is nothing inappropriate with that. But I've got to tell you, I watched this video, and that's a stupid statement. I should have never said that. I didn't say it to intimidate him. That statement would apply to somebody who's looking for a deal. If we have two suspects and one guy wants to make a deal with us and have consideration, and I would tell him, you know, "You better get to the finish line because your other guys want to cut a deal, too."
That wasn't the case in this interview or this investigation. Nobody was trying to cut a deal. I don't know why I said that. That's a stupid statement, I'll admit to that. That was a stupid statement. I must have heard it somewhere else, because it's not my style.
**Q. Was there anything -- according to your training and policy and your supervision with DPD, was there anything wrong with making that specific statement?**
A. No, there is nothing wrong with it.
**Q. Okay. You were never trained or counseled or warned against making a statement like that?**

A. No. But I took it out of my -- I guess you would call it repertoire. It's a stupid statement.
**Q. Do you think maybe you just said it once by accident during the interrogation, or do you think you might have said it more than once?**
A. I didn't say it more than once in this interview.
**Q. Okay. I'm going to play you another clip.**
A. Oh, did I? Prove me wrong.
**Q. This one is 5, 55 seconds through a minute 50.**
**(Video played but not transcribed.)**
A. I must have said it again.
**Q. Right. "This is like a race."**
**What were you implying to him there by saying that?**
A. Just what the other statement said. "First one to the finish line wins" or something. That's a stupid statement.
**Q. Is there any -- did you ever receive any training through DPD or any admonitions or warnings that saying something like that would be an inappropriate promise of leniency?**
A. No.
**Q. Okay. Ever receive any training that there**

**was anything wrong with saying something like that to a suspect during an interview?**
A. No, there is nothing wrong with that. I had a trial later on in my career that I must have said it there, too, and they just belabored that subject. And I was like, "That's a stupid statement."
**MS. BYRIALSEN:** What trial was that?
THE DEPONENT: I don't know.
**Q. (By Mr. Fisher) Okay. I'm going to play you one more. This is Section 5, again, 13:18 to 13:52.**
**(Video played but not transcribed.)**
**Q. So why are you telling him like this is his last -- what are you trying to convey there? This is his last chance to confess to what he knows here or we're out of here, we're leaving?**
A. As I stated before, I think we -- I can't tell you the time, but I think we said, "We're done," "We're out of here," "We're leaving," and we left the room, both of us.
**Q. So there was at -- again, just this was at Section 5, 13:18 to 13:52. So, actually, the interview went on for maybe another hour, all the way through video 8.**
**Was this kind of just trying to convey to him, "Hey, this is your last chance. You better tell**

**us now or it's too late. You're never going to have another opportunity to help yourself out"?**
A. That's not what it said.
**Q. What did it say?**
A. It said, you know, "I'm tired of listening to no information." "I'm tired of listening to your same denial." "You know something about this case."
I believed he -- if he didn't do it exactly -- which he confessed to at the end -- he knew the players and heard the story. You don't hang with these knuckleheads and get caught in a car with them and not know what's going on. And I'm trying to find out what his involvement is, what his participation is.
**Q. Okay. I'm going to play this part. This one is -- oh, shoot, I don't have the timestamp on this. It's towards the very end of the interview.**
**(Video played but not transcribed.)**
**Q. (By Mr. Fisher) So this is Priest talking, right?**
A. Yeah. I think you need to ask him the questions.
**Q. But he's just kind of pointing over at you, you're sitting there right next to him, right?**
A. I'm just listening.
**Q. And he points over at you and he says, "We're**

**in here busting our ass trying to save you," right?**
A. I don't know what that means. You have to ask Priest what it means.
**Q. You know you were there in the interrogation?**
A. I was.
**Q. Anything wrong with that statement by Priest? Was that against the training to say something like that, "We're in here busting our butts trying to save your ass"?**
A. I would not like to opine on what Priest said. I'd like you to ask him.
**Q. No, I'm just asking you whether or not you've ever learned through your training, supervision, et cetera, that saying something like that would be inappropriate to a suspect in an interview?**
A. No, I don't think that's inappropriate.
**Q. Okay. I'll just play the rest of it.**
**(Video played but not transcribed.)**
**Q. Anything wrong with that last part of the clip we played? Does that violate any training/policy at DPD or anything?**
A. No.
**MR. COOPER:** Objection to form; foundation.
A. No.
**Q. (By Mr. Fisher) So cursing at the suspect,**

**even if it's a child, 14-year-old, nothing wrong with that?**
**MR. COOPER:** Same objection.
A. No. I'm sure Lorenzo Montoya heard curse words before.
**Q. (By Mr. Fisher) Okay.**
**MR. FISHER:** This one is clip -- or Section 5, 4:34 to 4:55.
(Video played but not transcribed.)
**Q. (By Mr. Fisher) You say to him, "So we can do damage control." "You better tell us what your involvement is so we can do damage control," right?**
A. Correct.
**Q. What were you trying to convey there to him? What did you mean by "damage control"?**
A. As I stated earlier --
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Same objection.
A. As I stated earlier in the deposition, it's -- we don't know what we're going to charge him until we know what he knows and what the story is. So that would be damage control. I don't know what the DA is going to charge him. I don't know what his involvement is. He's not talking.

**Q. (By Mr. Fisher) What kind of damage control could you have done if he had talked or had confessed earlier to something?**
A. It wouldn't have been me, it would be the DA's office. They would have -- they would charge him appropriately, whether he's a cooperating witness or he's a murder suspect, they would have charged accordingly.
**Q. Now, you were saying there to him, so we can do damage control.**
A. I meant collectively, the police department, the DA's office. I didn't articulate that, but that's what I meant.
**Q. Okay. And you meant if he were to kind of fess up and tell more about his involvement, that's when we could do damage control, right?**
A. If he told me he saw Nicholas Martinez kick her in the head and hit her with an object, kill her and drag her outside and put lighter fluid on her and tried to set her on fire and took her keys and did this and I just stood there -- like he did in the end, "I just stood there" -- it would be a whole different interview. But he said that at the end, and I still don't know if that's the complete truth.
**Q. So you're saying if he had admitted those**

**things in the beginning of the interview?**
A. It would be a different interview.
**Q. Okay. You would have been able then to do more damage control?**
A. No.
**Q. Okay.**
A. The damage control is done with the DA's office on what they file.
**Q. Okay. Let's keep -- oh, so saying this in an interview, that we can do damage control if you fess up now and tell what your involvement was, did that run afoul of any of your training or policies at DPD in how to conduct interviews?**
A. No, I don't think it's inappropriate.
**Q. Okay. I'll keep going.**
**(Video played but not transcribed.)**
**Q. I'll play the next one here. This one is Section 4, 17:22 to 18:09.**
**(Video played but not transcribed.)**
**Q. So there you ask him, "Are you scared of going to prison," right?**
A. Yes.
**Q. And while he's crying, he shakes his head yes, right?**
A. Correct.

**Q. And at that point you're using a very sympathetic tone, right?**
A. I'm just talking to him.
**Q. Kind of quietly, right?**
A. Well, okay.
**Q. And, again, really close to him, right?**
A. Yeah. I'm the same proximity I've been during the whole interview.
**Q. And you're putting your arm on his arm, right?**
A. Yes.
**Q. Trying to convey a little bit of sympathy?**
A. No.
**Q. Why are you touching him like that?**
A. Just a habit. A quirk.
**Q. Okay. And you say to him, while you're touching him like that, "You've got to help yourself out on this thing," right?**
A. I believe so, yes.
**Q. And what are you trying to convey there?**
A. I meant to tell us what happened.
**Q. And if he does that, he's going to help himself out?**
A. Possibly.
**MR. COOPER:** Object to form.

**Q. (By Mr. Fisher) Right? That's what you're conveying to him? You're saying it specifically to him, right?**
A. Possibly. As I stated before --
**Q. (By Mr. Fisher) Well, you didn't say, "You could possibly help yourself out if you confess to this crime," you told him, "You need to tell us what happened so you can help yourself out," as you're stroking his arm sitting next to him in a sympathetic voice?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and the foundation.
A. Well, I'm not stroking him arm, I touch his arm.
**Q. (By Mr. Fisher) Okay.**
A. But I do say that, yes.
**Q. Okay. And anything wrong with this, according to your training, policies, everything you've been taught as a homicide detective?**
**MR. COOPER:** Objection to form.
A. No training or policies in regards to that.
**Q. (By Mr. Fisher) Okay.**
A. And I don't think it's inappropriate.
**Q. Just going to Section 4, 9:35 to 9:57.**

**(Video played but not transcribed.)**
**Q. You're telling him over and over again in this clip you know he was there, right?**
A. Yes.
**Q. He's denying it, correct?**
A. Correct.
**Q. But you're saying, "It's up now. We know, Lorenzo. We know you were there," right?**
A. Correct.
**Q. How did you know that?**
A. I didn't.
**Q. Okay. But it's just something you were saying to him, right, to make him think that he didn't have another way out or to make him think that you guys knew something you didn't know?**
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Join.
A. Make him think we knew he was there. Then I asked him about the car.
**Q. (By Mr. Fisher) Okay. And you hear at the very end of that clip, again, this time it's Martinez saying it, but he says -- you're telling him, "We know you're there, we know you were there, he denies it, right?**

A. Correct.
**Q. And then Martinez says at the end of this clip --**
**(Video played but not transcribed.)**
**Q. (By Mr. Fisher) -- "this is the time to save yourself."**
**Anything wrong with doing that, according to your training, everything you were taught about interrogations over the years, saying to the suspect, "We know you were there, we're not going to accept your denials, but this is the time to save yourself."**
**Anything wrong with saying that?**
A. I don't think that's inappropriate.
**MR. COOPER:** Objection to the form; foundation.
**MR. RINGEL:** Object to the form.
**Q. (By Mr. Fisher) It's not an appropriate promise or anything like that?**
A. It's not a promise.
**Q. Okay.**
**MS. BYRIALSEN:** Training.
**Q. (By Mr. Fisher) This was in line with your training?**
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Same objection.

A. There is no specific training or procedures in regards to saying that statement.
**Q. (By Mr. Fisher) Okay. Did you ever convey to him or his mom that if they just -- if he would just tell you what you want to hear, he would be able to go home that night?**
A. I don't recall. I don't believe we said that. I don't believe I said that. I don't know if somebody else said it.
**Q. Whether or not you said it outright, did you ever try to convey that message to either him or his mom, that if they just tell you what you want to hear, he gets to go home that night?**
A. I don't recall, no.
**Q. Okay. I'm just going to play you this clip of what his mom says at one point during the interview before she leaves the room. And this is Section 2, 15:07 to 15:12. It's a short clip.**
**(Video played but not transcribed.)**
**Q. Did you hear his mom say that, "Tell them exactly" --**
A. Yeah, she's the one who said that.
**Q. Yeah. "Tell them exactly what they want to hear so we can get out of here," right?**
A. Yes.

**Q. And apparently that's what she understood was going on at that point; that if Lorenzo told you guys what you wanted to hear, he could get out of there, right?**
**MR. COOPER:** Object to form.
**MR. RINGEL:** Object to the form and the foundation.
A. You have to talk to her about what she understood. I don't know what she understood.
**Q. (By Mr. Fisher) Okay.**
A. I didn't solicit that statement, and she said it on her own.
**Q. Okay. Clearly, you know, the clip speaks for itself.**
A. Correct.
**Q. Let's play a few more.**
**MR. RINGEL:** Yeah, clearly the whole interview speaks for itself.
**MR. FISHER:** Yes, it does.
Let's play a few more here.
**MR. RINGEL:** Can we take a break?
**MR. FISHER:** Sure.
**MR. RINGEL:** How much more do you have?
**MR. FISHER:** Total time, you want to know?
**MR. RINGEL:** Yeah. I want to get a sense of

how much more time you have in this deposition.
**MR. FISHER:** I would probably say, best guess, hour and a half, maybe a little bit more.
**MR. RINGEL:** Okay. If we could take ten minutes, I would appreciate it.
**MR. FISHER:** Sure.
(A recess was taken from 3:31 to 3:43 p.m.)
**Q. (By Mr. Fisher) All right. So I'm going to play another clip. This is from Section 5, 14:43 to 15:44.**
**(Video played but not transcribed.)**
**Q. So that clip we just watched, anything wrong with your conduct in that clip at all?**
A. No. I'm sure you're going to say I banged on the table.
**Q. Well, you did.**
A. That's emphasis. He didn't flinch; he didn't seem intimidated; he didn't get upset about it.
**Q. Okay.**
A. It was for emphasis.
**Q. Okay. So kind of repeatedly banging on the table, pointing at him, raising your voice.**
A. I pointed at him consistently. I guess I raised my voice. I talk loud. My wife has the same complaint, "Quit yelling at me." I'm not yelling at

you, I'm just talking to you.
**Q. So but anything -- were you ever taught or trained at DPD, you know, homicide trainings or interrogation trainings, that you should avoid the kind of conduct that you saw in this video?**
A. No. We weren't --
**MR. COOPER:** Objection. Sorry.
A. We weren't --
THE DEPONENT: I'm sorry, I keep interrupting you.
**MR. COOPER:** No, no, that was my fault. I was late.
A. There is no procedures or training. I don't think it's inappropriate. I wasn't yelling at him. I was -- I have a loud voice, you can tell I was very frustrated, I was kind of upset. But I didn't do anything outrageous. Banging on the table or maybe talking loudly, I don't think that's inappropriate.
**Q. (By Mr. Fisher) Okay. Let me just play the end of that part again. I just forget...**
**(Video played but not transcribed.)**
**Q. When you were saying to him, "We've got your footprints, we've got your fingerprints," you didn't have his fingerprints matching anywhere at the crime scene, right?**

A. Not that I knew of. I knew we had fingerprints.
**Q. So that was like a bluff about the fingerprints?**
A. We didn't have any identification until we caught him in the stolen car, so there wouldn't be time for the crime lab to analyze or compare fingerprints. But we do have fingerprints in the case.
**Q. Yeah. I think you were saying, "We've got your fingerprints."**
A. Yeah, I probably did.
**Q. And what did you mean by that?**
A. We have your fingerprints.
**Q. At the scene?**
A. Yes.
**Q. But it wasn't -- that wasn't true?**
A. I don't know if it was true or not, or whether it came to be true or not. But at that point in time we hadn't identified the fingerprints as his.
**Q. Okay. And there is nothing in your training at DPD, you were never cautioned against claiming you had someone's fingerprints at the scene when you really didn't, right?**
A. I think I've asked and answered that. There is no training or procedure saying that you can't not

tell him the whole truth.
**Q. Did you -- withdraw.**
**Let me just hear this one part again.**
**(Video played but not transcribed.)**
**Q. What does that mean, "We're out of here, you're done"?**
A. I believe when we left the interview, we were done.
**Q. Meaning?**
A. A lot of meanings to that. One meaning I could think of off the top of my head was usually when you conclude an interview and a suspect goes wherever they're going, they're not going to talk to you again. Counsel is going to get involved, things are going to happen. They're not going to talk to you again. So you really get one chance to interview somebody if you interview them, so I believe that. But I just was frustrated, like we keep getting the same answers -- roundabout answers to the questions, it's back and forth, "yes, I did," "no, I didn't," "I was there," "no, I wasn't" -- and it was just like we weren't getting anywhere. Spinning our wheels. You asked when do we conclude an interview; well, this was it.
**Q. I mean, this wasn't. This was --**
A. It wasn't.

**Q. It was sort of a bluff?**
A. In my mind, it was -- we were done.
**Q. It was kind of a bluff that you were done?**
A. No, it wasn't a bluff. It was, we were done.
**Q. So why did you go back -- this, again, was at --**
A. I don't know why. I can't recall why.
**Q. This is about two-thirds of the way in.**
**Did you go out and have a conversation with Priest or other supervisors and say, "Hey, we need to get more"? "We've got to get him to admit it"?**
A. Well, I'm sure I had a conversation with everybody out in the unit, but I don't recall what was said. But I went back in in regards to a polygraph that he agreed to take, so I -- I don't know why I went back in.
**Q. Right. And then you went back in and pretended that you were asking baseline questions?**
A. It's not pretend; it's called relevant questions. Those were relevant questions. I wasn't a polygraph examiner at that time, but those are the questions that we formulate for a polygraph examination. Relevant questions. Basically we don't ask "What color was the car," we ask, "Did you commit the murder?"

**Q. Right.**
A. You know, those are relevant questions. All those questions, after being a polygraph examiner for 11 years -- 9 and 11 years -- are relevant questions. They were questions I would use to formulate questions for a polygraph examination. So I must have been smarter than I thought I was.
**Q. Okay. So like an example of something you used were, "Were you inside the house when Emily Johnson was killed or outside the house?" That's an appropriate baseline question?**
A. No, I asked yes-or-no questions.
**Q. "Yes or No, were you inside the house when Emily Johnson was murdered?"**
A. That's a yes-or-no question, yes.
**Q. And that was appropriate?**
A. It would be.
**Q. Even though the answer, "yes" or "no," kind of both incriminates you, right? "Were you inside the house" --**
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Join.
**Q. (By Mr. Fisher) We'll get to that question.**
A. I don't know how "no" incriminates you.

**Q. "Were you inside the house when she was killed?" And if you say "no," then it implies you were outside the house, just being a lookout.**
A. Not necessarily.
**Q. We'll look at it when we get there.**
**Let me show you another one here. This one is Clip 3, 8:15 to 9:19.**
**(Video played but not transcribed.)**
**Q. So in this clip you come into the room raising your voice again, right?**
A. I wouldn't call it raising my voice, but talking loudly, yes.
**Q. Okay. You were talking louder than you were at other points during the interview, right?**
A. Yeah. My voice fluctuates a lot of times different ways.
**Q. And you're standing over him in this clip as well, correct?**
A. I'm standing next to him, yes.
**Q. Well, he's sitting down in the chair and you're standing next to him, but pretty darn close. Your legs are almost touching, right?**
**MR. RINGEL:** Object to the form and foundation.
**Q. (By Mr. Fisher) Right?**

A. A foot away, I don't know. Six inches away. I don't know. I'm not touching him.
**Q. And you're kind of hovering over him and putting a photograph in his face a couple different times, right?**
A. I'm showing him the photograph, yes.
**Q. Pointing at him when you come in the room while you raise your voice, right?**
A. Correct.
**MR. RINGEL:** Object to the form.
**Q. (By Mr. Fisher) This kind of body language -- this raising the voice, getting in someone's face, pointing at him -- ever taught that you shouldn't be doing that in an interrogation?**
A. No policies or training in regards to that specific question that you're asking about this specific event. I don't think it's inappropriate.
**Q. Okay. I'm talking about doing this type of thing in general, not just -- I'm sure you didn't have training that you should never point at Lorenzo Montoya and yell at him. I'm saying did you ever get training --**
A. That's what you're asking me.
**Q. No, not specifically about him. Did you ever specifically get training that you should not point and**

**raise your voice at a suspect, get in his face, tower over him, stay really close to him, anything like that?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form.
A. No. I can tell you, I've had probably about three cases where people have come in, sat down, and confessed to a murder.
**Q. (By Mr. Fisher) You need to give a little -- you need to give them a little something, right?**
A. Well, they don't do that.
**Q. Right.**
A. You have to do an interview.
**Q. Right. And sometimes you have to get in their face a little bit and raise your voice a little bit, and there is nothing wrong with that?**
A. Sometimes, sometimes not. It's all different.
**Q. I'll show you one more. One more here. This is Clip 4, 12:11 to 12:32.**
**(Video played but not transcribed.)**
**Q. In that clip he's trying to deny his involvement, right?**
A. He said he wasn't there.
**Q. Well, a few times, right?**
A. Correct.

Case No. 1:16-cv-01457-JLK-TPO Document 212-4 filed 07/20/23 USDC Colorado
pg 60 of 145

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

218

**Q. And you interrupt him, kind of loudly, and say, "You were there." "I know you were there," right?**
A. I talked to him in the same tones in the whole questioning of that segment, yes.
**Q. But you interrupt him in the middle of his denial and say, "I know you were there." "You were there," right?**
A. Yes.
**Q. Is that something you were trained to do in interrogations is constantly interrupt someone's denials?**
A. No.
**Q. Were you ever trained or warned against doing that?**
A. No. It's not inappropriate.
**Q. Okay. And, again, in this clip, you're also -- just like you were in a lot of the ones we're watching -- again, 1 to 2 feet away from his face while you're doing this?**
A. Correct.
**Q. Would you agree in this one you're kind of raising your voice as well?**
A. I'm speaking loudly. There's times I spoke loudly, there's times I spoke softer, there's times I spoke conversationally.

219

**Q. Okay. This one is -- I don't have the timestamp. I apologize.**
**(Video played but not transcribed.)**
**Q. Again, pretty close to him? 1 to 2 feet from his face, right?**
A. Correct.
**Q. Raising your voice a little bit?**
A. No, I think I'm talking to the same volume.
**Q. Okay. But you're saying to him, "You're not that tough," "You're just a boy, you're not a man," right?**
A. Did I say "You're not a man?" I said -- I think I said, "You're just a boy."
**Q. "Just a boy. You're not a man. But you're standing up for a man crime here"?**
A. Possibly, yes.
**Q. Anything in your training or supervision saying there is anything wrong with staying stuff like that to a 14-year-old?**
A. No, there is no training or procedures that would address that specific statement, and I don't think it's inappropriate.
**Q. Okay.**
**This is Clip 5, 5:48 to 6:21.**
**(Video played but not transcribed.)**

220

**Q. So here you're, again, 1 to 2 feet away from him, right?**
A. Correct. Same position.
**Q. Pounding on the table again, right?**
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Same objection.
A. For emphasis on the words "We're just going to give up on this investigation."
**Q. (By Mr. Fisher) Okay. And here you're telling Lorenzo you're not going to give up on this investigation, right?**
A. Correct.
**Q. You're telling him he can deny this thing all he wants, "We're going to keep asking you questions. We're not just going to quit if you just deny this thing," right?**
A. Correct.
**Q. In other words, his denials are not going to work. You guys are not going to give up, right?**
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) That's what you're trying to convey to him?**
A. Just because he comes in there and says "I didn't do it" doesn't mean we're going to stop interviewing him.

221

**Q. Right. Even if he says that dozens of times?**
A. He said back and forth certain things.
**Q. Okay. But even if he -- were you ever trained or warned by supervisors, taught by anybody at DPD, that this kind of statement, "We're not going to give up until you tell us," "we're not going to just take your word for it and stop this investigation," there is anything wrong with making that kind of statement?**
A. There is no training or policy specifically addressing that incident that you're talking about, and I don't believe it's inappropriate.
**Q. Any types of statements like that that would be inappropriate, like we're talking about? I'm not saying that you would have had training.**
A. That we're not going to give up on the investigation?
**Q. No, that we're not going to take your word -- "We're not going to just accept your denial. We're just going to keep going, we're just going to keep going," is there anything wrong with saying that in an interrogation?**
A. No.
**Q. Is there anything wrong -- you were never trained that -- withdrawn.**

Mile High Court Reporting and Video, Inc. 303-202-0210
contact@milehighreporting.com

**This is -- oops. This is Clip 2, 7:06 to 7:43.**
**(Video played but not transcribed.)**
**Q. So this is towards the beginning part of the interview, right?**
A. Correct.
**Q. Mom is still in the room. The detective walks in and says, "We've got Luke in the other room telling us a story," right?**
A. Correct.
**Q. Who is that detective?**
A. Dale Wallis.
**Q. Was this coordinated, like he was going to come in and do this, or this just like happened that he walked in there?**
A. It was not coordinated. He came in on his own accord.
**Q. Okay. So this wasn't like something that was talked about or planned or anything?**
A. No. No conspiracy.
**Q. Okay. I mean, you guys did talk in the other room about sharing information and whatnot, right?**
A. Yeah. I don't see what it would achieve to say, "Okay, you come in and tell us JR is telling us everything." I guess that could be a tactic by

somebody, but it's not -- wasn't in this case. He came in on his own. He would have been interviewing JR, or Luke I guess it was.
**Q. Let's keep hearing what he said here.**
**(Video played but not transcribed.)**
**Q. So you're saying, "As you can tell, we've got Luke telling the whole story, and I don't want you to get caught in the middle of this thing," right?**
**Do you know what Luke was saying in the other room?**
A. No. I hadn't talked to Dale Wallis at that time.
**Q. Do you know that Luke never said that he was there, never said that Lorenzo was there?**
A. I don't recall that.
**Q. You don't recall whether or not that happened?**
A. Whether he said that or what Luke said.
**Q. Okay. But the -- well, never mind.**
**This is 1 -- so Clip 1, 13:30 to 13:44. So it's pretty early in the interview.**
**(Video played but not transcribed.)**
**Q. Did you really know exactly what Nick had said at that point or was that untrue?**
A. I don't recall.

**Q. Okay. Where would you have learned what Nick had said?**
A. Probably other detectives. It's my recollection that Nick was never interviewed, but I don't know.
**Q. If that was the case, then certainly you didn't already know what Nick said, right?**
A. Say that again.
**Q. I said, if that was the case, if he was never interviewed, you certainly wouldn't have known what he said when you told him --**
A. That's correct. But I'm incorrect in that assumption.
**Q. Okay. Were you ever taught there is anything wrong with telling a suspect somebody else is incriminating when it's not true?**
A. That is appropriate. That's not inappropriate, I should say.
**Q. And not even with children, right?**
A. Doesn't matter.
**Q. This is -- this is 4 -- Clip 4, 7:47 to 8:05.**
**(Video played but not transcribed.)**
**Q. So here Detective Martinez claims he got a message on his screen saying that Nick said that Lorenzo was there, right?**

A. You know, I would have to look at the table. At one point we had a computer screen --
**Q. There was a computer screen.**
A. -- in the interview rooms that people could type information or questions on. And Lorenzo's response is pretty curious, "He's lying out his ass." How does he know Nick is lying out his ass when he says he was there?
**Q. He's saying that if Nick is telling these other detectives that Lorenzo was there, then Nick is lying out of his ass.**
**MR. COOPER:** Objection to form.
A. I thought they said Nick said he was there.
**Q. (By Mr. Fisher) No.**
A. Nick was there, not Lorenzo.
**Q. Listen again.**
A. Then that would make sense on that answer, "He's lying out his ass."
**Q. I'll just play it from the beginning again.**
**(Video played but not transcribed.)**
**Q. See, Martinez says, "Nick said you were there."**
A. Okay.
**Q. I'll represent to you -- I'll show you the statement later. Nick made a statement -- maybe this**

**will refresh your recollection. He said him and JR were just looking for cars in the neighborhood, they found the keys to a Lexus and they drove off with it.**
**Does that refresh your recollection?**
A. I had heard that, so we're --
**Q. Okay.**
A. I think maybe in discovery that -- something about them being on the mat or something.
**Q. On the what?**
A. On the mat inside the car.
**Q. Yeah, keys on the mat.**
A. And I don't recall knowing that information at that point in time.
**Q. Right. So here -- I'll represent to you that Nick never said that Lorenzo was at the scene of the homicide or he was there when the car was stolen. He never said that to detectives.**
A. Okay.
**Q. But here Martinez is claiming that he's got some message on the screen about Nick saying that about Lorenzo, right?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and foundation.
A. Correct.

**Q. (By Mr. Fisher) But you were taught it's not inappropriate to lie to suspects about what other people are saying about them, right?**
A. Yes. But I don't know if that was a lie. I don't know the source of that. I don't know --
**Q. I mean, I'll show you the statement. I'll show you the statement.**
A. Who, Nick's statement?
**Q. Yeah.**
A. Who says Nick is telling the truth?
**Q. I know. So then it would have just been where were you getting that information? You were telling him Nick says he was there. Martinez was telling him, right?**
A. Was that from the statement or interview of Nick? It sounds to me like they were interviewing Nick, but I don't recall them interviewing him.
**Q. I'll show you --**
A. Does that make sense?
**Q. Yeah. I'll show you the interview in a little bit. I'll show you the report. It's much shorter than watching the whole interview.**
A. As if I want to see it.
**Q. Right.**
**This is Section 4, 5:55 to 6:14.**

**(Video played but not transcribed.)**
**Q. So here he is denying that he was involved or that he killed her, right?**
A. Correct.
**Q. And you're getting pretty close to him, right?**
A. I'm the same distance.
**Q. Yeah, that 1 to 2 feet, right?**
A. Correct.
**Q. And he was pretty forceful in that denial, right? He was pretty loud about it?**
A. Yeah.
**Q. Is there something about his body language that makes you feel like he's not telling the truth or something?**
A. I just think he doesn't want to talk. He's closed up; his arms are folded. He's looking down. He could be emotional about what happened, I don't know. There's a lot of theories on body posture, but I can't say this represents them.
**Q. Okay. And this was, like we said, Section 4. So this is more than halfway into the interview. Does that make sense?**
A. Correct.
**Q. And he's still denying that he was involved in the homicide, right?**
**MR. RINGEL:** Object to the form.
A. Correct.

**Q. (By Mr. Fisher) This is Section 4, 9:35 to 9:57.**
**(Video played but not transcribed.)**
**Q. So here he is denying jacking the car, denying killing her, right?**
A. Yeah. Didn't we play this before?
**Q. We might have. My question is do you -- how many times does he have to deny it before you're going to believe him?**
**MR. COOPER:** Objection.
**MR. RINGEL:** Object to the form and the foundation.
A. I don't --
**Q. (By Mr. Fisher) Was there a way that you would ever believe him? Like how many times could he have denied it before you would stop?**
**MR. RINGEL:** Object to the form; foundation.
A. I don't know if there's a specific amount. I mean, ultimately he confessed, on video 7 and 8, which you're not playing, but in the conversation on -- interrogation, he confessed to facts about the case.
**Q. (By Mr. Fisher) Okay. So --**

230

A. So there is no number.
**Q. Okay. There is no number?**
A. There is no number.
**Q. And there's no -- you also weren't taught there any kind of limits on how many times you can ask a question over and over again?**
A. No.
**Q. I'm not going to play all of these about him denying it. You watched the video the other day. It's fair to say, he denied being involved in that crime many, many, many times?**
A. Correct.
**Q. Okay. Eventually he made some admissions about being there and being involved, right?**
A. And details about the crime, yes.
**Q. Okay. Let's look at some of these details he gave you, okay?**
**This is Section 6, 18:07 to 18:49.**
**(Video played but not transcribed.)**
**Q. So here he says they just booted the door down, right? He says it a few times, right?**
A. Correct.
**Q. As if they kicked the door in, right?**
A. Correct.
**Q. You try to ask him if maybe they had a**

231

**crowbar or a stick to pry something open, right? You didn't say the word "pry."**
A. No, I --
**Q. To suggest that maybe --**
A. -- asked him if he used an object to boot the door down.
**Q. There was no evidence of the door being kicked in or smashed in, the back door, or anything like that, right?**
A. That's correct.
**Q. Okay. So that's him giving a detail about the crime that doesn't actually match the crime scene, right?**
A. Correct.
**Q. Okay. And here he is, again, talking about a similar topic. This is at Clip 7 from 22:00 to the end of that clip -- to the end of that Clip 7.**
**(Video played but not transcribed.)**
**Q. So here you are telling him they didn't kick the door in, they got in some other way, right? Towards the end.**
A. No.
**Q. Do you want me to play the part again?**
A. No. He said he got in another way.
**Q. Here, listen. I'll play you the end again.**

232

**(Video played but not transcribed.)**
**Q. He said they didn't kick the door in, right?**
A. I don't hear that. That's hard to hear.
**Q. Because you know that there was no evidence of the door getting kicked in, right?**
A. Correct.
**Q. Okay. And you say to him --**
**(Video played but not transcribed.)**
**Q. So you say to him if they didn't kick the door in, how did they get in, and he says they bashed in the window, right?**
A. Correct.
**Q. There was no window bashed in the back, correct?**
A. Correct.
**Q. So that was a wrong fact about the case? Wrong detail, right?**
A. Correct.
**Q. And that's not something -- a detail that someone would withhold because -- or get wrong because it would somehow minimize their involvement, bashing in of a window versus sticking your hand through a milk chute, that doesn't help somebody out to get a better sentence or a better deal or be less guilty, right?**
**MR. COOPER:** Objection to form.

233

**MR. RINGEL:** Object to the form and the foundation.
**Q. (By Mr. Fisher) It's just a wrong fact?**
**MR. RINGEL:** Same objections.
**MR. COOPER:** Same objections.
A. It is in this case. The milk box next to the door could be perceived as a window.
I've got to tell you, it's my recollection that I thought they knocked on the front door, she recognized them as one of her students, one of them was her student, and she let him in. But I guess I was wrong. But I don't know during the interview what my assumption was. But it's my recollection that I thought they knocked on the front door and she let them in. I do remember the milk box.
**Q. If that was the case, then both bashing in the door and bashing in the back window would also be wrong facts about the case, right? Wrong details?**
A. Well, they are wrong facts. They didn't bash a window in and they didn't bash the back door.
**Q. Okay.**
A. But he said he came in through the front door after they opened it.
**Q. Okay. I'm going to play you another clip.**
**This is Clip 8, 22:29 to 23:06.**

234

(Video played but not transcribed.)
**Q. (By Mr. Fisher) So there you asked in an open-ended way, "What did she have on?" And then you suggested "Maybe pants?" And he said, "Either pants or sweats," right? That's what he said?**
A. Correct.
**Q. And then you said to him, "That's not what she had on. What did she really have on?" He just didn't respond to that, right?**
A. Correct.
**Q. You knew that she was wearing a silver dress, right?**
A. I don't recall knowing at that time in the interview what she had on. I must have known she didn't have sweats or pants on because I said "That's not what she had on," or else I didn't know. But it's my recollection that I learned in some discovery that she had a silver dress on, but I don't recall her having that on from the investigation initially. I wasn't involved in that. The body had been transported before I got to the crime scene. I never saw her body or her dress.
**Q. Well, I'm going to represent to you that there is no dispute in the case whatsoever that when she's found, she's wearing a silver dress.**

235

A. And I don't recall knowing that fact.
**Q. And I'm just asking you, here he is giving wrong facts about a minor detail in the case that he would have no reason to lie about, even if he's trying to minimize, right, whether she is wearing pants or a silver dress?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and the foundation.
**Q. (By Mr. Fisher) Right?**
**MR. RINGEL:** Same objections.
A. I think it would be problematic if he gave wrong information about her mode of dress if he knew she was wearing a silver dress, which I would assume would be just like a party dress. Because I know they went to the bars before and then came home from the bars and Mr. Davis passed out in the bedroom. But I would think if he saw her in that silver dress, that would be an important fact to obtain.
**Q. Right. But, in fact, he didn't know that -- it appears he didn't know that, right? He's saying she's wearing pants or sweats?**
A. He denies it, yes. He says she is wearing sweats.
**Q. And he says maybe a window was bashed in, he**

236

**says they booted the back door down. All three of those things are facts that were inconsistent with the other known evidence in the case, right?**
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Same objection.
A. Well, it's been revealed that he got it through the milk box, which you told me. And that could have been, like I said, misconstrued as a window in the back. So they are not --
**Q. (By Mr. Fisher) A milk box could have been bashed in, like a window?**
A. You ever seen a milk box?
**Q. Yes.**
A. What do they look like?
**Q. It's a little slot that you put the milk into.**
A. Right, in those old homes.
**Q. Yeah.**
A. Yeah. Through the wood, has a latch, lockable.
**Q. Was it bashed in?**
A. I don't recall. I really don't know. But I think they didn't bash it in, they -- they may have broken the latch or something and reached in and got in

237

that way.
**Q. Right.**
A. I don't really know the facts about the milk box.
**Q. Okay. My point is here, when you're hearing things in an interview, somebody is admitting to something, they're confessing to the crime supposedly and they're giving you wrong details or wrong facts, what does your training say you should do in that situation?**
A. Well, there is no training --
**MR. RINGEL:** Object to the form and the foundation.
**MR. COOPER:** Same objection.
A. There is no training and procedures. As I stated before in this deposition, that you would try to get the right information from a suspect. Do they not tell you everything? Yes. Is there a reason why he didn't say "silver dress"? In his mind it could be that that's really incriminating evidence that she had a silver dress on. That means he saw her in the house with a silver dress on.
**Q. At this point he's already admitting to being there when they're beating her up. Why lie about what she was wearing --**

MR. RINGEL: Object to the form and the foundation.
**Q. (By Mr. Fisher) -- as opposed to just getting it wrong?**
A. You'd have to ask --
MR. RINGEL: Object to the form and foundation.
A. You would have to ask Mr. Montoya that.
**Q. (By Mr. Fisher) Maybe you could have asked him at the time.**
MR. RINGEL: Object to the form.
MR. COOPER: Objection to form; foundation.
A. Well, I didn't.
**Q. (By Mr. Fisher) I know.**
**Let me play this other clip. This is Clip 6, 14:28 to 14:46.**
**(Video played but not transcribed.)**
**Q. Do you hear him say "Doing that to that old lady, they beat her up"?**
A. Yes.
**Q. She wasn't an old lady, right? She was 29 years old.**
A. She was older than he was.
**Q. Okay. Would you classify her as "an old lady" at 29?**

MR. COOPER: Objection to form.
A. I wouldn't, because I'm an old man at that time.
**Q. (By Mr. Fisher) Okay. Do you think that was a correct fact if he's saying "they were beating this old lady up"? Was that consistent with the actual crime?**
A. Yes.
**Q. Okay. You think she was an old lady?**
A. If he's her teacher, or one of their teachers, what did you call your teacher when you were in grade school?
**Q. Certainly not an old lady.**
A. You didn't?
**Q. Not unless she was an old lady.**
A. They weren't young like today's teachers.
**Q. But this woman was 29.**
**This one is Clip 7 from 6 to 7:13. 6 minutes to 7:13.**
**(Video played but not transcribed.)**
**Q. So here you're asking Lorenzo what time this all happened. And at first he says, 9:00, 9:15 at night, right?**
A. No. That's when he said he went to 7-Eleven at 10th and Federal.

**Q. Which was after the homicide?**
A. Correct. And you could travel that from 38th to 10th in ten minutes.
**Q. Right. But you were saying it couldn't have been at 9, 9:15 at night, because this thing happened after New Year's.**
A. Well, I was confused, as I said. You can see, 9, 9:15. He's talking about when he went to the 7-Eleven. I guess I assume he was talking about when the murder happened, and I'm like, that doesn't fit.
**Q. Right before that he was just telling you how after the murder they went to the 7-Eleven on 10th and Federal, right?**
A. Correct.
**Q. And you said to him, "What time was that about?" and he said, "9, 9:15."**
A. Correct.
**Q. And you were asking about right after the murder?**
A. I asked what time he went to 7-Eleven.
**Q. Which was --**
A. He said 9 or 9:30. I think he said 9 or 9:15.
**Q. Which was right after the murder?**
A. Correct.

**Q. And you told him that's not correct because what everybody else knows the time of death was, right? I mean, you didn't say those exact words, but you corrected him. 9:15 couldn't be correct, right?**
A. Well, I think I was confused. I think I was thinking he was saying -- now that I watched the video, he's talking about going to 7-Eleven. I thought maybe he was saying when the murder occurred. That's why I started to nail down -- tried to nail down the time frame and told him what information we had when we believed the murder happened. I said between midnight, but I knew -- I don't know if during the interview, I knew later on that she went to the bar with Robert Davis and they came home. And they were downtown off of 14th and Larimer somewhere, and traveled there, which is only 10 minutes from 38th and Federal. And so it would probably have to occur after 2:00 if they left at 2:00. I can't remember what Robert Davis said.
**Q. Right. The other evidence was really they didn't get home until maybe 2:30, 3:00. They had gone to Chubby's after the bar closed?**
A. That's right.
**Q. Right?**
A. That could be consistent, yes.
**Q. Right. But here he said 9, 9:15. You told**

**him, "No, let me tell you what I know about the investigation. They didn't get home until after New Year's Eve." Right, you told him that?**
A. I believe so.
**Q. And then he said, "Okay, how about 1:00 a.m.?" And you said, "Okay, 1:00 a.m.," right? That was towards the end of the tape there.**
**MR. RINGEL:** Object to the form.
A. I guess I could have. We could replay it, but I'm going to agree with you.
**Q. (By Mr. Fisher) Okay. Neither of those times were correct with the other known evidence? This is another wrong fact or wrong detail, right? The murder didn't happen at 9:15 p.m., it didn't happen at 1:00 a.m.; she didn't get home until after 2:00, right? I mean, these are, again, wrong details?**
A. Well, that's the --
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Same objection.
A. That's the timeline we have during the investigation. But he also said, "I didn't have my watch, I didn't know what time it was." So he's -- he might be a little confused on timeframe, too. 1:00 and 2:00 in the morning look the same.
**Q. (By Mr. Fisher) Okay. Certainly not --**

**9:15 p.m. is a little different, right?**
A. Well, it's winter, so it would be dark, too.
**Q. But on New Year's Eve, you'd think you would remember --**
A. Well, that's --
**Q. -- the difference between those two?**
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) I could play you these other clips, but I'll just tell you, you just watched the video the other day. You asked him about the dog; he doesn't know anything about the dog, correct?**
**I'll just play you the clip, if you want.**
A. Well, no. Well, yeah, you might as well, because I can't recall whether he said they let the dog out or what.
**Q. So this is -- oh, shoot, I don't have this one timestamped. Sorry. It's a pretty short one.**
A. Your supervisor is going to be really mad at you.
**Q. I know.**
**(Video played but not transcribed.)**
**Q. "They didn't say nothing about no dog," right? That's what he said?**
A. Correct.
**Q. You know that there was a dog there at the**

**scene, right?**
A. At that time?
**Q. Yeah.**
A. I don't recall.
**Q. Why did you bring it up?**
A. Maybe I knew. I don't recall.
**Q. Okay. But he apparently didn't know about the dog, or at least didn't say so, right?**
A. He said "They didn't tell me about the dog."
**Q. Right.**
A. He said he saw them go in the back door, so I don't know -- you said -- you told me Nick said they took the dog to the garage, so I don't know --
**Q. Yeah.**
A. -- whether he knew about the dog or not, but he denied saying -- knowing about the dog. He said, "They didn't tell me anything about the dog."
**Q. Right. So doesn't know about the dog. He's wrong about the mode of entry. He doesn't know what she's wearing. He doesn't know what time this happened. He calls her an old lady.**
**How many facts does he have to get wrong before you start to doubt that he was really there?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and

foundation.
A. I concluded my interview shortly after that. The information was given to the assigned detectives and supervisors and then was filed by the DA's office. Apparently they thought it was enough. And it was tried by a jury of 12 and he was convicted. So I can't tell you -- you're asking me how much does he have to deny, what, for me to stop the interview? I concluded the interview shortly after that.
**Q. Those are not denials, those are just facts that he's getting wrong, which don't even make him less culpable to get those facts wrong, it's just he has wrong information. So what I'm asking you is --**
A. He's telling me wrong information. What he knows, I don't know.
**Q. What I'm asking you is what did your training say from DPD, from being in homicide in Denver PD, about when you're doing an interrogation and you get lots of wrong facts, what should you do then?**
**MR. RINGEL:** Object to the form and the foundation.
**Q. (By Mr. Fisher) What does your training say about that?**
**MR. RINGEL:** Same objections.
**MR. COOPER:** Join.

A. I don't know the training that specifically states that. There is no training or policy that states that. But my experience and tenure and common sense will tell you, you're trying to clear up the facts. If they're not cleared up, then that's what we have. That's what we have to live with. I don't know what to say about that. He's not -- either not telling me the whole truth or he's not -- he's denying that he knows about these facts, or maybe he just didn't know. I don't know. But I concluded the interview. My job was to interview him the best I could, and I did that.
**Q. (By Mr. Fisher) Okay. I guess I'm just asking you, did you ever receive any training or instructions on how to do interviews or interrogations where if you get wrong facts, you should ask more about that? Try to clear it up?**
A. I just answered, no.
**MR. COOPER:** Same objection.
**Q. (By Mr. Fisher) What about your training on when you get wrong facts, should you correct it and tell him the actual facts that you know as the investigator from the crime scene?**
**MR. RINGEL:** Object to form and the foundation.
**MR. COOPER:** Same objection.

A. I don't believe it's advantageous for interviews to give the suspect all the information you have. As I stated before, my job is not to give him information, my job is to obtain the information from the suspect.
Is there times where you have to give them information that you have to correct them or to see if they'll give you a different story? Yes. But I -- I don't believe in just saying, "Well, she had a silver dress on." He answered he thought she had sweats. I left it at that. I let it lie. And as I stated, I don't know if I knew she had a silver dress on. I guess I did. But I -- I left it lie. I couldn't get any more out of him. What more questions do I ask about her clothing --
**Q. Okay.**
A. -- without giving him the silver dress piece?
**Q. Let me play this clip for you. This is Clip 4, 7:02 to 7:31.**
**(Video played but not transcribed.)**
**Q. (By Mr. Fisher) So this is Clip 4. You asked him, "Who drug her out?" "Did you drag her out alone?" "How many people drug her out," right?**
A. Correct.
**Q. At this point in the interview, I'll**

**represent to you he hadn't said anything about her being dragged anywhere, but you asked him that question, "Who drug her out," right?**
**Is there anything wrong in your training or your experience or your supervision or your teaching on how to do interrogations or interviews that you should give a suspect a fact like that before he said anything about it?**
A. There is nothing inappropriate --
**MR. COOPER:** Objection to form; foundation.
A. There is nothing inappropriate or wrong, nothing is addressed in training or procedures. Is it a good idea? I don't know. I needed to give him some information to solicit information from him, and that's one fact that I revealed. Should I have done it? In hindsight, 20/20, maybe I should have queried him about where she ended up before I said that.
**Q. (By Mr. Fisher) I'm going to play you another clip. This is Clip 4, 8:46 to 8:57.**
**(Video played but not transcribed.)**
**Q. Here you're asking him who hit her with the shoe. He says he doesn't know, right? "Did you hit her with the shoe?" "No, I didn't hit her with the shoe."**
**Again, I'll represent to you at this point --**

**this is Clip 4 -- he hadn't admitted being there, he hadn't admitted seeing what happened, he hadn't said anything about a shoe, and here you are introducing the concept of who hit her with a shoe. Right? Is there anything wrong with that, according to your training?**
**MR. COOPER:** Objection to form; foundation.
A. There is no training or procedures that addresses that, and I don't think it's inappropriate. It's the same answer I just gave you. But I said, "What would you say if I told you your fingerprints were on the shoe?"
**Q. (By Mr. Fisher) But, again, he hadn't brought up the shoe at this point.**
A. I can't recall, but I don't think so.
**Q. Okay. And that was something you all -- you know, you found a bloody shoe at the crime scene and thought it was --**
**MS. BYRIALSEN:** Print.
**Q. (By Mr. Fisher) No, an actual bloody shoe, or high-heeled shoe. And that's what the crime scene revealed, that her shoe had been used as a weapon, it had blood on it, there were impressions of that. He hadn't said anything about that, but here you are introducing that idea to him before he ever said anything about that. Is there anything wrong with**

**that?**
A. No.
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) Okay.**
**This is Clip 4, 6:14 to 6:23.**
**(Video played but not transcribed.)**
**Q. So, again, this is Clip 4. I'll represent to you he hadn't, to this point, said anything about anybody kicking her in the head. And you ask him the question and introduced this into the interview for the first time, who kicked her in the head first.**
**According to your training and the way you were taught to do interrogations, is there anything wrong with adding that piece into the interrogation?**
A. No.
**MR. COOPER:** Objection to form; foundation.
A. No.
**Q. (By Mr. Fisher) Okay. So I asked you this with each of these facts individually. According to your training, what were you taught on how to -- what you were taught and how you to do interrogations and interviews by DPD and in sanctioned trainings. Was it appropriate to introduce several of these facts -- to have you be the one to introduce several of these facts into the interview, like "Who kicked her in the head**

**first?" "Who hit her with the shoe?" "Who drug her out?" -- to do all those things in combination to introduce them, not having come out of his mouth first, but to have you introduce them into the interview, is that inappropriate, that combination of things?**
**MR. COOPER:** Objection to form.
**MR. RINGEL:** Object to the form and the foundation.
A. It's not inappropriate, but there is only so long you can just ask the same question, "Did you kill Emily Johnson?" and he says "No," and not introduce some other information into the interview. I mean, where are you going to go with that? Are you going to sit there for two and a half hours and say, "Did you do it?" and he goes "No," and you leave it at that? You've got to give a little, take a little.
**Q. (By Mr. Fisher) Were you ever trained or taught that there is some kind of limit on how much information that you should introduce into the interview or that you should avoid trying to do that to some degree?**
A. There is no specific training or procedures in regards to that, but it's common sense. And I guess, to me, it makes a good interview when you don't just sit down and tell them everything you know right

away and then expect to get information from somebody. That doesn't make sense.
As I said many times in this deposition, my job is to get information, not give information.
**MR. FISHER:** Let's take five to ten minutes, and then I have like -- we can go off the record.
(A discussion was held off the record.)
(A recess was taken from 4:41 to 4:51 p.m.)
**Q. (By Mr. Fisher) There was a point we were just talking about earlier in the video where he's explaining after the homicide. He says, you know, me and Nick and JR went to 7-Eleven, right?**
A. Correct.
**Q. And you ask him where, and he says on 10th and Federal, right?**
A. Correct.
**Q. And you wanted to know -- and he, in fact, says that Nick or JR went inside the store, purchased some stuff, right?**
A. Correct.
**Q. And that the Lexus was outside at the gas station, right?**
A. Correct.
**Q. You wanted to know that because that's something that could be verified by the surveillance or**

**witnesses, right?**
A. Well, yes, I assume so. But that wasn't on my mind at that time. On my mind was what happened? What did you do?
**Q. Did that -- to your knowledge, that never -- there was no 7-Eleven footage of Nick or JR or Lorenzo being at that one on 10th and Federal, right?**
A. I do not have any knowledge of that.
**Q. Okay. Again -- and that's not a fact that somebody would try to make up to minimize their role in the offense, right? Where they went afterwards, whether they went to a 7-Eleven or some other store? That's not something someone -- it's not like "I didn't kick her," "I didn't kill her," "I didn't stab her"?**
**MR. COOPER:** Objection to form.
**Q. (By Mr. Fisher) It's not a fact that's going to get you in trouble --**
**MR. RINGEL:** Object to the form.
**Q. (By Mr. Fisher) -- admitting you went to a 7-Eleven, right?**
**MR. RINGEL:** Same objection.
**MR. COOPER:** Same objection.
A. Well, it's lying about the investigation in total. If they didn't go there and he lies about it, then he's lying.

254

**Q. (By Mr. Fisher) Maybe he's just making stuff up, right? That could be a possibility?**
A. It's the same as a lie.
**Q. Yeah. And making stuff up because at this point he's decided he can't keep just making denials to you, it's not going to work, he's got to tell you something, right?**
A. Or --
**MR. RINGEL:** Object to the form and foundation.
**MR. COOPER:** Same objection.
A. Or he thinks he's going to throw us off.
**Q. (By Mr. Fisher) He's got to help himself out at this point, he realizes?**
A. I can't tell you what's going through his mind. You have to ask him.
**Q. Several times during the interview, before he makes these admissions that he was actually there and actually involved with the killing of Emily Johnson, you offered him different explanations of how he could have been there, but ones that aren't as bad as going to intentionally kill someone, right?**
A. I believe so.
**Q. Is that a tactic that you were trained in doing, kind of developing a theme? Getting the suspect**

255

**to admit that they were actually there or part of or involved in the crime without maybe admitting the whole thing? Is that something that you were trained in?**
A. No training or procedures in regards to that specific information. It would just be, to me, kind of common sense, this -- like, "Really, why are you there?" "What's going on?" "Could you have been there to do this or that?" Different opportunities for different options.
**Q. Okay. I'm going to just play a couple of these clips. This is Clip 4, 8:08 to 8:22.**
**(Video played but not transcribed.)**
**Q. So here he hasn't admitted yet that he was there to jack the car or that he was there to kill the woman, and you're offering him an explanation of "You didn't mean to go there to kill that lady, you just meant to jack the car and it went bad," right?**
A. Correct.
**Q. And that's in hopes that you get him to admit to being there to some degree at all, right?**
A. It's offering him alternate opportunities or alternate information.
**Q. Okay. I'm going to play you another one. This is 4 -- Clip 4, 6:30 to 6:59.**
**(Video played but not transcribed.)**

256

**Q. (By Mr. Fisher) So here he's denying being there, right?**
A. Correct.
**Q. And you're offering him, again, the explanation of "You didn't mean to kill her; you just went to take the car," right?**
A. Correct.
**Q. I could play several more clips, but it's fair to say that was a theme that you were developing throughout the interview before he made admissions, right?**
A. You can call it --
**MR. RINGEL:** Object to the form.
A. You can call it a theme, but it's just a line of questioning.
**Q. (By Mr. Fisher) It's something that you brought up over and over again, unless you want me to just play it?**
A. Yes. No, I don't want you to play it.
**Q. Okay. So all of these clips, all these different clips that we've gone over here, clips of you telling him he's going to go to jail, right?**
A. Correct.
**MR. RINGEL:** Object to the form.
**Q. (By Mr. Fisher) Clips of you saying, "You've**

257

**got to help yourself out here," right?**
A. Correct.
**Q. Clips of you saying, "Whoever gets to the finish line wins the deal on this thing," right?**
**MR. RINGEL:** Object to the form.
**MR. COOPER:** Objection to form.
A. What is the question about that statement?
**Q. (By Mr. Fisher) I'm saying -- I just want to -- I don't want to ask you a question that's 20 minutes long, but I just want you to agree with me that we watched clips that have some of this content in them?**
A. That's correct, we did watch those.
**Q. And here we are in these last several clips of you giving him a possible explanation to say where it would make him still guilty of the crime but feel less culpable, right? Like maybe he went there, he didn't mean to kill her, it wasn't intentional, he just went to jack the car and it went wrong, right?**
A. Yes. I don't really know or knew at that time what the reasoning was why they went there.
**Q. Okay.**
A. I believe it was to get the car. Because there was some information that I heard they recognized the car because she had driven it to school. And one

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**258**

of them was her students and they said, "Yeah, that's Mrs. Johnson's car."

Q.  But kind of getting to my long question I'm trying to cut up into several pieces.

We watched clips of you talking about him being in prison -- or going to prison.  He's not going home that night.  He's got to help himself out.  Whoever gets to the finish line first wins the deal.  Him getting facts wrong about the interrogation and you correcting him.  Were you ever taught or trained that you should avoid doing a combination of all those things or it could lead to a false confession?

MR. RINGEL:  Object to the form.

MR. COOPER:  Same objection.

A.  There is no training or procedures addressing that specifically, no, and I don't think it's inappropriate.

Q.  (By Mr. Fisher)  I think I asked you this before, and correct me if I -- or if I didn't.  This interrogation wasn't like an outlier in your thousands of other interrogations?  Like this one didn't have any kind of especially bad conduct by you or anything, right?  This wasn't an atypical interrogation by you?  Do you know what I mean by that?

MR. COOPER:  Objection to form.

**259**

MR. RINGEL:  Object to the form.

A.  I do.  There is no atypical interrogation or interview, they're all person and situation specific.

Do I sit close to some people in interviews?  Yes.  Do I maybe bang on the table?  Yes.  I don't find that inappropriate or wrong.  Do I do it every interview?  No.

Q.  (By Mr. Fisher)  I'm just saying like in this interview you talk a lot about how he's going to go to jail, and things like that, right?  Is that something that you only did in this interview and never did in other interviews?

A.  No, I'm sure I've done it before.  Again, before or after.

Q.  In and around that time, before and after probably, right?

A.  Correct.

Q.  And saying stuff like, "You've got to help yourself out in this thing," or things like that, that's not -- you didn't only say this in this interrogation, that was the type of thing you might say in several interrogations before and after this one?

A.  Possibly, yes.

MR. COOPER:  Objection to form.

Q.  (By Mr. Fisher)  Asking a suspect questions

**260**

about facts about the scene that he hadn't yet brought up, that wasn't like, Hey, I've only ever done this in this interrogation, that happened in some other interrogations as well, right?

MR. COOPER:  Same objection.

A.  Correct.

Q.  (By Mr. Fisher)  And we're talking about before and after this, right?

A.  Correct.

Q.  Okay.  And conducting an interrogation in general the way you conducted this one -- tone of voice, body language, that sort of thing -- this one wasn't like an aberration or an outlier, I never conducted an interview like this in and around that time, right?  It wasn't like that?

MR. COOPER:  Objection to form.

A.  Correct.

Q.  (By Mr. Fisher)  Okay.  And, again, aside from this interview, the ones before and afterwards, you never got in any kind of trouble or admonished or counseled by supervisors, like, "Hey, you're doing things wrong here, Vigil?"  "You need to change the way you're doing these interrogations"?

A.  No.

Q.  At a certain point in the interrogation you

**261**

all asked Lorenzo if he wanted to talk with his mom outside of the room.  He agreed to that, she left the room, you guys continued the interrogation.

Tell me about that decision and why you made that offer or what was going on there.

MR. RINGEL:  Object to the form.

A.  You're saying we told Lorenzo he could talk to his mom outside the room and he did?

Q.  (By Mr. Fisher)  No, no, no.  You said -- about 45 minutes in you said, "Do you want to talk to us with mom out of the room?"

MS. BYRIALSEN:  Alone.

A.  I didn't say that.

Q.  (By Mr. Fisher)  I think it was you or --

A.  No, it wasn't.  It was Martinez.

Q.  Okay.  Martinez said it.  And he agreed.

Was that -- tell me about -- is that like a typical thing you did around that time?  Is that what you're supposed to do?  Are you allowed to talk to him without mom present?  Like what was the deal on that?

MR. COOPER:  Objection to form and foundation.

MR. RINGEL:  Join.

A.  The law allows for that.  There's a waiver on the back of the juvenile advisement.

**Q. (By Mr. Fisher) Okay.**
A. I regret that Mike didn't have them physically sign it, because that's what the motion was to defeat the interview was that it wasn't physically signed. The law states it has to have a signature. But it was memorialized on videotape, and there was no threats/intimidations in regards to that. So I disagreed with Robin Whitley by not appealing that motion.
**Q. Who is Robin Whitley?**
A. He's the appellate DA at the Denver District Attorney's office.
**Q. Okay.**
A. And had a discussion with him about that, and I thought it was wrong.
**Q. You did? You had a discussion with him at that time?**
A. I did. Because it affected my interview. It wasn't my case. But when they said they're not going to use the interview after the mother left because the form wasn't signed, my argument, and several other people's argument was it was memorialized on tape, which is even better than a signature.
**Q. Okay. In the very beginning of the interview you came in and you said, "Okay, Lorenzo, I think you**

**know what we want to talk to you about here," right?**
A. Yes, I believe I did.
**Q. How was he supposed to know -- like you must have talked outside the room, right? What happened before that tape went on?**
A. If you broke the lamp or cut down the cherry tree, as George Washington did --
**Q. Yeah.**
A. -- and your father says, "Come in my study," do you not think you know what he's going to talk about? You're going to talk about the crime that you did cutting down the cherry tree or breaking the lamp.
**Q. Okay. So you didn't have a conversation before then, you were just asking him like as if he would know that he must have done something wrong, you should talk about that?**
A. The totality of the interview is on the tape. It's memorialized on the tape.
Was there a minimal discussion that we want to talk to you and we're going to go to this room, and the tape doesn't reflect the first part where I read him his Miranda rights and then we leave, turn off the tape, and then come back in and they consent to talk. So that part is missing, too.
**Q. Right.**

A. But I didn't have any discussions with him or his mother outside the room.
**Q. You didn't even tell them like we're investigating a car theft or a homicide?**
A. I don't believe so. We covered that when we first got in after the Miranda had been signed and consent to talk was. So I -- I have a habit and a process of doing everything on tape. I don't talk to them outside the room, transporting them to jail. Do people make outcries sometimes? Yes. Going to the bathroom, I don't talk to them. It's not right. It's not -- you can get screwed up in court on motions in regards to that, so I'm not going to do it.
**Q. Okay. I'm just going to play this clip for you. It's Clip 1, 2:54 to 3:07. It's a short one.**
**(Video played but not transcribed.)**
**Q. So you haven't -- when you asked that question, you hadn't talked to him outside, like we're investigating a homicide that happened at this address?**
A. I don't recall. I don't believe so.
**Q. Or a car theft, or anything like that?**
A. No, I don't believe so.
**Q. Okay. I mean, after you asked him that, he didn't start telling you about the homicide from that night, right, right away?**

A. He should have.
**Q. Okay. If he had actually been there, he should have?**
A. Well, he was.
**MR. RINGEL:** Object to the form and the foundation.
**Q. (By Mr. Fisher) You said Detective Schneider was the --**
A. Primary.
**Q. -- primary, right?**
A. Correct.
**Q. Are you aware that he wrote the arrest affidavit in the case?**
A. For Lorenzo Montoya?
**Q. Yeah.**
A. I'm aware of that.
**Q. Okay. I'm going to give you a copy of that.**
A. I haven't reviewed it and I haven't read it.
**Q. It's only two pages, so take your time.**
**(Deposition Exhibit 7 was marked for identification.)**
**MR. FISHER:** Oh, Andrew, do you want me to put it up on the screen or do you have a copy of it?
**MR. RINGEL:** I know what it says. Thank you, though.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**266**

MR. FISHER:  No problem.

Q.  (By Mr. Fisher)  So just let me know when you've had time chance to look that over.  Okay?

A.  Correct.

Q.  And feel free to look at the whole thing and wait, or I can ask you specific questions, whichever way you want to do it.

A.  I'm going to look at the whole thing.

Q.  Okay.

A.  It's not a long piece.

MR. FISHER:  Okay.  And while you're doing that, I'll just have Aimee mark one other exhibit here.  And this will be 8.  But I won't give it to you yet.

And we'll mark one more.  This will be 9.

(Deposition Exhibits 8 and 9 were marked for identification.)

(The deponent perused the exhibit.)

MR. FISHER:  I guess if we're waiting, we'll do one more.

(Deposition Exhibit 10 was marked for identification.)

(The deponent perused the exhibit.)

A.  All right.

Q.  (By Mr. Fisher)  Got it?

A.  I do.

**267**

Q.  Okay.  So you'll see that this was authored by R.D. Schneider, right?

A.  Correct.

Q.  And he was, as you said, the primary in the case, right?

A.  Correct.

Q.  And he says -- it says at the very top -- "The Affiant states under oath the facts known to the Affiant," right?

A.  Correct.

Q.  And that oath is an important one, right?

A.  Correct.

Q.  That is something as a detective you take very seriously, right?

A.  Correct.

Q.  Are you trained that you are allowed to make any kind of misstatements in the affidavits for arrest warrants under oath?

A.  Yes.

Q.  You are trained that you're not supposed to make misstatements?

A.  Correct.

Q.  Okay.  Is that -- is that rule taken seriously by DPD?

A.  Yes.

**268**

MR. COOPER:  Objection to form; foundation.

Q.  (By Mr. Fisher)  You were a detective for about 33 years, or a police officer for 33 years?

A.  No.  I was a police officer for 35 years; Detective, 27 or 28 years.  I was a career detective.

Q.  In all that time at DPD, have you ever heard of anyone getting in any kind of trouble for making misstatements on an arrest affidavit?

A.  Yes.

Q.  And who was that?

A.  I don't know what kind of trouble he got into, but Joe Bini had some questionable facts in the affidavit of the arrest warrant.

Q.  What's his name?

A.  Joel Bini.

Q.  Do you know how to spell Bini?

A.  B-I-N-I.

Q.  Okay.  And when did that happen, approximately?

A.  I can't tell you.  I don't know.

Q.  Is that the only instance you ever remember?

A.  I believe so.

Q.  Okay.  You see on the third paragraph down here, on the first page it says, "Your affiant reviewed the offense report and the accompanying statements

**269**

learning the following."

Do you see that?

A.  I do.

Q.  When he says "accompanying statements," is he talking about like written reports of the statements or is he talking about the actual videotape of the statements, or did he actually review the statements themselves?

MR. COOPER:  Objection to form and foundation.

MR. RINGEL:  Object to the form and foundation.

A.  I think you would have to talk to Schneider about that.

Q.  (By Mr. Fisher)  Okay.  Well, I'm going to ask you some questions to see if we can try to figure that out.  Okay?

As the primary, do you know what would be the proper procedure for a detective to do in that situation?  Should he just review a report of the interview, or if there's extensive interviews should he be watching the entire interviews before he writes an arrest affidavit?

A.  Probably not watching them as they're being made.  Possibly watching them afterwards to take notes

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**270**

on what was said.  Other officer information could be used in the investigation.

Q.  What does that mean?

A.  An officer tells me that a suspect made outcry in the police car and he said this and this and this.  There is no recording to memorialize it, but that's officer information that he'll testify to and say is true and correct, and I can use that other officer information in obtaining an arrest warrant and search warrant.

Q.  You see on the last page of this affidavit it's signed at 1:11 a.m. -- I'm sorry, date 1/11 at 1:08 a.m.  Do you see that?

A.  Last page?

Q.  Yeah.

A.  Yeah, I do.  I was looking at that.

Q.  Yeah.  So it looks like he signed this basically a few hours after Montoya had been finished interrogated, right?  I mean, you started interrogating him about 8 p.m. on 1/10?

A.  And we ended at 10:30-ish.

Q.  10:30.  And then this was signed at 1:08, just a couple hours later, right?

A.  Three and a half hours.

Q.  Okay.  A little less than that.  Two and a

**271**

half.

A.  Two and a half hours.

Q.  Yeah.  Do you know whether or not he was present as the primary officer?  Here he is writing the affidavit less than two and a half hours after Montoya is interrogated.  Do you know whether he was present for Montoya's interrogation?

A.  You know, I can't recall if he was or not.  I would assume he would be because he was assigned the case, and this is a major development in the case.  But I can't recall whether he was there or not.  I would assume he would be.

Q.  Okay.  And what -- to the best of your knowledge, what is the best practice at DPD about him now filling out his arrest affidavit in terms of there is videotaped statements from Montoya.  Was DPD policy and practice that he should be watching that, if it's available, before filling out this arrest affidavit and putting stuff in here, or should he be just looking at reports of an interview?

MR. COOPER:  Objection to form; foundation.

Q.  (By Mr. Fisher)  To your knowledge.

A.  There is no specific policy, I don't believe.  I don't know for sure.  But when you write an arrest warrant or a search warrant, you should try to verify

**272**

the facts that's in the four corners of the warrant, either through other officer information or, like you say, watching a video or being at a crime scene observing things or getting reports.  So the affiant should do the best he can to get the correct information.

Q.  (By Mr. Fisher)  Okay.  So if you look at the second page, the paragraph I have grayed out there.

A.  It's --

Q.  First paragraph?

A.  On page 2, there is a whole bunch of gray.

Q.  Yeah.  Right on the top here.

A.  Correct.

Q.  Okay.  So right above that, actually, it says -- it's -- the paragraphs preceding that are talking about what they learned from Nicholas Martinez in an interview, right?

A.  I believe so.

Q.  Do you see that on the previous page?  On 1/10/2000, so the same day as Montoya's interrogation, 1700 hours, which is 5:00 p.m., right?  With me?

A.  Correct.

Q.  Martinez, it gives his date of birth, Nick Martinez was brought and interviewed about the case, right?

**273**

A.  Correct.

Q.  And then it says what he said, or some of what he said, right?

A.  Correct.

Q.  And then we get to the next paragraph.  It says, "Based on subsequent witness interviews, Denver police homicide investigators learned the identity of a third individual who was also present when the victim's vehicle was stolen from the victim's residence.  This individual was identified as Lorenzo Montoya."  And then it says, "After learning the identity of Lorenzo Montoya, Denver Police homicide investigators met with him and his mother at approximately 8:00 p.m.," right?  Do you see that?

A.  Correct.

Q.  What other witnesses, as R.D. Schneider says under oath here, "identified a third individual who was also present when the victim's vehicle was stolen from her residence"?

A.  I do not know.  You'll have to ask Schneider that.

Q.  Okay.  As you sit here today, are you aware of any other witnesses who ever said -- besides Montoya himself at the time of this interview -- any other witnesses who said "Montoya was there when we stole the

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**274**

car"?

A.  Just because I don't know about them doesn't mean there wasn't any.  I don't know of them myself.  I have no recollection, and I don't have any information in regards to that.

Q.  Okay.  I'll represent to you that I've not been made aware of any other witnesses who said that.  Do you have any reason to dispute that fact as you sit here today?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Same objection.

A.  As I said, you would have to ask Schneider.  I don't -- I'm not going to comment on that.

Q.  (By Mr. Fisher) I'm just -- I'm sorry to interrupt.  I'm just making sure.  Do you have any information to contradict that statement I just made right now?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Join.

A.  I think you're an honorable man and I think you're giving me the truth.

Q.  Thank you.

A.  But I don't know for sure.  I don't -- I

**275**

don't know what your sources are or what your investigation revealed, so I don't make comment on that.  My answer would be you're going to have to ask Detective Schneider about that.

Q.  Okay.  If, in fact, there were no other witness whose said Lorenzo Montoya was, quote, present when the victim's vehicle was stolen from the victim's residence, is that something that Schneider should have put in the affidavit if it weren't true?

MR. COOPER:  Objection; form.

MR. RINGEL:  Object to the form and the foundation.

A.  You're asking me to speculate on information that I have no knowledge of.

Q.  (By Mr. Fisher) I guess here's the question.

A.  And I'm not going to do it.

Q.  Here's the question.  Were you taught in DPD through training, supervisors, et cetera, that one should not make a false statement in an arrest affidavit?

A.  Correct.

Q.  Okay.  So if this weren't a true statement, it's not something he should have included or not.  I'm not asking you to opine or --

A.  If what?  If the warrant is not a true

**276**

statement?

Q.  No, if this were not a true statement that any other witness said that Montoya was there, that's not something that should be included, right?

MR. RINGEL:  Object to the form and the foundation.

MR. COOPER:  Same objection.

A.  You confused me by your question.  If the warrant said that Lorenzo wasn't there --

Q.  (By Mr. Fisher) No, the warrant said that somebody else said Lorenzo was there, right?

A.  Okay.

Q.  Let me ask you this.  JR, he's one of the people who was convicted of this homicide?

A.  So you say.

Q.  You're not aware of that?

A.  Yeah, I'm not aware of it.

Q.  He didn't make any statements to the police.  Do you have any --

A.  I have --

Q.  -- information to contradict that?

A.  I have no knowledge or information on that either.

Q.  Okay.  Nick Martinez, he made a statement to the police, but his statement was that "Me and Lloyd

**277**

Martinez went and stole a car, keys were on the floorboard, we took it."  Didn't say anything about Lorenzo.  Are you with me so far?

A.  So you say, yes.

Q.  Okay.  Let's look at his --

A.  I don't know.  I have no knowledge of that.

Q.  So take a look at Exhibit 9, and just take your time and tell me when you're done looking at it.

A.  Oh, my gosh.

Q.  I could point you to specifics or you can take your time and look at it slowly, it's up to you.

A.  Point me to specifics.

Q.  Okay.  So this -- you can see at the top is a memorialization -- a supplemental report of Nick Martinez's interview.  Do you see that?

A.  Correct.

Q.  And then right below it says video statement.  Right here.  It's on the first page here.

A.  Correct.

Q.  Do you see that?

MR. COOPER:  This is 205, right?

MR. FISHER:  DA_205.  Yeah.

Q.  (By Mr. Fisher) And then it gives a synopsis of the videotaped interview of Nicholas Martinez, right.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**278**

A.  Correct.

Q.  Do you see that?

And then in that paragraph Martinez said that he and his cousin, JR, a/k/a Lloyd Martinez, had been drinking beer at his house on New Year's Eve.  He said they left the house and decided to steal car radios. They walked along and tried door handles until they saw the victim's Lexus on the street.  Martinez tried the handle, the door opened, he saw the keys, and then he took the car.  He said that they had been walking towards Chris Romero's house and they had seen the car parked on the wrong side of the street.  He said the door was not locked.  He opened the door and saw the keys on the floor.  He then got into the car and took it.

A.  Okay.

Q.  Then in the subsequent paragraphs he's talking about what happened the following day in the afternoon.  Do you see that?

A.  Correct.

Q.  And this is -- there is this one section. The only thing that could possibly refer to Lorenzo Montoya in this statement is in this paragraph right here that's highlighted --

A.  Yes.

**279**

Q.  -- right at the end of that paragraph he said that when they were at Anthony's, they drank some more beer, and then he, Anthony, Luke, and Freddie left together.

And then you go to the next paragraph in the grayed-out part.  He stated that Freddie was driving the car when he crashed and Freddie's brother was also with them.

A.  It does say that.

Q.  Okay.  So now Lorenzo Montoya was Freddie's brother?

A.  Okay.

Q.  And you can take your time and read this whole statement if you want.

A.  Go ahead.

Q.  I'm happy if you want to do that.

A.  Go ahead.

Q.  But I'll represent to you nowhere else in this statement is Lorenzo Montoya mentioned -- he's not mentioned at all by name in this statement.  The only possible mention in this statement is where he says I was with Freddie's younger brother the following day when the car was crashed.  Okay?

A.  Okay.

Q.  Do you have any reason to doubt this report

**280**

or that it's incorrect in any way?

A.  Well, I have no reason to know or knowledge of or information in regards to -- the totality was Mr. Martinez said this is the synopsis.  This is not a line-by-line transcript of the interview of Mr. Martinez, it was written by Shawn K. Webster as a write-up for the case.  If he said something about Mr. Montoya and it's not in there, I wouldn't have knowledge of that.  So you would have to ask Detective Webster about that, what he put in his report.  So I can't testify to that.

Q.  Okay.  So I can either play for you the two-hour interrogation of Nick Martinez and we can sit here and listen to it, or you can take my word for it that he doesn't mention Lorenzo Montoya at all by name or say that Lorenzo Montoya was involved when he stole the car.  Which would you prefer?

MR. COOPER:  Object to the form.  I think we'd be over the seven hours with that, but you can answer the question.

Q.  (By Mr. Fisher)  I mean, you can read this whole statement, take your time and look at it, we can listen to the interview, take my word for it.

A.  Well, I read it, but it's not my work.  I didn't create it.  You would have to ask Webster that.

**281**

I think it would easier for you to call Webster for a deposition and ask him.

I don't -- like I said before, I think you're an honorable man.  I don't think you're lying to me about it because, if you were, it would be proven by watching this statement, and then if he said something about Lorenzo, then you would have egg on your face. But I can't testify, I don't have this knowledge.  This is the first time I've seen this report.  I didn't create it.  I don't have knowledge that he never mentioned Mr. Montoya.  He's not mentioned in this write-up at all; I can testify to that.

Q.  Okay.  Again, I'll represent to you nowhere in the recorded interview is Lorenzo mentioned by name, nor does he say anyone -- he says it's him and J.R., they steal the car together, nobody else is there.

A.  Okay.

Q.  I'll represent to you that's what they said.

A.  Okay.  That would be you testifying.  And, like I said, you're an honorable man, I don't doubt your word, but I don't have knowledge of it.  I can't testify to it.

Q.  I'm not asking you to testify to anything, I'm just telling you that fact for the purposes of some follow-up questions.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**282**

A.  Okay.

Q.  Luke Anaya also was interviewed that same day.  He does not say that he was there during the homicide or the burglary or the break-in at Emily Johnson's house.  He does not say that Lorenzo Montoya was there either.  You can take a look at his written statement if you want as well.  Would you like to do that?

A.  I suppose.  Or you can correct me.

(The deponent perused Exhibit 10.)

A.  Okay.  They state, "Did you know that Lorenzo was with Nick when the car was jacked?"  And he said, "No."  His knowledge of it is "No."  "Do you know where Lorenzo was New Year's Eve?"  "I think he was at his girlfriend's house."  And "When did Lorenzo get home?  The next morning, New Year's Day."  That's the only reference in regards to Lorenzo Montoya in a statement obtained by Detective Dale Wallis.

Q.  Let me ask you a question.  All the other interviews I have from that evening I have either audio or video recording, and this one I only have this written statement that's written by Detective Wallis for Luke Anaya.  Is that unusual?  Do you think this one would have been recorded as well?

A.  I can't speak to that, I have no knowledge of

**283**

it.  If it was recorded, you should do a supplementary write-up.  Does it always happen?  No, because you have the tape and it's memorialized on the tape and they can review the tape.  So your synopsis of it is kind of a moot point because it's good for the DA to read quickly and see some information, but they're going to have to watch all the tapes.

So based upon that, I don't -- I can't speculate and make an assumption.

Q.  You just don't know?

A.  I don't know exactly.  That's the first time I saw that, first time I saw this.

Q.  Okay.

A.  My job was to interview Lorenzo Montoya.  That's what I did.

Q.  You at one point went out of the room, brought Luke in, had him say whatever he said to Montoya, brought him back out.  Did you go get him from an interview room?

A.  I can't recall.  Maybe.  Because I think I found out what Dale had obtained information from him, whether it be in that statement or not.  Because in that statement he says Lorenzo was wearing those Lugz for several weeks, so I -- based upon that, I may have brought him in to the interview room based upon just

**284**

that statement, or maybe Dale Wallis told me.  But I can't recall --

Q.  Okay.

A.  -- 22 years ago.

Q.  But in general the policy at the time was in homicide investigations you record all interviews that you can at the station, I imagine?

MR. COOPER:  Objection to the form; foundation.

A.  I tried to.

Q.  (By Mr. Fisher)  Was that not a policy?

MR. COOPER:  Same objection.

A.  It's not necessarily a policy.  You can obtain written statements, as it says in the ops manual, in regards to witnesses.

Q.  (By Mr. Fisher)  Okay.

A.  But it's not necessarily policy.  I think it's good practice.

Q.  Okay.

A.  And I consistently do it.  Have I got statements -- written statements from people in the field?  Yes.  Have I audiotape-recorded in the field?  Yes.  Every case is situation- and person-specific; you have to do different things at different times for different places.

**285**

Q.  Okay.  So short answer, it was not a written -- it was not a policy that you had to record all these interviews?

MR. COOPER:  Objection; form.  Asked and answered.

A.  Correct.

Q.  (By Mr. Fisher)  Okay.  Even in that homicide investigation?

A.  Correct.

Q.  Okay.  This is a synopsis of Lorenzo -- a supplemental report of Lorenzo's videotaped statement.  It's relatively short, especially compared to the actual two-and-a-half-hour interrogation.

A.  Okay.  That was written by me, because my initials are at the end of it.

Q.  Okay.

A.  Like I said, it's not a transcript of the interview.

Do you want to ask questions about it?

Q.  Yeah.  Since it's pretty short, just read this one through, and then I'll ask you some questions about it.  This one is comparatively short.

(The deponent perused the exhibit.)

A.  All right.

Q.  Okay.  So you can kind of put that one down

**286**

for a second, because I'm going to ask you some questions about the arrest affidavit and whether or not that information is contained within that synopsis of the report or not. Okay?

So in the arrest affidavit, page 22, paragraph 3, it says -- you see that paragraph starts with, "Lorenzo Montoya disclosed that"?

Do you see that?

A. Yes.

Q. First full -- third paragraph there?

A. Yes.

Q. And then the next sentence, "After arriving at the victim's residence, 3088 West Denver Place, the three suspects gained entry to the victim's home by removing several boards covering a small opening in the rear of the house."

Do you see that?

A. Correct.

Q. That fact is not something that's in your synopsis of the statement, correct?

A. It is not.

Q. And, in fact, that's not something that Lorenzo Montoya said at all during his interview?

A. That is correct.

Q. And then in that same paragraph in the arrest

**287**

affidavit it says, "Lorenzo Montoya disclosed that Nicholas Martinez, Lloyd K. Martinez, confronted the victim, Emily Johnson, who was asleep on the living room couch."

Do you see that?

A. I do.

Q. That fact of her being asleep on the living room couch is not in the synopsis of the statement, is it?

A. It's not. But I believe it's in the interview.

Q. Right. So that would have been a fact he would have had to get from watching the interview, not just from the synopsis?

A. Possibly. You'll have to ask him. This is not a transcript, this is a synopsis. This would have been created after the arrest warrant would have been created.

Q. Okay.

A. This would have probably been the next day or a couple days.

Q. So this information about what he was getting about the statement, it either could have come from watching a video, seeing -- there wouldn't have been a transcript created yet, right?

**288**

A. No. Watching the video, other officer information --

Q. Or talking to other officers who knew what was said?

A. Correct. Correct.

Q. It couldn't have been from reading the synopsis, because that was created later?

A. Correct, it was.

Q. Do you see in that same paragraph right here --

A. Which one? The write-up?

Q. The arrest affidavit.

A. Okay.

Q. "Lorenzo Montoya then related the suspect, Lloyd Martinez, used a high-heeled shoe and also struck her in the head, causing Emily to pass out."

Do you see that?

A. I do.

Q. Would you agree with me that he never specified a "high-heeled shoe," but only admitted "shoe" at some point?

A. Yes, I do. I agree with you on that.

Q. Were you taught that in writing these affidavits you're allowed to kind of add details like that, like "high-heeled shoe" versus just "shoe"?

**289**

A. No.

Q. Is that a permissible thing?

A. No, I was never taught that.

Q. Is that a permissible thing, to kind of add details that aren't quite in there?

MR. COOPER: Objection to form.

A. You're going to have to ask Schneider about that. I -- I don't know whether it was a high-heeled shoe or low-heeled shoe. I assume, with a silver dress, being the fashionista that I am, that she had high heels on.

Q. (By Mr. Fisher) Okay. There was a high-heeled shoe found at the crime scene, had blood on it. I don't remember if you remember that or not.

A. I don't remember it, but...

Q. Okay. But that's not something Lorenzo specifically said in his interview, "high-heeled shoe," but it's something Schneider put in this affidavit. Is that fair to say?

A. It is in the affidavit, correct.

Q. Okay.

A. To me, that's more a description of the shoe.

Q. I'll --

A. Not in regard to what was said. It's just a shoe, but it was a high-heeled shoe, I assume. If you

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**290**

know what assume means.

Q.  Yep.

Then on also page 2, paragraph 3, a little bit further down, right after that, you know, "causes her to pass out," that same sentence we were just reading.

A.  Yes.

Q.  Then it says, "Lorenzo Martinez" and crossed out "Montoya."  I think you meant to say Montoya, right?

A.  Yeah.  It was a typo error.

Q.  Yeah.  "Lorenzo Montoya then disclosed that he and the other two suspects searched the residence for valuables."

Do you see that?

A.  Correct.

Q.  Isn't it true that in his videotaped statement, he only said the other two searched for valuables but that he never did?  Lorenzo, that is.

A.  I believe so.

Q.  Okay.  And then that next separately highlighted or grayed-out area, it says, "Nick Martinez and Lloyd Martinez" -- do you see that part?

A.  Correct.

Q.  -- "then dragged victim Emily Johnson from

**291**

the living room to the rear patio of the residence."

Do you see that?

A.  Correct.

Q.  Wouldn't you agree with me that Lorenzo did at some point say they dragged her, but he never specifically said they dragged her onto the rear patio of her home?

A.  To the rear of the house, which is down the stairs, four stairs, and out the door.

Q.  But he never described that with that kind of specificity --

A.  He did not.

Q.  -- "down the stairs, onto the patio"?

A.  He did not.  And that's where she was found, I assume.

Q.  Right.  That's where she was found, that's what the crime scene evidence said, but that's not something he related in his interview, correct?

A.  He did not.

Q.  With that specificity?

A.  Did not.

Q.  Okay.  So, again, just getting back to this point.  In your experience, discrepancies like that, when you're talking about what the suspect related and you add or exaggerate or add some things that maybe fit

**292**

the crime scene evidence that the suspect didn't actually say, were you ever taught that there was something wrong with doing that, or that was inappropriate?

MR. COOPER:  Objection to form; foundation.

A.  I know by being a police officer and a detective, that you are to do the best you can in formulating reports and warrants.  The warrant is to encompass the four corners of the warrant, and everything in it is to be factual and true.

So I would think you would try to verify what you put in the warrant, but I can't speak for Detective Schneider, why he used that language.

Q.  I'm just asking -- forget about what Schneider did.  In general, are you taught that you're allowed to kind of tweak affidavits, exaggerate a little bit, add some evidence here or there, make things fit the crime scene a little bit better?

A.  We are not.

MR. RINGEL:  Object to the form.

A.  We are not taught that.

Q.  (By Mr. Fisher)  Okay.

A.  And it is not policy.

Q.  Okay.  You're not supposed to do that, right?

A.  Yes.

**293**

Q.  Matt Hernandez, do you know who that is?

A.  No.

Q.  Jailhouse snitch in this case.  Do you remember him at all?

MR. COOPER:  Objection to form.

A.  I have no knowledge.

Q.  (By Mr. Fisher)  Do you even know what I'm talking about?  Do you know what I mean by "jailhouse snitch"?

A.  I do.

Q.  Okay.

A.  I do.

Q.  You don't even know about that facet of the case?

A.  No.

Q.  Okay.  Fair to say, then, I guess you never met with him?

A.  No.

Q.  Interviewed him?

A.  No.

Q.  Talked to him?

A.  No.

Q.  Okay.  I'll -- I've seen interviews with him and Martinez, I've seen interviews with him and R.D. Schneider just a few days after your interview with

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**294**

Montoya.  You've never seen those or heard about those?

A.  No.

Q.  Okay.

A.  You know, I'm going to state again, my job was to interview Lorenzo Montoya.  My involvement in this case, outside of that, is visiting the crime scene twice for brief periods of time, and apparently I escorted Mr. Montoya down to the juvenile bureau.  But that's probably my participation in this case.

Q.  Okay.

A.  I wasn't the primary detective; I wasn't assigned it; I had my own cases to work on.

Q.  And, again, you don't know why Luke Anaya was never arrested at the time, right?

A.  I do not.

Q.  And you don't know why he wasn't arrested after Nick Martinez's statement in 2014?

A.  I do not.

MR. FISHER:  All right.  Let's take five.  I have one more topic to cover for you, it shouldn't take that long, I hope, and then I'll be done.  Okay?

MR. COOPER:  How long do you think, David, after your next topic?

MR. FISHER:  Hopefully less than 20 minutes, half hour.

**295**

(A recess was taken from 5:46 to 5:37 p.m.)

(Deposition Exhibit 11 was marked for identification.)

MR. FISHER:  So I just handed the witness Exhibit 11, which we just marked, and it's Officer Vigil's Internal Affairs resume.  It starts on DENVER 6337, it's a 16-page document, and it ends with Denver 6352.  I'm going to ask just a few questions it about it.

Andrew, do you want me to put it up on the screen?

MR. RINGEL:  Yes, please.

MR. FISHER:  Okay.  I'll see if I can do that.  I'm going to start you on page 4, okay, Mr. Vigil?

THE DEPONENT:  Okay.

MR. FISHER:  And then I have to -- can I scroll down the shared screen?  Oh, yeah.  Page 4, yeah.

Q.  (By Mr. Fisher)  All right.  So this is an Internal Affairs resume that I got from Denver; it was produced to me in discovery.  On page 4, towards the bottom, you see that paragraph, it talks about an incident that happened in September of '96.  Do you see that?

**296**

A.  Yeah.

MR. RINGEL:  Can you scroll to that, please, because I can't control it?

MR. FISHER:  Yeah.  I think I'm right there.  That's where I am.  Do you see it?

MR. RINGEL:  Okay.  Now I got it.  Thank you.

MR. FISHER:  Okay.

Q.  (By Mr. Fisher)  It says, "Complaint states she was involved in a shoving match with another female while attending a concert at Mammoth Gardens.  Officer Vigil and an unknown security guard grabbed her, took her to the side door opening into the alley.  Vigil allegedly shoved her out the door with enough force that she was thrown to the pavement.  She states she fell face first and sustained a minor injury to her upper lip."

Do you see that?

A.  I do.

Q.  Did you ever work -- or were security for or anything at an event at Mammoth Gardens?

A.  I did.

Q.  What is that, Mammoth Gardens?

A.  It's now called something with an F.  It's at Colfax and Pearl on the north side of Colfax.

Q.  Is it like a bar or something?

**297**

A.  It's a venue.

Q.  Okay.

A.  Used to be a roller rink years ago, and then they turned it into a venue for concerts, and they used to have raves, and then Mexican Ranchero concerts.  The Fillmore, I think.  Is it the Fillmore?

MS. BYRIALSEN:  Oh, yeah.

A.  I think it's called the Fillmore.

Q.  (By Mr. Fisher)  Did you work security there sometimes?

A.  Yeah.  I was off-duty.

Q.  Moonlighting?

A.  Correct.

Q.  Do you remember this incident?

A.  I do not.

Q.  Not at all?

A.  Nope.

Q.  Were you ever interviewed by IA?  Did they ever investigate this incident by talking to you, trying to get a statement from you, hear your side of the story, anything like that?

A.  Most likely they unfounded it and it was assigned to -- doesn't say who it was assigned to.  I don't know if they interviewed me or not, to be honest with you.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**298**

Q.  Okay.  You have no memory of being interviewed by them, and you're saying you have no memory of this event ever happening?
A.  Correct.
Q.  Okay.
A.  There's a lot of people we asked to leave Mammoth Gardens.  Pretty rowdy crowd.
Q.  Okay.  If you go to the next page, page 5, at the bottom.
A.  Correct.
Q.  There's an incident in September of '99 where a patron is complaining about being ejected from Mile High Stadium in a rough manner.  Do you see that?
A.  I do.
Q.  Did you also work -- did you also moonlight at Mile High Stadium ever?
A.  I did.
Q.  In and around that time?  This is also '99.
A.  I remember this incident, yes.
Q.  You remember this incident?
A.  I do.
Q.  What can you tell us about it?
A.  I was working undercover in the store where they sell their merchandise.
Q.  Okay.

**299**

A.  And officer -- I can't remember his name -- was wrestling with this guy, they were in a resistance, and I responded to assist him.  We handcuffed this guy, called detox -- we didn't jail him -- called detox, and then put him in detox.  It says here -- I don't recall this part -- "Broncos cap and radio and earphones did not get returned.  They would be given to the detox van as his property."
So it wasn't our obligation or responsibility to give him his -- his property.  He says I made a comment about his wife.  I don't recall that.  And right shoulder and wrist, he said he sprained, but I don't -- you know, he was handcuffed, but -- and he was resisting arrest.  Terryall was the officer's name.  So I don't know if he hurt it during that time or not.  He didn't complain of any complaints when we gave him to detox or else detox would not have taken him.
Q.  Okay.  Were you ever interviewed by Internal Affairs about this incident?
A.  I don't think it went to that level.  This has an IA case number.  It doesn't say who it was assigned to.  I may have made a statement in regards to it.
Q.  Why do you think that?
A.  Because I recall him complaining.  We asked

**300**

him where he was sitting and where his seat was and who was up there with him and he said his wife.  That's where his wife was brought up.  But, I don't know, I just feel like I made a statement on this.
Q.  Okay.
A.  But I don't recall -- a written statement.
Q.  A written statement?
A.  Yeah.  They call you up and have you make a written statement.
Q.  And is it sort of like a blank piece of paper, you're supposed to fill in your statement, or is it like questions that you're supposed to answer?
A.  No, it's a statement you just had for --
Q.  Just kind of like this?
A.  Yeah.  And if there was an investigator assigned to it, he would have to ask me questions to clear up this case.  It was found unfounded.  No allegations were proven.
Q.  Do you see on page 6 towards the bottom -- I'll scroll to that here.
Do you see in this from '97?  It says, "The complainant" -- the writer of this throws in, "who was convicted of sexual assault to a child" -- "wrote that Detective Martin Vigil arrested him at his home on 1/6/97 and then Vigil drove him into an alley on 28th

**301**

and Champa where they took him out of the car, assaulted him, causing injuries to his thumb and wrist."
Do you remember who this is or what happened?
A.  I do not.  I don't remember this case at all.
It says I assaulted him and it caused injuries to his thumb and wrist.  I don't remember beating up anybody's thumb and wrist.  I don't recall this incident at all.  This is fictitious.  It didn't happen.
Q.  Okay.  Do you ever recall being interviewed by internal affairs about that?
A.  I don't.
Q.  What would it take, in your experience, in your 30 or so years at DPD, what would it take for IA to interview somebody about a complaint?
A.  An allegation?
MR. COOPER:  Objection to the form.
A.  Are you asking what type of allegation?
Q.  (By Mr. Fisher)  Yeah.  Like what type of allegations would -- in your experience -- would IA actually like interview an officer if there was an allegation made against him?
MR. COOPER:  Same objection.
A.  If an Internal Affairs sergeant was assigned

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**302**

the case, he was assigned to investigate it.  A lot of times they call the complainant down to headquarters and obtain information, which would be -- it's good practice in investigations -- find out exactly what he says happened.  They call in and make a complaint, and then they invite them down.

A myriad of things could happen in regards to that.  They could not show up; they refuse to talk to the IA sergeant; they give information that's not correct.  I don't know.  But they investigate it with witnesses and the complainant before they call the officer up there.  It would be stupid to call the officer up there blindly based upon a phone call, you know.  So that's -- there is no specific allegation like assault or this or that.  If something was really serious, they would, of course, take it.  Sex assault to a child or menacing somebody or hurting somebody with serious bodily injury, that kind of stuff, I'm sure they would take that just readily.

Q.  Right.  But for less-serious allegations, your experience is first IA will call in the complainant --

A.  On all allegations, IA interviews, the complainant.

Q.  First?

**303**

A.  I believe so, yes.

Q.  And then some other witnesses perhaps?

A.  If there is any.

Q.  And if there's people showing up and actually following through, eventually there might be an interview of the person against whom the allegation was made in the first place?

A.  Correct.

Q.  You have been -- have you ever been like -- had a sit-down interview with IA before where you're actually being asked questions and you're answering questions like the two of us are doing here?

A.  Yeah, as a witness and a subject officer.

Q.  Okay.  How many times as a subject officer?

A.  I can't tell you.  I can't remember.

Q.  More than once?

A.  Maybe.  Not very many.

Q.  Okay.  Do you remember if it was such few times what those cases were in which you were actually interviewed?

A.  Well, they would be in this record.  So you have the record going through page 6, and then everything else after that looks like it's accidents.  Traffic accidents.

Q.  So but I'm just asking you in the few times

**304**

that you were ever interviewed by IA, you can't remember what those cases were about?

A.  No.  It would be one of these -- up to page 6, I assume.

Now, this one on page 6 about the complainant saying I didn't give him information, there's a myriad of reasons why.

Q.  Yeah, we can skip that one.  Go to page 9 at the bottom.

A.  Okay.

Q.  Do you see that?  Complainant alleges Detective Vigil had her arrested for interference when she would not -- could not provide a witness name in a murder investigation.  She was acquitted of all charges and believed she was falsely arrested.  And this was about an incident that occurred in 2006.

A.  Yes.

Q.  Do you remember that?

A.  Yes, I do.

Q.  Who was that person?

A.  She was a witness in a homicide investigation and she was charged with interference.  I responded to where she worked, the school, and the Reverend Leon Kelly got in the midst of it and was interfering with my procedures as a police officer of contacting her.

**305**

And she interfered in the investigation, ran, hid from me, this and that.  Gerald Whitman was aware of the situation when it was happening, because Leon Kelly called Chief Whitman and I talked to Whitman and told him what we had.  And I had to have a supervisor respond to okay the interference charge.

Q.  What did she do to interfere?

A.  She ran, she hid from me, she had me chase her around the building, she wouldn't cooperate with us, she did some other stuff.

Q.  So you like went to interview her and she ran away from you?

A.  I went to just contact her, yes.

Q.  Is that illegal to --

A.  She gave false information.  I don't know if that's on there or not.  Name.

Q.  Is it illegal to run from an officer who asks you questions about an incident?

A.  No, but she was interfering in my investigation and she interfered with me conducting my investigation.  I can't tell you every nuance of the case, but that's my synopsis of it from my memory.

Q.  Okay.

A.  And the interference charge was approved by the supervisor who responded to the scene, and I

articulated in the complaint what happened.
**Q. Do you know if it's correct that she was actually acquitted of all charges?**
A. I don't know.
**Q. Okay.**
A. I think she took it to court, but I don't know what happened.
**Q. Do you know what her name is?**
A. No. No, I don't.
**Q. What was the case --**
A. I don't remember the case.
**Q. Who was it you said, Reverend who?**
A. Leon Kelly.
**Q. Okay.**
A. I almost arrested him for interference.
**Q. Okay. You say -- it says here, she claims -- somebody claims -- somebody wrote this, right? Not -- it says, "Complainant alleges Vigil arrested her for interference when she could not provide a witness name in an investigation.**
A. That could be true. It's a synopsis of what happened, but...
**Q. I noticed in Montoya's interrogation you told him several times at the beginning, "Do you want to be charged as an accessory for withholding?" "Do you want**

**to be charged as an accomplice for withholding information if you're not telling us"?**
A. Did I say for withholding? I said accessory in the crime. "Do you want to be charged with accessory in the crime for participation in it?" I don't believe I said for withholding information.
**Q. I could play you the tapes, if you want. There's a couple quick ones. But you said several times in the beginning before he admitted anything about what people had said to him, you said to him, "Do you want to be an accomplice on this? Do you want to be an accessory on this for withholding information?" You don't remember that?**
**MR. RINGEL:** Object to the form and foundation.
**MR. COOPER:** Same objection.
A. That would be incorrect. You can't arrest somebody for an accomplice in a murder for withholding information. If you have facts that say they were there during the murder, that's an accomplice itself.
**MR. FISHER:** Oh, is this just sharing? Look at that. Oh, but now the thing is in the way.
(Video played but not transcribed.)
A. Okay. "Be in trouble for withholding information." That's not charging you with accessory

for withholding information.
**Q. (By Mr. Fisher) Okay. Is there some crime that you could be in trouble for withholding information?**
**MR. RINGEL:** Object to form and the foundation.
**MR. COOPER:** Join.
A. Not that I know of.
**Q. (By Mr. Fisher) Okay. And so what did you mean, "be in trouble for withholding information"?**
**MR. RINGEL:** Object to the form and the foundation.
A. Being involved.
**Q. (By Mr. Fisher) Okay.**
A. Being involved in this crime and not telling us the truth.
**Q. Okay.**
A. I didn't say "arrest," I didn't say "charged."
**MR. FISHER:** Okay. Just for the record, that was Clip 2, 8:23 to 8:55.
What are you seeing there, Andrew? Are you still seeing the IA resume or no?
**MR. RINGEL:** Yes.
**MR. FISHER:** Okay.

Still now? Kind of gone for a second?
**MR. RINGEL:** It changed. It's --
**MR. FISHER:** Okay.
**MR. RINGEL:** Yeah, I have the same thing that you had up before.
**MR. FISHER:** Okay.
**Q. (By Mr. Fisher) Did you ever have a lawsuit in which you were in a car accident and received like a several-million-dollar verdict which was later overturned? Different Martin Vigil and his wife?**
A. No.
**Q. You don't know what I'm talking about?**
A. No.
**MS. BYRIALSEN:** Too bad.
THE DEPONENT: Yeah.
**Q. (By Mr. Fisher) Too bad. Well, it was overturned anyway. Against an insurance company, Progressive. You don't know what I'm talking about?**
A. No.
**MR. RINGEL:** If you're done with the IA resume, if you could take it down.
**MR. FISHER:** Yeah. I'm just looking through a couple more pages just to make sure I'm done with it before I take it off.
**MR. RINGEL:** Okay.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**310**

Q.  (By Mr. Fisher) I'll go to page 14 towards the top.  "Complainant alleges that she was wrongfully arrested and charged with domestic violence while attending a Colorado Rockies baseball game."

A.  Uh-huh.

Q.  Do you see that?

A.  Yeah, I do.

Q.  This was apparently in 2012.  She had -- as a result of being handcuffed, she had bruising on both her wrists.  She says there were three officers present; she wasn't able to identify which officers -- I guess those -- it just says "those officers."

Were you working extra duty at Rockies games in and around that time in 2012?

A.  I do.  I have no recollection of this incident or this complaint.  Apparently she didn't recognize me or identify me.

Q.  Okay.  Is this something you were ever asked about by Internal Affairs?

A.  Not that I recall.  It says no misconduct. They must have investigated it and made a determination based on the investigation.  I was never queried about that.

Q.  Just below it it talks about an incident from '13 in the middle.  Same page.

**311**

A.  Okay.

Q.  Do you see that?

A.  Yeah.

Q.  "Complainant alleges an officer erroneously thought he was a driver of a hit-and-run accident, pulled a gun on him and some others who were in the car."

Do you remember this incident from 2013?

A.  I do.

Q.  Can you tell us about it?

A.  It went to mediation.

Q.  Okay.

A.  Which I believed -- they said it wouldn't be on your record, but...

I was going home down South Sheridan and there was a civilian who was walking across the intersection, and there's three lanes and a right lane.

Well, I thought the guy that I stopped was in the right lane and struck this civilian, and she was injured very bad.  I don't know what happened to her. But then that car that I thought -- believed caused the accident and struck that pedestrian attempted to flee and went down the street.

Q.  Okay.

A.  So I got out of the street -- out of my car

**312**

and behind the suspect vehicle, I pulled my gun out and ordered him to stop.  "Stop."  "Stop."  Which he eventually did several hundred feet down the way.

There was a red light, too, so that caused him to stop.  And then I told the driver, "Let me see your hands, turn off the car, get out of the car."

Unfortunately there was a juvenile in the back, but I wasn't pointing my gun at her or causing havoc with her.  I had both the male parties get out of the car, the juvenile remained in the car, and then I put my gun away and we investigated it.  And I was incorrect because it was another car that had stopped, turned in the shopping center and stopped, that struck the pedestrian.  But I thought he was fleeing a hit-and-run on a serious bodily injury.  I thought she was going to die, this woman.  She was hurt severely in the middle of the intersection.

Q.  And it turns out you inadvertently had the wrong car and pulled out your gun?

A.  Correct.  My procedures were not incorrect. I stopped the car.  It was a hit-and-run.  It could have been a murder, traffic murder.  And I stopped them.  And they made a complaint, and I agreed to go to mediation with the gentleman.  And we mediated it and no further investigation was conducted.

**313**

Q.  What does that mean, mediation?  Like through IA?

A.  They created something that -- yeah, through Internal Affairs -- that if you go to mediation with a complainant on a citizen complaint and you sit before a referee and you talk it out and say what happened and you get to tell your side of the story and they get to tell their side of the story.  I apologized to this guy, I said, I tell you, the reason I thought I had to stop you is because I thought it was a vehicular murder, she was badly, severely injured, and you were fleeing, and it was my obligation as an officer to act. And he accepted my apology.

I listened to his side of the story.  He says his daughter was terrorized.  I said, Well, I'm very sorry.  I didn't know she was in the car.  In fact, I left her in the car after I stopped you, after they got out, I put my gun away, I got their driver's license and insurance.  They were pretty cooperative, which led me to believe they didn't have any inference in this. But they were very angry at me and cursing at me and cussing at me.  And I called a Lakewood officer who responded, because it was Lakewood's deal, and we talked to the gentlemen.  And then I found out I was incorrect, that the run -- the hit vehicle had turned

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**314**

into the parking lot.

Q.  What was the outcome of the mediation?

A.  I guess you would call it no harm no foul. We discussed it amongst each other, I apologized.  He didn't apologize, he just said he felt violated.  I said, I'm sorry, I said, but here's the reasons why I did this.

Q.  So then there was no kind of like punishment, reprimand --

A.  There was nothing.

Q.  -- fine, anything?

A.  There was nothing.

Q.  It was just like mediation, you all talked and that was it?

A.  Correct.  There was no improper actions in this case anyway, first of all.  It was appropriate for me to do what I did.

Q.  Was there ever a lawsuit filed?

A.  No.  No damages.

MR. FISHER:  Okay.  I don't have any other questions.  So I leave it to you other two gentlemen here.

MR. COOPER:  All right.  I'll try to move through quickly.

MR. RINGEL:  Can you take the screen-share

**315**

down, David?

MR. FISHER:  Yes.  Will do.

MR. RINGEL:  Thank you.

EXAMINATION
BY MR. COOPER:

Q.  All right.  Just to -- I'll jump around here a little bit, Detective, and I will try to save us all some time, since I'm tired.

You have your Internal Affairs summary, which is marked as Exhibit -- which one was it?

MR. FISHER:  11.

Q.  (By Mr. Cooper)  -- 11.

And counsel asked you about a few different cases in there, right?

A.  Correct.

Q.  And one of them was on DENVER 6345, and that was IA 2006-12081.

A.  What page, please?

Q.  Oh, it's at the -- the page number is on the bottom on DENVER 6345.

MS. BYRIALSEN:  Oh, I get it.  We thought you were on the top.

MR. COOPER:  I apologize.  Either -- it's page 9 on the top, if you want to use that one.

THE DEPONENT:  Okay.  I've got it.

**316**

Q.  (By Mr. Cooper)  And that was the case that you were talking about before, just where the complainant, who was acquitted, believed she was falsely arrested.

Is that the one you were asking about -- you were asked about?

A.  Correct.

Q.  Okay.  And did you see the date on what that was received?

A.  Occurred March 9th, 2006; received December 27th, 2006.

Q.  That was about six -- actually, closer to seven years after your interview of Lorenzo Montoya, right?

A.  No, it would be eight months.

Q.  Well, your interview of Lorenzo Montoya was what day?  What year?

A.  Oh, I'm sorry.  I didn't listen to the question.

Q.  So my only question is --

A.  How long after Lorenzo Montoya?  Yes, you're correct.

Q.  So seven years, approximately?

A.  Correct.

Q.  And why don't you flip forward to Bates stamp

**317**

DENVER 6350, which is page 14 on the top.  Actually, start with 6349, the very bottom.  I think counsel asked you about that.

A.  Okay.

Q.  And let's do them together.

Counsel asked you about two cases:  One, P2012-07081.  And that's on the bottom of this 6349, right?

A.  Correct.

Q.  And then I believe counsel also asked you about another case on 6350 that occurred in 2013, right?

A.  Correct.

Q.  Okay.  These two cases that we're talking about on Denver 6349 and 6350, does this document indicate when they occurred?

A.  Yes.

Q.  When was that?

A.  On February 7th, 2013, for the Case Number 2013-02035.  And for the other one it was April 27th, 2012.

Q.  Both of those were well over a decade after you interviewed Lorenzo Montoya; is that correct?

A.  That's correct.

MR. COOPER:  Did you guys -- were you going

**318**

to do continuous exhibits for you, or should I just keep going?

MR. FISHER:  We can just keep going.  Start at 12 now.

(Deposition Exhibit 12 was marked for identification.)

Q.  (By Mr. Cooper)  So this is Exhibit 12.  Let me find my document.  And just for the record, so it starts on DENVER 7684, and it goes until -- at least the ones that I'm going to be asking you about -- goes through DENVER 7687.

A.  Correct.

Q.  Do you know what this document is, just looking at it, Detective?

A.  Yeah.  It's a list of training and schools from the academy.  When I did training I tried to send the certificates of completion to the academy for documentation and storage in this.  I don't think they do it anymore.

Q.  Okay.  And just taking a quick flip through, it looks to me like this -- at least the four pages that you have before you encompass trainings from 1986 through 2002, or thereabouts; fair to say?

A.  Correct.

Q.  Okay.  And there's -- you also, of course --

**319**

and I'm not going to ask you about it -- you received additional training from DPD after 2002, correct?

A.  Right.

Q.  So now stay with me on the first page here on DENVER 7684.  The first -- do you see where it says, "Denver Police Academy:  Recruit Training"?

A.  Yes, I do.

Q.  And then you see there a column labeled "Hours" to the right of that?

A.  Correct.

Q.  And then there is a column labeled "Date" to the right of that, right?

A.  Correct.

Q.  That first line entry, does that reference your time at the Denver Police Academy?

A.  It does.

Q.  And how many hours of training did you receive at the Denver Police Academy?

A.  770 hours.

Q.  No reason to dispute that, right?

A.  Correct.

Q.  Do you have any -- if you just flip through this entire document, this Exhibit 12, any reason to dispute any of this, or does this all appear to be accurate and correct?

**320**

A.  No, this appears to be accurate and correct.

Q.  And then why don't you flip to page -- the next page, 7685, and I'll just ask you about a few things.

A.  Okay.

Q.  When did you -- just taking a step back, and I apologize.  When did you join homicide?

A.  May of 1999.

Q.  Okay.  And so just looking at this page, it looks like some of these trainings that are listed on this page 7685 would have preceded you coming to homicide and some would have been after you arrived in homicide, right?

A.  That is correct.

Q.  And so if we go to -- we're on -- they're broken up into Card 2 and Card 3.  Do you see that, Detective?

A.  Correct.

Q.  Card 2, Item Number 5.  I believe counsel asked you before about NCFUH.  And do you know what that stands for?

A.  At this time, I do not.

Q.  And then it says, "NCFUH Interview and Interrogation."  Can we assume that's a course that you attended?

**321**

A.  Yes.

Q.  And then if you go to the right of that, does it show how many hours that course was?

A.  24.

Q.  And that was in 1997, right?

A.  Correct.

Q.  Other than that course being about interview and interrogation, do you recall anything else about that course, that 24-hour course you attended?

A.  I do not.

I want to stand corrected on something.  They give training at the Academy.  They offer training on interview interrogation, Don Rabon, the interview training was given at the Academy.  So the Denver Police Department offers that at the Academy for officers and detectives to attend.

Q.  And just so I'm clear, it sounds like the Denver Police Academy offers recruit training on interviews and interrogations, which is then supplemented by other trainings, including the things we see on this Exhibit 12, right?

A.  That is correct.

Q.  Going down to line Item 6 on Card 2, still on page 7685, the next one is "American Prosecutors Research Institute:  Investigation of Child Deaths and

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**322**

Physical Abuse."  And then that was a 40-hour course in 1997.  Did I read that all right?

A.  That is correct.

Q.  Do you recall going to that course?

A.  I specifically don't recall where it was at or going to it, but it's documented because I sent them the certificate.

Q.  And now you were doing that -- that was the type of investigations you were doing prior to homicide, right?  You were dealing with child cases?

A.  Correct.

Q.  And fair to say that while certain -- the goals of those investigations may differ in certain ways, a number of investigatory techniques would have overlapped between child investigations and homicide?

A.  Yes.  Like I said, during the seminars and training, most times they have a day, a segment, hours, in regards to interview and interrogation.  It's inclusive in the totality of the seminars and training.

Q.  And again -- I think you just said this -- you don't recall specifically that 40-hour training though, right?

A.  I don't recall where it was or what it was.

Q.  Now, going down to same Card 2, Item Number 8.  Do you see where it says, "Children's Advocacy

**323**

Center in Colorado Springs"?

A.  Correct.

Q.  You know where that was one is, right?

A.  Yes.

Q.  And how many hours for that?

A.  14 hours.

Q.  And that was 1998?

A.  Correct.

Q.  Do you recall that training offhand, what happened in that course, or do you not recall?

A.  I don't recall.  I believe it would be a seminar in regards to child investigation -- child abuse investigation.

Q.  So sitting here today, likely similar type of content as the stuff in line item 6 above?

A.  Correct.

Q.  Now, Number 9 -- and it's already been brought up, we see "Reid & Associates, Inc.:  The Reid Technique of Investigative Interviewing."

Do you recall going to the Reid school -- or Reid school for the Reid Technique in August 1998?

A.  I do.

Q.  Now, there is -- do you see there is that column for hours, and on this page that one is blank, right?

**324**

A.  Right.

Q.  Do you recall, sitting here today, even if you can estimate, how long that -- how many hours you would have spent at the Reid school then?

A.  Oh, I estimate that that training is 24 hours.

Q.  Okay.  And, actually, it says -- if you go to the right -- it says 8/25 to 8/27, and that would indicate three days, right?

A.  That's correct.

Q.  And that would be consistent with the 24 hours you just mentioned?

A.  Correct.

Q.  Okay.  And now where was this -- the Reid school when you attended in August 1998, if you remember?

A.  I believe it was in Aurora.

Q.  Okay.  And do you recall if you went over there with other Denver detectives or police officers at that time or --

A.  I did.  There were several of us that went to that school at that time.

Q.  Okay.

A.  I can't tell you who.

Q.  Okay.  And was that a Reid program for only

**325**

Denver Police, or was it for others as well?

A.  Metro-wide.

Q.  Metro-wide, meaning?

A.  Denver metro area.  Aurora, Lakewood, Littleton.  Any law enforcement officer that signed up for it and qualified for it.

Q.  And did the training that Denver officers, DPD officers received at that Reid school differ from training that Reid gave to Aurora, Jeffco, the other jurisdictions you just mentioned?

A.  No.

Q.  You guys all got the same training on the Reid Technique?

A.  Correct.

Q.  Do you recall -- now I mean the 24 hours -- do you generally recall what you learned at that school during 1988?

A.  I'll give you a quick synopsis.  It's interview and interrogation techniques.  They have several theories and philosophies that they teach that belongs to Reid.  John Reid was a polygrapher examiner up until 1944, then he started these schools.

They teach interview and interrogation separate -- as I said earlier in this deposition -- they teach how a suspect or a witness responds.  They

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**326**

have a thing called "the bait question," which I don't like and I don't use, to have a bait question to talk to people to get them to solicit information.  I never really understood what it meant and I never used it.  But that's their philosophies and teachings and techniques.

Q.  And it sounds like when you conducted interviews and interrogations, you wouldn't take everything you learned from Reid, but you would be consistent with the Reid teachings; is that fair to say?

A.  I take something from everything.  From my past experiences of interviewing children in child abuse, interviewing suspect adults in child abuse, interviewing juvenile children in child abuse, my training at all these seminars.  I don't stick with one theory or method, I use everything -- every tool I can that I feel is applicable to the interview and interrogation.

Q.  And that would include things you learned from Reid and from the other training seminars and sessions, correct?

A.  That is correct.

Q.  And Reid teaches things -- and I believe you testified to a couple of these -- it teaches, among

**327**

others, certain techniques like closing distance and eliminating barriers between you and the person you're interviewing, right?

A.  They do.

Q.  And did you use those types of techniques in your interview of Lorenzo Montoya?

A.  I did.

Q.  And your interview of Lorenzo Montoya was consistent with the teachings of Reid, correct?

A.  Correct.

Q.  Now, going back to your exhibit there, staying on the same page.  Now let's go down to the -- you see Card 3 there?

A.  I do.

Q.  And the first line item, Number 1 there, is D.U. -- and I'll paraphrase.  I think I know what the words are.  "D.U. Child Welfare Training & Research Project:  Specialized Interviewing Skills for Child Welfare."

Do you recall going to that school in May 1997?

A.  Yes.  I believe it was at the University of Denver.

Q.  Okay.  Do you recall sitting here -- and the hours, again, aren't marked.  Do you recall

**328**

approximately how many hours that would have been?

A.  Well, the dates state 28 to 30.  So it would be three days.  24 hours.

Q.  And speaks for itself, I guess, but that -- that course was specifically geared to learning interview skills for interviewing children, right?

A.  Correct.

Q.  Now, if you go down to line item 4 on Card 3 again, we're still on 7685, we see another Reid course.  And this time we see "Advanced Course on Reid Technique of Interviewing and Interrogation," right?

A.  Correct.

Q.  And we see that that appears to be a 16-hour course that occurred on March 11th and 12th of 1999, right?

A.  Correct.

Q.  So you attended this advanced course from Reid less than a year before your interview with Mr. Montoya, correct?

A.  That's correct.

Q.  Sitting here today, do you recall going to that advanced course?  Do you recall what you learned there?

A.  I do.  They had some information in regards to different techniques I can't specifically state.  It

**329**

was a two-day course for people who had taken the initial Reid course.  I believe it was on Parker Road there at a hotel that I went to that.  So they gave you different -- different information to think about, they probably play some video and some interviews and stuff, and then analyze those during the process.

Q.  Okay.  And they would go through and say this is good techniques, this is bad techniques, stuff like that?

A.  Yeah.  And this is what we did here, this is why we did it.  And, you know, you can do what you want, but here's what we teach and here's what our philosophy is.

Q.  Okay.  And you took that seriously when you were taking those courses, right?

A.  I did.

Q.  And same thing, that advanced course with Reid, was that the same as what you said before with respect to the first Reid course, that it was Denver metro area at large?

A.  That is correct.

Q.  So that extends to other jurisdictions beyond Denver, correct?

A.  That is correct.

Q.  Is it your understanding that outside of the

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**330**

state of Colorado, people were teaching Reid back in the '90s and 2000s?

A.  That is correct.

Q.  Is it your understanding that that was -- actually, strike that.

So sticking on Card 3 here, just going down to Number 5, right underneath Number 4. It says, "Public Agency Training Council:  Practical Homicide Investigation."  It looks like that was a 24-hour course in August 1999.

Do you see that?

A.  I do.

Q.  And do you recall attending a course like that in August 1999?

A.  I do, but I can't recall.  I think it was in the Denver metro area, but I can't recall where it was at.

Q.  Do you recall what that course entailed?

A.  Totality of homicide investigation, inclusive of interview and interrogation, crime scene investigation, analysis of statements.  A variety of things.

Q.  So this would have been yet another course where you received training in interviews and interrogations prior to the time that you ever learned

**331**

about Lorenzo Montoya, right?

A.  That's correct.

Q.  And now just going down to Number 8 on the same, it says "National Center Study of Unsolved Homicides:  Advanced Homicide Investigations."  Again, it looks like that was a 40-hour course.  This one was actually in May 2000.  So this course would have post-dated your interview with Mr. Montoya, right?

A.  Correct.

Q.  Do you remember that course -- going to that course?

A.  I remember the course and going to it.  I tend to believe that I think it was out of state -- we went out of state for that one.  But I can't recall exactly where.

Q.  And, finally, on this exhibit if you just go two more pages to Denver 7687.

A.  Yes.

Q.  You see then we're on -- it's kind of a different-looking sheet that reflects CEP hours.  And do you see at the top right there it says "Total Completed Hours: 300"?

A.  Correct.

Q.  And then there's course titles.  There's, I don't know, maybe around a dozen course titles?

**332**

A.  That's correct.

Q.  All right.  If you go down one, two, three, four -- to the sixth, it says, "Violent Crimes and Major Offenders."

Do you see that?

A.  I do.

Q.  And then it -- I think if you go across the dates, it looks to me like that was January 13th, 1999, it began, and lasted -- it was 24 hours.  Does that look right to you?

A.  Correct.

Q.  Do you recall doing a course in January 1999 on violent crimes and major offenders?

A.  I don't recall at this time.  But, like I said, this was documented because I sent a certificate of completion.  I don't know where it was at, but -- I don't remember this specific seminar, but I know I attended it.

Q.  Do you know what this seminar actually -- like other than the title --

A.  Well, that would be my answer, violent crimes and major offenders.

Q.  That's fine.  But you -- like you said, you just don't recall?

A.  No.

**333**

Q.  Are you able to tell us, sitting here today, who -- was this a DA training or a DPD training, or you just can't tell from this document?

A.  I can't tell from this document.  I'm -- I can't tell.

Q.  Okay.  This crime was -- the crime against Emily Johnson was a serious crime, right, sir?

A.  It was.

Q.  About as serious as a crime can get?

A.  I believe so.

Q.  And was your goal to solve that crime?

A.  It was.

Q.  Now, I believe you testified earlier that it was your understanding that the Denver Police Department wanted well-trained detectives?

A.  Correct.

Q.  And that was so they could properly investigate crimes, correct?

A.  Correct.

Q.  And you testified, I believe earlier, just to make sure for the record, that if somebody is drunk, as a matter of policy and procedure, you should not be interviewing them, right?

A.  That's correct.

Q.  And that's because their capacity would be so

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**334**

diminished that it wouldn't be fair or appropriate to interview them, right?

A.  That is correct.

Q.  And that's the same thing you testified about earlier with other instances of diminished capacity. If you appreciate that somebody has diminished capacity and couldn't properly answer your questions, you shouldn't interview them, right?

A.  That's correct.

Q.  And that's DPD policy and has been since you were an officer, right?

A.  Correct.

Q.  Who -- is it Hebert, H-E-B-E-R-T, the guy that doesn't like you?

A.  We're discussing that, but it's H-E-B-E-R-T, is my recollection.

MR. FISHER:  I think that's right.

A.  Hal Hebert and Carol Hebert.  I wrote it down a million times during the case and the investigation.

Q.  (By Mr. Cooper)  Mr. Hebert was convicted of murder, right?

A.  He was.

Q.  Does he remain convicted of murder?

A.  He does.

Q.  Is he still in jail as a convicted murderer?

**335**

A.  He is, thankfully.

MR. COOPER:  That's all I have for you. Thank you.

MR. FISHER:  Can I -- I don't know if you have anything, Andrew, but I have about -- like a minute and a half of follow-up questions.  Do you mind if I ask those?

MR. RINGEL:  Go for it.

MR. FISHER:  Okay.

EXAMINATION
BY MR. FISHER:

Q.  Detective Vigil, all these trainings that you just went through with counsel here, Mr. Cooper, he talked to you about some of the Reid courses you went to, right?

A.  Affirmative.

Q.  And some of the other interrogation trainings you went to, correct?

A.  Correct.

Q.  That predated your interrogation of Mr. Montoya, right?

A.  Correct.

Q.  And some of those courses are nationally recognized courses, right?

A.  Reid is.

**336**

Q.  Or, I'm sorry, they're taught at a national level?

A.  Yes.  Reid is.

Q.  But you feel that your interrogation of Mr. Montoya was consistent with those trainings, correct?

A.  It doesn't have to be consistent with those trainings.  It has to be consistent with my experience and tenure and training itself.  I don't interview Mr. Montoya consistent with the Reid method.  I don't do that.  I don't use that.

Q.  Okay.  So you -- do you feel that your interview of Mr. Montoya was inconsistent with your trainings from Reid?

A.  No, no.  There are some things in there.

Q.  Okay.  Did DPD, or any of your supervisors, ever do anything or say to you your interrogation of Mr. Montoya or anybody else is not in compliance with the training you're getting for interrogations?

A.  No.

Q.  Nobody ever counseled you or reprimanded you, Hey, you've got these trainings, but the way you're actually doing interrogations is not in line with your training, so you need to fix it?

A.  No.

**337**

MR. FISHER:  Okay.  No other questions then.

THE DEPONENT:  Okay.

MR. RINGEL:  I don't have any questions today.  I will take care of review and signature.

(The deposition concluded at 6:46 p.m. after 7 hours and 11 minutes on the record.)

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

**338**

AFFIDAVIT
        I have read my deposition and it is true
and accurate, except for any changes or corrections now
indicated by me on the Amendment sheet.
        Amendment sheet attached   ( )
        No changes to testimony    ( )


_____
        MARTIN E. VIGIL
        SUBSCRIBED AND SWORN to before me this
date, _____.

        My commission expires _____

_____
NOTARY PUBLIC

_____
STREET ADDRESS
_____
CITY, STATE, ZIP


Return to:  MILE HIGH COURT REPORTING & VIDEO, INC.
        14143 Denver West Parkway
        Suite 100
        Golden, Colorado 80401

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

339

CERTIFICATE


I, Aimee S. Reisinger, RPR, Notary Public of the State of Colorado, do hereby certify that prior to the commencement of the examination of MARTIN E. VIGIL, said witness was sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said examination was taken in machine shorthand by me and was thereafter reduced to typewritten form, and that the foregoing is a true and accurate transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein, nor their counsel, and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 6th day of June, 2022.


_____
Aimee S. Reisinger, RPR, CSR
My Commission expires 9/20/2024
Notary No. 19964015065

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

340

June 6, 2022


ANDREW RINGEL, ESQ.
Hall & Evans, L.L.C.
1001 17th Street
Suite 300
Denver, Colorado 80202


RE:  Montoya v. City and County of Denver, et al.
     Civil Action No. 16cv1457 (RPM)
     Deposition of:  MARTIN E. VIGIL
     Taken:  May 24, 2022


Dear Mr. Ringel,

Attached with your electronic copy of the
above-referenced deposition is the signature page from
the Court's original transcript.

In accordance with the Rule, please have the witness
read and sign his or her testimony, then return the
executed signature page and any amendment sheets used
to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.

Encl.

cc:  Original transcript
     David N. Fisher, Esq.
     Jonathan Cooper, Esq.

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 1

**A**

**a.m**
 1:17 242:6,6,15
  270:12,13
**a/k/a**
 278:4
**aberration**
 260:13
**ability**
 66:21
**able**
 18:19 36:4,6
  48:23 49:5
  81:1 87:21
  112:23 125:20
  158:16 159:4
  178:3 202:3
  207:5 310:11
  333:1
**above-referen...**
 340:11
**abuse**
 85:5 86:22,24
  87:6,13 88:3
  88:17 90:3,14
  91:24 97:11
  128:17,18,23
  140:17,18
  322:1 323:13
  326:14,14,15
**academy**
 84:7 86:9,11
  318:16,17
  319:6,15,18
  321:12,14,15
  321:18
**accept**
 48:19 114:19,20
  186:12 206:10
  221:19
**accepted**
 313:13
**accessory**
 306:25 307:3,5

 307:12,25
**accident**
 196:4 309:8
  311:5,22
**accidents**
 303:23,24
**accompanying**
 268:25 269:4
**accomplice**
 307:1,11,18,20
**accord**
 222:17
**accounts**
 80:16
**accurate**
 19:4 319:25
  320:1 338:3
  339:11
**accusation**
 136:16
**accusing**
 129:3
**achieve**
 222:23
**acquitted**
 304:14 306:3
  316:3
**act**
 126:7 313:12
**Action**
 1:2 340:7
**actions**
 51:15 97:24
  120:24 314:15
**actively**
 7:24 141:20
**actor**
 35:7
**actual**
 239:6 246:21
  249:19 269:6
  285:13
**add**
 288:24 289:4

 291:25,25
  292:17
**adding**
 250:14
**addition**
 22:21 101:20
**additional**
 58:24 64:15
  157:23 319:2
**address**
 63:3 66:6 77:8
  77:13,22 78:5
  79:3,8,9 80:8
  80:11,13
  134:21 219:21
  264:19 338:15
**addressed**
 248:12
**addresses**
 83:5 249:8
**addressing**
 221:11 258:15
**admission**
 79:21 143:22
  144:6,9
**admissions**
 103:14 230:13
  254:18 256:10
**admit**
 103:19,24
  183:21 195:16
  213:11 255:1
  255:19
**admitted**
 164:5 180:21,23
  180:25 181:3
  183:23 201:25
  249:1,2 255:13
  288:20 307:9
**admitting**
 180:17 237:6,23
  253:19 255:2
**admonished**
 260:20

**admonition**
 184:19
**admonitions**
 165:6 176:17
  184:16 196:21
**adult**
 193:6
**adults**
 119:17 326:14
**advanced**
 85:21 328:10,17
  328:22 329:17
  331:5
**advantageous**
 247:1
**advertise**
 76:20
**advertising**
 93:2
**advice**
 11:9,24 14:12
  15:9,22 16:18
  16:20 18:11
  30:24 150:3
**advise**
 15:24
**advised**
 14:14 16:8,11
**advisement**
 119:25 261:25
**Advocacy**
 322:25
**affairs**
 5:3 142:9 295:6
  295:21 299:19
  301:12,25
  310:19 313:4
  315:9
**affiant**
 59:2 267:8,9
  268:24 272:4
**affidavit**
 4:7,17 59:2,7
  63:11 265:13

 268:8,13
  269:23 270:11
  271:5,15,18
  275:9,20 286:2
  286:5 287:1
  288:12 289:18
  289:20 338:1
**affidavits**
 58:4,4 267:17
  288:24 292:16
**Affirmative**
 8:21 21:11
  24:13 335:16
**affixed**
 131:24 339:16
**afoul**
 177:18 202:12
**afraid**
 17:5 185:23
**afternoon**
 278:19
**Agency**
 330:8
**ages**
 87:19
**aggressive**
 138:23 139:3
**ago**
 11:11 22:3
  73:11 76:9
  111:7 167:2
  284:4 297:3
**agree**
 57:20 104:11
  164:19 170:1
  218:21 242:10
  257:10 288:19
  288:22 291:4
**agreed**
 213:15 261:2,16
  312:23
**agreeing**
 7:2
**agrees**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 2

179:20
**Ah**
180:3
**ahead**
35:2 58:7 82:5
167:16 279:15
279:17
**Aimee**
1:18 82:20
266:12 339:3
339:20
**al**
137:8,16 340:6
**Alejo**
8:24 11:3,15
13:17 17:1
83:21 94:3
95:25 97:16
139:24
**alert**
60:13
**Alfrey**
39:8,10
**allegation**
88:9,20,22
97:12 301:17
301:19,23
302:14 303:6
**allegations**
13:14 128:2
130:6,8 300:18
301:21 302:20
302:23
**allegedly**
47:4 296:13
**alleges**
304:11 306:18
310:2 311:4
**alleging**
13:11
**alley**
296:12 300:25
**allowed**
7:8 162:2 175:3

175:12 261:19
267:16 288:24
292:16
**allows**
261:24
**alternate**
255:21,22
**amazing**
25:1
**Amended**
19:9 20:13
146:9
**amendment**
16:22,24 75:7
174:11 338:4,5
340:14
**American**
321:24
**amount**
12:24 229:21
**anal**
89:5
**anally**
89:4
**analysis**
28:1 58:25
105:9 109:12
330:21
**analyze**
69:9 211:7
329:6
**Anaya**
4:24 35:19,20
36:8 40:8,14
40:17 53:21,22
53:22 54:2,3,6
68:14 282:2,23
294:13
**Andrew**
2:14 6:13 7:1
143:13 158:12
159:9 265:22
295:10 308:22
335:5 340:3

**angry**
313:21
**answer**
9:5,9,20,21 11:7
12:12 14:25
15:2,10,11
16:19 17:21
18:19 26:1
29:2 32:2,4
34:4 35:2
46:22 48:9
75:4,8 89:7
91:7 92:5
100:15 114:24
115:15 117:24
128:23 156:19
162:17 169:9
169:16 170:8
170:18 172:10
172:14 214:18
225:17 249:9
275:3 280:20
285:1 300:12
332:21 334:7
**answered**
17:25 18:9
93:13 100:12
172:15 186:23
211:24 246:17
247:10 285:5
**answering**
12:14 14:23
17:13 74:24
303:11
**answers**
17:6,8 212:18
212:19
**Anthony**
279:3
**Anthony's**
279:2
**anus**
89:8,9
**anybody**

62:6 122:12
128:2 136:14
145:16 150:21
155:16,17
221:4 250:9
336:18
**anybody's**
301:8
**anymore**
318:19
**Anyplace**
89:1,2
**anyway**
9:20 124:16
309:17 314:16
**apologize**
42:13 171:5,15
171:25 172:4
219:2 314:5
315:23 320:7
**apologized**
313:8 314:4
**apology**
313:13
**apparently**
136:20 155:6
208:1 244:7
245:5 294:7
310:8,16
**appealing**
262:8
**Appeals**
7:6
**appear**
319:24
**APPEARAN...**
2:1 3:1
**appears**
235:21 320:1
328:13
**appellate**
262:11
**applicable**
326:18

**Application**
4:17
**applied**
116:7
**apply**
195:8
**appointed**
150:17,25
**appreciate**
136:5 209:5
334:6
**appropriate**
17:14 97:24
98:6 140:7
164:9,13
173:17 174:8
174:18 175:19
175:25 180:5
206:17 214:11
214:16 224:17
250:23 314:16
334:1
**appropriately**
201:6
**approval**
91:8,10 92:1,2
**approved**
91:5,17,18
305:24
**approximately**
22:13 87:21
153:24 268:19
273:13 316:23
328:1
**April**
317:20
**Arabia**
137:25
**Arabian**
137:9,25
**area**
27:17,18 290:22
325:4 329:20
330:16

Mile High Court Reporting and Video, Inc.   303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 3

**areas**
97:11
**argue**
44:10,19
**argued**
45:15 47:2,13
**argument**
262:21,22
**arm**
132:12 203:9,9
204:9,14,15
**arms**
106:18,24
228:17
**arrest**
4:17,18 25:11
25:18 28:22
29:6,14,17,19
31:6 58:4
265:12 267:17
268:8,13
269:23 270:9
271:15,18,24
275:19 286:2,5
286:25 287:17
288:12 299:14
307:17 308:18
**arrested**
28:12,14,21
54:2 112:24
133:14 294:14
294:16 300:24
304:12,15
306:15,18
310:3 316:4
**arresting**
25:4,7,14
**arrived**
320:12
**arriving**
286:12
**article**
57:10 133:1
183:5

**articles**
130:10
**articulate**
201:12
**articulated**
160:18 306:1
**aside**
16:7 72:17
90:14 129:1
157:18 260:18
**asked**
10:11 15:7 18:5
28:14 31:14
37:21 64:17,21
68:20 75:9,11
92:22 93:13
98:19,20
111:19 142:2
146:20 154:21
168:23 169:14
172:8 186:21
205:20 211:24
212:22 214:12
231:5 234:2
238:9 240:20
243:10 247:22
248:2 250:18
258:18 261:1
264:17,23
285:4 298:6
299:25 303:11
310:18 315:13
316:6 317:3,6
317:10 320:20
339:11
**asking**
14:21 29:17
65:6 67:2
77:14 79:14
95:22 107:20
107:23 110:13
118:2 126:5,13
128:22,24
142:7 146:18

168:14 187:13
190:15,16
199:12 213:18
216:16,23
220:14 235:2
239:21 240:18
245:7,13,16
246:13 248:21
259:25 263:14
275:13,24
281:23 292:14
301:19 303:25
316:5 318:10
**asks**
305:17
**asleep**
287:3,7
**ass**
199:1,9 225:6,7
225:11,18
**assault**
300:23 302:15
302:16
**assaulted**
154:19 301:2,6
**assertion**
7:4,12
**assign**
52:8
**assigned**
26:5 51:24 52:4
53:8 155:22
245:3 271:9
294:12 297:23
297:23 299:22
300:16 301:25
302:1
**assignment**
52:19
**assignments**
52:25 92:21
**assist**
299:3
**assistant**

2:9 76:14 152:7
152:8
**associated**
58:24 59:3,20
64:14 65:5
**Associates**
85:2,19 323:18
**assume**
47:6 113:1,2
235:14 240:9
253:2 271:9,12
289:9,25 290:1
291:15 304:4
320:24
**assumption**
38:18 224:13
233:13 283:9
**attached**
338:5 340:11
**attempted**
311:22
**attend**
91:11 92:2
321:16
**attendance**
91:17 92:23
**attended**
85:7,14,24 88:2
114:2 320:25
321:9 324:15
328:17 332:18
**attending**
296:10 310:4
330:13
**attention**
57:12 58:5,24
59:9,10,20,24
64:14 65:5,21
66:2 125:11
185:20
**attorney**
2:9 6:13 11:19
11:19 12:23
78:17 111:19

**Attorney's**
33:10,12 262:12
**attorneys**
74:10 118:18
**attributes**
108:13
**atypical**
258:23 259:2
**audio**
38:12 158:16
282:20
**audiotape-rec...**
284:22
**August**
76:10 323:21
324:15 330:10
330:14
**aunt's**
26:16,25
**Aurora**
324:17 325:4,9
**authored**
61:22 267:1
**authorized**
148:18,22,23
**autism**
108:3,9,17,18
108:19
**auto**
32:11
**automatically**
124:6
**autopsy**
131:1
**available**
18:14 136:1
271:18
**avoid**
89:14 101:14
114:5 115:3,10
116:11 117:4
117:14 126:13
138:23 139:2,6
139:11 140:23

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 4

178:4 190:20
190:21 191:2
210:4 251:20
258:11
**avoidance**
107:5
**avoided**
141:19,20
143:24 144:19
145:6
**aware**
29:18,21,24
30:4 32:9
44:12,20 45:19
45:21 46:3
48:12 57:18
60:6 97:16
113:12 120:19
121:23,23
122:9 123:20
126:11,20
127:24 129:3
130:1 144:15
154:24 155:6
156:25 157:13
157:15 265:12
265:16 273:22
274:7 276:16
276:17 305:2

___

**B**

**B**
54:19 83:22
**B-I-N-I**
268:17
**back**
14:11 18:3
27:24,25 30:25
32:7 36:4 41:7
53:19 54:22
56:6 66:6,13
66:15 69:11
83:15,17 105:2
106:16 126:21

128:8 131:21
133:16 145:2
145:19 148:9
151:18 168:19
169:9 212:19
213:5,14,16,17
221:2 231:8
232:13 233:17
233:20 236:1
236:10 244:11
261:25 263:23
283:18 291:22
312:8 320:6
327:11 330:1
**bad**
128:8 148:5
254:21 255:17
258:22 309:14
309:16 311:20
329:8
**badly**
313:11
**bail**
133:7
**bait**
326:1,2
**bang**
259:5
**banged**
209:14
**banging**
194:8 209:21
210:17
**bantering**
42:15
**bar**
241:13,21
296:25
**barriers**
165:13 327:2
**Barring**
140:13
**bars**
235:16,17

**baseball**
310:4
**based**
28:1 44:4,6
49:23 52:3
62:24 74:19
118:19 146:17
178:17 273:6
283:8,24,25
302:13 310:22
**baseline**
213:18 214:11
**basement**
45:13
**bash**
233:19,20
236:24
**bashed**
232:10,13
235:25 236:12
236:22
**bashing**
232:21 233:16
233:17
**basic**
97:13
**basically**
11:5 16:25
27:20 28:7
98:3 160:16
194:7 213:23
270:18
**basing**
21:15
**Bates**
63:9,23,25
316:25
**Bates-stamped**
124:13 135:23
142:20
**bathroom**
56:4 178:21,22
264:11
**bawling**

186:9
**beat**
36:9,13 238:19
**beating**
237:24 239:5
301:8
**bedroom**
235:17
**beer**
278:5 279:3
**began**
332:9
**beginning**
11:5 104:17
109:4 110:19
112:15,21
154:13 163:8
166:22 177:24
177:25 202:1
222:4 225:19
262:24 306:24
307:9
**behalf**
127:2
**behavior**
99:24 167:24
**behavioral**
105:9
**behaviors**
100:23
**belabored**
197:5
**belief**
176:8,9
**believe**
11:9 13:13,25
14:4 16:20
18:1 21:12
23:13 31:24
32:4 34:17,18
34:19 36:18,22
37:25 39:9,25
40:6 41:21,24
43:6 46:17

50:7 51:5 53:7
59:14,21,23
60:9 65:4 69:7
72:7 75:20
92:14 94:18
95:3 98:16
99:24 109:3
110:8,20
111:23 112:20
114:16 118:4
120:6 122:24
124:4,6 127:23
130:12,19
133:3 134:9
136:9 138:21
140:12 144:15
150:5 154:16
155:2 156:10
157:5 172:11
172:19 175:2
175:10,16
176:10 181:4
183:19 184:6
184:19 187:24
189:13 192:10
194:19 203:19
207:7,8 212:7
212:17 221:12
229:12,18
242:4 247:1,9
254:23 257:23
263:2 264:5,20
264:22 268:22
271:23 272:18
287:10 290:20
303:1 307:6
313:20 317:10
320:19 323:11
324:17 326:24
327:22 329:2
331:13 333:10
333:13,20
**believed**
170:9 174:17

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 5

|  |  |  |  |  |
|---|---|---|---|---|
| 175:5 198:8 241:11 304:15 311:13,21 316:3 | 268:12,15,16 | 36:4 69:1 286:15 | bow 131:15,18,21 | 263:6 |
| **bell** 127:21 | **bird** 37:17 | **boat** 7:21 | **box** 157:11 233:6,15 236:8,11,13 237:4 | **broken** 236:25 320:16 |
| **belonged** 40:24 | **birth** 272:23 | **bodily** 302:18 312:15 | | **Broncos** 68:3 299:6 |
| **belongs** 325:21 | **bit** 9:17 11:10 27:17 33:17 41:13 54:16 56:4 123:7 149:16 154:7 171:16 172:2 173:3 177:11 203:12 209:3 217:14,15 219:7 227:21 290:4 292:17 292:18 315:7 | **body** 27:13 36:9 52:6 89:1,3 105:15 105:24 106:18 108:2 130:25 130:25 154:16 216:11 228:13 228:19 234:20 234:21 260:12 | **boy** 161:12,23 162:4 174:6 178:20 219:10,13,14 | **brother** 112:8 279:7,11 279:22 |
| **bench** 131:25 132:4 | | | **boy's** 193:25 | **brought** 40:14 42:7,21 54:3 74:17 98:13,21 132:3 136:20,22 154:9 155:11 155:14 249:13 256:17 260:1 272:24 283:17 283:18,25 300:3 323:18 |
| **Benedetti** 34:5 | | | **boyfriend** 154:13 | |
| **Berg** 2:21 | | | **break** 15:5,20 68:18 83:15 105:2 111:13,14 135:3 136:7 138:4 139:21 178:21,21 208:21 | |
| **best** 30:18 54:23 55:7 80:2 89:11 209:2 246:11 271:13 271:14 272:5 292:7 | | **boilerplate** 65:12 | | |
| | | **bondsman** 133:13 | | |
| | **bitch** 131:8 | **Bonnie** 34:5 | | **brown** 45:12 47:15 |
| | **black** 68:4 | **book** 123:25 124:1 130:14 | | **bruising** 310:9 |
| **better** 37:24 87:24 175:23 180:3,8 180:15 181:14 181:15 195:11 197:25 200:11 232:23,24 262:23 292:18 | **blame** 95:3 | | **break-in** 282:4 | **brutely** 57:9 |
| | **blank** 110:13 300:10 323:24 | **boot** 231:5 | **breakfast** 73:10,16 81:11 | **buddy** 184:24 |
| | | **booted** 230:20 236:1 | **breaking** 263:12 | **building** 305:9 |
| | **blindly** 302:13 | **borderline** 100:7 | **brief** 7:18 27:21 51:9 69:17 294:7 | **bump** 150:20 |
| | **blocks** 159:14,14 | **bottle** 134:8 | | |
| **beyond** 329:22 | **blood** 27:17 155:6 187:22 249:22 289:13 | **bottom** 57:19 58:2,11 59:7 84:20,21 85:1 134:17 159:21 295:23 298:9 300:19 304:9 315:20 317:2,7 | **briefly** 9:2 26:5 69:9 74:5 154:6,7 | **bunch** 141:10 272:11 |
| **bias** 113:4,6,7,8 | | | **bring** 41:13 42:10 137:3 169:5,8 169:13,17,21 170:3,20 244:5 | **bureau** 25:12,19 150:18 152:4 294:8 |
| **big** 41:9 42:6 123:25 161:12 161:23 162:4 | **bloody** 249:16,19 | | | **burglary** 32:10 282:4 |
| | **blue** 123:25 159:21 | | | **business** 4:12 12:11,14 76:15,19 133:10,15 |
| **biggest** 28:9 | **bluff** 211:3 213:1,3,4 | **Boulder** 2:22 | **bringing** 128:4 188:9 | |
| **bill** 12:19 13:1 | **board** 52:17,18 160:7 | **Boulevard** 3:4 | **broad** 123:5 | **busting** 199:1,8 |
| **Bini** | **boards** | | **broke** | |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 6

**busy**
 23:8 60:11 74:5
**butt**
 89:8
**buttocks**
 89:9
**butts**
 199:8
**Byrialsen**
 2:3 57:22 58:1
   78:15 82:19
   89:19 111:14
   115:25 135:1
   136:4,6 171:17
   197:7 206:21
   249:18 261:12
   297:7 309:14
   315:21

—————————
        **C**
—————————
**C**
 6:1 54:20
**call**
 25:7 39:10
   51:16 75:6
   76:17 81:6
   82:9 85:9
   103:2 118:21
   121:1 150:20
   159:7,16 190:5
   193:21 196:2
   215:11 239:11
   256:12,14
   281:1 300:8
   302:2,5,11,12
   302:13,21
   314:3
**called**
 1:15 8:23 52:3
   52:14 81:14
   85:23 133:13
   213:19 296:23
   297:8 299:4,4
   305:4 313:22

 326:1
**calls**
 81:8,19,23
   131:2 244:21
**cap**
 299:6
**capacities**
 1:11
**capacity**
 118:6,9,10,23
   119:7 121:8
   122:22 333:25
   334:5,6
**captain**
 150:23 152:4,4
**captains**
 152:18
**captured**
 192:11
**car**
 110:21,24,25
   111:2,3,24,25
   112:2,5,8
   183:20 192:11
   198:11 205:20
   211:6 213:24
   226:10,16
   229:7 255:14
   255:17 256:6
   257:19,23,25
   258:2 264:4,21
   270:5 274:1
   277:1 278:6,10
   278:11,14
   279:7,23
   280:17 281:16
   282:12 301:1
   309:8 311:7,21
   311:25 312:6,6
   312:10,10,12
   312:19,21
   313:16,17
**card**
 4:13 82:19,21

 133:10,15
 134:14 320:16
 320:16,19
 321:23 322:24
 327:13 328:8
 330:6
**cards**
 137:13
**care**
 117:18 119:9,16
   121:13 337:4
**career**
 92:13 93:9
   149:20 197:4
   268:5
**careful**
 115:10
**Carol**
 134:4,7 334:18
**carrier**
 81:7 82:11
**cars**
 226:2
**carved**
 128:23
**cases**
 6:18,19,21 8:6,9
   8:19,19 59:8
   75:17 86:22
   94:13 98:16
   105:6 141:11
   144:13,14
   217:6 294:12
   303:19 304:2
   315:14 317:6
   317:14 322:10
**caught**
 54:20 198:11
   211:6 223:8
**cause**
 28:22 29:5,19
   31:6
**caused**
 301:6 311:21

 312:4
**causes**
 290:4
**causing**
 288:16 301:2
   312:8
**cautioned**
 211:21
**cc**
 340:21
**cell**
 81:6 82:14,25
   83:2,5 132:4
**cent**
 12:8
**center**
 130:19 312:13
   323:1 331:4
**CEP**
 331:20
**certain**
 9:18 11:23 44:8
   49:16,25 90:18
   105:21 126:14
   174:13 221:2
   260:25 322:12
   322:13 327:1
**certainly**
 31:5 43:8
   182:18 224:6
   224:10 239:13
   242:25
**certainty**
 44:2
**certificate**
 322:7 332:15
   339:1
**certificates**
 318:17
**certify**
 339:4,13
**cetera**
 39:17 105:25
   199:14 275:18

**chain**
 151:3 152:2
**chair**
 215:20
**Champa**
 301:1
**chance**
 170:11 197:14
   197:25 212:16
   266:3
**change**
 34:21 123:24
   159:19 260:22
**changed**
 63:4 66:7 78:3
   174:15 309:2
**changes**
 124:2,5,7,7
   338:3,6
**changing**
 123:12
**characterizati...**
 164:20
**characters**
 112:1
**charge**
 31:22 51:23
   200:21,24
   201:5 305:6,24
**charged**
 137:9 201:7
   304:22 306:25
   307:1,4 308:19
   310:3
**charges**
 33:14 146:17
   304:14 306:3
**charging**
 307:25
**chase**
 305:8
**cheap**
 17:17
**cherry**

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 7

130:18 263:6
263:12
**chief**
25:15 76:14
150:24 152:5,6
152:6,7,8
305:4
**child**
85:5 86:17,18
86:22,24 87:3
87:5,6,13 88:3
88:7,16,19,21
88:23,24 89:2
90:3,14 91:24
97:11 122:12
140:17,18
200:1 300:23
302:17 321:25
322:10,15
323:12,12
326:13,14,15
327:17,18
**children**
86:22 87:14,17
87:25 89:2,12
89:15 90:2,4
119:16 224:19
326:13,15
328:6
**Children's**
322:25
**chose**
68:8
**Chris**
278:11
**Chubby's**
241:21
**chute**
36:3,4 68:23
69:1,7,14,20
232:23
**cigarette**
132:11
**Circuit**

7:7
**circumstances**
8:12,15 154:8
**cite**
111:12 130:21
**citizen**
313:5
**City**
1:9 2:9,12 7:9
338:16 340:6
**civil**
1:2 8:18 10:21
72:18 74:8,10
74:12 75:15
76:12,12 340:7
**civilian**
311:16,19
**civilly**
74:16
**claim**
46:4 48:24
**claiming**
211:21 226:19
**claims**
7:9 224:23
306:16,17
**clarify**
30:19
**class**
91:23,24,24
**classes**
90:18 91:3,12
91:15,19 92:16
105:8 113:24
**classify**
110:6 238:24
**clear**
12:3 93:7 246:4
246:16 300:17
321:17
**cleared**
246:5
**clearly**
160:18 208:13

208:17
**clergy**
102:7,8,17,23
**clerk**
58:18
**clients**
7:22
**clip**
158:8 159:7,16
159:22 162:19
163:9 165:1
171:7 172:22
174:3,5 176:12
177:13,14,17
179:14,17
181:19 182:6
184:8 187:13
188:7,18
193:13 194:23
196:8 199:20
200:7 205:3,22
206:3 207:15
207:18 208:13
209:9,12,13
215:7,9,17
217:19,21
218:16 219:24
222:1 223:20
224:21 231:16
231:17,17
233:24,25
238:15,15
239:18 243:12
247:18,18,21
248:19,19
249:1 250:5,7
255:11,24
264:14,15
308:21
**clips**
158:8,13 243:9
255:11 256:8
256:20,21,21
256:25 257:3

257:11,14
258:5
**close**
164:17 165:6,7
165:24 177:1
185:21 187:17
193:17 203:6
215:21 217:2
219:4 228:5
259:4
**closed**
90:12 107:2
228:17 241:21
**closeness**
47:22,23
**closer**
47:24 316:12
**closest**
47:14
**closing**
327:1
**clothing**
247:15
**coffee**
56:3 81:11
**coincidental**
37:5
**cold**
98:15 137:2
**Colfax**
2:10 296:24,24
**collaborate**
55:4
**collaborated**
53:11
**collectively**
201:11
**color**
85:10 213:24
**Colorado**
1:1,20 2:4,10,16
2:22 3:5 310:4
323:1 330:1
338:21 339:4

340:5
**Colors**
88:14
**column**
319:8,11 323:24
**com**
77:18 80:4
**combination**
251:2,5 258:11
**come**
35:9,25 37:4,22
39:17 56:6
61:15,17,18
66:20 83:15
91:22 105:2
123:19 124:2,8
166:21 169:25
170:17 215:9
216:7 217:6
222:14,24
251:3 263:9,23
287:23
**comes**
58:21 153:20
220:23
**comfortable**
194:1
**coming**
32:7 43:4
320:11
**command**
132:19 141:24
149:23 151:3
151:15 152:2
**commander**
150:24
**commencement**
339:5
**commencing**
1:17
**comment**
98:2 274:14
275:2 299:11
**commented**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 8

**commission**
126:7 338:11
339:21
**commit**
175:16 180:24
190:11 213:24
**committed**
68:3,5
**common**
50:5,7 105:12
105:22 107:6,8
107:9 110:23
145:15 162:6
163:22 246:3
251:23 255:6
**communicate**
87:24
**communication**
86:11 105:19
**company**
75:25 78:23
309:17
**comparatively**
285:22
**compare**
145:13 211:7
**compared**
285:12
**complain**
299:16
**complainant**
300:22 302:2,11
302:22,24
304:5,11
306:18 310:2
311:4 313:5
316:3
**complained**
128:9
**complaining**
298:12 299:25
**complaint**
19:10 20:13
127:1,16,23

146:9 174:11
179:10 209:25
296:8 301:16
302:5 306:1
310:16 312:23
313:5
**complaints**
299:16
**complete**
55:1 157:8
201:24
**completed**
58:17 331:22
**completely**
30:10,13,16
88:21
**completion**
318:17 332:16
**compliance**
336:18
**comport**
59:24 71:15
**comprehension**
121:18
**computer**
124:3,4,20
143:12 225:2,3
**con-**
163:25
**concept**
249:4
**concerning**
110:21 133:23
**concert**
296:10
**concerts**
297:4,5
**conclude**
168:25 170:9
212:12,23
**concluded**
58:21 95:2
179:13 245:2,8
246:10 337:5

**concluding**
168:22
**conclusion**
43:4
**condition**
72:2
**conduct**
101:23 102:17
143:20 161:14
163:18 202:13
209:13 210:5
258:22
**conducted**
73:12 92:12
98:9 99:7
100:5 260:11
260:14 312:25
326:7
**conducting**
96:3,14 100:20
101:21 105:9
105:24 260:10
305:20
**confess**
95:11 106:8
146:6,7 181:15
190:11,16
197:14 204:6
**confessed**
94:10 106:16
114:15 153:21
198:9 201:2
217:7 229:22
229:24
**confesses**
166:12
**confessing**
146:2 166:14
237:7
**confession**
31:10,17,23
94:17,19,22
95:4,6 114:6,9
115:3,7,10

143:22 144:6,9
146:25 190:21
191:1 258:12
**confessions**
93:23 94:7,14
96:15 113:13
113:21,25
114:2 125:9
191:3
**confidential**
83:6,9
**Confidential/...**
4:8
**confirmation**
113:4,7,8
**Confrontation**
113:6
**confronted**
287:2
**confused**
10:14,23 175:15
240:7 241:5
242:23 276:8
**confusing**
114:21 154:15
**confusion**
16:25
**conglomeration**
33:6
**conglomerative**
91:1
**conjugal**
164:1
**consent**
263:23 264:7
**consequences**
161:5
**consider**
95:20 100:7
108:4 110:15
**consideration**
120:3 195:10
**considerations**
120:14

**considered**
99:16 111:11
**consistent**
69:2 239:6
241:24 324:11
326:10 327:9
336:5,7,8,10
**consistently**
146:1 209:23
284:20
**conspiracy**
222:20
**constant**
193:25
**constantly**
123:12 218:10
**constitute**
126:5
**consult**
55:16
**consulted**
33:25
**consulting**
75:24
**contact**
144:3 305:13
**contacting**
304:25
**contained**
286:3
**contamination**
115:19 116:4,7
116:11,15,21
**content**
257:11 323:15
**context**
183:17
**continually**
147:8,14 149:1
**continuance**
21:24
**continue**
117:25 146:15
172:17 173:14

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 9

continued
3:1 5:1 15:2,11
52:7 261:3
continues
146:23
continuous
318:1
contract
12:23,25
contradict
274:17 276:21
control
200:11,12,15,23
201:1,10,16
202:4,7,10
296:3
controversy
130:7 339:7
conversation
34:7 213:9,12
229:23 263:13
conversationa...
218:25
conversations
10:1
convey
166:19 197:13
197:24 200:14
203:12,20
207:3,11
220:22
conveying
36:15 39:15
204:2
convicted
33:3,15 37:10
39:7 54:1
127:8 130:9
175:8 193:4
245:6 276:14
300:23 334:20
334:23,25
conviction
32:10,10,11,11

127:11
convictions
67:11
convince
35:12
cooperate
131:8 305:9
cooperating
160:15 201:6
cooperative
313:19
coordinated
222:13,16
copy
123:16 134:24
135:4,5,11
136:7 265:17
265:23 340:11
corner
52:20 179:4,7
corners
272:1 292:9
corrected
26:12 241:4
321:11
correcting
258:10
corrections
338:3
correctly
14:20 18:22
46:23
correspondence
67:12
corroborate
104:4
corroboration
155:24
cost
91:9,18
Costa
133:13
couch
35:21,23 70:20

287:4,8
couched
163:5
Council
330:8
counsel
9:18 11:24 15:9
16:18,21 18:11
95:2 168:8
212:14 315:13
317:2,6,10
320:19 335:13
339:14
counseled
165:16 173:12
178:5 195:24
260:21 336:21
count
43:24
countless
99:14 100:5
153:8
country
138:1,2
county
1:9 2:9,12 7:9
98:18,21 134:3
340:6
couple
8:17 52:7 63:21
67:24 72:3
216:4 255:10
270:23 287:21
307:8 309:23
326:25
coupling
193:10
course
9:12 85:21 97:9
120:17 302:16
318:25 320:24
321:3,7,9,9
322:1,4 323:10
328:5,9,10,14

328:17,22
329:1,2,17,19
330:10,13,18
330:23 331:6,7
331:10,11,12
331:24,25
332:12
courses
329:15 335:14
335:23,24
court
1:1 6:21 7:6,7
9:7,12 46:14
79:12 83:11
127:2,16
137:20 144:13
158:9 264:12
306:6 338:19
340:18
Court's
340:12
cousin
35:18 40:24
163:15 164:8
278:4
cover
294:20
coverage
65:17
covered
264:5
covering
286:15
crashed
279:7,23
cream
76:7
create
12:23 280:25
281:10
created
287:17,18,25
288:7 313:3
credit

137:13
Creek
130:19
crew
56:21
crime
26:5 27:7,14,16
27:20 47:5,6
47:13,15 50:20
68:4,5 69:3,8
71:25 94:10
95:14,22 105:3
107:23 109:15
116:8 146:2,24
147:9,15 149:2
156:12 166:14
175:8,16
180:24 185:22
186:20 204:7
210:24 211:7
219:15 230:10
230:15 231:12
231:12 234:21
237:7 239:7
246:22 249:16
249:20 255:2
257:16 263:11
272:3 289:13
291:17 292:1
292:18 294:6
307:4,5 308:2
308:15 330:20
333:6,6,7,9,11
crimes
120:6 151:15
152:4 190:11
332:3,13,21
333:18
criminal
8:6,9,13,19 51:2
59:1 75:18
127:15 128:15
Cristie
4:13 135:21

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 10

**Cristie.'**
 134:6
**criticism**
 141:25 142:5
**crocodile**
 167:10
**crossed**
 106:18 290:8
**crowbar**
 231:1
**crowd**
 298:7
**crowding**
 139:11
**cry**
 167:9 173:8,25
**crying**
 21:1 108:21
  166:7 167:1,17
  171:23 172:13
  172:16 173:7
  185:3 186:9,14
  202:23
**CSR**
 339:20
**cues**
 106:2
**culpable**
 120:6 245:12
  257:17
**cup**
 56:3
**curious**
 32:6 225:6
**current**
 82:8
**currently**
 7:5 78:5 130:12
**Curriculum**
 4:9
**curse**
 200:4
**curses**
 139:7

**cursing**
 199:25 313:21
**curt**
 18:13 39:8,10
**cussing**
 187:1 313:22
**custody**
 191:8 192:14,21
**cut**
 195:12,14 258:4
  263:6
**cuts**
 21:5,17
**cutting**
 263:12
**CV**
 23:15,17 24:8
  83:20 84:24
  90:15 91:4,13
  91:20

___

**D**

**d**
 2:14 6:1 143:18
**D.U**
 86:17 327:16,17
**DA**
 111:19 160:12
  160:22 200:23
  262:11 283:5
  333:2
**DA's**
 33:4,24 111:10
  144:14 146:16
  150:6 153:18
  201:5,12 202:7
  245:4
**DA_00205**
 4:23
**DA_00207**
 4:23
**DA_00210**
 4:21
**DA_00211**

 4:21
**DA_00307**
 4:25
**DA_00309**
 4:25
**DA_00486**
 4:19
**DA_00489**
 4:19
**DA_205**
 277:22
**dad**
 37:23 88:15
  89:8
**Dale**
 40:13,13 222:12
  223:11 282:18
  283:21 284:1
**damage**
 200:11,12,15,23
  201:1,10,16
  202:4,7,10
**damages**
 314:19
**danger**
 133:11
**Dante**
 127:2,7 129:1
**dark**
 131:25 243:2
**darn**
 164:17 215:21
**DAs**
 154:3
**date**
 23:16 24:4 85:4
  130:4 270:12
  272:23 316:8
  319:11 338:10
  340:15
**dates**
 328:2 332:8
**daughter**
 313:15

**David**
 2:2 63:17 78:10
  129:12 145:8
  159:20 294:22
  315:1 340:21
**david@fblaw....**
 2:5
**Davis**
 36:11 68:9
  154:12 235:17
  241:14,18
**day**
 19:12,21,24
  20:2,4 22:10
  27:9,12,23,24
  32:21,23 33:7
  37:19 46:13
  57:15,25 60:8
  68:22 76:4
  112:8 155:11
  183:6,8 230:9
  243:10 272:20
  278:18 279:22
  282:3,16
  287:20 316:17
  322:17 339:17
**days**
 20:6 52:7,13
  59:4 72:4
  192:4 287:21
  293:25 324:9
  328:3 340:15
**deal**
 90:15 194:24
  195:9,10,12,14
  232:24 257:4
  258:8 261:20
  313:23
**dealer**
 68:9
**dealing**
 322:10
**dealings**
 76:15

**Dear**
 340:9
**death**
 87:6 156:13
  241:2
**Deaths**
 321:25
**decade**
 317:22
**December**
 316:11
**deceptive**
 106:3
**decide**
 32:21,22
**decided**
 12:20 68:17
  254:5 278:6
**decision**
 12:18 25:10
  29:14,17 33:9
  33:12 146:15
  261:4
**decisions**
 34:1
**defeat**
 262:4
**defendant**
 2:18,24 3:7 7:10
  98:24 127:3
  134:5
**Defendants**
 1:12
**defense**
 126:6
**define**
 25:6 65:10
  116:13,16
**defining**
 115:19 116:20
  116:21
**definite**
 125:18 126:2
**definitive**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 11

48:9
**degree**
 181:8 251:21
 255:20
**demonstrating**
 89:24
**denial**
 198:7 218:6
 221:19 228:10
**denials**
 186:12 206:11
 218:11 220:18
 245:10 254:5
**denied**
 7:7 184:3
 229:19 230:10
 244:16
**denies**
 149:2,6 205:24
 235:23
**Denver**
 1:9 2:4,9,10,12
 2:16 4:7,7,10
 4:11,11,14,15
 5:3,4,4,5,6,6
 7:10 8:9 33:9
 33:12 56:20
 63:9 64:1
 83:13 98:20
 102:25 123:11
 124:13 125:6
 125:24 136:21
 136:22 137:1
 142:20,23
 143:17 150:16
 245:17 262:11
 273:6,12
 286:13 295:6,7
 295:21 315:16
 315:20 317:1
 317:15 318:9
 318:11 319:5,6
 319:15,18
 321:14,18

324:19 325:1,4
 325:7 327:23
 329:19,23
 330:16 331:17
 333:14 338:20
 340:5,6
**Denver's**
 126:12
**DenverPD**
 77:11
**DenverPD.co....**
 77:24
**DenverPD.org**
 77:18
**deny**
 149:7 217:21
 220:13,15
 229:11 245:8
**denying**
 168:24 183:13
 205:5 228:2,25
 229:7,8 230:9
 246:8 256:1
**department**
 4:10,14 5:3,5
 63:1 73:25
 76:6,14 96:8
 103:1 127:23
 128:1 143:17
 146:16 201:11
 321:15 333:15
**depends**
 148:7,10
**deponent**
 49:20 57:24
 72:14,16 82:21
 115:23 124:25
 129:19,21
 143:2,8 159:2
 159:5 171:19
 172:1 197:8
 210:9 266:17
 266:22 282:10
 285:23 295:16

309:15 315:25
 337:2
**deposed**
 6:16 8:5,22
 10:19 11:12
**deposing**
 10:14 14:16
**deposition**
 1:4,14 7:3,13,23
 9:2,17,25
 10:12,16,16
 11:5,21,25
 12:12 13:16,20
 13:24 14:12,18
 15:4,14 16:12
 18:4,5,22 19:8
 22:19 30:12,14
 30:17 49:19,23
 64:7 72:23
 74:18 83:8,23
 83:24 124:17
 135:13 142:15
 158:5 200:20
 209:1 237:16
 252:3 265:20
 266:15,20
 281:2 295:2
 318:5 325:24
 337:5 338:2
 340:7,11
**depositions**
 6:20 8:9,13
**deprived**
 127:20
**describe**
 89:19
**described**
 68:23 140:16
 152:10 291:10
**describing**
 89:22
**description**
 68:25 289:22
**deserve**

34:18
**designated**
 159:23
**designation**
 83:7
**desk**
 83:1
**detail**
 146:7 231:11
 232:17,19
 235:3 242:13
**detailed**
 35:16
**details**
 24:24 36:15,17
 39:15 61:2
 114:13,13,22
 146:10,24
 147:8,14,16
 148:4,4 230:15
 230:16 233:18
 237:8 242:16
 288:24 289:5
**detective**
 1:9,10,11 4:12
 4:13 5:3 6:21
 7:1 21:5 24:17
 24:18,23 29:13
 51:25 56:14
 63:12 93:8
 98:19 100:23
 109:2 150:13
 150:15,17
 152:11 163:13
 204:20 222:7
 222:11 224:23
 265:7 267:13
 268:2,5,5
 269:19 275:4
 280:9 282:18
 282:22 292:7
 292:12 294:11
 300:24 304:12
 315:7 318:14

320:17 335:12
**detectives**
 29:12 50:22
 52:8 56:22,22
 72:1 92:21
 99:25 122:10
 185:9 186:10
 191:21 224:3
 225:10 226:17
 245:3 321:16
 324:19 333:15
**detectives'**
 70:15
**determination**
 48:24 49:5
 310:21
**determine**
 161:1,2
**determined**
 12:10 48:1
 88:11,12
 112:25
**detox**
 299:4,4,5,7,17
 299:17
**developing**
 254:25 256:9
**development**
 271:10
**diagrams**
 89:2
**die**
 312:16
**died**
 74:4
**differ**
 322:13 325:8
**difference**
 192:4 243:6
**different**
 9:17 53:24 66:5
 92:23 104:7
 107:17,18
 141:10 166:18

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 12

190:6 201:22
202:2 215:16
216:4 217:17
243:1 247:8
254:20 255:8,9
256:21 284:24
284:24,25
309:10 315:13
328:25 329:4,4
**different-look...**
331:20
**differentiate**
104:8
**differently**
58:6 60:14
120:21
**difficult**
80:2 174:12
189:22,22
**difficulty**
121:22
**digital**
63:7
**digitally**
88:23
**diminished**
118:9,10,22,23
119:6 121:8,22
122:21 334:1,5
334:6
**direct**
125:11
**dirty**
130:14,16
**disabilities**
121:10,13
**disagreed**
262:8
**disclosed**
286:7 287:1
290:12
**discovered**
20:18 52:5,6
136:2 189:23

**discovery**
7:8,11 8:1 23:9
36:25,25 39:17
142:23 226:7
234:17 295:22
**discrepancies**
291:23
**discrete**
159:12
**discuss**
73:15 74:15
150:7
**discussed**
22:18 118:5,18
183:20 314:4
**discussing**
334:15
**discussion**
138:6 252:7
262:14,16
263:19
**discussions**
264:1
**dislike**
104:24
**dismiss**
33:14
**dispensed**
132:16
**displays**
108:13
**dispute**
234:24 274:8
319:20,24
**distance**
165:2 187:19
228:7 327:1
**distinction**
175:1
**district**
1:1,1 7:7 33:9
33:12 74:10
83:10 118:18
127:2,16

262:11
**division**
152:5,6 186:10
**DNA**
189:20,22
**DOB**
4:19
**doctrine**
8:1
**document**
63:11 64:10
66:5 83:18
84:2,19 85:8
90:12 124:22
125:3,5 126:21
142:19,21
145:2 295:7
317:15 318:8
318:13 319:23
333:3,4
**documentation**
318:18
**documented**
51:12 322:6
332:15
**documents**
59:19
**dog**
35:25 243:10,11
243:14,22,25
244:8,9,13,15
244:16,17,18
**Doherty**
3:2 7:19
**doing**
54:18,19 55:10
55:24 56:12
64:20 66:13
74:5 75:21
76:4 92:3,4
99:10 117:22
117:25 119:10
133:12 141:25
142:18 145:4

151:1 153:3
157:24 165:19
165:23 166:1
168:8 176:1,18
184:14,16,24
188:7,22 206:7
216:14,18
218:13,19
238:18 245:18
254:25 258:11
260:21,23
264:8 266:11
292:3 303:12
322:8,9 332:12
336:23
**doings**
130:25
**domestic**
310:3
**Don**
86:8,10 105:18
321:13
**Donnie**
153:25
**door**
28:5 36:6 41:10
69:2,11 157:9
179:6,9,10,12
230:20,23
231:6,7,8,20
232:2,5,10
233:7,9,14,17
233:20,22
236:1 244:11
278:7,9,13,13
291:9 296:12
296:13
**dot**
80:4 131:20
**dots**
131:16
**double**
140:6
**doubt**

39:23,25 40:1,2
40:4,6 244:23
279:25 281:20
**downtown**
130:22 241:14
**dozen**
43:23 331:25
**dozens**
221:1
**DPD**
33:25 84:4 91:5
91:14,14 92:15
93:9 96:18,24
98:9,11 102:14
113:23,24
114:4,8 115:1
115:2,18
117:17 119:19
119:19 120:10
123:1,3 125:8
127:3 138:22
140:22 142:24
144:8 145:11
148:21,23
153:10 161:14
168:1 176:10
177:19 180:6
182:8,10
184:15 188:25
195:20 196:21
199:21 202:12
210:3 211:21
221:5 245:17
250:22 267:24
268:6 271:14
271:16 275:17
301:15 319:2
325:8 333:2
334:10 336:16
**DPD-sanction...**
116:11 117:3
118:3,16
138:13,17
139:2,6,11,16

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 13

| | | | | |
|---|---|---|---|---|
| 146:19 147:20 148:16 | **drug** 68:9 247:22,23 248:3 251:1 | 5:5 **effect'** 134:6,9 | 14:17 16:3 **em** 93:2 | **engage** 100:23 **engaged** 93:8 |
| **drag** 201:19 247:22 | **drugs** 68:10 | **egg** 281:7 | **email** 62:6 63:1,3 66:5 | **English** 137:21 |
| **dragged** 36:9 248:2 290:25 291:5,6 | **drunk** 68:16 119:2,4 130:21,22 333:21 | **eight** 20:16 21:10 22:6 158:9 159:13,24 192:1,2 316:15 | 77:8,12,22,25 78:4,23 79:3,7 79:9 80:5,7,11 80:13 83:5 134:21 | **enjoying** 75:23 **entailed** 330:18 |
| **dramatic** 41:9,11 | **drunker** 130:22 131:12 | **either** 21:3 26:14 29:3 | **emailed** 62:4 | **entered** 83:10 |
| **drank** 279:2 | **dude** 60:22 | 57:17 60:16 64:21 72:7 | **emails** 62:2 67:13 77:2 | **enticing** 65:17 |
| **drawing** 175:1 | **due** 29:11 58:4,23 59:19 64:13 | 89:23 116:17 117:7 119:2 166:2 182:14 | 78:12,20,22 79:6 80:11,14 | **entire** 158:4 269:22 319:23 |
| **dress** 71:14,22,23 72:4 234:11,18 234:22,25 235:6,13,14,15 235:18 237:19 237:21,22 247:10,12,17 289:10 | **duty** 310:13 ———— **E** ———— **E** 1:4,9,15 4:9 5:3 6:1,1,3 338:8 339:5 340:7 | 207:11 234:4 246:7 272:2 276:23 280:12 282:6,20 287:23 315:23 **ejected** 298:12 | **Emily** 34:18 51:3 110:14 156:13 183:7 214:9,14 251:11 254:19 282:4 287:3 288:16 290:25 333:7 | **entry** 36:7 244:19 286:14 319:14 **equation** 16:4,5 **erroneously** 311:4 |
| **dressed** 131:14 | **earlier** 51:22 68:25 | **electronic** 340:11 | **emotional** 110:3 228:18 | **error** 290:11 |
| **drink** 178:21,23 | 75:11 96:17 145:3 154:7 155:9,11 | **elevated** 58:23 59:8,10 59:20,23 60:4 | **emphasis** 193:24 209:17 209:20 220:7 | **escorted** 294:8 **especially** 122:8 258:22 |
| **drinking** 178:25 278:5 | 200:16,20 201:3 252:10 | 64:14 65:4,11 65:11,15,20 | **emphasize** 193:22,23 194:9 | 285:12 |
| **Driskell** 12:1 15:20 74:12 75:1 76:11,16 | 325:24 333:13 333:20 334:5 **early** 223:21 | 66:2 **elicit** 31:13 119:9 165:21 | **Encl** 340:19 **encompass** 292:9 318:22 | **Esq** 2:2,2,8,14,20 3:2 340:3,21 340:22 |
| **driven** 257:25 | **earphones** 299:6 | **elicited** 30:25 31:1,10 | **encouraged** 92:19,22 | **established** 72:13 149:19 |
| **driver** 311:5 312:5 | **easier** 158:23 281:1 | **eliciting** 114:5 | **ended** 161:21 248:17 270:21 | **estimate** 324:3,5 |
| **driver's** 313:18 | **easy** 80:3,3 | **eligible** 181:4,7 | **ends** 20:22,23 295:7 | **et** 39:17 105:25 199:13 275:18 |
| **driving** 279:6 | **educate** 92:20 | **eliminating** 327:2 | **enforcement** 325:5 | 340:6 |
| **drop** 106:6 | **Education** | **Elizabeth** | | **evaluate** |
| **drove** 226:3 300:25 | | | | |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 14

120:23 121:16
**Evans**
 2:15 74:21
  340:3
**Eve**
 41:23 44:7
  65:16 242:3
  243:3 278:5
  282:14
**evening**
 282:20
**event**
 31:9 181:12
  216:17 296:20
  298:3
**events**
 33:6 133:23
**eventually**
 149:7 230:13
  303:5 312:3
**everybody**
 83:9 135:4
  142:22 146:5
  190:25 213:13
  241:2
**everybody's**
 77:22
**evidence**
 28:21 29:5,18
  45:6 69:25
  145:14,22
  155:5 156:12
  157:16 188:3
  188:10 189:11
  189:13,16
  190:6,7,9
  231:7 232:4
  236:3 237:20
  241:19 242:12
  291:17 292:1
  292:17
**exact**
 8:15 15:11,13
  23:15 48:2

130:4 183:16
 241:3
**exactly**
 35:16 59:5
  60:10 198:9
  207:21,23
  223:23 283:11
  302:4 331:15
**exactness**
 44:5
**exaggerate**
 291:25 292:16
**examination**
 1:15 4:1 6:6
  213:23 214:6
  315:4 335:10
  339:5,8
**examiner**
 76:2 96:7
  213:21 214:3
  325:21
**example**
 88:6 214:8
**exceed**
 59:4
**Excerpt**
 4:10,14
**excuse**
 36:22 126:7
  187:1
**executed**
 26:25 340:14
**exhausted**
 52:25
**exhibit**
 63:7 64:5,7
  83:21,23,24
  92:9 124:10,17
  124:20 129:12
  135:11,13
  142:11,15
  143:8 158:4,5
  265:20 266:12
  266:17,20,22

277:7 282:10
 285:23 295:2,5
 315:10 318:5,7
 319:23 321:21
 327:11 331:16
**exhibits**
 4:6 5:1,2 266:15
  318:1
**exist**
 29:22
**existed**
 29:23
**expect**
 252:1
**experience**
 14:7 92:24
  93:17 96:3,14
  101:21,22
  107:9 117:21
  144:12 246:3
  248:5 291:23
  301:14,21
  302:21 336:8
**experienced**
 93:4 100:20
**experiences**
 102:9,13,24
  326:13
**expert**
 8:23 11:12 12:6
  13:5,6 14:5
  17:3 75:13,19
  76:12,17 83:20
  95:25 96:4,10
  96:12 103:4
  113:3,11
**expertise**
 96:6
**expires**
 338:11 339:21
**explain**
 18:10 47:21
  116:14 167:11
**explained**

13:24
**explaining**
 183:18 252:11
**explanation**
 18:14 255:15
  256:5 257:15
**explanations**
 254:20
**expressions**
 105:15
**extends**
 329:22
**extensive**
 58:25 269:21
**extensively**
 81:12
**extent**
 61:14
**extra**
 117:18 119:9
  120:21 310:13
**eyes**
 186:9

———————
      **F**
———————
**F**
 296:23
**fabricated**
 134:14,18
**face**
 107:15,20
  132:11 139:12
  164:22,23
  165:2,24 174:8
  177:1,7 180:19
  186:11 193:17
  194:1 216:4,13
  217:1,14
  218:18 219:5
  281:7 296:15
**Facebook**
 80:18,21 83:6
**facet**
 103:21 293:13

**facial**
 105:15
**fact**
 13:20 25:20
  37:17 42:5,18
  44:1 55:10
  57:8 126:4
  138:2 178:12
  178:13,15,16
  232:16 233:3
  235:1,19,20
  239:5 242:13
  248:7,15
  252:17 253:9
  253:16 274:8
  275:5 281:24
  286:19,22
  287:7,12
  313:16
**factor**
 101:23 108:10
  140:20
**factors**
 50:1 121:17
**facts**
 52:18 72:24
  103:9 104:2,4
  127:10 128:11
  134:7,11
  146:24 147:4
  229:24 233:18
  233:19 235:3
  236:2 237:3,8
  244:22 245:10
  245:12,19
  246:5,9,15,20
  246:21 250:19
  250:23,24
  258:9 260:1
  267:8 268:12
  272:1 307:19
**factual**
 292:10
**fair**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 15

| | | | | |
|---|---|---|---|---|
| 53:10 89:25 | **federal** | 202:10 | 302:4 318:8 | 258:8 263:21 |
| 112:24 230:10 | 127:2,15,16 | **fictitious** | **Finding** | 264:6 268:24 |
| 256:9 289:19 | 239:25 240:13 | 301:9 | 56:2 | 272:10 277:18 |
| 293:16 318:23 | 241:16 252:15 | **field** | **fine** | 281:9 283:11 |
| 322:12 326:10 | 253:7 | 284:22,22 | 75:3 83:12,13 | 283:12 286:10 |
| 334:1 | **feedback** | **fifth** | 116:2 185:15 | 296:15 302:21 |
| **fake** | 152:13,23 153:3 | 10:4,7,12,15,18 | 187:2 314:11 | 302:25 303:7 |
| 167:11,12 | 153:16 154:2 | 11:3,8 14:13 | 332:23 | 314:16 319:4,5 |
| **false** | **feel** | 14:15,18 15:1 | **finger** | 319:14 327:15 |
| 113:13,21,25 | 17:14 96:2 | 15:9,17,21,25 | 89:8 155:17 | 329:19 |
| 114:1,5,9 | 106:13 124:23 | 16:8,19,22,24 | 177:7 194:10 | **FISHER-BYR...** |
| 115:3,6,10 | 174:18 177:14 | 17:5,19 18:12 | 194:12 | 2:2 |
| 146:21 190:21 | 185:9 194:1 | 75:7 159:8,24 | **fingerprint** | **fit** |
| 190:25 191:3 | 228:14 257:16 | 171:21 | 28:1 | 240:10 291:25 |
| 258:12 275:19 | 266:5 300:4 | **figure** | **fingerprints** | 292:18 |
| 305:15 | 326:18 336:4 | 269:16 | 27:18 28:5 | **five** |
| **falsely** | 336:12 | **file** | 157:3,7,14 | 23:14 103:1 |
| 304:15 316:4 | **feeling** | 51:18 58:17 | 187:21 210:23 | 109:7 137:23 |
| **familiar** | 186:12 | 124:4 146:16 | 210:24 211:2,4 | 167:17 252:5 |
| 99:5 129:6 | **feelings** | 159:20 160:12 | 211:7,8,10,13 | 294:19 |
| 130:5,8 | 35:4 | 160:14 202:8 | 211:19,22 | **five-hour** |
| **family** | **feels** | **filed** | 249:10 | 155:1 |
| 72:21 | 125:20 | 73:21 127:1,16 | **finish** | **five-minute** |
| **far** | **feet** | 245:4 314:18 | 9:8 194:23 | 83:14 |
| 81:17 178:17 | 46:16 67:4 | **files** | 195:11 196:18 | **fix** |
| 182:7 277:3 | 164:25 165:1 | 61:18 | 257:4 258:8 | 336:24 |
| **farmed** | 174:10 177:5,6 | **filing** | **finished** | **flabbergast** |
| 98:13 | 187:17 218:18 | 150:9 | 270:18 | 67:21 |
| **farther** | 219:4 220:1 | **fill** | **fire** | **flabbergasted** |
| 15:19 | 228:8 312:3 | 300:11 | 201:20 | 33:23 |
| **fashion** | **fell** | **filling** | **first** | **fled** |
| 41:10 | 296:15 | 271:15,18 | 15:8,18 20:5,7 | 138:1,2 |
| **fashionista** | **felony** | **Fillmore** | 24:11 35:20 | **flee** |
| 289:10 | 181:1,2,4,8 | 297:6,6,8 | 37:19 39:13 | 114:18 311:22 |
| **fast** | **Felsoci** | **finally** | 48:13,20 70:19 | **fleeing** |
| 19:14 | 136:25 | 331:16 | 71:25 72:1 | 133:13 312:14 |
| **fat** | **felt** | **find** | 84:21 104:17 | 313:12 |
| 131:2 | 66:1 314:5 | 66:4 76:11 | 110:18 111:10 | **flinch** |
| **father** | **female** | 111:13 135:4 | 111:21 122:5 | 194:6 209:17 |
| 263:9 | 98:3 296:9 | 141:17 171:5,6 | 123:17 144:1 | **flip** |
| **fault** | **female's** | 171:11,12,24 | 159:6 181:8 | 316:25 318:20 |
| 210:11 | 137:1 | 172:3 183:2 | 194:23 196:17 | 319:22 320:2 |
| **February** | **fess** | 191:22 192:9 | 239:22 250:11 | **floor** |
| 317:19 | 180:3,15 201:15 | 198:12 259:5 | 250:11 251:1,3 | 1:17 2:4 278:14 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 16

floorboard
277:2
fluctuates
215:15
fluid
201:19
fly
43:3 48:25
folded
228:17
folks
55:16 71:25
102:16
follow
17:24 37:13
follow-up
281:25 335:6
followed
11:8
following
68:22 112:8
269:1 278:18
279:22 303:5
follows
6:5 62:22
food
127:20
foolproof
105:5 106:14
foot
164:22 174:7
216:1
footage
253:6
footprint
43:7
footprints
27:18 49:9,10
210:23
force
296:13
forceful
228:10
foregoing

339:10
forensic
13:6,25 14:5
50:3,10,15
58:25 92:13
93:9,20 94:9
94:12 95:7,21
96:4,6 98:8
100:21 101:21
101:23 102:11
102:18 113:3,5
113:12 115:20
116:5,9,21
117:22 149:19
156:25
forget
29:16 56:11
75:11 129:2
210:20 292:14
forgot
177:10 191:6
formal
125:14
formulate
213:22 214:5
formulating
292:8
forth
66:15 212:20
221:2
forward
160:13 316:25
foul
139:7 314:3
found
27:10,19 35:24
45:11 48:3
51:11,12 69:19
72:2 92:25
130:23 136:1
154:16 226:3
234:25 249:16
283:21 289:13
291:14,16

300:17 313:24
foundation
25:25 28:17
29:1,9 30:2
32:1 34:24
35:1 39:21
41:18 44:15,24
45:9,18 46:6
47:19 48:8
49:3,15 50:19
67:17 69:5,22
70:4,9 71:18
71:20 87:2
91:7 93:12
94:8 96:13
99:19 100:3,10
108:6 113:9
114:7 119:22
122:1 126:17
128:20 141:14
144:10,24
149:10 156:2
156:15 160:11
162:13 163:4
163:19 170:7
173:20 180:10
182:3,16
186:16 190:13
190:24 194:5
199:23 200:18
204:13 205:17
206:15 208:7
214:22 215:24
226:24 229:15
229:20 233:2
235:9 236:5
237:13 238:2,7
238:12 245:1
245:21 246:24
248:10 249:6
250:16 251:8
254:10 261:22
265:6 268:1
269:10,12

271:21 274:11
274:20 275:12
276:6 284:9
292:5 307:15
308:6,12
four
44:7 73:11
103:1 272:1
291:9 292:9
318:21 332:3
frame
241:10
Frank
98:25 99:5
136:19
Freddie
279:3,6
Freddie's
112:7 279:7,10
279:22
free
7:25 37:17
124:23 266:5
frequency
113:18 114:3
frequently
87:14
Friday
111:6,6
friend
39:11
friends
73:24 102:3,4
102:17
front
28:5 42:23
83:18 84:19
133:16 157:9
159:1 233:9,14
233:22
frustrated
210:16 212:18
full
192:5 286:10

furnace
46:22
further
52:11 53:2
290:4 312:25
339:13

---
**G**

G
6:1
gained
36:7 286:14
game
310:4
games
68:16 310:13
garage
36:1 244:13
Garcia
153:20
Gardens
296:10,20,22
298:7
gas
252:21
gather
104:18
geared
328:5
general
30:22 53:11
56:12 73:3
84:3 109:6
123:2 125:9
216:19 260:11
284:5 292:15
generally
13:8 126:1
325:16
gentle
187:20
gentleman
312:24
gentlemen

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 17

111:3 130:21 313:24 314:21
**George** 263:7
**Gerald** 305:2
**getting** 30:25 56:3 68:16 139:12 141:9 146:1 147:4 153:10 165:6 183:1 185:18 186:11 212:18,22 216:12 227:12 228:5 232:5 238:4 245:11 254:25 258:3,9 268:7 272:4 287:22 291:22 336:19
**gigantic** 124:4
**girlfriend** 163:15 164:8
**girlfriend's** 282:15
**give** 9:9 15:11 17:8 54:15 61:10 72:23 76:7 78:6 79:1,10 79:11,17,22,23 88:6 95:10,12 104:1 114:12 114:13,22 120:21 122:4 123:25 125:20 135:4 146:10 146:23 147:15 147:21 148:1,9 150:3 172:9 174:19 175:23 178:14 180:9

181:14 190:2 217:8,9 220:8 220:10,19 221:6,16 247:2 247:3,6,8 248:7,13 251:16 252:4 265:17 266:13 299:10 302:9 304:6 321:12 325:18
**given** 6:20 28:22 29:5 29:18 113:23 119:16 120:15 123:16 145:21 245:3 299:7 321:14 339:12
**gives** 272:23 277:23
**giving** 17:6 55:1 79:3 122:15 147:8 147:14 148:3 159:14 178:6 231:11 235:2 237:8 247:17 257:15 274:23
**glass** 42:8,25 43:1 50:23 88:7,7,8 88:8 89:23
**gloves** 42:7,21
**glue** 28:1 157:8
**go** 9:1 19:13 20:21 23:10 26:16 35:2 52:19,19 52:20,21 54:6 54:8,20,22 55:16 56:6,13 56:14 58:7

62:9 68:17 72:23 81:16 84:20 88:5,13 88:13 91:25 92:22 93:1,5 103:2 104:22 112:23 113:2 138:4 144:13 148:9,18,22 157:20 162:25 163:25 167:15 169:20 174:17 175:6,8,22,24 178:22 187:13 188:8,19 191:22 207:5 207:13 213:5,9 244:11 251:13 252:6 253:24 255:16 256:22 259:9 263:20 279:5,15,17 283:18 298:8 304:8 310:1 312:23 313:4 320:15 321:2 324:7 327:12 328:8 329:7 331:16 332:2,7 335:8
**goal** 103:5,18 333:11
**goals** 322:13
**God** 133:17
**goes** 119:24 154:22 160:18 189:7 212:12 251:15 318:9,10
**Golden** 338:21
**good**

6:8,9 34:17 42:22 54:25 92:25 131:23 138:4 153:19 153:23 248:13 251:24 283:5 284:18 302:3 329:8
**good-bye** 163:14 164:7,14 168:17 169:6 169:10,14,15 169:18 170:3 170:12,21
**goodness** 171:3
**gosh** 277:9
**gotten** 59:15
**grab** 54:6
**grabbed** 296:11
**grade** 239:12
**grandkid** 185:12
**grandkids** 185:14
**gray** 85:9 272:11
**grayed** 272:8
**grayed-out** 279:6 290:22
**Great** 30:24 47:12
**Greenleaf** 2:21
**Grissom** 127:2,7 129:1
**grocery** 74:4

**ground** 132:11
**guard** 296:11
**guardian** 119:25 120:11
**guess** 27:20 30:10,12 30:16,21 33:24 40:3,3 49:4 50:2,22 60:6 80:6 81:2 85:9 94:16 95:11 118:24 134:19 150:20 161:8 174:25 175:15 183:9 196:1 209:3,23 222:25 223:3 233:11 240:9 242:9 246:12 247:13 251:24 266:18 275:15 293:16 310:12 314:3 328:4
**guilt** 79:21
**guilty** 95:22 103:23 107:16 108:24 110:8 232:24 257:16
**gun** 35:21 36:14,23 36:24 70:18,23 71:3,3 311:6 312:1,8,11,19 313:18
**guy** 53:24 54:21,21 54:21,22 60:20 101:10 107:5 137:8,9,12 195:9 299:2,3

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 18

311:18 313:9
334:13
**guy's**
68:17
**guys**
38:14 42:1,6,14
43:18 45:4
47:14 53:11,12
55:5 60:13
69:3 82:3
137:12 143:12
155:19 171:6
171:25 178:14
189:16 192:4
195:12 205:14
208:2 220:19
222:21 261:3
317:25 325:12

---

**H**

**H-a-b-e-r-t**
129:20
**H-e**
129:21
**H-e-b-e-r-t**
129:19 334:13
334:15
**habit**
203:15 264:7
**hair**
187:22
**Hal**
129:7,8,18
130:6,8 133:5
133:24 134:5
334:18
**half**
22:12 174:7
178:18 194:13
209:3 251:14
270:24 271:1,2
271:5 294:25
335:6
**halfway**

228:22
**hall**
2:15 74:21
161:11 340:3
**hand**
119:24,24 124:9
232:22
**Hand-delivered**
135:7,9,15
**hand-delivering**
133:19 136:12
**handcuffed**
299:3,13 310:9
**handcuffs**
25:12,17 38:24
132:5
**handed**
82:20 126:11
295:4
**handful**
81:19
**handle**
74:24 75:2
278:9
**handles**
278:7
**handprint**
157:11
**hands**
155:6 312:6
**handwriting**
135:8,16
**Handwritten**
4:24
**hang**
198:10
**happen**
67:1 106:11
109:4 113:17
113:21 130:2
161:3,7 212:15
242:14,14
268:18 283:2
301:10 302:7

**happened**
16:15 19:5
21:16,25 24:25
35:17 56:11
61:8,8,8 67:5
71:14,16 88:22
90:10 114:17
114:17 127:4
127:15 137:6
149:18 161:1
166:22 168:7
169:22 203:21
204:8 222:14
223:17 228:18
239:22 240:5
240:10 241:11
244:21 249:2
253:3 260:3
263:4 264:19
278:18 295:24
301:4 302:5
306:1,7,22
311:20 313:6
323:10
**happening**
298:3 305:3
**happens**
33:2 56:16
106:10 168:23
**happy**
186:18,19
279:16
**hard**
172:13 232:3
**harm**
58:21 314:3
**hat**
68:4
**hates**
194:11
**havoc**
312:9
**he'll**
270:7

**head**
9:8 36:24 70:19
70:21,24 71:2
101:8 106:7
115:23 201:18
202:23 212:11
250:9,11,25
288:16
**headed**
188:20
**headquarters**
24:5 109:25
302:2
**hear**
25:2 36:12
129:22 158:16
159:18 184:10
186:2 205:21
207:5,12,20,24
208:3 212:3
232:3,3 238:18
297:20
**heard**
32:17 33:19,20
36:10 38:1
48:14 118:16
153:9 155:3
160:7 162:10
162:19 163:13
195:17 198:10
200:4 226:5
257:24 268:6
294:1
**hearing**
19:17,18 24:11
38:21,25 70:2
70:11,12 72:12
223:4 237:5
**heavily**
25:22 96:9,18
96:24
**Hebert**
129:7,8,19
133:24 134:4,5

334:13,18,18
334:20
**heck**
40:18,19
**heels**
289:11
**held**
86:10 138:6
252:7
**help**
53:5,5,6 81:3
123:7 131:25
132:8 160:8,19
160:21,25
161:4 166:9,13
168:15 198:2
203:17,22
204:6,8 232:23
254:13 257:1
258:7 259:18
**helped**
27:16 102:10
114:17
**helping**
57:2
**helps**
52:12
**hereto**
339:8
**Hernandez**
293:1
**Hey**
18:18 60:13
62:16 152:12
190:3 197:25
213:10 260:2
260:21 336:22
**hid**
305:1,8
**hiding**
79:6,17,19
**high**
60:5 68:16
289:11 298:13

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 19

| | | | | |
|---|---|---|---|---|
| 298:16 338:19 340:18 | 124:1 132:4 | **homicides** 97:10 331:5 | 68:7,8,10,15 68:18 70:21,22 | 66:6 115:22 248:13 249:24 |
| **high-functioni...** 108:18 | **home** 112:23 113:2 114:16 160:24 | **honest** 57:11 297:24 | 76:5 133:10 154:15 157:14 | **identification** 64:8 83:25 124:18 135:14 |
| **high-heeled** 249:20 288:15 288:20,25 289:8,13,17,25 | 174:1 207:6,13 235:16 241:14 241:20 242:2 242:15 258:7 | **honey-do** 76:5 **honorable** 274:22 281:4,20 | 184:4,5 214:9 214:10,13,20 215:1,3 237:21 278:5,6,11 | 142:16 158:6 211:5 265:21 266:16,21 295:3 318:6 |
| **high-profile** 57:6,11,20 | 282:15 286:14 291:7 300:24 | **hope** 62:14 79:16 | 282:5,15 286:16 291:8 | **identified** 211:19 273:10 |
| **higher-ups** 62:3,4 149:23 | 311:15 **homes** | 294:21 **hopefully** | **hovering** 216:3 | 273:17 **identify** |
| **Highlands** 3:5 | 236:18 **homicide** | 192:15 294:24 **hopes** | **Huh** 171:4 | 310:11,17 **identity** |
| **highlighted** 86:16 124:22 125:3,12 143:2 278:24 290:22 | 13:7,8 23:21 24:10,25 33:25 43:5 44:12 52:1,12 53:12 | 255:19 **hotel** 329:3 **hour** | **human** 105:22 **hundred** 312:3 | 273:7,11 **illegal** 305:14,17 **imagine** |
| **highlights** 85:8 | 56:13,20,22 57:4 67:2,6 | 24:22 186:11 197:22 209:3 | **hundreds** 93:22 94:7,13 | 16:14 133:2 141:11 284:7 |
| **Hill** 2:21 | 81:14 84:12,14 86:3,3,5,6 | 294:25 **hour-long** | 94:16,16 **hurt** | **immediate** 133:25 151:5,13 |
| **hindsight** 248:16 | 91:24 92:3,3 96:5 99:10 | 73:13 **hours** | 89:3 299:15 312:16 | **immediately** 52:5 106:8 |
| **hired** 11:19 12:4 75:12,14 76:17 95:25 | 112:14,19 119:20 137:10 151:8,13 155:18,19 | 38:17 127:19 178:18 251:14 270:18,23,24 271:2,5 272:21 | **hurting** 302:17 **Husky** 35:25 | 107:19 **immunity** 7:5,12 8:1 |
| **hit** 35:21,21 36:23 70:19,20 71:1 71:2,4 101:3 201:18 248:21 248:22,23 249:4 251:1 313:25 | 164:6 179:11 183:14,21,24 186:10 188:25 191:21,25 204:20 210:3 226:16 229:1 240:1 245:17 252:11 264:4 | 280:19 319:9 319:17,19 321:3 322:17 323:5,6,24 324:3,6,12 325:15 327:25 328:1,3 331:20 331:22 332:9 | ——————— **I** ——————— **IA** 128:2 142:7 297:18 299:21 301:15,21 302:9,21,23 | **impairment** 125:19 126:1,3 126:4,14 **implicate** 173:18 **implicated** 188:4 |
| **hit-and-run** 311:5 312:15,21 | 264:19,24 273:7,12 | 337:6 **hours'** | 303:10 304:1 308:23 309:20 | **implicating** 193:7 |
| **hitting** 70:21,24 101:9 193:19 | 276:14 282:4 284:6 285:7 304:21 320:7 | 22:12 **house** 26:16,19,22 | 313:2 315:17 **ice** 76:7 | **implies** 215:2 **implying** 196:15 |
| **Hmm** 106:17 **holding** | 320:12,13 322:10,15 330:8,19 331:5 | 27:1 35:17 36:3 37:21 45:12,25 48:4 | **idea** 21:25 30:3 42:22 52:23 55:3 62:18 | **important** 97:2 235:19 267:11 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 20

**impressions**
249:22
**improper**
13:11 100:17
118:11 153:10
165:20 170:25
178:9 181:13
181:17 314:15
**improperly**
129:4 136:16
**inadvertently**
312:18
**inappropriate**
11:1 17:2 99:16
99:24 100:8,22
101:8 117:9,13
139:25 140:11
167:19,21
173:23 174:24
175:17 176:2,7
177:14 180:14
182:11,14
184:19 185:16
186:6 188:14
192:24 194:17
194:20 195:2,4
196:23 199:15
199:16 202:14
204:24 206:13
210:14,18
216:17 218:15
219:22 221:12
221:14 224:18
227:2 248:9,11
249:8 251:5,9
258:17 259:6
292:4
**incentive**
35:9 37:4
**inches**
216:1
**incident**
27:1 221:11
295:24 297:14

297:19 298:11
298:19,20
299:19 301:9
304:16 305:18
310:16,24
311:8
**include**
99:23 148:17
326:20
**included**
84:15 275:23
276:4
**including**
100:14 321:20
**inclusive**
96:6 322:19
330:19
**inconsistent**
236:2 336:13
**incorporated**
51:19 85:2
**incorrect**
11:9 15:3
131:17 134:13
165:20 191:24
224:12 280:1
307:17 312:12
312:20 313:25
**incriminate**
10:9 17:6,20,23
**incriminated**
18:1 75:10
188:4
**incriminates**
214:19,25
**incriminating**
31:1 75:8
224:16 237:20
**independent**
107:23 155:24
**index**
4:1 5:1 177:7
**indicate**
317:16 324:9

**indicated**
338:4
**individual**
1:11 148:7
273:8,10,17
**individually**
250:19
**inference**
313:20
**information**
31:10 53:15,17
54:4,15,23
55:2,25 58:20
60:15 61:10
83:6 88:20
89:11 91:23
97:13 103:9
104:2,19 112:6
112:12,18
132:17 133:24
134:2,4 135:7
145:21 146:1
147:6,21 148:1
148:2 153:22
160:16 178:17
190:3 198:6
222:22 225:5
226:12 227:12
235:13 237:17
241:10 245:3
245:13,14
247:2,4,4,7
248:14,14
251:12,19
252:1,4,4
255:5,22
257:24 270:1,7
270:9 272:2,6
274:4,17
275:13 276:21
276:22 280:3
283:6,21 286:3
287:22 288:2
302:3,9 304:6

305:15 307:2,6
307:12,19,25
308:1,4,10
326:3 328:24
329:4
**initial**
36:18,21 105:8
329:2
**initially**
234:19
**initials**
285:15
**injured**
311:20 313:11
**injuries**
301:2,7
**injury**
296:15 302:18
312:15
**innocent**
95:14 147:9
190:10,15
**inside**
36:1 68:6 69:16
71:3 88:7,10
88:12 89:17
90:9 110:24
114:19 154:24
214:9,13,19
215:1 226:10
252:18
**insisted**
11:8 43:19
**instance**
107:13 181:21
268:21
**instances**
334:5
**Institute**
321:25
**instituted**
81:8
**instructions**
246:14

**insurance**
309:17 313:19
**intend**
7:23,25
**intending**
9:25
**intentional**
257:18
**intentionally**
254:22
**interchangeable**
110:12
**interest**
339:15
**interested**
28:2
**interfere**
305:7
**interfered**
305:1,20
**interference**
304:12,22 305:6
305:24 306:15
306:19
**interfering**
304:24 305:19
**internal**
5:3 142:9 295:6
295:21 299:18
301:12,25
310:19 313:4
315:9
**interoffice**
66:23 67:6
**Interpretation**
86:8
**interrogate**
98:14 103:3
136:21,23
143:21 144:5,8
155:2
**interrogated**
131:7 155:12,17
155:19 270:19

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 21

271:6
**interrogating**
56:14 95:14
103:24 138:15
138:24 139:3,7
140:21 163:17
195:3 270:19
**interrogation**
4:16 13:11,17
20:15 22:12
28:10 31:2,4
38:3 43:19,20
44:2,11,19
45:4 46:8
48:17,25 55:11
84:15 85:12,22
86:14 90:20
92:17 93:10,17
96:9 99:17,23
100:1,14,24
103:5,6,19,25
104:7,8,13
105:3,20
109:19 110:5,7
110:11 112:22
113:12 116:12
117:5 119:10
119:16 120:22
126:1 127:19
129:4 136:17
139:17 140:1,9
141:1,4,10
142:1 145:5,20
151:2,16,22
152:13 153:11
153:16 154:4
155:1,3 156:22
157:22 158:4
164:4 167:7,25
175:23 196:4
199:4 210:4
216:14 221:22
229:24 245:18
250:14 258:9

258:20,23
259:2,21 260:3
260:10,25
261:3 271:7
272:20 280:13
285:13 306:23
320:24 321:8
321:13 322:18
325:19,23
326:19 328:11
330:20 335:17
335:20 336:4
336:17
**interrogations**
13:22 14:1 84:3
84:10 92:4
96:11,19,25
99:8,11 117:4
141:7,21
145:11 149:18
149:24,25
152:11 153:2
161:15 163:18
177:20 206:9
218:10 246:14
248:6 250:13
250:21 258:21
259:22 260:4
260:23 321:19
326:8 330:25
336:19,23
**interrogator**
140:8
**interrupt**
218:1,5,10
274:16
**interrupting**
6:22 210:9
**intersection**
311:17 312:17
**intertwined**
110:17
**interviewed**
37:25 38:13,16

38:19 98:19
106:6 110:19
112:7,13,17,18
120:7 133:3
137:18,23
153:21 155:23
224:4,10
272:24 282:2
293:19 297:18
297:24 298:2
299:18 301:11
303:20 304:1
317:23
**interviewing**
85:3 86:18 87:3
87:7,8,9 89:15
90:16 103:12
113:12 119:1
119:23 145:11
220:25 223:2
227:16,17
323:19 326:13
326:14,15
327:3,18 328:6
328:11 333:23
**interviews**
13:6 14:1,5
38:13 54:18,19
56:25 58:25
64:15 90:19
92:13 93:9,16
93:20 94:9,12
95:21 96:3,4,7
96:11,15,18,24
98:8 100:21
101:21,24
102:11,18
104:14 105:24
113:4,5 116:9
117:3,22
137:13 141:13
149:20 153:7
163:18 165:15
167:10 202:13

246:14 247:2
248:6 250:22
259:4,12
269:21,22
273:6 282:20
284:6 285:3
293:23,24
302:23 321:19
326:8 329:5
330:24
**intimidate**
186:24 195:7
**intimidated**
209:18
**intimidation**
117:7,15
**introduce**
250:23,24 251:3
251:4,11,19
**introduced**
64:7 70:1
135:13 158:5
250:10
**introducing**
249:3,24
**invasion**
114:17
**investigate**
297:19 302:1,10
333:18
**investigated**
310:21 312:11
**investigating**
52:11 55:8 85:3
264:4,19
**investigation**
13:7 25:22
36:19,22 51:3
51:15,21 52:7
53:12 56:12
57:4 58:21,22
62:1,19 66:14
69:8 86:3 87:6
96:25 97:3,14

97:25 98:7,17
128:15 130:18
154:9 195:14
220:8,11 221:7
221:17 234:19
242:2,21
253:23 270:2
275:2 285:8
304:14,21
305:1,20,21
306:20 310:22
312:25 321:25
323:12,13
330:9,19,21
334:19
**investigations**
13:8 56:13 67:2
67:6 92:4 96:5
189:19 284:6
302:4 322:9,13
322:15 331:5
**Investigative**
323:19
**investigator**
114:5 115:2,9
139:25 246:22
300:15
**investigators**
273:7,12
**investigatory**
322:14
**invitation**
126:5
**invite**
302:6
**involved**
8:20 25:22 35:6
39:24,25 40:2
40:6 68:21
75:18 112:14
112:19 128:15
128:16 155:21
155:25 156:4
164:5 186:19

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 22

191:14 192:11
212:14 228:2
228:25 230:10
230:14 234:20
254:19 255:2
280:16 296:9
308:13,15
**involvement**
26:4 27:4 28:9
37:14 103:20
109:15 149:2
183:14 198:13
200:12,24
201:15 202:11
217:22 232:21
294:5
**involving**
92:16
**IQ**
120:20 121:2,3
**issue**
137:19
**item**
320:19 321:23
322:24 323:15
327:15 328:8

——————
**J**
——————
**J.R**
281:15
**jack**
255:14,17
257:19
**jacked**
282:12
**jacket**
68:3 69:12,13
69:14
**jacking**
229:7
**jail**
37:6,7,8 133:6
134:3 160:24
161:23 162:2,3

162:4,8,25
163:25 164:2
174:13 176:21
187:13 256:22
259:10 264:9
299:4 334:25
**jailhouse**
293:3,8
**jam@bhgrlaw...**
2:23
**JANE**
2:2
**jane@fblaw.org**
2:6
**January**
135:8 332:8,12
**Jeffco**
98:13,14,15,18
136:19,21,23
325:9
**Jefferson**
98:18,21
**jerk**
131:3
**Jmemev@q.c...**
79:25 80:3
**job**
6:20 55:7 60:19
62:5 76:3 93:4
114:9 118:2
123:22 132:25
148:1 153:19
153:23 192:17
246:10 247:3,4
252:4 283:14
294:4
**Joe**
268:12
**Joel**
268:15
**jog**
154:10
**John**
74:5 80:3

165:23 325:21
**Johnson**
34:18 51:3
110:14 156:13
214:10,14
251:11 254:19
287:3 290:25
333:7
**Johnson's**
183:7 258:2
282:5
**join**
101:1 109:10
128:21 163:20
174:22 185:11
190:14 205:18
214:23 245:25
261:23 274:21
308:7 320:7
**Jonathan**
1:10 2:8 3:7
7:20 340:22
**jonathan.coop...**
2:11
**Josh**
2:20 7:17
**JR**
1:11 53:19,23
53:24 222:24
223:2 226:1
252:12,18
253:6 276:13
278:4
**JR's**
49:25
**judge**
9:14 58:18
79:10
**jump**
185:24 315:6
**jumps**
21:17
**June**
339:17 340:1

**jurisdictions**
98:10 325:10
329:22
**jury**
245:6
**juvenile**
25:12,18 140:13
140:15 161:11
193:6 261:25
294:8 312:7,10
326:15
**juveniles**
33:3 87:10
119:24 140:13

——————
**K**
——————
**K**
280:6 287:2
**keep**
32:15 59:16
143:4 148:15
149:8 166:4,23
168:3,3 191:15
202:9,15 210:9
212:18 220:14
221:20,20
223:4 254:5
318:2,3
**keeps**
147:4 168:23
**Kelly**
304:24 305:3
306:13
**kept**
16:17 49:9,17
**keys**
201:20 226:3,11
277:1 278:9,14
**kick**
201:17 231:19
232:2,9 253:14
**kicked**
35:23 132:10
230:23 231:8

232:5 250:11
250:25
**kicking**
36:14 250:9
**kid**
81:5 102:1
185:8
**kids**
185:14
**kill**
110:14 180:15
201:18 251:10
253:14 254:22
255:14,16
256:5 257:18
**killed**
51:3 60:5 136:9
137:12 153:20
154:21 166:15
179:25 180:25
214:10 215:2
228:3
**killer**
155:25
**killing**
229:8 254:19
**kind**
21:17 24:23
28:3,6 38:5
48:24 51:22
65:12 68:12
73:19 74:18
89:10 93:10
98:12 105:4
106:9 107:5
108:3 115:17
121:21 122:21
140:5 149:17
149:22 154:8
163:16 167:1
167:15,23,24
172:13 184:2
185:17 187:20
190:5,9 193:19

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 23

| | | | | |
|---|---|---|---|---|
| 194:16 197:24 198:22 201:1 201:14 203:4 209:21 210:4 210:16 213:3 214:18 216:3 216:11 218:1 218:21 221:5,8 230:5 251:18 254:25 255:5 258:3,22 260:20 267:17 268:7,11 283:4 285:25 288:24 289:4 291:10 292:16 300:14 302:18 309:1 314:8 331:19 | 24:10 126:2 153:14 253:5,8 271:14,22 275:14 276:22 277:6 280:2,9 281:8,10,21 282:13,25 293:6 | lamp 263:6,12 | 112:22 137:18 | 164:2 186:3,3 197:15,18 |
| **kinds** 174:6 | **knowledgeable** 123:23 | lane 311:17,19 | lead 88:19 89:5 | led 8:12 313:19 |
| **Kinesic** 86:13 | **known** 36:18,21 67:9 125:13 145:13 224:10 234:14 236:3 242:12 267:8 | lanes 311:17 | 190:10 258:12 | left 27:22 50:17 66:8 69:10 127:19 159:21 166:5 171:22 172:2 173:2 179:8,9 197:18 212:7 241:17 247:11,13 261:2 262:20 278:6 279:3 313:17 |
| **kitchen** 37:21 | | language 105:25 106:19 108:2 139:7 216:12 228:13 260:12 292:13 | leading 88:16 89:10,14 139:25 140:8 140:23 141:3,6 141:12,19 142:2,5,8 143:24 144:18 145:4 190:15 | |
| **knee** 36:6 | **knows** 61:20 189:24,25 190:1 197:14 200:22 241:2 245:15 246:9 | large 329:20 | leads 52:25 189:8 | legislation 33:2 |
| **knew** 23:24 36:23 37:10 39:11,13 68:11,12 88:12 111:25 112:11 157:12 198:9 205:15,19 211:1,1 234:11 235:13 241:12 241:13 244:6 244:15 247:12 257:20 288:3 | **knuckleheads** 198:11 | Larimer 241:15 | lean 185:23 | legislators 32:25 |
| | | Larry 37:20 | learn 62:24 102:10,16 102:21,22 103:2 104:15 114:4 | legislature 32:21 34:8 174:15 |
| | **L** | Lasater 3:3 | | legs 106:25 215:22 |
| | **L.L.C** 2:15 340:3 | lasted 332:9 | learned 45:2 56:7 71:21 71:24 72:3 91:1 104:19 118:1 157:2 199:13 224:1 234:17 272:16 273:7 325:16 326:9,20 328:22 330:25 | lend 105:6 |
| | **lab** 27:20 47:6,14 50:20 211:7 | latch 236:20,25 | | leniency 160:23 196:23 |
| | **labeled** 25:5 319:8,11 | late 198:1 210:12 | | Leon 304:23 305:3 306:13 |
| | **lack** 137:21 | law 32:22,25 34:9 174:15 261:24 262:5 325:5 | | less-serious 302:20 |
| | **lady** 238:19,21,25 239:6,9,13,15 244:21 255:16 | Lawrence 1:6 4:16 | learning 48:21 102:1 121:9,13 122:7 269:1 273:11 328:5 | let's 11:10 16:2 19:13 23:13 115:18 157:17 158:3 163:6,7 169:11,13,17 171:8,16 174:2 202:9 208:16 208:20 223:4 230:16 252:5 |
| **knocked** 233:9,14 | **lady's** 184:4,4 | lawsuit 22:23,25 72:19 73:21 81:8 127:24,25 129:2 309:7 314:18 | | |
| **knowing** 226:12 234:13 235:1 244:16 | **Lakewood** 313:22 325:4 | lawyer 10:15,19 11:2 11:24 12:3 14:14,16 16:3 16:7 28:15 37:24 74:17,21 97:22 99:6 | leave 24:9 105:1 146:7 189:21 251:15 263:22 298:6 314:21 | |
| **knowledge** | **Lakewood's** 313:23 | | leaves 207:17 | |
| | | | leaving | |

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 24

| | | | | |
|---|---|---|---|---|
| 277:5 294:19 317:5 327:12 | 157:9 312:4 **lighter** 201:19 | 159:1 169:11 225:16 231:25 280:14,23 316:18 | 35:18 36:5,8 39:3 53:24 68:14 276:25 278:4 287:2 288:15 290:23 | 124:21 142:18 165:11,12 215:5 225:1 230:16 236:15 242:24 266:3,5 |
| **letter** 4:13 133:10,20 133:22 134:12 134:14,16,20 135:5 136:12 136:12 340:15 | **lighting** 28:4 **lightly** 18:16 **lights** 85:10 | **listened** 38:12 313:14 **listening** 198:5,6,24 | **LLP** 2:21 **lockable** 236:21 | 266:8 272:7 277:5,7,11 280:22 282:6 307:21 332:10 |
| **letters** 67:13 | **liking** 109:25 | **Listerine** 134:6,8,9 | **locked** 179:9,10,12 278:13 | **looked** 23:5,6 26:13 42:8 55:22 |
| **level** 150:13 299:20 336:2 | **limit** 139:17,20 149:6 251:18 | **literally** 63:21 **litigation** 7:2 125:6 | **logic** 17:24 | 69:7 **looking** 42:23 49:24,24 |
| **Lexus** 226:3 252:21 278:8 | **limits** 230:5 | 339:15 **little** 9:17 11:10 | **logs** 81:6 **Lombard** 60:23,24,25 | 69:16 107:14 107:14 108:2 134:20 195:8 |
| **license** 313:18 | **line** 11:1 15:19 157:25 161:13 163:17 165:5 167:6,17,24 176:12 182:7 189:2 194:24 195:11 196:18 206:22 256:14 257:4 258:8 319:14 321:23 323:15 327:15 328:8 336:23 | 19:13 27:16 33:17 41:13 42:15 54:16 112:8 123:7 128:4 146:7 149:16 154:7 164:24 171:16 173:3 177:11 203:12 209:3 217:8,9,14,14 219:7 227:21 236:16 242:23 243:1 251:16 251:16 270:25 290:3 292:17 292:18 315:7 | 61:14,20 **Lombardi** 60:20 **long** 20:21 27:22 41:3 76:9 80:7 80:9 82:1,3 128:10 131:11 132:6 138:4 149:8 151:16 158:14 171:6,7 171:22 178:19 178:20 251:10 257:10 258:3 266:10 294:21 294:22 316:21 324:3 | 226:2 228:17 270:16 271:19 277:8 309:22 318:14 320:9 **lookout** 215:3 **looks** 21:16 108:15 135:17 270:17 303:23 318:21 320:10 330:9 331:6 332:8 |
| **lie** 38:9 138:14 161:25 227:2,4 235:4 237:24 247:11,13 254:3 | | | | |
| **lies** 253:24 | | | | |
| **lieutenant** 1:10 54:9 150:23 151:3 151:11,14,15 151:19,19 152:3 | **line-by-line** 280:5 **lines** 83:8 **lip** 296:16 | **Littleton** 325:5 | **longer** 171:16 | **loose** 69:1 **Lorenzo** 4:18,21 6:12 10:20,24,25 11:6 14:22 15:8 17:1 19:19,22 25:8 26:6,25 37:5 38:22 39:1,6 40:6,10,20,23 41:20,25 42:24 44:19 46:12 49:9,11 53:18 |
| **life** 33:3 90:9 101:22 102:9 127:8 163:15 164:3,8 174:14 174:18 175:7,9 175:11,25 179:19,24 180:8 191:13 191:19 193:2,5 193:9 | **list** 52:21,22 101:12 101:12 102:20 318:15 **listed** 84:23 91:4,13 171:11 320:10 **listen** 114:23 150:10 | **live** 146:12 246:6 **lived** 46:19 68:11 137:25 **living** 27:1 35:22 287:3,7 291:1 **Lloyd** | **look** 19:1 23:8 43:6 52:19 64:10,11 69:15 81:1,2 84:1,17 105:24 106:2,7,13 107:4,15 | |
| **light** | | | | |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 25

68:20,21 99:23
100:14 106:15
108:12 110:18
111:10,20
112:7,13,16
155:12,18,22
156:12 157:14
157:17 166:7
169:8 173:7,8
200:4 205:8
208:2 216:20
220:10 223:14
224:25 225:10
225:15 226:15
226:21 239:21
253:6 261:1,7
262:25 265:14
273:10,11
275:6 276:9,11
277:3 278:22
279:10,19
280:15,16
281:7,14 282:5
282:11,14,15
282:17 283:14
283:23 285:10
286:7,23 287:1
288:14 289:16
290:8,12,19
291:4 294:5
316:13,16,21
317:23 327:6,8
331:1
**Lorenzo's**
151:2 225:5
285:11
**lot**
20:22 36:24
42:15 56:23
57:12 59:15
76:23 84:8
86:21 92:25
96:14,15
102:19 105:19

108:23 109:11
132:16 135:19
141:3,5 171:23
179:6 212:10
215:15 218:17
228:19 259:9
298:6 302:1
314:1
**lots**
93:16 245:19
**loud**
9:5 194:7,7
209:24 210:15
228:11
**louder**
215:13
**loudly**
210:18 215:12
218:1,23,24
**lousy**
131:8
**low**
120:20 121:2,3
**low-heeled**
289:9
**Lugz**
43:7,9 45:12
46:15,16,20
47:3,16,23,24
283:23
**Luke**
4:24 35:19,20
36:8 40:8,14
40:17,24 41:2
41:6,7 44:6
53:21,22,22
54:2,3,6 68:6
68:14 70:19
71:1,2 222:8
223:3,7,9,13
223:18 279:3
282:2,23
283:17 294:13
**lunch**

111:14 116:1
136:6 138:7
**lured**
75:7
**lying**
54:16 138:18
189:18 225:6,7
225:11,18
253:23,25
281:4

_____
**M**
_____
**M.E**
63:12
**machine**
339:9
**mad**
73:22 243:18
**magnifying**
42:8,25 43:1
50:23
**mailman**
52:20
**main**
35:6
**major**
151:15 271:10
332:4,13,22
**making**
48:25 49:17
126:7 174:5
195:21,25
221:8 254:1,4
254:5 268:7
274:16
**male**
312:9
**Mammoth**
296:10,20,22
298:7
**man**
114:10 219:10
219:12,14,15
239:2 274:22

281:4,20
**mandate**
93:10
**mandatory**
91:21 92:15,19
**manner**
298:13
**manual**
4:11,15 123:7,9
123:10 125:8
142:24 143:17
284:15
**March**
316:10 328:14
**mark**
76:13,16 83:4
135:10 158:3
266:12,14
**marked**
4:6 5:2 83:22,24
124:10,17
142:15 265:20
266:15,20
295:2,5 315:10
318:5 327:25
**Marks**
2:20 7:17,17
**Martin**
1:4,9,15 2:18
3:3 4:9 5:3,5
6:3 7:1 80:22
165:23 300:24
309:10 338:8
339:5 340:7
**Martinez**
1:10 4:23 21:1,6
23:21,24 24:18
24:18,23 32:6
34:23 35:4,18
36:8 38:24
39:3,5,15,24
49:8 53:24
67:25 73:6,7
73:13 81:9,20

128:14 137:15
155:11 163:13
164:13 169:9
173:8 186:2
201:17 205:22
206:2 224:23
225:21 226:19
227:13 261:15
261:16 272:16
272:23,24
276:24 277:1
277:24 278:3,4
278:8 280:4,6
280:13 287:2,2
288:15 290:8
290:22,23
293:24
**Martinez's**
26:22 36:5
37:16 45:12
48:4 69:19
277:15 294:17
**Mary**
80:3,3
**mat**
226:8,10,11
**match**
21:3 39:17 48:3
48:11,12,17,18
49:1,6 50:10
50:15 145:22
156:25 231:12
296:9
**matched**
44:20 45:15
46:4 47:4,15
157:14,17
**matches**
97:12 145:14
**matching**
210:24
**Matt**
293:1
**matter**

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 26

10:18,19 21:22
120:17 138:2
224:20 333:22
**matters**
6:18 10:21
339:7
**maximization**
146:9
**mean**
10:6,13 11:4
20:5 25:3
28:20 29:21
30:25 31:13
34:15 38:20
43:8 44:9
45:10,22 47:6
47:23 53:21
56:6 57:6,19
59:11 60:3
65:22 71:7,7
80:17 92:24
94:1,6,25
95:11 105:15
106:23 107:15
107:17,18
108:21,23,23
109:8,11 110:7
118:8 140:25
147:3 150:12
159:8 160:1,9
166:12 169:24
181:6 190:7
200:15 211:12
212:5,24
220:24 222:21
227:6 229:22
241:3 242:16
251:12 255:16
256:5 257:18
258:24 264:23
270:3,19 274:3
280:21 293:8
308:10 313:1
325:15

**meaning**
41:25 51:6
160:20 212:9
212:10 325:3
**meanings**
212:10
**means**
10:4 52:9 90:9
113:2,5 116:7
199:2,3 237:21
290:1
**meant**
10:14 113:18
201:11,13,14
203:21 255:17
290:9 326:4
**media**
57:12,13 58:5
58:16,24 59:9
59:10,17,17,20
59:24 60:12,15
60:22,22 61:10
61:15 64:14
65:17,21 66:2
77:4 80:16
132:17,18,19
132:20,21
133:4
**mediated**
312:24
**mediation**
311:11 312:24
313:1,4 314:2
314:13
**memorializati...**
277:14
**memorialize**
270:6
**memorialized**
262:6,22 263:18
283:3
**memory**
15:7 21:15,18
40:18 59:25

69:10 71:15
154:11 298:1,3
305:22
**memos**
66:24 67:6
**menacing**
302:17
**mental**
117:5,7,13,14
118:6,8,9,10
118:21,23
119:7 121:1,4
121:8,22
122:22 125:18
126:3,14
**mentally**
121:7 125:20
128:18
**mention**
73:14 279:21
280:15
**mentioned**
23:2 51:22
91:13,20 129:2
136:15 279:19
279:20 281:11
281:11,14
324:12 325:10
**merchandise**
298:24
**message**
207:11 224:24
226:20
**messages**
66:14 77:4
**met**
6:10 68:21
273:12 293:17
**metal**
132:4
**method**
326:17 336:10
**metro**
325:4 329:20

330:16
**Metro-wide**
325:2,3
**Mexican**
297:5
**MICHAEL**
1:10
**middle**
218:5 223:8
310:25 312:17
**midnight**
241:11
**midst**
304:24
**Mike**
24:19 53:7,8,8
73:4,7 81:10
136:25 151:9
262:2
**Mile**
298:12,16
338:19 340:18
**milk**
36:3,4 68:23
69:1,7,14,20
157:11 232:22
233:6,15 236:8
236:11,13,16
237:3
**million**
97:21 334:19
**Millions**
43:13
**mind**
15:3 21:23 31:5
79:3 148:15
153:20 213:2
223:19 237:19
253:3,3 254:16
335:6
**mine**
29:15
**minimal**
263:19

**minimize**
146:8,9 232:21
235:5 253:10
**minor**
120:3,5 235:3
296:15
**minute**
32:17 115:25
124:16 143:6
171:23 173:7
185:4 196:10
335:6
**minutes**
104:18 109:7
131:25 167:2
167:17 183:13
209:5 239:18
240:3 241:16
252:5 257:10
261:10 294:24
337:6
**Miranda**
119:25 131:12
137:19 263:22
264:6
**misconduct**
310:20
**misconstrued**
236:9
**misquote**
133:2
**misquoted**
148:8
**missed**
130:18
**missing**
20:18,20 21:7
21:13 22:1
263:24
**misstatements**
267:17,21 268:8
**mocking**
167:1
**mode**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 27

235:13 244:19
**mom**
37:21 88:14
163:14 164:7
164:14 169:5,8
169:8,10
170:12,21
171:22 182:25
183:14 207:4
207:12,16,20
222:7 261:1,8
261:11,20
**mom's**
68:15
**money**
68:10,19
**monitoring**
7:23
**month**
32:23 33:7
**months**
11:11 39:6
73:11 86:2
316:15
**Montoya**
1:6 4:16,18,21
6:12 10:20,24
10:25 11:6
14:22 15:8
17:1,7,9,22
18:7 19:22
20:3,15 21:1,5
25:4,8,23 26:6
28:10 29:19
31:1 32:22
33:15 34:13
38:3,23 39:1
40:6,20 44:11
46:19 68:20,22
99:23 100:14
106:15 108:25
109:3 110:18
111:20 112:16
126:23 140:25

148:8 151:22
154:4,8 155:12
155:16,18
156:12 157:14
157:17 164:5
164:17 185:3
200:4 216:20
238:8 265:14
270:18 271:5
271:16 273:10
273:12,23,25
275:6 276:3
278:23 279:10
279:19 280:8
280:15,16
281:11 282:5
282:17 283:14
283:18 286:7
286:23 287:1
288:14 290:9,9
290:12 294:1,5
294:8 316:13
316:16,21
317:23 327:6,8
328:19 331:1,8
335:21 336:5
336:10,13,18
340:6
**Montoya's**
16:9 19:19,23
26:25 32:9,13
40:10 46:12
67:11 154:2
157:22 167:12
271:7 272:20
306:23
**moonlight**
298:15
**Moonlighting**
297:12
**moot**
283:5
**morals**
102:22

**morning**
6:8,9 27:15
242:24 282:16
**mother**
74:4 122:9
168:15,18
169:15,21
170:3 172:2
179:8,8 262:20
264:2 273:13
**motion**
7:7 262:3,9
**motions**
264:12
**mournful**
106:7
**mouth**
251:3
**move**
159:2,3 314:23
**movement**
105:15
**muddied**
130:11
**multiple**
167:9 176:19
**multitude**
107:17,18 131:2
165:14
**murder**
31:23 32:10
33:3 43:16
52:13 61:7,11
111:1 114:17
120:7 156:5
157:4 160:13
166:17 174:1
175:3,7 181:1
181:2,4,8,8
183:7,19
187:14 192:11
193:4 201:7
213:25 217:7
240:10,12,19

240:24 241:8
241:11 242:14
304:14 307:18
307:20 312:22
312:22 313:11
334:21,23
**murdered**
34:18,19 57:9
134:8 214:14
**murderer**
191:22 192:9
334:25
**murderers**
56:25
**myriad**
302:7 304:6

─────── **N** ───────

**N**
2:2 6:1 340:21
**nail**
241:9,9
**name**
74:22 80:21,23
98:24 99:5
102:19 127:9
129:17,18
130:6,11
133:15 137:2
268:14 279:20
280:15 281:14
299:1,14
304:13 305:16
306:8,19
**named**
121:17 127:3
137:8
**national**
331:4 336:1
**nationally**
335:23
**nature**
105:22
**navigate**

179:11
**NCFUH**
85:11,16 320:20
320:23
**necessarily**
11:18 20:5 35:3
59:10,13 90:5
107:15 121:3
122:11 147:18
166:14 215:4
284:13,17
**necessary**
58:25 64:15
**need**
6:23 10:17
14:18 15:1
34:11 59:16
60:19 93:5
120:4,11 160:7
181:22 198:20
204:7 213:10
217:8,9 260:22
336:24
**needed**
52:24 53:5
178:22 248:13
**needle**
131:9,10
**needs**
182:1
**negative**
115:24 140:7
152:14,24
153:3
**neglected**
171:14
**neighborhood**
226:2
**Neither**
242:11
**nephew**
108:9,13
**never**
6:10 9:25 23:5,5

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 28

23:24 33:19,20
37:24 38:1,19
39:11 45:2
54:2 67:7,9
71:23 74:5
100:6 116:10
116:24 117:14
127:24 130:20
130:25 132:7
134:13,15,19
137:6 138:20
140:22 141:18
141:23 142:5,7
152:21 162:9,9
165:16 170:24
176:20 178:4,8
181:13,16
190:20 192:5
194:15 195:6
195:24 198:1
211:21 216:20
221:24 223:13
223:14,19
224:4,9 226:15
226:17 234:21
253:5 259:11
260:13,20
281:10 288:19
289:3 290:19
291:5,10
293:16 294:1
294:14 310:22
326:3,4
**new**
 27:12 28:3,6
 34:9 41:22
 44:7 65:16
 240:6 242:2
 243:3 278:5
 282:14,16
**news**
 57:15,17,23,24
 60:8,10,11,14
**newspapers**

130:10
**Nextels**
 66:18
**Nicholas**
 4:23 26:22 35:4
 201:17 272:16
 277:24 287:2
**Nick**
 23:21,24 32:6
 33:16,17 34:22
 37:7,8,16,17
 37:19 38:6
 39:5,15,24
 67:25 69:19
 70:21,24 71:4
 73:13 112:7
 155:11 179:25
 180:15,24
 191:8 223:23
 224:1,4,7,24
 225:7,9,10,13
 225:15,21,25
 226:15,20
 227:10,13,16
 227:17 244:12
 252:12,18
 253:6 272:23
 276:24 277:14
 280:13 282:12
 290:22 294:17
**Nick's**
 227:8
**night**
 22:10 28:14
 29:19 43:15
 112:23 130:22
 154:18 155:19
 207:6,13
 239:23 240:5
 258:7 264:25
**nine**
 96:8
**nods**
 9:8

**nonverbal**
 86:11 105:18
**Nope**
 78:21 297:17
**north**
 296:24
**Northglenn**
 37:20
**Notary**
 1:19 338:13
 339:3,21
**note**
 85:1 171:12
**notes**
 269:25
**notice**
 1:14 23:6
**noticed**
 306:23
**notification**
 67:13
**November**
 24:9
**nuance**
 154:21 305:21
**number**
 20:19,20 21:2
 54:19 63:24
 82:8,13,16,23
 94:18 113:19
 142:11,13,14
 158:4 159:16
 163:9 168:12
 172:22,24,25
 230:1,2,3
 299:21 315:19
 317:19 320:19
 322:14,24
 323:17 327:15
 330:7,7 331:3
**numbers**
 54:19 83:5
 114:3

_____ **O** _____
**O**
 6:1
**O'Connell**
 8:23 11:15
 83:21 94:3
 95:25 97:16
 139:23
**oath**
 64:23 138:10
 267:8,11,18
 273:17
**objected**
 11:23 176:5
**objections**
 7:24 9:15 30:5,6
 46:9 95:8
 233:4,5 235:11
 245:24
**obligation**
 299:9 313:12
**obliged**
 178:23,24
**observations**
 50:6,6
**observed**
 28:7
**observing**
 272:4
**obtain**
 46:17 94:17,19
 95:6 103:8,9
 148:2 235:19
 247:4 284:14
 302:3
**obtained**
 26:15 36:25
 46:14 54:5
 65:13 93:22
 94:6,13 142:22
 157:10,11
 282:18 283:21
**obtaining**
 94:22 96:15

 115:3,6 143:22
 144:6,9 270:9
**obvious**
 126:4
**obviously**
 24:14 102:13
 106:14
**occasion**
 98:12
**occur**
 113:16 241:17
**occurred**
 150:6 241:8
 304:16 316:10
 317:11,16
 328:14
**occurrence**
 113:13,19,25
**October**
 24:6
**off-duty**
 297:11
**offenders**
 332:4,13,22
**offense**
 42:5 88:9
 253:11 268:25
**offer**
 261:5 321:12
**offered**
 254:20
**offering**
 255:15,21 256:4
**offers**
 321:15,18
**offhand**
 323:9
**office**
 5:3 33:4,10,13
 33:24 52:4,14
 57:1 91:11
 144:14 146:16
 150:6 153:18
 201:5,12 202:8

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 29

245:4 262:12
**officer**
5:5 8:5 13:17
25:4,14 60:4
60:22 62:10
99:15 102:25
123:16 124:5
137:1 150:15
153:10,21
268:3,4 270:1
270:4,7,9
271:4 272:2
288:1 292:6
295:5 296:10
299:1 301:22
302:12,13
303:13,14
304:25 305:17
311:4 313:12
313:22 325:5
334:11
**officer's**
97:24 299:14
**officers**
47:1,3,6 50:14
60:12,15 61:17
62:3 66:15
73:1 74:8
91:25 92:20
102:24 127:4
132:5 133:14
143:20 144:3
154:3 288:3
310:10,11,12
321:16 324:19
325:7,8
**official**
1:11
**oh**
12:9 13:13
23:11 26:12,12
31:9 40:25
55:22 58:1
65:24 70:11

71:2 72:22
73:10 82:12,12
89:21 92:10
94:25 104:10
110:11 121:3
129:8 130:4,17
132:13 137:11
151:7 164:24
170:19 171:3
171:16 172:19
182:21,24
183:16 196:9
198:15 202:9
243:16 265:22
277:9 295:18
297:7 307:21
307:22 315:19
315:21 316:18
324:5
**old**
73:24 87:17
90:8 120:6
140:19 236:18
238:18,21,22
238:24 239:2,6
239:9,13,15
244:21
**older**
120:10 238:23
**on-the-job**
87:10 93:16
**once**
8:16,16 58:16
73:4 114:10
135:11 137:18
196:3,5,6
303:16
**one-hour**
24:15
**one-page**
142:21
**ones**
21:9 46:24
80:10 91:4

131:20 153:1,8
218:17 254:21
260:19 307:8
318:10
**online**
63:18
**oops**
181:19 222:1
**open**
41:10 106:22,23
106:24,24,25
106:25,25
231:1
**open-ended**
24:24 89:6
234:3
**opened**
233:23 278:9,13
**opening**
286:15 296:12
**operations**
4:11,15 123:9
123:10 125:8
142:24 143:17
**opine**
13:21,25 199:10
275:24
**opined**
13:16 139:24
**opinion**
13:15 29:11
30:18 34:21
122:2,4,16
140:3 144:13
146:5 147:18
147:21
**opinions**
90:25 144:15
**opportunities**
255:8,21
**opportunity**
166:21 168:19
198:2
**opposed**

46:7 122:16
238:3
**ops**
284:14
**option**
180:16,20
**options**
255:9
**orange**
68:3 131:14,17
**order**
4:8 58:18 79:10
79:12 83:7,10
**ordered**
312:2
**org**
66:12
**original**
340:12,21
**outcome**
166:17 314:2
**outcries**
264:10
**outcry**
88:20 270:5
**outlier**
258:20 260:13
**outrageous**
71:5,8 210:17
**outrank**
150:21
**outright**
30:10,16 207:10
**outside**
36:13 69:16
70:21,22 71:3
71:4 89:17
90:9 114:16,16
130:13 179:12
201:19 214:10
215:3 252:21
261:2,8 263:4
264:2,9,18
294:6 329:25

**overall**
147:3
**overlapped**
322:15
**overnight**
157:8
**oversight**
149:22
**oversized**
131:15
**overturned**
127:11 309:10
309:17

---

**P**

**P**
6:1
**P.C**
3:3
**p.m**
68:15 83:16
138:8 209:7
242:14 243:1
252:8 270:20
272:21 273:13
295:1 337:5
**P2012-07081**
317:7
**page**
4:1 9:3 19:16
63:10,15 64:1
84:17,18,20,21
84:21 85:6,11
125:2,12
268:24 270:11
270:14 272:8
272:11,19
277:18 286:5
290:3 295:14
295:18,22
298:8,8 300:19
303:22 304:3,5
304:8 310:1,25
315:18,19,24

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 30

| | | | | |
|---|---|---|---|---|
| 317:1 319:4 | 272:15 278:17 | 25:7 111:2 | **PD's** | 141:12 |
| 320:2,3,9,11 | **paraphrase** | 166:16,17 | 123:11 | **perceived** |
| 321:24 323:24 | 327:16 | 198:13 294:9 | **Pearl** | 233:7 |
| 327:12 340:11 | **parent** | 307:5 | 2:21 296:24 | **percent** |
| 340:14 | 88:14,23 119:25 | **particular** | **pedestrian** | 48:10 107:11 |
| **pagers** | 120:4,11 | 146:2 159:15 | 311:22 312:14 | 113:19,19 |
| 66:17 | **parents** | 160:2 171:12 | **peel** | **percentages** |
| **pages** | 102:2,17,20 | **parties** | 36:4 | 113:25 114:3 |
| 4:9 83:8 265:19 | 164:1 | 73:5 312:9 | **pen** | **perfect** |
| 309:23 318:21 | **parked** | 339:8 | 89:22 | 107:11 |
| 331:17 | 278:12 | **parts** | **pendency** | **Perfectly** |
| **paid** | **Parker** | 20:19 44:18 | 133:6 | 189:2 |
| 12:6,8,9,16,17 | 329:2 | 104:12 | **pending** | **perform** |
| 12:21,24 | **parking** | **party** | 7:5 74:20 | 134:5 |
| **pair** | 314:1 | 81:15 146:17 | **penetrated** | **period** |
| 43:8,14 45:11 | **Parkway** | 235:15 339:14 | 88:23 | 59:3 139:12 |
| 46:20 47:3 | 338:20 | **pass** | **penis** | 171:23 194:17 |
| **palm** | **part** | 288:16 290:5 | 88:10 | **periods** |
| 69:19 | 7:8 28:9 86:12 | **passed** | **people** | 294:7 |
| **pants** | 89:13 97:13 | 32:22,25 33:7 | 21:21 56:23 | **permissible** |
| 234:4,4,15 | 102:14 103:18 | 235:17 | 57:3 92:24 | 289:2,4 |
| 235:5,22 | 108:17 123:22 | **patio** | 99:10 102:1,11 | **person** |
| **paper** | 125:7,15 | 291:1,6,13 | 102:24 106:23 | 103:11,23 106:3 |
| 57:9,14 60:11 | 126:12 142:23 | **patrol** | 107:24 109:23 | 106:22 107:12 |
| 60:17,18 65:18 | 143:16 144:2 | 102:25 | 112:25 119:4 | 108:22 110:3,8 |
| 124:2 134:24 | 144:17 147:11 | **patrolman** | 136:15 146:7,9 | 120:21,21 |
| 183:5,8 300:11 | 147:13 159:17 | 150:17 | 146:11 152:9 | 122:21 125:17 |
| **papers** | 160:6 177:9 | **patron** | 152:15 167:9 | 125:19 140:18 |
| 69:16 | 187:4 191:5 | 298:12 | 174:12 182:1 | 149:6 165:11 |
| **paperwork** | 198:14 199:19 | **pattern** | 185:21 189:18 | 259:3 303:6 |
| 25:5 27:21 | 210:20 212:3 | 47:24 189:25 | 190:2,10,15 | 304:20 327:2 |
| 52:10 58:3 | 222:4 231:23 | **patterns** | 192:10,14,20 | **person's** |
| **parade** | 255:1 263:21 | 46:16,20 | 217:6 225:4 | 126:14 |
| 41:7,8 | 263:24 279:6 | **pause** | 227:3 247:23 | **person-specific** |
| **paragraph** | 290:23 299:6 | 163:7 176:25 | 259:4 264:10 | 284:23 |
| 64:12,13 143:18 | **participate** | **pavement** | 276:14 284:21 | **personal** |
| 268:23 272:8 | 7:3,11,24 28:4 | 296:14 | 298:6 303:4 | 78:4 79:7 80:11 |
| 272:10 273:5 | 47:7 168:16 | **pay** | 307:10 326:3 | 122:15 176:8,9 |
| 278:3,23 279:1 | **participated** | 91:10 150:20 | 329:1 330:1 | **persons** |
| 279:5 286:6,6 | 99:14 153:8 | 185:20 | **people's** | 137:25 152:4 |
| 286:10,25 | 166:15 | **paying** | 262:22 | **Persons(s)** |
| 288:9 290:3 | **participating** | 148:22 | **peoples'** | 4:18 |
| 295:23 | 7:13 57:1 | **PD** | 166:16 | **pertained** |
| **paragraphs** | **participation** | 245:17 | **peppered** | 25:22 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 31

| | | | | |
|---|---|---|---|---|
| **pertaining** 8:6 23:1 | 125:18 126:2 145:22 156:12 322:1 | 222:19 **planning** 12:16 | 202:19 205:1 206:4 207:19 209:11 210:21 | **ploy** 190:6,9 |
| **pertinent** 17:2 133:25 | **physically** 25:11 101:2 | **planted** 130:19,24 | 212:4 215:8 217:20 219:3 | **plus** 38:17 |
| **peruse** 124:23 | 105:1 125:20 128:17,23 | **play** 158:8,16 159:7 | 219:25 222:3 223:5,22 | **point** 14:21 15:15 |
| **perused** 143:8 266:17,22 282:10 285:23 | 262:3,4 **pick** 92:23 173:1 | 159:17 168:11 170:19 171:2 | 224:22 225:20 228:1 229:6 | 42:1 50:10 52:23 66:17 110:9,13 |
| **Peter** 3:2 7:19 | **picks** 172:23 | 172:24 177:23 179:14 191:5 | 230:19 231:18 232:1,8 234:1 | 111:22 112:13 119:14 131:24 |
| **peter@lasater...** 3:6 | **picture** 43:6 49:25 | 196:8 197:9 198:14 199:17 | 238:17 239:20 243:21 247:20 | 133:7 146:3,25 149:3 161:1 |
| **Petrol** 151:9 | 147:3 **piece** | 202:17 207:15 208:16,20 | 248:20 250:6 255:12,25 | 164:4,9 168:22 169:21 183:12 |
| **PH** 19:12 26:14 | 54:15 97:2 124:1 247:17 | 209:9 210:19 225:19 229:9 | 264:16 307:23 **players** | 183:24 192:6 203:1 207:16 |
| 39:2 72:7,12 | 250:14 266:10 | 230:8 231:23 | 198:10 | 208:2 211:18 |
| **phase** 105:8 | 300:10 **pieces** | 231:25 233:24 238:15 243:8 | **playing** 68:16 158:7,19 | 216:20,25 223:24 225:2 |
| **philosophies** 90:18,24 104:21 | 44:7 258:4 **PIO** | 243:12 247:18 248:18 255:10 | 166:4 191:15 229:23 | 226:13 237:5 237:23 247:25 |
| 325:20 326:5 | 132:19 | 255:23 256:8 | **plead** | 248:25 249:13 |
| **philosophy** 105:4 106:9 | **place** 88:10 286:13 | 256:18,19 264:14 280:12 | 10:4,6,15,17 11:8 14:13,14 | 250:8 252:9 254:5,14 |
| 329:13 | 303:7 | 307:7 329:5 | 14:18 15:1,17 | 260:25 277:10 |
| **phone** 37:23 81:7,10 | **placed** 44:12 132:3 | **played** 160:5 163:11 | 15:24 16:8,22 16:23 | 277:12 283:5 283:16 288:21 |
| 82:8,13,14,25 83:5 302:13 | 179:7 **places** | 165:2 166:6,24 168:13 169:12 | **pleading** 15:9,21 16:18 | 291:5,23 **pointed** |
| **phones** 66:16 | 284:25 **placing** | 172:5,18,21 173:5 174:4 | 17:4 18:11 **please** | 154:10 209:23 **pointing** |
| **photo** 44:4 | 25:17 89:22 **plaid** | 176:24 177:12 178:1 179:16 | 13:23 19:3,6 42:17 44:16 | 155:17 177:6 198:22 209:22 |
| **Photocopy** 4:12 | 131:15 **Plain** | 180:2 181:20 182:23 183:3 | 80:1 138:25 295:12 296:2 | 216:7,13 312:8 **points** |
| **photograph** 216:4,6 | 61:12 **plaintiff** | 183:11 184:22 185:2 187:11 | 315:18 340:13 **pled** | 41:20 193:20 198:25 215:14 |
| **phrased** 177:10 | 1:7,16 2:7 13:10 14:14 97:19 | 188:17 189:9 191:7,11,17 | 10:12 11:3 17:18 | **police** 4:10,14 5:3,5 |
| **phrasing** 140:5 | **plaintiff's** 7:9 16:3 | 193:15 196:12 197:11 198:17 | **plenty** 169:3 | 8:5 24:5 35:10 37:23 51:14 |
| **physical** 117:4,6,7,10 | **planned** | 199:18,20 200:9 202:16 | **PLLC** 2:3 | 56:20 58:3 60:4 61:23 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 32

71:25 72:25
73:25 74:7
76:6,14 102:25
109:25 131:6
143:17 150:15
153:20 154:3
201:11 268:3,4
270:5 273:7,12
276:18,25
292:6 304:25
319:6,15,18
321:15,18
324:19 325:1
333:14
**policies**
 119:19,23 123:1
 123:11,23
 184:14,18
 188:13,24
 189:4 190:17
 192:23 202:12
 204:19,22
 216:15
**policy**
 114:8 119:24
 121:20,24
 122:2,16,20
 123:3,7 125:25
 126:12 144:2,7
 144:20 149:14
 176:11 177:19
 180:6 188:8
 195:20 221:10
 246:2 271:16
 271:23 284:5
 284:11,13,17
 285:2 292:23
 333:22 334:10
**polka**
 131:15,20
**polygraph**
 76:2 96:7
 106:16 114:10
 213:14,21,22

 214:3,6
**polygrapher**
 325:21
**polygraphs**
 76:2
**portion**
 87:7 143:3
**portrayal**
 19:4
**position**
 7:10,14 21:21
 62:5 106:7
 220:3
**positions**
 150:24,24 151:2
 152:1,10
**positive**
 152:14,23
 153:16 154:2
**possibility**
 95:19 109:16,18
 109:22 147:10
 254:2
**possible**
 26:19 95:13,21
 126:6 186:8
 188:10 257:15
 279:21
**possibly**
 26:16 93:25
 110:24 113:17
 134:6 147:24
 165:4 203:24
 204:4,6 219:16
 259:23 269:25
 278:22 287:15
**post-dated**
 331:8
**posts**
 77:4
**posture**
 105:20 228:19
**Pounding**
 220:4

**Practical**
 86:13 330:8
**practice**
 61:6 90:7
 145:15 148:6,6
 271:14,17
 284:18 302:4
**practices**
 153:11,16
**preceded**
 193:1 320:11
**preceding**
 64:12 272:15
**predated**
 335:20
**prefer**
 280:17
**prejudice**
 33:4
**preliminary**
 19:17,18 38:20
 38:25 70:2,11
 70:12 72:12
**preparation**
 19:7 22:19
**present**
 3:8 120:1,4,12
 261:20 271:4,6
 273:8,18 275:6
 310:11
**presented**
 45:6
**preserved**
 7:14
**press**
 172:24
**pretend**
 50:5 213:19
**pretended**
 213:18
**pretty**
 22:9,11 90:7,8
 101:17 164:16
 171:21 185:6

 187:17 193:16
 215:21 219:4
 223:21 225:6
 228:5,10,11
 243:17 285:20
 298:7 313:19
**previous**
 164:16 272:19
**Priest**
 1:10 3:7 7:20
 42:7,10,12,18
 49:7 54:9
 64:21 73:20
 74:1 81:22
 128:14 137:15
 151:11,13
 152:17 198:18
 199:3,6,10
 213:10
**primary**
 29:13 51:25,25
 52:1,9 53:1,6
 62:5,12,18
 265:9,10 267:4
 269:18 271:4
 294:11
**prime**
 154:13,14
**print**
 44:4,5 46:4
 49:24 69:19
 136:6 249:18
**printout**
 63:8
**prints**
 42:2 44:20 47:4
 47:15 48:4,18
 157:10
**prior**
 322:9 330:25
 339:4
**prison**
 108:24,25 109:3
 131:4 161:10

 161:12,21
 170:14 172:9
 172:12 174:14
 174:17 175:2,6
 175:9,11,22,24
 179:19,24
 180:8 181:14
 181:23,25
 182:1 186:21
 186:22 188:9
 188:19 191:13
 191:19 193:2,5
 193:10 202:21
 258:6,6
**prisons**
 37:1
**privileged**
 78:15,16
**privy**
 152:19
**probability**
 95:16,17
**probable**
 28:22 29:5,19
 31:6 48:3,11
 48:12,17
**probably**
 8:17 27:23
 59:17 62:6,9
 72:3 81:18,21
 87:7 93:20,22
 99:8 116:24
 118:5 141:8
 158:14 183:1
 190:1 209:2
 211:11 217:5
 224:3 241:17
 259:16 269:24
 287:20 294:9
 329:5
**problem**
 122:7 158:17
 176:1 266:1
**problematic**

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 33

235:12
**procedure**
59:1 170:20
 211:25 269:19
 333:22
**procedures**
98:4 167:7,25
 182:8,10
 194:20 207:1
 210:13 219:20
 237:15 248:12
 249:7 251:22
 255:4 258:15
 304:25 312:20
**proceed**
7:8
**proceeded**
132:18
**proceedings**
339:12
**process**
27:17 28:2,3,8
 69:9 88:5
 123:24 141:9
 264:8 329:6
**processes**
115:6
**processing**
25:19 27:16,19
 28:5 157:6
**produced**
295:22
**Professional**
1:19
**proficient**
80:24
**profile**
60:5
**program**
324:25
**Progressive**
309:18
**Project**
86:17 327:18

**prolonged**
139:12 194:16
**promise**
82:8 196:23
 206:18,19
**promises**
160:23,23,24
**promotion**
150:23
**prompts**
189:18 190:2
**pronounce**
129:7,7 130:7
**proper**
13:18 269:19
**properly**
333:17 334:7
**property**
299:8,10
**prosecute**
39:8
**prosecuted**
54:1
**prosecution**
47:1,2,13 75:19
 103:15 133:6
 161:5 166:13
**prosecutor**
39:9 44:9,18
 45:15
**Prosecutors**
321:24
**protective**
4:8 83:7,10
**Prove**
196:9
**proven**
281:5 300:18
**provide**
148:4 304:13
 306:19
**provided**
20:16 83:20
 85:9

**provider**
80:5
**proximity**
193:18,24,25
 194:16 203:7
**pry**
231:1,2
**prying**
69:1
**Public**
1:19 330:8
 338:13 339:3
**publicly**
136:1
**publish**
124:6,7
**pull**
63:18 185:19,25
**pulled**
311:6 312:1,19
**pulling**
185:17
**punishment**
314:8
**punishment-w...**
160:21
**punishments**
181:9
**purchased**
252:18
**purpose**
143:22 144:5,9
 170:4 189:16
**purposes**
6:25 7:22 16:6
 281:24
**pursuant**
1:14 7:4 8:1,18
 47:16 59:1
**push**
117:10
**put**
8:2 18:16 25:16
 25:21 36:1

42:7 44:7 45:5
 51:17 52:18,22
 59:7,16 60:17
 64:17 65:20
 75:19 83:18,19
 84:19 85:3,7
 89:8 94:2
 124:15 132:7
 134:14 142:17
 142:25 143:6,9
 157:17 161:10
 161:11,12
 171:14 201:19
 236:16 265:23
 275:9 280:10
 285:25 289:18
 292:12 295:10
 299:5 312:11
 313:18
**puts**
9:19 62:20,23
**putting**
25:11 52:10
 65:1 193:3
 203:9 216:4
 271:19

**———— Q ————**
**qualified**
7:5,12 8:1 13:21
 13:25 14:4
 96:12 325:6
**queen**
80:4
**queried**
248:16 310:22
**query**
10:24 88:9
**querying**
11:6
**question**
9:9,20,21 10:11
 12:14 14:2
 15:8,10,19

16:7 18:9,19
 32:19 42:17
 44:16 49:4
 54:17 62:7,8
 62:16 89:6,10
 111:10 113:22
 114:23 117:24
 122:14 123:5
 125:25 126:5
 126:13 128:1
 175:4,15
 177:24 189:21
 214:11,15,24
 216:16 229:10
 230:6 248:3
 250:10 251:10
 257:7,9 258:3
 264:18 275:15
 275:17 276:8
 280:20 282:19
 316:19,20
 326:1,2
**questionable**
268:12
**questioned**
125:17 189:23
**questioning**
111:24 218:4
 256:15
**questions**
9:18,24 10:20
 10:25 11:7
 12:13 14:19,21
 14:23,25 15:13
 16:8,19 17:11
 17:14,15,22,25
 18:6 24:24
 31:14,20 74:25
 75:9,9 88:16
 89:15 104:25
 105:21 106:25
 107:20 120:25
 140:1,8,23
 141:3,7,12,19

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 34

142:2,5,8
143:24 144:18
145:5 154:10
157:23 198:21
212:19 213:18
213:20,20,22
213:23 214:2,3
214:4,5,5,12
220:14 225:5
247:14 259:25
266:6 269:16
281:25 285:19
285:21 286:2
295:8 300:12
300:16 303:11
303:12 305:18
314:21 334:7
335:6 337:1,3
339:11

**quick**
63:7 64:10
74:18 307:8
318:20 325:18

**quickly**
283:5 314:24

**quietly**
203:4

**quirk**
194:14 203:15

**quit**
178:15 193:8
209:25 220:15

**quite**
56:4 111:16
151:20 158:13
172:1 289:5

**quote**
50:9,15 59:8
131:25 174:19
178:6,14 275:6

**quote/unquote**
25:3

**quoted**
146:8

**quoting**
133:1

**Qwest**
80:4

___

**R**

**R**
6:1

**R.D**
1:11 2:24 54:14
267:2 273:16
293:24

**Rabon**
86:8,10 105:18
321:13

**race**
196:14

**radio**
299:6

**radios**
278:6

**raise**
7:24 216:8
217:1,14

**raised**
209:24

**raising**
209:22 215:10
215:11 216:12
218:22 219:7

**ran**
57:10 305:1,8
305:11

**Ranch**
3:5

**Ranchero**
297:5

**range**
87:18

**rank**
150:21 151:23

**raves**
297:5

**reach**

36:6

**reached**
36:5 236:25

**reaching**
69:1

**react**
194:6

**reacts**
105:21

**read**
15:4 45:22,23
47:8,10 57:13
57:14 60:10
64:13,16 65:19
70:12 143:1,2
143:5,18
263:21 265:18
279:13 280:21
280:24 283:5
285:20 322:2
338:2 340:14

**readily**
302:19

**reading**
72:4 107:11
143:4 288:6
290:6

**reads**
62:22

**ready**
116:1 163:14
164:7,13
168:24

**real**
63:6 64:9 87:9
149:18 187:17

**realizes**
254:14

**really**
12:12 15:22
28:7,24 29:3
35:3,4 40:9
52:9 65:21
69:9,15 73:4,7

74:1 77:19
84:8 90:4 96:5
97:13 101:9
106:20,23
107:3,4 108:19
122:14 130:20
140:20 150:21
155:21 157:5
170:17 172:14
175:2,11,22
187:20 203:6
211:22 212:16
217:2 223:23
234:8 236:23
237:3,20
241:19 243:18
244:23 255:6
257:20 302:15
326:4

**rear**
286:16 291:1,6
291:8

**reason**
17:13 46:17
68:8 74:2
132:20 235:4
237:18 274:8
279:25 280:2
313:9 319:20
319:23

**reasoning**
257:21

**reasons**
94:25 95:4,5
146:13 304:7
314:6

**reassess**
147:5

**recall**
14:2 15:13
18:22 25:11,13
26:10,11,20,21
27:14,23 39:4
40:12 58:11

60:10 64:20
66:5,21 82:15
82:16 96:22
99:1 111:11,12
112:9,12 114:3
115:11,16
119:12,13,14
120:16,18
122:24 127:5
128:7,8 130:4
133:12,19
136:8,11,14,20
137:22 151:7
151:10 153:5
153:13 154:5
155:8,16,17
157:7 168:21
169:22 183:16
207:7,14 213:7
213:13 223:15
223:16,25
226:12 227:17
234:13,18
235:1 236:23
243:14 244:4,6
249:14 264:20
271:8,11
283:20 284:2
299:5,11,25
300:6 301:8,11
310:20 321:8
322:4,5,21,23
323:9,10,11,20
324:2,18
325:15,16
327:20,24,25
328:21,22
330:13,15,16
330:18 331:14
332:12,14,24

**receive**
67:13 87:23
115:1 154:2
184:18 196:20

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 35

196:25 246:13
319:18
**received**
84:3 133:24
134:2,4 148:21
161:14 167:25
170:24 309:8
316:9,10 319:1
325:8 330:24
**recess**
83:16 138:7
209:7 252:8
295:1
**recognize**
127:9 310:17
**recognized**
233:10 257:24
335:24
**recollection**
15:15 25:17,19
155:14 224:4
226:1,4 233:8
233:13 234:17
274:4 310:15
334:16
**recommended**
76:16
**reconsideration**
130:13
**record**
5:5 6:23,25 7:18
8:2 9:19 72:12
83:4,18 85:7
89:20,21 138:5
138:6 142:20
158:11 182:25
252:6,7 284:6
285:2 303:21
303:22 308:20
311:14 318:8
333:21 337:6
**recorded**
98:4 281:14
282:24 283:1

**recording**
270:6 282:21
**recordings**
38:13
**recover**
26:16
**recovered**
46:10,11,21
47:16 68:6
69:12 157:3
**recovering**
45:25
**recruit**
319:6 321:18
**red**
312:4
**reduced**
339:9
**reevaluate**
147:5
**refer**
83:23 278:22
**referee**
313:6
**reference**
282:17 319:14
**refers**
134:9
**refile**
33:5
**reflect**
122:8 263:21
**reflected**
11:2
**reflects**
107:2,19 331:20
**refresh**
226:1,4
**refuse**
15:10 16:19
79:11 92:23
302:8
**refuses**
107:14

**refusing**
79:23 186:11
**regard**
105:19 146:22
289:24
**regarding**
93:16 145:10
149:24 154:4
161:5,7
**regards**
11:3 17:15 87:5
87:10 98:16,17
100:19 115:20
116:4,5,8
118:13 119:23
133:4,23 134:3
145:25 148:13
162:5 176:14
180:13 182:11
189:4 204:22
207:2 213:14
216:15 251:23
255:4 262:7
264:13 274:5
280:3 282:17
284:15 299:22
302:7 322:18
323:12 328:24
**Registered**
1:19
**regret**
262:2
**regular**
77:10,21
**Reid**
85:2,2,18,21
104:16 105:7
323:18,18,20
323:21,21
324:4,14,25
325:8,9,13,21
325:21 326:9
326:10,21,24
327:9 328:9,10

328:18 329:2
329:18,19
330:1 335:14
335:25 336:3
336:10,14
**Reisinger**
1:18 339:3,20
**relate**
106:19
**related**
288:14 291:18
291:24 339:13
**relates**
113:5
**relation**
339:7
**relatively**
285:12
**relatives**
104:23 164:14
**release**
32:22,25 133:24
**relevance**
78:9,24
**relevant**
63:25 125:25
213:19,20,23
214:2,4
**relies**
96:8,18,24,25
**remain**
334:23
**remained**
312:10
**remember**
14:20 21:18
22:2 27:5 38:2
40:16 41:14,23
45:13 48:2
53:4 57:16
60:20 69:10,13
69:15,18,24
74:22 77:19
99:3,4,6

119:15 127:7,9
127:11,13
128:5,11,12
129:9,11,15
133:5 137:8,19
151:17 154:12
154:23 155:10
233:15 241:18
243:4 268:21
289:14,14,15
293:4 297:14
298:19,20
299:1 301:4,5
301:7 303:15
303:18 304:2
304:18 306:11
307:13 311:8
324:16 331:10
331:12 332:17
**remind**
63:23
**removed**
27:13
**removing**
286:15
**repeatedly**
177:6 181:24
209:21
**repertoire**
196:2
**repetition**
93:1
**replace**
124:2
**replay**
242:9
**report**
4:20,22 13:16
61:23 62:24
94:3 139:23
152:3,5 227:21
268:25 269:20
277:14 279:25
280:10 281:9

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 36

285:11 286:4
**reporter**
 1:19 6:4 9:7
   32:3 42:14,17
   64:4 115:12
   116:2 124:12
   135:10 142:13
   158:9
**REPORTING**
 338:19 340:18
**reports**
 51:14,16 61:23
   62:22 152:6
   269:5 271:20
   272:4 292:8
**represent**
 6:12 7:1,18 29:4
   33:11 35:15,17
   38:12 47:10
   125:5 127:14
   142:21 143:16
   155:10 169:24
   225:24 226:14
   234:23 248:1
   248:25 250:7
   274:6 279:18
   281:13,18
**represented**
 11:18,20 37:18
   125:7 179:10
**representing**
 11:2
**represents**
 7:20 228:20
**reprimand**
 314:9
**reprimanded**
 165:16 336:21
**request**
 80:25
**requested**
 93:6
**requests**
 59:2

**required**
 7:11
**research**
 23:8 86:17
   321:25 327:17
**residence**
 273:9,19 275:8
   286:13 290:13
   291:1
**resistance**
 299:2
**resisting**
 299:14
**resources**
 56:20
**respect**
 7:8 29:11
   329:19
**respectfully**
 59:2
**respond**
 17:11 24:5
   165:12 168:20
   234:9 305:6
**responded**
 299:3 304:22
   305:25 313:23
**responds**
 325:25
**response**
 24:23 31:19
   49:22 111:9
   225:6
**responses**
 120:24
**responsibility**
 299:9
**responsible**
 52:10
**rest**
 169:25 175:24
   179:18,23
   180:8 191:20
   191:20,21

 192:7,8,13,19
 193:2,5,9
 199:17
**restart**
 42:17
**result**
 310:9 339:15
**results**
 160:15
**resume**
 5:3 295:6,21
   308:23 309:21
**retained**
 13:5,6
**retardation**
 121:4
**retarded**
 121:7
**retire**
 76:9
**retired**
 23:13 75:22
   76:13 77:15
   81:11 82:4,4
   82:14 194:13
**retirement**
 73:5 75:23
**retried**
 37:6
**retry**
 33:5 34:11
**retrying**
 34:6
**return**
 338:19 340:14
**returned**
 299:7
**reveal**
 134:12
**revealed**
 236:7 248:15
   249:21 275:2
**Reverend**
 304:23 306:12

**review**
 18:20 20:14
   22:6,14,18
   111:5 269:7,20
   283:4 337:4
**reviewed**
 19:7,9 22:5,22
   23:1 24:14
   130:12 265:18
   268:24
**reviewing**
 18:8 21:19
**rewind**
 177:9 179:22
**rewound**
 177:10
**Rica**
 133:13
**Richard**
 7:18
**ride**
 131:9,10
**Ridgeline**
 3:4
**rights**
 7:4,25 137:20
   263:22
**Ringel's**
 74:22
**ringela@halle...**
 2:17
**ringing**
 127:21
**rings**
 130:24
**rink**
 297:3
**Road**
 329:2
**robberies**
 23:7,10
**robbery**
 32:10
**Robert**

 36:11 68:9
   154:12 241:13
   241:18
**Robin**
 262:8,10
**rock**
 36:13 70:22,25
   71:2,4
**Rockies**
 310:4,13
**role**
 253:10
**roller**
 297:3
**Romero's**
 278:11
**Ronald**
 153:20
**room**
 21:2,4,6,22,24
   35:22 36:11
   38:6 40:12,17
   40:19 41:4,7
   44:3 46:22
   48:25 49:6
   50:23 53:17,20
   54:4,9,18,19
   54:23 55:15,17
   55:20,24 56:15
   105:1 122:9
   127:19 128:9
   131:25 168:21
   169:25 171:22
   172:2 173:2
   179:1,5 182:25
   183:2,15 185:9
   186:9 197:19
   207:17 215:9
   216:7 222:7,8
   222:22 223:10
   261:2,3,8,11
   263:4,20 264:2
   264:9 283:16
   283:19,25

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 37

287:4,8 291:1
**rooms**
 225:4
**rough**
 298:13
**roughly**
 86:2
**roundabout**
 212:19
**rowdy**
 298:7
**RPM**
 1:2 340:7
**RPR**
 339:3,20
**rubber**
 42:7,21
**Ruben**
 4:21
**RUBIN**
 1:6
**rule**
 30:13 53:11
   267:23 340:13
**rules**
 9:1,4,14
**ruling**
 34:9
**run**
 177:17 202:11
   305:17 313:25
**Ruscitti**
 2:21

——————
**S**
——————
**S**
 1:18 2:3 3:4 6:1
   339:3,20
**safety**
 133:23,25 134:3
**saliva**
 189:13
**sanctioned**
 91:14 113:24

115:2 145:10
 148:17,23
 250:22
**sat**
 44:2 217:6
**satisfied**
 184:9
**Saudi**
 137:9,12,24,25
**save**
 199:1,8 206:5
   206:11 315:7
**saw**
 34:22 41:14
   69:3 71:23
   73:9 97:9
   99:10 155:3
   201:17 210:5
   234:21 235:18
   237:21 244:11
   278:7,9,13
   283:12,12
**saying**
 8:4 14:12,13
   16:11,17 17:23
   39:16 40:12,23
   44:6 47:17
   49:9 56:2
   61:22 62:11
   70:10 75:7
   96:22 123:2
   133:10 142:1
   155:18 159:9
   160:16 165:13
   168:3,3 169:4
   171:10 175:6
   176:11,17,20
   178:2 183:22
   184:23 186:2
   188:8,18 190:3
   192:19,24
   194:9,9,23
   195:2 196:15
   196:22 197:1

199:14 201:9
 201:25 202:9
 204:2 205:7,13
 205:23 206:9
 206:12 207:2
 210:22 211:9
 211:25 216:21
 219:9,18
 221:15,21
 223:6,9 224:24
 225:9 226:20
 227:3 235:21
 239:5 240:4
 241:6,8 244:16
 247:9 256:25
 257:3,8 259:8
 259:18 261:7
 298:2 304:6
**says**
 37:22 41:19,25
   58:4 59:11,12
   68:2,4,5,7
   70:18 83:21
   125:13,24
   130:23,24
   131:1,5 132:10
   133:16 135:7
   143:18 144:2,5
   164:13 169:9
   173:8 186:20
   186:22 188:19
   198:25 205:23
   206:2 207:16
   220:23 221:1
   222:8 225:7,21
   227:10,13
   230:20,21
   232:10 235:23
   235:25 236:1
   239:22 248:22
   251:11 252:11
   252:14,18
   263:9 265:24
   267:7,7 268:24

269:4 272:15
 273:2,6,11,16
 277:17 279:21
 281:15 283:23
 284:14 286:6
 287:1 290:8,22
 296:8 299:5,10
 300:21 301:6
 302:5 306:16
 306:18 310:10
 310:12,20
 313:14 319:5
 320:23 322:25
 324:7,8 330:7
 331:4,21 332:3
**scared**
 107:22,25
   108:25 109:2,2
   172:8,9,12
   181:22 182:1
   186:20,21,22
   186:23 202:20
**scene**
 21:24 26:5 27:7
   27:14,16,24,25
   27:25 42:2,3
   43:5,15,21
   44:12,20 45:5
   45:16 46:4,12
   47:5,15 48:4
   48:10,18 49:11
   50:8 52:3 69:3
   69:8 71:22,25
   116:8 157:4,6
   157:16 189:20
   189:21 210:25
   211:14,22
   226:15 231:12
   234:21 244:1
   246:22 249:16
   249:20 260:1
   272:3 289:13
   291:17 292:1
   292:18 294:6

305:25 330:20
**scenes**
 61:5
**Schneider**
 1:11 2:24 7:19
   25:16 29:13
   51:19,21 54:14
   62:9,11 64:21
   67:3 73:20,22
   81:24 128:15
   265:7 267:2
   269:13 273:16
   273:20 274:13
   275:4,8 289:7
   289:18 292:13
   292:15 293:25
**school**
 84:13 104:16,22
   106:21 239:12
   257:25 304:23
   323:20,21
   324:4,15,22
   325:8,16
   327:20
**schools**
 104:10 107:10
   145:20 318:15
   325:22
**schoolteacher**
 57:8 65:16
**screen**
 83:19 92:9
   124:15,20
   142:18,25
   143:7 158:24
   159:21 224:24
   225:2,3 226:20
   265:23 295:11
   295:18
**screen-share**
 314:25
**screwed**
 264:12
**script**

Deposition of: Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 38

104:25 107:11
**scroll**
295:18 296:2
 300:20
**scuttlebutt**
155:3
**seal**
58:13,18,19
 64:18 65:13
**sealed**
59:3
**search**
4:7 26:7,15,20
 26:22,25 27:16
 46:11 47:16
 51:10 58:3,11
 58:14,17,19,20
 59:21 63:12
 64:16 65:11,13
 270:10 271:25
**searched**
27:20 290:13,18
**seat**
179:8 300:1
**second**
16:4,6 19:9 20:6
 20:7,13 24:3
 24:12 63:15
 124:22 125:2,2
 125:12 129:3
 143:10,25
 146:8 163:12
 172:7 174:11
 176:25 187:4
 272:8 286:1
 309:1
**secondary**
52:2,2,11 53:1,3
 53:7,8
**seconds**
40:22 137:24
 172:24 173:3
 189:8 196:10
**secret**

59:16
**section**
124:3 125:9
 144:16 169:1
 171:21 172:1
 174:3 176:22
 184:20 185:1
 187:3,6 188:16
 189:6,8 193:13
 197:10,21
 200:7 202:18
 204:25 207:17
 209:9 227:25
 228:21 229:4
 230:18 278:21
**secured**
27:25
**security**
296:11,19 297:9
**see**
17:23 23:13
 24:8 28:8 38:5
 58:2 68:18
 73:4 74:3 85:6
 85:11 86:8,16
 97:12 99:15
 103:11,12,13
 108:1 124:20
 125:8,13,14,22
 126:3,9 127:1
 141:12 143:12
 143:13,14
 145:14 150:6
 154:10 157:6
 158:19,25
 159:4,18,19
 160:17 163:7
 164:15 166:7
 171:8,16,22
 173:2,3 222:23
 225:21 227:23
 240:8 247:7
 267:1 268:23
 269:2,16

270:11,13
 272:19 273:14
 277:13,15,20
 278:2,19 283:6
 286:6,8,17
 287:5 288:9,17
 290:15,23
 291:2 295:13
 295:23,24
 296:5,17
 298:13 300:19
 300:21 304:11
 310:6 311:2
 312:5 316:8
 319:5,8 320:16
 321:21 322:25
 323:18,23
 327:13 328:9
 328:10,13
 330:11 331:19
 331:21 332:5
**seeing**
58:11 69:15
 96:15 153:4
 249:2 287:24
 308:22,23
**seen**
15:4 18:17,23
 68:1 73:5
 100:6 153:9
 182:7 183:5
 236:13 278:11
 281:9 293:23
 293:24 294:1
**sees**
131:3
**segment**
20:19,20 159:8
 159:12,12,15
 163:24 172:11
 183:17 218:4
 322:17
**segments**
20:17 21:10,23

22:1,6 158:9
 159:24
**self-incrimina...**
11:4
**self-incrimina...**
10:8
**sell**
298:24
**semiautomatic**
70:18
**seminar**
91:9,11 323:12
 332:17,19
**seminars**
84:14,16 87:5,6
 88:2,3 105:19
 114:2 148:18
 176:19 322:16
 322:19 326:16
 326:21
**send**
93:5 136:4,7
 318:16
**sending**
136:12
**Senior**
2:9
**sense**
30:20 47:17,22
 48:5 50:5,7
 105:12 107:6,8
 107:9 110:23
 145:15 160:3
 162:6 163:22
 208:25 225:17
 227:19 228:23
 246:4 251:23
 252:2 255:6
**sent**
62:2 78:12,13
 78:18 80:25
 133:14 322:6
 332:15
**sentence**

127:8 144:1
 232:24 286:12
 290:5
**sentences**
33:4
**separate**
10:18,21 44:18
 80:10 104:11
 325:24
**separately**
63:18 290:21
**September**
24:6 33:13
 295:24 298:11
**sergeant**
57:1 150:13,22
 151:5,13,24
 301:25 302:9
**Sergeants**
152:17
**serious**
165:12 302:16
 302:18 312:15
 333:7,9
**seriously**
267:14,24
 329:14
**seriousness**
185:22
**serve**
33:3
**served**
72:19
**service**
23:6
**sessions**
326:22
**set**
104:25 126:6
 201:20
**settled**
97:17
**settlement**
97:20

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 39

**seven**
280:19 316:13
   316:23
**several-millio...**
309:9
**severely**
312:16 313:11
**Sex**
302:16
**sexual**
300:23
**shakes**
202:23
**share**
63:20 124:19,23
   158:12
**shared**
53:15 144:15
   295:18
**sharing**
125:1 222:22
   307:21
**Shawn**
280:6
**sheet**
331:20 338:4,5
**sheets**
340:14
**Sheridan**
311:15
**sheriff**
98:5
**Shield**
1:9,10,10,11
**shins**
132:10
**shit**
186:24
**shoe**
42:8,23 43:4,20
   44:5 45:25
   46:3,7,10,11
   46:12,21 47:23
   47:24 49:1,6

49:24 50:3
189:24 248:22
248:23,24
249:3,4,11,13
249:16,19,20
249:21 251:1
288:15,20,21
288:25,25
289:9,9,13,17
289:22,25,25
**shoeprints**
157:18 189:22
**shoes**
26:17 40:24
   41:14 42:1,2
   44:6,11,19
   45:3,11 46:15
   46:23 47:4,14
   48:3,10,16
   50:7 53:19
   130:18 156:18
   156:21,24
   189:25
**shook**
115:23
**shoot**
198:15 243:16
**shooting**
134:10
**shopping**
130:19 312:13
**short**
171:16 188:18
   207:18 243:17
   264:15 285:1
   285:12,20,22
**shorter**
227:22
**shorthand**
339:9
**shortly**
245:2,9
**shoulder**
299:12

**shoved**
296:13
**shoving**
296:9
**show**
15:5 18:4 26:11
   42:6 61:5 63:6
   63:9,15 64:9
   81:8 135:5
   142:10 215:6
   217:18 225:24
   227:6,7,18,20
   227:21 302:8
   321:3
**showed**
71:25 72:1
   73:10
**showing**
63:21 112:13
   216:6 303:4
**shows**
159:21
**side**
76:3 89:23
   124:22 278:12
   296:12,24
   297:20 313:7,8
   313:14
**sign**
262:3 340:14
**signature**
64:12 134:17
   135:6,17 262:5
   262:23 337:4
   339:17 340:11
   340:14
**signed**
63:16 135:19
   262:5,21 264:6
   270:12,17,22
   325:5
**significant**
101:22
**silencer**

134:9
**silver**
70:18,23 71:14
   71:22 72:4
   234:11,18,25
   235:6,14,18
   237:19,21,22
   247:9,12,17
   289:9
**similar**
43:7 46:16,20
   98:16 231:16
   323:14
**similarity**
44:5
**simple**
61:13 76:6,7
   81:16 88:15
**simplifying**
33:2
**Sincerely**
340:16
**sing**
108:14
**singing**
108:15
**single**
57:15 60:8
**sir**
78:7 333:7
**sister**
164:7
**sit**
46:25 51:9
   106:23 152:12
   185:18,20
   186:1 251:14
   251:25 259:4
   273:22 274:8
   280:13 313:5
**sit-down**
303:10
**sitting**
38:24 50:23

57:1 67:4
   106:24 128:9
   174:7 198:23
   204:9 215:20
   300:1 323:14
   324:2 327:24
   328:21 333:1
**situation**
109:25 237:10
   259:3 269:20
   305:3
**situation-**
284:23
**six**
127:12 216:1
   316:12
**sixth**
332:3
**skills**
86:18 327:18
   328:6
**skip**
304:8
**skunk**
131:13
**slam**
128:13
**slammed**
127:17
**slamming**
128:12 194:8
**slap**
117:9
**slapped**
132:11
**sleeping**
36:11 154:17,19
**slept**
46:21
**slot**
236:16
**slow**
42:14
**slowly**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 40

| | | | | |
|---|---|---|---|---|
| 19:13 277:11 | 147:4,7 151:8 | 94:4 111:17 | 229:21 251:22 | **spoken** |
| **small** | 154:24 162:25 | 155:12 | 255:5 259:3 | 72:18,25 73:20 |
| 87:24 286:15 | 163:16 165:14 | **sounds** | 266:6 271:23 | **spots** |
| **smarter** | 168:23 170:20 | 23:19 40:5 99:5 | 302:14 332:17 | 21:7 |
| 214:7 | 173:18 175:23 | 227:16 321:17 | **specifically** | **sprained** |
| **smashed** | 189:20 195:8 | 326:7 | 9:21 40:20 | 299:12 |
| 231:8 | 207:9 212:16 | **source** | 68:13,20 98:23 | **Springs** |
| **snitch** | 223:1 224:15 | 72:8 130:13 | 102:19,20 | 323:1 |
| 293:3,9 | 232:23 237:6 | 134:2 148:5 | 114:23 130:15 | **stab** |
| **snoring** | 252:1 253:10 | 227:5 | 144:4 145:16 | 253:14 |
| 36:11 | 276:11 301:16 | **sources** | 149:4 173:15 | **Stadium** |
| **sobbing** | 302:17,17 | 275:1 | 194:21 204:2 | 298:13,16 |
| 21:5 108:22 | 306:17,17 | **South** | 216:24,25 | **staff** |
| 109:7 172:13 | 307:18 333:21 | 1:16 311:15 | 221:10 246:1 | 52:14 141:24 |
| 185:6,8,13 | 334:6 | **space** | 258:16 289:17 | 149:24 |
| 186:14 | **somebody's** | 20:21 | 291:6 322:5,21 | **stairs** |
| **social** | 108:1 | **speak** | 328:5,25 | 291:9,9,13 |
| 77:4 80:16 | **someone's** | 63:8 73:3 87:21 | **specificity** | **stamp** |
| **softer** | 211:22 216:13 | 127:18 132:21 | 291:11,20 | 63:9,25 158:10 |
| 218:24 | 218:10 | 282:25 292:12 | **specifics** | 316:25 |
| **sole** | **somewhat** | **speakers** | 128:4 277:10,12 | **stand** |
| 47:25 | 104:11 | 159:1 | **specified** | 26:12 85:16 |
| **solely** | **son** | **speaking** | 288:20 | 128:10 140:3 |
| 35:12 | 131:8 | 137:21 218:23 | **specter** | 158:22 192:20 |
| **solicit** | **sorry** | **speaks** | 188:9 | 321:11 |
| 53:6 208:11 | 6:22 19:13,14 | 208:13,18 328:4 | **speculate** | **standing** |
| 248:14 326:3 | 42:5 47:2 | **special** | 30:7,21 99:2 | 36:5 109:1 |
| **solve** | 53:22 63:10 | 119:16 120:2,14 | 182:17 275:13 | 215:17,19,21 |
| 192:12 333:11 | 72:16 84:18,19 | 121:13 | 283:9 | 219:15 |
| **solved** | 115:12 118:9 | **specialist** | **spell** | **stands** |
| 61:12 | 129:17 156:7 | 50:3 | 268:16 | 320:21 |
| **somebody** | 172:20 191:6 | **specialized** | **spend** | **stare** |
| 10:11 53:18 | 210:7,9 243:17 | 87:23 327:18 | 193:5,9 | 167:16 |
| 54:5 56:8,9 | 270:12 274:15 | **Specializing** | **spending** | **start** |
| 62:7 64:22 | 313:16 314:6 | 86:18 | 179:18,23 | 84:20 105:2 |
| 65:14 81:3 | 316:18 336:1 | **specific** | 191:12 193:2 | 115:18 123:17 |
| 95:3 98:19 | **sort** | 6:19 10:24,25 | **spent** | 143:25 158:19 |
| 107:13 111:19 | 8:5 30:13 41:9 | 14:2 18:6,6 | 324:4 | 244:23 264:24 |
| 117:9 118:6,20 | 43:3 100:7 | 83:8 87:9 | **Spinning** | 295:14 317:2 |
| 119:1,6 120:19 | 173:18 213:1 | 93:10 147:1 | 212:22 | 318:3 |
| 121:2,6,9,13 | 260:12 300:10 | 176:15,15 | **split** | **started** |
| 122:6 136:9,23 | **sound** | 181:16 195:21 | 159:13 | 11:6 21:20 |
| 138:24 139:3,8 | 23:18 36:16 | 207:1 216:16 | **spoke** | 22:23 86:6,7 |
| 142:1 146:20 | 38:17 58:23 | 216:17 219:21 | 218:23,24,25 | 172:21 241:9 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 41

| | | | | |
|---|---|---|---|---|
| 270:19 325:22 | 195:16,17,22 | **stay** | **stopped** | 233:10 258:1 |
| **starting** | 195:25 196:2 | 7:7 217:2 319:4 | 114:14 311:18 | **studied** |
| 84:17,18 | 196:17,19 | **stayed** | 312:12,13,21 | 108:19 |
| **startled** | 197:6 199:6 | 151:19 | 312:22 313:17 | **study** |
| 185:25 | 207:2 208:11 | **staying** | **storage** | 263:9 331:4 |
| **starts** | 219:21 221:5,9 | 165:7 219:18 | 318:18 | **stuff** |
| 20:22 64:3 | 225:25,25 | 327:12 | **store** | 27:21 30:17 |
| 101:25 108:22 | 227:6,7,8,15 | **steadfastly** | 52:20 74:4 | 36:24 55:5 |
| 109:7 166:7 | 257:7 274:17 | 184:3 | 252:18 253:12 | 60:17 61:14 |
| 189:7 286:6 | 275:19,22 | **steal** | 298:23 | 69:17 74:6 |
| 295:6 318:9 | 276:1,2,24,25 | 278:6 281:16 | **story** | 76:5,6 81:16 |
| **state** | 277:17 278:23 | **stealing** | 160:17 198:10 | 88:15,15 |
| 1:20 121:22 | 279:14,19,20 | 112:5 | 200:22 222:9 | 105:16 107:6 |
| 282:11 294:4 | 279:21 280:22 | **steel** | 223:7 247:8 | 118:19 164:2 |
| 328:2,25 330:1 | 281:6 282:7,17 | 131:24 | 297:21 313:7,8 | 187:23 194:21 |
| 331:13,14 | 282:22 283:22 | **step** | 313:14 | 219:18 252:19 |
| 338:16 339:4 | 283:23 284:1 | 320:6 | **straight** | 254:1,4 259:18 |
| **state.co.us** | 285:11 286:20 | **step-by-step** | 62:9 | 271:19 302:18 |
| 78:1 | 287:8,23 | 35:16 | **strange** | 305:10 323:15 |
| **stated** | 290:18 294:17 | **stick** | 154:21 | 329:5,8 |
| 10:15 22:2 | 297:20 299:22 | 21:23 231:1 | **street** | **stupid** |
| 46:15,15 49:19 | 300:4,6,7,9,11 | 326:16 | 1:17 2:3,15,21 | 137:5 194:14 |
| 49:23 110:11 | 300:13 | **sticking** | 103:1 151:18 | 195:6,15,16 |
| 137:23 156:6 | **statements** | 232:22 330:6 | 278:8,12 | 196:2,19 197:6 |
| 157:6,10 | 10:24 18:6 31:1 | **stole** | 311:23,25 | 302:12 |
| 163:24 174:11 | 49:25 86:9 | 273:25 277:1 | 338:15 340:4 | **style** |
| 185:20 197:16 | 143:20 144:3 | 280:16 | **strength** | 165:8 194:10 |
| 200:16,20 | 146:21 148:9 | **stolen** | 192:5 | 195:18 |
| 204:4 237:16 | 173:6 174:6 | 110:21,24 111:2 | **stressed** | **subject** |
| 247:3,11 279:6 | 221:13 268:25 | 111:24 112:1 | 109:24 | 21:22 165:12 |
| **statement** | 269:4,5,7,7 | 211:6 226:16 | **strike** | 197:5 303:13 |
| 4:24 23:22,22 | 271:16 276:18 | 273:9,18 275:7 | 330:5 | 303:14 |
| 23:25 28:23 | 284:14,21,21 | **stood** | **striking** | **subjects** |
| 29:20 31:16,18 | 330:21 | 201:21,22 | 101:2,14 | 81:13 |
| 32:7 33:18 | **states** | **stop** | **stroking** | **submit** |
| 35:12 49:17 | 1:1 7:6 26:15 | 19:15 21:20 | 204:9,14 | 92:1 |
| 65:12 125:14 | 106:20,21 | 88:25,25 94:21 | **struck** | **submitted** |
| 125:21 126:8 | 246:2,3 262:5 | 143:25 163:12 | 288:15 311:19 | 12:18 13:1 51:7 |
| 143:23,23 | 267:8 296:8,14 | 165:23 172:6 | 311:22 312:13 | **subpoena** |
| 144:18 161:13 | **stating** | 178:3 183:4 | **stuck** | 79:9,10 |
| 162:23 163:16 | 174:23 | 220:24 221:7 | 179:4,7 | **subpoenaed** |
| 167:23 176:15 | **station** | 229:19 245:8 | **student** | 78:22 |
| 181:16 186:6 | 131:6 252:22 | 312:2,2,2,5 | 233:11 | **subscribe** |
| 191:24 195:6,8 | 284:7 | 313:10 | **students** | 105:4 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 42

**SUBSCRIBED**
338:9
**subsequent**
273:6 278:17
**subsequently**
39:6
**succinct**
18:13
**sudden**
21:5 106:6
**sued**
72:22 73:1
74:16 76:25
126:24 127:5
**suffering**
125:18
**suggest**
105:1 231:4
**suggested**
185:19 234:4
**suggestion**
190:6
**suing**
74:19
**suit**
11:9 131:15,18
**Suite**
2:16 3:4 338:20
340:4
**summary**
315:9
**Sunday**
22:10,10 111:6
**super**
28:1 157:8
**supervision**
149:17,22
157:25 176:11
184:15 195:20
199:13 219:17
248:5
**supervisor**
118:4 142:1
150:9 151:5,14

151:21 243:18
305:5,25
**supervisors**
60:13 118:13,17
141:23 149:23
150:2,5,12
153:17,19
165:22 182:13
213:10 221:4
245:4 260:21
275:18 336:16
**supplemental**
51:16 61:23
62:23 277:14
285:11
**supplementary**
4:20,22 283:1
**supplemented**
321:20
**supply**
171:5
**suppose**
282:9
**supposed**
12:9 37:3 62:18
121:25 123:19
146:3 177:19
261:19 263:3
267:20 292:24
300:11,12
**supposedly**
237:7
**sure**
6:24 9:11 18:5
19:16 20:24
30:18 32:20
33:8 35:13
37:2 42:16
62:21 92:10
101:11,25
109:14 114:12
122:4 129:14
133:4 152:17
153:15 163:25

171:21 191:4
200:4 208:22
209:6,14
213:12 216:19
259:13 271:24
274:16,25
302:19 309:23
333:21
**surprised**
25:1,2 67:19
73:17
**surveillance**
252:25
**suspect**
4:20,22 94:9
95:1,1,3,13,21
98:3,14 101:2
101:4,14 103:6
103:11,19
104:21 105:10
105:21 110:5,7
110:15,19
111:11,20
112:5 117:5,8
117:15 119:9
120:8 121:15
121:16,21
126:6 128:8
138:14 139:12
139:20 143:21
143:24 144:4,5
144:8,18
145:13,22,24
145:25 146:23
147:6 148:8
149:1 154:13
154:14,15
165:7 173:13
178:5 180:7
183:18 195:2
197:2 199:15
199:25 201:7
206:9 212:12
217:1 224:15

237:17 247:2,5
248:7 254:25
259:25 270:4
288:14 291:24
292:1 312:1
325:25 326:14
**suspects**
59:15 61:9
90:16 97:9
98:2 106:5
114:18 117:19
138:18 140:21
145:12 148:1
165:24 195:9
227:2 286:14
290:13
**sustained**
296:15
**sweats**
234:5,15 235:22
235:24 247:10
**sworn**
6:4 338:9 339:6
**sympathetic**
203:2 204:9
**sympathy**
203:12
**synopsis**
51:9,10 74:18
277:23 280:4
283:4 285:10
286:3,20 287:8
287:14,16
288:7 305:22
306:21 325:18
**synopsizes**
62:23
**Syracuse**
1:16 2:3
**system**
54:25

——————
**T**
——————
**table**

193:19 194:8
209:15,22
210:17 220:4
225:1 259:5
**tables**
165:13
**tactic**
222:25 254:24
**tactics**
13:17
**take**
9:8 16:2,5 42:5
44:18 53:1
64:11 83:14
92:9,16 94:1
105:1 111:14
117:18 121:12
124:21 126:21
129:12 139:20
142:18 143:6
143:20 144:3
145:1,7,19
158:14 171:6
208:21 209:4
213:15 221:7
221:18 251:16
252:5 256:6
265:19 267:13
269:25 277:7,7
277:11 279:13
280:14,22,23
282:6 294:19
294:20 301:14
301:15 302:16
302:19 309:21
309:24 314:25
326:8,12 337:4
**taken**
1:16 83:16
138:7 143:23
209:7 252:8
267:23 295:1
299:17 329:1
339:8 340:8

Mile High Court Reporting and Video, Inc.   303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 43

| | | | | |
|---|---|---|---|---|
| **takes** | **talking** | 307:7 | 323:19,21 | 242:1 243:9 |
| 157:8 | 8:16 11:11 12:1 | **taught** | 325:13 328:10 | 244:9,17 245:7 |
| **talk** | 20:7 21:22 | 107:7 117:4,14 | **techniques** | 246:4,21 |
| 14:5 15:16 17:1 | 38:7 39:14 | 117:17 121:10 | 13:12 90:19 | 251:25 254:6 |
| 35:10 37:22 | 40:11 58:8 | 138:13,17,22 | 92:17 100:6 | 254:15 261:4 |
| 41:6 52:19 | 73:23 81:25 | 139:1,5,10,15 | 103:5 322:14 | 261:17 264:3 |
| 54:9 56:8,15 | 82:3 89:24 | 139:19,22 | 325:19 326:6 | 268:20 277:8 |
| 60:16,18 61:1 | 91:4 98:25 | 140:22 141:18 | 327:1,5 328:25 | 298:22 303:15 |
| 62:7,10 74:1,7 | 104:16,19 | 145:12,16,17 | 329:8,8 | 305:21 311:10 |
| 74:12 79:2 | 105:11,13 | 148:25 149:5 | **tell** | 313:7,8,9 |
| 81:13 88:3 | 106:22,24 | 173:12,15 | 6:19 8:8,14 | 324:24 333:1,3 |
| 95:1 102:1,2,3 | 107:1 108:12 | 178:8 181:13 | 18:18 20:19 | 333:4,5 |
| 102:10,20 | 109:6 113:24 | 181:16 190:4 | 21:19 28:19 | **telling** |
| 105:20 106:16 | 115:22 122:11 | 204:20 206:8 | 29:3 30:17 | 25:17 30:22 |
| 107:3,16,21 | 122:12 125:9 | 210:2 216:13 | 35:20,22,23 | 35:14 36:17 |
| 132:18,20 | 148:14,15 | 221:4 224:14 | 36:1,7,10,13 | 48:15,19 60:7 |
| 149:17 185:22 | 156:20 161:4 | 227:1 230:4 | 61:2,7 67:25 | 65:6 164:6 |
| 208:8 209:24 | 181:13 183:6 | 250:13,20,21 | 72:22,23 89:11 | 170:4,20 |
| 212:13,15 | 191:9 198:18 | 251:18 258:10 | 97:8,9 110:23 | 175:22 179:17 |
| 222:21 228:16 | 200:25 203:3 | 275:17 288:23 | 113:4 123:2 | 181:22,24 |
| 259:9 261:1,7 | 210:1,18 | 289:3 292:2,15 | 129:23,25 | 184:2,7 187:16 |
| 261:10,19 | 215:12,13 | 292:21 336:1 | 134:22 141:15 | 189:10,15 |
| 263:1,10,11,16 | 216:18 219:8 | **teach** | 141:17 146:13 | 191:18 192:6,7 |
| 263:20,23 | 221:11,14 | 90:18,21,24 | 150:3 151:17 | 192:9 197:12 |
| 264:7,8,11 | 231:15 240:8,9 | 105:7 106:4,9 | 158:8 160:17 | 205:2,23 |
| 269:13 302:8 | 241:7 252:10 | 119:8 145:20 | 160:17,20,25 | 220:10,13 |
| 313:6 326:2 | 258:5 260:7 | 325:20,23,25 | 162:2 163:14 | 222:9,24 223:7 |
| **talked** | 269:5,6 272:16 | 329:12 | 164:7 166:22 | 224:15 225:9 |
| 10:16 13:20 | 278:18 288:3 | **teacher** | 170:2 173:13 | 227:10,13,14 |
| 22:22 23:2 | 291:24 293:8 | 68:11 239:10,11 | 174:24 180:6 | 228:14 231:19 |
| 28:13 34:5 | 297:19 309:12 | **teachers** | 180:22 181:5 | 240:11 245:14 |
| 37:21 38:5 | 309:18 316:2 | 102:5,6,17,23 | 182:20 184:9 | 246:7 256:22 |
| 45:24 53:14 | 317:14 | 239:11,16 | 187:4 189:19 | 264:24 281:24 |
| 74:4,5 81:10 | **talks** | **teaches** | 189:19 190:25 | 307:2 308:15 |
| 81:12 82:2 | 105:18 132:19 | 326:24,25 | 191:12 195:5 | **tells** |
| 93:19 95:24 | 295:23 310:24 | **teaching** | 195:11 197:17 | 9:21 145:13 |
| 114:1 118:12 | **tape** | 101:23 248:5 | 197:25 200:11 | 146:5 166:16 |
| 149:15 155:9 | 18:8 41:12 | 330:1 | 201:15 202:11 | 194:11 270:4 |
| 169:23 201:2 | 242:7 262:22 | **teachings** | 203:21 204:7 | **ten** |
| 218:3 222:19 | 263:5,17,18,21 | 326:5,10 327:9 | 207:5,12,20,23 | 86:2 96:8 192:2 |
| 223:11 263:4 | 263:23 264:8 | **tears** | 210:15 212:1 | 209:4 240:3 |
| 264:18 293:21 | 283:3,3,4 | 167:10,11,12 | 217:5 221:6 | 252:5 |
| 305:4 313:24 | **tapes** | **technique** | 222:24 223:6 | **tend** |
| 314:13 335:14 | 141:10 283:7 | 85:3,22 165:9 | 233:8 237:18 | 25:20 60:17 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 44

| | | | | |
|---|---|---|---|---|
| 61:10 331:13 | 20:2,4 26:14 | 220:16 223:8 | 286:10 | **three-way** |
| **Tenth** | 45:23,24 70:12 | 240:5 255:3 | **thorough** | 76:17 |
| 7:6 | 111:4,9 338:6 | 257:4 259:19 | 130:17 | **throw** |
| **tenure** | 339:11 340:14 | 259:21 260:12 | **thought** | 254:12 |
| 92:24 96:14 | **testing** | 261:18 266:5,8 | 11:1 17:2,17 | **thrown** |
| 117:21 246:3 | 150:22 | 278:22 289:2,4 | 37:17,18 42:1 | 296:14 |
| 336:9 | **text** | 307:22 309:4 | 68:8 104:10 | **throws** |
| **term** | 66:14,22 77:4 | 326:1 329:17 | 109:4 111:20 | 300:22 |
| 116:8 | **texts** | 334:4 | 113:18 121:4 | **thumb** |
| **terminology** | 66:21 | **things** | 155:4 182:13 | 301:2,7,8 |
| 48:11 | **Thank** | 11:23 22:17,21 | 214:7 225:13 | **tie** |
| **terms** | 7:15,16 8:3 | 22:25 23:1 | 233:9,14 241:7 | 131:15 |
| 7:21 33:2 88:4 | 30:24 92:11 | 30:19 31:4 | 245:5 247:10 | **ties** |
| 88:13 271:15 | 126:22 143:14 | 52:12 55:2 | 249:17 262:15 | 131:18,21 |
| **terrible** | 145:2 187:10 | 67:24 76:7 | 311:5,18,21 | **timeframe** |
| 71:6,9,11,12 | 193:23 265:24 | 94:21 96:12,16 | 312:14,15 | 242:23 |
| **terrorized** | 274:24 296:6 | 103:22 107:8 | 313:9,10 | **timeline** |
| 313:15 | 315:3 335:3 | 107:17,19 | 315:21 | 242:20 |
| **terrorizing** | **thankfully** | 108:23 109:11 | **thousands** | **times** |
| 174:12 | 335:1 | 115:9 130:16 | 92:13 93:8,20 | 6:20 8:17 9:11 |
| **Terryall** | **Thanks** | 131:2 132:15 | 94:12 96:3 | 15:12 16:21 |
| 299:14 | 145:9 | 135:19 146:7 | 98:8 99:8,13 | 43:23,25 49:9 |
| **tested** | **theft** | 146:12 148:8 | 100:4,22 | 114:11 127:18 |
| 187:23,24 | 32:11 183:20 | 157:21,24 | 149:19 152:11 | 149:6 158:14 |
| 189:11,12 | 264:4,21 | 168:9,24 | 153:2,7 258:20 | 193:20 215:15 |
| **testified** | **theme** | 174:13 189:15 | **threat** | 216:5 217:24 |
| 6:4 9:11 20:6 | 254:25 256:9,14 | 190:21 193:10 | 162:11,17,20 | 218:23,24,24 |
| 46:14 47:2,3 | **themself** | 202:1 212:14 | 163:1 170:25 | 221:1 229:11 |
| 47:14 48:16 | 105:6 | 221:2 236:2 | 175:13 178:9 | 229:18 230:5 |
| 70:2,7 326:25 | **theories** | 237:6 251:2,5 | 178:10 | 230:11,21 |
| 333:13,20 | 228:19 325:20 | 258:12 259:10 | **threating** | 242:12 247:6 |
| 334:4 | **theory** | 259:19 260:22 | 136:8 | 252:3 254:17 |
| **testify** | 326:17 | 272:4 284:24 | **threats** | 284:24 302:2 |
| 37:16 38:20 | **thereabouts** | 291:25 292:18 | 162:10 | 303:14,19,25 |
| 44:10 270:7 | 318:23 | 302:7 320:4 | **threats/intimi...** | 306:24 307:9 |
| 280:11 281:8 | **thing** | 321:20 326:20 | 262:7 | 322:17 334:19 |
| 281:12,22,23 | 28:18 34:20 | 326:24 330:22 | **three** | **timestamp** |
| 339:6 | 51:13 67:5 | 336:15 | 35:19 44:7 50:1 | 159:11,14 160:2 |
| **testifying** | 98:7 101:10 | **thinking** | 50:22 138:1 | 171:3,4,15,24 |
| 281:19 | 124:24 125:24 | 98:23 241:6 | 158:14 217:6 | 172:20 182:22 |
| **testimonies** | 126:4 130:14 | **thinks** | 236:1 270:24 | 183:2 198:15 |
| 70:15 | 143:5 192:12 | 254:12 | 286:14 310:10 | 219:2 |
| **testimony** | 194:24 203:18 | **third** | 311:17 324:9 | **timestamped** |
| 19:12,21,23 | 216:19 220:13 | 268:23 273:8,17 | 328:3 332:2 | 243:17 |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 45

**tired**
198:5,6 315:8
**title**
20:12 332:20
**titled**
20:9
**titles**
331:24,25
**today**
6:10 7:22
273:22 274:9
323:14 324:2
328:21 333:1
337:4
**today's**
239:16
**told**
14:17 24:1 32:6
45:4 54:5
67:21 73:17
74:16 97:21
111:23 141:23
156:17 160:13
181:2 182:18
201:17 204:7
208:2 224:11
236:8 241:1,10
241:25 242:3
244:12 249:10
261:7 284:1
305:4 306:23
312:5
**Tomasita**
45:12 48:4
**tone**
105:25 203:2
260:11
**tones**
138:23 139:3
218:3
**tonight**
186:3,4 191:22
192:8,20 193:8
**Tony**

60:25 61:20
**tool**
326:17
**top**
88:8 89:23
101:7 125:2
212:11 267:7
272:12 277:13
310:2 315:22
315:24 317:1
331:21
**topic**
148:15 176:15
231:16 294:20
294:23
**total**
208:24 253:24
331:21
**totality**
15:14 21:7
44:25 53:16
104:13 110:12
178:18 263:17
280:3 322:19
330:19
**totals**
22:11
**touch**
204:14
**touched**
149:16 154:7
185:24
**touching**
203:14,17
215:22 216:2
**tough**
167:16 174:14
179:18,21,23
180:7 219:10
**tower**
217:1
**trace**
157:16
**traffic**

303:24 312:22
**train**
91:25 168:4
**trained**
106:13 116:10
116:17,24
121:10 140:22
141:18 144:21
146:19,25
147:7,17,20
162:9 166:1
173:12,15
178:5 190:16
190:20 194:16
195:24 210:3
218:9,13 221:4
221:25 251:17
254:24 255:3
258:10 267:16
267:20
**training/policy**
199:20
**trainings**
84:23 90:13
116:11 146:19
147:20 148:21
148:23,25
176:18 184:18
188:24 190:4
210:3,4 250:22
318:22 320:10
321:20 335:12
335:17 336:5,8
336:14,22
**transcribed**
160:5 163:11
166:6,24
168:13 169:12
172:5,18 173:5
174:4 176:24
177:12 178:1
179:16 180:2
181:20 182:23
183:3,11

184:22 185:2
187:11 188:17
189:9 191:7,11
191:17 193:15
196:12 197:11
198:17 199:18
200:9 202:16
202:19 205:1
206:4 207:19
209:11 210:21
212:4 215:8
217:20 219:3
219:25 222:3
223:5,22
224:22 225:20
228:1 229:6
230:19 231:18
232:1,8 234:1
238:17 239:20
243:21 247:20
248:20 250:6
255:12,25
264:16 307:23
**transcript**
16:15 18:4,7,18
18:20 19:2
22:14 26:13
45:23,24 47:8
70:2,13 280:5
285:17 287:16
287:25 339:11
340:12,21
**transcripts**
19:12,17 20:10
47:11 72:5,6
**transported**
71:22 234:20
**transporting**
25:13 264:9
**travel**
240:2
**traveled**
241:15
**treat**

83:9 120:21
121:15
**treated**
109:19 136:16
**treating**
129:4
**tree**
263:7,12
**trial**
19:21,23 20:2,6
43:18 44:9,17
45:1,6 48:16
70:1 72:7
111:4,9 156:18
197:4,7
**trials**
26:14
**trick**
17:17
**tricked**
75:6
**tried**
39:6 134:22
201:20 241:9
245:6 278:7,8
284:10 318:16
**trouble**
142:7 145:4
153:10 184:24
253:17 260:20
268:7,11
307:24 308:3
308:10
**true**
38:17 65:2
96:23 106:4,10
132:17 162:22
162:24 179:11
211:16,17,18
224:16 270:8
275:9,22,25
276:2 290:17
292:10 306:21
338:2 339:10

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 46

| | | | | |
|---|---|---|---|---|
| **trust** | 258:4 297:20 | 169:2 170:21 | **understanding** | **updates** |
| 35:4 | **Tuesday** | 213:8 | 88:4 119:3 | 123:19,20,25 |
| **truth** | 1:18 | **tying** | 120:24 121:18 | **upper** |
| 35:14 38:10 | **turn** | 156:12 | 121:22 122:19 | 296:16 |
| 65:6 106:8 | 107:4 158:24 | **type** | 144:7 329:25 | **upset** |
| 146:6,13 | 263:22 312:6 | 161:13 185:13 | 330:4 333:14 | 10:23 109:12,12 |
| 161:16,19,25 | **turned** | 216:18 225:5 | **understood** | 109:14,18 |
| 162:1 174:10 | 156:24 297:4 | 259:21 301:19 | 32:24 137:20 | 209:18 210:16 |
| 174:13,15,17 | 312:13 313:25 | 301:20 322:9 | 177:18 208:1,9 | **use** |
| 174:23,24 | **turns** | 323:14 | 208:9 326:4 | 16:23 50:5 |
| 175:1,5,12,21 | 312:18 | **types** | **Unfortunately** | 54:23 58:19 |
| 189:19 193:12 | **TV** | 190:20 221:13 | 312:7 | 80:11,13 88:4 |
| 201:24 212:1 | 55:17,21 65:18 | 327:5 | **unfounded** | 88:16 90:25 |
| 227:10 228:14 | **tweak** | **typewritten** | 297:22 300:17 | 91:1 95:12 |
| 246:8 274:23 | 292:16 | 339:10 | **unit** | 103:14 134:8 |
| 308:16 339:6 | **twice** | **typical** | 56:20 57:4 | 136:8 139:25 |
| **truthful** | 20:6 26:5 75:20 | 261:18 | 81:14 98:16 | 140:8 160:14 |
| 106:3 162:22 | 294:7 | **typically** | 99:10 151:8,24 | 214:5 262:20 |
| **try** | **two** | 8:8 61:1 | 179:11 188:25 | 270:8 315:24 |
| 88:16 89:14 | 10:20 20:2,4 | **typo** | 192:15 213:13 | 326:2,17 327:5 |
| 114:23 124:16 | 21:22 22:11 | 290:11 | **United** | 336:11 |
| 124:19,23 | 38:16 46:20 | | 1:1 7:6 | **user** |
| 135:4 145:12 | 137:12 138:1 | ———— **U** ———— | **University** | 80:23 |
| 146:11 150:10 | 158:14 178:18 | **Uh-huh** | 327:22 | **usually** |
| 154:9 158:18 | 186:10 193:3 | 14:24 310:5 | **unknown** | 8:11 51:8 57:17 |
| 174:19 192:12 | 193:10 194:13 | **ultimately** | 296:11 | 58:13 90:7 |
| 207:11 230:25 | 195:9 243:6 | 161:21 229:22 | **unlock** | 91:9,22 212:11 |
| 237:16 246:16 | 251:14 265:19 | **unbelievable** | 36:6 | |
| 253:10 269:16 | 270:25 271:2,5 | 71:10 | **unlocking** | ———— **V** ———— |
| 271:25 292:11 | 290:13,18 | **uncomfortable** | 69:2 | **v** |
| 314:23 315:7 | 303:12 314:21 | 194:2 | **unpack** | 340:6 |
| **trying** | 317:6,14 | **uncontrollably** | 11:10 | **vacated** |
| 17:19 40:12 | 331:17 332:2 | 109:7 185:6,7 | **unquote** | 32:12 67:11 |
| 48:2 50:2 | **two-and-a-hal...** | **undated** | 50:9,15 59:8 | **vacation** |
| 58:10 66:16 | 285:13 | 4:13 | 132:1 174:19 | 192:5 |
| 104:18 106:2 | **two-day** | **undercover** | 178:6,14 | **vagina** |
| 141:9 165:21 | 329:1 | 298:23 | **Unsolved** | 88:10,23 |
| 166:19 195:14 | **two-hour** | **underneath** | 331:4 | **Valencia** |
| 197:13,24 | 280:13 | 88:8 330:7 | **untrue** | 37:20 |
| 198:12 199:1,8 | **two-page** | **understand** | 223:24 | **valid** |
| 200:14 203:12 | 63:11 125:3 | 6:13 9:22 49:4 | **unusual** | 12:13,15 |
| 203:20 217:21 | **two-sided** | 56:19 87:20 | 282:23 | **valuables** |
| 220:21 235:4 | 124:21 | 122:6 159:9 | **updated** | 290:14,19 |
| 246:4 251:20 | **two-thirds** | 175:4 | 123:13 | **values** |

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 47

102:22
**van**
299:7
**varies**
56:19
**variety**
87:19 94:25
 95:4 103:8
 104:24 151:10
 330:21
**various**
88:2 146:13
**Vasquez**
76:13
**vehicle**
273:9,18 275:7
 312:1 313:25
**vehicular**
313:10
**venue**
297:1,4
**venues**
92:21
**verbal**
12:25
**verbiage**
16:23 58:11,19
**verdict**
309:9
**verified**
252:25
**verify**
54:4 271:25
 292:11
**Verizon**
82:12
**versed**
90:8,8
**versus**
8:23 11:15
 46:12 83:21
 94:3 95:25
 97:16 119:17
 139:24 232:22

288:25
**victim**
87:3 88:3,6,11
 88:12 89:12,15
 134:7 136:9
 140:16 153:25
 287:3 290:25
**victim's**
52:6 110:24
 273:8,9,18
 275:7,7 278:8
 286:13,14
**victims**
87:4,7,8,15
 88:16 90:3
 97:10,12
 140:14
**victims/training**
87:9
**Victor**
80:3
**video**
4:16 20:14
 21:13 38:2
 41:15 52:20
 68:16 158:4
 160:5,7 163:11
 164:16 166:6
 166:24 168:13
 169:12 171:9
 172:5,18,21,22
 173:2,5 174:4
 176:24 177:12
 177:13 178:1
 179:16 180:2
 181:20 182:23
 183:3,11
 184:22 185:2
 187:11 188:17
 189:9 191:7,11
 191:17 193:15
 195:5 196:12
 197:11,23
 198:17 199:18

200:9 202:16
 202:19 205:1
 206:4 207:19
 209:11 210:5
 210:21 212:4
 215:8 217:20
 219:3,25 222:3
 223:5,22
 224:22 225:20
 228:1 229:6,22
 230:9,19
 231:18 232:1,8
 234:1 238:17
 239:20 241:6
 243:10,21
 247:20 248:20
 250:6 252:10
 255:12,25
 264:16 272:3
 277:17 282:21
 287:24 288:1
 307:23 329:5
 338:19 340:18
**videoconference**
2:14,20 3:3
**videotape**
18:20 262:6
 269:6
**videotaped**
23:22 34:22
 157:22 271:16
 277:24 285:11
 290:17
**view**
47:7
**viewed**
153:9
**viewing**
61:18
**Vigil**
1:4,9,15 2:18
 4:9,13 5:3,5
 6:3,8 7:2,21
 63:12 80:22

83:18 84:2
 89:22 98:25
 99:6 117:23
 125:4 136:19
 138:9 142:2
 143:1 171:18
 173:2 260:22
 295:15 296:11
 296:12 300:24
 300:25 304:12
 306:18 309:10
 335:12 338:8
 339:5 340:7
**Vigil's**
4:12 7:4,10
 83:20 295:6
**VigilM**
77:17
**VigilM@ci.de...**
134:21
**VigilM@Denv...**
66:8
**VigilM@Denv...**
66:12
**VigilM@Denv...**
77:9
**violate**
199:20
**violated**
314:5
**violence**
310:3
**violent**
332:3,13,21
**virtually**
158:3
**visiting**
294:6
**visits**
163:25 164:1
**Vitae**
4:9
**voice**
105:25 187:21

204:10 209:22
 209:24 210:15
 215:10,11,15
 216:8,12 217:1
 217:14 218:22
 219:7 260:12
**volume**
219:8
**volumes**
129:25
**voluntarily**
31:18,19 79:24
**voluntary**
91:21,22
**volunteer**
76:5 79:17
**vs**
1:8
**vulnerable**
117:19 119:9

—————————
        **W**
—————————
**W**
 1:10
**wait**
9:8 19:13 266:6
**waiting**
266:18
**waive**
7:25
**waiver**
261:24
**waiving**
7:3
**walk**
174:1
**walked**
55:23 222:15
 278:7
**walking**
278:10 311:16
**walks**
222:8
**wall**

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 48

127:17 128:13
185:23
**wallet**
130:23
**Wallis**
38:14 40:13,13
54:12 222:12
223:11 282:18
282:22 284:1
**Wang**
14:17 16:3
**want**
12:16,21 15:16
16:25 19:15
30:7,9,13,16
36:12 37:19,22
49:20 55:3
64:4,11 74:23
75:2 79:5,22
83:8 87:20
88:19,21,24,25
89:5,6,10
92:20 93:1
94:2 95:2,11
103:16,16,24
104:1 107:3,4
107:4,16,20,21
110:15 114:9
116:16 117:24
118:1 127:18
135:10 143:5
145:21 146:13
147:4 149:8,17
158:15,15
165:12 166:9
168:15 169:5,7
169:8,10 173:9
184:9 187:13
188:19 191:2
195:12 207:5
207:12,23
208:24,25
223:7 227:23
228:16 231:23

243:12 256:17
256:19 257:8,9
257:10 261:10
263:1,19
265:22 266:7
279:14,16
282:7 285:19
295:10 306:24
306:25 307:4,7
307:11,11
315:24 321:11
329:12
**wanted**
8:2 54:7 84:2
111:25 129:22
137:17 168:18
168:20 169:14
170:11,17,17
170:18 178:23
208:3 252:17
252:24 261:1
333:15
**wanting**
81:15
**wants**
195:9 220:14
**warned**
195:25 218:13
221:4
**warnings**
196:21
**warrant**
4:7,18,18 26:15
26:20,22,25
46:11 47:16
51:10 58:3,12
58:17 59:21
63:12 64:17
65:12,13,21
268:13 270:9
270:10 271:25
271:25 272:1
275:25 276:9
276:10 287:17

292:8,9,12
**warrants**
26:7 58:14,19
58:20 59:3
64:18,23 65:2
267:18 292:8
**Washington**
263:7
**wasn't**
17:19 21:23
27:21 53:6
62:5 63:20
67:23 75:7
77:12 87:12
98:7,21 111:11
122:20 133:4
136:1 137:11
141:6 155:14
155:21 178:6
178:25 179:7
179:12 180:25
184:3,3,4,4
185:23 194:7
195:13 210:14
211:16,16
212:21,24,25
213:4,20
217:23 222:18
223:1 234:20
238:21 253:2
257:18 258:20
258:23 260:2
260:13,15
261:15 262:4
262:19,21
274:3 276:9
294:11,11,16
299:9 310:11
312:8
**watch**
41:12,12 57:17
57:24 60:11
150:2,5 153:1
163:6 174:2

242:22 257:13
283:7
**watched**
21:9,13 28:2,3,6
38:2 140:25
152:12,18
167:17 174:5
177:13 195:5
209:12 230:9
241:6 243:9
257:11 258:5
**watches**
150:7
**watching**
45:22 55:11,17
55:19,21 56:15
171:17 218:18
227:22 269:22
269:24,25
271:17 272:3
281:6 287:13
287:24 288:1
**water**
89:23
**waving**
194:12
**way**
18:8 20:9 23:10
25:21 36:2
37:1 52:1
67:14 85:7
89:11,24 92:1
106:9,11
109:19 136:9
138:20 140:6
142:2 150:16
156:25 165:15
169:2 170:22
186:13 197:22
205:14 213:8
229:17 231:20
231:24 234:3
237:1 250:12
260:11,22

266:7 280:1
307:22 312:3
336:22
**ways**
215:16 322:14
**we'll**
18:3 19:1 41:12
106:17 141:11
159:19 160:17
214:24 215:5
266:14,18
**we're**
7:13 9:2 19:16
63:17 83:17,22
111:1 142:12
161:2 173:3,9
173:9,13,18,19
178:2,4,16
183:17 184:8
192:5,7,8,12
192:19,19
193:7 197:15
197:15,17,18
197:18 198:25
199:8 200:21
206:10 212:5
218:17 220:7
220:14,15,24
221:5,6,14,16
221:18,19,19
221:20 226:5
260:7 263:20
264:3,18
266:18 317:14
320:15 328:9
331:19 334:15
**we've**
22:21 73:23
91:12 118:12
149:19 182:7
187:21,22,22
187:22 210:22
210:23 211:9
213:11 222:8

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 49

223:6 256:21
**weapon**
249:21
**wear**
131:18,21
**wearing**
40:24 41:2,22
  43:20 44:6
  46:8,13 68:2
  71:14 156:21
  234:11,25
  235:5,14,22,23
  237:25 244:20
  283:23
**Webster**
38:14 54:10
  280:6,10,25
  281:1
**week**
76:4 111:7
**weeks**
283:24
**Welfare**
86:17,19 327:17
  327:19
**well-trained**
333:15
**went**
23:5 26:4,24
  27:14,15,24,25
  35:24 37:20
  41:4 45:11
  85:1 86:4 87:5
  90:13,15 98:19
  106:15 124:3
  133:9 151:18
  157:6 169:22
  170:14 197:22
  213:14,15,17
  235:16 239:24
  240:8,12,20
  241:13 252:12
  252:18 253:11
  253:12,19

255:17 256:6
257:17,19,19
257:21 263:5
277:1 283:16
299:20 305:11
305:13 311:11
311:23 324:18
324:21 329:3
331:14 335:13
335:14,18
**weren't**
8:18 11:18 17:4
  17:13 36:18
  43:15 46:24
  55:20 57:18
  116:18 156:18
  166:1 210:6,8
  212:21 230:4
  239:16 275:9
  275:22
**West**
2:10 286:13
  338:20
**whatnot**
222:22
**whatsoever**
234:24
**wheels**
212:22
**WHEREOF**
339:16
**whichever**
266:6
**white**
35:25 52:17,18
  131:15
**Whitley**
262:8,10
**Whitman**
305:2,4,4
**whoa**
155:4
**wife**
72:22 74:3 76:6

82:2 153:21
194:10,11
209:24 299:11
300:2,3 309:10
**Wilburn**
4:13 133:20,21
  133:22 135:21
**willing**
95:1
**window**
131:14 232:11
  232:13,22
  233:7,17,20
  235:25 236:9
  236:12
**windowpane**
131:18
**wins**
194:24 196:18
  257:4 258:8
**winter**
243:2
**withdraw**
141:24 212:2
**withdrawn**
148:12 221:25
**withhold**
232:20
**withholding**
306:25 307:1,3
  307:6,12,18,24
  308:1,3,10
**witness**
8:23 11:13
  44:10 111:22
  112:2 128:7
  134:6,12
  160:15 201:6
  273:6 275:6
  276:3 295:4
  303:13 304:13
  304:21 306:19
  325:25 339:6
  339:16 340:13

**witness's**
133:9
**witnessed**
99:9,15
**witnesses**
59:15 61:9
  90:16 97:8
  98:2 134:3
  143:21 144:4
  253:1 273:16
  273:23,25
  274:7 284:15
  302:11 303:2
**woman**
180:25 239:17
  255:15 312:16
**won**
34:19
**wonder**
189:21
**wood**
236:20
**word**
65:11 73:14
  95:12 116:6,14
  116:21 221:7
  221:18 231:2
  280:14,23
  281:21
**words**
48:2 54:8 63:21
  65:14 91:14
  118:24 146:23
  173:14 176:16
  178:13 194:9
  200:5 220:7,18
  241:3 327:17
**wore**
44:11,19 45:3
  48:17
**work**
52:21,24 56:23
  75:21 76:23
  77:8 80:10,11

80:13,14 81:14
82:13,14,23,25
83:1,2 86:24
91:18 98:13
133:16 144:14
220:19 254:6
280:24 294:12
296:19 297:9
298:15
**worked**
52:14 98:11,15
  118:5 136:25
  151:20 304:23
**working**
29:12 55:2
  60:11 87:13
  298:23 310:13
**works**
52:1 150:16
  158:19,23
**world**
43:10 149:18
  184:23
**worried**
108:24
**worth**
22:12
**wouldn't**
28:13 35:11,12
  55:14 61:1,2
  61:15 62:4,6
  66:9 89:9 93:1
  95:10,11 141:5
  154:14 175:3
  175:11 185:7
  201:4 211:6
  215:11 224:10
  239:2 280:8
  287:24 291:4
  305:9 311:13
  326:8 334:1
**wrestling**
299:2
**wrist**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 50

299:12 301:3,7
301:8
**wrists**
310:10
**write**
135:9 271:24
**write-up**
280:7 281:12
283:2 288:11
**write-ups**
51:5
**writer**
300:22
**writes**
269:22
**writing**
66:23 135:15
271:4 288:23
**written**
51:2,4,13,14
63:12 66:14
76:24 80:25
86:9 98:5
130:10 144:20
269:5 280:6
282:6,22,22
284:14,21
285:2,14 300:6
300:7,9
**wrong**
102:23 146:1,12
146:24 147:4,8
147:14 148:3
166:25 167:9
170:22 181:24
184:13,15,24
188:6,10,22
192:18 193:3,7
193:10 195:1
195:21,23
196:9 197:1,3
199:6,19 200:1
204:18 206:7
206:12 209:12

217:15 219:18
221:8,21,24
224:15 232:16
232:17,20
233:3,12,18,18
233:19 235:3
235:13 237:8,8
238:4 242:13
242:13,16
244:19,22
245:11,12,13
245:14,19
246:15,20
248:4,11 249:5
249:25 250:14
257:19 258:9
259:6 260:22
262:15 263:15
278:12 292:3
312:19
**wrongfully**
310:2
**wrote**
26:7,16,20,21
265:12 300:23
306:17 334:18

_____
**X**
_____
**X**
30:18 54:16
56:7 60:14
153:3
**Xfinity**
80:6

_____
**Y**
_____
**Y**
30:18 54:16
56:7 60:14
153:3
**year**
66:19 81:17
82:5 153:24
316:17 328:18

**Year's**
27:12 41:23
44:7 65:16
240:6 242:3
243:3 278:5
282:14,16
**years**
18:23 22:3
23:14 38:18
63:4 73:24
78:1,3 81:7
90:8 93:15
96:8 103:1
120:5 127:12
131:23 136:15
140:19 152:10
194:13 206:9
214:4,4 238:22
268:3,3,4,5
284:4 297:3
301:15 316:13
316:23
**yell**
216:21
**yelling**
209:25,25
210:14
**Yep**
290:2
**yes-or-no**
214:12,15
**York**
130:23
**young**
81:5 88:7
114:10 153:25
239:16
**younger**
90:4 120:11
279:22
**Yousif**
137:8,16

_____
**Z**
_____

**Z**
30:18 54:16
56:7 60:14
153:3
**ZIP**
338:16
**Zoom**
6:14 7:19

_____
**0**
_____
**000277**
4:7
**000278**
4:7 63:9
**006337**
5:4
**006352**
5:4
**007684**
5:6
**007687**
5:6
**008163**
4:15
**008168**
4:11
**008169**
4:11
**02-10-85**
4:19

_____
**1**
_____
**1**
4:7,22 20:20,25
64:5,7 84:20
84:21 218:18
219:4 220:1
223:20,20
228:8 264:15
327:15
**1,600**
68:6
**1/10**
270:20

**1/10/2000**
272:20
**1/11**
270:12
**1/15/97**
85:12
**1/6/97**
300:25
**1:00**
242:6,6,15,23
**1:08**
270:13,22
**1:11**
270:12
**1:20**
138:7
**1:56**
193:13
**1:57**
138:8
**10**
4:24 56:21
120:5,10
140:19,20
241:16 266:20
282:10
**10-year-old**
53:5
**10:30**
270:22
**10:30-ish**
270:21
**10:35**
159:12,16
**10:37**
163:10
**10:42**
1:17
**100**
107:11 149:6
338:20
**1001**
2:15 340:4
**10th**

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 51

239:25 240:3
240:12 252:14
253:7
**11**
5:3 214:4,4
295:2,5 315:11
315:12 337:6
**11/1/14**
23:17
**11:21**
163:10
**11:27**
168:12
**11:44**
168:12
**110**
48:10
**11th**
328:14
**12**
5:5 191:20,25
245:6 318:4,5
318:7 319:23
321:21
**12:02**
83:16
**12:10**
83:16
**12:11**
217:19
**12:32**
187:3,7 217:19
**124**
4:10
**12th**
328:14
**13**
310:25
**13-page**
135:2
**13:11**
187:3,9
**13:18**
197:10,21

**13:30**
223:20
**13:44**
223:20
**13:52**
197:10,21
**135**
4:12
**13th**
332:8
**14**
23:15 90:8
310:1 317:1
323:6
**14-year-old**
174:6 178:20
185:8 193:25
200:1 219:19
**14:19**
179:15
**14:28**
238:16
**14:36**
174:3
**14:37**
179:15
**14:43**
209:9
**14:46**
238:16
**14143**
338:20
**142**
4:14
**14th**
241:15
**15**
59:4
**15:05**
174:3
**15:07**
207:18
**15:12**
207:18

**15:32**
181:19
**15:44**
209:10
**15:58**
181:19
**158**
4:16
**16**
56:22 87:22
**16-hour**
328:13
**16-page**
295:7
**16-year-old**
90:3,6,7
**16cv1457**
1:2 340:7
**17-minute**
159:14
**17:22**
202:18
**1700**
272:21
**1712**
2:21
**17th**
2:15 340:4
**18**
82:6 120:11
**18:07**
230:18
**18:09**
202:18
**18:12**
185:1
**18:49**
230:18
**19**
76:10 87:22
**19:19**
185:1
**19:22**
172:22

**1944**
325:22
**1986**
318:22
**1988**
325:17
**19964015065**
339:21
**1997**
321:5 322:2
327:21
**1998**
323:7,21 324:15
**1999**
85:20 125:7
127:4,15
142:23 143:16
320:8 328:14
330:10,14
332:8,12

_____
**2**
_____
**2**
4:9 20:20,25
83:23,24 84:18
84:18,20
164:25 165:1
174:10 177:5,6
187:17 189:7
207:17 218:18
219:4 220:1
222:1 228:8
272:11 290:3
308:21 320:16
320:19 321:23
322:24
**2:00**
68:15 241:17,18
242:15,24
**2:19**
193:14
**2:30**
241:20
**2:54**

264:15
**20**
18:23 73:24
257:9 294:24
**20-minute**
159:13
**20/20**
248:16
**20:11**
189:7
**2000**
66:9,19 77:12
151:1 152:7
331:7
**2000s**
330:2
**2001**
86:14 137:10
**2002**
135:8 318:23
319:2
**2005**
153:25
**2006**
127:1 130:2
304:16 316:10
316:11
**2006-12081**
315:17
**201**
2:10
**2012**
310:8,14 317:21
**2013**
311:8 317:11,19
**2013-02035**
317:20
**2014**
23:22 24:4,7
32:6,9 33:13
39:16 67:10
294:17
**2016**
22:25 23:7

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 52

**23:13**
23:13
**2022**
1:4,18 339:17
340:1,8
**205**
277:21
**22**
22:3 38:18
284:4 286:5
**22:00**
231:16
**22:29**
233:25
**23:06**
233:25
**24**
1:4,18 321:4
324:5,11
325:15 328:3
332:9 340:8
**24-hour**
321:9 330:9
**25**
131:25
**265**
4:17
**266**
4:20
**27**
172:24 173:3
268:5
**277**
4:22 64:3
**278**
64:1,1
**27th**
316:11 317:20
**28**
268:5 328:2
**282**
4:24
**28th**
300:25
**29**

238:21,25
239:17
**294**
5:3

_____ **3** _____

**3**
4:10,20 124:11
124:12,17
184:20,20
189:8 215:7
286:6 290:3
320:16 327:13
328:8 330:6
**3/11/99**
85:25
**3:00**
241:20
**3:07**
264:15
**3:31**
209:7
**3:42**
176:22,23
**3:43**
209:7
**30**
15:11 40:22
104:17 183:13
301:15 328:2
**300**
2:16 331:22
340:4
**303-256-6345**
2:5
**303-319-9235**
82:10
**303-402-1600**
2:22
**303-628-3300**
2:17
**303-685-2244**
2:11
**303-730-3900**

3:5
**3088**
286:13
**31**
189:8
**315**
4:3 5:5
**33**
268:3,3
**335**
4:2
**35**
268:4 340:15
**38th**
240:2 241:16

_____ **4** _____

**4**
4:12 135:13
172:22,22
174:3,3 179:15
181:19 185:1
187:3,6 202:18
204:25 217:19
224:21,21
227:25 228:21
229:4 247:19
247:21 248:19
249:1 250:5,7
255:11,24,24
295:14,18,22
328:8 330:7
**4:32**
176:23
**4:34**
200:8
**4:41**
252:8
**4:51**
252:8
**4:55**
200:8
**40**
15:11 183:13

**40-hour**
322:1,21 331:6
**400**
68:7
**405**
3:4
**40th**
130:23
**41(d)(2)**
59:1
**45**
104:17 261:10
**4600**
1:16 2:3

_____ **5** _____

**5**
4:9,14 67:4
87:21 113:19
142:13,14,15
159:7,16,22
163:9,9 168:12
169:1 172:24
172:25 176:22
176:23 188:16
193:13,13
196:10 197:10
197:21 200:8
209:9 219:24
298:8 320:19
330:7
**5:00**
272:21
**5:37**
295:1
**5:46**
295:1
**5:48**
219:24
**5:55**
227:25
**50**
149:6 196:11
**55**

196:10

_____ **6** _____

**6**
4:2,16 87:21
158:4,5 230:18
238:15 239:18
239:18 300:19
303:22 304:4,5
321:23 323:15
340:1
**6:14**
227:25 250:5
**6:21**
219:24
**6:23**
250:5
**6:30**
255:24
**6:46**
337:5
**6:59**
255:24
**6337**
295:7
**6345**
315:16,20
**6349**
317:2,7,15
**6350**
317:1,11,15
**6352**
295:8
**64**
4:7
**65**
114:11
**6th**
339:17

_____ **7** _____

**7**
4:17 229:22
231:16,17

Deposition of:  Martin E. Vigil - May 24, 2022
Lawrence Rubin Montoya v. City and County of Denver, et al.

Page 53

| | | | |
|---|---|---|---|
| 239:18 265:20 337:6 | 322:25 331:3 | 1:10 | **90s** 330:2 |
| **7-Eleven** 239:24 240:9,12 240:20 241:7 252:12 253:6 253:12,20 | **8/16/83** 4:23 | **83** 4:9 | **96** 295:24 |
| **7/27/19** 23:17 | **8/25** 324:8 | **85-24** 1:11 | **97** 86:19 113:19 300:21 |
| **7:02** 247:19 | **8/25/98** 85:4 | **86-12** 1:9,10 | **99** 86:7 125:25 298:11,18 |
| **7:06** 222:1 | **8/27** 324:8 | **8822** 3:4 | **9th** 1:17 2:4 316:10 |
| **7:13** 239:18,19 | **8:00** 273:13 | ——————— **9** ——————— | |
| **7:31** 247:19 | **8:05** 224:21 | **9** 4:22 135:8 214:4 240:5,8 240:16,22,22 241:25 266:14 266:15 277:7 304:8 315:24 323:17 | |
| **7:43** 222:2 | **8:08** 255:11 | **9/20/2024** 339:21 | |
| **7:47** 224:21 | **8:15** 215:7 | **9:00** 239:22 | |
| **720-641-0931** 83:1 | **8:22** 255:11 | **9:03** 188:16 | |
| **720-913-6099** 82:24 | **8:23** 308:21 | **9:15** 239:22 240:5,8 240:16,23 241:4,25 242:14 243:1 | |
| **7684** 318:9 319:5 | **8:46** 248:19 | **9:19** 215:7 | |
| **7685** 320:3,11 321:24 328:9 | **8:55** 308:21 | **9:20** 184:20 | |
| **7687** 318:11 331:17 | **8:57** 188:16 248:19 | **9:27** 159:12,16 | |
| **770** 319:19 | **80129** 3:5 | **9:30** 240:22 | |
| **7th** 317:19 | **80202** 2:10,16 340:5 | **9:35** 204:25 229:4 | |
| ——————— **8** ——————— | **80237** 2:4 | **9:36** 184:21 | |
| **8** 4:20 56:21 159:8 169:1 197:23 229:22 233:25 266:13 266:15 270:20 | **80302** 2:22 | **9:57** 204:25 229:5 | |
| | **80401** 338:21 | | |
| | **8163** 142:21 | | |
| | **8168** 124:13 | | |
| | **8169** 124:14 | | |
| | **82-29** | | |